UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DANIEL JOYCE,<br>Individually and on behalf of a class of others<br>similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>JOHN HANCOCK FINANCIAL SERVICES,<br>INC. SEVERANCE PAY PLAN and JOHN<br>HANCOCK FINANCIAL SERVICES, INC.,<br>as Administrator and Fiduciary of the John<br>Hancock Financial Services, Inc. Severance<br>Pay Plan<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.05-11428 – WGY<br>Leave has been granted 5/12/06 |

## **FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

### I.    **NATURE OF THIS ACTION**

1.    This case, inter alia, is a claim for severance benefits under the Employee

Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001, et seq. ("ERISA"),

and specifically, 29 U.S.C. §§ 1132(a)(1)(B). Plaintiff seeks to recover, individually and on

behalf of a class of others similarly situated (the "Class"), potentially millions of dollars in

severance benefits Defendants John Hancock Financial Services, Inc. Severance Pay Plan ("the

Plan") and John Hancock Financial Services, Inc., as Administrator and Fiduciary of the Plan

("Hancock") wrongfully denied him and each member of the Class under the Plan. The

wrongful denial of benefits is the product of the Defendants' arbitrary and capricious

interpretation and application of the Plan. Specifically, Plaintiff asserts that Defendants acted

wholly unreasonable when they determined that: 1) the sale of three Hancock buildings to

Beacon Capital Partners Management, LLC ("Beacon") constituted a "sale or outsourcing" of the Hancock Real Estate Operations Department business unit (REOD), thus triggering the 'Comparable Job' provision under the Plan; and 2) Beacon offered Plaintiff a comparable job as defined under common law and/or the Plan.

2.      Plaintiff asserts that the Defendants' acts and omissions violated contractual, statutory and fiduciary duties established by the terms of the Plan, ERISA and federal common law.

3.      As a result of Defendants' practices, the Plaintiff and other participants and beneficiaries of the Plan were unlawfully deprived of Plan benefits. Further, as a result of these practices, Defendants profited from breaches of their fiduciary duties. This complaint seeks compensatory damages, declaratory and injunctive relief, and other equitable remedies as may be available under ERISA and the federal common law of ERISA.

## II.    JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action by virtue of 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States. Specifically, this action is brought under 29 U.S.C. § 1132(a)(1)(B),(a)(3), (e)(1) and (f).

5.      This Court has personal jurisdiction over Defendants because Hancock transacts business in, and/or has significant contacts with, the Commonwealth of Massachusetts, and because ERISA provides for nationwide service of process. 29 U.S.C. § 1132(e)(2).

6.      Venue is proper here, under 29 U.S.C. § 1132(e)(2), for either of two reasons. First, venue is proper because certain breaches alleged herein occurred in this district, i.e., the benefits sought by Plaintiff and the Class through this action should have been received in this district. Second, venue is proper because the Plan was administered by Defendants in this

2

district, i.e., Hancock transacts business in, and/or has significant contacts with, the district and Plaintiff and the Class earned their severance benefits in Massachusetts.

### III.    PARTIES

7.     Plaintiff Daniel Joyce ("Joyce") is an individual who resides at 131 Bay Avenue, Marshfield, Massachusetts. From March 1994 to June 2003, Joyce was an employee of Hancock and at all times has been a participant in the Plan as defined by 29 U.S.C. §1002(7)-(8).

8.     Defendant, John Hancock Financial Services, Inc. Severance Pay Plan (the "Plan") is and was at all relevant times an employee welfare benefit plan governed by ERISA.

9.     Defendant, John Hancock Financial Services, Inc., is a foreign corporation doing business in the Commonwealth of Massachusetts with a principal place of business at 1209 Orange Street, Wilmington, Delaware. Hancock's directors and officers are located at 200 Clarendon Street, Boston, Massachusetts according to the Secretary of State's Office for the Commonwealth of Massachusetts. Hancock is the Plan sponsor, Plan Administrator and named fiduciary of the Plan, within the meaning of 29 U.S.C. §§ 1002(16)(A)-(B), 1102(a). *See a true and accurate copy of the Plan, Art. VII, §7.1, appended hereto as **Exhibit A**.*

### IV.    FACTUAL BACKGROUND

### OVERVIEW

10.    At all times relevant to this action, the Plan was in existence.

11.    At all times relevant to this action, Hancock was the named administrator and fiduciary of the Plan.

12.    At all times relevant to this action, the Plan provided that Hancock could designate any person or persons to carry out fiduciary responsibilities whether or not fiduciary in nature.

3

13.     Hancock, at all times relevant to this action, maintained a business unit known as the REOD.

14.     The REOD was primarily responsible for the leasing and daily operations of three Hancock-owned buildings, located at 200 Clarendon Street, 197 Clarendon Street and 200 Berkeley Street, in downtown Boston, Massachusetts (collectively known as the "Tower Complex").

15.     The Hancock REOD performed various services for other Hancock business units and non-Hancock associated tenants, including building maintenance, construction, operations, office space planning and design, security, safety and purchasing.

16.     Building services were divided between in-house personnel and outsourced contractors.

17.     In or around November 2002, Plaintiff and the Class were employed by Hancock to work in various positions within the REOD.

18.     At all times relevant hereto, Plaintiff and members of the Class were participants and/or beneficiaries of the Plan.

19.     Upon information and belief, Hancock made two significant changes to the Plan by adding Subsections 3.2 (c) and (d), which became effective on November 18, 2002 (hereinafter referred to as the "Plan Amendment"). The Summary Plan Description ("SPD") interprets the Plan Amendment as follows:

4

- In the event of the sale or outsourcing of a business unit, if an employee of the business unit is offered a comparable job by, or accepts a non-comparable job with, the purchaser or successor company, severance will not be paid (comparable will be defined as similar salary, *competitive benefit offerings*, and work location within 50 miles of the current work location).

- If the purchaser or successor company subsequently terminates the employee within six months of the sale or outsourcing (and hire) date, severance will not be paid under the John Hancock plan.

*See a true and accurate copy of the December 2002 Benefits Supplement to the Summary Plan Description (SPD), p.13, appended hereto as **Exhibit B**. (emphasis added).*

20.    The Plan Amendment did not change any of the specific Plan benefits previously available to Hancock employees.

21.    The Plan, as amended through the years, provided an assortment of severance benefits if Plaintiff and the Class were so deemed eligible by the Plan Administrator, including, but not limited to:

a.    Employability expenses, i.e., services related to termination of employment or seeking and preparing for new employment or a new career, such as additional outplacement services, career development testing and/or coaching, education, financial counseling, fees associated with starting one's own business (including legal fees), child and/or elder care, etc. as defined by the Plan;

b.    Salary continuation for the term of service based on one week's pay per every six months of service (with a maximum payment of one year's salary);

c.    An additional eight (8) weeks of salary, which may be in addition to the maximum benefit;

5

      d.      Group term life insurance and health care coverage until the expiration of the severance term (with the ability to request a temporary extension of benefits);

      e.      Service credit accrual for pension contribution purposes;

      f.      401(k) Plan (aka TIP) with matching contribution during term of severance period; and

      g.      Optional lump sum payment.

      22.      In or around November 26, 2002, Hancock disclosed to its employees its intention to sell the Tower Complex. The anticipated date of sale was slated for March 2003.

      23.      From the onset, Hancock represented to Plaintiff and the Class that it would retain part of the REOD business unit in any sale of the buildings and that it would be the new owner's responsibility to decide how to staff the buildings and whether to extend offers of employment to the remaining employees within the REOD business unit.

      24.      Shortly after the Plan Amendment became effective, Morgan Stanley, the company hired to broker the sale of the three buildings, began scheduling tours with prospective buyers.

      25.      January 2003, Hancock announced that it was outsourcing several services being performed by its Infrastructure Support Services Department ("ISSD"), which is a part of Hancock's Information Technology Services Sector, to International Business Machines Corporation ("IBM"),

      26.      Upon information and belief, Hancock executed an outsourcing contract with IBM.

27.     Upon information and belief, of the 300 affected Hancock employees, about 180 made the transition to IBM, about twenty (20) employees were retained by Hancock and the remaining employees not offered comparable jobs were provided severance benefits under the Plan.

