UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DANIEL JOYCE,
Individually and on behalf of a class of others
similarly situated,

        Plaintiff,

    v.

JOHN HANCOCK FINANCIAL SERVICES,
INC. SEVERANCE PAY PLAN and JOHN
HANCOCK FINANCIAL SERVICES, INC., as
Administrator and Fiduciary of the John Hancock
Financial Services, Inc. Severance Pay Plan,

        Defendants.

Civil Action No. 05–11428–WGY

**<u>MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

Anthony M. Feeherry (BBO #160860)
Daniel P. Condon (BBO #547676)
Erin N. Jackson (BBO #647375)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
617.570.1000

*Attorneys for John Hancock Financial
Services, Inc. Severance Pay Plan and John
Hancock Financial Services, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

I.   STATEMENT OF UNDISPUTED FACTS .................................................................. 2

ARGUMENT ....................................................................................................................... 2

I.   SUMMARY JUDGMENT STANDARD .................................................................... 2

II.  JOYCE'S OWN COMPLAINT COMPELS THE CONCLUSION THAT HE IS
     INELIGIBLE FOR SEVERANCE BENEFITS UNDER THE PLAN. .............................. 2

III. HANCOCK'S INTERPRETATION AND APPLICATION OF THE PLAN, AND
     RESULTANT DENIAL OF JOYCE'S CLAIM FOR SEVERANCE BENEFITS,
     WERE NOT ARBITRARY OR CAPRICIOUS ............................................................. 3

     A.   The Deferential Arbitrary and Capricious Standard of Review Applies to
          Hancock's Interpretation and Application of the Plan. .................................. 4

     B.   Hancock's Interpretation of the Terms of the Plan was Reasonable and
          Rational. .................................................................................................... 5

     C.   Hancock's Application of the Terms of the Plan to Joyce's Job Offer from
          Beacon, and Its Conclusion That the Job Offered Was Comparable, Were
          Reasonable. ................................................................................................. 8

          1.   Joyce Received a Job Offer from a Successor Company. .............................. 8

          2.   Joyce Was Offered a "Comparable Position" with Beacon. ........................ 11

IV.  COUNT VI FAILS TO STATE A CAUSE OF ACTION. ............................................ 15

V.   COUNTS II THROUGH VIII ARE DISGUISED BENEFIT CLAIMS. .......................... 16

VI.  COUNT V DOES NOT STATE A CAUSE OF ACTION UNDER 29 U.S.C. §
     1132(2) AND IS MOOT, IN ANY EVENT.

VII. JOYCE'S CLAIMS FOR UNJUST ENRICHMENT (COUNT III) AND
     PROMISSORY ESTOPPEL (COUNT VII) ARE STATE-LAW CAUSES OF ACTION
     PREEMPTED BY ERISA. .............................................................................. 18

CONCLUSION .............................................................................................................. 20

i

## TABLE OF AUTHORITIES

**Federal Cases**                                                                                   **Page**

*Aetna Health Inc. v. Davila,*
    542 U.S. 200 (2004)........................................................................................................19

*Anderson v. Liberty Lobby,*
    477 U.S. 242 (1986)..........................................................................................................2

*Bachelder v. Commc'ns Satellite Corp.,*
    837 F.2d 519 (1st Cir. 1988)............................................................................................7

*Balestracci v. NSTAR Elec. & Gas Corp.,*
    449 F.3d 224 (1st Cir. 2006)........................................................................................5, 6

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)..........................................................................................................2

*Curtiss-Wright Corp. v. Schoonejongen,*
    514 U.S. 73 (1995)............................................................................................................5

*Edes v. Verizon Communications, Inc.,*
    417 F.3d 133 (1st Cir. 2005)............................................................................................3

*Firestone Tire & Rubber Co. v. Bruch,*
    489 U.S. 101 (1989)......................................................................................................4, 8

*Forsythe v. Sun Life Fin., Inc.,*
    112 F. Supp. 2d 100 (D. Mass. 2006)............................................................................19

*Fox v. PNC Fin. Servs. Group, Inc.,*
    37 EBC (BNA) 2316 (E.D. Pa. 2006)...........................................................................16

*Hampers v. W.R. Grace Co., Inc.,*
    202 F.3d 44 (1st Cir. 2000)............................................................................................19

*Intergen N.V. v. Grina,*
    344 F.3d 134 (1st Cir. 2003)..........................................................................................19

*Ivy v. Raytheon Employees Disability Trust,*
    307 F. Supp. 2d 301 (D. Mass. 2004)..............................................................................4

LIBA/1687993.3

**Page**

*LaRocca v. Borden, Inc.,*
   276 F.3d 22 (1st Cir. 2002) ................................................................................18

*Leahy v. Raytheon,*
   315 F.3d 11 (1st Cir. 2002) ..................................................................................5

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Inc.,*
   463 U.S. 29 (1983) ................................................................................................5

*N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,*
   514 U.S. 645 (1995) ............................................................................................19

*Skretvedt v. E.I. DuPont de Nemours & Co.,*
   268 F.3d 167 (3d Cir. 2001) .................................................................................8

*Shiffler v. Equitable Life Assurance Soc'y of the U.S.,*
   838 F.2d 78 (3d Cir. 1988) ...................................................................................5

*Sullivan v. Raytheon Co.,*
   262 F.3d 41 (1st Cir. 2001) ..................................................................................4

*Terry v. Bayer Corp,*
   145 F.3d 28 (1st Cir. 1998) ..................................................................................5

*Turner v. Fallon Cmty. Health Plan,*
   127 F.3d 196 (1st Cir. 1997) ..............................................................................19

*Varity Corp. v. Howe,*
   516 U.S. 489 (1996) ............................................................................................17

*Watson v. Deaconess Waltham Hospital,*
   298 F.3d 102 (1st Cir. 2002) ..............................................................................17

