UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DANIEL JOYCE,
Individually and on behalf of a class of others
similarly situated,

        Plaintiff,

    v.

JOHN HANCOCK FINANCIAL SERVICES, INC.
SEVERANCE PAY PLAN and JOHN HANCOCK
FINANCIAL SERVICES, INC., as Administrator
and Fiduciary of the John Hancock Financial
Services, Inc. Severance Pay Plan,

        Defendants

Civil Action No. 05–11428–WGY

## DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, Defendants John Hancock Financial Services, Inc. Severance Pay Plan (the "Plan") and John Hancock Financial Services, Inc. ("Hancock") (collectively "Defendants") hereby submit this Statement of Undisputed Facts in Support of Defendants' Motion for Summary Judgment. The documents supporting the citations herein to exhibits, deposition transcript excerpts, and interrogatory answers may be found in the Appendix in Support of Defendants' Motion for Summary Judgment.

## I.    The Parties

1.    Hancock is a Delaware corporation with a principal place of business in Boston, Massachusetts. (Defendants' Answer to Plaintiff's First Amended Complaint ("Answer") ¶ 9.)

2.    Until March 2003, Hancock owned and operated the John Hancock Tower Complex, which includes three buildings located at 200 Clarendon Street, 197 Clarendon Street,

1

and 200 Berkeley Street in Boston, Massachusetts (the "Tower Complex"). (*Id.* ¶¶ 14, 22, & 30.)

    3.      The Plan is an employee welfare benefit plan that is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§1001–1461. (Plaintiff's First Amended Complaint and Demand for Jury Trial ("Am. Compl.") ¶ 8; Answer ¶ 8.) The Plan provides severance benefits to employees who meet the eligibility criteria set forth in the Plan. (John Hancock Financial Services, Inc. Severance Pay Plan, Am. Compl., Ex. A, art. I & art. III.)

    4.      Hancock is the Plan sponsor, Plan administrator, and named fiduciary of the Plan. (*Id.*, art. I & § 7.1; Answer ¶ 9.)

    5.      The purpose of the Plan is to bridge an employee who is involuntarily terminated by Hancock to future employment within his industry. (Transcript of Deposition of Peter J. Mongeau of 5/22/06 ("Mongeau Dep. Tr.") at 75:18–76:3, 76:7–76:9 ("Given my experience and years in human resources, it was understood that a severance pay plan was provided to bridge an employee."), 76:22–76:23 ("The purpose of the Plan is to bridge the employees to new employment."); Transcript of Deposition of Joan M. DiCicco of 5/24/06 ("DiCicco Dep. Tr.") at 31:10–31:16 ("[T]he purpose of the Severance Plan is to bridge employees to employment."), 32:15–33:3; E-mail from JH Communication to Hancock employees of 11/21/02, hereinafter Exhibit 1 (identifying the "primary purpose" of the Plan as being to "'bridge' employees to future employment").

    6.      Daniel Joyce was an employee of Hancock from March 1994 to July 2003. (Answer ¶ 7; Pl.'s Objs. & Answers to Defs.' First Set of Interrogs. Answer Nos. ("Pl.'s Interrog. Answer Nos.") 10 & 13.)

2

7.      From 2000 to 2003, Joyce worked within Hancock's Real Estate Operations Department as a Project Manager and Senior Project Manager in the Tower Complex. (Transcript of Deposition of Daniel P. Joyce of 6/2/06 ("Joyce Dep. Tr.") at 19:10-19:14.)

8.      Joyce holds a Bachelor of Science degree in Business Administration and an Associate of Science degree in HVAC technology; has been certified in facility management and licensed in construction supervision; is a candidate to be a real property administrator; and has attended numerous seminars on water conservation, water plants, water treatment, energy conservation, and facilities management. (Pl.'s Interrog. Answer No. 9; Joyce Dep. Tr. at 7:1–11:10.) In his new position as Project Manager with Liberty Mutual, Joyce has secured a base salary of $94,000 with the opportunity to receive an additional bonus. (*Id.* at 41:9–41:18, 42:17–42:19)

## II.    The Plan Amendment and the Summary Plan Description of the Plan Amendment

9.      The Plan contains a clear reservation to Hancock of the "right to amend or modify the Plan in any way whatsoever and to terminate it completely." (Am. Compl., Ex. A, § 7.3.)

10.     Effective November 18, 2002, Hancock amended Sections 3.2(c) and (d) of the Plan to state that a Hancock employee is not eligible for severance benefits if he:

> (c) is offered a comparable position, as determined by the Company, as an employee with, or provides services in any capacity to, a Successor Company, or (d) accepts any position as an employee with, or provides services in any capacity to, a Successor Company.

(*Id.* §§ 3.2(c) & (d); Answer ¶ 19.)

11.     A "Successor Company" is defined by the Plan as "an entity unaffiliated with the Company which performs the services previously performed by an employee's or a Participant's former work unit." (Am. Compl., Ex. A, art. II at 4.)

3

12.     The term "work unit" is defined within Hancock as "a group of people who perform similar services." (DiCicco Dep. Tr. at 141:24–142:2.) The term "work unit" is used interchangeably with the phrase "business unit." (*Id.* at 49:14–49:17, 139:23–140:4; Mongeau Dep. Tr. at 35:16–35:21, 36:7–36:11, 36:22–36:23, 37:9–37:15.)