28.     Upon information and belief, Hancock applied the 'Comparable Job' provision of the Plan Amendment when determining whether the ISSD employees were eligible for benefits under the Plan.

29.     Upon information and belief, outsourced members of the ISSD were deemed ineligible for severance benefits because IBM offered said employees comparable jobs, at least in part based on the fact that IBM offered greater benefits than Hancock.

30.     In or around March 2003, Morgan Stanley brokered a sale between Hancock and Beacon for the Tower Complex.

31.     The transaction required that Beacon pay $910 million which, at the time, was listed by the publication "Banker and Tradesmen" as the largest sale in the country for the fiscal quarter.

32.     Upon information and belief, the REOD business unit was not included in the sale price or otherwise deemed a bargained-for asset as part of the sale price.

33.     The REOD business unit was not sold or outsourced to Beacon.

34.     In or around May 2003, Hancock notified the REOD, including Joyce, of a pending reduction in REOD staff due to the sale of the buildings.

35.     Contrary to the circumstances surrounding the complete outsourcing of the ISSD two months prior, in which Hancock employees' services were contractually dealt to IBM,

7

Plaintiff and members of the Class were informed that some employees would retain their positions at Hancock, others would be terminated with full Plan benefits, and the rest would potentially be offered employment by Beacon.

36.    Plaintiff and the Class were never informed by Hancock, in any meeting or by press release, of any outsourcing contract with Beacon.

37.    On or around May 5, 2003, the Director of the REOD, John Durnan, distributed letters offering positions of employment at Beacon to Plaintiff and members of the Class.

38.    The letters addressed to each member of the Class, including Plaintiff, detailed that if the offers were accepted, each Class member would: 1) receive a similar salary to the one received while employed by Hancock; and 2) work at a location within 50 miles of their work location while employed by Hancock.

39.    The letters failed to detail any benefit offerings even remotely competitive or comparable with the benefits that Plaintiff and the Class had received while employed by Hancock.

40.    Despite acknowledging it was not yet able to provide information regarding specific benefits, Beacon requested in the letters that all offers be accepted by May 16, 2003.

41.    In response to Beacon's offers, many Hancock employees expressed their concerns to Hancock's Human Resources Department regarding Beacon's non-competitive and significantly reduced benefits package.

42.    Comparatively, the benefits packages offered by Beacon to Plaintiff and the Class included, without limitation, the following:

a.    no pension plan;

8

b.     no severance plan;

c.     significantly higher premiums for medical insurance ($25.00 more per week for the family plan with less coverage);

d.     significantly higher premiums for dental insurance (dental coverage was $10.00 more per week than Hancock's plan, with less coverage);

e.     half the vision care coverage (Hancock's plan covered vision care 100% while Beacon's plan covered only 50%);

f.     significantly less long-term disability coverage (under Hancock's plan disability pay was 8 weeks at 100% and 26 weeks at 60% while Beacon's plan paid 100% for two weeks and 60% for 26 weeks);

g.     less vacation time (three weeks from Beacon compared with four weeks from Hancock);

h.     no tuition reimbursement (Hancock allowed $7,500.00 per school year or 8 credits);

i.     substantially lower life insurance coverage (Hancock offered life insurance coverage equal to one to five times the employee's salary whereas Beacon's plan only offered an amount equal to the employee's salary);

j.     no holiday overtime pay; and

k.     no holiday day-off time.

43.     Joan M. DiCicco ("DiCicco"), an employee within Hancock's Human Resources Department, assured all employees that a determination would be made on a case-by-case basis and that she would be meeting with Class members to discuss their offers.

44.    On May 30, 2003, prior to discussing issues with individual Class members, as promised, DiCicco purportedly distributed a memorandum to each Class member stating in part: "it has been determined that all job offers extended by [Beacon] are comparable job offers and therefore recipients of a job offer from [Beacon] are not eligible for [Hancock] severance benefits." *See a true and accurate copy of DiCicco's letter dated May 30, 2003, appended hereto as **Exhibit C**.*

45.    Hancock and it agents arrived at such a determination while having full knowledge that the sale of the Tower Complex did not involve a "sale or outsourcing" of the REOD business unit and that Beacon's job offers were vastly inferior and not comparable with the jobs Plaintiff and members of the Class had at Hancock.

46.    Upon information and belief, Beacon's benefit package to migrating Hancock employees did not take shape until July 2003.

47.    Hancock did not provide a benefits specialist to discuss the transition and severance benefits until at least July 2003, long after the time expired for which Plaintiff and the Class had to accept Beacon's offers of employment.

48.    Hancock's purportedly conducted a competitive assessment analysis in which included a review of Beacon's 401(k) plan.

49.    At one benefits meeting prior to May 30, 2003, DiCicco and other Hancock senior executives represented that Beacon had a 401(k) plan that was going to match employee contributions up to 6%, as compared to Hancock's 4% employee matching contribution plan.

50.    Upon information and belief, the 6% matching contribution represented to Plaintiff and the Class was based on the matching contribution provided to Beacon Capital

Partners Investors, a company affiliated with Beacon.

51.     Upon information and belief, when Hancock represented to Plaintiff and the Class that Beacon's benefit package would include a match of 6% of employee contributions, Beacon had not yet legally formed a 401(k) plan.

52.     Upon information and belief, Beacon did not have a 401(k) plan for its employees until at least August 2003.

53.     In the end, Plaintiff and members of the Class came to learn that Beacon was only going to match their employee contributions by 4%, equaling Hancock's matching contribution policy.

54.     With only days before Beacon's offers were set to expire and with full knowledge that Beacon had already determined they were ineligible to receive severance benefits under the Plan, Plaintiff and many members of the Class accepted Beacon's offers.

55.     To the extent Plaintiff and the Class had been assured they would receive one week's pay per every six months worked (in addition to the other Plan Benefits listed in paragraph 21 above), if not offered a 'comparable job', Defendants' determination precluded Plaintiff and members of the Class from receiving, and saved Defendants from tendering, millions of dollars.

56.     Defendants, despite repeated requests from Plaintiff and counsel, refused to provide specific data justifying their determination that Beacon's benefit offerings were 'competitive.'

57.     At or around the time the Plan Amendment was published, Defendants had at their immediate disposal information concerning the limited educational backgrounds of Plaintiff

and the Class.

58.    Despite possessing such information, Defendants failed to define or clarify the phrase "competitive benefit offerings."

59.    Plaintiff has exhausted all administrative remedies prior to commencing this action, including submissions for Plan benefits and letters appealing the denial of Plan benefits. *See a true and accurate copy of the letter dated December 16, 2004 from Hancock appended hereto as* **Exhibit D**.

60.    Upon information and belief, members of the Class subsequently terminated by Beacon did not receive severance or any of the Plan benefits.

### B.    PLAINTIFF DANIEL JOYCE

61.    From in or around March 1994, through June 14, 2003, Joyce was employed by Hancock and was a participant or beneficiary of the Plan as defined by 29 U.S.C. § 1002(7).

62.    During the course of his employment with Hancock, Joyce served in a number of positions, including real estate operations coordinator, project manager and senior project manager.

63.    In November 2002, Joyce received notice of the Plan Amendment.

64.    After the Plan Amendment became effective, Joyce continued to work for Hancock with the understanding that the only circumstance under which he would not be entitled to receive his Plan benefits would be in the event his REOD business unit was sold or outsourced to a successor company and said successor company offered him a comparable job, as defined by the Plan Amendment.

65.    On or around May 5, 2003, Joyce received an offer of employment from Beacon.

66.    The offer of employment from Beacon consisted of a similar salary to that of his at Hancock and involved working in a similar work location to which he had been working in while at Hancock.

67.    Beacon's offer of employment to Joyce included no pension plan, no severance plan, more costly medical care with less coverage, less long-term disability coverage, less vacation time, no tuition reimbursement and less life insurance coverage.