**Federal Statutes**

29 U.S.C. § 502(a)(1)(B) .........................................................................................3

29 U.S.C. §§ 1001–1462 ......................................................................................2, 16

29 U.S.C. § 1144(a) ...............................................................................................18

29 U.S.C. § 1144(c) ...............................................................................................19

29 U.S.C. § 1022 ...........................................................................................6, 15, 16

LIBA/1687993.3

**Page**

29 U.S.C. § 1132(a)(1)(B) ..........................................................................................2, 16, 17

29 U.S.C. § 1132(a)(3)...................................................................................................2, 17

29 U.S.C. § 1133(2) ...........................................................................................................18

29 C.F.R. § 2520.102-2...........................................................................................6, 15, 16

29 C.F.R. § 2560.503-1(h)(2)(iii) .....................................................................................18

**Federal Rules**

Fed. R. Civ. P. 10(c) ............................................................................................................2

Fed. R. Civ. P. 56 ................................................................................................................2

**Other Authorities**

10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure,*
     § 2727 (3d ed. 1998) ....................................................................................................2

Reporting and Disclosure Under ERISA, Preamble,
     40 Fed. Reg. (Dep't of Labor Aug. 15, 1975)................................................................7

LIBA/1687993.3

**INTRODUCTION**

On May 5, 2003, Plaintiff Daniel Joyce was offered a job by Beacon Capital Partners Management, LLC ("Beacon") as a Project Manager in the John Hancock Tower Complex (the "Tower Complex"). (Defs.' Statement of Undisputed Facts in Supp. of Defs.' Mot. for Summ. J. ("Facts") ¶ 35.) Beacon offered Joyce this job after one of its affiliates purchased the Tower Complex from John Hancock Financial Services, Inc. ("Hancock") and Beacon became responsible for operating and managing the Tower Complex facilities. (*Id.* ¶¶ 32, 33, 35.) The position of Project Manager was the same job, located in the same complex of buildings—but with a higher salary—that Joyce had held for the prior three years while working for Hancock when it owned, operated, and managed the Tower Complex. (*Id.* ¶¶ 7, 35, 69.)

Despite never missing a day of pay in transitioning from employment by Hancock to a virtually identical job with Beacon with better pay and substantial, competitive benefits (*id.* ¶¶ 7, 35, 47, 75, 85), Joyce believes he is entitled to severance payments from Hancock under the John Hancock Financial Services, Inc. Severance Pay Plan (the "Plan") and has filed this action to recover such benefits (Am. Compl. ¶ 1). Pursuant to Section 3.2 of the Plan, however, a Hancock employee is not eligible for severance benefits if he

> (c) is *offered a comparable position*, as determined by the Company, as an employee with, or provides services in any capacity to, a Successor Company, or (d) *accepts any position* as an employee with, or provides services in any capacity to, a Successor Company.

(John Hancock Financial Services, Inc. Severance Pay Plan, Am. Compl., Ex. A, §§ 3.2(c) & (d) (emphases added); Facts ¶ 10.) A "Successor Company" is defined by the Plan as "an entity unaffiliated with the Company which performs the services previously performed by an employee's or a Participant's former work unit." (Am. Compl., art. II, at 4; Facts ¶ 11.) Under either Section 3.2(c) or (d) of the Plan, Joyce is not eligible for severance benefits.

1

In addition, while Joyce has cobbled together various purported causes of action beyond his lead claim to recover benefits under the Plan pursuant to 29 U.S.C. § 1132(a)(1)(B), these claims are nothing more than disguised claims for severance benefits, some of which are state-law causes of action that are clearly preempted by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461.  Consequently, summary judgment should be granted to Defendants.

## BACKGROUND

### I.     STATEMENT OF UNDISPUTED FACTS

Please see Defendants' Statement of Undisputed Facts in Support of Defendants' Motion for Summary Judgment, which was filed on July 7, 2006.

## ARGUMENT

### I.     SUMMARY JUDGMENT STANDARD

Please see Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325–26 (1986); 10A Wright, Miller & Kane, *Federal Practice & Procedure*, § 2727 at 455–57, 471–72, 486–88 (3d ed. 1998); *Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986).

### II.    JOYCE'S OWN COMPLAINT COMPELS THE CONCLUSION THAT HE IS INELIGIBLE FOR SEVERANCE BENEFITS UNDER THE PLAN.

In Counts I, II, and IV of the Amended Complaint, Joyce brings suit under 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3) to recover severance benefits that he alleges are due to him under the Plan.  Pursuant to the express terms of the Plan—which is attached to, and therefore part of, the Amended Complaint, Fed. R. Civ. P. 10(c)—however, an employee is *not* eligible for severance benefits if he "*accepts any position* as an employee with, or provides services in any capacity to, a Successor Company."  (Am. Compl., Ex. A, § 3.2(d) (emphasis added); Facts ¶ 10.)  A Successor Company is defined by the Plan as "an entity unaffiliated with the Company which

performs the services previously performed by an employee's or a Participant's former work unit." (Am. Compl., Ex. A, art. II, at 4; Facts ¶ 11.) It is undisputed that Beacon is the Successor Company to Hancock in managing and operating the Tower Complex, a fact that Joyce has conceded. (*Id.* ¶ 34.) It is also undisputed that on June 13, 2003, Joyce accepted a position as a Project Manager with Beacon. (*Id.* ¶ 41.)

In *Edes v. Verizon Communications, Inc.*, 417 F.3d 133 (1st Cir. 2005), the First Circuit was similarly confronted with plaintiffs who were ineligible for benefits under the allegations of the plaintiffs' own complaint and the plan documents, which were incorporated into the complaint. The First Circuit observed, "Plaintiff's own complaint alleges, and the plan documents submitted by Defendants confirm, that GTE's ERISA plans explicitly exclude from participation employees who were not 'paid directly' by GTE . . . . Plaintiffs further allege that they were not 'paid directly' by GTE, but by third-party payroll agencies." *Id.* 137–38. The Court then reached the only conclusion supported by the allegations in the complaint and the terms of the plan document: "Because they 'can prove no set of facts to support [their] claim' for benefits under the ERISA plans, the district court properly dismissed Plaintiffs' claim under ERISA § 502(a)(1)(B)." *Id.* at 138 (internal citation omitted). Like the plaintiffs in *Edes*, Joyce is ineligible under the express terms of the Plan to participate in the Plan because he accepted a job with Hancock's Successor Company Beacon. (*See* Am. Compl., Ex. A, § 3.2(d).)