13.     Under the terms of the Plan,

> The Company shall have the sole and exclusive right to interpret the provisions of the Plan and to determine all questions arising in connection with the administration, interpretation and application of the Plan. With respect to issues not addressed in provisions of the Plan, or where such provisions are ambiguous, including questions of eligibility for benefits, the Company or its designee shall have discretionary authority to make the determination. Any determination made pursuant to this section by the Company or its designee shall be final, conclusive and binding on all persons affected thereby.

(Am. Compl., Ex. A, § 7.1.)

14.     Hancock provided to employees a Summary Plan Description ("SPD") of the Plan Amendment that further explained to Hancock employees the meaning of the term "comparable position" as used in the Plan Amendment. (*2002 Benefits Supplement to Your Summary Plan Description*, hereinafter Exhibit 2, at 13; Am. Compl. ¶ 19; Answer ¶ 19.)

15.     Hancock was conscious of its obligation to write a Summary Plan Description of the Plan Amendment "in a manner calculated to be understood by the average plan participant," 29 U.S.C. § 1022; 29 C.F.R. § 2520.102-2. (DiCicco Dep. Tr. at 74:4–74:11.)

16.     In the SPD, Hancock explained the term "Successor Company" by providing some examples of when the Plan Amendment would apply, such as "[i]n the event of the sale or outsourcing of a business unit." (Ex. 2 at 13; Mongeau Dep. Tr. at 50:19–50:22, 60:15–60:18; 61:24–62:8; 89:12–89:15.) In providing these examples, however, Hancock was not prohibited by the terms of the Plan from applying Sections 3.2(c) and (d) of the Plan if a sale or outsourcing of a business unit did not occur. (Transcript of Deposition of Brian J. Bisciotti of 5/9/06 ("Bisciotti Dep. Tr.") at 44:10–44:14, 46:19–47:9.)

4

17.    In the SPD, Hancock also further explained the meaning of the term "comparable position" in the Plan Amendment by employing the more colloquial phrase of "comparable job" instead of "comparable position." (Ex. 2 at 13.)

18.    In the SPD, Hancock listed the components of the meaning of the terms "comparable position" and "comparable job." (*Id.*)

19.    The components behind the terms "comparable position" and "comparable job" were determined by a working group of Hancock's human resource ("HR") professionals, including Peter Mongeau, then-Second Vice President of Human Resource Services for Hancock; Joan DiCicco and Lisa Blake, both Human Resources Officers for Hancock at the time; and Sandra Colley, then-Director of Workforce Diversity. (Mongeau Dep. Tr. at 81:7–81:21, 136:4–136:6; DiCicco Dep. Tr. at 89:13–90:7.)

20.    Mr. Mongeau has an extensive background in the human resources field. Currently serving as Vice President of Hancock's HR Shared Services, Mr. Mongeau has spent the last fifteen years as an HR professional at Hancock focusing on employee benefits. (Mongeau Dep. Tr. at 5:9, 5:24–6:6.) Mr. Mongeau also worked on communications and marketing for Hancock's Group Benefit Department at the beginning of his career. (*Id.*)

21.    Ms. DiCicco also has a deep background in the human resources field. She has worked for thirty-one years in Hancock's Human Resources Department and currently serves as Assistant Vice President of that department. (DiCicco Dep. Tr. at 13:22–14:15.)

22.    Utilizing the work of Mr. Mongeau, Ms. DiCicco, Ms. Blake, and Ms. Colley, Hancock described the term "comparable job" in the SPD as a job that (1) pays a "similar salary"; (2) has "competitive benefit offerings"; and (3) has "a work location within 50 miles of the current work location." (Ex. 2 at 13.)

5

23.    The Summary Plan Description of the Plan Amendment read as follows:

> In the event of the sale or outsourcing of a business unit, if an employee of the business unit is offered a comparable job by, or accepts a non-comparable job with, the purchaser or successor company, severance will not be paid (comparable will be defined as similar salary, competitive benefit offerings, and a work location within 50 miles of the current work location).

(*Id.*)

24.    This language explaining the Plan Amendment also appeared in a company-wide e-mail communication to employees on November 21, 2002, just three days after the Plan Amendment became effective. (Ex. 1.)

25.    In the *2002 Benefits Supplement to Your Summary Plan Description* in which the Summary Plan Description of the Plan Amendment was published, Hancock also cautioned its employees not to rely solely on the Summary Plan Description, as it is not the legally controlling document for the Plan. (Ex. 2 at JH 001098.)

26.    On the second page of the *2002 Benefits Supplement to Your Summary Plan Description*, Hancock provided the following admonition to employees:

> This summary does not attempt to cover all details. Full details of the Plan[] are available in [the] formal written plan document[] that legally govern[s] the operation of the plan[]. If this summary differs in any way from the terms of the plan document[], the plan document[] shall control.

(*Id.*)

27.    Through its working group of HR professionals, Hancock interpreted the term "competitive benefit offerings" that was used in the SPD to mean benefits that are competitive within the industry of the Successor Company from which a given employee receives a job offer. (Draft of Comparable Job Definition, hereinafter Exhibit 3, at 2; Mongeau Dep. Tr. at 126:15–126:18, 127:20–127:22; DiCicco Dep. Tr. at 91:7–92:3, 116:7–116:17.)