68.    On or about May 30, 2005, Joyce received a letter from DiCicco stating Hancock had determined that he was not eligible to receive Plan benefits because the offer of employment he had received from Beacon was deemed to be a "comparable job" as defined under the Plan.

69.    On or about June 2, 2003, Joyce sent an email to DiCicco inquiring as to the basis for the denial of his Plan benefits.

70.    On or about June 3, 2003, DiCicco stated in response to Joyce's email that Hancock, in conducting a competitive assessment analysis of selected benefits (health, pension, 401(k) and vacation), did not compare Beacon's benefits package to Hancock's, but instead compared Beacon's benefits package to benefits offered by other employers in the property management industry.

71.    Joyce was then forced to decide hastily whether to risk unemployment in a fledgling economy or accept Beacon's offer and its sharply reduced benefits.

72.    Joyce accepted Beacon's offer of employment.

73.    Had Hancock properly acknowledged to Joyce that the sale of the Tower Complex did not constitute "a sale or outsourcing" of the REOD business unit and/or that Beacon's offer of employment was not comparable, Joyce would have been afforded the option

13

of exercising his right to receive benefits under the Plan, a right Hancock never allowed him to act upon.

74.     As a result of Defendants' misrepresentations and the subsequent denial of his Plan benefits, Joyce had no practical option but to accept Beacon's offer of employment.

75.     Joyce has exhausted all administrative remedies prior to filing this complaint.

## V.     CLASS ALLEGATIONS

76.     Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(a), (b)(1) and (b)(3), on behalf of a class of all persons similarly situated (the "Class"). The Class may be defined as follows:

> All persons who: 1) are or were participants in or beneficiaries of the John Hancock Financial Services, Inc. Severance Pay Plan (the "Plan") on May 5, 2003; and 2) are or were employees/contractors of the Real Estate Operations Department in Boston, Massachusetts; and 3) received an offer of employment from Beacon Capital Partners Management, LLC ("Beacon"); and 4) were subsequently denied Plan benefits and the option to exercise Plan benefits because the offer of employment from Beacon was deemed "comparable" by any of the named Defendants to this action.

77.     The Class is so numerous that joinder of each of the members of the Class would be impracticable.

78.     There are questions of law and fact that are common to the claims of the Class, which predominate over questions affecting only individual class members.

79.     The common questions of law and fact that are common to all members of the Class include, but are not limited to, the following:

a.     Whether Defendants acted arbitrarily and capriciously in denying Plan benefits to Plaintiff and the Class;

14

b.     Whether Defendants' denial of Plan benefits to Plaintiff and the Class was wholly unreasonable;

c.     Whether Defendants abused their discretion when they denied Plan benefits to Plaintiff and the Class;

d.     Whether the sale of the Tower Complex involved a "sale or outsourcing" of the REOD business unit from Hancock to Beacon;

e.     Whether Hancock, prior to May 30, 2003, conducted a competitive benefits analysis report;

f.     Whether Beacon's benefit offerings to Plaintiff and members of the Class were competitive with Hancock's benefit offerings;

g.     Whether Beacon's benefit offerings to Plaintiff and members of the Class were competitive with those benefits commonly afforded to employees in the property management industry;

h.     Whether Defendants, by only analyzing select certain benefits were able to fairly and accurately conclude that Beacon's benefit offerings were competitive with Hancock's benefit offerings or with benefit offerings commonly afforded to employees in the property management industry;

i.     Whether Hancock's competitive assessment analysis reveals the extent to which Beacon's benefit offerings were competitive with Hancock's benefit offerings;

j.     Whether Hancock's competitive assessment analysis reveals the extent to which Beacon's benefit offerings were competitive with benefit offerings provided to employees in the property management industry, assuming arguendo Beacon had a right to conduct an industry-

15

wide analysis;

       k.      Whether Defendants misrepresented the terms of the Plan for their own financial gain and advantage;

       l.      Whether Defendants misrepresented or omitted material facts relating to Plaintiff and members of the Class' eligibility to receive Plan benefits;

       m.      Whether Defendants breached their fiduciary duty to Plaintiff and the Class;

       n.      Whether a conflict of interest existed when Defendants denied Plan benefits to Plaintiff and the Class;

       o.      Whether DiCicco promised Plaintiff and members of the Class private meetings to discuss their offers of employment from Beacon;

       p.      Whether Defendants unjustly benefited from the denial of Plan benefits to Plaintiff and the Class;

       q.      Whether Defendants intentionally misrepresented to Plaintiff and the Class that the job offers from Beacon were comparable;

       r.      Whether Plaintiff and members of the Class have a statutory remedy under ERISA;

       s.      Whether the facts dictate the Court should review this matter de *novo*;

       t.      Whether Defendants are estopped from denying or interpreting the Plan so as to deny Plan benefits to Plaintiff and the Class;

       u.      Whether Defendants have denied Plaintiff and members of the Class their right to review pertinent and relevant documents;

       v.      Whether Defendants drafted the Plan Amendment in such a way that could not be

16

understood by the average plan participant;

w.      Whether Defendants knew or should have known their failure to define
"competitive benefit offerings" would cause confusion among Plan participants;

x.      Whether Plaintiff and members of the Class relied on Defendants' promise to pay
full Plan benefits in the event their business unit was sold or outsourced to a successor company
and said successor company failed to offer them a comparable job;

y.      Whether, and to what extent, the conduct of Defendants caused injury to Plaintiff
and members of the Class, and, if so, the appropriate measure of damages;

z.      Whether Plaintiff and members of the Class are entitled to a declaration that the
REOD business unit was not sold or outsourced to Beacon or that Beacon's benefit offerings
were not competitive with Hancock's benefit offerings;

aa.     Whether Plaintiff and members of the Class are entitled to a declaration that
Beacon's benefit offerings were not competitive with benefits commonly afforded to employees
in the property management industry, assuming arguendo Beacon had a right to conduct an
industry-wide analysis;

bb.     Whether Class members are entitled to an equitable order enjoining the continued
practice of Defendants' scheme; and

cc.     Whether Class members are entitled to an order requiring Defendants
immediately to permit Plaintiff, individually and on behalf of the Class, the right to review
documents pertinent or relevant to his claim for Plan Benefits.

80.     Common questions of law and fact as shown above predominate over individual
questions of causation and of individual damages. Class members can be uniformly treated as

17

there are, on information and belief, no individual defenses that Defendant(s) can assert against individual plaintiff(s).

81.    The only individual questions concern the identification of class members, which can be ascertained from records maintained by Defendant, and the computation of the relief to be afforded each class member, which can be calculated by a ministerial examination of the relevant files.

82.    The claims of Joyce are typical of the claims of the Class, as all claims are based on the same legal and remedial theories as Joyce and the Class were all damaged by the same wrongful conduct of Defendant.

83.    Plaintiff will fairly and adequately protect the interests of all Class members in the prosecution of this action and in the administration of all matters relating to the claims stated herein. The interests of Joyce are coincident with, and not antagonistic to, those of the other members of the Class.

84.    Plaintiff has retained counsel experienced and competent in the prosecution of complex consumer class action litigation.

85.    This class action would preclude the potential for inconsistent or contradictory individual judgments that would dispose of, or impair the interests of other prospective class members not parties to individual litigation. This class action would establish compatible and consistent standards of conduct for the Defendant(s).

86.    Class action treatment is the superior (if not the only) method for the fair and efficient adjudication of this controversy because, among other reasons, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single

forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and judicial resources that numerous actions would engender. The benefits of proceeding by means of class action, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh the difficulties, if any, which may arise in the management of this case as a class action.

## CAUSES OF ACTION

### COUNT I – DENIAL OF BENEFITS DUE UNDER THE TERMS OF THE PLAN

87.    Plaintiff realleges each of paragraphs 1 though 86 above as if fully set forth herein.

88.    The Plan constitutes an employee welfare benefit plan as defined by ERISA.

89.    Plaintiff is a beneficiary and/or participant of the Plan as defined by ERISA.

90.    Pursuant to the terms of the Plan, in the event of a sale or outsourcing of a business unit Hancock promised to disburse Plan benefits to all participants not offered a "comparable job" from a successor company.