Accordingly, Joyce cannot maintain an action to recover benefits, and his claims under Counts I, II, and IV should be dismissed with prejudice.

## III.    HANCOCK'S INTERPRETATION AND APPLICATION OF THE PLAN, AND RESULTANT DENIAL OF JOYCE'S CLAIM FOR SEVERANCE BENEFITS, WERE NOT ARBITRARY OR CAPRICIOUS.

In Count I, Joyce accuses Defendants of arbitrarily and capriciously interpreting and applying the Plan to deny him severance benefits. (Am. Compl. ¶¶ 87-96.) Similarly, in Count

3

IV, Joyce seeks an order enjoining Defendants from interpreting the Plan so as to deny him

benefits. (*Id.* ¶ 125.) Joyce's accusations in Counts I and IV are baseless.

### A. The Deferential Arbitrary and Capricious Standard of Review Applies to Hancock's Interpretation and Application of the Plan.

Where an employee benefit plan grants the administrator "discretionary authority to

determine eligibility for benefits or to construe the terms of the plan," *Firestone Tire & Rubber*

*Co. v. Bruch*, 489 U.S. 101, 115 (1989), the determination to deny benefits "is reviewed under a

more deferential 'arbitrary, capricious, or an abuse of discretion' standard." *Ivy v. Raytheon*

*Employees Disability Trust*, 307 F. Supp. 2d 301, 305 (D. Mass. 2004) (Young, C.J.); *Firestone*

*Tire*, 489 U.S. at 115. Under the arbitrary and capricious standard, "[the administrator's]

decision will be upheld if it was within [the administrator's] authority, reasoned, and 'supported

by substantial evidence in the record.'" *Sullivan v. Raytheon Co.*, 262 F.3d 41, 50 (1st Cir.

2001).

In the instant case, the arbitrary and capricious standard applies because the Plan vests

full discretionary authority for all aspects of Plan interpretation and application with Hancock,

the Plan sponsor and administrator. (Am. Compl., Ex. A, § 7.1). The Plan states,

> The Company shall have the sole and exclusive right to interpret the provisions of the Plan and to determine all questions arising in connection with the administration, interpretation and application of the Plan. With respect to issues not addressed in provisions of the Plan, or where such provisions are ambiguous, including questions of eligibility for benefits, the Company or its designee shall have discretionary authority to make the determination. Any determination made pursuant to this section by the Company or its designee shall be final, conclusive and binding on all persons affected thereby.

*Id.*

The First Circuit has clarified the Court's role when applying the arbitrary and capricious

standard on summary judgment as follows:

> This respectful [arbitrary and capricious] standard requires deference to the findings of the plan administrator, and, thus, even under Fed. R. Civ. P. 56, does not permit a district court independently to weigh the proof. Rather, the district court must ask whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits.

4

*Leahy v. Raytheon*, 315 F.3d 11, 18 (1st Cir. 2002); *Ivy*, 307 F. Supp. 2d at 306. In sum "'[a]

court is not to substitute its judgment for that of the [decision-maker].'" *Terry v. Bayer Corp.*,

145 F.3d 28, 40 (1st Cir. 1998) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.

Co.*, 463 U.S. 29, 43 (1983)). On judicial review then, Joyce may recover only if he can show

that the denial of benefits was either a "clear error" or was "irrational." *Shiffler v. Equitable Life

Assurance Soc'y of the U.S.*, 838 F.2d 78, 83 (3d Cir. 1988).

### B. Hancock's Interpretation of the Terms of the Plan was Reasonable and Rational.

Under the Plan, a Hancock employee may be eligible for severance benefits if his

employment is involuntarily terminated by Hancock. (Facts ¶¶ 3, 5.) In November 2002,

Hancock amended the Plan[1] by revising Section 3.2 to state that "[e]mployment is not terminated

for the purposes of this Plan if an employee . . . (c) is offered a comparable position, as

determined by the Company, as an employee with or provides services in any capacity to a

Successor Company, or (d) accepts any position as an employee with, or provides services in any

capacity to, a Successor company." (Am. Compl., Ex. A, §§ 3.2(c) & (d) (emphasis added);

Facts ¶ 10.) "Successor Company" is defined as "an entity unaffiliated with the Company which

performs the services previously performed by an employee's or a Participant's former work unit

with the Company." (Am. Compl., Ex. A, art. II at 4.)

Hancock then undertook to provide a Summary Plan Description[2] ("SPD") of the Plan

Amendment. (Facts ¶ 16.) Hancock explained the term "Successor Company" by providing

---

[1]    As the Plan sponsor, Hancock has the right, as a matter of law, to amend or modify the Plan in any way
whatsoever at any time and to terminate it completely. *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73,
78 (1995) ("Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to
adopt, modify or terminate welfare plans."); *Balestracci v. NSTAR Elec. & Gas Corp.*, 449 F.3d 224, 230 (1st
Cir. 2006) (same). Moreover, the Plan contains a clear reservation to Hancock of the "right to amend or
modify the Plan in any way whatsoever and to terminate it completely." (Am. Compl., Ex. A, § 7.3; Facts ¶ 9.)

some examples of when the Plan Amendment would apply, such as "[i]n the event of the sale or outsourcing of a business unit." (*Id.*) Hancock also further explained the meaning of the term "comparable position" in the Plan Amendment by employing the more colloquial phrase of "comparable job" and listing sensible, concrete components of the meaning of that term that employees could understand. (*Id.* ¶¶ 17 –18.)