28.    The HR working group identified which benefits would be included in an analysis of the benefit offerings of a Successor Company to determine whether the Successor Company has competitive benefit offerings. The benefit categories selected for inclusion were 401(k) plan

6

benefits, pension benefits, medical benefits, dental benefits, and vacation benefits. (John

Hancock Financial Services, Inc.'s Objs. & Answers to Pl.'s First Set of Interrogs. to Def. John

Hancock Financial Services, Inc., Answer to Interrog. No. ("Hancock's Interrog. Answer No.")

4; Ex. 3 at 2; DiCicco Dep. Tr. at 120:3–120:11.)

29.    These categories of benefits were selected because, based on the knowledge and

experience of the HR professionals in the working group, these are the benefits that employees

care about the most and that have the greatest monetary value to employees. (Hancock's

Interrog. Answer No. 4; Mongeau Dep. Tr. at 118:8–118:11, 118:16–118:18, 155:23–156:5;

DiCicco Dep. Tr. at 110:11–110:17.)

### III.    Sale of the Tower Complex

30.    On November 26, 2002, Hancock announced that it intended to sell the Tower

Complex. (Answer ¶ 22.)

31.    On November 26 and 27, 2002, Hancock informed its employees that it expected

that positions would be eliminated as a result of the sale. In two separate announcements,

Hancock stated,

> We expect the company's trades people (i.e. electricians, mechanics and service technicians) and security
> personnel will be most affected by the sale of the property. Ultimately, it will be up to the new owner to
> determine how the buildings will be staffed. Given the unique operational aspects of the Tower, it is our
> hope that many of our associates affected by the sale will be hired by the new owner and continue to
> perform essentially the same functions. In other cases, positions will be eliminated and those employees
> will be provided with a severance package under the terms of the company's severance plan. The exact
> number of employees that may be impacted by this sale has not yet been determined.

(*John Hancock Complex Questions and Answers, November 26, 2002*, hereinafter Exhibit 4, at 6;

*Questions on Tower Complex Sale Answered in Q&A*, 11/27/02, hereinafter Exhibit 5, at 3.)

32.    In March 2003, Hancock sold the Tower Complex to Beacon Capital Partners,

LLC. (Answer ¶ 30.)

7

33.    Following the March 2003 sale of the Tower Complex, Beacon Capital Partners

Management, LLC ("Beacon"), a wholly owned subsidiary of Beacon Capital Partners, LLC,

became responsible for operating and managing the Tower Complex facilities.  (Hancock's

Interrog. Answer No. 1; Transcript of Deposition of William A. Bonn of 5/16/06 ("Bonn Dep.

Tr.") at 12:7–13:2, 13:3–13:7, 46:7–46:13, 64:24–66:15 .)

34.    Beacon is the Successor Company to Hancock in managing and operating the

Tower Complex.  (Class Action Complaint and Demand for Jury Trial ("Compl.") ¶ 1 (referring

to "Hancock's successor company, Beacon Capital Partners Management, LLC") & ¶ 54 ("On or

around May 5, 2003, Joyce received an offer of employment from *the successor company,*

*Beacon.*" (emphasis added)); *see also* Am. Compl. ¶¶ 116–117 (specifically identifying

Beacon's offer of employment to Joyce in discussion regarding the competitive benefit offerings

of "the successor employer") and ¶¶ 65, 71, 138, & 140 (paragraphs together alleging that Joyce

had not been offered a comparable job by the "successor company," where the job offer at issue

was from Beacon); DiCicco Dep. Tr. at 68:9–68:10, 131:13–131:17, 134:7–134:11, 135:10–

135:16, 138:20–139:10.)

## IV.    Beacon's Offer of Employment to Joyce

35.    On May 5, 2003, Joyce was offered a full-time position as a Project Manager with

Beacon upon transfer of management responsibilities for the Tower Complex from Hancock to

Beacon, which was expected to occur in July of 2003.  (Letter from John Durnan, Vice President

of Beacon Capital Partners Management, LLC, to Daniel P. Joyce of 5/5/03, hereinafter Exhibit

6; Am. Compl. ¶ 65; Answer ¶ 65; Pl.'s Interrog. Answer No. 12.)

36.    In the May 5, 2003 offer letter from Beacon to Joyce, Beacon offered Joyce a

salary of $75,100, a bonus opportunity of up to 10 percent of his base salary, and a

8

comprehensive employee benefits program in which Beacon "intend[ed] to include medical and

dental insurance, life insurance, short-term and long-term disability insurance, and a 401(k)

plan." (Ex. 6.) Beacon promised to provide shortly "[a]dditional information regarding the

specific benefits available from Beacon" (*id.*), as Beacon was still in the process of determining

the details of the benefit offerings for its newly formed company (Bonn Dep. Tr. at 39:21–

41:13).

      37.     While this initial letter requested a response by May 16, 2003 (Ex. 6), Beacon

extended the deadline for a reply to the offer until June 13, 2003, because its benefits package

was not finalized until late May 2003 (Letter from Paul M. Crowley, Senior Vice President of

Beacon Capital Partners Management, LLC, to Daniel Joyce of 5/30/03, hereinafter Exhibit 7, at

1; Bonn Dep. Tr. at 88:11–90:5).