91.    The sale of the Tower Complex did not involve a "sale or outsourcing" of the REOD business unit and the jobs offered by Beacon to Plaintiff and members of the Class were not comparable, thereby making the interpretation or application of the Plan Amendment moot.

92.    Per the terms of the Plan, Plaintiff and members of the Class should have been permitted to exercise their right to receive Plan benefits, rather than be deemed ineligible to receive such benefits.

93.    Even if the sale of the Tower Complex is deemed to have involved a "sale or outsourcing" of the REOD business unit, Beacon, failed to include "competitive benefit

19

offerings" in its offers of employment to Plaintiff and the Class.

94.    Per the terms of the Plan, Plaintiff should have been permitted to exercise his right to receive Plan benefits, rather than be deemed ineligible to receive such benefits.

95.    As a result, Plaintiff has been deprived of such benefits as described herein.

96.    Pursuant to 29 U.S.C. § 1132(a)(1)(b), Plaintiff, individually and on behalf of the Class, is entitled to recover benefits due under the terms of the Plan and exercise his rights under the Plan.

## COUNT II – BREACHES OF FIDUCIARY DUTY

97.    Plaintiff realleges each of paragraphs 1 though 96 above as if fully set forth herein.

98.    Defendant Hancock is the named administrator and fiduciary of the Plan.

99.    Defendants and their agents made affirmative misrepresentations regarding Plaintiff and the Class' eligibility to receive Plan benefits and his entitlement to a private meeting to discuss his eligibility.

100.    Further, Defendants failed to adequately inform Plaintiff and the Class that the sale of the Tower Complex did not involve a "sale or outsourcing" of the REOD business unit and that 'competitive benefit offerings' was to be interpreted and applied with total consideration to industry/normative data.

101.    In both instances, Defendants knew of the confusion its misrepresentations or silence generated and/or would likely generate.

102.    As a result of said acts and omissions, there was resulting harm to Plaintiff and the Class.

20

103.    As fiduciaries, Defendant owed Plaintiff and the Class the duties imposed by the terms of the Plan, the ERISA statutory duties and the duties arising under common law.

**A.    *Breach of Duty Under 29 U.S.C. § 1132(a)(1)(B)***

104.    Plaintiff realleges each of paragraphs 1 though 103 above as if fully set forth herein.

105.    As fiduciary, Hancock was at all times obliged under 29 U.S.C. § 1104(a)(1)(D) to discharge its duties with respect to the applicable terms of the Plan solely in the interest of the Plaintiff and the Class and "in accordance with the documents and instruments governing" the Plan.

106.    Hancock breached its fiduciary duty when it intentionally misrepresented or omitted material facts relating to Plaintiff and the Class' eligibility to receive Plan benefits, such as, but not limited to: 1) indicating that the sale of the Tower Complex involved a "sale or outsourcing" of the REOD business unit; 2) representing that Beacon's offers of employment were "comparable" as defined by the Plan; and 3) representing that its agents would meet with each participant separately to discuss the comparability of their job offers.

107.    As a result of Hancock's breach of its fiduciary duty, Plaintiff was precluded from exercising his right to receive Plan benefits and utilize said benefits in order to pursue other opportunities.

108.    Pursuant to 29 U.S.C. § 1132(a)(1)(B), plaintiff, individually and on behalf of the Class, is entitled to relief from Defendants' breaches of their fiduciary duty for incorrectly interpreting and applying the Plan documents.

21

**B.**    *Breach of Duty Under 29 U.S.C. § 1132(a)(3)*

109.    Plaintiff realleges each of paragraphs 1 though 108 above as if fully set forth herein.

110.    Wholly separate and apart from Hancock's duty to act in accord with the documents and instruments of the Plan, Hancock owes a duty of loyalty to Plaintiff and the Class under common law and 29 U.S.C. § 1104(a)(1)(A)(i) to discharge its duties "solely in the interest of the participants and beneficiaries . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries."

111.    Wholly separate and apart from Hancock's duty to act in accord with the documents and instruments of the Plan, Hancock is prohibited by its duty of loyalty under common law and 29 U.S.C. §§ 1106(b)(1) from "deal[ing] with the assets of the [Plan] in [its] own interest or for [its] own account."

112.    As such, notwithstanding the terms of the documents and instruments of the Plan, and as an entirely distinct claim explicitly asserted pursuant to 29 U.S.C. § 1132(a)(3), Hancock's intentional misrepresentations, misinterpretations and misapplications of the Plan for their own financial gain and advantage, violated Hancock's duty of loyalty under common law and 29 U.S.C. §§ 1104(a)(1)(A)(i) and 1106(b)(1).

113.    Pursuant to 29 U.S.C. § 1132(a)(3), Plaintiff, individually and on behalf of the Class, is entitled to relief from Hancock's breach of its fiduciary duty.

## COUNT III - UNJUST ENRICHMENT

114.    Plaintiff realleges each of paragraphs 1 though 113 above as if fully set forth herein.

22

115.    Plaintiff and the Class has suffered a direct and proximate financial injury as a result of Defendants' refusal to tender Plan benefits.

116.    Defendants have been unjustly enriched in that they wrongfully benefited from substantial hours of work from Plaintiff and the Class, and further saved money they would not have otherwise obtained or retained but for their material, intentional misrepresentations at the expense of the Plaintiff and the Class, namely expressly promising that each Class member would receive severance benefits in the event the successor employer did not offer "competitive benefit offerings."

117.    Beacon's offers of employment to Plaintiff and each member of the Class were substantially identical and, therefore, each plaintiff and each member of the Class are challenging the same common course of conduct.  See ¶ 42.

118.    Plaintiff, individually and on behalf of the Class, is entitled to an Order requiring Defendants to disgorge themselves of these unlawful monetary gains retained at the expense of Plaintiff and the Class.

## COUNT IV – EQUITABLE ESTOPPEL

119.    Plaintiff realleges each of paragraphs 1 though 118 above as if fully set forth herein.

120.    Pursuant to 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3), Plaintiff is entitled to an Order enjoining "any act or practice which violates any provision of [ERISA] or the terms of the [Plan]" and to obtain "other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [ERISA] or the terms of the [Plan]."

121.    Defendants materially misrepresented to Plaintiff that the sale of the Tower

Complex involved a "sale or outsourcing" of the REOD business unit and that Beacon's offer of employment was "comparable," as defined by the Plan, thereby precluding Plaintiff from receiving severance benefits under the Plan.

122.    Having only a short period of time to decide whether to accept employment offers from Beacon coupled with the reality of a fledgling economy, Plaintiff reasonably and detrimentally relied upon Defendants' representations when he accepted Beacon's offer of employment.

123.    Plaintiff and those members of the Class who accepted job offers from Beacon accepted such offers based on Defendants' misrepresentations and said misrepresentations were material and constituted extraordinary circumstances.

124.    Those members of the Class who retired or elected to accept employment with an employer other than Beacon did so because they relied entirely on Defendants' material, intentional misrepresentations regarding their inability to receive severance benefits under the Plan.

125.    By virtue of Defendants' material and intentional misrepresentations, the Defendants are estopped from denying, or interpreting the Plan so as to deny benefits under the Plan to Plaintiff and the Class.

## COUNT V – DENIAL OF RIGHT TO REVIEW PERTINENT AND RELEVANT DOCUMENTS AND INFORMATION

126.    Plaintiff realleges each of paragraphs 1 though 125 above as if fully set forth herein.

127.    29 U.S.C. § 1133(a)(2) provides, "in accordance with regulations of the Secretary, every employee benefit plan shall . . . afford a reasonable opportunity to any

24

participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(a)(2).

128.    The opportunity to review the pertinent and relevant documents and other information is critical to a full and fair review, because only then can a claimant have access to the purported evidence upon which the Plan Administrator relied in denying the claim and thus the opportunity to challenge its accuracy and reliability. Review of the pertinent and relevant documents, and other information in this case is additionally important because it will also help Plaintiff establish that Defendants' denial of Plan benefits lacked any rational basis and was the product of a conflict of interest.