The components behind the terms "comparable job" and "comparable position" were determined by a working group of Hancock's dedicated and highly experienced human resource ("HR") professionals.[3] (*Id.* ¶¶ 19, 20, 21.) Hancock described these terms in the SPD as a job that (1) pays a "similar salary"; (2) has "competitive benefit offerings"; and (3) has "a work location within 50 miles of the current work location." (*2002 Benefits Supplement to Your Summary Plan Description*, hereinafter Exhibit 2, at 13; Facts ¶ 22.)[4] The Summary Plan Description of the Plan Amendment read as follows:

> In the event of the sale or outsourcing of a business unit, if an employee of the business unit is offered a comparable job by, or accepts a non-comparable job with, the purchaser or successor company, severance will not be paid (comparable will be defined as similar salary, competitive benefit offerings, and a work location within 50 miles of the current work location).

(Ex. 2 at 13; Facts ¶ 23.) Hancock nevertheless cautioned its employees not to rely solely on the Summary Plan Description, as it is not the legally controlling document for the Plan. (*Id.* ¶ 25); *Balestracci v. NSTAR Elec. & Gas Corp.*, 449 F.3d 224, 233 (1st Cir. 2006). For this reason,

---

[2]    A summary plan description is a document that is required by ERISA and subject to extensive ERISA regulations. *See* 29 U.S.C. § 1022 and 29 C.F.R. § 2520.102-2.

[3]    Both Mr. Mongeau and Ms. DiCicco, the only individuals from this group who were deposed, have extensive backgrounds in the human resources field. Mr. Mongeau, who currently serves as Vice President of Hancock's HR Shared Services, has spent the last fifteen years as a human resource professional at Hancock focusing on employee benefits. (Facts ¶ 20.) Moreover, he worked on communications and marketing for Hancock's Group Benefit Department at the beginning of his career. (*Id.*) Similarly, Ms. DiCicco, who serves as Assistant Vice President in Hancock's Human Resource Department, has worked for thirty-one years in that department. (*Id.*)

[4]    The documents supporting the citations herein to exhibits, deposition transcript excerpts, and interrogatory answers may be found in the Appendix in Support of Defendants' Motion for Summary Judgment.

Hancock provided the following admonition to employees on the second page of the *2002 Benefits Supplement to Your Summary Plan Description*, which was the document in which the description of the Plan Amendment appeared:

> This summary does not attempt to cover all details. Full details of the Plan[] are available in [the] formal written plan document[] that legally govern[s] the operation of the plan[]. If this summary differs in any way from the terms of the plan document[], the plan document[] shall control.

(Ex. 2 at JH 001098; Facts ¶ 26.)

Hancock's next step in interpreting the terms of the Plan Amendment was to define further the term "competitive benefit offerings" that was used in the SPD. (*Id.* ¶ 27.) Through its working group of HR professionals, *see supra* note 3, Hancock interpreted "competitive benefit offerings" to mean benefits that are competitive within the industry of the Successor Company from which a given employee receives a job offer. (*Id.*) This interpretation was consistent with the purpose of the Plan, which is to bridge an employee who is involuntarily terminated to future employment within his industry. (*Id.* ¶ 5); *Bachelder v. Commc'ns Satellite Corp.*, 837 F.2d 519, 522 (1st Cir. 1988) ("A plan must be interpreted in light of its apparent purposes, its structure and its history."); Reporting and Disclosure Under ERISA, Preamble, 40 Fed. Reg. 34,526, 34,527 (Dep't of Labor Aug. 15, 1975) (noting that benefits under severance plans provide former employees with "temporary 'cushion' against loss of income from employment").

The HR working group then identified 401(k) plan benefits, pension benefits, medical benefits, dental benefits, and vacation benefits for inclusion in the analysis of the benefit offerings of a Successor Company to determine whether the Successor Company has competitive benefit offerings. (Facts ¶ 28.) These categories of benefits were selected because, based on the knowledge and experience of the HR professionals in the working group, these are the benefits

7

that employees care about the most and that have the greatest monetary value to employees.  (*Id.* ¶ 29.)

Not only were Hancock's actions reasonable and rational in interpreting the Plan in the manner described above, but Hancock acted entirely within its authority under the terms of the Plan.  (*See* Am. Compl., Ex. A, § 7.1; Facts ¶ 13; *see generally* Section III.A. above; *see also Firestone Tire*, 489 U.S. at 111 (administrator's interpretation of plan "will not be disturbed if reasonable"); *Skretvedt v. E.I. DuPont de Nemours & Co.*, 268 F.3d 167, 177 (3d Cir. 2001) (holding administrator's interpretation of ambiguous provision entitled to deference unless contrary to plan's plain language).

### C. Hancock's Application of the Terms of the Plan to Joyce's Job Offer from Beacon, and Its Conclusion That the Job Offered Was Comparable, Were Reasonable.

When Beacon issued job offers to Joyce and the other Hancock employees who had expertise in managing and operating the Tower Complex, Hancock undertook to determine whether these employees were entitled to severance benefits.  (Facts ¶ 48.)  This entailed a determination of whether the job offers that the employees had received were for comparable positions within the meaning of the Plan Amendment, as an employee who "is offered a comparable position, as determined by the Company, as an employee with, or provides services in any capacity to, a Successor Company" is not eligible to receive severance benefits under the Plan (Am. Compl., Ex. A, § 3.2(c); Facts ¶ 48).

#### 1. *Joyce Received a Job Offer from a Successor Company.*

Applying the Plan's terms, Hancock first considered whether Beacon was a Successor Company.  (Facts ¶ 49.)  The Plan defines Successor Company as "an entity unaffiliated with the Company which performs the services previously performed by an employee's or a Participant's former work unit with the Company."  (Am. Compl., Ex. A, art. II at 4; Facts ¶ 11.)  The term

8

"work unit" is defined within Hancock as "a group of people who perform similar services." (*Id.* ¶ 12.) The term "work unit" is also used interchangeably with the phrase "business unit" that was substituted for "work unit" in the SPD.[5] (*Id.*)

Beacon had no relationship or affiliation with Hancock as a corporate entity. (*Id.* ¶ 50.) In addition, as the new owner and landlord of the Tower Complex, Beacon would be performing all of the building operations and management services that previously were performed by Joyce's Hancock work unit. (*Id.* ¶ 51.) In fact, Joyce has testified that after making the transition to Beacon, he continued working in the Tower Complex performing much of the same property management work that he did at Hancock. (*Id.* ¶ 54.) Joyce's work unit at Hancock consisted of a group of employees who worked together and applied their trades and expertise in the Tower Complex to perform the similar service of managing and operating the Tower Complex, as opposed to Hancock's several other properties. (*Id.* ¶ 52.) For example, within Joyce's work unit, "[a]n electrician or an HVAC technician would be performing functions of a similar nature or to a similar end. Their overarching work would be around the maintenance of the building." (DiCicco Dep. Tr. at 49:1–49:4; Facts ¶ 52.)