      38.     Other Hancock employees who had expertise in managing and operating the

Tower Complex also received job offers from Beacon. (Hancock's Interrog. Answer No. 1.)

      39.     On May 30, 2003, Joyce received a letter from Beacon that notified him that

Beacon had "finalized its benefit package for Employees" and that "the components of the

BCPM Benefits Program have been posted on a website for your viewing convenience." (Ex. 7

at 1.) The letter further stated that "Beacon is committed to making sure that you have sufficient

time to evaluate the Benefits Package" and, accordingly, extended the deadline to accept

Beacon's offer to June 13, 2003. (*Id.* at 1; Joyce Dep. Tr. at 73:5–73:8; Bonn Dep. Tr. at 88:11–

90:5.)

      40.     Joyce reviewed the information provided by Beacon concerning its benefits

package at the beginning of June and knew what benefits he would receive as a Beacon

9

employee by the time that he accepted Beacon's employment offer.  (Joyce Dep. Tr. at 73:9–74:8.)

41.    On June 13, 2003, Joyce accepted Beacon's employment offer for the position of Project Manager in the Tower Complex. (Ex. 6; Joyce Dep. Tr. at 32:10–32:16, 34:4–34:10, 45:6–45:8, 59:22–59:24, 88:6–88:7; Am. Compl. ¶ 72; Answer ¶ 72.)

42.    Although Joyce could have looked for a job other than the position that he accepted with Beacon, Joyce chose not to do so.  (Pl.'s Interrog. Answer No. 11; Joyce Dep. Tr. at 42:20–43:9, 60:1–60:3, 89:3–89:7.)  Indeed, Joyce made no effort to look for a job at any point in the six months preceding the deadline to accept Beacon's job offer.  (Pl.'s Interrog. Answer No. 11; Joyce Dep. Tr. at 42:20–43:9, 60:1–60:3, 89:3–89:7.)

43.    Joyce had a choice to accept Beacon's job offer or not to accept it.  (*Id.* at 89:8–89:13.)

44.    Joyce could have found employment other than the position that he was offered and accepted with Beacon.  (*Id.* at 89:14–89:16.)

45.    On June 17, 2003, Joyce sent a letter to his soon-to-be Beacon supervisor arguing for an increase in salary and a more prestigious title before even starting in his new position at Beacon.  (Letter from Daniel Joyce to John Durnan, Vice President of Beacon Capital Partners Management, LLC, of 6/17/03, hereinafter Exhibit 8.)

46.    Joyce officially became an employee of Beacon on July 14, 2003.  (Pl.'s Interrog. Answer No. 13; Joyce Dep. Tr. at 32:13–32:16.)

47.    Joyce did not miss a day of pay in the transition from employment by Hancock to employment by Beacon.  (*Id.* at 89:22–90:11.)

**V.**    **Hancock's Application of the Terms of the Plan to Joyce's Job Offer from Beacon**

48.    When Beacon issued job offers to Joyce and the other Hancock employees who had expertise in managing and operating the Tower Complex, Hancock undertook to determine whether these employees were entitled to severance benefits.  (*See* Hancock's Interrog. Answer Nos. 2 & 6; Am. Compl., Ex. C.)

49.    Hancock considered whether the job offers that the employees had received were for comparable positions within the meaning of the Plan Amendment, as an employee who "is offered a comparable position, as determined by the Company, as an employee with, or provides services in any capacity to, a Successor Company" is not eligible to receive severance benefits under the Plan.  (Am. Compl., Ex. A, § 3.2(c); Mongeau Dep. Tr. at 62:10–62:13, 63:11–63:13 (explaining that the focus of the Plan was on whether an employee had been offered a comparable position with a Successor Company); DiCicco Dep. Tr. at 50:24–51:1, 51:13–51:14 (stating that Hancock's responsibility under the Plan was to "determine if a work unit's functions would be performed by a Successor Company"); *see generally id.* at 82:6–82:10, 83:14–83:19; Am. Compl., Ex. C).

**A.**    **The Determination that Joyce Received a Job Offer from a Successor Company**

50.    Consistent with the definition of a "Successor Company," Beacon had no relationship or affiliation with Hancock as a corporate entity.  (*See* Bonn Dep. Tr. at 13:3–13:7.)

51.    As the new owner and landlord of the Tower Complex, Beacon would be performing all of the building operations and management services that previously were performed by Joyce's Hancock work unit.  (*Id.* at 64:24–66:15.)

52.    Joyce's work unit at Hancock consisted of a group of employees who worked together and applied their trades and expertise in the Tower Complex to perform the similar

11

service of managing and operating the Tower Complex, as opposed to Hancock's several other properties. (DiCicco Dep. Tr. at 49:1–49:4; *see, e.g.*, Joyce Dep. Tr. at 39:4–40:11, 53:24–55:13 (discussing Joyce's expertise in the infrastructure of the Tower Complex; Hancock's Interrog. Answer No. 1).