129.    Plaintiff and members of the Class have been denied their rights to review the pertinent documents, records and other information generated or referenced in support of Defendants' decision to deny Plan benefits.

130.    Defendants should be ordered to permit the Plaintiff and the Class to review all pertinent or relevant documents, records and other information.

### COUNT VI – VIOLATION OF 29 C.F.R. § 2520.102-2, 29 U.S.C. § 1022(a)

131.    Plaintiff realleges each of paragraphs 1 though 130 above as if fully set forth herein.

132.    The Plan Amendment fails to define or offer any express insight into the manner in which 'competitive benefit offerings' is to be applied or interpreted.

133.    Defendants took the position in their letter denying Plaintiff and the Class' appeals for severance benefits that, despite the first two provisions of the 'comparable job provision' specifically calling for the comparison of Beacon's salary offer and work location to

those contemporaneously offered by Hancock, the 'competitive benefit offerings' provision was to be interpreted and applied with consideration only to industry/normative data.

Defendants failed to draft the Plan in a manner calculated to be understood by the average plan participant.

134.    Defendants failed to define "competitive benefit offerings" when they were fully aware that many of the Plan participants had backgrounds consisting of limited formal educations.

135.    To the extent Plaintiff and the Class were employees of Hancock, Defendants knew the Class was not technically trained to be conversant in Plan documents (or other ERISA documents) and Defendants failed to disclose essential information in a way Plaintiff and the Class could understand them, Defendants violated 29 C.F.R. § 2520.102-2, 29 U.S.C. § 1022(a).

### COUNT VII -PROMISSORY ESTOPPEL

136.    Plaintiff realleges each of paragraphs 1 though 135 above as if fully set forth herein.

137.    Defendants promised, pursuant to the terms of the Plan and the Plan Amendment, that Plaintiff and members of the Class would receive full Plan benefits in the event their REOD business unit was sold or outsourced to a successor company and said company failed to offer them a comparable job, defined in part as an offer including competitive benefit offerings.

138.    By virtue of Defendants' promises, Plaintiff continued working for Defendant, refrained from exploring other employment opportunities and/or accepting other offers of employment and/or retiring, with the understanding that the only circumstance under which he would not be entitled to receive Plan benefits would be in the event the REOD business unit was

sold or outsourced to a successor company and said successor company offered him a comparable job.

139.    Defendants, by making said promise in the Plan Amendment, should have reasonably expected Plaintiff to be induced to act or otherwise refrain from acting in the aforementioned manner.

140.    Plaintiff was not offered a comparable job as defined under the Plan Amendment, yet Defendants have refused to issue Plan benefits to him.

141.    Injustice can be avoided only by enforcement of the Defendants' promise to grant Plaintiff his Plan benefits.

142.    Enforcement of Defendants' promise would give Plaintiff precisely the relief he requests.

## COUNT VIII – DECLARATORY RELIEF

143.    Plaintiff realleges each of paragraphs 1 though 142 above as if fully set forth herein.

144.    An actual controversy exists as to the terms of the Plan as it applies to Plaintiff and the Class.

145.    Pursuant to 28 U.S.C. §§ 2201 and 2202, Plaintiff, individually and on behalf of the Class, is entitled to a declaration that Defendants breached their respective contractual, statutory and common law obligations to Plaintiff and the Class by: 1) unjustifiably determining that the sale of the Tower Complex involved a "sale or outsourcing" of the REOD business unit; 2) intentionally misleading Plan participants as to the manner in which "competitive benefit offerings" was to be interpreted and applied, and 3) concluding that, without any basis or factual

27

support, selected benefit offerings by Beacon were competitive with benefits commonly afforded by employers in the property management industry.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, requests the following relief:

a)      Certification of the Class pursuant to Fed.R.Civ.P. 23, appointment of Plaintiff as class representative, and appointment of Plaintiff's counsel and class counsel;

b)      Recovery of benefits due under the Plan in the form of compensatory damages payable to the Plaintiff and each of the Class members in amounts equal to the amount each would have received had each been deemed eligible to receive Plan benefits on May 30, 2003, plus interest;

c)      A permanent injunction prohibiting Defendants from interpreting and applying the phrase "competitive benefit offerings" in a manner that gives total consideration to industry/normative data, unless redrafted with considerable clarification;

d)      An Order requiring Defendants to immediately permit Plaintiff, individually and on behalf of the Class, the right to review documents pertinent or relevant to his claim for Plan benefits;

e)      A declaratory judgment in the form described in paragraph 149 above;

f)      An award of reasonable costs, attorneys' fees and interest pursuant to 29 U.S.C. § 1132(g)(1); and

g)      Such other relief as may be equitable and just.

## DEMAND FOR JURY TRIAL

Please take notice that Plaintiff demands a trial by jury in this action.

                         Respectfully submitted,

                         DANIEL JOYCE, et al.

                         By his attorneys,

                         Kevin T. Peters (#: 550522)
                         kpeters@toddweld.com
                         Seth J. Robbins (#: 655146)
                         srobbins@toddweld.com
                         TODD & WELD LLP
                         28 State Street, 31st Floor
                         Boston, MA 02109
                         (617) 720-2626

Dated:  May 12, 2006

## JOHN HANCOCK FINANCIAL SERVICES, INC.
## SEVERANCE PAY PLAN

### Article I - Purpose of the Plan

In order to make certain severance benefits available to its employees and employees of Participating Subsidiaries, John Hancock Financial Services, Inc. hereby establishes the John Hancock Financial Services, Inc. Severance Pay Plan. This Plan shall consist of this document, as it may be amended from time to time.

### Article II - Definitions

A "Change of Control" shall be deemed to have occurred if:

(i) any Person (as defined below) has acquired, "beneficial ownership" (within the meaning of Rule 13d-3, as promulgated under Section 13(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")), directly or indirectly, of securities of the Company or John Hancock Life Insurance Company representing 30% or more of the combined Voting Power (as defined below) of the securities of the Company or John Hancock Life Insurance Company; provided, however, that the event described in this paragraph (i) shall not be deemed to be a Change of Control by virtue of an acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company, John Hancock Life Insurance Company, or any Affiliate; or

(ii) within any 24-month period, the persons who, at the beginning of such period, were members of the Board (the "Incumbent Company Directors") shall cease to constitute at least a majority of the Board or the board of directors of any successor to the Company; provided, however, that any director elected to the Board, or nominated for election to the Board, by at least two-thirds (2/3) of the Incumbent Company Directors then still in office shall be deemed to be an Incumbent Company Director for purposes of this subclause (ii); provided, however, that no individual initially elected or nominated for election to the Board as a result of an actual or threatened election contest with respect to directors or as a result of any other actual or threatened solicitation of proxies by or on behalf of any Person other than the Board shall be deemed to be an Incumbent Company Director; or

(iii) within any 24-month period, the persons who, at the beginning of such period, were members of the John Hancock Life Insurance Company Board (the "Incumbent John Hancock Life Insurance Company Directors") shall cease to constitute at least a majority of the John Hancock Life Insurance Company Board or the board of directors of any successor to John Hancock Life Insurance

11/15/02

Company; provided, however, that any director elected to the John Hancock Life Insurance Company Board, or nominated for election to the John Hancock Life Insurance Company Board, by at least two-thirds (2/3) of the Incumbent John Hancock Life Insurance Company Directors then still in office shall be deemed to be an Incumbent John Hancock Life Insurance Company Director for purposes of this subclause (iii); provided, however, that no individual initially elected or nominated for election to the John Hancock Life Insurance Company Board as a result of an actual or threatened election contest with respect to directors or as a result of any other actual or threatened solicitation of proxies by or on behalf of any Person other than the John Hancock Life Insurance Company Board shall be deemed to be an Incumbent John Hancock Life Insurance Company Director; or

(iv) upon the consummation of a merger, consolidation, share exchange, division, sale or other disposition of all or substantially all of the assets of the Company (a "Company Corporate Event") and immediately following the consummation of which the stockholders of the Company, immediately prior to such Company Corporate Event do not hold, directly or indirectly, a majority of the Voting Power of