Joyce's work unit resided within the Real Estate Operations Department ("REOD") at Hancock, which was an umbrella department within which were organized various groups that performed a spectrum of building services for Hancock at its many properties, including building maintenance, construction, operations, office space planning and design, security, safety, and

---

[5]    As Ms. DiCicco explained, the definition of business unit is based on "knowledge . . . and understanding of how work units operate and are structured." (DiCicco Dep. Tr. at 49:14–49:17.) A "[w]ork group is people who are performing services. . . . A work group and a business unit are terms . . . [that] . . . essentially mean the same thing." (*Id.* at 139:23–140:4.) Similarly, Mr. Mongeau explained that a business unit is "a phrase to describe a group of employees who provide services" (Mongeau Dep. Tr. at 35:16–35:21) and work together (*id.* at 36:7–36:11, 36:22–36:23, 37:9–37:15).

9

purchasing. (*Id.* ¶ 55.) Given the breadth of the REOD, Hancock logically regarded Joyce's

work unit as the considerably smaller group of employees described above. (*Id.* ¶ 52.) Indeed,

these were the trades people with expertise in running the Tower Complex and with whom Joyce

regularly worked. (*Id.*; *see, e.g.*, Transcript of Deposition of Daniel P. Joyce of 6/2/06 ("Joyce

Dep. Tr.") at 39:4–40:11, 53:24–55:13 (discussing Joyce's expertise in the infrastructure of the

Tower Complex).) Joyce himself has described the group as the "multi-shop trade" group,

comprising approximately twenty-five to twenty-seven employees from different trades who

worked for Hancock in the Tower Complex and were supervised by Joyce

in his role as a Project Manager.[6] (Facts ¶ 53.)

In light of the fact that Beacon satisfied each of the criteria under the definition of

"Successor Company," Hancock concluded that Beacon was a Successor Company within the

meaning of the Plan. (*Id.* ¶ 58.) As Ms. DiCicco testified, Hancock "referred to the language in

the Plan document that talks about a work unit that provides services to a Successor Company

and that's in effect what happened. These folks supplied [property management] services to

John Hancock when John Hancock was the landlord. When the buildings were purchased by

Beacon, those same services were provided by those employees who accepted comparable jobs

with Beacon." (DiCicco Dep. Tr. at 138:20–139:4; Facts ¶ 54.) Moreover, these property

management services were required to be provided by Beacon as the new landlord of the Tower

Complex to Hancock as a tenant. (*Id.* ¶ 57.)

---

[6]    Joyce purports to represent "a class of all persons similarly situated" that he defines as, among other things, "employees/contractors of the Real Estate Operations Department in Boston, Massachusetts." (Am. Compl. ¶ 76.) However, Joyce's own description of the small group of individuals with whom he worked reveals that he is not qualified to act as the representative for such a broadly defined class. Joyce admits that he did not work with several of the groups of employees from the Real Estate Operations Department, such as security employees, that he claims to represent. (Joyce Dep. Tr. at 95:23–97:11.) Thus, Joyce's alleged class, if one exists at all, can be no larger than the twenty-five to twenty-seven employees that he testified he worked with on a regular basis.

10

In sum, Hancock reasonably and rationally applied the terms of Section 3.2(c) to consider whether the job offers that Hancock employees had received from Beacon should be deemed offers from a Successor Company, as defined by the Plan in Article II. Furthermore, to the extent that Joyce argues that the terms of the Plan differ from the SPD, Hancock openly cautioned employees that "if [the] summary differs in any way from the terms of the plan document[], the terms of the plan document[] shall control." (Ex. 2 at JH 001098; Facts ¶¶ 25–26.) Thus, where the specific examples of a sale or an outsourcing of a business unit appear in the SPD but do not appear in the Plan, Hancock's ability to apply Sections 3.2(c) and (d) is not prohibited if such events do not occur, as long as the terms of the Plan document itself are satisfied. (Id. ¶ 16.) And in the case of Beacon's job offer to Joyce, Hancock indeed determined, after applying the terms of the Plan, that Joyce had received a job offer from a Successor Company.[7] (Id. ¶ 58.)

### 2. Joyce Was Offered a "Comparable Position" with Beacon.

The Summary Plan Description, which provides a further explanation for employees of the term "comparable position" in the Plan Amendment, defines a comparable job as a job that (1) pays a "similar salary"; (2) has "competitive benefit offerings"; and (3) has "a work location within 50 miles of the current work location." (Ex. 2 at 13; Facts ¶ 22.) Thus, after determining that Beacon was a Successor Company, Hancock evaluated Beacon's offers of employment to

---

[7]    Even if the language of the SPD were controlling, contrary to Joyce's claims, an outsourcing of Joyce's business unit to Beacon as Hancock's Successor Company indeed occurred. Outsourcing of a business unit occurs "when the services performed by a work unit [are] transferred to a Successor Company." (Facts ¶ 59.) That is, "outsourcing refers to work being transferred to an entity unaffiliated with John Hancock and performing the same services or functions that were performed prior to that transfer." (Id.) As a result, the Hancock employees transferred "would provide services to John Hancock as employees of another company." (Id.) Prior to Hancock's sale of the Tower Complex, Joyce's business unit provided building operations and management services for the Tower Complex. (See id. ¶¶ 2, 51.) Likewise, when Beacon became the new owner and landlord of the Tower Complex, Beacon assumed overall responsibility for the building services that Hancock had previously performed and ultimately hired employees in Joyce's work unit to perform these functions. (Id. ¶ 64.) Clearly, this "constituted an outsourcing." (Id. ¶ 65.)