53.     Joyce characterizes this group as the "multi-shop trade" group, comprising approximately twenty-five to twenty-seven employees from different trades who worked for Hancock in the Tower Complex and were supervised by Joyce in his role as a Project Manager. (Joyce Dep. Tr. at 60:21–61:16; *see also* Mongeau Dep. Tr. at 37:16–38:4 (identifying Joyce's business unit as a trades group that Joyce oversaw that was made up of the maintenance team, support group, "electricians, plumbers, people who worked in the building").)

54.     After making the transition to Beacon, Joyce continued working in the Tower Complex performing much of the same property management work that he did at Hancock. (Joyce Dep. Tr. at 34:8–35:22, 48:1–48:17.)

55.     Joyce's work unit resided within the Real Estate Operations Department at Hancock, which was an umbrella department within which various groups that performed a spectrum of building services for Hancock at its many properties—including building maintenance, construction, operations, office space planning and design, security, safety, and purchasing—were organized. (Answer ¶ 15; *see, e.g.*, DiCicco Dep. Tr. at 98:17–99:2 (stating that the building and trade group is within the Real Estate Operations Department).)

56.     In sum, Hancock determined that Beacon would be performing the building services previously performed by Joyce's work unit at Hancock. (*Id.* at 134:24–135:9 ("The services performed by the folks who supported th[e] three buildings [in the Tower Complex] were . . . outsourced to Beacon. . . . It was the business unit that provided property management

12

to the three buildings. . . . It was a subset of the real estate operations department. A group of employees.").)

57.    Moreover, these property management services were required to be provided by Beacon as the new landlord of the Tower Complex to Hancock as a tenant. (*Id.* at 139:5–139:10.)

58.    In light of the fact that Beacon satisfied each of the criteria under the definition of "Successor Company," Hancock concluded that Beacon was a Successor Company within the meaning of the Plan. Hancock "referred to the language in the plan document that talks about a work unit that provides services to a successor company and that's in effect what happened. These folks supplied [property management] services to John Hancock when John Hancock was the landlord. When the buildings were purchased by Beacon, those same services were provided by those employees who accepted comparable jobs with Beacon." (*Id.* at 138:20–139:4.)

### B.    The Outsourcing of Joyce's Business Unit

59.    A business unit is outsourced "when the services performed by a work unit [are] transferred to a Successor Company." (DiCicco Dep. Tr. at 55:10–55:14.) "Outsourcing refers to work being transferred to an entity unaffiliated with John Hancock and performing the same services or functions that were performed prior to that transfer." (*Id.* at 55:19–55:23; Mongeau Dep. Tr. at 40:19–41:3.) As a result, the Hancock employees transferred "would provide services to John Hancock as employees of another company." (*Id.* at 41:11–41:12.)

60.    When Hancock sold the Tower Complex, the majority of the functions that Joyce's work unit fulfilled were no longer Hancock's responsibility, because the new owner and landlord was in charge of maintaining and operating the Tower Complex buildings. (Hancock's Interrog. Answer No. 1; *see also* Bonn Dep. Tr. at 64:24–66:15.)

61.    Anticipating this change prior to the sale of the Tower Complex, Hancock explicitly stated in its Term Sheet for the Purchase and Sale Agreement for the Tower Complex that Hancock employed "several employees in its real estate operations and security area who may be available for employment by a prospective Purchaser"; that "[b]ids should include the potential interest of a prospective Purchaser to hire these employees, including the anticipated number of employees and the area of specialty"; and that "[b]ids [would] be evaluated in part on the nature and extent of interest in hiring some or all of these employees." (*John Hancock Tower Complex in Boston Term Sheet for Purchase and Sale Agreement*, hereinafter Exhibit 9, at 94.) The implication of these statements was that "Hancock would look favorably upon a bid if someone hired the employees." (Bonn Dep. Tr. at 60:7–60:19.)

62.    Beacon explicitly informed Hancock that Beacon's "desire would be to bring over the property management team currently in place to the extent those employees are not retained by Hancock." (E-mail from Jeff Brown of Beacon to Hugh MacDonnell of Morgan Stanley of 2/19/03, hereinafter Exhibit 10.)

63.    Beacon sought to take on Hancock's employees who were employed to run building operations for the Tower Complex. (Bonn Dep. Tr. at 35:12–36:8 (stating that Beacon inquired as to whether any Hancock employees "who were involved in the management of the Tower Complex" would be available to hire and noting that such people "would no longer be needed by John Hancock after we took over the management of the Tower Complex because that's what those people did" at Hancock), 62:18–63:22.)

64.    When Beacon became the new owner and landlord of the Tower Complex, Beacon assumed overall responsibility for the building services that Hancock had previously performed (*id.* at 64:24–66:15) and ultimately made job offers to and hired employees in Joyce's

14

work unit to perform these functions (*id.* at 63:23–64:10, 92:16–92:18 (stating that "[t]he people

that we hired from Hancock we hired in order to manage the complex")).

66. 65. Hancock understood this to have "constituted an outsourcing." (DiCicco Dep. Tr.

at 135:10–135:16; *see also* Mongeau Dep. Tr. at 46:8–46:12, 47:12–47:17, 48:24–49:16, 50:13–

51:7 (stating that Joyce's business unit was outsourced, but noting that Hancock focused on

whether Beacon was a Successor Company, as that is the term used in the Plan, and outsourcing

was just one example of when a Successor Company might be involved).)