(A) in the case of a merger or consolidation, the surviving or resulting corporation,

(B) in the case of a statutory share exchange, the acquiring corporation,

(C) in the case of a division or a sale or other disposition of assets, each surviving, resulting or acquiring corporation which, immediately following the relevant Company Corporate Event, holds more than 25% of the consolidated assets of the Company immediately prior to such Company Corporate Event, [provided that no Change of Control shall be deemed to have occurred if the Executive is employed, immediately following such Company Corporate Event, by any entity in which the stockholders of the Company immediately prior to such Company Corporate Event hold, directly or indirectly, a majority of the Voting Power];

Provided that in each case such majority of the Voting Power is represented by securities of the Company that were outstanding immediately prior to such Company Corporate Event (or, if applicable, is represented by shares into which such securities of the Company were converted pursuant to such Company Corporate Event); or

(v) upon the consummation of a merger, consolidation, share exchange, division, sale or other disposition of all or substantially all of the assets of John Hancock Life Insurance Company which has been approved by the stockholders of John Hancock Life Insurance Company (a "John Hancock Life Insurance Company

11/15/02

2

Corporate Event"), and immediately following the consummation of which the stockholders of John Hancock Life Insurance Company immediately prior to such John Hancock Life Insurance Company Corporate Event do not hold, directly or indirectly, a majority of the Voting Power of

(A)    in the case of a merger or consolidation, the surviving or resulting corporation,

(B)    in the case of a statutory share exchange, the acquiring corporation, or

(C)    in the case of a division or a sale or other disposition of assets, each surviving, resulting or acquiring corporation which, immediately following the relevant John Hancock Life Insurance Company Corporate Event, holds more than 25% of the consolidated assets of John Hancock Life Insurance Company immediately prior to such John Hancock Life Insurance Company Corporate Event, [provided that no Change of Control shall be deemed to have occurred if the Executive is employed, immediately following such John Hancock Life Insurance Company Corporate Event, by any entity in which the stockholders of John Hancock Life Insurance Company immediately prior to such John Hancock Life Insurance Company Corporate Event hold, directly or indirectly, a majority of the Voting Power];

Provided that in each case such majority of the Voting Power is represented by securities of John Hancock Life Insurance Company that were outstanding immediately prior to such John Hancock Life Insurance Company Corporate Event (or, if applicable, is represented by shares into which such securities of John Hancock Life Insurance Company were converted pursuant to such John Hancock Life Insurance Company Corporate Event); or

(vi) any other event occurs which the Board or the John Hancock Life Insurance Company Board declares to be a Change of Control.

"Company" shall mean John Hancock Financial Services, Inc., and, where appropriate in context, a Participating Subsidiary.

"Employability Expense" shall mean expenses incurred for any of the following services associated with a Participant's termination of employment or in connection with seeking and preparing for new employment or career:

♦    Additional outplacement services
♦    Career development testing and/or coaching
♦    Education (non-matriculating student - any course or program)
♦    Tuition reimbursement (matriculating student in degree program)

11/15/02

- Financial counseling
- Retirement planning
- Legal fees associated with setting up an estate (will, trust, etc.)
- Relocation expenses
- Personal computer (and other associated equipment) purchase
- Non-reimbursable travel to job interview
- Fees associated with start up of own business (including legal fees)
- Child and/or elder care expenses
- Image consultant services
- Dues to professional organizations

"General Agency" shall mean a General Agency of the Company or its subsidiary, Signator Insurance Agency, Inc.

"Last Day Worked" shall be the date determined by the Company as the employee's last day of active employment with the Company as a salaried employee.  "Active employment" shall not include any period for which the employee is considered a salaried employee for payroll purposes only, including, but not limited to, vacation, Short-Term Disability, and pay in lieu of notice.

"Managing Director" shall mean a Managing Director of a General Agency.

"Participant" shall mean an employee who is eligible for benefits under the Plan, who executes an agreement as described in Section 3.4, and who otherwise qualifies for the payment of benefits under the Plan.

"Participating Subsidiary" shall mean a domestic subsidiary or affiliated corporation or a foreign subsidiary or affiliated corporation, the inclusion of which in the Plan has been approved by the Company upon such conditions with respect to adoption of the Plan or contributions to its cost by the subsidiary or affiliate as the Company may require.

"Plan" shall mean the John Hancock Financial Services, Inc. Severance Pay Plan.

"Successor Company" shall mean an entity unaffiliated with the Company which performs the services previously performed by an employee's or a Participant's former work unit with the Company.

## Article III - Eligibility

**3.1**    Subject to any exclusions and exceptions contained herein, a person is eligible for benefits under this Plan if:

**a.**    he is a salaried employee of the Company or a Participating Subsidiary on his Last Day Worked;

11/15/02

**b.**    he is not a Senior Officer, a Managing Director, or employed in a General Agency on his Last Day Worked;

**c.**    his employment is terminated by the Company or a Participating Subsidiary as part of a reduction in staff;

**d.**    he is not receiving payments on account of disability under any Company-sponsored benefit or pension plan, including but not limited to, the John Hancock Financial Services, Inc. Employee Welfare Plan, on his Last Day Worked; and

**e.**    he otherwise meets and complies with all the terms and conditions of this Plan.

**3.2**    Without limiting the generality of the foregoing, an employee who voluntarily terminates his employment, whose employment is terminated for reasons other than a reduction in staff or whose employment is terminated for reasons relating to his performance shall not be eligible for benefits under the Plan.  Employment is not terminated for the purposes of this Plan if an employee:  (a) is offered another position, with comparable conditions, as determined by the Company, as an employee with, or to provide services in any capacity to, the Company or one of the Company's subsidiaries or affiliates, or a General Agency of the Company; (b) accepts another position as an employee with, or provides services in any capacity to, the Company or one of the Company's subsidiaries or affiliates, or a General Agency of the Company, (c) is offered a comparable position, as determined by the Company, as an employee with, or provides services in any capacity to, a Successor Company, or (d) accepts any position as an employee with, or provides services in any capacity to, a Successor Company. Subsections 3.2(a) and 3.2(b) above shall not include an arrangement whereby an employee provides services under a written contractual agreement with the Company that has been approved by the Senior Officer in charge of Human Resources.

**3.3**    If an employee is receiving Short-Term Disability benefits on his Last Day Worked, any benefits due under this Plan shall be deferred until Short-Term Disability benefits cease, provided the employee does not qualify for Long-Term Disability benefits.  In the event Long-Term Disability benefits are not payable to the employee, the period between the Last Day Worked and the date Short-Term Disability benefits terminate shall be disregarded for the purposes of determining benefits under this Plan. Any employee who receives Long-Term Disability benefits on or after his Last Day Worked is not eligible to receive benefits under this Plan.

**3.4**    To receive benefits under the Plan, an otherwise eligible employee must execute an agreement, in a form prescribed by the Company, which includes, among other things:

**a.**    A release which releases the Company, as well as any and all parents, subsidiaries and affiliates, from all liability for claims relating to his employment and termination from employment;

11/15/02

**b.**    Non-disparagement and non-disclosure of trade secrets and proprietary information clauses;

**c.**    A non-solicitation clause, including, but not limited to, the solicitation of employees, agents, customers, or clients of the Company; and

**d.**    An agreement to (i) return Company files and property and, (ii) upon request, cooperate with the Company by providing information relating to the business dealings of the Company in which the Participant was involved while employed.

## Article IV- Calculation of Benefits

**4.1**    Subject to the maximum and minimum benefit, the amount of the benefit payable to a Participant shall be equal to the greater of: (a) one week of salary for every six completed months of service with the Company or (b) one week of salary for every full $5,000 increment of annual salary. The minimum benefit is two weeks of salary and the maximum benefit is 52 weeks of salary. A Participant who first becomes entitled to benefits under this Plan within three years after the date a Change of Control occurs, shall be entitled to an additional benefit of 8 weeks of salary, which may be in addition to the maximum benefit, and a lump sum payment, in an amount determined by the Company but not to exceed $2,500, to be used at the Participant's discretion for an Employability Expense, subject to any claim requirements the Company in its discretion may impose.