11

Hancock employees within Joyce's work unit based on these three enumerated components to determine whether the offers were for comparable jobs. (*Id.* ¶¶ 66, 67.)

With respect to the first component, Hancock found that the jobs offered by Beacon to Joyce and others in his work unit paid similar salaries to the salaries paid by Hancock. (*Id.* ¶ 68.) In fact, the average Beacon salary for employees in Joyce's work unit was two percent higher than that paid by Hancock. (*Id.*) Joyce in particular was offered $75,100 by Beacon, an increase from his salary of $74,358 as a Senior Project Manager at Hancock. (*Id.* ¶ 69.)

In its effort to assess the second component—whether Beacon had "competitive benefit offerings"—Hancock conducted a competitive assessment analysis in which it properly relied upon objective data sources to gather normative data about the range of competitive benefits offered to employees by general industry employers. (*Competitive Assessment of Beacon Capital Partners Management, LLC Benefits Package with respect to John Hancock's Severance Pay Plan "Comparable Job" Eligibility Provision*, hereinafter Exhibit 11, at 1; Facts ¶ 70.) Consistent with the terms and provisions of the Plan, Hancock did not and was not required to make any direct comparison between its benefits package and that of Beacon. (Am. Compl., Ex. A, § 7.1 ("The Company shall have the sole and exclusive right to interpret the provisions of the Plan and to determine all questions arising in connection with the administration, interpretation and application of the Plan."); Facts ¶ 13.) Using this competitive assessment analysis, Hancock determined that Beacon's benefits package was competitive among general industry employers. (Ex. 11 at 2; Facts ¶ 75.)

On the third component of the "comparable job" analysis, since all of the jobs offered by Beacon to Hancock's employees, including Joyce, were located in the very same complex of buildings in which those employees were currently working for Hancock, the jobs that Beacon

12

was offering were well within fifty miles of the Hancock employees' current work location. (*Id.* ¶ 89.)

Because all Hancock employees who received a job offer from Beacon were being offered higher salaries than they were earning at Hancock, the same benefits package, and the same work location, Hancock was able to assess the three components of the "comparable job" definition as it applied to the entire group of employees who had received job offers from Beacon. (*Id.* ¶ 90.)

As explained above in Section III.B., the benefit categories selected for inclusion in Hancock's competitive assessment analysis were 401(k) plan benefits, pension benefits, medical benefits, dental benefits, and vacation benefits. (*Id.* ¶ 28.) The competitive assessment analysis of Beacon's benefits package was a composite assessment, made up of weighted scores assigned to each of the selected benefit categories that Beacon offered and added together to calculate the total competitive assessment score for Beacon's benefits package. (Ex. 11; Facts ¶ 77.) This method of assessment was based upon Hewitt Associates LLC's[8] Benefit Index Base Company "Total Value" Distribution ("Hewitt Benefit Index"), a trusted and reliable benefits analysis tool in the human resources field. (*Id.*) Using this methodology, a score from zero, representing no benefit, to three, representing an above average benefit, was assigned to a selected benefits category based upon how that benefit offering compared to available normative data concerning that type of benefit among general industry employers. (Ex. 11; Facts ¶ 77.) Each of the selected benefits categories was also assigned a weighting percentage, with the sum total of the percentages equaling one hundred percent. (Ex. 11; Facts ¶ 77.) The score assigned to each

---

[8] Hewitt Associates LLC is "the world's largest provider of multi-service HR business process outsourcing." Hewitt Associates LLC, http://www.hewittassociates.com/Intl/NA/en-US/AboutHewitt/WhoWeAre/ (last visited June 23, 2006). The firm specializes in "helping organizations maximize their HR investment and solve important HR issues." *Id.*

category of benefits was a percentage of the composite competitive assessment score: 401(k)

plan benefits counted for 20 percent; pension benefits for 15 percent; medical benefits for 30

percent; dental benefits for 5 percent; and vacation benefits for 30 percent—all adding up to a

total of 100 percent. (Ex. 11; Facts ¶ 77.)

The Hewitt Benefit Index was applied to Beacon's benefits data and the general industry

data from three HR studies, which are denoted on Exhibit 11 as Mercer/Foster Higgins 2002,

Hewitt U.S. Salaried 2002, and the Massachusetts Small Business Association.[9] (*Id.* ¶ 78.) As

illustrated in Exhibit 11, where Beacon's 401(k) plan would match employee contributions by up

to 4 percent, which was higher than the general industry average of 3 percent, a competitive

score of three, representing "above average" was assigned to that benefit and counted for 20

percent of the overall Competitive Assessment Score under the Hewitt Benefit Index. (Ex. 11;

Facts ¶ 79.) Since Beacon did not offer a pension plan as part of its benefits package, the

pension benefits category was assigned a competitive score of zero that counted for 15 percent of

the composite competitive assessment score for Beacon's benefits package. (Ex. 11; Facts ¶ 80.)

With regard to medical benefits, Beacon's plan was better than that of other employers in terms

of the amount of co-payments, deductibles, co-insurance, out-of-pocket maximums, and

prescription co-payments. (Ex. 11; Facts ¶ 81.) This meant that Beacon's medical benefits were

above average, and this benefit received a competitive score of three that counted for 30 percent

of the composite competitive assessment score. (Ex. 11; Facts ¶ 81.) Because the deductible for

dental benefits was the norm for the industry but the annual maximum benefit was larger, dental

benefits were deemed average to above average, and given a score of two, meaning average, that

---

[9] To the extent that it was available through Hewitt Associates, Hancock relied on data from property management employers in that such data was included among the general industry data. (Facts ¶ 86.) While Hancock initially set out to gather information solely on the benefit offerings of employers in the property

counted for 5 percent. (Ex. 11; Facts ¶ 83.)  Finally, where Beacon's vacation benefits were

fixed, rather than being based on years of service, they were deemed below average and received

a corresponding score of one that counted for 30 percent. (Ex. 11; Facts ¶ 84.)  The overall

resulting Competitive Assessment Score for Beacon's benefit offerings was 1.9. (Ex. 11; Facts ¶

85.)  Given that an average score was 2.0, Hancock, consistent with simple rounding principles,

reasonably and rationally viewed Beacon's score as average and, therefore, competitive within

the industry. (*Id.*; Ex. 11.)