### C.   Hancock's Determination that Joyce Was Offered a Comparable Position with Beacon

66. Hancock evaluated Beacon's offers of employment to Hancock employees within

Joyce's work unit to determine if the job offers would (1) pay a "similar salary"; (2) have

"competitive benefit offerings"; and (3) have "a work location within 50 miles of the current

work location." (Ex. 2 at 13; Am. Compl., Ex. C.)  These three components were evaluated

separately and in the aggregate. (*Id.*)

67. Joan DiCicco, Sandra Colley, and Peter Mongeau, three HR professionals,

evaluated whether Hancock's employees, including Joyce, were eligible to receive benefits under

the Plan in light of the employment offers that they had received from Beacon. (Mongeau Dep.

Tr. at 135:19–135:20; 136:6; DiCicco Dep. Tr. at 166:2–166:19.)  Ms. DiCicco and Ms. Colley

evaluated the salary component of the assessment, while Mr. Mongeau focused on the benefits

package, which employed a competitive assessment analysis of Beacon's benefit offerings. (*Id.*)

68. With respect to the salary component, Hancock found that the jobs offered by

Beacon to Joyce and others in his work unit paid similar salaries to the salaries paid by Hancock.

(*Id.*; *see also* Am. Compl. ¶ 66.)  The average Beacon salary for employees in Joyce's work unit

was two percent higher than that paid by Hancock. (Hancock's Interrog. Answer No. 2;

*Competitive Assessment of Beacon Capital Partners Management, LLC Benefits Package with*

*respect to John Hancock's Severance Pay Plan "Comparable Job" Eligibility Provision* (the

"Competitive Assessment of Beacon's Benefits Package"), hereinafter Exhibit 11.)

69.　　Joyce was offered $75,100 by Beacon, an increase from his salary of $74,358 as a

Senior Project Manager at Hancock.  (Joyce Dep. Tr. at 45:23–46:1, 49:13–49:16. )

70.　　To assess whether Beacon had "competitive benefit offerings," the second

component, Hancock conducted a competitive assessment analysis in which it properly relied

upon objective data sources to gather normative data about the range of competitive benefits

offered to employees by general industry employers.  (Ex. 11 at 1; Mongeau Dep. Tr. at 138:22–

139:3; Hancock's Interrog. Answer No. 3.)

71.　　On May 21, 2003, Beacon forwarded to Joan DiCicco a memorandum outlining

"the benefits which Beacon Capital Partners Management, LLC . . . currently intends to offer to

its property management employees at the Hancock Complex ." (*Memorandum Re: Proposed*

*Benefits for Beacon Capital Partners Management, LLC Employees*, hereinafter Exhibit 12.)

72.　　The benefits outlined in Exhibit 12, excluding the severance plan, are the benefits

that ultimately were offered to Hancock employees.  (Bonn Dep. Tr. at 29:13–29:20, 85:18–

87:3.)

73.　　Ms. DiCicco promptly forwarded the memorandum at Exhibit 12 to Mr. Mongeau

to use in the competitive assessment analysis. (DiCicco Dep. Tr. at 159:15–159:17, 159:24–

160:3.)

74.　　Mr. Mongeau relied on the information contained in Exhibit 12 to conduct the

competitive assessment analysis of Beacon's benefit offerings. (Mongeau Dep. Tr. at 105:11–

105:19.)

16

75.    Using the competitive assessment analysis, Hancock determined that Beacon's benefits package was competitive among general industry employers. (Ex. 11 at 2; Hancock's Interrog. Answer No. 2.)

76.    The benefit categories selected for inclusion in Hancock's competitive assessment analysis of Beacon's benefits package were 401(k) plan benefits, pension benefits, medical benefits, dental benefits, and vacation benefits. (Hancock's Interrog. Answer No. 4; Ex. 3 at 2; DiCicco Dep. Tr. at 120:3–120:11.)

77.    The competitive assessment analysis was a composite assessment, made up of weighted scores assigned to each of the selected benefit categories that Beacon offered and added together to calculate the total competitive assessment score for Beacon's benefits package. (Ex. 11.) This method of assessment was based upon Hewitt Associates' Benefit Index Base Company "Total Value" Distribution ("Hewitt Benefit Index"), a trusted and reliable benefits analysis tool in the human resources field. (Mongeau Dep. Tr. at 7:18–7:20, 140:20 –141:1; 143:11–143:14.) Using this methodology, a score from zero, representing no benefit, to three, representing an above average benefit, was assigned to a selected benefits category based upon how that benefit offering compared to available normative data concerning that type of benefit among general industry employers. (Ex. 11.) Each of the selected benefits categories was also assigned a weighting percentage, with the sum total of the percentages equaling one hundred percent. (*Id.*) The score assigned to each category of benefits was a percentage of the composite competitive assessment score: 401(k) plan benefits counted for 20 percent; pension benefits for 15 percent; medical benefits for 30 percent; dental benefits for 5 percent; and vacation benefits for 30 percent—all adding up to a total of 100 percent. (*Id.*)

17

78.     The Hewitt Benefit Index was applied to Beacon's benefits data (Ex. 12;
Mongeau Dep. Tr. at 105:11–105:19) and the general industry data from three HR studies, which
are denoted on Exhibit 11 as Mercer/Foster Higgins 2002, Hewitt U.S. Salaried 2002, and the
Massachusetts Small Business Association (*see generally* Mongeau Dep. Tr. at 109:18–109:22,
119:1–123:20).