**4.2**    One week of salary is equal to a Participant's annual salary divided by 52. For the purposes of this calculation, annual salary shall be a Participant's base annual salary as of the payroll period which includes the date immediately preceding the Participant's Last Day Worked, excluding overtime, shift differential payments and incentive or bonus payments, with the following exception: The determination of annual salary under this paragraph shall include the average for the last three calendar years of any incentive payments made by the Company pursuant to the terms of a written incentive or bonus plan document, approved by the Board of Directors, the Compensation Committee or the Senior Committee, which specifies that payments thereunder shall be included for the purposes of calculating benefits under this Plan. Without limiting the generality of the foregoing, in no event will the determination of annual salary include payments made under the Incentive Compensation Plan for Employees of John Hancock Financial Services, Inc. (the "ICP Plan"), or under any other incentive or bonus plan or arrangement which fails to meet the requirements of the immediately preceding sentence.

**4.3**    For the purposes of Section 4.1, service shall be determined as of the Participant's Last Day Worked and shall include all periods of service as a salaried employee with the Company, its subsidiaries and affiliates or as a Managing Director, a full-time life insurance salesman of the Company or a salaried employee with any of the

11/15/02

Company's General Agencies or Managerial Agencies. Vacation days or personal days not used as of the Last Day Worked shall not be counted in calculating severance service.

## Article V - Payment of Benefits

**5.1**    Subject to Section 5.3 below, a Participant may select a payment period from among the following four options:

    **a.**    Weekly payments for a period equal to the number of weeks used to calculate the amount of the benefit pursuant to Section 4.1.

    **b.**    Weekly payments for a period equal to one and one half (1-1/2) times the number of weeks used to calculate the amount of the benefit pursuant to Section 4.1.

    **c.**    Weekly payments for a period equal to two (2) times the number of weeks used to calculate the amount of the benefit pursuant to Section 4.1.

    **d.**    Payment in a lump-sum.

**5.2**    Each weekly payment shall be equal to the amount of the benefit determined under Section 4.1, divided by the number of weeks in the payment period selected by the Participant pursuant to Section 5.1. The Company at its option may make benefit payments on a bi-weekly or weekly basis.

**5.3**    The Participant shall elect a payment period under Section 5.1. The Participant shall not be entitled to change this election once the election has been made, except that the Participant may, at any time, elect in writing to receive any unpaid benefit amount in a lump-sum.

**5.4**    Following a Participant's Last Day Worked and prior to the payment of benefits under this Plan, a Participant shall be required to take: (a) any unused vacation, accumulated in prior years subject to the limits of the Company's vacation policies; (b) if the Participant is not eligible to retire on his Last Day Worked, a prorated portion of unused vacation days earned in the last calendar year worked, based on the number of calendar months completed before the Last Day Worked; (c) if the Participant is eligible to retire on or before the Last Day Worked, the full vacation allowance that he would have been entitled to in the year of termination had employment continued throughout the calendar year; and (d) a prorated portion of unused personal days, based upon the number of calendar months completed before the Last Day Worked. The payment of benefits under this Plan shall be deferred until the day after these vacation and personal days, if any, have expired.

**5.5**    The payment of benefits under this Plan shall cease, and no additional benefits shall be due, as of the date a Participant: (a) commences employment with, or provides

11/15/02

services in any capacity to, the Company, a subsidiary or affiliate of the Company, or any of the Company's General Agencies or (b) commences employment with, or provides services in any capacity to, a Successor Company. Subsections 5.5(a) above shall not include an arrangement whereby an employee provides services under a written contractual agreement with the Company that has been approved by the Senior Officer in charge of Human Resources. In the event a Participant who has received a lump-sum payment of benefits satisfies the conditions of subsections (a) or (b) of this Section, the benefits paid to him under this Plan may be overpaid. The amount of any such overpayment will be equal to the total amount of benefits paid to him under this Plan less the amount of benefits he would have received had he selected the payment period under Section 5.1(a) and received payments only for the period of unemployment. The period of unemployment for the receipt of benefits under this Plan is the period from the Last Day Worked until the date employment or provision of services as described in subsections (a) and (b) of this Section commences. A Participant shall be liable to repay the Company any overpaid amounts.

**5.6**    The payment of benefits under this Plan shall cease, and no additional benefits shall be due, as of the date of a Participant's death.

### Article VI - Effect on Other Plans and Programs

**6.1**    With respect to all coverages under the John Hancock Financial Services, Inc. Employee Welfare Plan, except coverage for Short-Term Disability benefits and Long-Term Disability benefits, a Participant who is eligible for coverage on his Last Day Worked shall continue to be eligible for all such coverages that were available to the Participant on his Last Day Worked (subject to any changes made by the Company with respect to such coverages) until the earliest of (i) the conclusion of the payment period selected by the Participant pursuant to Section 5.1, (ii) the date severance benefits cease for any reason, or (iii) the date the Participant receives a lump-sum payment pursuant to Section 5.1(d) or 5.3. Coverage under the John Hancock Financial Services, Inc. Employee Welfare Plan for Short-Term Disability benefits and Long-Term Disability benefits ceases as of a Participant's Last Day Worked.

**6.2**    Service will continue to accrue for the purposes of the John Hancock Financial Services, Inc. Pension Plan until the earliest of (i) the conclusion of the payment period selected by the Participant pursuant to Section 5.1, (ii) the date severance benefits cease for any reason, or (iii) the date the Participant receives a lump-sum payment pursuant to Section 5.1(d) or 5.3.

**6.3**    Payroll deductions which the Participant elected when an active employee may be applied to the benefit payments under this Plan in accordance with rules and procedures established by the Company or as may be required under the terms of other Company-sponsored benefit plans.

**6.4**    Benefits under this Plan shall constitute salary for the purpose of any Company-sponsored pension plan, 401(k) plan or life insurance coverage, but shall not constitute

11/15/02

salary, pay or compensation for any purpose under any other Company-sponsored benefit or compensation plan except to the extent permissible under the terms of any plan sponsored by the Company allowing for the deferral of a Participant's salary. Except to the extent necessary to fulfill the terms of this Article, the common-law employment relationship with an eligible employee is deemed to have terminated as of the Last Day Worked.

**6.5**    A Participant shall not be entitled to any benefits under the ICP Plan or any comparable short term incentive plan, after the Participant's Last Day Worked.

**6.6**    For the purposes of any grant under any employer-sponsored stock option or stock ownership plan, and unless such plan specifies otherwise, employment terminates on the Last Day Worked or the first day for which severance benefits are payable, if later.

## Article VII - Administrative and Fiduciary Provisions

**7.1**    The Company shall be the named fiduciary and the administrator of the Plan for purposes of the Employee Retirement Income Security Act of 1974 ("ERISA") and shall have the authority to control and manage the operation and administration of the Plan. The Company shall have the power to adopt such rules and regulations as it may deem necessary or appropriate for the efficient operation and administration of the Plan. Such rules and regulations shall be consistent with the terms of this Plan. The Company shall have the sole and exclusive right to interpret the provisions of the Plan and to determine all questions arising in connection with the administration, interpretation and application of the Plan. With respect to issues not addressed in the provisions of the Plan, or where such provisions are ambiguous, including questions of eligibility for benefits, the Company or its designee shall have discretionary authority to make the determination. Any determination made pursuant to this section by the Company or its designee shall be final, conclusive and binding on all persons affected thereby.

**7.2**    In carrying out its fiduciary and administrative responsibilities under the Plan, the Company may, through its Board of Directors:

   **a.**    designate other persons as named fiduciaries with respect to particular matters of administration or operation of the Plan;

   **b.**    enter into agreements with any or all of such named fiduciaries or authorize among themselves to enter into agreements for the allocation of fiduciary responsibilities among some or all of the named fiduciaries;

   **c.**    allocate such of its responsibilities as it deems appropriate to any person or persons;

   **d.**    designate any person or persons to carry out such responsibilities whether or not fiduciary in nature; and

11/15/02

9

e.    employ one or more persons to render advice with regard to such responsibilities.