        In sum, Hancock's thoughtful evaluation revealed that Beacon's job offers included

competitive benefit offerings (Ex. 11) and were indeed for comparable jobs, as defined by the

Plan Amendment and the Summary Plan Description (Am. Compl., Ex. C; Facts ¶ 91).[10]

Accordingly, Counts I, IV, and VI should be dismissed with prejudice.

## IV.    COUNT VI FAILS TO STATE A CAUSE OF ACTION.

        Count VI alleges that Defendants failed to write the Plan and the Plan Amendment in a

manner that was understandable to Joyce, as an average plan participant, in violation of 29

U.S.C. § 1022 and 29 C.F.R. § 2520.102-2. (Am. Compl. ¶ 135.)  However, these authorities

address the requirement that the plan sponsor write the *Summary Plan Description*—an entirely

different document from the Plan or the Plan Amendment—"in a manner calculated to be

---

management industry, Hewitt simply did not have adequate data on such companies. (*Id.* ¶ 87.)  In order to
consistently apply the Hewitt evaluation tool, Hancock was required to broaden its focus. (*Id.*)

[10]    In late 2004, long after the determination that Hancock employees with job offers from Beacon were not
eligible to receive severance benefits under the Plan, Joyce and other former Hancock employees requested
review by Hancock's Company Benefit Plan Appeal Committee (the "Appeal Committee") of the initial denial
of benefits. (Facts ¶ 95.)  As discussed in the Facts, the Appeal Committee conducted a thorough review of
Hancock's initial decision to deny severance benefits to Joyce and other employees. (*Id.* ¶¶ 97, 98, 99, 100.)
By the time the Appeal Committee had completed its consideration of the appeal, they had conducted three
separate meetings, undertaken in-depth review of pertinent documents, questioned the initial decision-makers,
and conducted outside legal research. (*Id.* ¶ 101.)  The Appeal Committee completed its work by writing a
letter to the appellants that set forth the reasons for the denial, as well as the Plan provision upon which the
Appeal Committee had based its decision. (Am. Compl., Ex. D; Facts ¶ 102.)  These painstaking efforts were
part of Hancock's process of interpreting and applying the Plan in a reasonable and rational manner.

15

understood by the average plan participant." 29 U.S.C. § 1022. Thus, Joyce fails to state a claim

under 29 U.S.C. § 1022 and 29 C.F.R. § 2520.102-2. Even if Joyce had identified the SPD as the

document at issue, Hancock's description of the Plan Amendment in the SPD was proper.

While Joyce attempts to fault Defendants for not including in the SPD every possible

example of when the Plan Amendment would apply, Defendants are not legally obligated to

describe exhaustively every circumstance that could arise under the Plan.  Rather, 29 U.S.C. §

1022 requires that the Summary Plan Description  be "*sufficiently* accurate and comprehensive to

*reasonably* apprise . . . participants . . . of their rights and obligations under the plan." 29 U.S.C.

§ 1022 (emphases added); 29 C.F.R. § 2520.102-2 (similar); *Fox v. PNC Fin. Servs. Group, Inc.*,

37 EBC (BNA) 2316, 2320 (E.D. Pa. 2006) ("Nothing in ERISA requires an SPD to address

every possible employment scenario.").  If the Summary Plan Description were required to be as

exhaustive as the Plan itself, it would defeat the SPD's *summary* purpose.

Finally, claiming that Joyce is not educated or intelligent enough to have understood the

Plan, Plan Amendment, or SPD is utterly disingenuous given his substantial education and

intelligence, as evidenced by his conduct and accomplishments. (*See* Facts ¶¶ 8, 45, 93.)

## V.    COUNTS II THROUGH VIII ARE DISGUISED BENEFIT CLAIMS.

In each of Counts II through VIII of Joyce's Complaint, Joyce either alleges no particular

harm at all or, using some phraseology or other, recites Hancock's denial of severance benefits

as the harm that he has suffered. (*See generally* Am. Compl. ¶¶ 87–145.)  Indeed, in the first

paragraph of his Amended Complaint, Joyce makes clear his singular goal: "Plaintiff seeks to

recover . . . potentially millions of dollars in severance benefits . . . ." (*Id.* ¶ 1.)  Joyce also

asserts from the outset that "[t]his case, inter alia, is a claim for severance benefits under the

Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001, et seq. . . . ,

and specifically, 29 U.S.C. § 1132(a)(1)(B)." (*Id.*)  The monothematic nature of Joyce's case is,

16

therefore, not surprising. As a matter of law, however, a claim for severance benefits under the terms Plan may only be brought pursuant to 29 U.S.C. § 1132(a)(1)(B). Thus, where each of Joyce's Counts II through VIII at their core are based on a theory and a claim for benefits that is indistinguishable from that which underlie his claim for benefits in Count I, the Court should dismiss Counts II through VIII as improperly pleaded claims for benefits alleged to be due under the Plan.

Even Joyce's claims that Defendants breached their fiduciary duty under the Plan are nothing more than disguised claims for benefits. First, Joyce asserts a claim for breach of fiduciary duty under 29 U.S.C. § 1132(a)(1)(B), the provision under which a plaintiff may seek to recover severance benefits, in which he alleges no specific harm at all. (Am. Compl. ¶¶ 104–108.) Fiduciary duty claims on behalf of individual severance plan participants, however, may only be brought under 29 U.S.C. § 1132(a)(3). Thus, Joyce's breach of fiduciary duty claim under 29 U.S.C. § 1132(a)(1)(B) fails as a matter of law. Second, while Joyce asserts a second claim for breach of fiduciary duty under the proper ERISA provision, 29 U.S.C. § 1132(a)(3), he again fails to specify any harm that he has suffered. The only discernible harm that Joyce references in his Amended Complaint is being "wrongfully denied" severance benefits under the Plan. (Am. Compl. ¶ 1.) As a matter of black-letter ERISA law, however, the alleged denial of benefits under the terms of a severance plan cannot be the basis for an action under 29 U.S.C. § 1132(a)(3).