79.     As illustrated in Exhibit 11, where Beacon's 401(k) plan would match employee
contributions by up to 4 percent, which was higher than the general industry average of 3
percent, a competitive score of three, representing "above average" was assigned to that benefit
and counted for 20 percent of the overall Competitive Assessment Score under the Hewitt
Benefit Index.  (Ex. 11.)

80.     Since Beacon did not offer a pension plan as part of its benefits package, the
pension benefits category was assigned a competitive score of zero that counted for 15 percent of
the composite competitive assessment score for Beacon's benefits package.  (*Id.*)

81.     With regard to medical benefits, Beacon's plan was better than that of other
employers in terms of the amount of co-payments, deductibles, co-insurance, out-of-pocket
maximums, and prescription co-payments.  (*Id.*)  This meant that Beacon's medical benefits were
above average, and this benefit received a competitive score of three that counted for 30 percent
of the composite competitive assessment score.  (*Id.*)

82.     The competitive assessment score evaluated "what the level of coverage would be
for medical" benefits, as the assessment focused on "the value that the benefit delivered and what
was competitive in the industry." (Mongeau Dep. Tr. at 139:10 –139:13.)  The competitive
assessment score did not, therefore, include the cost of medical coverage.  (Ex. 11.)
Nevertheless, Mr. Mongeau reviewed this issue separately and listed his findings on Exhibit 11.

18

83.    Because the deductible for dental benefits was the norm for the industry but the annual maximum benefit was larger, dental benefits were deemed average to above average, and given a score of two, meaning average, that counted for 5 percent. (*Id.*)

84.    Finally, where Beacon's vacation benefits were fixed, rather than being based on years of service, they were deemed below average and received a corresponding score of one that counted for 30 percent. (*Id.*)

85.    The overall resulting Competitive Assessment Score for Beacon's benefit offerings was 1.9. (*Id.*) Given that an average score was 2.0, Hancock, consistent with simple rounding principles, reasonably and rationally viewed Beacon's score as average (Mongeau Dep. Tr. at 144:13–144:17) and, therefore, competitive within the industry (Ex. 11.).

86.    In conducting the competitive assessment analysis, Hancock relied on data from property management employers in that such data was included among the general industry data to the extent that it was available through Hewitt Associates. (Mongeau Dep. Tr. at 20:18–20:20, 129:9–129:20; Bisciotti Dep. Tr. at 111:21–112:4.)

87.    While Hancock initially set out to gather information solely on the benefit offerings of employers in the property management industry, Hewitt simply did not have adequate data on such companies. (Mongeau Dep. Tr. at 20:18–20:20, 133:10–133:14, 147:21–148:4.) In order to consistently apply the Hewitt evaluation tool, Hancock was required to broaden its focus. (*Id.* at 134:19–134:22.)

88.    The competitive assessment analysis of Beacon's benefit offerings was conducted and completed during the time frame from May 21, 2003 to May 30, 2003. (*Id.* at 158:23 – 158:24.)

19

89.     On the location component of Hancock's "comparable job" analysis, since all of the jobs offered by Beacon to Hancock's employees, including Joyce, were located in the very same complex of buildings in which those employees were currently working for Hancock, the jobs that Beacon was offering were well within fifty miles of the Hancock employees' current work location. (Hancock's Interrog. Answer No. 1; Am. Compl. ¶ 66; *see also* DiCicco Dep. Tr. at 166:2–166:6.)

90.     Because all Hancock employees who received a job offer from Beacon were being offered higher salaries than they were earning at Hancock, the same benefits package, and the same work location, Hancock was able to assess the three components of the "comparable job" definition as it applied to the entire group of employees who had received job offers from Beacon. (Mongeau Dep. Tr. at 132:22–133:2; *see also* DiCicco Dep. Tr. at 165:18–166:19.)

91.     After a thorough analysis of all three components of the "comparable job" definition, Hancock's evaluation revealed that Beacon's job offers included competitive benefit offerings (Ex. 11) and were indeed for comparable jobs, as defined by the Plan Amendment and the Summary Plan Description. (Am. Compl., Ex. C; *see also* Hancock's Interrog. Answer No. 2.)

92.     Hancock communicated the results of its "comparable job" analysis to Hancock employees in a memorandum dated May 30, 2003, in which Hancock stated, "[I]t has been determined that all the job offers extended by Beacon Capital Partners, LLC are comparable job offers and therefore recipients of a job offer from Beacon are not eligible for JHF severance benefits." (Am. Compl., Ex. C.)

93.     In an email to Joan DiCicco on June 2, 2003, Joyce challenged the comparability determination that Hancock had made concerning job offers from Beacon. (E-mail from Dan

20

Joyce to Joan DiCicco of 6/2/2003, hereinafter Exhibit 13.) Ms. DiCicco responded to Joyce's inquiry within twenty-four hours by sending a reply e-mail on June 3, 2003, in which she explained the components of the "comparable job" definition and of the competitive assessment analysis of the Beacon benefits package. (E-mail from Joan DiCicco to Dan Joyce of 6/3/03, hereinafter Exhibit 13.) She also invited Joyce to contact her with any additional questions. (*Id.*) She received no further inquiries from Joyce regarding severance benefits until Hancock was contacted by his attorney. (Hancock's Interrog. Answer No. 9.)