The Company or any such person may serve in more than one fiduciary capacity.

**7.3**    The Company through its Board of Directors or Senior Committee reserves the right to amend or modify the Plan in any way whatsoever and to terminate it completely, except that no such termination shall first be effective within three years after the date a Change of Control occurs nor shall any such amendment or modification first effective within three years after the date a Change of Control occurs serve to reduce benefits payable under the Plan below the level in effect on the day immediately preceding the date the Change of Control occurred.

**7.4**    A claim or request for a Plan benefit may be submitted in writing to the Company. If a claim is denied, in whole or in part, the claimant shall be notified in writing of the reasons for the denial within ninety (90) days after the claim is filed. Such notice shall refer to the pertinent Plan provisions on which the denial is based; describe and explain the need for any additional material or information necessary to perfect the claim; and call attention to or explain the Plan's claim review procedure. If an extension of time is required for processing the claim, a written notice of extension for not more than an additional ninety (90) days shall be furnished to the claimant before the end of the initial ninety (90) day period. The extension notice shall state the special circumstances requiring an extension of time and the date by which the final decision is expected.

**7.5**    A claimant, or his representative, may appeal the denial of a benefit under this Plan by submitting a written request for review to the Company within sixty (60) days after the notice of denial has been received by the claimant. In the course of such a review, the claimant, or his representative, may review pertinent documents and may submit issues and comments in writing to the Company.

**7.6**    The Company shall notify the claimant of its decision within sixty (60) days after the Company's receipt of the request for the review. The decision shall be in writing and shall include specific reasons for the decision and specific references to the provisions of the Plan on which the decision is based. The Company may extend the time for a decision to one hundred twenty (120) days if special circumstances arise in the reviewing process. In such cases written notice of the extension shall be furnished to the claimant prior to the commencement of the extension.

**7.7**    If any person entitled to payments under the Plan is, in the judgment of the Company, legally, physically or mentally incapable of personally receiving and receipting for any payment due under the Plan, payment thereon may be made to such other person or institution who, in the opinion of the Company, is then maintaining or has custody of such payee, until claim is made by a duly appointed guardian or the legal representative of such payee. Such payments shall constitute a full discharge of the liability of the Company under the Plan to the extent thereof.

11/15/02

**7.8**    All parties to this Plan and all persons claiming any interest whatsoever hereunder agree to perform any and all acts and execute any and all documents and papers which may be necessary or desirable for the carrying out of this Plan or any of its provisions.

**7.9**    Neither the establishment of this Plan, nor any modification thereof, nor the creation of any fund or account, nor the payment of any benefits, shall be construed as giving to any Participant or other person any legal or equitable right against the Company or any officer or employee thereof.  Under no circumstances shall the terms of employment of any Participant be modified or in any way affected thereby.

**7.10**    Whenever any words are used herein in the masculine gender, they shall be construed as though they were also used in the feminine gender in all cases where they would so apply, and whenever any words are used here in the singular form they shall be construed as though they were used in the plural form in all cases where they would so apply.

**7.11**    This document shall be construed, regulated and administered under the laws of the Commonwealth of Massachusetts, except where superseded by the provisions of ERISA.

11/15/02

## 12. Severance Pay Plan

*Please note that JH Funds, Independence Investment LLC, Hancock Natural Resource Group, First Signature Bank & Trust, and Essex Corporation associates are not eligible for the John Hancock Financial Services, Inc. Severance Pay Plan.*

| Plan | Carrier | Most Recent Printed Material / Date Distributed* | Current Online Information / More Information |
|---|---|---|---|
| Severance Pay Plan | John Hancock Financial Services, Inc. | *Your Benefits Book* (January 1999) | Benefits & HR Services 1-800-990-4404 <br><br> Hancock Hub |

*To request another copy of the most recent printed material, call Benefits & HR Services at 1-800-990-4404.

In the event that the company finds it necessary to end your employment, and you are eligible for severance benefits, the Severance Pay Plan is intended to help you financially while you find other employment. There is no cost to associates for the Severance Pay Plan.

Effective October 19, 1999, the plan has been amended so that if you first become entitled to benefits under the Severance Pay Plan within three years after the date a Change of Control (as defined by the plan) occurs, you will receive:

- an additional benefit of 8 weeks of salary, which may be in addition to the maximum benefit, and

- a lump sum payment, in an amount determined by the company but not to exceed $2,500, to be used for employability expenses

Employability expenses include services related to your termination of employment, or your seeking and preparing for new employment or a new career, such as additional outplacement services, career development testing and/or coaching, education, financial counseling, fees associated with starting your own business (including legal fees), child and/or elder care expenses, etc. as defined by the plan.

Effective November 18, 2002, two provisions of the Severance Pay Plan were changed as follows:

- In the event of the sale or outsourcing of a business unit, if an employee of the business unit is offered a comparable job by, or accepts a non-comparable job with, the purchaser or successor company, severance will not be paid (comparable will be defined as similar salary, competitive benefit offerings, and a work location within 50 miles of the current work location).

- If the purchaser or successor company subsequently terminates the employee within six months of the sale or outsourcing (and hire) date, severance will not be paid under the John Hancock plan.

If you have questions on the Severance Pay Plan, you may contact Benefits & HR Services at 1-800-990-4404.

John Hancock Place
Post Office Box 111
Boston, Massachusetts 02117
(617) 572-5516
Fax: (617) 572-6100
E-mail: jdicicco@jhancock.com

Joan M. DiCicco
Human Resource Officer

May 30, 2003

Memorandum to: Prospective Beacon Capital Partners Management, LLC Employees

Re: Eligibility for John Hancock Severance

As you know, we have been waiting to review Beacon Capital Partners Management, LLC's Employee Benefit Package. Under the John Hancock Severance Plan, employees are not eligible for the severance benefit if they have been offered a position by a successor company that is deemed to be a "comparable job". There are three components looked at when determining if a job offer is comparable. They are similar salary, competitive benefits and work location within 50 miles of your current work location. Upon review of these components, both separately and in the aggregate, it has been determined that all the job offers extended by Beacon Capital Partners, LLC are comparable job offers and therefore recipients of a job offer from Beacon are not eligible for JHF severance benefits. Should you have questions on this issue, please contact me at 25516.

Joan M. DiCicco

John Hancock Financial Services, Inc.

Human Resources

John Hancock Place
ѕʋᵃPost Office Box 111
Boston, Massachusetts 02117
(617) 572-6744
Fax: (617) 572-6799
Cgrant@jhancock.com

*John Hancock.*
FINANCIAL SERVICES

**Carlton Grant**
Benefit Analyst

December 16, 2004

Corcoran, Fitzgerald, & Hennessy, LLC
Counsellors At Law
500 Granite Avenue
Milton, MA 02186

**Re:    ERISA Appeal – Severance Benefits**

Dear Mr. Robbins:

I am writing to advise you on the outcome of the Company Benefit Plan Appeals Committee meeting regarding your clients' severance appeals. Their claim for benefits arises under the John Hancock Financial Services, Inc. Severance Pay Plan established by John Hancock pursuant to the Employee Retirement Income Security Act of 1974 (ERISA).

The Committee has thoroughly reviewed all the facts and circumstances regarding your clients' severance appeals. In addition, John Hancock performed a competitive assessment analysis based on industry data, which considered the competitiveness of selected benefits versus industry/normative data and assessed Beacon's employee benefits package with respect to John Hancock's Severance Pay Plan 'Comparable Job' provision. Based on this review and the competitive assessment analysis, the Committee has voted unanimously to uphold the denial.

All affected associates were invited to benefit meetings, some of which were held by John Hancock and some by Beacon Capital Partners Management, LLC. Furthermore, they were also given the opportunity to meet individually with Human Resources professionals to discuss their concerns regarding severance benefit. The follow sessions mentioned above were made available to the associates to assist them in making the decision that was appropriate for their individual situation. While it is difficult to turn down individual situations, we must apply the rules of the plan in a non-discriminatory manner.

Sincerely,

. Carlton Grant