The breach of fiduciary duty claim available to individual plan participants under Section 1132(a)(3) is limited to cases in which the plaintiff does not claim to be entitled to benefits *under the plan*. *See Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996); *Watson v. Deaconess Waltham Hospital*, 298 F.3d 102, 110 (1st Cir. 2002). The First Circuit has stated this clearly: "when the

plaintiff can bring a claim for benefits under Section [1132]a(1), equitable relief would not be appropriate and she *does not have a cause of action* under Section [1132]a(3)." *LaRocca v. Borden, Inc.*, 276 F.3d 22, 29 (1st Cir. 2002) (emphasis added) (internal quotation marks and citations omitted).

For the reasons stated above, Counts II through VIII should be dismissed with prejudice.

## VI.   COUNT V DOES NOT STATE A CAUSE OF ACTION UNDER 29 U.S.C. § 1133(2) AND IS MOOT, IN ANY EVENT.[11]

In Count V of the Amended Complaint, Joyce alleges that he was denied the right "to review the pertinent documents, records and other information generated or referenced in support of Defendants' decision to deny Plan benefits." (Am. Compl. ¶ 129.) Yet, Joyce does not identify any specific documents to which he has been denied access. Moreover, Joyce has not identified any request for documents, such as a letter, that was submitted to Hancock *during the appeal*, which concluded on December 16, 2004 (Am. Compl., Ex. D), as required by 29 C.F.R. § 2560.503-1(h)(2)(iii). In any event, however, Joyce's claim under Count V is moot, since Defendants have produced to Joyce all documents, records, and information that are relevant to Hancock's denial of severance benefits to Joyce, that are within Defendants custody or control, and that are not subject to the attorney-client privilege.

Accordingly, Count V should be dismissed with prejudice.

## VII.  JOYCE'S CLAIMS FOR UNJUST ENRICHMENT (COUNT III) AND PROMISSORY ESTOPPEL (COUNT VII) ARE STATE-LAW CAUSES OF ACTION PREEMPTED BY ERISA.

ERISA preempts "any and all State laws" that "relate to any employee benefit plan" subject to ERISA, *id.* §1144(a), such as the Plan at issue in this case. The State laws preempted by ERISA broadly include "all laws, decisions, rules, regulations, or other State action having

18

the effect of law, of any State." *Id.* §1144(c)(1). Any state law, including common law, that has "connection with or a reference to" an employee benefit plan is preempted by ERISA. *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995). Accordingly, the First Circuit has held that ERISA preempts all state-law claims—such as Joyce's claims for unjust enrichment (Count III) and promissory estoppel (Count VII)[12]—that directly or even indirectly affect an ERISA plan. *See, e.g.*, *Hampers v. W.R. Grace Co., Inc.*, 202 F.3d 44, 51–54 (1st Cir. 2000); *Turner v. Fallon Cmty. Health Plan*, 127 F.3d 196, 199–200 (1st Cir. 1997).

Joyce's unjust enrichment and promissory estoppel claims allege that Hancock made purported "promises" of severance benefits in the Plan document and the SPD and then refused to provide them. (Am. Compl. ¶¶ 115–116, 137–138.) As relief, Joyce seeks Plan benefits. (*Id.* ¶¶ 118, 141–142). Thus, Joyce again seeks to challenge the decision to deny him severance benefits under the Plan, which requires the Court to evaluate Hancock's interpretation, application, and administration of the Plan. "[A] cause of action 'relates to' an ERISA plan when a court must evaluate or interpret the terms of the ERISA-regulated plan to determine liability under the state law cause of action." *Hampers*, 202 F.3d at 52. In addition, "[t]hat the very same conduct . . . underlies both [Joyce's] state law . . . claim[s] and his ERISA-benefits claim suggests that the state law claim[s are] an alternative mechanism for obtaining ERISA plan benefits," *id.* at 52, and are preempted, *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004).

---

[11]    Joyce cites 29 U.S.C. § 1133(a)(2) as the basis for his claim in Count V. No such provision exists, however. Defendants, therefore, have assumed that Joyce intended to cite 29 U.S.C. § 1133(2).

[12]    *Intergen N.V. v. Grina*, 344 F.3d 134, 140 (1st Cir. 2003) (referring to promissory estoppel as a Massachusetts state-law cause of action); *Forsythe v. Sun Life Fin., Inc.*, 112 F. Supp. 2d 100, 113 (D. Mass. 2006) (referring to unjust enrichment as a Massachusetts state-law cause of action).

Joyce's state-law claims for unjust enrichment and promissory estoppel clearly "relate to" Hancock's ERISA Plan and are barred by ERISA's broad preemption provision.

## CONCLUSION

For all of the reasons set forth above, Defendants request that the Court enter summary judgment in their favor on all Counts of Joyce's Amended Complaint.

Respectfully submitted,

JOHN HANCOCK FINANCIAL
SERVICES, INC. SEVERANCE PAY
PLAN and JOHN HANCOCK FINANCIAL
SERVICES, INC.,

By their attorneys,

/s/ Erin N. Jackson
Anthony M. Feeherry (BBO #160860)
Daniel P. Condon (BBO #547676)
Erin N. Jackson (BBO #647375)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
Dated: July 7, 2006                    617.570.1000

## CERTIFICATE OF SERVICE

I, Erin N. Jackson, hereby certify that on July 7, 2006 this MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT was filed through the ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on this date.

Dated: July 7, 2006                    /s/ Erin N. Jackson
                                       Erin N. Jackson

LIBA/1687993.3