94.    Shortly after leaving Hancock, Joyce began compiling a list of documents, events, and other items that he apparently believed supported his position that he was entitled to severance pay (Joyce Dep. Tr. at 93:24–95:22; Handwritten notes of Daniel P. Joyce, hereinafter Exhibit 14) and seeking counsel with his cousin concerning the events surrounding Hancock's denial of severance benefits to Joyce (Joyce Dep. Tr. at 97:17–97: 21; Plaintiff's Privilege Log, hereinafter Exhibit 15).

## D.    Joyce's Appeal of the Denial of Severance Benefits

95.    In late 2004, Joyce and other former Hancock employees requested review by Hancock's Company Benefit Plan Appeal Committee (the "Appeal Committee") of the initial denial of benefits. (Mongeau Dep. Tr. at 160:9–160:10; Bisciotti Dep. Tr. at 30:1–30:5.)

96.    These appeals were considered by members of Hancock's Company Benefit Plan Appeal Committee, including Brian Bisciotti, Counsel in Hancock's Tax Department, and Kathy Suchenski, Director of Hancock's Signator Field Administration. (Mongeau Dep. Tr. at 160:18–160:20.) Although Peter Mongeau was also a member of the Appeal Committee, he recused himself from participation in these appeals due to his involvement in the initial determination

21

and denial of severance benefits to Joyce. (*Id.* at 160:11–160:17; Bisciotti Dep. Tr. at 33:3–33:11.)

97.    The Appeal Committee conducted a thorough review of Hancock's initial decision to deny severance benefits to Joyce and other employees. (*Id.* at 13:2–13:9 (stating that the work of the Appeal Committee involves review of the whole case at hand, including supporting documents, and questioning or interviewing relevant individuals as necessary).)

98.    The Appeal Committee reviewed documents that were pertinent to the initial determination, including the Plan (Am. Compl., Ex. A), the draft guidelines concerning Hancock's "comparable job" definition (Ex. 3), and the Competitive Assessment of Beacon's Benefits Package (Ex. 11). (Bisciotti Dep. Tr. at 31:11–32:10, 61:17, 63:20–63:23, 101:10–101:17.)

99.    The Appeal Committee also questioned both Peter Mongeau and Joan DiCicco about various aspects of the information provided to affected Hancock employees, Hancock's communications with the affected employees, the work that Mr. Mongeau and Ms. DiCicco had performed, the sources upon which they relied, and the conclusions that had been reached. (*Minutes of Company Benefit Plan Appeal Committee of* 11/16/04, hereinafter Exhibit 16; *Minutes of Company Benefit Plan Appeal Committee of* 12/9/04, hereinafter Exhibit 17; Bisciotti Dep. Tr. at 106:2–106:3, 109:12–109:15, 110:14–110:20; 114:16–114:22, 130:13–131:2, 137:19–137:24, 141:22–142:8; 150:1–150:6, 175:11–177:1.)

100.    In addition, Mr. Bisciotti reviewed case law concerning how the terms "comparable position" and "comparable job" have been defined and applied in the context of other employers' severance benefit plans. (*Id.* at 138:11–140:7.)

22

101.    By the time the Appeal Committee had completed its consideration of the appeal, the members had conducted three separate meetings (*id.* at 149:13–149:15.); undertaken in-depth review of pertinent documents (*id.* at 31:11–32:10, 61:17, 63:20–63:23, 101:10–101:17); questioned the initial decision-makers (*id.* at 106:2–106:3, 109:12–109:15, 110:14–110:20; 114:16–114:22, 130:13–131:2, 137:19–137:24, 141:22–142:8; 150:1–150:6, 175:11–177:1); and conducted outside legal research (*id.* at 138:11–140:7).

102.    Upon reaching its conclusion that Hancock had properly denied severance benefits to Joyce and other Hancock employees who had appealed the initial determination, the Appeal Committee completed its work by writing a letter to the appellants that set forth the reasons for the denial, as well as the provision of the Plan upon which the Appeal Committee had based its decision. (Am. Compl., Ex. D.)

LIBA/1708288.1

Respectfully submitted,

JOHN HANCOCK FINANCIAL
SERVICES, INC. SEVERANCE PAY
PLAN and JOHN HANCOCK FINANCIAL
SERVICES, INC.,

By their attorneys,

/s/ Erin N. Jackson
Anthony M. Feeherry (BBO #160860)
Daniel P. Condon (BBO #547676)
Erin N. Jackson (BBO #647375)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
617.570.1000

Dated: July 7, 2006

## CERTIFICATE OF SERVICE

I, Erin N. Jackson, hereby certify that on July 7, 2006 this DEFENDANTS'
STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT was filed through the ECF system and will be sent electronically to
the registered participants as identified in the Notice of Electronic Filing (NEF), and paper
copies will be sent to those indicated as non-registered participants on this date.

Dated: July 7, 2006                       /s/ Erin N. Jackson
                                          Erin N. Jackson

LIBA/1708288.1