UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DANIEL JOYCE,
Individually and on behalf of a class of others
similarly situated,

        Plaintiff,

    v.

JOHN HANCOCK FINANCIAL SERVICES,
INC. SEVERANCE PAY PLAN and JOHN
HANCOCK FINANCIAL SERVICES, INC., as
Administrator and Fiduciary of the John Hancock
Financial Services, Inc. Severance Pay Plan,

        Defendants.

Civil Action No. 05–11428–WGY

## APPENDIX IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Anthony M. Feeherry (BBO #160860)
Daniel P. Condon (BBO #547676)
Erin N. Jackson (BBO #647375)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
617.570.1000

*Attorneys for John Hancock Financial
Services, Inc. Severance Pay Plan and John
Hancock Financial Services, Inc.*

LIBA/1712115.1

# TABLE OF CONTENTS

**DOCUMENT**                                                                                     **TAB**

**EXHIBITS 1–17** ............................................................................... EXHIBITS 1–17

## DEPOSITION TRANSCRIPT EXCERPTS

Brian J. Bisciotti Deposition Transcript Excerpts...............................................Bisciotti Dep. Tr.

William A. Bonn Deposition Transcript Excerpts....................................................Bonn Dep. Tr.

Joan M. DiCicco Deposition Transcript Excerpts ...............................................DiCicco Dep. Tr.

Daniel P. Joyce Deposition Transcript Excerpts.....................................................Joyce Dep. Tr.

Peter J. Mongeau Deposition Transcript Excerpts............................................Mongeau Dep. Tr.

## INTERROGATORIES

Plaintiff's Objections & Answers to Defendants'
    First Set of Interrogatories ...................................................................Pl.'s Interrog Answers

John Hancock Financial Services, Inc.'s Objections & Answers
    to Plaintiff's First Set of Interrogatories to Defendant
    John Hancock Financial Services, Inc. ........................................Hancock's Interrog. Answers

# EXHIBIT 1



| From: | JH Communication |
| Sent: | Thursday, November 21, 2002 9:57 AM |
| Subject: | Severance Pay Plan Changes |
| Importance: | High |

*On behalf of Human Resources, this message is intended for John Hancock Home Office, Home Office Field and John Hancock Signature Services associates.*

**Severance Pay Plan Changes**

Annually, John Hancock evaluates the competitive standing and costs of its benefit plans. We typically focus on our health and retirement benefits, which can change year-to-year for all companies. We recently evaluated the Company's Severance Pay Plan as well - comparing its provisions to those of our peers and to industry norms.

Generally, our Severance Pay Plan is at or above average with respect to key provisions - for example, the number of weeks of pay per year of service, the choice of various payout options which can extend the duration of severance payments, and continuing medical benefits and crediting service during severance. However, other provisions (pertaining to the sale or outsourcing of a business unit) were found to be the exception to those benefits offered by other employers. As a result, the following two provisions of the plan have been changed, effective November 18, 2002, so that:

> in the event of the sale or outsourcing of a business unit, if an employee of the business unit is offered a comparable job by, or accepts a non-comparable job with, the purchaser or successor company, severance will not be paid (comparable will be defined as similar salary, competitive benefit offerings, and a work location within 50 miles of the current work location)

> if the purchaser or successor company subsequently terminates the employee within six months of the sale or outsourcing (and hire) date, severance will not be paid under the John Hancock plan

The reasons for these changes are:

> the competitive findings as described above

> the realignment of our Severance Pay Plan with its primary purpose to "bridge" employees to future employment

> the need to support necessary and strategic divestitures and outsourcing

We want to acknowledge that these changes to the Severance Pay Plan are being made at the same time some John Hancock business units have announced a potential sale or outsourcing of their business. Therefore, one of the evaluation criteria of the bidders may be their ability to offer viable positions to our employees in a company at which they can be successful. John Hancock severance benefits will be paid to an employee who is not offered a position with a successor company.

Should you have any questions about this benefit change, please contact Benefits & HR Services at 1-800-990-4404. If you are an employee in a business unit that has announced a potential sale or outsourcing, you will receive additional information as soon as it is available.

1

CONFIDENTIAL

JH 001808

# EXHIBIT 2

**benefits supplement**

# 2002 Benefits Supplement to Your Summary Plan Description (SPD)

EXHIBIT
mariecan
# 11
5 2206

John Hancock is committed to communicating benefit plan information to associates on a regular basis. In addition, the company is legally obligated to provide certain information in order to comply with the Internal Revenue Code and Department of Labor regulations.

The information in this booklet, which we are required to distribute, is intended as a supplement to the Summary Plan Description (SPD) previously provided to you. Your SPD is the binder entitled "Your Benefits Book" that describes the employee benefit plans sponsored by John Hancock Financial Services, Inc.

This supplement is intended to update "Your Benefits Book" with information on the current 2002 plan offering. This is not new information -- it has all been communicated previously, through Open Enrollment newsletters, pension brochures and 401(k) updates. This supplement also serves as a directory of how to obtain additional information, either online or in print.

Fully revised SPDs are being developed for 2003 and will include information on the 2003 plan changes announced in this fall's Open Enrollment communications. The 2003 SPDs will be accessible online! The online format will enable you to find information easily and will allow us to update the contents more quickly when there are benefit changes. You'll receive information on the rollout of the new SPDs in 2003.

If you have any questions, you may contact John Hancock's Benefits & HR Services at 1-800-990-4404.

This supplement and its contents apply to active, benefit-eligible associates of the Home Office, Home Office Field, John Hancock Signature Services, John Hancock Funds, Independence Investment LLC, Hancock Natural Resource Group, First Signature Bank & Trust, and Essex Corporation, unless noted otherwise.

JH 001097

This summary describes highlights of and recent changes to some aspects of the John Hancock Financial Services, Inc. Employee Welfare Plan, the John Hancock Financial Services, Inc. Cafeteria Plan, the Medical and Dependent Care Flexible Spending Account Plans, the John Hancock Financial Services, Inc. Adoption Plan, The Investment-Incentive Plan for John Hancock Employees (TIP), the John Hancock Financial Services, Inc. Pension Plan, and the John Hancock Financial Services, Inc. Severance Pay Plan (collectively, the Plans). This summary does not attempt to cover all details. Full details of the Plans are available in formal written plan documents that legally govern the operation of the plans.  If this summary differs in any way from the terms of the plan documents, the plan documents shall control.

This summary is not intended to be a contract of employment or a statement of enforceable benefits or employment rights. John Hancock reserves the right to modify or amend, at any time and in any way whatsoever, the terms of these plans, including eligibility requirements, and to terminate the plans completely.

The TIP and SIP 401(k) plans (except the portion of the plan which includes the Restricted Company Match) are intended to constitute a plan described in section 404(c) of the Employee Retirement Income Security Act and Title 29 of the Code of Federal Regulations, section 2550.404 (c). Under these provisions of law, fiduciaries of the plan may be relieved of liability for any losses that are the result of investment instructions given by a participant or beneficiary.

JH_001098

# Table of Contents

1.   Medical *page 1*

2.   Dental  *page 3*

3.   Vision Care  *page 4*

4.   Long-Term Care (LTC) Insurance  *page 4*

5.   Flexible Spending Accounts (FSAs)  *page 5*

6.   Life Insurance  *page 5*

7.   Disability  *page 7*

8.   Adoption Benefit  *page 8*

9.   401(k) Savings Plan  *page 9*

10.   Pension  *page 11*

11.   Benefits at Retirement  *page 12*

12.   Severance Pay Plan  *page 13*

13.   Important Administrative Information  *page 14*

   a.  Your Rights Under ERISA

   b.  Your Rights Under COBRA

   c.  Your Rights Under USERRA

   d.  Newborns and Mothers Health Protection Act

   e.  Women's Health and Cancer Rights Act

   f.  QDRO (Qualified Domestic Relations Order) Procedure

   g.  QMCSO (Qualified Medical Child Support Order) Procedure

   h.  FMLA (Family and Medical Leave Act)

   i.  PBGC (Pension Benefit Guaranty Corporation)

   j.  Claims and Appeals

   k.  Claims Addresses

CONFIDENTIAL

JH 001099

# 1. Medical

| Plan | Carrier | Most Recent Printed Material / Date Distributed* | Current Online Information / More Information |
|---|---|---|---|
| Point of Service Plan (POS) | Harvard Pilgrim HealthCare | *Benefit More, Learn More* brochures (Fall 2001)<br><br>*Benefits Today* (Fall 2000)<br><br>*Benefits Today* (Fall 1999) | www.sageo.com<br>www.harvardpilgrim.org |
| Preferred Provider Organization (PPO) | Blue Cross Blue Shield | *Benefit More, Learn More* brochures (Fall 2001) | www.sageo.com<br>www.bcbsma.org |
| Exclusive Provider Organization (EPO) | Blue Cross Blue Shield | *Benefit More, Learn More* brochures (Fall 2001) | www.sageo.com<br>www.bcbsma.org |
| Prescription Drug Coverage (carved out for the Blue Cross Blue Shield plans only) | Caremark | *Benefit More, Learn More* brochures (Fall 2001) | www.sageo.com<br>www.caremark.com |
| Health Maintenance Organization (HMO) | Various - see list on following page | *Benefit More, Learn More* brochures (Fall 2001)<br><br>*Benefits Today* (Fall 2000)<br><br>*Benefits Today* (Fall 1999) | www.sageo.com |

*To request another copy of the most recent printed material, call Benefits & HR Services at 1-800-990-4404.*

John Hancock offers several different medical plans. The cost for coverage is shared by both the company and associates.

**The Harvard Pilgrim Point of Service (POS) Plan**
Offered in Massachusetts, the POS plan gives you the freedom to choose in-network or out-of-network care. Most eligible charges for in-network services are covered in full after a copayment, with no deductible or claim forms to file. For out-of-network services, you are reimbursed for most eligible charges at an 80% rate after a deductible. Your Primary Care Physician (PCP) will coordinate all of your in-network medical care, including referrals and decisions regarding hospitalization. Provider directories and prescription drug formulary listings can be accessed online at www.sageo.com or www.harvardpilgrim.org. Or, you can request a printed copy by calling Harvard Pilgrim Health Care at 1-888-333-4742.

**Blue Cross Blue Shield Preferred Provider Organization (PPO)**
John Hancock began offering this plan effective January 1, 2002, to associates who live outside of Massachusetts. A PPO plan is similar to a POS plan which offers the flexibility to choose in-network or out-of-network care. However, unlike a POS plan, a PPO does not require you to select a Primary Care Physician (PCP) or obtain referrals to specialists for in-network services. Provider directories can be accessed online at www.sageo.com or www.bcbsma.org. Or, you can request a printed copy by calling Blue Cross Blue Shield at 1-800-952-4196.

*Benefits Supplement / December 2002*

**CONFIDENTIAL**

JH 001100

**Blue Cross Blue Shield Exclusive Provider Organization (EPO)**

This plan was also first offered effective January 1, 2002, to associates outside of Massachusetts. The EPO is similar to an HMO in that it covers care that you receive from in-network hospitals and physicians – there are no out-of-network benefits. Unlike an HMO, you are not required to select a Primary Care Physician (PCP) or obtain referrals to specialists. Provider directories can be accessed online at www.sageo.com or www.bcbsma.com. Or, you can request a printed copy by calling Blue Cross Blue Shield at 1-800-952-4196.

**Caremark Prescription Drug Coverage**

Caremark is the pharmacy benefit manager for the Blue Cross Blue Shield PPO and the Blue Cross Blue Shield EPO. Information about the formulary and non-formulary prescription drugs is available from Sageo, www.sageo.com or 1-877-847-2436, and Caremark, www.caremark.com or 1-800-776-5416.

**Local Health Maintenance Organizations (HMOs)**

HMOs offer comprehensive services through contracted physicians and facilities. Most services are covered for a small copayment, with no deductible and no claim forms to file. Plan information, provider directories and prescription drug formulary listings can be obtained through Sageo, www.sageo.com or 1-877-847-2436, or by contacting the HMO directly. Please see the list of HMOs below for contact information.

| HMOs | Telephone Number | Website |
|---|---|---|
| Aetna U.S. Healthcare – PA | 1-800-323-9930 | www.aetna.com |
| AvMed Health Plan – FL | 1-800-88AvMed | www.avmed.org |
| Fallon Community Health Plan – MA | 1-800-868-5200 | www.fchp.org |
| Harvard Pilgrim Health Care HMO – MA | 1-888-333-4742 | www.harvardpilgrim.org |
| Health Alliance Plan – MI | 1-800-422-4641 | www.hap.org |
| Kaiser - Northern CA | 1-800-464-4000 | www.kp.org |
| Kaiser – Southern CA | 1-800-464-4000 | www.kp.org |
| Oxford Health Plan – NY | 1-800-444-6222 | www.oxfordhealth.com |
| Pacificare HMO – So. CA | 1-800-624-8822 | www.pacificare.com |
| Presbyterian Health Plan – NM | 1-800-356-2219 | www.phs.org |
| Tufts Health Plan HMO – MA | 1-800-462-0224 | www.tufts-health.com |
| United Health Care – New England | 1-800-422-1404 | www.uhc.com |

Note: This is a listing of the HMOs offered as of December 2002. If you have a question about an HMO that is no longer offered, contact that HMO directly or Benefits & HR Services at 1-800-990-4404.

**CONFIDENTIAL**                    JH 001101

**New Drugs, Procedures and Devices**
Technological advances in medicine continue to result in new drugs, procedures and devices.
Please contact your health plan directly for information on whether and under what circumstance
new drugs, procedures and devices are covered.

**Prescription Drugs**
Most health plans offer a three-tiered prescription drug benefit. **Generic drugs**, which are
approved by the U.S. Food and Drug Administration and contain the same active ingredients as
brand-name drugs, generally have the lowest copayment amount. The next tier is **Preferred
(Brand)**, which are Single Source brand drugs (no generics available) that are more cost effective
than Non-Preferred brand name drugs but have the same medical efficacy. The third tier is **Non-
Preferred (Brand)**, which often have a generic or other brand alternative. These medications are
covered, but the highest copayment applies.

Formulary lists and copayment amounts are available from your plan.

**Denial, Loss, or Forfeiture of Benefits**
Certain circumstances could result in disqualification, ineligibility, denial, loss, forfeiture,
suspension, offset reduction or recovery of benefits for a participant or beneficiary.  Please
contact your health plan directly for specific information on these circumstances.

## 2. Dental

| Plan | Carrier | Most Recent Printed Material / Date Distributed* | Current Online Information / More Information |
|------|---------|--------------------------------------------------|---------------------------------------------|
| Delta Passive PPO | Delta Dental of Massachusetts | *Benefit More, Learn More* brochures (Fall 2001) <br><br> *Benefits Today* (Fall 2000) <br><br> *Benefits Today* (Fall 1999) | www.sageo.com <br> www.deltamass.com |

*To request another copy of the most recent printed material, call Benefits & HR Services at
1-800-990-4404.

John Hancock offers dental coverage through Delta Dental.  John Hancock and associates share
in the cost for dental coverage.

The dental plan covers Preventive (Type I) services at 100%, Basic Restorative (Type II) at 80%
after deductible, and Major Restorative (Type III) at 50% after deductible, up to a calendar year
maximum of $1,500 per person. Orthodontia is also covered at 50% of the maximum plan
allowance to any age. The orthodontic benefit lifetime maximum was increased from $1,000 to
$1,500 effective January 1, 2002.

The three-year eligibility waiting period was eliminated effective January 1, 2002.

More information, including a provider directory, is available through Sageo, at www.sageo.com
or 1-877-847-2436, or from Delta Dental, www.deltamass.com or 1-800-872-0500.

**CONFIDENTIAL**

JH 01102

## 3. Vision Care

| Plan | Carrier | Most Recent Printed Material / Date Distributed* | Current Online Information / More Information |
|------|---------|------------------------------------------------|---------------------------------------------|
| ECPA Select Basic Plan | Eye Care Plan of America | *Benefit More, Learn More* brochures (Fall 2001) | www.sageo.com www.ecpa.com |
| ECPA Select Premium Plan | Eye Care Plan of America | *Benefits Today* (Fall 2000) *Benefits Today* (Fall 1999) | www.sageo.com www.ecpa.com |

*To request another copy of the most recent printed material, call Benefits & HR Services at 1-800-990-4404.*

Vision care coverage is provided by Eye Care Plan of America (ECPA). Vision care coverage is an associate-pay-all benefit. Associates have a choice of two plans that offer both in-network and out-of-network coverage:

- ECPA Select Basic Plan
- ECPA Select Premium Plan

The two plans differ in benefit levels and costs. The Select Premium Plan offers more generous benefits but is more expensive. More information, including a provider directory, is available through Sageo, www.sageo.com or 1-877-847-2436, or from ECPA, at www.ecpa.com or 1-800-843-3272.

## 4. Long-Term Care (LTC) Insurance

| Plan | Carrier | Most Recent Printed Material / Date Distributed* | Current Online Information / More Information |
|------|---------|------------------------------------------------|---------------------------------------------|
| Long-Term Care Insurance | John Hancock Group Long-Term Care | *Benefit More, Learn More* brochures (Fall 2001) *Benefits Today* (Fall 2000) *Benefits Today* (Fall 1999) | http://gltcbenefit.jhancock.com Group Long-Term Care: 1-800-543-7108 |

*To request another copy of the most recent printed material, call Benefits & HR Services at 1-800-990-4404.*

Long-Term Care (LTC) insurance coverage helps protect against financial loss if you become unable to care for yourself due to chronic illness, injury or the effects of aging. LTC insurance provides a benefit to pay for qualified nursing home care, adult day care and in-home care.

LTC is an associate-pay-all benefit. The John Hancock plan allows you to choose between different levels of Daily Maximum Benefit (DMB) amounts.

More information on LTC insurance is available through John Hancock Group Long-Term Care. Call 1-800-543-7108 or logon to http://gltcbenefit.jhancock.com (user name: gltcbenefit; password: jhancock).

**CONFIDENTIAL**

JH 001103

## 5. Flexible Spending Accounts (FSAs)

| Plan | Carrier | Most Recent Printed Material / Date Distributed* | Current Online Information / More Information |
|---|---|---|---|
| Health Care Flexible Spending Account | Wausau Benefits, Inc. | *Benefit More, Learn More* brochures (Fall 2001) <br><br> *Benefits Today* (Fall 2000) | www.sageo.com <br><br> www.wausaubenefits.com |
| Dependent Care Flexible Spending Account | Wausau Benefits, Inc. | *Benefits Today* (Fall 1999) | www.sageo.com <br><br> www.wausaubenefits.com |

*To request another copy of the most recent printed material, call Benefits & HR Services at 1-800-990-4404.

### Health Care FSA
The Health Care reimbursement account allows you to pay for certain eligible medical, dental, vision and hearing care expenses, which are not covered by your medical, dental or vision care plans, with pre-tax dollars. The minimum annual election is $50 and the maximum is $3,000. Guidelines for eligible expenses (IRS Publication 502) can be found at www.wausaubenefits.com or by calling Wausau Benefits, Inc. at 1-800-523-5183.

### Dependent Care FSA
The Dependent Care spending account covers eligible childcare and elder care expenses necessary for you (and your spouse, if married) to work. The minimum annual election is $50 and the maximum is $2,500 (married and filing separate tax return) or $5,000 (single, head of household, or married and filing a joint tax return).

The minimum annual election amount for both the Health Care and the Dependent Care FSAs was changed to $50 effective January 1, 2002.

### Submitting a Claim for Reimbursement
Effective January 1, 2002, Wausau Benefits, Inc. became the administrator for the Health Care FSA and the Dependent Care FSA. (Prior to January 1, 2002, FSA claims were processed by Sykes HealthPlan Services (SHPS).) FSA claim forms are available on the Hancock Hub and online at www.wausaubenefits.com or by calling Wausau Benefits, Inc. at 1-800-523-5183.

## 6. Life Insurance

| Plan | Carrier | Most Recent Printed Material / Date Distributed* | Current Online Information / More Information |
|---|---|---|---|
| Employee Group Term Life Insurance | John Hancock Life Insurance Company | *Benefit More, Learn More* brochures (Fall 2001) <br><br> *Benefits Today* (Fall 2000) <br><br> *Benefits Today* (Fall 1999) | www.sageo.com |

*To request another copy of the most recent printed material, call Benefits & HR Services at 1-800-990-4404.

*Benefits Supplement / December 2002*

**CONFIDENTIAL**

JH001104

Effective January 1, 2001, the employee life insurance carrier changed from Unicare to John Hancock Group Life Insurance.

Several types of life insurance benefits are offered. John Hancock pays the cost of Basic Life Insurance and Basic Accidental Death & Dismemberment (AD&D); all other options, including Optional Life, Spouse Life, Child Life, and Optional AD&D, are paid for by the associate.

**Definition of Pay**
Effective January 1, 2002, the life insurance and AD&D insurance definition of pay was reduced to base salary only. Bonus pay, such as the Incentive Compensation Plan (ICP), is not included.

**Basic Life Insurance**
Effective January 1, 2002, basic life insurance, paid for by John Hancock, is equal to one times your base salary only.

**Optional Life Insurance**
Effective January 1, 2002, you can choose optional life insurance coverage in amounts up to six times your eligible pay.

**Spouse Life Coverage**
Effective January 1, 2002, you can elect up to $100,000 of coverage, in multiples of $10,000.

**Child Life Coverage**
Effective January 1, 2002, you can elect up to $25,000 of coverage, in multiples of $5,000.

**Survivor Income Benefits (SIB)**
Survivor Income Benefits (SIB) were discontinued effective January 1, 2002. Associates who had SIB coverage in 2001 were given the option to convert the commuted value to an individual policy by January 30, 2002.

**Evidence of Insurability / Proof of Good Health**
Associates are required to provide Proof of Good Health (POGH) for life insurance coverage under certain circumstance, such as:

- If you have only Basic Life Insurance coverage and are electing Optional Life Insurance for the first time.

- If you have already elected Optional Life Insurance and are looking to increase your election by more than one times your eligible pay.

- If your total election and/or benefit compensation increase will take you over $500,000 in total coverage.

- If your life insurance election is over $500,000 and your merit increase is $50,000 or more.

**Maximum Life Insurance Coverage Amount**
The maximum dollar amount of life insurance coverage is $2.5 million.

**CONFIDENTIAL**

JH 001105

**Actively at Work and Start Date Deferral Provisions**
The plan has Actively At Work and Start Date Deferral provisions that may impact your life insurance coverage elections. For more information, contact Sageo at 1-877-847-2436.

**Basic Accidental Death and Dismemberment (AD&D) Coverage**
Effective January 1, 2002, John Hancock provides basic AD&D coverage equal to one times base salary.

**Optional AD&D Coverage**
*(known prior to January 1, 2002 as Voluntary AD&D or VADD coverage)*
Effective January 1, 2002, you can elect up to six times your base pay which, when combined with basic AD&D, could total up to seven times pay in accidental death and dismemberment protection for your family. Associates pay the cost of Optional AD&D coverage.

More information on AD&D coverage is available from Sageo, www.sageo.com or 1-877-847-2436.


# 7. Disability

| Plan | Carrier | Most Recent Printed Material / Date Distributed* | Current Online Information / More Information |
|------|---------|--------------------------------------------------|----------------------------------------------|
| **Short-Term Disability** | The Hartford | *Benefit More, Learn More* brochures (Fall 2001)<br><br>*Benefits Today* (Fall 2000) | Contact Benefits & HR Services 1-800-990-4404 |
| **Long-Term Disability** | The Hartford | *Benefits Today* (Fall 1999) | www.sageo.com |

*\*To request another copy of the most recent printed material, call Benefits & HR Services at 1-800-990-4404.*

Disability coverage provides financial security if you are absent from work due to illness or injury. Disability benefits include Short-Term Disability (STD) and Long-Term Disability (LTD). STD provides you with benefits equal to 100% of your base salary at no cost to you if you become disabled or are unable to work from one day up to eight weeks. For a disability from nine to 26 weeks, the STD benefit is 60% of your salary at no cost to you. For more information on STD, contact Benefits & HR Services at 1-800-990-4404.

Long-Term Disability (LTD) protects you if you are still disabled when STD ends. LTD coverage equal to 50% of your base salary is provided by the company; you have the option to elect and pay for an additional 10% of coverage, which brings your total LTD coverage level to 60% of your base salary. Information on LTD can be obtained from Sageo, www.sageo.com or 1-877-847-2436.

Once your STD benefits are exhausted, if you are still disabled and eligible for Long-Term Disability benefits, your employment may be terminated subject to applicable federal and state laws. You will be contacted by Human Resources to discuss your individual situation.

CONFIDENTIAL

JH 001106

The Hartford became the disability carrier effective January 1, 2002. The Hartford insures and issues payment for disabilities beginning on or after January 1, 2002. Please note that for disabilities that began on or after January 1, 1999 but prior to January 1, 2002, CIGNA is the disability carrier. Disabilities that began prior to January 1, 1999 are administered by Kemper/IDR.

**Definition of LTD Compensation**
Effective January 1, 2002, LTD benefits are based on your compensation as of October 1 of the year prior to the year in which you become disabled.

**Initiating a Disability Claim**
To initiate a claim, call The Hartford at 1-800-707-5333.

# 8. Adoption Benefit

| Plan | Carrier | Most Recent Printed Material / Date Distributed* | Current Online Information / More Information |
|---|---|---|---|
| Adoption Benefit | John Hancock Financial Services, Inc. | *Your Benefits Book* (January 1999) | Hancock Hub<br><br>Benefits & HR Services 1-800-990-4404 |

*To request another copy of the most recent printed material, call Benefits & HR Services at 1-800-990-4404.

The adoption benefit reimburses you for up to the first $3,000 of eligible expenses incurred for the adoption of each child. Eligible expenses include:

- adoption agency fees
- legal fees
- court fees
- travel expenses
- the cost of the child's first medical examination
- pregnancy-related out-of-pocket medical expenses of the natural mother, provided they are not eligible for reimbursement under any medical plan

There is no cost to associates for the Adoption Benefit.

Effective January 1, 2002, claims for the Adoption Benefit are processed by John Hancock's Benefits & HR Services. (Previously, claims were processed by Sykes HealthPlan Services (SHPS)).

When your child's adoption is final, complete and submit the Adoption Benefit Claim Form (Form 15947). If you have any questions, you may call Benefits & HR Services at 1-800-990-4404.

CONFIDENTIAL

JH 001107

# 9. 401(k) Savings Plan

*Please note that JH Funds, Independence Investment LLC, Hancock Natural Resource Group and Essex Corporation are not eligible to participate in TIP, but may have separate 401(k) plans. Associates in these subsidiaries should check with their Human Resources department.*

| Plan | Plan Administrator | Most Recent Printed Material / Date Distributed* | Current Online Information / More Information |
|---|---|---|---|
| The Investment-Incentive Plan (TIP) | John Hancock Financial Services, Inc. | *ESOP brochure and new prospectus*  (October 2002)<br><br>*401(k) Update* (November 2001)<br><br>*Investment Fund Changes* (April 2001)<br><br>*Own It* February 2000<br><br>*Website/Benefits Center 800#* (December 1999)<br><br>*401(k) Update* (November 1999) | http://resources.hewitt.com/jhancock<br><br>401(k) Benefits Center 1-800-450-5667 |

*To request another copy of the most recent printed material, call Benefits & HR Services at 1-800-990-4404.*

The Investment-Incentive Plan (TIP) is the 401(k) savings plan for eligible Home Office, Home Office Field, Signature Services (JHSS) and First Signature Bank & Trust associates.

### Contributions

Newly-hired associates are eligible to contribute to The Investment-Incentive Plan (TIP) after six months of service, and can rollover a balance from a prior employer's 401(k) plan to TIP at any time. TIP allows pre-tax and post-tax contributions, and provides a 4% company match. In March of 2000, a change was made so that the first 2% of the company match is automatically invested in the John Hancock Stock Fund and is designated as Restricted Company Match. Restricted Company Match cannot be withdrawn or borrowed while you are still an active associate, and cannot be transferred to other investment funds until you reach age 55 or you leave John Hancock. Associates may invest the next 2% of company match in the fund(s) of their choice.

### Contribution Changes to the Plan Under EGTRRA

The *401(k) Update* distributed in November of 2001 described some changes to the plan as provided by EGTRRA :

- The contribution rate maximum was increased to 50% pre-tax beginning January 1, 2002. The maximum post-tax rate is still 10%, with an overall maximum of 50% pre-tax and post-tax combined, up to IRS limits.

- Age 50 catch-up contributions are allowed, beginning in 2002.

- TIP accepts rollovers from inactive participants.

*Benefits Supplement  / December 2002*

**CONFIDENTIAL**

JH 001108

**Investment Funds**

The John Hancock Stock Fund was added as an investment option to TIP in March of 2000. Five more funds were added to the plan in April of 2001, bringing the total number of investment choices to 14. Information on the investment funds is available online at http://resources.hewitt.com/jhancock or by calling the Benefits Center at 1-800-450-5667.

In October 2002, the John Hancock Stock Fund was restructured as an Employee Stock Ownership Plan, or ESOP. Under the ESOP arrangement:

- Associates can elect to reinvest dividends or receive them as a cash payment.

- Active associates age 55 or older have the option to transfer or reallocate their restricted John Hancock Stock Fund balances at any time

- Partial withdrawals or distributions from the John Hancock Stock Fund may be paid in cash, John Hancock Stock , or a mixture of both

**Administrative Fees**

John Hancock accrues an administrative fee of .08% (annual rate) on each investment fund as part of the daily NAV calculation. These fees are used to pay for a portion of the costs of administering the plan, such as record keeping services, communication materials, and the plan's voice response system and website.

**Loans**

The number of plan loans was reduced to a maximum of two and a $50 loan fee was instituted effective January 1, 2000. More information on loans is available online at http://resources.hewitt.com/jhancock or by calling the Benefits Center at 1-800-450-5667.

**Managing Your Account**

In December of 1999, John Hancock announced the new 401(k) website, http://resources.hewitt.com/jhancock that allows associates to process transactions online. Associates can also process transactions over the telephone or speak to a customer service representative by calling 1-800-450-5667.

CONFIDENTIAL

JH 001109

## 10. Pension

*Please note that Essex Corporation associates are not eligible for the John Hancock Financial Services, Inc. Pension Plan.*

| Plan | Plan Administrator | Most Recent Printed Material / Date Distributed* | Current Online Information / More Information |
|---|---|---|---|
| John Hancock Pension Plan | John Hancock Financial Services, Inc. | Cash Balance *Overview* brochure (September 2001)<br><br>Cash Balance *Transition* brochure (July 2001)<br><br>*Plan Ahead* brochure (June 2001)<br><br>*New Pension Plan Provision* (February 2001) | http://resources.hewitt.com/jhancock<br><br>John Hancock Benefits & HR Services 1-800-990-4404 |

*To request another copy of the most recent printed material, call Benefits & HR Services at 1-800-990-4404.*

The Pension Plan transitioned to a cash balance pension plan effective January 1, 2002. The cash balance formula determines the dollar amount (equal to a percentage of your eligible compensation) that the company contributes to your cash balance account each calendar quarter. Your cash balance account earns daily interest and you become vested over a five-year schedule, starting with your date of hire.

Special "grandfathering" rules apply to certain associates who were participants in the pension plan at the time it transitioned from the former final average pay formula to the current cash balance formula. The grandfathering provisions and eligibility are described in the *Plan Ahead* and *Transition* brochures distributed in 2001. Your grandfathered status, if applicable, was included in your opening balance statement as of January 1, 2002, and is also noted on the semi-annual account statements that you receive.

Associates can run pension estimates on the pension website, http://resources.hewitt.com/jhancock, or, if you don't have web access, you can request an estimate by calling Benefits & HR Services at 1-800-990-4404.

CONFIDENTIAL

JH 001110

## 11. Benefits at Retirement

*Please note that Essex Corporation associates are not eligible for the John Hancock Financial Services, Inc. Pension Plan.*

| Most Recent Printed Material / Date Distributed* | Current Online Information / More Information |
|---|---|
| *Plan Ahead* brochure (June 2001)<br><br>*Your Benefits Book* (January 1999) | John Hancock Benefits & HR Services 1-800-990-4404<br><br>www.sageo.com<br><br>http://resources.hewitt.com/jhancock<br><br>401(k) Benefits Center 1-800-450-5667 |

*To request another copy of the most recent printed material, call Benefits & HR Services at 1-800-990-4404.*

When you retire, dental, vision care, FSA, disability and severance pay benefits will end, while medical and some life insurance benefits will continue, but at different levels. Other benefits – such as pension or the 401(k) savings plan– may begin monthly payments at retirement.

Some changes have been made to retirement benefits, as communicated in the brochure entitled *Plan Ahead* distributed in June of 2001. The changes include:

- There is a cap on the Company's contributions for retiree medical coverage for associates who retire in 2002 and later.

- Dental coverage ceases at retirement.

- Life insurance is capped at $15,000 except if you meet the grandfathering and 15 years of service requirements.

- There is no longer an RIOB (Retiree Installment Option Benefit) option.

- There is no longer an SIOB (Survivor Installment Option Benefits) option.

CONFIDENTIAL

JH 001111

## 12. Severance Pay Plan

*Please note that JH Funds, Independence Investment LLC, Hancock Natural Resource Group, First Signature Bank & Trust, and Essex Corporation associates are not eligible for the John Hancock Financial Services, Inc. Severance Pay Plan.*

| Plan | Carrier | Most Recent Printed Material / Date Distributed* | Current Online Information / More Information |
|------|---------|--------------------------------------------------|----------------------------------------------|
| Severance Pay Plan | John Hancock Financial Services, Inc. | *Your Benefits Book* (January 1999) | Benefits & HR Services 1-800-990-4404 Hancock Hub |

*\*To request another copy of the most recent printed material, call Benefits & HR Services at 1-800-990-4404.*

In the event that the company finds it necessary to end your employment, and you are eligible for severance benefits, the Severance Pay Plan is intended to help you financially while you find other employment. There is no cost to associates for the Severance Pay Plan.

Effective October 19, 1999, the plan has been amended so that if you first become entitled to benefits under the Severance Pay Plan within three years after the date a Change of Control (as defined by the plan) occurs, you will receive:

- an additional benefit of 8 weeks of salary, which may be in addition to the maximum benefit, and

- a lump sum payment, in an amount determined by the company but not to exceed $2,500, to be used for employability expenses

Employability expenses include services related to your termination of employment, or your seeking and preparing for new employment or a new career, such as additional outplacement services, career development testing and/or coaching, education, financial counseling, fees associated with starting your own business (including legal fees), child and/or elder care expenses, etc. as defined by the plan.

Effective November 18, 2002, two provisions of the Severance Pay Plan were changed as follows:

- In the event of the sale or outsourcing of a business unit, if an employee of the business unit is offered a comparable job by, or accepts a non-comparable job with, the purchaser or successor company, severance will not be paid (comparable will be defined as similar salary, competitive benefit offerings, and a work location within 50 miles of the current work location).

- If the purchaser or successor company subsequently terminates the employee within six months of the sale or outsourcing (and hire) date, severance will not be paid under the John Hancock plan.

If you have questions on the Severance Pay Plan, you may contact Benefits & HR Services at 1-800-990-4404.

CONFIDENTIAL

JH 001112

# 13. Important Administrative Information

## a. Your Rights Under ERISA

As a participant in the John Hancock benefit plans, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all plan participants shall be entitled to:

*Receive Information About Your Plan and Benefits*

Examine, without charge, at the plan administrator's office and other specified locations, all documents governing the plan, including insurance contracts and collective bargaining agreements, and a copy of the latest annual report (Form 5500 series) filed by the plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Pension and Welfare Benefit Administration.

Obtain, upon written request to the plan administrator, copies of documents governing the operation of the plan, including insurance contracts and collective bargaining agreements, and copies of the latest annual report (Form 5500 series) and updated summary plan description. The administrator may make a reasonable charge for the copies.

Receive a summary of the plan's annual financial report. The plan administrator is required by law to furnish each participant with a copy of this summary annual report.

Obtain a statement telling you whether you have a right to receive a pension at normal retirement age (age 65 in most cases) and if so, what your benefits would be at normal retirement age if you stop working under the plan now. If you do not have a right to a pension, the statement will tell you how many more years you have to work to get a right to a pension. This statement must be requested in writing and is not required to be given more than once every twelve months. The plan must provide the statement free of charge.

*Continue Group Health Plan Coverage*

Continue health care coverage for yourself, spouse or dependents if there is a loss of coverage under the plan as a result of a qualifying event. You or your dependents may have to pay for such coverage. Review the summary plan description and the documents governing the plan on the rules governing your COBRA continuation coverage rights.

Reduction or elimination of exclusionary periods of coverage for preexisting conditions under your group health plan, if you have creditable coverage from another plan. You should be provided a certificate of creditable coverage, free of charge, from your group health plan or health insurance issuer when you lose coverage under the plan, when you become entitled to elect COBRA continuation coverage, when your COBRA continuation coverage ceases, if you request it before losing coverage, or if you request it up to 24 months after losing coverage. Without evidence of creditable coverage, you may be subject to a preexisting condition exclusion for 12 months (18 months for late enrollees) after your enrollment date in your coverage.

*Prudent Actions by Plan Fiduciaries*

In addition to creating rights for plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries. No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a pension or welfare benefit or exercising your rights under ERISA.

CONFIDENTIAL

JH 001113

*Enforce Your Rights*

If your claim for a pension or welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of plan documents or the latest annual report from the plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the plan administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. In addition, if you disagree with the plan's decision or lack thereof, concerning the qualified status of a domestic relations order or a medical child support order, you may file suit in federal court. If it should happen that plan fiduciaries misuse the plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

*Assistance with Your Questions*

If you have any questions about your plan, you should contact the plan administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the plan administrator, you should contact the nearest office of the Pension and Welfare Benefits Administration, U.S. Department of Labor, listed in your telephone directory, or the Division of Technical Assistance and Inquiries, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Pension and Welfare Benefits Administration.

## b. Your Rights Under COBRA

Effective January 1, 2002, the COBRA administrator changed from Sykes HealthPlan Services (SHPS) to Sageo, 1-877-847-2436 or www.sageo.com. The cost for continuing coverage under COBRA is 102 percent of the full group premium. The extra two percent charge is intended to cover the cost of Plan Administration.

*Group Health Continuation Coverage Under COBRA (Consolidated Omnibus Budget Reconciliation Act)*

On April 7, 1986, a federal law was enacted (Public Law 99-272, Title X) requiring that most employers sponsoring group health plans offer employees and their families the opportunity for a temporary extension of health coverage (called "continuation coverage") at group rates in certain instances where coverage under the plan would otherwise end. This notice is intended to inform you, in a summary fashion, of your rights and obligations under the continuation coverage provisions of the law. Both you and your spouse should take the time to read this notice carefully.

If you are an employee of John Hancock Financial Services, Inc., covered by the company's group health plan, you have a right to choose this continuation coverage if you lose your group health coverage because of a reduction in your hours of employment or the termination of your employment (for reasons other than gross misconduct on your part).

**CONFIDENTIAL**

JH 001114

If you are the spouse of an employee covered by the company's group health plan, you have the right to choose continuation coverage for yourself if you lose group health coverage under the John Hancock Financial Services, Inc. group health plan for any of the following four reasons:

1) The death of your spouse;
2) A termination of your spouse's employment (for reasons other than gross misconduct) or reduction in your spouse's hours of employment with John Hancock Financial Services, Inc.;
3) Divorce or legal separation from your spouse; or
4) Your spouse becomes entitled to Medicare.

In the case of a dependent child of an employee covered by the John Hancock Financial Services, Inc. group health plan, he or she has the right to continuation coverage if group health coverage under the John Hancock Financial Services, Inc. group health plan is lost for any of the following five reasons:

1) The death of the employee;
2) A termination of the employee's employment (for reason other than gross misconduct) or reduction in the employee's hours with John Hancock Financial Services, Inc.;
3) The employee's divorce or legal separation;
4) The employee becomes entitled to Medicare; or
5) The dependent child ceases to be a "dependent child" under the John Hancock Financial Services, Inc. group health plan.

Under the law, the employee or a family member has the responsibility to inform the John Hancock Financial Services, Inc. group health Plan Administrator of a divorce, legal separation, or a child losing dependent status under the John Hancock Financial Services, Inc. group health plan within 60 days of the date of the event. John Hancock Financial Services, Inc. has the responsibility to notify the Plan Administrator of the employee's death, termination, reduction in hours of employment or Medicare entitlement. Similar rights may apply to certain retirees, spouses, and dependent children if your employer commences a bankruptcy proceeding and these individuals lose coverage.

When the Plan Administrator is notified that one of these events has happened, the Plan Administrator will in turn notify you that you have the right to choose continuation coverage. Under the law, you have at least 60 days from the date you would lose coverage because of one of the events described above to inform the Plan Administrator that you want to continue coverage.

If you do not choose continuation coverage on a timely basis, your group health insurance coverage will end.

If you choose continuation coverage, John Hancock Financial Services, Inc. is required to give you coverage which, as of the time coverage is being provided, is identical to the coverage provided under the plan to similarly situated employees or family members. The law requires that you be afforded the opportunity to maintain continuation coverage for 36 months unless you lost group health coverage because of a termination of employment or reduction in hours. In that case, the required continuation period is 18 months. This 18 months may be extended for affected individuals to 36 months from termination of employment if other events (such as a death, divorce, legal separation, or Medicare entitlement) occur during that 18-month period.

In no event will continuation coverage last beyond 36 months from the date of the event that originally made a qualified beneficiary eligible to elect coverage. The 18 months may be extended to 29 months if a qualified beneficiary is determined by the Social Security Administration to be disabled (for Social Security disability purposes) at any time during the first 60 days of COBRA coverage. This 11-month extension is available to all individuals who are qualified beneficiaries due to a termination or reduction in hours of employment. To benefit from this extension, a

**CONFIDENTIAL**

JH 001115

qualified beneficiary must notify the Plan Administrator of that determination within 60 days and before the end of the original 18-month period. The affected individual must also notify the Plan Administrator within 30 days of any final determination that the individual is no longer disabled.

A child who is born or placed for adoption with the covered employee during a period of COBRA coverage will be eligible to become a qualified beneficiary. In accordance with the terms of the John Hancock Financial Services, Inc. group health plans and the requirements of federal law, these qualified beneficiaries can be added to COBRA coverage upon proper notification to the Plan Administrator of the birth or adoption.

However, the law also provides that continuation coverage may be cut short for *any* of the following five reasons:

1) John Hancock Financial Services, Inc. no longer provides group health coverage to any of its employees;
2) The premium for continuation coverage is not paid on time;
3) The qualified beneficiary becomes covered  - after the date he or she elects COBRA coverage – under another group health plan that does not contain any exclusion or limitation with respect to any pre-existing condition he or she may have;
4) The qualified beneficiary becomes entitled to Medicare after the date he or she elects COBRA coverage;
5) The qualified beneficiary extends coverage for up to 29 months due to disability and there has been a final determination that the individual is no longer disabled.

The Health Insurance Portability and Accountability Act of 1996 (HIPAA) restricts the extent to which group health plans may impose pre-existing condition limitations. These rules are generally effective for plan years beginning after June 30, 1997. HIPAA coordinates COBRA's other cut-off rule with these new limitations as follows.

If you become covered by another group health plan and that plan contains a pre-existing condition limitation that affects you, your COBRA coverage cannot be terminated. However, if the other plan's pre-existing condition rule does not apply to you by reason of HIPAA's restrictions on pre-existing condition clauses, the John Hancock Financial Services, Inc. group health plan may terminate your coverage.

You do not have to show that you are insurable to choose continuation coverage. However, continuation coverage under COBRA is provided subject to your eligibility for coverage; the John Hancock Financial Services, Inc. group health Plan Administrator reserves the right to terminate your COBRA coverage retroactively if you are determined to be ineligible.

Under the law, you may have to pay all or part of the premium for your continuation coverage. There is a grace period of at least 30 days for payment of the regularly scheduled premium. At the end of the 18 month, 29 month or 36 month continuation coverage period, qualified beneficiaries may be allowed to convert certain coverage to individual policies under the John Hancock Financial Services, Inc. group health plan.

If you have any questions about COBRA, please contact Sageo at 1-877-847-2436 or www.sageo.com. Also, if you have changed marital status, or you or your spouse have changed addresses, please notify Sageo at the following address:
Sageo
P.O. Box 785020
Orlando, FL 32878-5020
Attn: Customer Care

**CONFIDENTIAL**

JH 001116

### c. Your Rights Under USERRA

The Uniformed Services Employment and Re-employment Rights Act of 1994 (USERRA) requires certain rights and benefits to be provided or made available to employees absent due to military service, including in certain circumstances, coverage under the employer's health plan. Additional information can be obtained from the Benefits Office at the military base to which the active duty member is attached.

### Military Leave Policy for Home Office and JHSS associates

John Hancock's current Military Leave Policy for Home Office and JHSS associates is outlined below. Please note that military leave policies may vary by subsidiary. If you are a subsidiary associate, please check with your Human Resources representative.

The following summarizes the company's Military Leave policy, including some enhancements to the policy as it relates to the current crisis.

### Length of Leave

- The Company must allow an employee leave for training requirements.

- In the current situation, the length of leave may not be known, at least initially.

- Employees going on Military Leave will need to provide a copy of their activation papers, complete a Leave of Absence Form and ensure their benefit status is clear prior to their departure, unless giving notice is unreasonable or impossible.

### Pay

- Employees are eligible for two weeks of paid Military Leave at full salary each year.

- Additionally, the Company will institute a special policy during this crisis under which it will continue to compensate activated employees for the difference between their John Hancock base salary and Military base pay for up to fifty weeks.

- Employees on Military Leave will maintain eligibility for incentive compensation plans under the terms of the Company's plans for performance during any year in which they are actively at work.

### Health, Pension and 401(K) Benefits

This section identifies how your health, pension and 401(k) benefits are affected upon military activation during the crisis. Unless otherwise noted, these changes are effective on the first day of active duty. Military leaves due to training may vary. Please check with your HR Administrator for benefit changes.

### Medical and Dental

- Medical and/or dental coverage ceases for employees that are activated to active duty for more than 31 days; however the employee's eligible dependents may continue their coverage with John Hancock.

- Sageo, John Hancock's benefit administrator, cannot separate employees and dependent's record for loss of medical and/or dental coverage due to military duty. When employees return from military leave, employees will be reimbursed for employee premiums only. Prior to reimbursement of premiums, employees will need to sign a waiver, stating medical and/or dental coverage was not used while on active duty.

CONFIDENTIAL

JH 001117

- Employees that become eligible to elect TRICARE medical and/or dental coverage for their eligible dependents and wish to drop coverage with John Hancock, will need to contact Sageo and drop their dependents from coverage within 31 days from 1st day of active duty. Unlike above, all premiums will be stopped. More information about the TRICARE program is available on its web site at www.tricare.osd.mil/.

## Vision

- Vision coverage will continue for employees and eligible dependents.

## Pension and 401(k)

- The military leave period counts toward pension eligibility service, vesting service and benefit accrual.

- Upon return to active employment, employees will be allowed to make-up missed 401(k) contributions and receive the corresponding company match.

## Life Insurance

- Basic and optional group life insurance coverage ceases. Employees do have the right to convert their group policy to an individual policy. Employees would need to contact Sageo directly to request the conversion form and return the form to Group Life Department within 31 days from 1st day of active duty.

- Dependent life insurance coverage ceases. Employees do have the right to convert their group policy to an individual policy. Employees would need to contact Sageo directly to request the conversion form and return to Group Life Department within 31 days from 1st day of active duty.

## Accidental Death and Dismemberment

- Basic and optional Accidental Death & Dismemberment (AD&D) coverage ceases. Employees do not have conversion rights as AD&D coverage is a non-convertible benefit.

- Upon return to work, employees will be able to elect benefits they had prior to their military leave. One exception, if the employees opted to convert any life insurance, employees would have to lapse coverage or provide Proof of Good Health in order to re-elect life insurance.

## Disability

- LTD coverage terminates.

## Flexible Spending Accounts (FSAs)

- Health and/or dependent flexible spending account(s) will continue. However, due to the fact that employees lose their medical and/or dental coverage, employees will be able to

**CONFIDENTIAL**

JH 001118

decrease/drop their health FSA. Employees would need to contact Sageo within 31 days from 1st day of active duty to decrease/drop their health FSA.

## Long-Term Care (LTC)

- LTC coverage continues. LTC does have an "Act of War" provision; therefore, benefits will not be paid out if injury is caused by an "Act of War".

## Stock Options

- For employees on Military Leave, any unexercisable stock options shall become exercisable in accordance with the normal schedule and such stock options may be exercised on or before the Normal Expiration Date. For more information, please contact PaineWebber at (877) JHF-0799/(877) 543-0799 or by logging on to their web site at www.cefs.ubspainewebber.com/jhf .

## Miscellaneous

- Counseling Services, Child Care Center, Back-up Child Care and LifeWorks will remain available to employees who are called up for Military service during this crisis. Contact Benefits & HR Services at 800-990-4404 or x24404 to discuss special situations.

## Vacation

- If Military Leave is less than three months, when you return to active employment, you will be provided with the full vacation allowance based on your service, including the Military Leave period (less any vacation days used previously for the calendar year). For any time the Military Leave exceeds three months, your vacation allowance will be prorated consistent with the Company leave policies.

## Re-Employment Rights

- Following Military Leave, employees who have been honorably discharged will be restored to their former positions or to positions of like seniority, status and pay.

- The length of time in which application for re-employment must be made is dependent on the length of the leave. In compliance with the Uniformed Services Employment and Reemployment Rights Act (USERRA):

  o If the leave is less than 180 days, application for re-employment must be made within 14 days following completion of military service.

  o For leaves more than 180 days, application for re-employment must be made no later than 90 days following completion of service

- The pay of a returning veteran will be established as if he/she had been actively at work at John Hancock during the leave period.

CONFIDENTIAL

JH C51119

### d. Newborns and Mothers Health Protection Act

Group health plans and health insurance issuers generally may not, under federal law, restrict benefits for any hospital length of stay in connection with childbirth for the mother or newborn child to less than 48 hours following a vaginal delivery, or less than 96 hours following a cesarean section. However, federal law generally does not prohibit the mother's or newborn's attending provider, after consulting with the mother, from discharging the mother or her newborn earlier than 48 hours (or 96 hours as applicable). In any case, plans and issuers may not, under federal law, require that a provider obtain authorization from the plan or the insurance issuer for prescribing a length of stay not in excess of 48 hours (or 96 hours).

### e. Women's Health and Cancer Rights Act

The Women's Health and Cancer Rights Act of 1998 requires health plans to provide benefits for mastectomy-related services, including all stages of reconstruction and surgery to achieve symmetry between the breasts, prostheses, and complications resulting from a mastectomy, including lymphedema. Call your plan (see contact information under the Medical section of this brochure) for more information.

### f. QDRO (Qualified Domestic Relations Order) Procedure

Participants and beneficiaries can obtain, without charge, a copy of the procedures governing Qualified Domestic Relations Order (QDRO) determinations. Contact Benefits & HR Services at 1-800-990-4404.

### g. QMCSO (Qualified Medical Child Support Order) Procedure

Participants and beneficiaries can obtain, without charge, a copy of the procedures governing Qualified Medical Child Support Order (QMCSO) determinations. Contact Benefits & HR Services at 1-800-990-4404.

### h. FMLA (Family and Medical Leave Act)

Effective September 1, 2001, salaried full-time employees with at least 12 months (versus the former six months) of service are eligible for up to 12 weeks of FMLA (Family and Medical Leave Act) leave. Salaried short-hour employees with at least 12 months of service are eligible for FMLA leave on a pro-rated basis. Hourly employees are ineligible for FMLA leave.

FMLA allows employees to take up to 12 weeks per calendar year of unpaid leave, with company subsidized benefits. FMLA leave may be taken all at once or in blocks of time, or in some situations, on an intermittent or reduced leave basis. The leave may be taken for the birth and first year care of a child; adoption or foster placement of a child in the employee's home; the care of a spouse, child or parent with a serious health condition; or the serious health condition of the employee.

Time out of the office for an FMLA reason may be taken as family care days, vacation, personal leave, personal days, deduct days or disability, depending on the situation.

For more information, please contact your Human Resources representative.

### i. PBGC (Pension Benefit Guaranty Corporation)

Your pension benefits under the John Hancock Financial Services, Inc. Pension Plan are insured by the Pension Benefit Guaranty Corporation (PBGC), a federal insurance agency. If the plan terminates (ends) without enough money to pay all benefits, the PBGC will step in and pay

CONFIDENTIAL

JH 001120

pension benefits. Most people receive all of the pension benefits they would have received under their plan, but some people may lose certain benefits. The PBGC guarantee generally covers: (1) normal and early retirement benefits; (2) disability benefits if you become disabled before the plan terminates; and (3) certain benefits for your survivors.

The PBGC guarantee generally does not cover (1) benefits greater than the maximum guaranteed amount set by law for the year in which the plan terminates; (2) some or all of benefit increases and new benefits based on plan provisions that have been in place for fewer than 5 years at the time the plan terminates; (3) benefits that are not vested because you have not worked long enough for the company; (4) benefits for which you have not met all of the requirements at the time the plan terminates; (5) certain early retirement payments (such as supplemental benefits that stop when you become eligible for Social Security) that result in an early retirement monthly benefit greater than your monthly benefit at the plan's normal retirement age; and (6) non-pension benefits, such as health insurance, life insurance, certain death benefits, vacation pay, and severance pay.

Even if certain of your benefits are not guaranteed, you still may receive some of those benefits from the PBGC depending on how much money your plan has and on how much the PBGC collects from your employers.

For more information about the PBGC and the benefits it guarantees, ask your plan administrator or contact the PBGC's Technical Assistance Division, 1200 K Street N.W., Suite 930, Washington, D.C. 20005-4026 or call 202-326-4000 (not a toll-free number). TTY/TDD users may call the federal relay service toll-free at 1-800-877-8339 and ask to be connected to 202-326-4000. Additional information about the PBGC's pension insurance program is available through the PBGC's website at http://www.pbgc.gov.

## j. Claims and Appeals

If you think you are eligible for a benefit from any plan, you must file a claim. Specific instructions about filing claims are available from the plan. Claims addresses are included in section k of this supplement. The claims and appeals timeframes indicated are effective January 1, 2003 for group health plans and January 1, 2002 for all other plans.

## Claims

Once your claim has been documented and you've filled out all the necessary forms, the claims administrator ordinarily will act on it within the timeframe indicated below:

Group Health Plans

- **Urgent Care:** Plan must notify claimant within 72 hours.

- **Pre-Service Claims:** Plan must notify claimant within 15-days. One 15-day extension for special circumstances is allowed.

- **Post-Service Claims:** Plan must notify claimant within 30 days. One 15-day extension for special circumstances is allowed.

- **Concurrent Care:** If urgent care, Plan must notify claimant within 24 hours.

**CONFIDENTIAL**

JH 001121

**Disability Plans**

- Plan must notify claimant within 45 days.

- Plan may extend for up to two additional 30-day periods for special circumstances, provided claimant is notified of extension within the original time period for response.

**Retirement and Other ERISA Plans**

- Plan must process claims within 90 days, with an additional 90 days for special circumstances.

If your claim is denied, you'll be notified in writing. This written notice will tell you the reason for the denial as well as how you can have a claim denial reviewed.

## Appeals

If your claim has been denied, or if you have not heard anything within the allotted timeframe after you've sent it in, you can appeal the denial and have your claim reviewed by submitting a written request. You may appeal within 180 days from the time you are notified of the denial, or from the end of the processing period for Group Health and Disability Claims. However, for Retirement and Other ERISA Plans, you may appeal within 60 days from the time you are notified of the denial, or from the end of the 90-day processing period if you have heard nothing by that time.

As part of your appeal, you or your authorized representatives can examine documents pertinent to your denied claim. You can also submit, in writing, reasons why you think the claim should not be denied.

Those reviewing your appeal have to act within the following timeframes after receipt of your appeal:

**Group Health Plans**

- **Urgent Care Claims:** Plan must notify claimant within 72 hours.

- **Pre-Service Claims:** Plan must notify claimant within 30 days.

- **Post Service Claims:** Plan must notify claimant within 60 days.

**Disability Plans**

- Plan must make determination within 45 days of receipt, with an additional 45 days if special circumstances exist.

**Retirement and Other ERISA Plans**

- Plan must make determination within 60 days of receipt of appeal, with an additional 60 days if special circumstances exist.

The final decision will be sent to you in writing with an explanation of the reasons for the decision.

**CONFIDENTIAL**

JH 001122

### k. Claims Addresses

Following is a list of addresses for submitting claims to the plans. Please note that these addresses are for the plans offered as of December 2002.

## Medical plans

**Aetna**
P.O. Box 1125
Blue Bell, PA 19422

**Avmed**
P.O. Box 569000
Miami, FL 33256

**Blue Cross Blue Shield/Claims in MA**
P.O. Box 9196
North Quincy, MA 02174

**Blue Cross Blue Shield/outside of MA**
Use local office on your BCBS ID card

**Caremark** (Pharmacy claims for Blue Cross Blue Shield plans)
P.O. Box 686005
San Antonio, TX 78268

**Fallon Community Health Plan**
10 Chestnut St. - 7th Floor
Worcester, MA 01608

**Harvard Pilgrim Health Care**
P.O. Box 699183
Quincy, MA 02269-9183

**HAP (Health Alliance Plan)**
Attn: Claims Dept
2850 West Grand Blvd
Detroit, MI 48202

**Kaiser of No. California**
P.O. Box 12923
Oakland, CA 94604-2923

**Kaiser of So. California**
P.O. Box 7102
Pasadena, CA 91109-9882

**CONFIDENTIAL**

JH 001123

**Oxford Health Plan**
P.O. Box 8702
Bridegeport, CT 06601

**Pacificare HMO**
Attn: Claims Dept
P.O. Box 6006
Cypress, CA 90630

**Presbyterian Health Plan**
Attn: Claims Dept
P.O. Box 27489
Albuquerque, NM 87125

**Tufts Health Plan**
P.O. Box 9163
Watertown, MA 02471-9163

United Health Care of RI
Metrocenter
475 Kilvert St.
Warwick, RI 02886

## Dental

**Delta Dental Plan**
P.O. Box 9695
Boston, MA 02114

## Vision Care

**ECPA Claims Administration** (Vision claims)
P.O. Box 51810
Phoenix, AZ 85076-1810

## Long-Term Care Insurance

**John Hancock Group Long-Term Care**
X-03
P.O. Box 111
Boston, MA 02115

CONFIDENTIAL

JH 003124

## Flexible Spending Accounts (FSAs)

**Wausau Benefits, Inc.**
P.O. Box 8022
Wausau, WI 54402-8022

## Group Life Insurance

**John Hancock Financial Services, Inc.**
Attn: GLAD X3A
P.O. Box 111
Boston, MA 02117

## Disability

**The Hartford**
Benefit Management Services
Northland Plaza
3800 West 80th St.
Bloomington, MN 55431-4440

## Adoption Benefit

**John Hancock Financial Services, Inc.**
Attn: Linda Conway
Benefits & HR Services C-1-04
P.O. Box 111
Boston, MA 02117

## 401(k) Savings Plans

**John Hancock Benefits Center**
2300 Discovery Drive
P.O. Box 785019
Orlando, FL 32878-5019

## Pension Plan

**John Hancock Financial Services, Inc.**
Benefits & HR Services, C-01-04
John Hancock Place
P. O. Box 111
Boston, MA 02117

**CONFIDENTIAL**

JH 001125

## Benefits at Retirement

**John Hancock Financial Services, Inc.**
Benefits & HR Services, C-01-04
John Hancock Place
P. O. Box 111
Boston, MA 02117

## Severance Pay Plan

**John Hancock Financial Services, Inc.**
Benefits & HR Services, C-01-04
John Hancock Place
P. O. Box 111
Boston, MA 02117

## Benefits Administration

**Sageo**
P.O. Box 785020
Orlando, FL 32878-5020
Attn: Customer Care

*Benefits Supplement / December 2002*

CONFIDENTIAL

JH 001126



Ben Supp HO/Subs 12/02

CONFIDENTIAL

JH 001127

CONFIDENTIAL

JH 001128

# EXHIBIT 3



**DRAFT**

Severance
Comparable Job definition

Audience for this document:  Human Resources and JH Senior Management

Issue:  John Hancock's Severance Pay Plan states that "Without limiting the generality of the foregoing, an employee who voluntarily terminates his employment, whose employment is terminated for reasons other than a reduction in staff or whose employment is terminated for reasons relating to his performance shall not be eligible for benefits under the Plan.  Employment is not terminated for the purposes of this Plan if an employee:.............. C) is offered a comparable position, as determined by the Company, as an employee with, or provides services in any capacity to, a Successor Company".

Further, in an employee communication dated 11/21/02 "comparable position" was defined as "similar salary, competitive benefit offerings, and a work location within 50 miles of the current work location".

The purpose of this document is to provide further guidance  regarding the issue of comparability used in the 11/21/02 communication.  In the determination as to whether or not a position is comparable, all three of the following elements will be considered separately as well as collectively.

Note:  If an offered position is deemed to be not comparable, the employee will have a choice between accepting the position **or** electing severance – they will not get both.

**Similar Salary**
- We will consider a range.
- When evaluating salary for comparability we will consider a guideline of 80-90% or more of current base salary as likely to be comparable.  We will also consider the out of pocket benefit costs to employees in the successor company benefit plans vs. the out of pocket costs to employees at JH in determining the range.
- Bonus will be excluded from consideration
- Overtime and shift differentials will be excluded from consideration.

**Geography**
- If the work location of the position offered is within 50 miles of the current work location, the position will meet the criteria of comparability for severance purposes.  The mileage will be determined based on **(JOAN TO RESEARCH)**

JH 000045

## <u>Competitive Benefit Offerings</u>

In determining whether or not the benefits offered are competitive, we will consider the value of the benefit package to the employee compared to the industry of which the successor company is a part. We will determine this competitiveness using available industry data. The benefits are not compared to those offered by JH or by the Financial Services industry.

The following benefits will be considered in this comparison:

- 401(k) – current savings
- Pension
- Medical
- Dental
- Vacation

## <u>Notes:</u>

- The overall comparability assessment will be determined for the entire affected group rather than on an employee-by-employee basis.
- Individuals may appeal the decision in writing by following the attached appeal instructions.
- The appeal committee will be comprised of the comparability evaluation group plus the addition of the head of Human Resources as the appeals chairperson.

JH 000046

# EXHIBIT 4



**John Hancock Complex Sale**
**Questions and Answers**
**November 26, 2002**

## FINANCIAL

- **Why are you selling the complex?**

  We are selling the Tower, Brown Building and Berkeley Building to unlock a significant amount of capital that can be redeployed in ways that strengthen the company and create value for our stakeholders. The sale is a logical next step in the strategic capital management process that Hancock began several years ago.

  As part of that process, Hancock has divested itself of nearly all of the company's approximately $2 billion equity real estate portfolio, including the John Hancock Center in Chicago. The Hancock home office complex is the last of the company's large real estate holdings.

  A critical part of the sale is that Hancock will be signing a long-term lease of at least ten years for much of the space it currently occupies for its business operations in the complex. The company will also have several options to extend the leases and anticipates having the ability to reside in the complex for at least 25 years. The company has no plans to move from Boston; the complex will remain John Hancock's corporate headquarters and Hancock will continue its commitment to being an involved, contributing and active corporate citizen in Boston and the surrounding community.

- **Why are you selling now?**

  As the equity and bond markets have continued to slip over the past year or so, investors have increasingly turned to hard assets such as real estate. As a result, despite a sluggish economy, the real estate market for class-A, "trophy" office properties -- like Hancock's three key home office complex buildings -- in premier locations like Boston is strong right now.

  Given strong investor demand for properties like ours now, we believe this is an opportune time to maximize the value of our assets. The company will be unlocking a significant amount of capital that can be redeployed in ways that strengthen the company and create value for our stakeholders.

  In so doing, John Hancock will also be following the lead of many publicly traded financial services companies that lease their corporate headquarter space rather than commit significant capital to owning and managing that property.  These companies include:  Nationwide Financial, Lincoln National, MONY, Mellon Financial, State Street, Citigroup and CIGNA.

  Numerous media outlets have published stories about other companies that also have been selling properties. Stories that offer good insight into this are *"Billionaires Bet on Buildings,"* Forbes.com, October 21, 2002, *"Commercial Real Estate Investors Seek Refuge Under Some Big Roofs,"* Los Angeles Times, July 23, 2002, *"Corporate Real-Estate Sales Surge,"* The Wall Street Journal, October 22, 2002 (to obtain copies of these stories please contact Jo Breiner at jbreiner@jhancock.com).

1

JH 001164

- **Does this decision mean the company is also for sale?**

  No, the fact that we are selling the buildings does not mean the company is for sale. We are signing leases for much of the space we currently occupy in the complex for business purposes. This clearly should indicate that we intend to stay in Boston and keep the complex as our corporate headquarters.

  We are not moving and will continue our commitment to being an involved, contributing and active corporate citizen in Boston and the surrounding community.

- **What will the company do with the proceeds of the sale?**

  Our overall goal is to redeploy the capital in ways that strengthen the company and create value for our stakeholders. Hancock has many options in this regard, including acquisitions, organically growing our U.S. life insurance companies and/or improving the life company's overall risk-based capital requirements from a ratings perspective.

- **Is this sale being done to cover the credit losses your company has suffered over the past year?**

  No, we are selling the complex at an opportune time to unlock a significant amount of capital that can be redeployed in ways that strengthen the company and create value for our stakeholders. The sale is a logical next step in the strategic capital management process that Hancock began several years ago.

- **What do you expect the sale price will be?**

  We have an exceptionally attractive property and expect to secure the highest possible price for it. We will not speculate on what that price might be.

- **What happens if you do not get a price you consider to be fair and reasonable?**

  We have an exceptionally attractive property and expect to secure the highest possible price for it. Given the state of the markets and our property, we believe that we will receive strong offers for the assets. If we do not, we always have the option of taking the properties off the market.

- **Who might be potential buyers?**

  There is strong interest right now among foreign buyers to purchase high-quality office properties in the United States. Other potential buyers are pension funds, private investors, and real estate investment trusts (REITs).

- **Who will be the marketing agent for the property and where are they located?**

  Morgan Stanley, which is based in New York City.

- **Does adding this money to the bottom line make Hancock more attractive to a potential buyer?**

  We don't think it makes a significant difference. The Hancock complex is, in effect, a hidden asset of the company. The properties have a market value well in excess of their book value. This is not being done to attract buyers.

2

CONFIDENTIAL

JH 001165

- **Will John Hancock help finance the purchase?**

  The company does not want to be involved in the financing of the property.

- **Will Wall Street see this as a positive move?**

  We will unlock a significant amount of capital that can be redeployed in ways that strengthen the company and create value for our stakeholders. We think this will be viewed as a positive move by our investors and the Wall Street analysts who cover us. The sale also reinforces the commitment that Hancock has made to the strategic capital management process that it began several years ago.

- **Will this affect the stock price?**

  A company's stock price is affected by numerous factors. It's difficult to say whether this would have any impact on the company's stock price. However, we do think that because this unlocks significant capital that can be redeployed in ways that strengthen John Hancock Financial Services and our life insurance companies, and create value for our stakeholders, it will be viewed by investors as a positive and strategic business move.

- **If you look at Hancock's peers, are there other companies that do not own their headquarters?**

  Hancock will be one of many financial services companies that does not own their corporate headquarters. Nationwide Financial, Lincoln National, MONY, Mellon Financial, State Street, CIGNA and Citigroup do not own their corporate headquarters.

- **When do you expect this deal to close?**

  We are looking to move this process along as quickly as possible and to realize the appropriate value for the properties. Given that, it's difficult to predict if and when the closing will occur, but we anticipate that it will be some time in the next several months.

- **What properties comprise the John Hancock complex and where are they located? Are they all being sold? How many square feet of office space does the complex comprise?**

  The following properties in the Hancock home office complex are being put on the market as one package:

  | The John Hancock Tower | 200 Clarendon Street |
  |---|---|
  | The Stephen L. Brown Building | 197 Clarendon Street |
  | The Berkeley Building | 200 Berkeley Street |

  Together, these buildings approach three million square feet of office space.

  The Hancock Parking Garage at 100 Clarendon Street is under an air rights lease with the Massachusetts Turnpike Authority. Therefore, rather than selling the Hancock Parking Garage, we are planning to transfer certain rights under that lease in the offering.

3

CONFIDENTIAL

JH 001166

- **How many floors does each building have? When were they built? By whom?**

| Building | Floors | Year Built | Architect |
|---|---|---|---|
| The John Hancock Tower | 62 | 1973 | Henry Cobb for I.M. Pei & Associates |
| The Stephen L. Brown Building | 12 | 1923 | Parker, Thomas & Rice |
| The Berkeley Building | 26 | 1947 | Cram & Ferguson Architects-Engineers |

- **Will these properties only be sold as a package?**

It is our expectation that the properties will be sold as a package. However, we are flexible and want to maximize the total value of the properties.

- **Is the 380/370 Stuart Street building or the Conference Center at 40 Trinity Place included in the offering?**

No. These buildings are not included in the package of properties to be sold. At this time, the company has decided to hold on to these properties.

- **It was previously announced that several adjoining properties on Clarendon Street were being offered for sale. Are these part of this offering?**

No. The package does not include Hancock's Clarendon Assemblage properties, which consist of 131 Clarendon Street (the Hard Rock Café building) and adjacent parking lots on both sides of that building (one on the corner of Stuart and Clarendon Streets, and the other at the corner of Stanhope and Clarendon Streets).

In May, the company said that these development parcels would be put up for sale, and with today's announcement, these parcels and the Tower Complex will be marketed separately, but at approximately the same time.

The marketing agent for Hancock's Clarendon Assemblage properties is Cushman & Wakefield of Massachusetts.

4

CONFIDENTIAL

JH 001167

**Community Impact**

- **Is the company moving to a new location in Boston or out of town altogether?**

No. Any sale will include Hancock signing long-term leases for much of the space that it currently occupies for business operations in the complex. We have no plans to move from Boston. The complex will remain John Hancock's corporate headquarters and Hancock will continue its commitment to being an involved, contributing and active corporate citizen in Boston and the surrounding community.

Employees will occupy numerous floors of the Tower. Hancock also will be leasing nearly all of the Stephen L. Brown building located across the street from the Tower, for its employees, as well as floors in the 200 Berkeley Street building.

Although the precise terms of Hancock's lease or leases will be negotiated with any prospective purchaser, the company will sign a long-term lease of least ten years with several options to extend. The company anticipates having the ability to reside in the complex for at least 25 years.

Hancock also owns 380/370 Stuart Street, where employees will continue to occupy numerous floors.

- **What impact will this have on the company's commitment to Boston and the community?**

The sale of the properties will have no impact on John Hancock's commitment to the area. We have no plans to move from Boston. The complex will remain John Hancock's corporate headquarters and Hancock will continue its commitment to being an involved, contributing and active corporate citizen in Boston and the surrounding community.

5

CONFIDENTIAL

## Employee Impact

- **Who will be in charge of operating the building and providing security?**

  As is common with all such transactions, the new owner will be responsible for operating and managing the buildings and providing security. It is important to note, however, that the strength of the operations and security for the Hancock complex is one of the key factors making it such attractive rental space. We expect that any new owner will assign a high priority to operations and security at the complex.

- **What will happen to Hancock associates who currently perform these duties? How many positions do you anticipate will be eliminated?**

  We expect that the company's trades people (i.e. electricians, mechanics and service technicians) and security personnel will be most affected by the sale of the property.

  Ultimately, it will be up to the new owner to determine how the buildings will be staffed. Given the unique operational aspects of the Tower, it is our hope that many of our associates affected by the sale will be hired by the new owner and continue to perform essentially the same functions.

  In other cases, positions will be eliminated and those employees will be provided with a severance package under the terms of the company's severance plan. The exact number of employees that may be impacted by this sale has not yet been determined.

- **Will JH continue to have its own security group?**

  Yes. It will maintain a reduced security staff. John Hancock's in-house security operation will continue to provide many of the same functions they perform now for the company, including Hancock identification distribution, special events work, business contingency planning and disaster safety planning.

  The new owner will be responsible for the building's security.

- **How will security and access be provided on floors that Hancock leases?**

  Like many of the current tenants in the building, Hancock floors will be secured with doors and card readers.

  Overall security for the buildings will be provided by the new owner.

- **Will the cleaning service change?**

  As is common with all such transactions, the new owner will be responsible for operating and maintaining the buildings and selecting the maintenance company. This is, however, a premier property and not only is the new owner responsible for providing standards for a class-A office building, but we expect that any new owner will assign a significant priority to maintaining the properties at a high level.

6

JH 001169

- **What will happen to:**
  - **The Tunnel between the Tower and the Brown buildings?**

    As part of the offering, the new owner will be required to continue to allow employees to use the tunnel between the two buildings.

  - **Employee parking?**

    Hancock employees will continue to be able to park in the garage. The location of parking and cost currently are being considered and will be part of the negotiations with the new owner.

  - **The child care center?**

    The child care center will remain in its current location. The Stuart Street property, where it is located, is not being sold as part of this transaction.

  - **The cafeteria, Choices and the Coffee Stop?**

    The company does not anticipate any short-term change to the cafeteria, Choices or Coffee Stops. The company anticipates negotiating longer-term arrangements to maintain a cafeteria, catering and other food services in the complex. Exactly what forms these services take in the future ultimately will be decided by the new owner. We believe, however, that these amenities help make the property a first-class office space and will continue in some form.

    John Hancock will work with the owner to continue providing subsidies to employees making purchases in the cafeteria.

  - **ATMs?**

    The ATMs have leases to operate in the Tower concourse that will remain in effect after the sale.

  - **The Fitness Center?**

    FitCorp has a management agreement to manage and operate the John Hancock Fitness Center until December 31, 2003. The ultimate disposition and use of this space will be the subject of negotiation between Hancock and the new owner.

    The Stay Fit benefit will continue to be offered.

  - **John Hancock Hall and the Dorothy Quincy Suite?**

    As part of the purchase, Hancock plans to negotiate rights to use these facilities for its annual meeting, company forums, and other key events. It also expects to retain the option to offer it for use by the City of Boston for events such as the State of the City Address.

  - **FCA space?**

    The FCA will continue to operate. Whether its location will change has not been determined.

7

JH 001170

- **Will the company continue to move associates out of the Tower into less expensive buildings in the complex?**

  Most of that work has already been done. Since 1998, Hancock has been reducing the number of employees it has in the Tower and reconfiguring space needs throughout the complex. The majority of this work has been completed to reduce expenses, maximize use of resources and make the Tower more of an investment vehicle.

  Today, approximately 80 percent of the Tower is leased to outside tenants compared to 46 percent in 1998. While we continually evaluate our space needs, there are no plans to move remaining Hancock employees from the Tower.

- **Does this mean we will be reconfiguring office space or seeing widespread office moves?**

  While we continually evaluate our space needs, there are no plans for any significant reconfiguring of office space or other office moves at this time.

- **Once the buildings are sold, will the company move any of its operations and associates to buildings outside the current complex where rent might be cheaper?**

  While we continually evaluate our space needs, the company does not have any current plans to move any of its operations and/or associates to buildings outside the existing complex where rent might be less expensive. Any sale will include Hancock signing long-term leases for much of the space it currently occupies for business operations in the complex.

8

CONFIDENTIAL

**Miscellaneous**

- **What will the Tower and other buildings be named after new owner takes over?**

  It is expected that both the John Hancock Tower and the Stephen L. Brown Building will retain their names.

- **Will the new owner re-open the Observatory?**

  In light of the security issue, the offering will include a clause that will not allow an Observatory to re-open in the building.

  John Hancock will lease the former location of the Observatory on the 60th floor.

- **Will the sale have any impact on the security improvements ongoing around the Tower?**

  No. The Tower plaza renovation will continue, and is on schedule and expected to be completed in January 2003.

- **What will happen to the tenants?**

  The current leases of the complex's tenants will be honored. When those leases come up for renewal, the tenants will negotiate with a new owner.

- **Who are the tenants in your buildings?**

  As a matter of company policy, we do not provide the names of tenants.

- **Will the new owner continue to operate the weather beacon on the top of the 200 Berkeley Street building?**

  As part of the offering, we anticipate requiring the new owner to continue to operate the weather beacon on the top of the 200 Berkeley Street building.

- **Are there still issues with windows popping out of the Hancock Tower?**

  No. Fortunately, engineers were able to resolve this issue many years ago.

- **Will the Fleet Boston bank branch in the Berkeley Building remain?**

  Yes. Fleet Boston has a lease on the space.

9

CONFIDENTIAL

JH 001172

# EXHIBIT 5

Joyce

EXHIBIT NO. 5

M. D. O'CONNOR   6/2/06

**HOME   SEARCH   FEEDBACK   SITEMAP   WSS LOGOUT**

BUSINESS )    ) FINANCIALS )    employee CENTRAL )



*THE HANCOCK* **hub**

*News Archive* - Media Coverage - Media Links - JH Publications

## Questions on Tower Complex Sale Answered in Q&A

*(Nov. 27) With yesterday's announcement of the decision to place the Tower, Berkeley and Brown buildings up for sale, and to transfer certain Hancock Garage lease rights, employees may have questions related to the sale. A Q&A is listed below.*

**FINANCIAL**

- **Why are we selling the complex?**
  We are selling the Tower, Brown Building and Berkeley Building to unlock a significant amount of capital that can be redeployed in ways that strengthen the company and create value for our stakeholders. The sale is a logical next step in the strategic capital management process that Hancock began several years ago.

  As part of that process, Hancock has divested itself of nearly all of the company's approximately $2 billion equity real estate portfolio, including the John Hancock Center in Chicago. The Hancock home office complex is the last of the company's large real estate holdings.

  A critical part of the sale is that Hancock will be signing a long-term lease of at least ten years for much of the space it currently occupies for its business operations in the complex. The company will also have several options to extend the leases and anticipates having the ability to reside in the complex for at least 25 years. The company has no plans to move from Boston; the complex will remain John Hancock's corporate headquarters and Hancock will continue its commitment to being an involved, contributing and active corporate citizen in Boston and the surrounding community.

- **Why are we selling now?**
  As the equity and bond markets have continued to slip over the past year or so, investors have increasingly turned to hard assets such as real estate. As a result, despite a sluggish economy, the real estate market for class-A, "trophy" office properties – like Hancock's three key home office complex buildings – in premier locations like Boston is strong right now.

  Given strong investor demand for properties like ours now, we believe this is an opportune time to maximize the value of our assets. The company will be unlocking a significant amount of capital that can be redeployed in ways that strengthen the company and create value for our stakeholders.

  In so doing, John Hancock will also be following the lead of many publicly traded financial services companies that lease their corporate headquarter space rather than commit significant capital to owning and managing that property. These companies include: Nationwide Financial, Lincoln National, MONY, Mellon Financial, State Street, Citigroup and CIGNA.

  Numerous media outlets have published stories about other companies that also have been selling properties. Stories that offer good insight into this are "Billionaires Bet on Buildings," Forbes.com, October 21, 2002, "Commercial Real Estate Investors Seek Refuge Under Some Big Roofs," Los Angeles Times, July 23, 2002, "Corporate Real-Estate Sales Surge," The Wall Street Journal, October 22, 2002 (to obtain copies of these stories please contact Jo Breiner at jbreiner@jhancock.com).

- **Does this decision mean the company is also for sale?**
  No, the fact that we are selling the buildings does not mean the company is for sale. We are signing leases for much of the space we currently occupy in the complex for business purposes. This clearly should indicate that we intend to stay in Boston and keep the complex as our

corporate headquarters.
We are not moving and will continue our commitment to being an involved, contributing and active corporate citizen in Boston and the surrounding community.

- **What do you expect the sale price will be?**
  We have an exceptionally attractive property and expect to secure the highest possible price for it. We will not speculate on what that price might be.

- **What happens if you do not get a price you consider to be fair and reasonable?**
  Given the state of the markets and our property, we believe that we will receive strong offers for the assets. If we do not, we always have the option of taking the properties off the market.

- **Who might be potential buyers?**
  There is strong interest right now among foreign buyers to purchase high quality office properties in the United States. Other potential buyers are pension funds, private investors, and real estate investment trusts (REITs).

- **Who will be the marketing agent for the property and where are they located?**
  Morgan Stanley, which is based in New York City.

- **Does adding this money to the bottom line make Hancock more attractive to a potential buyer?**
  We don't think it makes a significant difference. The Hancock complex is, in effect, a hidden asset of the company. The properties have a market value well in excess of their book value. This is not being done to attract buyers.

- **Will John Hancock help finance the purchase?**
  The company does not want to be involved in the financing of the property.

- **Will Wall Street see this as a positive move?**
  We think this will be viewed as a positive move by our investors and the Wall Street analysts who cover us. The sale also reinforces the commitment that Hancock has made to the strategic capital management process that it began several years ago.

- **Will this affect the stock price?**
  A company's stock price is affected by numerous factors. It's difficult to say whether this would have any impact on the company's stock price.

- **When do you expect this deal to close?**
  We are looking to move this process along as quickly as possible and to realize appropriate value for the properties. Given that, it's difficult to predict if and when the closing will occur, but we anticipate that it will be some time in the next several months.

- **What properties comprise the John Hancock complex and where are they located? Are they all being sold? How many square feet of office space does the complex comprise?**
  The following properties in the Hancock home office complex are being put on the market as one package:

| The John Hancock Tower | 200 Clarendon Street |
| The Stephen L. Brown Building | 197 Clarendon Street |
| The Berkeley Building | 200 Berkeley Street |

Together, these buildings approach three million square feet of office space.

The Hancock Parking Garage at 100 Clarendon Street is under an air rights lease with the Massachusetts Turnpike Authority. Therefore, rather than selling the Hancock Parking Garage, we are planning to transfer certain rights under that lease in the offering.

- **How many floors does each building have? When were they built? By whom?**

| Building | Floors | Year Built | Architect |
| --- | --- | --- | --- |
| The John Hancock Tower | 62 | 1973 | Henry Cobb for I.M. Pei & Associates |
| The Stephen L. Brown Building | 12 | 1923 | Parker, Thomas & Rice |
| The Berkeley Building | 26 | 1947 | Cram & Ferguson Architects-Engineers |

- **Will these properties only be sold as a package?**
  It is our expectation that the properties will be sold as a package. However, we are flexible and want to maximize the total value of the properties.

- **Is the 380/370 Stuart Street building or the Conference Center at 40 Trinity Place included in the offering?**

CONFIDENTIAL                                                                        JH 001152

No. These buildings are not included in the package of properties to be sold. At this time, the company has decided to hold on to these properties.

- It was previously announced that several adjoining properties on Clarendon Street were being offered for sale. Are these part of this offering?
No. The package does not include Hancock's Clarendon Assemblage properties which consist of 131 Clarendon Street (the Hard Rock Café building) and adjacent parking lots on both sides of that building (one on the corner of Stuart and Clarendon Streets, and the other at the corner of Stanhope and Clarendon Streets).

In May, the company said that these development parcels would be put up for sale, and with today's announcement, these parcels and the Tower Complex will be marketed separately, but at approximately the same time.

The marketing agent for Hancock's Clarendon Assemblage properties is Cushman & Wakefield of Massachusetts.

## COMMUNITY IMPACT

- Is the company moving to a new location in Boston or out of town altogether?
No. Any sale will include Hancock signing long-term leases for much of the space that it currently occupies for business operations in the complex. We have no plans to move from Boston. The complex will remain John Hancock's corporate headquarters and Hancock will continue its commitment to being an involved, contributing and active corporate citizen in Boston and the surrounding community.

Employees will occupy numerous floors of the Tower. Hancock also will be leasing nearly all of the Stephen L. Brown building across the street from the Tower for its employees, as well as floors in the 200 Berkeley Street building.

Although the precise terms of Hancock's lease or leases will be negotiated with any prospective purchaser, the company will sign a long-term lease of least ten years with several options to extend. The company anticipates having the ability to reside in the complex for at least 25 years.

Hancock also owns 380/370 Stuart Street where employees will continue to occupy numerous floors.

- What impact will this have on the company's commitment to Boston and the community?
The sale of the properties will have no impact on John Hancock's commitment to the area. We have no plans to move from Boston. The complex will remain John Hancock's corporate headquarters and Hancock will continue its commitment to being an involved, contributing and active corporate citizen in Boston and the surrounding community.

## EMPLOYEE IMPACT

- Who will be in charge of operating the building and providing security?
As is common with all such transactions, the new owner will be responsible for operating and managing the buildings and providing security. It is important to note, however, that the strength of the operations and security for the Hancock complex is one of the key factors making it such attractive rental space. We expect that any new owner will assign a high priority to operations and security at the complex.
- What will happen to Hancock associates who currently perform these duties? How many positions do you anticipate will be eliminated?
We expect that the company's trades people (i.e. electricians, mechanics and service technicians) and security personnel will be most affected by the sale of the property. Ultimately, it will be up to the new owner to determine how the buildings will be staffed. Given the unique operational aspects of the Tower, it is our hope that many of our associates affected by the sale will be hired by the new owner and continue to perform essentially the same functions. In other cases, positions will be eliminated and those employees will be provided with a severance package under the terms of the company's severance plan. The exact number of employees that may be impacted by this sale has not yet been determined.

CONFIDENTIAL

JH 001153

- **Will JH continue to have its own security group?**
  Yes, it will maintain a reduced security staff. John Hancock's in-house security operation will continue to provide many of the same functions they perform now for the company, including Hancock identification distribution, special events work, business contingency planning and disaster safety planning.
  The new owner will be responsible for the building's security..

- **How will security and access be provided on floors that Hancock leases?**
  Like many of the current tenants in the building, Hancock floors will be secured with doors and card readers.
  Overall security for the buildings will be provided by the new owner.

- **Will the cleaning service change?**
  As is common with all such transactions, the new owner will be responsible for operating and maintaining the buildings and selecting the maintenance company. This is, however, a premier property and not only is the new owner responsible for providing standards for a class-A office building, but we expect that any new owner will assign a significant priority to maintaining the properties at a high level.

- **What will happen to:**

  - **The Tunnel between the Tower and the Brown buildings?**
    As part of the offering, the new owner will be required to continue to allow employees to use the tunnel between the two buildings.

  - **Employee parking?**
    Hancock employees will continue to be able to park in the garage. The location of parking and cost are currently being considered and will be part of the negotiations with the new owner.

  - **The child care center?**
    The child care center will remain in its current location. The Stuart Street property, where it is located, is not being sold as part of this transaction.

  - **The cafeteria, Choices and the Coffee Stop?**
    The company does not anticipate any short-term change to the cafeteria, Choices or Coffee Stops. The company anticipates negotiating longer term arrangements to maintain a cafeteria, catering and other food services in the complex. Exactly what forms these services take in the future ultimately will be decided by the new owner. We believe, however, that these amenities help make the property a first-class office space and will continue in some form.
    John Hancock will work with the owner to continue providing subsidies to employees making purchases in the cafeteria..

  - **ATMs?**
    The ATMs have leases to operate in the Tower concourse that will remain in effect after the sale.

  - **The Fitness Center?**
    FitCorp has a management agreement to manage and operate the John Hancock Fitness Center until December 31, 2003. The ultimate disposition and use of this space will be the subject of negotiation between Hancock and the new owner. The Stay Fit benefit will continue to be offered.

  - **John Hancock Hall and the Dorothy Quincy Suite**
    As part of the purchase, Hancock plans to negotiate rights to use these facilities for its annual meeting, company forums, and other key events. It also expects to retain the option to offer it for use by the City of Boston for events such as the State of the City Address.

  - **FCA space?**
    The FCA will continue to operate. Whether its location will change has not been determined.

- **Will the company continue to move associates out of the Tower into less expensive buildings in the complex?**
  Most of that work has already been done. Since 1998, Hancock has been reducing the number of employees it has in the Tower and reconfiguring space needs throughout the complex. The majority of this work has been completed to reduce expenses, maximize use of resources and make the Tower more of an investment vehicle.

Today, approximately 80 percent of the Tower is leased to outside tenants compared to 46 percent in 1998. While we continually evaluate our space needs, there are no plans to move remaining Hancock employees from the Tower.

- **Does this mean we will be reconfiguring office space or seeing widespread office moves?**
  While we continually evaluate our space needs, there are no plans for any significant reconfiguring of office space or other office moves at this time.

- **Once the buildings are sold, will the company move any of its operations and associates to buildings outside the current complex where rent might be cheaper?**
  While we continually evaluate our space needs, the company does not have any current plans to move any of its operations and/or associates to buildings outside the existing complex where rent might be less expensive. Any sale will include Hancock signing long term leases for much of the space it currently occupies for business operations in the complex.

## MISCELLANEOUS

- **What will the Tower and other buildings be named after new owner takes over?**
  It is expected that both the John Hancock Tower and the Stephen L. Brown Building will retain their names.

- **Will the new owner re-open the Observatory?**
  In light of the security issue, the offering will include a clause that will not allow an Observatory to re-open in the building.
  John Hancock will lease the former location of the Observatory on the 60th floor.

- **Will the sale have any impact on the security improvements ongoing around the Tower?**
  No. The Tower plaza renovation will continue, and is on schedule and expected to be completed in January 2003.

- **What will happen to the tenants?**
  The current leases of the complex's tenants will be honored. When those leases come up for renewal, the tenants will negotiate with a new owner.

- **Who are the tenants in our buildings?**
  As a matter of company policy, we do not provide the names of tenants.

- **Will the new owner continue to operate the weather beacon on the top of the 200 Berkeley Street building?**
  As part of the offering, we anticipate requiring the new owner to continue to operate the weather beacon on the top of the 200 Berkeley Street building.

- **Are there still issues with windows popping out of the Hancock Tower?**
  No. Fortunately, engineers were able to resolve this issue many years ago.

- **Will the Fleet Boston bank branch in the Berkeley Building remain?**
  Yes. Fleet Boston has a lease on the space.

# EXHIBIT 6



**Beacon Capital Partners Management, LLC**
One Federal Street, 26th Floor
Boston, MA 02110

May 5, 2003

Mr. Daniel P. Joyce
John Hancock Financial Services, Inc.
John Hancock Place
Post Office Box 111
Boston, MA 02117

Dear Daniel:

We are pleased to offer you a full-time (37.5 hours per week) position with Beacon Capital Partners Management, LLC ("Beacon") as a Project Manager commencing upon the transfer of on-site management responsibilities for the John Hancock Tower Complex from John Hancock to Beacon. The transfer is expected to occur during July of this year.

The key aspects of your employment with us are as follows:

- Base salary of $75,100.00 per year, payable bi-weekly.

- Bonus opportunity of up to 10% of your base salary, based upon Company and individual performance. You must be on the Company's active payroll the day the bonus is paid. All bonuses are ultimately discretionary.

- You will be eligible to participate in our comprehensive employee benefits program, in which we intend to include medical and dental insurance, life insurance, short-term and long-term disability insurance and a 401(k) plan. Additional information regarding the specific benefits available from Beacon will be provided to you shortly.

- You agree that your employment relationship with Beacon will be "at-will", which means that either you or Beacon may terminate your employment at any time and for any reason.

Daniel, we look forward to having you as a valued member of our team and are confident that you will find your employment with Beacon rewarding. If this offer of employment is acceptable to you, please so indicate by executing one copy of this letter and returning it to me. The second copy is for your records. Given that Beacon is interested in moving quickly to assemble the right team to take over the management of the John Hancock Tower Complex, we would appreciate hearing from you by Friday, May 16, 2003 if you would like to accept our offer. We sincerely hope that you will join us.

Sincerely,

John Durnan
Vice President

PLEASE SIGN AND RETURN ONE COPY OF THIS LETTER TO INDICATE YOUR ACCEPTANCE OF THIS OFFER OF EMPLOYMENT. THANK YOU.

Daniel P. Joyce

Date 6/12/03

BCPM 00061

# EXHIBIT 7

Joyce
EXHIBIT NO. 6
6/2/06
M. D. O'CONNOR

**Beacon Capital Partners Management, LLC**
**One Federal Street, 26th Floor**
**Boston, MA  02110**

May 30, 2003

Mr. Daniel Joyce
John Hancock Financial Services, Inc.
John Hancock Place
P.O. Box 111
Boston, MA  02117

Dear Daniel:

I am pleased to inform you that Beacon Capital Partners Management, LLC ("BCPM") has finalized its benefit package for Employees. The components of the BCPM Benefits Program have been posted on a website for your viewing convenience. The website address is www.mybenergy.com. You can access the website using the following information;

UserID:   bcpm

Password: benefits

Note:  Please use lower case text for the UserID and Password.

Please note that Beacon Capital Partners has worked diligently with Goodwin Procter LLP to develop a comprehensive Benefits Package for the newly formed Beacon Capital Partners Management entity. Per the terms of your Offer Letter, Beacon is very interested in moving quickly to assemble an outstanding team to manage the John Hancock Tower Complex. However, Beacon is committed to making sure that you have sufficient time to evaluate the Benefits Package.

To that end, Beacon has instructed me to extend the acceptance date in your Offer Letter to Friday, June 13, 2003. You are invited to a meeting at which information regarding the Benefits Package will be presented, and there will be an opportunity to ask questions. The date, time and place of the meeting will be provided to you shortly. After the meeting, if you have any additional questions regarding the Benefits Package, please contact Susan Digilio at (212) 813-8847 or Al Solecki at (212) 813-8833 of Goodwin Procter, LLP.

In the event you do not have access to the internet, please contact Barry Camiel or John Durnan for a hard copy of the Benefits Package.

On behalf of Beacon Capital Partners, I extend their appreciation for your patience in the process. Beacon Capital is looking forward to you joining the Beacon Capital Partners Management Team. If Beacon's offer of employment is acceptable to you, please indicate your acceptance by signing one copy of your letter and returning to Barry Camiel, Security; John Durnan, Real Estate Operations; or me.

Thank you for your consideration and I am looking forward to working with you in the future.

Sincerely,

Paul M. Crowley
Senior Vice President
Beacon Capital Partners Management, LLC

JOY 000254

# EXHIBIT 8



June 17, 2003

John Durnan
Vice President
Beacon Capital Partners Management
1 Federal St.
Boston, MA

John,

Pursuant to the notification by John Hancock over the past several weeks that I have been terminated as of the transition date of July 10, 2003. I have signed the offer presented to me for employment by the stated deadline with Beacon Capital Partners Management for the position of Project Manager at the pay of $75,000 per year for 37.5 hours worked weekly.

I welcome this opportunity and the additional responsibility of having the various trade shop staff reporting through me and whatever else this position would entail as of the transition date.

As much as I appreciate this offer and have enjoyed working for John Hancock for the past 10 years, I would like you to be aware that I have had some concerns regarding this change and the current situation for a number of reasons. Some you have acknowledged you can change and for some I assume you have no control. Regardless, I wanted you to be aware of these matters as they have had some effect on my situation and perhaps others in our group.

First of all, thank you for acknowledging my initial concern regarding the matter of title for the position that has been offered by BCPM. I realize this has yet to be officially decided but I believe an appropriate title to be important for many reasons based upon my past and pending job function in working for you respectively as a Director and Vice President of Real Estate Operations for Hancock and Beacon.

My second matter of concern is John Hancock's severance policy. I am total disagreement with the explanation provided by Joan DiCicco of Human Resources. Frankly I believe Hancock is grossly misrepresenting the policy, using the sale of the buildings as an excuse not to pay severance compensation and benefits. I see no basis for their perspective.

JOY 000344

Thirdly, although the timing of this matter may seem coincidental, this transition has effected compensation and for that reason I raise the concern now. It's a fact that my compensation has effectively been reduced by a significant percentage by the loss of an employer pension contribution plan and the loss of one week's vacation. Although my current base salary was honored by BCPM, in my case I believe my base compensation to be 12-15% less than is standard for the facility management professionals based on the 1998 IFMA salary profile report that I provided. This report is comprehensive and takes into account factors such as geography, job scope, functions, size of facility, industry sector, education, experience, age and gender. Comparably I believe I am compensated what was comparable in 1998, which is less than some of my peers and even less than the head Janitronics supervisior.

According to the IFMA 1998 Salary Report Research project #19 and the Boston Globe's Boston Works.com -Salary Wizard I am being compensated approximately 15-20% below the industry standards. Upon being terminated by John Hancock and then accepting the offer with Beacon there was a loss of pension benefit and a loss of one week's vacation. My position at John Hancock was Senior Project Manager. This position included various aspects of facility management for the past 4 of 10 years, including project management of new construction and retrofit work, extensive energy conservation and varying aspects of the building operations including engineering, outsourced contract and contractor management, assistance with capital budgeting; assistance to the trade shops and interaction with building officials, utilities and many other tasks as needed.   As I have mentioned previously, I consider the title of project manager to be of limited description and misleading based upon the industry definition as cited in the IFMA Salary Report-Profiles 1998 and the breath of responsibility and duties performed for at the John Hancock Complex. And on these lines, considering the additional responsibility I propose the title of position be Director of building operations. I have given this offer lengthy thought and considering the additional responsibility in having the multi-mechanical shop which is 2/3 of the work force I see my role changing would like for you to consider an increase in salary that is comparable to industry standards as cited in the IFMA Salary Report 1998. According to this very thorough document my salary is in line with 1998 levels albeit 5 years behind the times.

JOY 000345

# EXHIBIT 9



DEFENDANT'S
EXHIBIT
Benn 7
5/16/06

NY1BDF1421466BA/QA6 DEC 2000 3:30 PM99

*John Hancock*

**Appendix B**

# Term Sheet for Purchase and Sale Agreement

**John Hancock Tower
Complex in Boston**

**Morgan Stanley**

CONFIDENTIAL

JH 002366

John Hancock Tower
Complex in Boston

Term Sheet for Purchase and Sale Agreement

# Purchase and Sale Agreement

| Term Sheet for Purchase and Sale Agreement | |
|---|---|
| **Purchaser** | Purchaser should specifically identify who the purchasing entity will be and describe its experience and financial capability, creditworthiness and capacity to meet the obligations under the Purchase and Sale Agreement. |
| **Purchase and Sale Agreement** | The form of Purchase and Sale Agreement will be circulated to prospective purchasers in a subsequent distribution (the lease with the Seller will be attached as an exhibit). Purchasers should not propose a new form of agreement or lease. |
| | Bids will be evaluated in part on the nature and extent of the comments to the Purchase and Sale Agreement. |
| **Property** | Purchasers should make a bid for all four of the properties—the Tower, Stephen L. Brown Building, 200 Berkeley Street and the Garage—as an entirety. Purchasers shall allocate a value to each building, but each proposal should cover all buildings and improvements composing the Property. |
| | Purchaser's allocation of value will not necessarily be determinative in any eventual sale. |
| **Purchase Price** | Seller will require a cash sale, meaning that the entire purchase price shall be paid by wire transfer, in good funds on the closing date.  Seller shall not provide financing for the sale. |
| | Seller reserves the right to allocate the purchase price amongst the buildings composing the Property and between real estate and personal property. |
| | In addition to clearly stating the gross purchase price, please acknowledge that Purchaser will pay for the following closing costs, including: |
| | • Fees for recording documents of title |
| | • Title insurance and reinsurance costs and premiums |
| | • Any additional survey requirements beyond the surveys furnished by Seller |
| | • Escrow fees; and |
| | • Its own due diligence expenses including, without limitation, the cost of its lawyers, accountants, engineers, consultants and other agents and vendors |

*John Hancock*

91

Morgan Stanley

CONFIDENTIAL

JH 002367

John Hancock Tower
Complex in Boston

Term Sheet for Purchase and Sale Agreement

# Purchase and Sale Agreement (cont'd)

| Term Sheet for Purchase and Sale Agreement | |
|---|---|
| **Bid Capitalization** | Purchaser should indicate how it plans to capitalize its purchase, specifying its relative amounts of equity and debt and the intended use of senior, mezzanine, subordinate or structured debt. |
| | Seller will not accept a condition or contingency for financing or funding. |
| **Deposit** | Seller will require a deposit equal to five percent (5%) of the gross Purchase Price of the Property upon the signing of the Purchase and Sale Agreement. The deposit shall be in the form of good funds held in escrow pursuant to the escrow provisions in the Purchase and Sale Agreement (or an independent escrow agreement) or a letter of credit issued by a bank and otherwise in form and substance satisfactory to Seller. |
| **Discretionary Authority and Required Approvals** | Please clarify the authority and discretion of Purchaser to commit the necessary capital for the acquisition. |
| | Please clearly state: |
| | • What approvals have been obtained already in making the written bid |
| | • What approvals will be needed prior to the signing of a Purchase and Sale Agreement and consummating the transaction; and |
| | • The timing of obtaining such approvals |
| | The terms of the Purchase and Sale Agreement and closing of the sale may not be contingent upon obtaining any approvals. |
| **Due Diligence** | Purchasers should complete all or most of their due diligence (including without limitation title, survey and environmental due diligence) before the Purchase and Sale Agreement is signed. A short due diligence period after the contract's signing is strongly preferred, no more than seven (7) days. |
| **Closing** | Bids should provide for a closing within seven (7) days after expiration of the due diligence period in the Purchase and Sale Agreement. |

*John Hancock*  92

Morgan Stanley

CONFIDENTIAL

JH 002368

**John Hancock Tower Complex in Boston**

Term Sheet for Purchase and Sale Agreement

# Purchase and Sale Agreement (cont'd)

## Term Sheet for Purchase and Sale Agreement

| | |
|---|---|
| **Conditions and Contingencies** | Please state any conditions or contingencies to which your proposal is subject (including additional due diligence requirements, if any).<br><br>Bids will be evaluated in part on the nature and extent of the conditions and contingencies of a proposed Purchaser. |
| **Tenant Estoppel Certificates** | Seller will circulate to each tenant a form of tenant estoppel certificate attached to the proposed Purchase and Sale Agreement. It will be a condition of closing that Purchaser receive one for the Seller's space, for certain other tenants specified in the Purchase and Sale Agreement and from other tenants, to a total of seventy-five percent (75%) of the leased space at the Property.<br><br>Subject to the provisions below, Purchaser may terminate the Purchase and Sale Agreement if Seller fails to obtain the required number of estoppel certificates or if a tenant estoppel certificate discloses a material default of the lease or a material deviation from the terms set forth in the rent roll (except for adjustments made to accommodate the remeasurement of space).<br><br>Purchaser may not change the form of estoppel certificate attached to the draft Purchase and Sale Agreement and must accept the form attached to a given lease if it differs from that attached to the Purchase and Sale Agreement.<br><br>Seller will have the right to deliver a landlord's estoppel certificate to compensate for any deficiencies in the tenant estoppels and cause the sale to close. Landlord's estoppel certificate would terminate and be replaced and superseded for any lease for which it actually obtains and delivers to Purchaser a tenant estoppel certificate, whether before or after closing. |
| **Managing Entity** | Purchaser should identify the property manager to be used and its relevant experience, if the Property will not be managed directly by the Purchaser. |

*John Hancock*

93

**Morgan Stanley**

CONFIDENTIAL

JH 002369

John Hancock Tower
Complex in Boston

Term Sheet for Purchase and Sale Agreement

# Purchase and Sale Agreement (cont'd)

| Term Sheet for Purchase and Sale Agreement | |
|---|---|
| **Employees** | Seller currently employs several employees in its real estate operations and security area who may be available for employment by a prospective Purchaser. |
| | Bids should include the potential interest of a prospective Purchaser to hire these employees, including the anticipated number of employees and the area of specialty. |
| | Bids will be evaluated in part on the nature and extent of the interest in hiring some or all of these employees. |
| **Name of Buildings and Reservation of Rights** | The name "John Hancock Tower" for the property located at 200 Clarendon Street and the name "Stephen L. Brown Building" for the property located at 197 Clarendon Street shall remain in perpetuity and may not be changed without the prior written consent of the seller. |
| | There may also be certain reservation of rights and restrictions on the use of the likeness of the Property for particular purposes, which shall be embodied in the Purchase and Sale Agreement, the lease with Seller or a separate agreement. |
| **Flip Protection** | The Purchase and Sale Agreement will provide that should any or all of the Property be sold to a third party within five years of the closing, Seller will be entitled to fifty percent (50%) of the difference between the purchase price paid by the third party and the allocated purchase price paid by the Purchaser for the portion of the Property sold. |

MTSDJF1421465A005 DEC 20083520 PJM105

*John Hancock*

94

MorganStanley

CONFIDENTIAL

JH 002370

John Hancock Tower
Complex in Boston

Term Sheet for Purchase and Sale Agreement

# Purchase and Sale Agreement (cont'd)

**Term Sheet for Purchase and Sale Agreement**

**Reservation of Rights**

By submitting a bid or proposal, a prospective Purchaser acknowledges and agrees that (a) Seller is free to conduct the process leading to a possible sale of any or all of the Property as it, in its sole discretion, determines (including, without limitation, by entertaining or rejecting any bid or proposal, negotiating or not negotiating with any prospective Purchaser and entering into a Purchase and Sale Agreement for all or any portion of the Property without prior notice to any other person or prospective Purchaser), (b) Seller reserves the right, in its sole discretion, to change the procedures relating to its consideration of a sale of all or any portion of the Property at any time without prior notice to any person or prospective Purchaser, to reject any and all bids, proposals or offers made by any prospective Purchaser with regard to the Transaction, and to terminate discussions and negotiations with any prospective Purchaser at any time and for any reason prior to the signing a Purchase and Sale Agreement with that party, and (c) unless and until a Purchase and Sale Agreement for the Property has been executed, and subject to any limitations on liability contained in that agreement or otherwise applicable, Seller will have no liability to any prospective Purchaser with respect to a sale of all or a portion of the Property and then only to the parties to such Purchase and Sale Agreement to the extent set forth in that agreement.

**Purchaser Acknowledgment**

By submitting a bid or proposal, a prospective Purchaser acknowledges and agrees to all of the conditions in this investor bid package, including without limitation the terms of the disclaimer language contained in it.

*John Hancock*

95

**MorganStanley**

CONFIDENTIAL

JH 002371

# EXHIBIT 10

**Moloney, Thomas**

| | |
|---|---|
| **From:** | Hugh.Macdonnell@morganstanley.com |
| **Sent:** | Wednesday, February 19, 2003 10:31 PM |
| **To:** | Devin.Murphy@morganstanley.com; tmoloney@jhancock.com; pcrowley@jhancock.com; Jeffrey.Granoff@morganstanley.com; Will.Kirby@morganstanley.com |
| **Subject:** | Fw: Hancock Property Management |

FYI - this was not described in detail in the bid letter.

---------------------------
Hugh Macdonnell
Morgan Stanley


----- Original Message -----
From: Jeff_Brown
Sent: 02/19/2003 02:47 PM
To: hugh.macdonnell@morganstanley.com
Subject: Hancock Property Management

Hugh,

Beacon will directly manage the complex.  Our desire would be to bring over the property management team currently in place to the extent those employees are not retained by Hancock.

Beacon's intention is to continue the level of service at the Complex and minimize the impact on Hancock of the change in ownership.

Jeff

DEFENDANT'S
EXHIBIT

Bass 8
5-16-06    C

1

JH 001223

# EXHIBIT 11

**Competitive Assessment of Beacon Capital Partners Management, LLC Employee Benefits Package
with respect to John Hancock's Severance Pay Plan "Comparable Job" Eligibility Provision**

This assessment considers: 1) the competitiveness of selected benefits versus industry/normative data, 2) whether certain benefit differences may create a "noise factor" with transitioning associates, and 3) a comparison of employee health plan contributions for Beacon versus John Hancock.

| Benefit | Competitiveness* | Comment |
|---|---|---|
| *401(k)* | Above Average | ➢ Up to 4% match versus 3% norm ($0.50 up to 6%) |
| *Pension* | NA | ➢ *Note:* Small employers do not offer pension plans – *Significant Noise Factor  (4% loss)* |
| *Medical:* Blue Cross Blue Shield includes large network (w/significant overlap to HPHC) | Above Average | ➢ HMO/POS office visit copay: $10 versus $15 norm<br>➢ POS out-of-network deductible: $250/$500 versus $400/$800 norm<br>➢ POS out-of-network coinsurance: 20% versus 30% norm<br>➢ POS out-of-network out-of-pocket maximum: $1,000/$2,000 versus $1,500/$2,500<br>➢ HMO/POS Rx 3-tier copays: $10/$20/$35 same as norm |
| *Dental:* Guardian network not as large as Delta Dental *Noise Factor* | Average to Above | ➢ Combined with Vision Care benefit – *Modest Noise Factor*<br>➢ Annual deductible: $50 same as norm<br>➢ Annual maximum: $1,500 versus norm of $1,000 |
| *Health Plan Costs* | Average | <table><tr><td>Plan/Weekly</td><td>JH single</td><td>Beacon single</td><td>JH family</td><td>Beacon family</td></tr><tr><td>HMO</td><td>$16.12</td><td>$19.01 *($150)*</td><td>$49.84</td><td>$59.84 *($520)*</td></tr><tr><td>POS</td><td>$18.65</td><td>$20.30 *($ 85)*</td><td>$57.68</td><td>$63.88 *($320)*</td></tr><tr><td>Dental/Vision</td><td>$3.36</td><td>$ 2.31 *$ 55*</td><td>$10.22</td><td>$ 7.67 *$150*</td></tr></table><br>The Beacon medical plan employee contributions are greater than JH's. Given an average JH salary of $46,000, the greatest impact would be for an associate with HMO family coverage in an amount of ~$500 (or 1%) which is offset by the average Beacon salary which is 2% higher than JH's. However, Beacon does not offer a "dual coverage" rate – and for associates with this coverage level under the JH plans, the additional (to the above) cost increases are HMO - $850 and POS - $980. *Noise Factor Recommendation:* One-time^ grossed-up "bonus" payment to associates moving from dual to family. |
| *Vacation* | Below Average ___*Significant Noise Factor*___ | Only 1% of employers offer a fixed number of days of vacation to all employees. The majority (75%) of employers use a years-of-service schedule. Fifteen days of vacation is the norm for five years of service. Generally, there's an additional 2.5 days every five years thereafter. Therefore, for longer-service associates, the vacation schedule is not competitive. In addition, the MASBA average is 4 weeks. |

*Sources: Mercer/Foster Higgins 2002, Hewitt US Salaried 2002 and Massachusetts Small Business Association

^A one-time payment is recommended as it is "comparable" to the severance pay maximum of 52 weeks during which the lower contributions would apply.



**CONFIDENTIAL**

JH 000041

| | "Competitive" Assessment Score | | |
|---|---|---|---|
| **Benefit** | **Weighting\*** | **Score\*\*** | **Total** |
| *401(k)* | 20% | 3 | .6 |
| *Pension* | 15% | 0 | 0 |
| *Medical* | 30% | 3 | .9 |
| *Dental* | 5% | 2 | .1 |
| *Vacation* | 30% | 1 | .3 |
| *Total* | 100% | | 1.9 = Average |

Weighting: The weighting is based on Hewitt's Benefit Index Base Company "Total Value" Distribution
Scores: With respect to "Competitiveness," the scores are:  Above Average = 3   Average = 2   Below Average = 1   No Benefit = 0

*Summary:* <u>The Beacon benefits package is competitive, and satisfies the "comparable job" criteria of the JH severance pay plan.</u>

Assessor: Peter Mongeau, 2nd VP, Benefits & HR Services

CONFIDENTIAL

JH 000042

# EXHIBIT 12

EXHIBIT
MONEGAN
# 14
5/22/06

# GOODWIN | PROCTER

Goodwin Procter LLP
Counsellors at Law
599 Lexington Avenue
New York, NY 10022
T: 212.813.8800

# MEMORANDUM

EXHIBIT
DiCicco 10
SCP 5/24/06

| | |
|---|---|
| To | Joan M. DiCicco |
| From | Albert J. Solecki, Jr. <br> Susan E. Digilio |
| CC | William A. Bonn, Esq. <br> Douglas S. Mitchell |
| Re | Proposed Benefits for Beacon Capital Partners Management, LLC Employees |
| Date | May 21, 2003 |

This memorandum provides a brief summary of the benefits which Beacon Capital Partners Management, LLC ("Beacon") currently intends to offer to its property management employees at the Hancock Complex.

### Components of the Benefit Program

Beacon intends to include the following plans and policies in its Benefits Program:

    I.    Medical Insurance

    II.    Dental Insurance and Vision Plan

    III.    Short-Term Disability Protection

    IV.    Long-Term Disability Protection

    V.    Life/Accidental Death & Dismemberment Insurance

    VI.    401(k) Plan

    VII.    Health Care Flexible Spending Account

    VIII.    Dependent Care Flexible Spending Account

    IX.    Vacation

    X.    Parking Discount

    XI.    MBTA Transit Pass Program

    XII.    Severance Plan

BCPM 00230

JOY 001121

## I.    Medical Insurance

Eligible employees will have a choice of two medical insurance plans provided by BlueCross BlueShield of Massachusetts.

Carrier:        **BlueCross BlueShield of Massachusetts**

| Benefits | Option 1 | Option 2 |
|---|---|---|
| Type of Plan | *HMO Blue* (HMO) | *Blue Choice* (Point-of-Service) |
| In-Network | | |
| Office Visits | $10 | $10 |
| Emergency Room Visits | $50 (waived if admitted) | $50 (waived if admitted) |
| Routine Vision Exam | $10 (every 24 months) | $10 (every 24 months) |
| Inpatient Care | Covered at 100% | Covered at 100% |
| Ambulatory Day Surgery | Covered at 100% | Covered at 100% |
| Lifetime Maximum | Unlimited | Unlimited |
| Out-of-Network | | |
| Deductible (individual/Family) | HMOs | $250/$500 |
| Coinsurance | provide no coverage | 20% |
| Coinsurance Maximum | for services rendered | $1,000/$2,000 |
| Emergency Room Visits | out-of-network. | $75 (waived if admitted) |
| Lifetime Maximum | | $2,000,000 |
| Prescription Drug Benefits | | |
| Generic | $10 | $10 |
| Preferred Brand Name | $20 | $20 |
| Non-Preferred | $35 | $35 |
| Weekly Cost to Employees[1] | | |
| Individual | $19.01 | $20.30 |
| Family | $59.84 | $63.88 |

---

[1]  The weekly cost to employees as reflected in this memorandum is based on certain assumptions concerning the census data of employees who will be participating in the Beacon benefit plans.  The actual weekly cost to employees may vary slightly from the amounts reflected herein.

BCPM 00231

JOY 001122

## II.    Dental Insurance and Vision Plan

Eligible employees will have the option of enrolling in a bundled dental insurance and vision plan.

Carrier:        The Guardian

### Dental

| | | |
|---|---|---|
| Type of Plan: | PPO | |
| Deductible: | $50/$150 (Individual/Family); Waived for Preventive Services | |
| Coinsurance: | In-Network | Out-of-Network |
| Preventive | 100% | 100% |
| Basic | 90% | 80% |
| Major | 60% | 50% |
| Orthodontia | 50% | 50% |
| Annual Maximum | $1,500 (Preventive, Basic and Major Services) | |
| Orthodontia - Lifetime Maximum | $1,000 | |

### Vision

| | | |
|---|---|---|
| Provider network: | Vision Service Plan | |
| Frequency of Service: | | |
| Exam | Every 12 months | |
| Lenses | Every 12 months | |
| Frames | Every 24 months | |
| Contact Lenses (in lieu of frames/lenses) | Every 12 months | |
| Copayment: | | |
| Exam | $10 | |
| Material | $20 | |
| | | |
| Benefits (after Copayment) | In-Network | Out-of-Network |
| Eye Exam | Covered in Full | up to $46 |
| Single Vision | Covered in Full | up to $47 |
| Bifocal Lenses | Covered in Full | up to $66 |
| Trifocal Lenses | Covered in Full | up to $85 |
| Lenticular Lenses | Covered in Full | up to $125 |
| Frames | Covered in Full | up to $47 |
| Contact Lenses - Medically Necessary | Covered in Full | up to $210 |
| Contact Lenses - Elective (copayment waived) | Covered in Full | up to $105 |
| | | |
| Weekly Cost to Employees[2] | | |
| Individual | $2.31 | |
| Family | $7.67 | |

---

[2]    The weekly cost to employees as reflected in this memorandum is based on certain assumptions concerning the census data of employees who will be participating in the Beacon benefit plans. The actual weekly cost to employees may vary slightly from the amounts reflected herein.

BCPM 00232

JOY 001123

III.    <u>Short-Term Disability</u>

<u>Carrier:</u>    Mutual of Omaha

| Short Term Disability | |
|---|---|
| Eligibility: | Date of Hire.  Salaried Employees working 30 or more hours per week. |
| Premium: | Company Pays 100% |
| Benefits: | 60% of Base Salary to a Weekly Maximum of $2,000 |
| | Definition of Disability:    Own Job |
| | Benefit Duration:    26 weeks |
| | Elimination period:    14 Days for Accident and Illness; Waived when confined to a Hospital |
| | Waiting Period:    None |

IV.    <u>Long-Term Disability</u>

<u>Carrier:</u>    Mutual of Omaha

| Long Term Disability | |
|---|---|
| Eligibility: | Date of Hire.  Salaried Employees working 30 or more hours per week. |
| Premium: | Company Pays 100% |
| Benefits: | 60% of Base Salary to a Monthly Maximum of $7,500 |
| | Definition:    Two Year Own Occupation: Disability or Disabled means that for 180 Days and for the next 24 months, employee is prevented by accidental, bodily injury; sickness; Mental Illness; Substance Abuse; or pregnancy, from performing one or more of the Essential Duties of the employee's occupation; after 24 months, the employee must be so prevented from performing the Essential Duties of any occupation: |
| | Elimination Period:    180 Days |

4

BCPM 00233

JOY 001124

## V.  Life/Accidental Death & Dismemberment Insurance

**Carrier:**  Mutual of Omaha

| Life Accidental Death and Dismemberment | |
|---|---|
| Eligibility: | Date of Hire. Salaried employees working 30 or more hours per week. |
| Coverage: | Two times basic annual earnings to a Maximum of $300,000 |
| Evidence of Insurability: | The maximum benefit of $300,000 is required without evidence of insurability. |

## VI.  401(k) Plan

Beacon will offer eligible employees the option to participate in the Company's 401(k) Plan. Beacon intends to match employee contributions up to 4% of employee compensation.

## VII.  Health Care Flexible Spending Account

Eligible employees will have the option of contributing up to $3,000 to a Health Care Flexible Spending Account, which may be used to pay for covered health care expenses.

## VIII.  Dependant Care Flexible Spending Account

Eligible employees will have the option of contributing up to $5000 to a Dependant Care Flexible Spending Account, which may be used to pay for covered dependant care expenses.

## IX.  Vacation

Eligible employees will be entitled to three weeks of paid vacation per calendar year. Employees accrue vacation at a rate of ten hours per month beginning on the first day of employment.

## X.  Parking Discount

The current Hancock parking discount program will be continued for 2003, with adjustments to be made thereafter at the discretion of Beacon.

## XI.  MBTA Transit Pass Program

Employees will be eligible to purchase MBTA transit passes with pre-tax dollars, up to the statutory limit.

5

BCPM 00234

JOY 001125

**XII.**   <u>Severance Plan</u>

Beacon will implement a Severance Plan which will provide eligible employees with a severance benefit equal to one week of base salary for each full year of employment with Beacon, with no cap, in the event of a severance eligible termination.

If you have any questions regarding the foregoing, please contact Al Solecki (212.813.8833) or Susan Digilio (212.813.8847).

LIBNY/4216694.1

6

BCPM 00235

JOY 001126

# EXHIBIT 13

Mes

**Joyce, Dan**

---

| | |
|---|---|
| **From:** | DiCicco, Joan M. |
| **Sent:** | Tuesday, June 03, 2003 3:35 PM |
| **To:** | Joyce, Dan |
| **Subject:** | RE: BEACON CAPITAL PARTNERS MANAGEMENT |

*Joyce*

**EXHIBIT NO.** *13*

*6/2/06*

**M. D. O'CONNOR**

---

Dan,

Thank you for your note. Before answering your question, I'd like to clarify a point. The second sentence of your note asks about whether we considered pension, 401(k) and vacation as part of three components in determining if BCPM job offers were comparable. John Hancock's Severance Policy indicates that employees are not eligible for severance if they are offered a comparable job by the successor company. There are 3 components considered to determine if the job offer is comparable. They are similar salary, **competitive** benefits and work location within 50 miles of the current work location. Given that, the question I'll be answering concerns whether or not the Beacon benefits package is competitive.

The determination that the Beacon benefits package was competitive was based on an assessment of selected benefits, including health, pension, 401(k) and vacation. Senior members of the benefits team conducted the assessment and evaluation, using different, objective data sources. I should point out that the assessment was against normative data - that is, what is within the **range** of competitive benefits offered to employees generally or in certain industries (in this case, property management). The assessment was not a comparison to John Hancock's benefits package and we did not make any such comparison.

Based upon the above, I am confident that the determination was based upon objective information and appropriate under the circumstances. I hope this helps to clarify the matter.

If you have any questions, please contact me. Joan

-----Original Message-----
**From:** Joyce, Dan
**Sent:** Monday, June 02, 2003 3:56 PM
**To:** DiCicco, Joan M.
**Subject:** BEACON CAPITAL PARTNERS MANAGEMENT

Joan,

In response to your letter of May 30, 2003 to prospective BCPM, LLC employees . Can you inform me as to whether items such as 401K, pension, and vacation pay will be included in the 3 components considered when determining if a BCPM,LLC job offer is comparable. ? Your letter states that all offers were determined to be comparable and therefore severance will not be available but the letter failed to address these very important factors. When will these items be addressed.?

In regards the benefits package provided on line, will a documented comparison be presented to prospective employees or is it up to individuals to make this comparison themselves ?

Thank you

Dan Joyce
John Hancock Real Estate Operations

6/18/2003

# EXHIBIT 14

- DiCicco E.mo.] - need
- 1988 JH Policy Statement
- Project Salmon - selling R.E. see
  ⊛ provides all players          list

  [ Hancock/Scanlon Seperation Agreemnt.

  - Carol Gregory Law suit / Scanlon
    H.R./ Affidavts ⊛

  [ - 7/2002 Notes Bldg. trades / J. DiCicco
             MATCHES          J. Durnan

  [⊙ 2001 - DJ. Promotion
          + letter of from Daycare
            Ex-Emplary cust. Servic.
  - Misc. Trade Shop Descriptions ⊂  etc.
      8/2002          Salaries etc

  - ~~Fut.~~ Market Analysis
  [ ~~Entr~~ List of Employers

    - Salary Benchmark Participant
      TSG, Mercer,  2001 - 2003

  ⊛ [ - ~~Selection~~ Process for   Dated
         Selection of Employees for ~~2/03~~
        Severence  March 2003
        "Total Job elimination"         2/27/03

      - Benefit Work Shop E.mo.l DiCicco.
        Feb 2003 for Personnal
        Not staying w/ JH.

JOY 000249

Joyce
EXHIBIT NO. 15
4/6/06
M. D. O'CONNOR

- 2002 Severance process.

- Purpose of Severance plan

⊛  1) Bridge employees New
   2) benefits only        old
      mentioned

1999 Plan - Ammendment
Entitle benefits ~~withinpaus to~~
Under severance plan within
3 yrs. After "change of control"
As defined by plan
Effective 10/19/99
per K. Jenkins
- 8 weeks - add. tional etc. etc

( Change of control )

- MANULIFE Sale date - ?
  Change in control
* - KAREN'S Note re:-
* - Employee HR Info HUB ONLINE
  2/2004 See Severence pg 3
Authority of severance plan admin
  See All Pages - change of control

JOY 000250

PLAN TO Sell ALL R.E.

~~SAle of~~   Due Diligence

Received BCPM

employee handbook

7-17-03 - 2 DAYS

After Hiring

NO EXEMPT / NON exempt (?)

* [ relevant
    HANCOCK News Article
    re: SAle + severence ltr
        exec. pay
    Long term lease
        SAle / Lease back

* ( JH still has control )
      w/ Lease

 Exec. sEverence 

JOY 000251

# EXHIBIT 15

Joyce v. John Hancock Financial Services, Inc.
Privilege Log for Plaintiff's Document Production

| Bates Number | Date | Author/Source | Recipient | CC | Title/Subject | Page Count |
|---|---|---|---|---|---|---|
| | | Daniel Joyce | Attorney Brian Joyce | | Summary of events surrounding Hancock's denial of severance benefits and request for legal opinion | 2 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

# EXHIBIT 16

# Minutes of the Company Benefit Plan Appeal Committee

## November 16, 2004

**Attendees:** Brian Bisciotti, Carlton Grant, Kathy Suchenski.
**Recused :** Peter Mongeau

EXHIBIT
*Bisciotti 11*
*Jlp 5/9/06*

## Case # 04-03:

*Severance Benefits:-*

- ➤ The Committee considered an appeal regarding the denial of severance benefits to 23 former John Hancock associates.
- ➤ Kathy indicated that it was very surprising that Beacon Capital did not offer a Pension Plan.
- ➤ Brian wanted to find out if John Hancock gave the associates a clear idea of what to expect during the transition.
- ➤ Brian indicated that he will do additional research on what constitutes the John Hancock Severance Pay Plan "comparable job" Eligibility Provision.
- ➤ Kathy requested to know what criteria were used for Hewitt to determine the competitive weighting for the different benefits. For example, what industry/normative data was used. Please see "Competitive" Assessment Score Chart for more details.
- ➤ Brian is requesting more about the type of material/documentation that was given to the associates during the presentation, explaining the difference in benefits. information

Updated 12/7/2004

**CONFIDENTIAL**

JH 001758

# EXHIBIT 17

Weber, Corrine L.

| | |
|---|---|
| **From:** | Bisciotti, Brian |
| **Sent:** | Monday, December 13, 2004 5:23 PM |
| **To:** | Suchenski, Kathy |
| **Subject:** | RE: Severance Benefits Appeal Case # 04-03 |

In my attempt to be as general as possible I made things more unclear. I edited below.

Thanks.

Brian Bisciotti
Counsel
John Hancock Financial Services, Inc.
200 Clarendon St. T-30-16
Boston, MA 02117

Phone (617) 572-4493

STATEMENT OF CONFIDENTIALITY

The information contained in this email message and any attachments to this message is confidential and may be privileged or constitute attorney work product. If you are not an intended recipient, please (i) notify me immediately by replying to this message, (ii) do not use, disseminate, distribute or reproduce any part of the message or any attachment, and (iii) destroy all copies of this message and any attachments.

> -----Original Message-----
> **From:** Suchenski, Kathy
> **Sent:** Monday, December 13, 2004 5:04 PM
> **To:** Bisciotti, Brian
> **Subject:** RE: Severance Benefits Appeal Case # 04-03

Sounds good. My only comment is that the first chronological item implies that we (JH) may have done joint benefit meetings with Beacon. I don't believe that was the case. I believe the JH meetings were to discuss the job change/severance package being offered and then Beacon held separate benefit meetings - Joan mentioned that they were Beacon's benefits so we weren't involved other than to provide an extension to date when they could elect severance, due to the lateness of the benefits being finalized.

I don't know that we have to go into specifics so we may just want to say that separate benefit meetings were held with JH and Beacon.

Kathy

> -----Original Message-----
> **From:** Bisciotti, Brian
> **Sent:** Monday, December 13, 2004 4:39 PM
> **To:** Suchenski, Kathy
> **Subject:** Severance Benefits Appeal Case # 04-03

Kathy,

Before I send out to interested parties I wanted to get your review.

Thanks,

Brian

Kathy and I voted to uphold the denial of benefits in Case # 04-03.

Minutes of the Company Benefit Plan Appeal Committee Thursday Dec 9, 2004

Attendees: Brian Bisciotti, Kathy Suchenski

1

**EXHIBIT**
Bisciotti 12
swo 5/9/06

Recused: Peter Mongeau, Carlton Grant

Case # 04-03:

Severance Benefits:-

As a follow up to our meeting on November 16, 2004 Kathy and I met with Peter Mongeau and Joan DiCicco to discuss some of the details surrounding the denial of severance benefits to 23 former John Hancock associates.

Kathy and I had questions regarding our application of John Hancock's Severance Pay Plan term 'comparable job'. Our intent was to determine whether John Hancock (JH) made an informed decision in determining whether the new positions offered at Beacon were comparable to their former position at John Hancock. In particular, we were only required to focus on whether Beacon's employee benefits were 'competitive' as that term is used with regard to defining comparable job.

Joan DiCicco noted that all affected associates were invited to benefit meetings some of which were held by John Hancock and some by Beacon. In addition, these associates were also given the opportunity to meet individually with Human Resources professionals to discuss their concerns regarding severance.

Peter Mongeau performed a competitive assessment analysis based on industry data which considered the competitiveness of selected benefits versus industry/normative data and assessed Beacon's employee benefits package with respect to John Hancock's Severance Pay Plan 'Comparable Job' provision. JH determined that the Beacon's benefit package was competitive and satisfied the comparable job criteria of the JH Severance Pay Plan.

All affected associates ultimately received a written job offer from Beacon and were allowed adequate time to decide whether to accept the offer. In consideration of the foregoing, Kathy and I both voted to uphold the denial of severance benefits in Case #04-23.

Brian Bisciotti
Counsel
John Hancock Financial Services, Inc.
200 Clarendon St. T-30-16
Boston, MA 02117

Phone (617) 572-4493

STATEMENT OF CONFIDENTIALITY

The information contained in this email message and any attachments to this message is confidential and may be privileged or constitute attorney work product. If you are not an intended recipient, please (i) notify me immediately by replying to this message, (ii) do not use, disseminate, distribute or reproduce any part of the message or any attachment, and (iii) destroy all copies of this message and any attachments.

2

JH 002000

Bisciotti Dep. Tr.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


CIVIL ACTION NO. 05-11428-WGY


*************************************
DANIEL JOYCE, Individually and on    *
behalf of a class of others          *
similarly situated,                  *
       Plaintiff,                    *
                              *
v.                                   *
                              *
JOHN HANCOCK FINANCIAL SERVICES,     *
INC., and JOAN M. DiCICCO,           *
       Defendants.                    *
*************************************


DEPOSITION OF BRIAN J. BISCIOTTI,
taken pursuant to a mutual confidentiality
agreement and the applicable provisions of the
Federal Rules of Civil Procedure, before Susan L.
Prokopik, Registered Merit Reporter and Notary
Public in and for the Commonwealth of
Massachusetts, at the offices of Todd & Weld LLP,
28 State Street, Boston, Massachusetts, on
Tuesday, May 9, 2006, at 11:02 a.m.


KACZYNSKI REPORTING
72 CHANDLER STREET, SUITE 3

BOSTON, MASSACHUSETTS 02116

(617) 426-6060

9a0ae8c5-545e-4b33-9728-a797a716bc34

Page 10

1    worked for the subsidiary?
2    A. One year. From '87 to '88.
3    Q. Were you employed by John Hancock when you
4      attended the New England School of Law?
5    A. Yes, I was. Yes, I did.
6    Q. Is it fair to say after one year with JH
7      Distributors you then went into the tax law
8      department?
9    A. No. I went to budget and cost accounting.
10   Q. Okay. How long were you there for?
11   A. I was there until 1995. From '88 to '95.
12   Q. And then you went to law school?
13   A. Yeah. During the time I was in budget and cost,
14     I went to law school, correct.
15   Q. When you graduated from law school, did you come
16     back and work for John Hancock?
17   A. Yes, I did.
18   Q. Did you work in their tax law department --
19   A. Not at that time.
20   Q. -- when you came back?
21   A. When I came back I worked in budget and cost and
22     then I went over to the corporate tax department.
23   Q. What was the time period from when you came back
24     that you worked in the budget and cost

Page 11

1    department?
2    A. Graduated in '95. Went over to corporate taxes
3      actually that year and stayed there until 1998.
4    Q. After 1998, did you then become a part of the tax
5      law department?
6    A. Correct.
7    Q. Okay. What were your duties and responsibilities
8      with respect to each of the positions you held at
9      Hancock that you just described?
10   A. At John Hancock Distributors, I was a general
11     accountant. Did financial statements, budget and
12     cost accounting. I did what it sounds like.
13     Budget and cost for the company.
14   Q. What did that entail?
15   A. That entailed budgeting for particular cost
16     centers of the company. Allocating expenses to
17     different areas. Preparing any kind of expense
18     reports.
19   Q. And what about your duties and responsibilities
20     with respect to your position in the tax
21     department?
22   A. Prepared the tax returns for the life at John
23     Hancock and its subsidiaries.
24   Q. With respect to all of these positions, what

Page 12

1    experience, if any, did you have with ERISA?
2    A. In those positions? None.
3    Q. Are you currently a member of the Hancock Benefit
4      Plan Appeals Committee?
5    A. Correct. Yes.
6    Q. For how long have you been a member of the
7      Appeals Committee?
8    A. Since about 2002 sometime. Mid 2002 until now.
9    Q. I'm sorry. Did you say mid --
10   A. Mid 2002, yeah.
11   Q. What are your duties and responsibilities as a
12     member of the Appeals Committee?
13   A. When a decision is made according to the plans,
14     the committee if it's denied and an appeal is
15     taken, we determine whether the -- we acted with
16     informed consent in making the decision.
17   Q. I'm sorry. You mentioned "informed consent."
18   A. (Witness nods.)
19   Q. Can you describe, what is that?
20   A. That we made an educated decision based on the
21     terms of the plans and on the appeal at hand.
22   Q. How do you define "an educated decision"?
23   A. Review of all the pertinent documents. Review
24     the situation at hand and even hand

Page 13

1    administration of the case.
2    Q. On what basis is it that you determine that the
3      standard of review essentially is an educated
4      decision?
5    A. We try to review the whole -- the case at hand,
6      whatever kind of documents were given to us to
7      review. We ask questions as far as if that needs
8      to be done. Interview applicable people as that
9      may require, too.
10   Q. I guess my question, and maybe I didn't phrase it
11     correctly, is are there any documents that
12     outline or expressly state that the standard of
13     review for the Appeals Committee is to ensure
14     that the original decision suffices as an
15     educated decision?
16         MS. JACKSON: Objection.
17   Q. Or an educated -- I believe that's what you said.
18     Educated decision?
19   A. Right.
20         MS. JACKSON: Objection.
21   Q. You can answer.
22         MS. JACKSON: If you understand the
23     question.
24   Q. Do you understand the question?

4 (Pages 10 to 13)

9a0ae8c5-545e-4b33-9728-a797a716bc34

Page 30

1  Q. In late 2004, do you recall reviewing an appeal
2     for severance benefits on behalf of 23
3     individuals, including an employee named Daniel
4     Joyce?
5  A. Yes.
6        MR. ROBBINS:  Actually, could we mark
7     that as Exhibit 1?
8        (Procedural Rules for Claims Appeals
9     marked Exhibit No. 1.)
10 Q. Mr. Bisciotti, I would like you to take a look at
11    this document that I have set forth before you.
12       MS. JACKSON:  Thank you.
13 Q. Are you familiar with this document?
14 A. Yes.
15 Q. Have you ever reviewed this document?
16 A. Yes.
17 Q. Do you recall if you were provided with copies of
18    these -- strike that.  Do you recall if you were
19    provided with copies of the document set forth in
20    this letter?
21       MS. JACKSON:  Objection.  You don't
22    have to answer that question.  It is again going
23    back to my objection at the initial part of this
24    deposition that it's tending towards the

Page 31

1     attorney-client privilege as well as work-product
2     doctrine.
3        MR. ROBBINS:  This is a communication
4     from Peter Mongeau to Carlton Grant stating --
5        MS. JACKSON:  I'll withdraw my
6     objection.  I thought you were going somewhere
7     else with the question.
8        MR. ROBBINS:  On that note, could we
9     mark this as Exhibit 2, please?
10       (10/4/04 letter marked Exhibit No. 2.)
11 Q. Mr. Bisciotti, do you recall if you were provided
12    with copies of the documents set forth in Exhibit
13    2?
14 A. Generally, yes.
15 Q. Why do you say "generally"?
16 A. I couldn't say specifically each one of these
17    things that was in here but it's familiar to me.
18 Q. Who is the other member of the Appeals Committee
19    that heard this matter?
20 A. Kathy Suchenski.  Is that how you say it?
21 Q. Was Kathy to the best of your knowledge also
22    provided with the documents listed in Exhibit 2?
23 A. To the best of my knowledge, yes.
24 Q. When did you receive these documents?

Page 32

1  A. Late 2004.
2  Q. Was it prior to the Appeals Committee meeting?
3  A. Yes, it was.
4  Q. Do you have specific knowledge that you received
5     these documents prior to the Appeals Committee
6     meeting?
7  A. Yes, I do.
8  Q. How long before the meeting did you receive these
9     documents?
10 A. About a week.
11 Q. Were you provided with any additional documents
12    when reviewing Daniel Joyce's appeal other than
13    the documents set forth in Exhibit 2?
14 A. Not that I'm aware of.
15 Q. Is Peter Mongeau a member of the Appeals
16    Committee?
17 A. At the time he was.
18 Q. He is no longer a member of the Appeals
19    Committee?
20 A. No.
21 Q. Why is that?
22 A. I'm not sure.
23 Q. Has someone replaced him?
24 A. Yes.

Page 33

1  Q. What's that person's name?
2  A. Ruth Persson.
3  Q. Did Mr. Mongeau recuse himself from voting on
4     Daniel Joyce's appeal?
5  A. Yes.
6  Q. Why did he recuse himself?
7  A. He was too closely involved with the decision
8     here.
9  Q. Can you elaborate on that?  What do you mean?
10 A. He prepared some of the documentation regarding
11    this comparability analysis.
12 Q. Was it Mr. Mongeau's decision that he recuse
13    himself?
14 A. That I'm not sure of.  It wasn't mine.
15 Q. To the best of your knowledge, on how many
16    occasions did Mr. Mongeau recuse himself from
17    voting on an appeal?
18 A. That's the only one I recall.
19 Q. If you could take a look at this document.
20       MR. ROBBINS:  And if we could mark that
21    as Exhibit 3.
22       (John Hancock Financial Services, Inc.,
23    Severance Pay Plan marked Exhibit No. 3.)
24 Q. Mr. Bisciotti, are you familiar with this

9 (Pages 30 to 33)

KACZYNSKI REPORTING

9a0ae8c5-545e-4b33-9728-a797a716bc34

Page 42

1  Q. So is it your testimony that Hancock can
2     interpret the plan differently than what has been
3     provided here in Exhibit 4?
4  A. The plan is interpreted by the company.
5  Q. I just want to make sure we're clear on this. Is
6     it your testimony that the summary plan
7     description does not fully interpret the plan?
8        MS. JACKSON: Objection.
9        MR. ROBBINS: Okay.
10       MS. JACKSON: If you're not clear on
11    what the question is, just let him know that.
12 A. Yeah. I'm not clear. I mean --
13 Q. What is the purpose of this language in Exhibit
14    4? And I'm referring to the language that begins
15    "In the event of the sale or outsourcing of a
16    business unit."
17 A. In my opinion, it's supposed to help interpret
18    the plan document.
19 Q. And in using that as a means of assisting the
20    Appeals Committee to determine whether to reverse
21    or uphold a decision to deny severance benefits,
22    is it your understanding that the condition
23    precedent for applying this provision is that
24    there be a sale or outsourcing of a business

Page 43

1     unit?
2        MS. JACKSON: Objection. I think some
3     of the confusion may be --
4        MR. ROBBINS: Your objection is noted.
5        MS. JACKSON: I think some of the
6     confusion --
7        MR. ROBBINS: I would like him to be
8     able to have an opportunity to answer the
9     question.
10       MS. JACKSON: We might be able to move
11    the question along if you could --
12       MR. ROBBINS: If you give him a minute
13    to answer, we may be able to move --
14       MS. JACKSON: You're referring to the
15    provision. He's understanding it as the plan.
16       MR. ROBBINS: He is looking directly at
17    the provision that I'm referring to in Exhibit 4.
18 Q. Did you understand the question?
19       MS. JACKSON: Again, it's not a
20    provision of the plan. I believe that's why he
21    is confused.
22       MR. ROBBINS: Miss Jackson, he hasn't
23    stated whether he is confused or not. You
24    haven't let him answer the question.

Page 44

1        MS. JACKSON: You haven't received an
2     answer.
3        MR. ROBBINS: That's exactly what I
4     want.
5  A. Repeat the question, please.
6        MR. ROBBINS: Can we repeat the
7     question back?
8        (Question read.)
9  A. It's my understanding it doesn't have to be.
10 Q. So it's your understanding that the plan and
11    specifically the comparable job analysis here can
12    apply even in the event that there is not a sale
13    or outsourcing of a business unit?
14 A. Correct.
15 Q. And on what basis do you make that determination?
16 A. By the reading of the plan.
17 Q. Can you show me in the plan which has been marked
18    as Exhibit 3, can you describe for me in the plan
19    where in the plan you come to this conclusion?
20 A. Section 3.2.
21 Q. In reading Exhibit 4, and just taking Exhibit 4
22    as it is, if we can almost push the plan aside
23    for a second --
24 A. Fine.

Page 45

1  Q. How do you in -- do you interpret this provision
2     alone as meaning that there first has to be an
3     outsourcing or sale of a business unit before the
4     plan administrator can determine whether an
5     associate has been offered a comparable job?
6  A. Based on the terms of the Exhibit 4, yes.
7  Q. Is it your understanding then that the terms of
8     Exhibit 4 that we just referenced are contrary to
9     the terms set forth in section 3.2 of the plan?
10 A. I don't think it's contrary.
11 Q. Well, it's fair to say that your understanding,
12    correct, is that there first has to be a sale or
13    outsourcing of a business unit before the plan
14    administrator can conduct a comparable job
15    analysis as it states in Exhibit 4 alone,
16    correct? I believe that's what you said.
17 A. Based on Exhibit 4.
18 Q. Alone, correct?
19 A. Alone.
20 Q. And I believe it was your testimony earlier that
21    under section 3.2 it's not necessary that there
22    first be -- that the plan administrator first
23    determine there be a sale or outsourcing of a
24    business unit in order to conduct a comparable

KACZYNSKI REPORTING

9a0ae8c5-545e-4b33-9728-a797a716bc34

Page 46

1    job analysis, correct?
2         MS. JACKSON: Objection.
3    A. It just doesn't state so.
4    Q. But I believe it was your testimony that under
5    section 3.2, and correct me if I'm wrong, under
6    section 3.2 that the plan administrator has the
7    right to conduct a comparable job analysis even
8    in the event that there is not a sale or
9    outsourcing of a business unit?
10        MS. JACKSON: Objection.
11   A. Can you repeat that?
12        MR. ROBBINS: Can you repeat the
13   question back to him?
14        (Question read.)
15        THE WITNESS: Can you repeat that one
16   more time?
17        (Question read.)
18   A. I just don't see that in the plan document.
19   Q. May a plan administrator pursuant to the plan
20   conduct a comparable job analysis in the event
21   there is no outsourcing or sale of a business
22   unit?
23   A. It appears to me you can.
24   Q. Under the summary plan description, which has

Page 47

1    been marked as Exhibit 4, may the plan
2    administrator conduct a comparable job analysis
3    in the event there is no sale or outsourcing of a
4    business unit?
5    A. It doesn't say you can't.
6    Q. I'm sorry?
7    A. It doesn't say they can't perform the
8    comparability analysis. Only if there's a sale
9    or outsourcing.
10   Q. I'm sorry. The answer -- my question was, may --
11   as we read Exhibit 4, may a plan administrator
12   conduct a comparable job analysis in the event
13   there is no sale or no outsourcing of a business
14   unit?
15        MS. JACKSON: Objection. It's been
16   asked and answered.
17        MR. ROBBINS: I'm sorry? He said
18   can't. He said it can't.
19   Q. The answer to my question is in all likelihood
20   yes or no. It's, may a plan administrator
21   conduct a comparable job analysis in the event
22   there is no sale or outsourcing of a business
23   unit?
24        MS. JACKSON: Objection.

Page 48

1    A. That's not clear to me.
2    Q. Do you think that's something that should be
3    clear to you as a member of the Appeals
4    Committee?
5    A. No.
6    Q. Why is that?
7    A. It's not necessary.
8    Q. So in the event that there is no sale or
9    outsourcing of a business unit and an appeal is
10   made as to such, it's not necessary for you to
11   determine whether under the terms of the plan it
12   is necessary that there be an outsourcing or sale
13   of a business unit?
14        MS. JACKSON: Objection.
15        (Mr. Peters and Mr. Robbins confer.)
16   Q. Did you understand the question?
17   A. Repeat it, please.
18   Q. Okay.
19        MR. PETERS: Can we take a minute?
20        MS. JACKSON: Sure.
21        (Recess.)
22   Q. Mr. Bisciotti, according to Exhibit 4, the plan
23   administrator must first determine whether there
24   has been a sale or outsourcing of a business unit

Page 49

1    prior to determining whether a comparable job has
2    been offered to an associate, correct?
3    A. Again, the SPD is not controlling here. This is
4    -- this is helpful to interpreting the plan
5    language. But the plan controls.
6    Q. So is it your testimony if there is a conflict
7    between the summary plan description and the plan
8    language that the plan controls?
9    A. That's correct.
10   Q. And what do you base that on?
11   A. My knowledge of the plan. An SPD specifically
12   says the plan controls.
13   Q. Wouldn't that be a legal issue as far as which
14   document controls?
15        MS. JACKSON: Objection.
16   A. Just our general understanding of the plan.
17   Q. Okay.
18   A. And the SPD.
19   Q. Where in the plan does it state that if there is
20   a conflict between the summary plan description
21   and the plan that the language of the plan
22   controls?
23   A. I have to look at it.
24   Q. Would you mind taking a look?

13 (Pages 46 to 49)

KACZYNSKI REPORTING

Page 58

1   A. I couldn't comment on that.
2        MS. JACKSON: Objection.
3        MR. PETERS: Pardon me. Quick break.
4   I'm going to run something by you.
5        (Recess.)
6   Q. Mr. Bisciotti, you indicated earlier that at
7   times as a member of the Appeals Committee you
8   are asked to step in the shoes of a reasonable
9   employee. Is that correct?
10  A. I said that but that's my terminology for
11  reviewing the case at hand.
12  Q. Sure. Sure. To the extent that reasonable
13  employees are reviewing the summary plan
14  description, what is your understanding of how a
15  reasonable employee would interpret an
16  outsourcing of a business unit?
17       MS. JACKSON: Objection.
18  A. To my knowledge, that issue comes from reviewing
19  the plan and that's as far as I needed to go in
20  this as far as determining what was -- what was a
21  successor company and what was the outsourcing of
22  the business unit.
23  Q. I'm asking you to draw from your experience as a
24  member of the Appeals Committee who at times

Page 59

1   steps in the shoes of reasonable employees. And
2   to the extent that reasonable employees interpret
3   the summary plan description, how is an
4   outsourcing of a business unit interpreted?
5        MS. JACKSON: Objection.
6   A. I don't understand the question basically. I
7   don't see how that fits.
8   Q. Well, we can determine what fits later on. My
9   question is to you, though, is if you can answer
10  the question -- if you don't know, you can answer
11  "I don't know." But to the extent that you do
12  know, I'm interested in your -- you to draw on
13  your experience as -- stepping into the shoes of
14  reasonable employees in order to define or
15  provide some insight into what is an outsourcing
16  of a business unit.
17  A. In the context of the SPD?
18  Q. In the context of the SPD.
19  A. I don't know.
20  Q. All right. To the best of your knowledge, has
21  there ever been an outsourcing of a business unit
22  at Hancock for which there was no outsourcing
23  contract or agreement executed?
24       MS. JACKSON: Objection.

Page 60

1   A. I have no knowledge of that.
2   Q. Again, drawing on your experience as an Appeals
3   Committee member, what constitutes or how does a
4   reasonable -- how should a reasonable employee
5   define a sale of a business unit as it's stated
6   in the SPD?
7   A. I couldn't say that.
8   Q. What is your knowledge and understanding of the
9   sale of the Tower complex?
10       MS. JACKSON: Objection.
11  A. I know we sold the building.
12  Q. Sold one building?
13  A. I know we sold a tower. I don't have much
14  knowledge on that, no.
15  Q. Okay. What was the purpose of the transaction?
16       MS. JACKSON: Objection.
17  A. I couldn't say.
18  Q. Was the purpose to sell real estate?
19  A. I don't know.
20       MS. JACKSON: Objection. We've
21  provided a 30(b)(6) witness on these subjects.
22       MR. ROBBINS: Well, I'm getting at
23  this.
24  Q. I want to know as a member of the Appeals

Page 61

1   Committee. Certainly Joyce's appeal resulted or
2   came about as a result of the sale of the Tower
3   complex. Is that fair to say?
4   A. I would -- yes, I would assume so.
5   Q. Okay. Did you take any steps then to acclimate
6   yourself with what this transaction for the sale
7   of the Tower complex consisted of?
8   A. Not details.
9   Q. What, if anything, did you do to acclimate
10  yourself with the sale of the Tower complex?
11  A. Nothing.
12  Q. What steps, if any, did you take as a member of
13  the Appeals Committee to determine whether the
14  sale of this Tower complex involved or resulted
15  in an outsourcing or sale of Joyce's business
16  unit?
17  A. By reviewing the terms of the severance plan.
18  Q. Is that the only document that you referred to
19  or, rather, was referring to the severance plan
20  the only step that you undertook to determine
21  whether the sale of the Tower complex involved or
22  resulted in an outsourcing of the sale -- an
23  outsourcing or sale of Joyce's business unit?
24  A. That's the main document I used.

KACZYNSKI REPORTING

9a0ae8c5-545e-4b33-9728-a797a716bc34

Page 62

1  Q. Were there others?
2  A. Not that I'm aware of right now.
3  Q. Why was it necessary that Peter Mongeau then
4     forward all these other documents to the Appeals
5     Committee in addition to the severance pay plan?
6         MS. JACKSON: Objection. If you know,
7     answer.
8  A. To determine whether comparable positions were
9     offered to the employees.
10 Q. But in order to determine whether there were
11    comparable benefits offered to the employees, you
12    had to refer or, rather, did you refer to what
13    has been marked as Exhibit 4, the severance pay
14    plan?
15 A. Say that again. I'm sorry.
16        THE WITNESS: Exhibit 3 he's talking
17    about?
18 Q. Exhibit 4.
19        MS. JACKSON: If you can just restate
20    the question because I think there was some
21    confusion.
22 A. I thought you were talking about the SPD. You
23    referred to the plan and the SPD.
24        MS. JACKSON: He'll restate the

Page 63

1     question.
2  Q. I believe you stated that the extent to which you
3     referred to Exhibit 4 was to provide you with
4     some assistance in interpreting the plan. Is
5     that correct?
6  A. It may have been.
7  Q. May have been. Do you specifically recall
8     referring to Exhibit 4 in order to provide you
9     with assistance in interpreting the plan or did
10    you just refer to the plan?
11 A. I may have referred to this but I'm not sure.
12 Q. My question was, do you have specific knowledge?
13 A. I don't have specific knowledge that I referred
14    to Exhibit 4.
15 Q. Okay. With respect to the plan, which has been
16    marked as Exhibit 3, how were you able to
17    determine how to define "comparable"? I'm
18    talking with respect to section 3.2, subsection C
19    and D.
20 A. My recollection, defining "comparable," the
21    materials that were given to us on the Exhibit 2
22    had information regarding what constitutes a
23    comparable position.
24 Q. Is it fair to say that Exhibit 4 specifically

Page 64

1     sets forth -- or strike that. Sets forth, is it
2     fair to say that Exhibit 4 sets forth three
3     elements that will be considered in defining what
4     is a comparable job?
5  A. I guess that's fair to say.
6  Q. And is it fair to say this is the document that
7     is provided to the employees of Hancock, correct?
8     Or is at least accessible to employees at
9     Hancock.
10 A. Yes. Correct.
11 Q. Is this document, which has been marked as
12    Exhibit 4, is that filed with the Department of
13    Labor?
14        MS. JACKSON: Objection.
15 A. I'm not sure.
16 Q. Is the summary plan description filed with the
17    Department of Labor?
18        MS. JACKSON: Objection.
19 A. I'm not sure.
20 Q. Do you know if any of those documents that you
21    referred to in order to assess whether Beacon
22    offered former Hancock associates comparable
23    jobs, do you have any knowledge whether those
24    documents were filed with the Department of

Page 65

1     Labor?
2  A. I don't have knowledge.
3  Q. In putting yourself in the position of a
4     reasonable employee, wouldn't it be fair to say
5     that this is the document, Exhibit 4, that
6     employees have to rely on in order to determine
7     whether they have been offered a comparable job?
8  A. Repeat that again.
9         MR. ROBBINS: Can you repeat the
10    question?
11        (Question read.)
12 A. No.
13        MS. JACKSON: Objection.
14 Q. No? There are other --
15 A. It's not the only document. The plan is the
16    controlling document.
17 Q. Okay. But you didn't refer to the plan to
18    interpret what "comparable job" was, correct?
19 A. There is no definition of comparable in the plan.
20 Q. You had to refer to other documents in order to
21    come to that conclusion, correct?
22 A. That's correct.
23 Q. Okay. And the other documents that you referred
24    to you believe are listed on what has been marked

17 (Pages 62 to 65)

9a0ae8c5-545e-4b33-9728-a797a716bc34

Page 98

1      MR. ROBBINS: But you're interrupting.
2  As you know, speaking objections are prohibited.
3      MS. JACKSON: As his counsel, I will
4  make whatever objections I feel are necessary.
5      MR. ROBBINS: Under Massachusetts
6  rules, you don't have a right to make a speaking
7  objection.
8  Q. Is it fair to say this document refers to the ISS
9     outsourcing?
10 A. It appears so.
11 Q. Okay. I believe earlier you testified, and let's
12    clarify if necessary, that you were unaware of
13    any outsourcing that had ever taken place at
14    Hancock. Would you like to clarify that
15    question?
16 A. I may have general knowledge in passing but other
17    than that.
18 Q. General knowledge in passing of what?
19 A. Just from working at John Hancock.
20 Q. So you have general knowledge just from working
21    at John Hancock that there has been instances
22    when a business unit has been outsourced?
23 A. I'm not going to deny that. Specifically I
24    couldn't say what areas.

Page 99

1  Q. Okay. What does it mean in the second paragraph
2     when it states, "Our definition of comparable is
3     that the job must include a benefits package that
4     is competitive in our industry"?
5  A. I couldn't guess what that -- how they -- how
6     they meant it in that context.
7  Q. Do you know which industry they were referring
8     to?
9      MS. JACKSON: Objection.
10 A. I didn't write this so I'm not sure.
11 Q. Okay. But was it the Hancock, the John Hancock
12    financial services industry or was it the
13    industry of the successor company? Do you know?
14     MS. JACKSON: Objection.
15 A. It's not clear from this document.
16 Q. Okay. So as you read this document, it could
17    potentially mean Hancock's industry or the
18    successor company's industry; is that --
19     MS. JACKSON: Objection.
20     MR. ROBBINS: Can I please finish the
21    statement, the question?
22 A. I can't definitively comment on that. I can't
23    say.
24 Q. Okay. Did you rely in any way on this document

Page 100

1     when considering Joyce's appeal?
2  A. To the best of my knowledge, no.
3  Q. What role did this document serve, if any, in
4     assisting the Appeals Committee to make its
5     decision?
6  A. I don't think it affected my decision whatsoever.
7  Q. Do you know why Peter Mongeau may have found it
8     necessary to pass along this information to the
9     Appeals Committee? Or pass along Exhibit 9,
10    rather, to the Appeals Committee?
11 A. I couldn't say that for sure.
12 Q. But the Appeals Committee came to the conclusion
13    that it was not a relevant document?
14 A. If it was in the package of material that I
15    received -- I don't think this was relevant to my
16    decision.
17 Q. Do you recall whether a competitive assessment
18    analysis was done with respect to the benefit
19    offerings received by the ISS employees?
20 A. I'm not aware.
21 Q. What do you recall, if anything, about the
22    benefits that the ISS employees received from the
23    successor company?
24 A. I don't recall.

Page 101

1  Q. Mr. Bisciotti, are you familiar with the document
2     that I have set forth before you?
3  A. Yes, I am.
4  Q. What is it?
5  A. Competitive assessment. Benefits offered by
6     Beacon.
7  Q. Of benefits offered by Beacon to --
8  A. With respect to our severance pay plans.
9     Comparable job provisions.
10     MR. ROBBINS: Could we mark this
11    document, please, as Exhibit 10?
12     (Competitive Assessment of Beacon
13    Capital Partners Management, LLC Employee
14    Benefits Package marked Exhibit No. 10.)
15 Q. Mr. Bisciotti, did you review this document in
16    anticipation of your testimony here today?
17 A. I reviewed it in anticipation of the benefits
18    appeal committee.
19 Q. Did you review this document in anticipation of
20    your deposition testimony here today?
21 A. Not specifically.
22 Q. I'm sorry. What do you mean "not specifically"?
23 A. I didn't review it before today.
24 Q. Okay. Do you know who drafted this document?

26 (Pages 98 to 101)

KACZYNSKI REPORTING

9a0ae8c5-545e-4b33-9728-a797a716bc34

Page 106

1  A. Correct.
2  Q. So when did you ask him these questions?
3  A. We had called him in in another session.
4  Q. To the best of your recollection, how long did
5     you dedicate to reviewing this document?
6  A. I couldn't say for sure. Couple hours. I don't
7     know. I mean, we mulled it over -- could have
8     been a couple days.
9  Q. I'm talking specifically with respect to Exhibit
10    10.
11 A. Specifically with regard to Exhibit 10, in
12    talking to Mr. Mongeau or reviewing? Just
13    reviewing it?
14 Q. Just reviewing the document.
15 A. I couldn't say for sure but --
16       MS. JACKSON: That's fine.
17 A. That's --
18 Q. Okay. Would you say it would have exceeded an
19    hour?
20 A. I'm sure it was more than that.
21 Q. So you believe --
22 A. I gave this very serious consideration. I
23    couldn't give you an hour time limit on it,
24    though.

Page 107

1  Q. Okay. Upon reviewing this document for the first
2     time, did you have any concerns with the manner
3     in which the assessment was conducted?
4  A. No. I thought it was done very well.
5  Q. Why did this assessment only consider selected
6     benefits and not assess Beacon's entire benefit
7     offering?
8  A. I'm not sure of that.
9  Q. Where in the plan or summary plan description
10    does it say that competitive benefit offerings
11    requires an analysis of selected benefits and not
12    the entire benefits package?
13 A. I'm not sure it does say that.
14 Q. Do you have any knowledge as to whether it does
15    say that?
16 A. I don't have knowledge to that, no.
17 Q. What is your understanding of the phrase "noise
18    factor" with respect to Exhibit 10?
19 A. In my opinion, that would be if employees are --
20    potential people affected would complain.
21 Q. Why would they complain?
22 A. I don't know. Because the benefit's not there or
23    it's not the same as they were receiving. That's
24    just my opinion, though.

Page 108

1  Q. Mm-hmm. Was it a concern of the Appeals
2     Committee that of the six benefits analyzed in
3     Exhibit 10 four of them contained at least a
4     modest noise factor?
5  A. I think from the standpoint of the entire
6     assessment I was concerned but not specifically
7     with the benefits.
8  Q. I'm asking you specifically because Exhibit 10,
9     correct, deals specifically with the benefits; is
10    that correct?
11 A. Correct.
12 Q. Okay. With respect to Exhibit 10, was it a
13    concern of the Appeals Committee that of the
14    benefits listed here four of them contained
15    reference to at least a modest noise factor?
16 A. That was considered by us. It was, you know --
17 Q. To what extent was it considered?
18 A. It was considered to the extent that we wanted to
19    make sure these benefits were competitive and we
20    wanted to make sure how that weighed on our
21    decision.
22 Q. Again, and competitive is determined as a
23    comparison to other benefit offerings within the
24    successor company's industry, correct?

Page 109

1  A. Correct.
2  Q. Were you provided with a copy of the sources
3     listed at the bottom of the first page when
4     reviewing this document?
5  A. I can honestly say no. I wasn't.
6  Q. With respect to Exhibit 2, can you tell me if it
7     appears Mr. Mongeau included these sources in his
8     package of documents to the Appeals Committee?
9  A. These sources?
10 Q. Right. The sources as referenced --
11 A. I don't recall seeing them.
12 Q. Okay. What steps, if any, did you take to ensure
13    that Mr. Mongeau's findings were accurate?
14 A. Based on a review of this document. That's --
15    and questioning Mr. Mongeau.
16 Q. Did you ask Mr. Mongeau specific questions in
17    order to assess whether his statistics or
18    percentages referenced were accurate?
19 A. I couldn't recall exactly but yeah, that's the
20    kind of questioning we went to. How good was
21    your sources.
22 Q. Okay. But again, you did not actually see these
23    sources that Mr. Mongeau purportedly relied on in
24    drafting this document?

KACZYNSKI REPORTING

9a0ae8c5-545e-4b33-9728-a797a716bc34

Page 110

1  A. Right. No, I didn't.
2  Q. Okay. Do you yourself have any experience
3     conducting competitive benefits assessments?
4  A. No, I don't.
5  Q. Was this the first time you have ever reviewed a
6     competitive benefits assessment?
7  A. Yes.
8  Q. Did this document assign each benefit a weighted
9     percentage?
10 A. Yes.
11 Q. Do you recall on what basis some benefits were
12    allocated more weight than others?
13 A. I don't know on what basis that was made.
14 Q. Did you inquire as to why some benefits were
15    allocated more weight than others?
16 A. I believe we did but I couldn't give you
17    specifics of the questioning but we did -- we
18    asked questions in that regard.
19 Q. What questions did you ask in that regard?
20 A. Why the weighting was given what it was. But I
21    couldn't -- I don't have anything, you know --
22    nothing right now in my head that I could tell
23    you why exactly they weighted those as they did.
24 Q. Okay. Now, I believe it was your testimony that

Page 111

1     the competitive benefits assessment analysis was
2     to involve a comparison of Beacon's benefits to
3     that of other companies in Beacon's industry,
4     correct?
5  A. Correct.
6  Q. In what industry is Beacon?
7  A. Real estate management.
8  Q. Okay. Beacon is in the property management
9     industry, right?
10 A. Right. Right.
11 Q. Are you aware of any information collected by Mr.
12    Mongeau or any member of the human resources
13    department on benefits offered by property
14    management companies in Massachusetts?
15 A. I'm not aware of what he got for that.
16 Q. Are you aware of any information collected by Mr.
17    Mongeau or any member of the human resources
18    department on benefits offered by property
19    management companies anywhere?
20 A. No. I'm not aware.
21 Q. To the best of your knowledge, does this
22    competitive benefits assessment analysis, Exhibit
23    10, contain any information on the benefits
24    offered to employees in the property management

Page 112

1     industry?
2  A. To my knowledge it does.
3  Q. Okay. On what basis?
4  A. It was told to us by Mr. Mongeau.
5  Q. The sources, however, identified by Mr. Mongeau
6     -- strike that. You stated that Mr. Mongeau
7     indicated that they did collect information on
8     competitive benefits offered within the property
9     management industry?
10 A. To my recollection, yes.
11 Q. Okay. Did he provide any such information to you
12    in the benefits when the Appeals Committee
13    convened in November of 2004?
14 A. Regarding that particular issue?
15 Q. Right.
16 A. None that I can recall.
17 Q. From just looking at this document, Exhibit 10,
18    can you determine whether these figures are
19    figures obtained or are figures that reference
20    benefits within the property management industry?
21 A. I couldn't confirm for sure.
22 Q. This assessment includes a direct comparison of
23    Beacon's employee health plan contributions to
24    Hancock's employee health plan contributions,

Page 113

1     correct?
2  A. It appears that way, yes.
3  Q. In fact, at the top, number three indicates such,
4     correct?
5  A. Yes, it does.
6  Q. In fact, the administrative guidelines in Exhibit
7     8 as we touched on specifically say that there is
8     to be no comparison of Beacon's benefits to that
9     of Hancock's, correct?
10       MS. JACKSON: Objection.
11 A. It says they're not compared to those offered by
12    John Hancock or the financial service industries.
13 Q. In this case in Exhibit 10 it appears there is a
14    direct comparison of employee health plan
15    contributions for Beacon versus John Hancock?
16 A. Yes, it does.
17 Q. Okay. Why is that the case if the guidelines
18    suggest that the benefits are not to be compared
19    to those offered by John Hancock?
20       MS. JACKSON: Objection.
21 A. My recollection is that this is the best
22    available data they had to use for that
23    comparison.
24 Q. So they made a determination that because they

KACZYNSKI REPORTING

9a0ae8c5-545e-4b33-9728-a797a716bc34

Page 114

1    couldn't get enough data on the property
2    management industry that they would go in a
3    different route?
4  A.  That's just my opinion.
5  Q.  Oh --
6  A.  I don't --
7  Q.  I thought in your previous statement, I thought
8    that was based on some knowledge you had.
9  A.  My recollection is when we talked to Peter
10   Mongeau regarding this is that's the best
11   available information he had.  I don't recall
12   more specifics other than that.
13 Q.  Okay.
14 A.  That's why they had to use the Hancock amounts in
15   that.
16 Q.  Okay.  What steps, if any, did you take to
17   confirm that the remaining analysis involved a
18   comparison of Beacon's benefit offerings to those
19   benefits offered by employers within Beacon's
20   industry?
21 A.  Just by questioning Mr. Mongeau and reviewing the
22   document.
23 Q.  But Mr. Mongeau, I believe, stated to you that --
24   did he indicate to you that he didn't have

Page 115

1    information on the property management industry?
2  A.  Regarding health plan costs or the entire --
3  Q.  Regarding this entire document.
4  A.  I don't recall.
5  Q.  Okay.  So I guess what I'm asking is, what steps,
6    if any, did you take to confirm this entire
7    document or any aspect of this document involved
8    a comparison of Beacon's benefit offerings to
9    those benefits offered by employers within
10   Beacon's industry?
11 A.  None other than reviewing this.
12 Q.  Okay.
13 A.  And talking to Mr. Mongeau.  That's all I can
14   give you.
15 Q.  Okay.  And did you come to the conclusion that
16   Mr. Mongeau did conduct an analysis involving a
17   comparison of Beacon's benefit offerings to those
18   benefits offered in the property management
19   industry?
20 A.  To the best of his ability, correct.  Yes.
21 Q.  Okay.
22 A.  In my opinion.
23 Q.  In your opinion or did he state that?
24 A.  I don't recall what he stated exactly.  So I

Page 116

1    guess it's fair to say in my opinion I thought we
2    came to the conclusion that he did.
3  Q.  Isn't this assessment, isn't it true this
4    assessment fails to compare Beacon's benefits to
5    benefits offered to other employees in the
6    property management industry?
7  A.  I don't agree.
8  Q.  On what basis you don't agree?
9  A.  It was compared as much as -- as much as it
10   possibly could be.  As best it could be.
11 Q.  Well, whether it was done as best it could be or
12   not, is it true that this document does not
13   reflect a comparison of Beacon's benefits to
14   benefits offered to other employees in the
15   property management industry?
16       MS. JACKSON:  Objection.
17 A.  I think he compared them.
18 Q.  You think he compared them or you know he
19   compared them?
20 A.  My opinion, he compared them to that industry.
21 Q.  Have you seen any documents that were compiled or
22   that you reviewed that indicates that Mr. Mongeau
23   did conduct a comparison of Beacon's benefit
24   offerings to the benefits offered to employees in

Page 117

1    the property management industry?
2  A.  I don't have any other documentation other than
3    this regarding that.
4  Q.  Is it clear to you just from this document,
5    Exhibit 10, that Beacon -- strike that.  That
6    Peter Mongeau conducted a comparison of Beacon's
7    benefits to benefits offered to employees in the
8    property management industry?
9       MS. JACKSON:  Objection.
10 A.  Can you repeat the question again?
11      MR. ROBBINS:  Can you repeat the
12   question back?
13      (Question read.)
14 A.  This document in conversations with Mr. Mongeau
15   --
16 Q.  My question --
17 A.  -- led me to that conclusion.
18 Q.  My question was just this document.
19 A.  Not just that document.
20 Q.  My question was with respect to just this
21   document, was it clear?
22 A.  No.
23 Q.  Isn't this assessment erroneous if part of
24   Beacon's benefits package is compared directly to

30 (Pages 114 to 117)

9a0ae8c5-545e-4b33-9728-a797a716bc34

Page 130

1  was below average, average or above average?
2  A. For a particular benefit?
3  Q. With respect to any of the benefits.
4  A. Just what was on this -- the competitive
5  assessment score.
6  Q. Were there any guidelines that you were aware of
7  that he followed in order to assess whether the
8  competitiveness was above average, average or
9  below average?
10  A. Just based on the sources he listed here.
11  Q. Okay. But you didn't review those sources?
12  A. No, I did not.
13  Q. Is it your understanding that these sources as
14  listed here in Exhibit 10 indicate or provide
15  guidance for determining the competitiveness of a
16  benefit?
17  A. As far as I know they do.
18  Q. And what do you base that on?
19  A. Questioning Mr. Mongeau.
20  Q. You specifically questioned Mr. Mongeau about the
21  -- how he came to his competitiveness -- how he
22  determined the competitiveness column?
23  A. My recollection is yes. We did.
24  Q. And again, you believe this took place in a

Page 131

1  subsequent meeting with Mr. Mongeau?
2  A. Yes.
3  Q. Did you discuss with Peter Mongeau on what basis
4  a benefit receives a score of a one, two or
5  three?
6  A. I don't recall exactly.
7  Q. While Mr. Mongeau, while Exhibit 10 indicates
8  that Beacon's 401(k) plan is above the norm of
9  three percent, why is four percent above average
10  and not just average?
11  A. I don't know for sure.
12  Q. For instance, if the normal 401(k) employer
13  contribution was 3.5 percent, is it your
14  understanding that four percent would be average
15  or above average?
16  A. I couldn't say that definitively. It seems
17  above. Above average if that's the case.
18  Q. Did you have any discussions with Mr. Mongeau to
19  determine how he assessed or what guidelines he
20  used to determine whether something came in,
21  whether one benefit was above average or below
22  average or average?
23  A. I can't recall specific. I know we talked about
24  this but I can't remember specific questions.

Page 132

1  Q. With respect to medical benefits, if the Beacon
2  medical plan employee contributions are greater
3  than Hancock's, as it so states under health plan
4  costs, why were Beacon's health plan costs deemed
5  average?
6  A. I don't know for sure.
7  Q. Did you think that this was something that wasn't
8  a concern of the Appeals Committee?
9  A. I wouldn't say that.
10  Q. Did you take any steps to inquire as to whether,
11  as to why it was that the health plan costs were
12  deemed average when Beacon's medical plan
13  employee contributions were greater than John
14  Hancock's?
15  A. Let me read this for a second.
16       It appears from the document that the
17  average Beacon salary was higher than John
18  Hancock's. And that might have played a factor.
19  Q. Did you inquire as to, of Mr. Mongeau whether
20  that did play a factor?
21  A. We may have. I'm not sure.
22  Q. Why are health plan costs not included in the
23  assessment on the second page?
24  A. Can you clarify that?

Page 133

1  Q. Well, the second page lists, gives certain weight
2  to 401(k) plan, pension, medical, dental and
3  vacation, correct?
4  A. Mm-hmm.
5  Q. But there's nothing here with respect to health
6  plan costs. And it seems on the first page there
7  was an assessment done with respect to health
8  plan costs.
9  A. I believe it goes to the medical benefits.
10  Q. Do you know that for a fact?
11  A. I'm not sure right now.
12  Q. It's almost as if the employee health plan
13  contributions were not deemed to be a factor in
14  determining whether Beacon's benefit offerings
15  were competitive, correct?
16  A. I couldn't say that for sure.
17  Q. Well, to the extent the 401(k) plan receives a
18  three score, that pension receives a zero, that
19  medical receives a three, that dental receives a
20  two, why is it then that health plan costs don't
21  receive a two?
22       MS. JACKSON: Objection. It's been
23  asked and answered.
24  A. I don't know for sure.

KACZYNSKI REPORTING

Page 134

1  Q. Did you ever specifically ask that question as to
2     why that was the case?
3  A. I don't recall. Again, I would have to talk to
4     Peter on that. I know we quizzed him on this,
5     though.
6  Q. The total score equals 1.9, correct?
7  A. Correct.
8  Q. Isn't it true that if an average benefits plan is
9     a 2.0, that a 1.9 is below average?
10 A. In my mind, it's considered average.
11 Q. Why is that?
12 A. Because it's very close to two.
13 Q. Is it fair to say that Mr. Mongeau came to the
14    same conclusion?
15 A. I couldn't speak for Peter.
16    MS. JACKSON: Objection.
17 Q. Did you speak with Peter about the fact that this
18    was a 1.9 and not a 2.0?
19 A. I am not sure.
20 Q. Do you know where Mr. Mongeau was willing to draw
21    the line? For instance, what if the final score
22    was a 1.7? Would that still be competitive?
23 A. I'm not sure. I don't think we asked him about
24    that.

Page 135

1  Q. Mr. Bisciotti, are you familiar with the document
2     that I put before you?
3  A. Yes, I am.
4  Q. What is it?
5  A. It's minutes to our meeting and issues that we
6     wanted to look into further.
7     MR. ROBBINS: Could we please mark this
8     document as Exhibit 11?
9     (Minutes of the Company Benefit Plan
10    Appeal Committee marked Exhibit No. 11.)
11 Q. Mr. Bisciotti, are these your markings on this
12    document?
13 A. They may be.
14 Q. Is this document which has been marked as Exhibit
15    11 consistent with your recollection of what
16    transpired during the Appeals Committee's
17    meeting?
18 A. As far as I recall, yes.
19 Q. As you sit here today, is this document
20    consistent with your recollection of what
21    transpired during the meeting?
22 A. Correct. Yes.
23 Q. To the best of your recollection, how long did
24    the Appeals Committee convene on November 16,

Page 136

1     2004 to discuss case number 04-03?
2  A. I can't recall correct -- exactly.
3  Q. Would that be information that would be available
4     through the minutes?
5  A. How long the meeting was?
6  Q. Right. Is there anyone keeping track of how long
7     the meeting goes?
8  A. I don't think so. Probably Carlton Grant but I
9     don't know.
10 Q. Did the Appeals Committee consider appeals on
11    behalf of 23 former Hancock associates
12    collectively and without consideration to
13    individual claims?
14 A. Correct.
15 Q. Why is that?
16 A. That's how it was presented to us. Twenty-three
17    people. Well, when you say "collectively,"
18    you're saying --
19 Q. Did you go through each individual case or was it
20    a collective endeavor?
21 A. We went through -- let's put it this way: We
22    went through each of the 20 -- the 23 cases and
23    looked at them. They were all based on the same
24    issue. Let's put it that way. But all the cases

Page 137

1     -- each person was considered separately, you
2     know. When you say "collectively," you kind of
3     --
4  Q. It's fair to say all 23 cases, 23 appeals
5     presented similar issues?
6  A. Absolutely.
7  Q. What do you recall Kathy stating about Beacon's
8     lack of a pension plan?
9  A. I don't recall specifics of that.
10 Q. Do you recall as it states here that she was very
11    surprised that Beacon did not offer a pension
12    plan?
13 A. Based on this, yeah. To the best of my
14    recollection, she said it but --
15 Q. What did you find out when you inquired whether
16    Hancock gave the associates a clear idea of what
17    to expect during the transition?
18 A. Say that again. I'm sorry.
19 Q. What did you find out when you inquired whether
20    Hancock gave the associates a clear idea of what
21    to expect during the transition?
22 A. I was told that there was meetings with the
23    affected associates and they were apprised of
24    what was going on in the transition process.

KACZYNSKI REPORTING

9a0ae8c5-545e-4b33-9728-a797a716bc34

Page 138

1  Q. Do you recall the substance of those meetings?
2  A. No, I don't. I wasn't involved in them.
3  Q. Okay. Were you provided with documents or notes
4     referencing the substance of the communications
5     of these meetings?
6  A. Not that I can recall.
7  Q. Okay. And from whom did you acquire this
8     information?
9  A. That information was from Joan DiCicco. And
10    Peter I think was included in that, too.
11 Q. What additional research did you conduct as far
12    as what constitutes the Hancock severance pay
13    plan comparable job eligibility provision?
14 A. I just did general research on the Internet
15    regarding that specific provision. What
16    constitutes comparable job.
17 Q. And do you recall what sources you found on the
18    Internet that assisted you in determining what
19    constituted the Hancock severance pay plan
20    comparable job eligibility provision?
21 A. Just various case law.
22 Q. Why did you feel the need to resort to the
23    Internet?
24 A. Whatever. It was just research.

Page 139

1  Q. Did you feel that you weren't provided with
2     enough information that you had to conduct some
3     supplemental research?
4        MS. JACKSON: Objection.
5  A. I wanted to be more comfortable with the
6     decision.
7  Q. Okay. What type of -- when you say "case law,"
8     did you access West Law or Lexis-Nexis?
9  A. CCH.
10 Q. I'm sorry. What is CCH?
11 A. A Commerce Clearinghouse.
12 Q. What is that?
13 A. It's a research service. Tax research service.
14 Q. Do you still possess a copy of the documents that
15    or the -- strike that. Did you print out what
16    you found on the Internet from CCH?
17 A. I maybe either printed it out or viewed it
18    on-line.
19        MR. ROBBINS: I would request to the
20    extent those documents are available if they
21    haven't already been produced, they be produced.
22        MS. JACKSON: For the record, they have
23    all been produced.
24 Q. Okay. But Hancock is the one who came up with

Page 140

1     the comparable job provision. Why was it
2     necessary to conduct outside sources in order to
3     assess what constitutes the Hancock severance pay
4     plan comparable job eligibility provision?
5        MS. JACKSON: Objection.
6  A. I just wanted to make sure they made a
7     nonarbitrary, a noncapricious decision.
8  Q. What about making an educated decision?
9        MS. JACKSON: Objection.
10 A. That's what I stated.
11 Q. What other resources did you consult in order to
12    research what constitutes the severance pay plan
13    comparable job eligibility provision?
14 A. Just the material that I got in preparation for
15    the Appeals Committee meeting.
16 Q. What was Kathy's concern with respect to the
17    criteria used for Hewitt to determine the
18    competitive weighting for the different benefits?
19 A. I don't recall that exactly. I have to ask
20    Kathy.
21 Q. Do you recall Kathy reporting back to you with
22    her findings as far as the criteria used for
23    Hewitt to determine the competitive weighting for
24    the different benefits?

Page 141

1  A. I can't recall that specific issue but she
2     concurred in our decision.
3  Q. Right. But you had a vote as well?
4  A. Right.
5  Q. Correct?
6  A. Yes.
7  Q. And I take it from this document marked as
8     Exhibit 11 that you kind of split up the duties
9     as far as finding out some more information?
10 A. Correct.
11 Q. Did Kathy at one point in time report back to you
12    with respect to her findings?
13 A. She probably did. I can't recall specifics,
14    though.
15 Q. Did you both have a copy of the Hewitt data with
16    you during the meeting?
17 A. The Hewitt data?
18 Q. Right. Did you both have a copy of any document
19    generated by Hewitt with you during the meeting
20    on November 16, 2004?
21 A. Not to my knowledge.
22 Q. Why did you find it necessary to request more
23    information about the type of material given to
24    associates during the benefits presentation?

36 (Pages 138 to 141)

Page 142

1  A. They just went to my decision on whether the
2     decision was not arbitrary.
3  Q. But if you can be more specific. Why was that
4     the case? I mean, why did you specifically need
5     to know about the information that the associates
6     were provided?
7  A. I just wanted to make sure they were fully
8     informed.
9  Q. Did you find that the associates were fully
10    informed with respect to whether the comparable
11    job provision applied?
12 A. Say that again. I'm sorry.
13 Q. Did you find that the associates were fully
14    informed that in the event -- that because of the
15    sale of the Tower complex and because they were
16    offered comparable jobs by Beacon that they would
17    not be offered severance?
18        MS. JACKSON: Objection.
19 A. I would rather -- I'm not sure I understand how
20    you're questioning there.
21 Q. Well, the employees -- what did you mean by --
22    maybe I'll ask you this: What did you mean by
23    "fully informed"? Fully informed of what?
24 A. I don't know. Just the whole entire process.

Page 143

1  Q. What process?
2  A. When they were -- become -- became Hancock
3     associates to Beacon associates.
4  Q. But how is that relevant with respect to
5     determining whether they have been offered a
6     comparable job or whether there's been an
7     outsourcing or sale of a business unit?
8  A. I don't know. In my mind -- in my mind it was
9     helpful. That's --
10 Q. Okay. I'll ask you one more time. In your mind,
11    why was that helpful?
12        MS. JACKSON: Could we just specify
13    what "that" is at this point?
14 Q. You said it would be helpful to know that the --
15    you would feel more comfortable with your
16    decision if you knew that the Hancock employees
17    were fully informed?
18 A. Of what was competitive benefits. It goes right
19    to the point.
20 Q. So did you find that the Hancock associates were
21    fully informed as far as what would constitute
22    competitive benefits?
23 A. I do.
24 Q. And what do you base that on?

Page 144

1  A. My complete review of the case.
2  Q. But what do you base it on that the -- on what do
3     you base that Hancock employees were fully
4     informed as far as what constituted competitive
5     benefits? Were they provided with a copy of this
6     document? Of Exhibit 10.
7  A. Exhibit 10?
8  Q. Which is the comparability assessment.
9  A. I don't know.
10 Q. Did you find in your research that they were
11    provided with copies of the administrative
12    guidelines that defines what a comparable job is?
13 A. I don't recall.
14 Q. So what did you find when you came to the
15    conclusion that the Hancock associates were fully
16    informed of competitive -- of what constitutes a
17    competitive benefit offering?
18 A. At the time I made this decision, I was
19    comfortable. I came to the conclusion I -- I
20    couldn't give you specifics -- that they were
21    informed that the benefits were competitive and
22    it was a comparable job position. That's as far
23    as I can go.
24 Q. But as you sit here today, you don't know?

Page 145

1  A. I can't recall. I mean, the specifics.
2  Q. Okay. Did the Appeals Committee discuss during
3     this meeting on November 16, 2004 whether the
4     sale of the Tower complex involved or amounted to
5     a sale or outsourcing of a business unit?
6  A. I'm not sure if we discussed that matter or not.
7  Q. Is it fair to say that point is not referenced in
8     this document that's been marked as Exhibit 11?
9  A. Correct.
10 Q. Is it your understanding as a member of the
11    Appeals Committee that if that was discussed it
12    would be reflected in the minutes marked as
13    Exhibit 11?
14 A. It's possible. Not everything always gets into
15    the minutes but --
16 Q. Should it be in the minutes? You're an Appeals
17    Committee member.
18 A. Yeah.
19 Q. And you see what goes into the minutes after you
20    have these appeals. Should something like this,
21    a determination as to whether this was a sale or
22    outsourcing of a business unit, be included in
23    the minutes?
24 A. Sure.

37 (Pages 142 to 145)

KACZYNSKI REPORTING

9a0ae8c5-545e-4b33-9728-a797a716bc34

Page 146

1   Q. Is it fair to say from Exhibit 11 that the
2      Appeals Committee did not review information
3      concerning what constituted the makeup of Joyce's
4      business unit?
5   A. I'm not sure.
6   Q. But is it fair to say from this document marked
7      as Exhibit 11 that it appears that was not
8      discussed at this meeting?
9         MS. JACKSON: Objection.
10  A. I just said to you that it may have been
11     discussed. It's not in the minutes.
12  Q. Okay. Did the Appeals Committee discuss whether
13     competitive benefits assessment analysis, whether
14     the competitive benefits assessment analysis
15     conducted by Peter Mongeau involved a direct
16     comparison of Beacon's employee health plan
17     contributions to Hancock's employee health plan
18     contributions?
19  A. I don't recall.
20  Q. Okay. Why isn't that mentioned in this document?
21     Document marked as Exhibit 11.
22  A. We may have discussed that after this meeting.
23  Q. Okay. Do you recall if you discussed it after
24     this meeting?

Page 147

1   A. I don't recall that.
2   Q. Did the Appeals Committee discuss at this meeting
3      whether Hancock had compared any of Beacon's
4      benefits to benefits offered by companies in
5      Beacon's industry, the property management
6      industry?
7   A. I don't recall that.
8   Q. Why isn't that mentioned in this document?
9   A. It may not have been discussed in that meeting.
10  Q. Do you recall discussing that outside of the
11     meeting?
12  A. I don't recall. May have been discussed in a
13     different meeting we had.
14  Q. Did the Appeals Committee review the sources
15     cited by Mr. Mongeau in Exhibit 10?
16        MS. JACKSON: Objection. This is asked
17     and answered.
18  A. We did not review the sources.
19  Q. What did the Appeals Committee do to confirm
20     whether Peter Mongeau's figures were correct?
21        MS. JACKSON: Objection. This was
22     asked and answered.
23        MR. ROBBINS: I asked what he did. I'm
24     asking now what the Appeals Committee did.

Page 148

1   A. Other than talking to Mr. Mongeau, the committee
2      did nothing else in reviewing this exhibit.
3   Q. Mr. Bisciotti, are you familiar with the document
4      I've put forth before you?
5   A. Yes.
6   Q. Okay. What are you requesting --
7   A. Do you want to label this?
8   Q. One second. What are you requesting in this
9      E-mail?
10        Actually, strike that. Why don't we
11     first mark this as Exhibit 12?
12        (12/13/04 E-mail string marked Exhibit
13        No. 12.)
14  A. Okay.
15  Q. Have you had an opportunity to review this
16     document?
17  A. Yes, I have.
18  Q. Why was there a second meeting?
19  A. I think we discussed this. This was to talk to
20     Joan DiCicco and Peter Mongeau. Any additional
21     questions.
22  Q. When did this meeting with Peter Mongeau and Joan
23     DiCicco take place?
24  A. I don't recall exactly.

Page 149

1   Q. The first page of Exhibit 12 at the bottom, the
2      second line from the bottom, states, "Minutes of
3      the Company Benefit Plan Appeal Committee,
4      Thursday, December 9, 2004."
5   A. Okay.
6   Q. Does this reflect the fact that the meeting with
7      Peter Mongeau and Joan DiCicco took place on
8      December 9, 2004?
9   A. I'm not sure.
10  Q. Was there any other meeting that you were aware
11     of that could have taken place in December 9,
12     2004?
13  A. Well, Kathy and I had a follow-up meeting when we
14     came to that conclusion so that would probably be
15     the third of the meetings.
16  Q. So December 9th may be the third?
17  A. May be the second or the third, yeah.
18  Q. Were there minutes for the meeting with Peter
19     Mongeau and Joan DiCicco?
20  A. I don't think we kept minutes. I don't recall.
21  Q. Was there one meeting with Mr. Mongeau and Miss
22     DiCicco both present?
23  A. I thought we had them come in separately but I'm
24     not sure.

38 (Pages 146 to 149)

9a0ae8c5-545e-4b33-9728-a797a716bc34

Page 150

1  Q. What was discussed in the meeting or meetings?
2  A. With Joan, we discussed what kind of meetings
3     they had. That was in general terms. So what
4     they had done to inform the employees of what was
5     going on. And with Peter, our focus was on his
6     competitive assessment analysis.
7  Q. On what basis did you conclude that Hancock made
8     a, quote, unquote, informed decision in
9     determining whether the new positions offered at
10    Beacon were comparable?
11 A. Based on the fact that it met the criteria in our
12    severance plan.
13 Q. Is that the standard of review for the Appeals
14    Committee in order to uphold a decision to deny
15    severance, that Hancock made an informed
16    decision?
17 A. In my -- can you repeat that again? I'm sorry.
18    I want to respond properly.
19 Q. My question was, is that the standard of review
20    for the Appeals Committee in order to uphold a
21    decision to deny severance, that Hancock made an
22    informed decision?
23 A. No. We determine whether they acted in a
24    nonarbitrary and capricious manner. That's the

Page 151

1     committee's job --
2  Q. Okay.
3  A. -- in making their decision.
4  Q. With respect to the second page of Exhibit 12,
5     the second paragraph starting with "Kathy and I."
6  A. Okay.
7  Q. If you could read into the record the second
8     sentence which starts "Our intent." If you could
9     read that.
10 A. "Our intent was to determine whether John Hancock
11    made an informed decision in determining whether
12    the new positions offered at Beacon were
13    comparable to their former position at John
14    Hancock."
15 Q. So at least the representation in this document
16    is that the standard by which you determined
17    whether to uphold the decision to deny severance
18    was based on whether Hancock made an informed
19    decision.
20        MS. JACKSON: Objection.
21 Q. Correct?
22 A. That goes part and parcel to applying the plan
23    terms fairly.
24 Q. It's either correct, yes or no. My question was,

Page 152

1     based on the representation made in this E-mail,
2     is it fair to say that the intent of the Appeals
3     Committee was to determine whether John Hancock
4     made an informed decision in determining whether
5     the new positions offered at Beacon were
6     comparable to their former positions at John
7     Hancock?
8        MS. JACKSON: Objection.
9  A. This is a memo -- this is an E-mail that I wrote
10    --
11 Q. I know. I understand that. My question to you
12    is very simple. It's very simple. I'm not
13    trying to trick you. I want to try to find out
14    facts about this. You were there. I wasn't.
15 A. Okay.
16 Q. My question is, according to this E-mail, is it
17    fair to say that the Appeals Committee's intent
18    was to review -- was to determine whether John
19    Hancock made an informed decision in determining
20    whether the new positions offered at Beacon were
21    comparable to their former position at John
22    Hancock?
23 A. No.
24 Q. It's not fair to come to that conclusion as a

Page 153

1     result of this E-mail; is that correct?
2        MS. JACKSON: Objection. Asked and
3     answered.
4  Q. Why is that? Why is that not an accurate
5     summarization of what the intent was of the
6     Appeals Committee, to make an informed decision?
7  A. That goes --
8  Q. Strike that. What did you mean here by "informed
9     decision"?
10 A. That they considered all the facts. They
11    considered the terms of the plan and applied them
12    fairly to these -- to the employees.
13 Q. Okay. And on --
14 A. You're taking that out of context there. It's
15    making it sound a lot less clear, you know.
16    You're saying you're not trying to trick me here.
17 Q. I'm asking you what was the intent of the Appeals
18    Committee when reviewing Joyce's appeal. Was it
19    to ensure that Hancock made an informed decision
20    in determining whether the new positions offered
21    at Beacon were comparable to their former
22    position at John Hancock?
23        MS. JACKSON: Objection. The question
24    regarding what --

39 (Pages 150 to 153)

KACZYNSKI REPORTING

Page 174

1    What is the word printed at the top of each --
2    Exhibit 7 is the exhibit which you identified as
3    the comparable job -- as a draft of the
4    comparable job definition of the -- associated
5    with the severance pay plan. Exhibit 8 is also a
6    draft of a document that you identified as being
7    a definition of comparable job associated with
8    the severance pay plan.
9         What is the word printed clearly at the
10   very top of both of these documents?
11        MR. ROBBINS: Objection.
12   A. Draft.
13   Q. Is it your understanding that these two
14   documents, either separately or in conjunction,
15   have been established as the official guidelines
16   of the severance pay plan?
17   A. Not to my knowledge.
18   Q. Throughout Mr. Robbins' questioning regarding
19   Exhibit 10, if you can take that out.
20   A. Okay. Yeah.
21   Q. And that is the competitive assessment analysis.
22   A. Correct.
23   Q. There was discussion regarding industry/normative
24   data?

Page 175

1    A. Correct.
2    Q. And you expressed that this industry/normative
3    data was based on general industry data to the
4    extent -- and to the extent property management
5    data was available, it was rolled into that. Is
6    that an accurate understanding of what you were
7    expressing?
8         MR. ROBBINS: Objection.
9    A. That's an accurate understanding of what I was
10   expressing.
11   Q. What did the Appeals Committee do as part of its
12   due diligence in understanding this document and
13   the data presented in it?
14   A. We reviewed the document and questioned Peter
15   Mongeau on his preparation of the document.
16   Q. And what were you interested to find out in your
17   questioning?
18   A. We were interested to find out if the competitive
19   assessment was accurate and led to a
20   determination that the benefits were competitive.
21   Q. And did you find out the information that you
22   sought to find?
23   A. Yes, we did.
24   Q. Did you in any way just rubber stamp this

Page 176

1    document as a member of the Appeals Committee?
2    A. Absolutely not.
3         MR. ROBBINS: Objection.
4    Q. And what sort of investigation -- what -- strike
5    that. What did you want to know specifically
6    about the analysis that Peter Mongeau had
7    conducted in compiling this document?
8    A. We wanted to know that he used good sources in
9    production of the document and that the results
10   were accurate that led to the determination that
11   the benefits were competitive.
12   Q. Were you satisfied that good sources were used?
13   A. Yes, we were.
14   Q. How were you satisfied that good sources were
15   used?
16   A. The sources he used I was familiar with the names
17   Hewitt and Mercer/Foster in the HR field. And I
18   was also -- Peter is very professional in putting
19   something like this together so I know he used
20   the data properly in determining the final score.
21   Q. Did Peter's professionalism in any way affect the
22   rigorousness with which you approached this
23   assessment?
24   A. We still questioned it the same way we always do.

Page 177

1    We always would.
2    Q. Okay. You received some questions regarding
3    Exhibit 11 --
4    A. Okay.
5    Q. -- which are the minutes of the Company Benefit
6    Plan Appeal Committee dated November 16, 2004?
7    A. Yes.
8    Q. And Exhibit 12, which also contains minutes of
9    the Company Benefit Plan Appeal Committee dated
10   Thursday, December 9, 2004.
11        MR. ROBBINS: Objection. Is that a
12   question?
13        MS. JACKSON: I'm just orienting the
14   question because I'm obviously taking it from the
15   entire several hours of deposition.
16   Q. Is it accurate to state that the minutes are a
17   summary of what occurs at the Benefits Plan
18   Appeal Committee meetings?
19   A. Correct.
20   Q. Would it be accurate to say that some things are
21   not included in a summary of what occurs at a
22   plan, at a Benefit Plan Appeal Committee meeting?
23   A. Correct. Yes.
24   Q. You're not a stenographer, are you, Mr.

KACZYNSKI REPORTING

9a0ae8c5-545e-4b33-9728-a797a716bc34

Bonn Dep. Tr.

1                                        Volume:     I
                                         Pages:      1 to 97
2                                        Exhibits:   1 to 12

3

4                  UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
5
     * * * * * * * * * * * * * * * *
6    DANIEL JOYCE, Individually
     and on behalf of a class of
7    others similarly situated,
                          Plaintiff,
8
          vs.                              Civil Action No.
9                                          05-11428 WGY
     JOHN HANCOCK FINANCIAL SERVICES,
10   INC., SEVERANCE PAY PLAN and
     JOHN HANCOCK FINANCIAL SERVICES,
11   INC., as Administrator and
     Fiduciary of the John Hancock
12   Financial Services, Inc.,
     Severance Plan,
13                        Defendants.
     * * * * * * * * * * * * * * * *
14

15     PURSUANT TO THE MUTUAL CONFIDENTIALITY AGREEMENT

16

17              DEPOSITION OF WILLIAM A. BONN, a
     witness called on behalf of the Plaintiffs, taken
     pursuant to the applicable provisions of the Federal
18   Rules of Civil Procedure before Cynthia A. Powers,
     Shorthand Reporter and Notary Public in and for the
19   Commonwealth of Massachusetts, at the law offices of
     Todd & Weld, LLP, 28 State Street, Boston,
20   Massachusetts, on Tuesday, May 16, 2006, commencing
     at 2:15 p.m.

21
                         * * * * *
22

23                  KACZYNSKI REPORTING
                72 Chandler Street, Suite 3
                Boston, Massachusetts 02116
24                   (617) 426-6060

Page 9

1    A.  Well, John Hancock was, started
2  marketing I believe the complex, they put out an
3  offer memorandum in late 2002, probably sometime in
4  December if my memory serves me correctly.  And we
5  were taking a look at the book.  And we didn't engage
6  in discussions with the Hancock, we were directly,
7  until the very end of the offering process.  I'm
8  having a blank.  But they had a broker that was
9  representing them as I recall.
10    Q.  Was that Morgan Stanley?
11    A.  I believe that's right.  And so the
12  negotiations really began in earnest in late February
13  2003 and culminated in us executing a purchase
14  agreement on the date that we closed.
15    Q.  Was that a relatively expedited
16  negotiation process in your experience?
17    A.  Yes, when we -- it was I believe
18  around March 1st or thereabouts of 2003 that we were
19  told that we would, that the Hancock was willing to
20  sell the tower complex to us rather than that anyone
21  else.  There was no agreement in writing at that
22  time.  And we agreed that we would close in seven
23  days.  And Hancock actually said let's make it ten.
24  And it actually up ended up being twelve or thirteen.

Page 10

1  We signed the purchase and sale agreement on the date
2  the money was wired.
3    Q.  Are there aspects of that transaction
4  that are subject to confidentiality agreements that I
5  may need to know about?
6    A.  I believe so.  There were some I
7  believe in the -- there's a confidentiality provision
8  in the purchase and sale agreement as to the term of
9  the sale, economic terms of the sale.
10    Q.  So I'll honor that.  If any of my
11  questions you think --
12    A.  All right.
13    Q.  -- might encroach on that
14  confidentiality, let me know, and we'll figure out
15  the contours of what the confidentiality provision
16  is.
17        What accounted for the relatively
18  expedited nature of the purchase and sale?
19    A.  That was generated by our company.
20  Our company, it is our philosophy that if we tell the
21  seller of a commercial complex that we will close in
22  a short period of time, and that we've completed all
23  or most of our due diligence on the assets, that it
24  gives us a leg up in the offering process.  And so

Page 11

1  that really came from us.
2    Q.  Had you acquired other, had Beacon
3  acquired other properties from John Hancock in Boston
4  previously?
5    A.  No.
6    Q.  Were you personally involved in the
7  negotiations to acquire the tower complex?
8    A.  Yes, I was.
9    Q.  Can you summarize your role in that
10  process?
11    A.  My role -- I'm general counsel for the
12  company.  So my role is primarily to make sure that
13  from a legal perspective we're getting what we think
14  we're getting and to coordinate with outside counsel
15  all aspects of the acquisition of the property.  And
16  my role also -- I have background in, a limited
17  background in human resources and so my role is also
18  involved that aspect.
19    Q.  Can you define for me the types of
20  things that you needed to do from a human resources
21  perspective in this transaction?
22    A.  We had -- at Beacon Properties
23  Corporation, which we sold to Equity Office
24  Properties in December 1997 -- Equity Office

Page 12

1  Properties is the largest office in the country.  We
2  were number two or three at the time.  We had a fully
3  vertically integrated real estate company.  We had
4  in-house development personnel and leasing and
5  management subsidiary and acquisitions people; people
6  who did financing, accounting, everything.
7        Our new company, Beacon Capital
8  Partners, we had determined to hire third party
9  property managers and leasing agents rather than
10  staffing up in that fashion.  And we felt that it
11  would give us a leg up in this transaction given that
12  John Hancock was selling its corporate headquarters.
13  And given Beacon's, I hope, very good reputation for
14  property management on a nationwide basis, that if we
15  made an offer and we would manage the asset that that
16  would sit well with Hancock.
17        And so when I talk about human
18  resources, we had internally decided once we were
19  awarded the acquisition that if we did end up
20  managing the asset that I would handle the formation
21  of the management subsidiary and coordinate the
22  hiring of people and personnel to run it.
23    Q.  Is that what ultimately happened?
24    A.  Yes, it is.

Page 13

1    Q. And the management subsidiary, is it a
2  separately incorporated entity?
3    A. It's a separate limited liability
4  company, a Delaware limited liability company, called
5  Beacon Capital Partners Management, LLC and it was,
6  it is one hundred percent owned by my employer,
7  Beacon Capital Partners, LLC.
8    Q. But the employees that work at the
9  tower complex managing the property or overseeing the
10  property, they are employees of Beacon Capital
11  Partners Management, LLC?
12    A. That is correct.
13    Q. Could you tell me the other people at
14  Beacon along with you who are involved in
15  negotiations and due diligence in terms of acquiring
16  the tower complex?
17    A. Primarily on the business side it was
18  Jeff Brown who is a managing director at our company
19  involved in acquisitions of sales of assets. He was
20  actively involved in the underwriting of the asset
21  and in discussions probably with Morgan Stanley.
22  Very, very limited extent, much less extent,
23  president of our company, Fred Siegel, S I E G E L,
24  but it was primarily Jeff Brown who was

Page 14

1  quarterbacking.
2    Q. Mr. Siegel was overviewing documents?
3    A. Helping with discussions. Not really
4  documents. We would talk about strategy and how to
5  position ourselves to acquire the assets.
6    Q. What were the folks that you were
7  competing against to acquire the tower complex?
8    A. The final two, the highest bidders
9  were Equity Office Properties and Beacon Capital
10  Partners.
11    Q. Were there any other viable
12  contenders?
13    A. To my recollection, yes, and I do
14  apologize, I don't remember how many. We own a lot
15  of properties and so it becomes a blur after a while,
16  but I tend to remember about probably ten other
17  bidders at least.
18    Q. And are there documents that would
19  show those ten?
20    A. Not really, not that we would have
21  because Morgan Stanley would be running a sales
22  process. As a matter of fact, a lot of it was just
23  surmise on our part as to who the other parties were.
24  We were subject to a confidentiality agreement and

Page 15

1  could not go out and discuss this with potential
2  bidders.
3    Q. The discussions that you had to
4  acquire the tower complex, who at John Hancock did
5  you negotiate with?
6    A. In the final -- we primarily worked
7  through Morgan Stanley and in the final -- I remember
8  talking to Joan DiCicco, the head of human resources,
9  and Michael Epstein who was their in-house counsel,
10  real estate counsel. And those would have been the,
11  who I would have talked to. And maybe Tom, is it
12  Malloy, who was retired chief financial officer, I
13  think -- I'm having a memory lapse, Mallory or
14  Malloy.
15    Q. Primarily who was responsible from the
16  John Hancock side of the transaction from your
17  perspective anyway?
18    A. Maloney, it's Tom Maloney, excuse me.
19  I would have thought from my perspective it was
20  Michael Epstein because him being in-house counsel
21  was responsible for getting the transaction done and
22  from their perspective in a legally correct way, but
23  I wouldn't be surprised if Tom Maloney was, you know,
24  behind the scenes.

Page 16

1    Q. When did it first occur to Beacon,
2  more specifically to you, that you would operate or
3  that you would be hopefully the property manager of
4  this tower complex?
5    A. That's hard to remember exactly when,
6  but it was late in the bidding process. So it
7  probably was late February 2003.
8    Q. And did you convey that thought, that
9  desire, to anyone at Beacon, or was it through Morgan
10  Stanley?
11    A. It was we discussed it internally and
12  that we thought that might be a good strategy to
13  acquire the asset and that was conveyed, as my memory
14  serves me correctly, to Morgan Stanley.
15    Q. What was your conception of how you
16  would acquire the employees to run the office, the
17  tower complex?
18    MS. DeIASI: Objection to form. You
19  can answer.
20    A. We were not acquiring a piece of the
21  John Hancock company if that's what you're asking me.
22  We were acquiring real estate. We would have
23  endeavored to hire whatever people we could to manage
24  the asset not having a leasing and management

Page 29

1   whatnot, but our goal was to try to retain these
2   people. We wanted to as best we could mirror the
3   Hancock plan or improve upon it, if possible.
4       Q. Was there any industry analysis done
5   to determine whether or not the benefits that Beacon
6   would offer these employees were consistent with the
7   benefits within the industry?
8       A. That part I don't recall. I think we
9   did. I think there was -- I didn't personally do
10  that, but I think we might have had Goodwin check
11  with some others. But honestly, that's speculation.
12  I don't recall.
13      Q. Okay. As you take a look at the
14  benefits, the components of the benefit program
15  listed on Exhibit 2, can you tell me which of these
16  were ultimately provided or offered in any event to
17  employees?
18      A. I believe we actually implemented all
19  of them except perhaps for the severance plan, Roman
20  numeral XII.
21      Q. And did -- well, I guess you know that
22  John Hancock had a severance plan?
23      A. I only know that from the context of
24  this litigation.

Page 30

1       Q. Was it among the benefits that
2   Ms. DiCicco supplied to you on her list?
3       A. I don't know. It probably -- you
4   know, the fact that it's here, it might have been.
5   And I only say that because when I went back through
6   our file I didn't see a written severance plan and I
7   didn't see that in our file for the benefits that we
8   offer people. And I remember that in the context of
9   producing documents in response to the subpoena. And
10  I don't know why that's the case. I think it's an
11  oversight. We said we were going to do this, we
12  should have, but that would have been my fault for
13  not implementing it.
14      Q. In any event, there is no existing
15  severance plan?
16      A. Not to my knowledge.
17      Q. And there's no existing defined
18  benefits pension plan?
19      A. That's correct.
20      Q. But other than that, as we take a look
21  at the list on Exhibit 2, some form of all the
22  benefits listed have been offered to former Hancock
23  employees?
24      A. Yes, I believe so.

Page 31

1       Q. Okay. Did you talk at any point with
2   Ms. DiCicco or anyone else for that matter outside of
3   Beacon about the fact that John Hancock had a
4   severance plan?
5       A. No, I didn't have any specific
6   discussions other than if I was given a list by Joan
7   DiCicco of what benefits were offered. If that was
8   on the list, which it might very well have been,
9   which is probably why it appears here on Exhibit 2,
10  but I didn't have any specific discussions with
11  anyone about what kind of severance plan, if any,
12  Hancock had.
13      Q. Did you learn at some point prior to
14  this -- prior to receiving a subpoena in this case,
15  did you learn at some point that there was an
16  analysis done at Hancock as to whether or not its
17  employees that were being offered jobs by Beacon
18  might be entitled to severance?
19      A. And I'm sorry, your question?
20      Q. Let me start it over again. Let me
21  start by telling you at some point in time John
22  Hancock conducted an analysis to specifically
23  determine whether or not the employees that Beacon
24  was hiring might be eligible for severance under

Page 32

1   their existing severance plan. That's a fact.
2       A. Okay.
3       Q. Okay. When did you learn about that?
4       A. I --
5       MS. JACKSON: Objection.
6       A. Yeah, I --
7       Q. You didn't?
8       A. I didn't.
9       Q. You're hearing it here?
10      A. Yeah, I gather from the context of the
11  litigation here that there's a severance plan, and I
12  gather your clients feel they're entitled to
13  severance, but I did not have any discussions or hear
14  from anyone about an analysis being done as to
15  whether or not someone qualified.
16      Q. At some point in time did you provide
17  a list of the benefits that Beacon intended to offer
18  Hancock's employees to Joan DiCicco or someone else
19  at John Hancock?
20      A. Yes, in Exhibit 2 here we did indicate
21  those things.
22      Q. Do you know why you were providing
23  that information to Hancock?
24      A. I had wanted Joan's feedback as to

Page 33

1   whether or not they thought we would be likely to
2   retain people. And did she give you feedback?
3       Q. And did she give you feedback?
4       A. I think she indicate that this looked
5   like a good, you know, group of benefits and, you
6   know, she wished us luck.
7       Q. Right. Now, Hancock is still a
8   tenant?
9       A. Yes.
10      Q. Hancock is Beacon's largest tenant
11  over in the tower complex?
12      A. I believe they're still the largest,
13  but their space needs are contracting, not
14  increasing.
15      Q. So obviously you want to keep them
16  happy by making sure that the building is running
17  properly and smoothly?
18      A. Yes, we did.
19      Q. As with any property?
20      A. That's correct.
21      Q. Did Ms. DiCicco say anything else to
22  you about the benefits that are listed in this
23  memorandum from Goodwin Procter that you can recall
24  for us?

Page 34

1       A. Not that I recall.
2       Q. Did you tell Ms. DiCicco later on that
3   Beacon did not intend to offer a severance plan?
4       A. No, because it was our intent to offer
5   one, and I was somewhat surprised when I didn't see
6   one in the file. It's something, as I think I
7   indicated before, it would be my responsibility that
8   I simply forgot to do.
9       Q. In your experience in human resources,
10  is it considered by employees to be an important
11  benefit?
12      A. I really don't know if I could speak
13  to that. I don't have a broad human resources
14  background. But I would think that it's probably a
15  benefit, yeah, I would think that it would be an
16  important benefit to an employee.
17      Q. Is the same true about a defined
18  benefits pension plan from your perspective?
19      A. Well, a defined benefit pension plan
20  is a good benefit if an employee remains long enough
21  with the company and they build up years of service
22  and whatnot, and I would think that would be an
23  important benefit for an employee.
24      MR. PETERS: Can I take a two minute

Page 35

1   break.
2       (Whereupon, a recess was taken)
3   BY MR. PETERS:
4       Q. Mr. Bonn, not to go back over old
5   ground, but just quickly, in the context of your
6   discussions with either Morgan Stanley or John
7   Hancock, was there ever any discussion about Hancock
8   outsourcing its employees as part of this
9   transaction?
10      MS. DeIASI: Objection to form.
11      A. I do not recall anyone talking about
12  outsourcing. We had asked if there would be any
13  people that would be available, current Hancock
14  employees who would be available who were involved in
15  the management of the tower complex that we could
16  hire once we had been awarded the transaction so that
17  we could then get ready to get a management company
18  up and running.
19      Q. Was it your understanding that those
20  were employees that were going to be terminated by
21  Hancock?
22      A. That I don't know, but that was my
23  assumption.
24      Q. And that once terminated they would be

Page 36

1   rehired by Beacon to have the same jobs?
2       A. I'm sorry, I misunderstood your first
3   question. I assumed that the list of employees I was
4   given was people that would no longer be needed --
5       Q. Right.
6       A. -- by John Hancock after we took over
7   the management of the tower complex because that's
8   what those people did. If we didn't hire, you know,
9   hire them, my assumption they would not have jobs.
10      Q. That there would be a downsizing at
11  Hancock that included those employees?
12      A. That was my understanding.
13      Q. And did you have any conversations
14  with anyone at Hancock about that topic other than
15  what you've told us about generally?
16      A. No, not to my recollection.
17      Q. And did you have any conversations
18  with John Hancock where people such as Mr. Joyce were
19  described as being part of the REOD, or real estate
20  operations department?
21      MS. JACKSON: Objection.
22      A. Did I have any discussions --
23      Q. Let me strike that question and ask it
24  another way with some foundation.

Page 37

1    Have you heard of the term at Hancock
2  real estate operations department, or REOD?
3    A.  I had not recalled that term until I
4  saw the subpoena.
5    Q.  And did it refresh your recollection
6  when you saw the subpoena that it was something that
7  was discussed with Hancock during the negotiations?
8    A.  Quite frankly, I don't recall hearing
9  the term before.  I do remember asking Joan for a
10 list of people who were involved in the operations of
11 the real estate, you know, the complex, the tower
12 complex, but I really don't know the term real estate
13 operations, if that's what it is, department.
14   Q.  Okay.
15       (Marked Exhibit 3; Memorandum dated
16       April 4, 2003)
17   Q.  Mr. Bonn, I am showing you a
18 memorandum --
19   A.  Mm-hmm.
20   Q.  -- with document control numbers BCPM
21 171 and 172 from Fred Siegel, S I E G E L, to you and
22 others.
23   A.  Mm-hmm.
24   Q.  Do you recall seeing this memorandum

Page 38

1  in the early April time frame?
2    A.  Let me just take a quick look here.
3    Q.  Take your time.
4    A.  Yes, I do recall seeing this.
5    Q.  In a general way, does this discuss a
6  meeting that took place on April 4, 2003?
7    A.  This was, looks like it came from Fred
8  Siegel, the president of our company.  And I had set
9  up a series of ad hoc meetings, internal meetings,
10 Beacon Capital Partners personnel only, to talk about
11 how we would prepare for the management of the tower
12 complex.  And this appears to be Mr. Siegel's notes
13 on what he thought was covered under the meeting on
14 that particular day.
15   Q.  Now, on number two he writes, Goodwin
16 met with Hancock HR personnel on March 31.  They are
17 preparing a memo which we'll have by April 7 which
18 will cover salary levels by position, benefits,
19 Hancock termination obligations, et cetera.
20   A.  Mm-hmm.
21   Q.  What is the reference here, if you
22 know, to Hancock termination obligations?
23   A.  I really don't know.  This would have
24 been the list of people that I had asked Joan DiCicco

Page 39

1  for which would include the persons involved in the
2  management of the tower complex that Hancock would
3  make available for us to hire, but I don't know what
4  the reference to Hancock termination obligations is,
5  quite frankly.
6    Q.  You don't recall any discussions
7  either in the context of this April 4th meeting or
8  otherwise about obligations Hancock may have upon
9  terminating its employees?
10   A.  I do not.  The only context in which I
11 would have been interested as general counsel was to
12 make sure we would not inherit any obligations.  So
13 this might reference the fact that we wanted to know
14 if they did have termination obligations.  I don't
15 recall any follow up discussions there, but I wanted
16 to be sure that it wasn't going to be something we
17 inherited.
18   Q.  Okay.
19       (Marked Exhibit 4; Letter dated
20       May 5, 2003)
21   Q.  Mr. Bonn, Exhibit 4 is a May 5th
22 letter to Mr. Joyce from Beacon with document control
23 number BCPM 61.  Is this something you've seen before
24 today, or the form of it in any event?

Page 40

1    A.  Yes.  I don't recall this particular
2  letter to Mr. Joyce, but I do recall seeing the
3  format.
4    Q.  Did you participate in drafting the
5  form?
6    A.  I drafted the format.
7    Q.  So this is an offer letter to
8  Mr. Joyce dated May 5, 2003; correct?
9    A.  Yes.
10   Q.  And at the time that Beacon Capital
11 offered Mr. Joyce a position, did Beacon Capital have
12 a benefits package in place?
13   A.  By this date in May we had -- oh, I
14 don't remember.
15   Q.  If you take a look at Exhibit 2 it may
16 facilitate a memory.
17   A.  Exhibit 2 is dated May 22.  The date
18 of Exhibit 4 is May 5th, which would indicate to me
19 this is what we intended to offer in the letter.  And
20 the list of people on the, on Exhibit 2 is actually
21 longer than those mentioned in May 5 and that was
22 because I addressed -- because I was certain we would
23 be offering the items listed in Exhibit 4; medical
24 and dental insurance, life insurance, short-term and

Page 41

1  long-term disability insurance, and a 401(k) plan. I
2  wasn't yet certain about -- obviously, we were going
3  to offer vacation, et cetera, but we had not
4  finalized the plan to answer your question.
5      Q.  You do say in this letter, Beacon says
6  in this letter, Additional information regarding the
7  specific benefits available from Beacon will be
8  provided to you shortly.  Third bullet point.
9      A.  That's correct.
10      Q.  At this point in time Beacon was still
11  looking into what specific benefits it would be
12  offering?
13      A.  That is my recollection.
14      Q.  And John Durnan, he is a
15  vice-president with Beacon Capital?
16      A.  John Durnan was an employee of Hancock
17  and did not become an employee of Beacon Capital
18  Partners Management, LLC until a July 14th date, I'm
19  pretty sure, but we had the permission from Hancock
20  to make him an offer of employment for purposes of
21  the transition and for making offer letters.  He may
22  have become an employee earlier, but I don't think
23  so.
24      Q.  Here you state, by that I mean Beacon

Page 42

1  states in the last sentence, Given that Beacon is
2  interested in moving quickly to assemble the right
3  team to take over the management of the John Hancock
4  Tower Complex, we would appreciate hearing from you
5  by Friday, May 16, 2003 if you would like to accept
6  our offer.  We sincerely hope that you will join us.
7  How did that date get chosen?
8      A.  It was arbitrary.  I recall that I
9  thought if we cut a fairly short time fuse we would
10  get people to respond quickly.  So if someone
11  declined the offer, we would have the chance to find
12  someone else to fill the position before July 14th
13  came.  But that was the genesis of that.
14      Q.  Why were you interested in getting
15  people hired to Beacon when John Hancock was going to
16  be providing management pursuant to the transition
17  services agreement?
18      A.  Because it takes time to find people,
19  to find employees.  And as it was, May 16th, which is
20  the date you have here where we asked Mr. Joyce to
21  respond, was dangerously close to July 14th.  Eight
22  weeks is not a lot of time to locate people to take
23  over the management of a multi-million square foot
24  complex.

Page 43

1      Q.  July 14th was the date that services
2  contract expired?
3      A.  That's correct.  I was very concerned
4  about having sufficient people on board, not having a
5  calamitous event if we didn't have adequate staffing.
6          (Marked Exhibit 5; Letter dated
7          May 30, 2003)
8      Q.  Exhibit 5 is a May 30th letter to
9  Mr. Joyce from Beacon with document control numbers
10  JOY 253 and 254.  It is from Mr. Crowley, C R O W L E
11  Y.  I'm wondering if this is something that you've
12  seen before today?
13      A.  Yes, I have seen it before.
14      Q.  Did you participate in drafting the
15  form of this letter?
16      A.  Yes, I did.  I don't recall.  I don't
17  believe I drafted the first draft, but I certainly
18  had, clearly had a hand in it.
19      Q.  Okay.  And this letter dated May 30th
20  extends, among other things, the offer letter to
21  Friday, June 13th.  Do you see that in the third
22  paragraph?
23      A.  Yes, I do.
24      Q.  Can you tell me what inspired that

Page 44

1  extension?
2      A.  We had not heard back from a number of
3  people as I recall to whom we had given letters, or
4  we heard back that they wanted to think about it.
5  And we still remained interested in employing as many
6  of the people that we could whom we interviewed and
7  we wanted to employ that Hancock indicated were
8  available simply because for ease of transition and
9  not having, as I mentioned earlier, to reinvent the
10  wheel with new staff who would not be familiar with
11  the complex or would not be familiar with the largest
12  tenant, John Hancock, and their needs.  And I was
13  concerned about the June 13th date.  I had wanted to
14  put an earlier date in, but that didn't work the
15  first time, so everyone urged me to give people two
16  weeks.
17      Q.  Did you ever learn either specifically
18  or generally what kept people from accepting your
19  offers in droves?
20      A.  Not really.  I think it's just --
21  quite frankly, from my perspective it was people
22  might have been out interviewing looking for other
23  jobs elsewhere.  Sometimes people choose -- I've been
24  involved in other mergers and whatnot and sales of

1  assets, and people will look to see what their
2  options are on the open market, maybe a career
3  change. We don't know what's going through the
4  employees' minds. All we knew, we had to get people
5  on board as quickly as possible. And I was very
6  nervous at this point.
7      Q. May 30th has come around and Beacon
8  has committed to providing property management;
9  correct?
10     A. We had told John Hancock that, you
11 know, if they would like us to, we would manage the
12 complex and form a management subsidiary to manage
13 the complex. And that did interest them because of
14 our reputation. But there was no written agreement.
15 If we had not done so, I don't believe there would
16 have been any action, any action would have played in
17 favor of Hancock. It was -- but we told them that we
18 would manage the complex, be willing to manage the
19 complex. And I believe that helped us probably get
20 the asset, acquisitions.
21     Q. Now, when you closed on the
22 transaction, the office tower transaction on
23 March 13, '03, was the property management component
24 of the transaction signed up, finalized?

1      A. The only property management function
2  that was finalized as of March 13th was the
3  transition services agreement with John Hancock where
4  they would manage it for 120 days. There was no
5  other agreement in existence as to the, what would
6  happen after that date.
7      Q. Is there any document that
8  memorializes an obligation to provide property
9  management for the tower complex?
10     A. Not to my recollection.
11     Q. Okay. It's just an obligation that
12 Beacon assumed?
13     A. That's correct.
14     Q. Okay. Was there any conversations
15 after March 13th, '03 about the possibility of Beacon
16 not being able to provide management services because
17 you didn't have enough of a turnkey operation in
18 substance?
19     A. I don't recall conveying that message
20 to anyone outside of our organization because I
21 didn't want to scare anybody at Hancock. It was our
22 intent to provide the property management services
23 and it was -- I had been charged with getting the
24 company formed and up and running. And so I was very

1  focused on trying to make sure it happened.
2      Q. Beacon does provide property
3  management in other parts of the country and other
4  parts of the world; is that a fair statement?
5      A. No, we do national.
6      Q. This is the only place Beacon provides
7  property management; Boston, Massachusetts?
8      A. That is correct.
9      Q. This is Beacon's first experience in
10 property management?
11     A. No, our predecessor company going back
12 to 1946 developed and ultimately owned a number of
13 office complexes primarily in Boston but then across
14 the country, and we had a full vertically integrated
15 real estate organization that had a property
16 management function.
17     We do provide I will say asset
18 management services at all of our properties across
19 the country, but at our other properties we typically
20 hire a third party property management company to be
21 the on site property manager.
22     The John Hancock Tower Complex is the
23 only asset where we have a subsidiary that currently
24 provides those services. We used to do it as a

1  matter of routine in Beacon Properties Corporation
2  and its prior company, The Beacon Companies, but not
3  at this new company. We have many of the same people
4  at this current company that worked for the old
5  company.
6      Q. Whose idea was it in the context of
7  this transaction with John Hancock for Beacon to, or
8  the acquirer to provide property management services;
9  was it something that John Hancock conspired, or was
10 it something that Beacon came up with?
11     A. It was my idea.
12     Q. And it was more or less -- well, see
13 if I'm listening. You thought it would make the,
14 make Beacon a more attractive candidate for the
15 acquisition?
16     A. Yes. In a prior life I worked for the
17 Prudential Insurance Company of America for ten years
18 as an in-house attorney. And I worked at four
19 different offices in ten years and had a stint with
20 them at their corporate headquarters in Newark, New
21 Jersey, and knew how focused an insurance company
22 would be on matters of security, quality of
23 management, when outsider companies would come in to
24 visit just the appearance. And I had a feeling, it

Page 57

1    MR. PETERS: Objection.
2    A. It does to the extent that this is a
3    wish list, once again, but it's -- what's common in
4    the industry is this is a -- if a purchaser came in
5    and said, I will give you everything on this list,
6    which would be uncommon, then you would end up with
7    the property.
8    Q. That term, excuse me, that provision
9    that you've heard entitled Employees, what does that
10    state?
11    A. Do you want me to read it?
12    Q. Or you can summarize it.
13    MR. PETERS: Well, objection.
14    MS. DeIASI: Objection. I think the
15    language speaks for itself.
16    Q. Okay, certainly read it, that's fine.
17    A. Seller currently employs several
18    employees in its real estate operations and security
19    area who may be available for employment by a
20    prospective purchaser. Bids should include the
21    potential interest of a prospective purchaser to hire
22    these employees, including the anticipated number of
23    employees and the area of specialty. Bids will be
24    evaluated in part on the nature and extent of the

Page 58

1    interest in hiring some or all of these employees.
2    Q. Do you know whether there was any
3    discussion between Beacon and Hancock regarding
4    employment of Hancock's employees in the real estate
5    operations and securities areas by Beacon as a
6    prospective purchaser of the tower complex?
7    A. I'm sorry, it was so long ago.
8    MS. DeIASI: Objection, form.
9    Q. Do you know whether there was any
10    discussion between Beacon and Hancock regarding
11    employment of the employees mentioned in that
12    provision in the course of negotiations regarding the
13    tower sale?
14    A. Yes, I recall discussions that I had
15    with Joan DiCicco and I believe Michael Epstein
16    indicating an interest, that we would be interested
17    in managing the complex if they wanted us to do that.
18    Q. Were you then aware of this term
19    generally when you were putting in a bid for the
20    tower complex?
21    MS. DeIASI: Objection, form.
22    A. I don't recall it quite frankly at
23    all, but I'm not surprised to see these words, and
24    that probably is what the genesis was for our offer

Page 59

1    to manage the company. This is different, I will
2    point out, than saying that you would hire everyone
3    that might be available and that this just said they
4    had some people that would be available and would
5    somebody be interested in hiring them. And that's
6    when we determined that it might be a good idea and
7    say, yes, we would.
8    Q. You indicated that this may well be
9    the reason for the offer to manage the tower complex
10    at some point; is that accurate? This may well be,
11    you said, the genesis of the offer to --
12    A. Our offer?
13    Q. Right, right.
14    A. Yes, yes. And also my recollection of
15    life insurance companies in particular being
16    concerned about security and the Hancock tower being
17    the tallest building north of Manhattan in the United
18    States.
19    Q. Would it be accurate to say that
20    Beacon's awareness of Hancock's preference for the
21    buyer to employ employees from the real estate group
22    or the security group that that, that it was Beacon's
23    understanding that its bid would be favored if that
24    were offered?

Page 60

1    MR. PETERS: Objection.
2    MS. DeIASI: Objection.
3    A. I think what this section indicates is
4    that it says the bids will be elevated in part on the
5    nature and extent of the interest in hiring some or
6    all of these employees. I think there is an
7    indication there that Hancock would look favorably
8    upon a bid if someone hired the employees, yes. I
9    mean, that I think is a fair reading of that.
10    Q. Thank you, Mr. Bonn. I think we're
11    done with that exhibit for now.
12    MS. JACKSON: If you could please mark
13    that for identification as Exhibit 8.
14    (Marked Exhibit 8; E-mail dated
15    February 19, 2003)
16    Q. Mr. Bonn, if you could take a moment
17    just to read through that document.
18    A. Yes, I've read it.
19    Q. Do you recognize this document?
20    A. No, I do not.
21    Q. The document before you is an e-mail
22    from Jeff Brown of Beacon, whom I believe you
23    referred to earlier in your deposition --
24    A. Yes.

Page 61

1    Q. -- to Hugh Macdonnell of Morgan
2  Stanley on February 19 of 2003.
3    A. Mm-hmm.
4    Q. Have you seen the document before?
5    A. Not to my recollection, no.
6    Q. Based on Beacon's business practices,
7  do you have any reason to believe that this e-mail
8  was not sent from Jeff Brown to Hugh Macdonnell of
9  Morgan Stanley on February 19, 2003?
10    A. No, I have no reason to think it was
11  not sent.
12    Q. As Beacon's representative here today,
13  do you have -- what did Beacon mean when it said that
14  it wanted to bring over the property management team
15  currently in place to the extent those employees are
16  not retained by Hancock?
17    MR. PETERS: Objection.
18    A. I'm not sure -- I know what Jeff was
19  trying to say, which is what I conveyed to Joan
20  DiCicco. Or perhaps it was at this point, because
21  this is February 19th, 2003, it might have been
22  conveyed to, looks like to Morgan Stanley, seeing
23  that this went to Hugh Macdonnell at Morgan Stanley,
24  who's one of the brokers who works on transactions of

Page 62

1  this type, is that to the extent there were employees
2  available that Hancock had in their employ who
3  managed the complex, we would certainly like to
4  interview them to see if they were the people that
5  we'd want to hire to manage the complex, which is I
6  think what he's trying to say here. And that is what
7  I think is meant by bring the team over.
8    This is consistent with what we were
9  trying to convey to Hancock; that we wanted to
10  assuage their concerns about a change in the property
11  management at the complex, and to the extent that we
12  could find good people that they might have on staff
13  that they would be made available to us, the
14  assumption being they wouldn't have jobs after we
15  took over management -- that's what I assumed -- that
16  we would be happy to interview them and, if we liked
17  them, to extend offers to them.
18    Q. Would it be fair to say that Beacon
19  was seeking to take on Hancock's employees who had,
20  who were employed to run the building operations for
21  the tower complex?
22    MR. PETERS: Objection.
23    MS. DeIASI: Objection.
24    A. To the extent that when we interviewed

Page 63

1  them that we -- the hiring process at best is 50/50.
2  When we were given the list of the employees, we
3  wanted to interview them and to meet with them and
4  then make a determination if they were the right
5  people we thought for the job to manage the complex,
6  number one; and number two, did we need that many
7  people.
8    It's not uncommon in a corporate
9  managed building for there to be some inefficiencies;
10  too many people in one category, not enough in
11  others. But we did want to interview them. This is
12  a sales pitch by Jeff Brown, who was quarterbacking
13  the transaction, to try to get Hancock to accept our
14  offer.
15    Q. Sure, from what you're saying, and
16  correct me if I'm not understanding it correctly, you
17  were most interested in the group who had experience
18  running the tower complex and from there would make
19  your selection, is that --
20    A. That's correct.
21    Q. Was Hancock agreeable to doing that?
22    A. To my recollection, yes.
23    Q. And so in the end did Beacon, in fact,
24  take on the group from Hancock that was experienced,

Page 64

1  select from the group at Hancock the individuals who
2  were experienced in running the tower complex for
3  employment; is that what ultimately happened?
4    MR. PETERS: Objection.
5    A. Yes, we did make offers. I don't
6  recall if we made offers to everyone on the list, but
7  we did not, once again, did not hire a department or
8  a group. We were given a list of people that managed
9  the complex, and then we interviewed those people,
10  and we extended a number of offers; that's correct.
11    Q. At any point did Beacon feel that it
12  was necessary to include as an actual term of the
13  sale of the tower complex that Hancock would make
14  employees responsible for running the tower complex,
15  for running building operations for the tower
16  complex, available for hire to Beacon?
17    A. I'm sorry, I'm not following you.
18    Q. Sure. At any point did Beacon feel
19  that it was necessary to include as an actual term of
20  the sale of the tower complex that Hancock would make
21  available the employees who were responsible for
22  running the tower complex?
23    A. No.
24    Q. What functions does Beacon perform as

Page 65

1  owner and landlord of the tower complex?
2      A.  Well, Beacon Capital Partners
3  Management, LLC is, has approximately one hundred
4  employees and employs the day-to-day property
5  management function at the John Hancock Tower
6  Complex, including having on staff security
7  personnel, which is not always the case.  Often times
8  security is outsourced.  I'm joking.  Companies are
9  hired to employ security.  And we determined that
10  given the high profile nature of this building and
11  the post 9/11 era that we wanted to control the
12  security, as an example.  So we provide day-to-day
13  property management function at the complex very much
14  like you'd see in most other complexes around the
15  city with the exception that we have certain
16  functions in house that might have been provided by a
17  third party at other complexes.
18      Q.  Does that include building maintenance
19  functions?
20      A.  Yes, it does.
21      Q.  Would that include servicing of
22  electricity, HVAC, things of that nature?
23      A.  That's correct.  We have -- the HVAC
24  technicians are our employees.  The janitorial I

Page 66

1  believe are not our employees.  I believe that is a
2  function that we, I'm virtually certain we use a
3  third party provider there.
4      Q.  So the functions that Beacon currently
5  performs, is it your understanding that those are the
6  same functions that Hancock performed when they were
7  the owner and landlord of the tower complex?
8      A.  That I honestly don't know.  I don't
9  recall if Hancock had as their employees the
10  janitorial service personnel, for example.  But as to
11  the HVAC technicians, security, people to manage the
12  complex and oversee the security personnel and
13  whatnot, yes, those would have been services that it
14  was my understanding were provided by Hancock at the
15  time we bought the property.
16      Q.  How did -- I'd like to move a little
17  bit toward talking about the selection of employees
18  that were offered jobs by Beacon.
19      A.  Yes.
20      Q.  How did Beacon determine which
21  positions that it needed to hire to fulfill its
22  function as the landlord of the tower complex?
23      A.  Well, given the background that our
24  company has had in, at Beacon Properties Corporation

Page 67

1  and the Beacon Companies in having a property
2  management function, we had a pretty good feel for
3  how many security personnel one needs in a complex
4  based upon the square footage and the complexities.
5      This is a complicated property with
6  three buildings that are interconnected by
7  underground tunnels.  And given its high profile
8  nature, there are some differences.  But we had
9  enough experience that we could have a pretty good
10  feel for how many people one needs to run a property
11  of this type and the different functions that are
12  required.
13      Q.  And those different functions include
14  functions beyond security?
15      A.  Oh, yes.
16      Q.  Was Beacon's determination based on
17  the types of position or the trades people that
18  historically had been needed to run the tower complex
19  based on information provided by Hancock?
20      A.  What, Beacon's decision?  I'm sorry.
21      Q.  Sure.  Was Beacon's decision as to who
22  it needed to hire to run the tower complex, was that
23  based on the types of positions or the types of
24  trades people that were needed historically by

Page 68

1  Hancock to fulfill the functions of a landlord in the
2  tower complex?
3      A.  Not really.
4      MS. DeIASI:  Objection to form.
5      A.  I'm sorry.  Not really.  You know,
6  office buildings are largely, are very similar, large
7  office complexes.  So there are certain categories of
8  employees that one would typically expect to see in a
9  property management company when you're running that
10  company.
11      The fact that Hancock might have had a
12  certain number of people doing one function as
13  opposed to another function, that might have been an
14  area where we could have brought some greater
15  efficiency as a provider of services to a
16  multi-tenant complex as opposed to a corporate run
17  complex.
18      Be that as it may, the list of people
19  that Hancock gave us, as I recall, and the functions
20  they served was largely consistent with what you
21  would see in running an office complex of this type.
22      Q.  Did Hancock provide any input to you
23  regarding the positions and types of people that
24  would be needed?

Page 85

1 determination which benefits -- I'll withdraw the
2 question. We probably touched on it in sufficient
3 form earlier. I'll withdraw the question.
4     A. Thank you.
5     Q. Was Beacon's intention to offer a
6 benefits package that was similar and competitive to
7 that that was available to Hancock employees when
8 they worked for Hancock?
9     A. Yes.
10    Q. What was the purpose of offering a
11 benefits package that was on par with what Hancock
12 employees were receiving when they worked for
13 Hancock?
14    A. As I believe I indicated earlier, we
15 wanted to try to hire the people to whom we would be
16 extending offers. Our goal was to hire them, not to
17 fail in our efforts to hire them.
18    Q. Turning your attention to an exhibit
19 that we used earlier in the deposition, plaintiff's
20 exhibit, excuse me, just Exhibit 2.
21    A. Okay, yes.
22    Q. Since you received several questions
23 about this earlier, let me just ask two quick
24 questions to orient us back to the document.

Page 86

1        Would it be accurate to say that this
2 memorandum identifies twelve different benefit plans
3 and policies that Beacon intended to include in its
4 benefits program?
5     A. Yes.
6     Q. And would it also be accurate to say
7 that it identifies the specific terms and the
8 employee costs for benefits offered?
9        MR. PETERS: Objection.
10    A. After the first page there are
11 summaries of the co-pay requirements for employees,
12 that's correct, and the different, what different
13 things would cost for the employees, that's correct.
14    Q. Would you say that this document
15 accurately captures the type, level, and cost of the
16 benefits that Beacon was offering as part of the job
17 offers that were extended to Hancock employees in May
18 of 2003?
19        MR. PETERS: Objection.
20        MS. DeIASI: Objection.
21    A. Well, we made offers to employees that
22 predated the finalization of these benefits. As I
23 think we discussed earlier when I was being
24 questioned by plaintiff's counsel, we had offer

Page 87

1 letters out to people, we were finalizing the plan,
2 but yes, it's my recollection that this is what we
3 offered the employees. If that's what you're asking.
4        MS. JACKSON: Would you please mark
5 that as Exhibit 12.
6        (Marked Exhibit 12; 2003 Beacon
7        Capital Partners Management, LLC
8        Summary of Full-Time Employees
9        Benefits)
10    Q. Mr. Bonn, you're looking at a document
11 that has just been marked for identification as
12 Exhibit 12. If you could just take moment to look
13 through it.
14    A. Yes, I've looked through it.
15    Q. Do you recognize that document?
16    A. Yes, I do.
17    Q. What is that?
18    A. I believe, if I'm not mistaken, that
19 this is a summary of full-time employee benefits that
20 we distributed to persons whom had accepted offers
21 with Beacon Capital Partners Management, LLC.
22    Q. Do you know whether this document was
23 created before or after the May 21, 2003 memorandum;
24 that is, Exhibit 2?

Page 88

1     A. I don't know, but I think after
2 because this looks like the final plan.
3     Q. Would it be to the best of your
4 recollection that this postdated the document,
5 Exhibit 2?
6     A. Yes, it would.
7     Q. I'm just trying to avoid asking you
8 questions you've already had. Just give me a moment
9 to review.
10    A. Certainly, thank you.
11    Q. Mr. Bonn, if I could call your
12 attention to Exhibit 5.
13    A. Certainly.
14    Q. Which we used earlier in the
15 deposition.
16    A. Yes.
17    Q. Just calling your attention to the
18 first three sentences of the first paragraph. If you
19 could just read those aloud, please?
20    A. I am pleased to inform you that Beacon
21 Capital Partners Management, LLC (BCP) has finalized
22 its benefit package for employees. The components of
23 the BCPM benefits program have been posted on a web
24 site for your viewing convenience. The web site

Page 89

1 address is www.mybenergy.com.
2 Q. And then I'd like to call your
3 attention to the next full paragraph, the last
4 sentence of that paragraph if you could.
5 A. However, Beacon is committed to making
6 sure that you have sufficient time to evaluate the
7 benefits package.
8 Q. And the next sentence after that?
9 A. To that end, Beacon has instructed me
10 to extend the acceptance date of your offer letter to
11 Friday, June 13, 2003.
12 Q. Was Beacon concerned about giving
13 employees plenty of time to evaluate the full offer
14 of employment with, including salary, bonus potential
15 and benefits package? Were they concerned with that?
16 A. Yes. As I believe I indicated
17 earlier, there was an earlier, another exhibit where
18 we had an offer letter to I believe this same
19 gentleman, Daniel Joyce, that went out at the
20 beginning of the month. And then we asked for a
21 response toward the middle of the month. And that
22 clearly was not enough time. And I don't recall
23 exactly the sequence of events; but once we got this
24 benefit package out, we did want to give people

Page 90

1 enough time to analyze it. Which is why I originally
2 wanted to go earlier than June 13th because I was
3 concerned about the July 14th date coming up where we
4 had take over management, but I was persuaded to go
5 with the June 13th date to give people enough time.
6 Q. Calling your attention to the third
7 full paragraph, the second sentence there.
8 A. You're invited to a meeting at which
9 information regarding the benefits package will be
10 presented, and there will be an opportunity to ask
11 questions.
12 Q. How many meetings were held between
13 Beacon and Hancock employees regarding the offers of
14 employment including the benefits that Beacon had
15 made?
16 A. I honestly don't recall. I believe
17 there were a series of meetings which were chaired by
18 Susan Digilio of Goodwin Procter.
19 Q. Were these group meetings or
20 individual meetings, do you know?
21 A. I'm not certain, but I believe they
22 were group. Given that the complex is run 24 hours a
23 day, seven days a week, 365 day a year, you have to
24 have meetings at different times during the day so

Page 91

1 people on their shifts can attend.
2 Q. Do you know whether any of the
3 offerees had asked for individual meetings with
4 Beacon?
5 A. That I don't know. I do not recall
6 hearing of any.
7 Q. Just calling your attention to the
8 second full paragraph, the second sentence beginning,
9 Per the terms?
10 A. Yes.
11 Q. That statement reads, Per the terms of
12 your offer letter, Beacon is very interested in
13 moving quickly to assemble an outstanding team to
14 manage the John Hancock Tower Complex; is that
15 accurate?
16 A. That's correct.
17 Q. In light of that statement, would it
18 be accurate to say that Beacon regarded the group of
19 employees that it sought to bring over from Hancock
20 as a work unit with expertise in operating the tower
21 complex?
22 MS. DeIASI: Objection to form.
23 A. I don't really know what you mean as a
24 unit. We were given a list of, as I believe I

Page 92

1 testified earlier, a list of employees that were
2 going to be made available by John Hancock that they
3 felt, Hancock felt, would be appropriate to manage
4 the complex. And as some of the other exhibits
5 indicate, we agreed in part and disagreed in part
6 with that list. And then we did not extend offers to
7 everyone. So I would not characterize it -- in truth
8 I would not characterize it as a work unit that
9 Hancock was offering us that could manage the
10 complex. We had to in-fill and back-fill.
11 Q. So a group of people who had expertise
12 who were running the tower complex who ended upcoming
13 over?
14 MR. PETERS: Objection.
15 A. No. Some of the people that we hired
16 from Hancock were -- excuse me. The people that we
17 hired from Hancock we hired in order to manage the
18 complex, but that would not have been enough. We had
19 to hire other people outside of the offer from John
20 Hancock to manage the complex that we felt we would
21 need to manage the complex satisfactorily.
22 Q. When did Daniel Joyce become an
23 employee of Beacon?
24 A. I do not recall exactly, but I believe

DiCicco Dep. Tr.



UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11428-WGY

```
*****************************************
DANIEL JOYCE, Individually and on       *
behalf of a class of others             *
similarly situated,                     *
          Plaintiff,                    *
                                        *
v.                                      *
                                        *
JOHN HANCOCK FINANCIAL SERVICES,        *
INC., and JOAN M. DiCICCO,              *
          Defendants.                   *
*****************************************
```

<u>PURSUANT TO MUTUAL CONFIDENTIALITY AGREEMENT</u>

DEPOSITION OF JOAN M. DiCICCO, taken pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Susan L. Prokopik, Registered Merit Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Todd & Weld LLP, 28 State Street, Boston, Massachusetts, on Wednesday, May 24, 2006, at 10:33 a.m.

**KACZYNSKI REPORTING**
**72 CHANDLER STREET, SUITE 3**
**BOSTON, MASSACHUSETTS 02116**
**(617) 426-6060**

Page 13

1  Q. And how long was the course?
2  A. It was several courses over a period of time.  I
3     did not ultimately get the certification.
4  Q. Why was that?
5  A. I didn't take the last course.  I was involved in
6     other things.
7  Q. What other things were you involved in?
8  A. My work.
9  Q. Was this a course that was being paid for by your
10    employer?
11 A. Yes.
12 Q. Which employer was --
13 A. John Hancock.
14 Q. So things got too busy at work that you couldn't
15    finish the course or --
16 A. Correct.
17 Q. Okay.
18 A. Nor was my career going in that particular
19    direction any longer.
20 Q. Okay.  Who is your current employer?
21 A. John Hancock.
22 Q. For how long have you been employed by John
23    Hancock?
24 A. Thirty-one years.

Page 14

1  Q. Wow.  And what's your current position at
2     Hancock?
3  A. Assistant vice-president, human resources.
4  Q. And prior to being the assistant vice-president
5     for human resources, what was your position
6     title?
7  A. Human resources officer.
8  Q. And prior to being a human resources officer?
9  A. HR consultant.  I think.
10 Q. Did you hold any other position titles at John
11    Hancock other than assistant VP of human
12    resources, human resources officer and human
13    resources consultant?
14 A. Human resources assistant and secretary.  Two
15    separate titles.
16 Q. Okay.  Why don't we start with your secretarial
17    duties?  How long, for how long and when were you
18    a secretary?
19 A. I don't know.  Two years.
20 Q. Okay.  For how long were you an HR assistant?
21 A. I don't know.  Five or six.
22 Q. For how long were you an HR consultant?
23 A. I'm going to have to add to 30, huh?  Ten to 12.
24 Q. For how long were you an HR officer?

Page 15

1  A. Eight.
2  Q. Okay.
3  A. I'm probably over, huh?
4  Q. And for how long have you been the assistant
5     vice-president of HR?
6  A. Approximately two years.
7  Q. So at some point in 2004, you became the
8     assistant vice-president of HR?
9  A. Mm-hmm.  Yes.
10 Q. As the human resources officer, what were your
11    duties and responsibilities?
12 A. I reported to the chief financial officer of the
13    company.  And my duties were to work with him on
14    human resources matters to -- and act as liaison
15    between the corporate human resources department
16    and the financial sector of John Hancock of which
17    Mr. Moloney was the head.
18 Q. Mr. Moloney was the CFO?
19 A. Correct.
20 Q. Okay.  And were those your duties and
21    responsibilities for your entire eight years as
22    human resources officer?
23 A. Yes.
24 Q. Were there any other human resources officers at

Page 16

1     that time?
2  A. Yes.
3  Q. How many were there?
4  A. I don't recall exactly.  Less than ten.
5  Q. From what you recall, if you can just name for
6     me, if you remember, if you could identify for me
7     who those human resources officers were.
8  A. Lisa Blake.  Kathy Dole.  Ellen Brown.
9  Q. Ellen?
10 A. Ellen Brown.
11 Q. As human resources officer, who did you report
12    to?
13 A. Tom Moloney.
14 Q. Tom was your supervisor?  Mr. Moloney was your
15    supervisor?
16 A. Yes.
17 Q. Okay.  What was Peter Mongeau's position at that
18    time when you were human resources officer?
19 A. Second vice-president of shared services in human
20    resources.
21 Q. Did you, while you were human resources, work
22    with Peter Mongeau?
23 A. We worked on matters together at times, yes.
24 Q. Other than the Joyce severance benefits, sale of

Page 29

1  A. It was distributed to Hancock employees if they
2     asked for a copy.
3  Q. So it was up to Hancock employees to ask for a
4     copy. Otherwise, they would not have received a
5     copy?
6         MR. FEEHERRY: Objection.
7  A. Correct.
8         MR. FEEHERRY: You can answer.
9  A. Correct.
10 Q. The Hancock Severance Pay Plan, which has been
11    marked as Exhibit 1, was amended on November 18,
12    2002, correct?
13 A. Yes.
14 Q. Okay.
15 A. It says "11/15."
16 Q. Do you know why that says "11/15"?
17 A. No, I don't.
18 Q. In what respects do you recall the plan, the
19    Severance Pay Plan, being amended?
20 A. I believe it was amended for two provisions.
21 Q. And which two provisions were amended? Can you
22    show me which section of the Severance Pay Plan
23    was amended?
24 A. Page five. Item 3.2.

Page 30

1  Q. Was all of section 3.2 amended?
2         MR. FEEHERRY: Objection.
3  A. I don't know for sure.
4  Q. Do you recall which portions, if any, of section
5     3.2 were specifically amended?
6  A. Item C. Under 3.2.
7  Q. What was the purpose for the amendment to section
8     3.2 C?
9         MR. FEEHERRY: Objection. You can
10    answer.
11 A. I did not author or request the amendment so I
12    don't know the thought in mind of the people who
13    wanted this amendment or the management.
14 Q. Is it your testimony you were not privy to any
15    information leading you to believe what the
16    purpose was behind this amendment?
17 A. Could you re -- please say that again.
18 Q. Is it your testimony that you were not privy to
19    any communications or discussions regarding the
20    purpose behind the amendment to section 3.2?
21 A. I had been involved in conversations once the
22    amendment had been made.
23 Q. Okay. And once the amendment had been made, were
24    you apprised of what the purpose was for the

Page 31

1     purpose -- what the purpose was of the amendment
2     to section 3.2?
3         MR. FEEHERRY: Objection. You can
4     answer.
5  A. It was my understanding that the purpose was to
6     be -- provide a severance plan that was
7     competitive with other severance plans in the
8     industry and to support the business strategy of
9     the company around certain events and to provide
10    employees -- the purpose of the severance plan is
11    to bridge employees to employment. And this
12    particular amendment defines, better defines when
13    the company determined there was a need to bridge
14    employees to employment --
15 Q. Okay.
16 A. -- through the severance plan.
17 Q. I believe you stated one of the purposes behind
18    the amendment was to make the Hancock severance
19    plan competitive with other severance plans in
20    the industry, correct?
21 A. I stated that, yes.
22 Q. To what industry are you referring to when you
23    make that statement?
24 A. Those -- that's a statement that I heard so I

Page 32

1     presumed the industry was financial services.
2  Q. All right. Do you have any reason to believe
3     that the industry was not financial services?
4  A. It could have been broader than that.
5  Q. On what basis do you believe it could have been
6     broader than that?
7  A. Just a supposition I have based on the way that
8     we sometimes look at benefits. Looking at
9     benefits in different ways.
10 Q. On what other occasions do you look at benefits
11    in different ways?
12 A. I don't personally.
13 Q. I mean Hancock.
14 A. I don't know specifically.
15 Q. Okay. I believe you stated one of the purposes
16    of the severance plan was so it can bridge
17    employees to future employment. On what basis do
18    you make that statement?
19 A. It has been my -- in my role as a human resources
20    professional at John Hancock, that was something
21    that I had come to know over time, over the 30
22    years that I had been involved in human resources
23    matters, that that was the company's philosophy
24    around the need to have a severance plan. And

Page 33

1 also I believe it was cited in a document that I
2 believe it was the -- amendment to the Summary
3 Plan Description.
4 Q. Okay. Do you rely on this document that you're
5 referencing when you make your statement that the
6 purpose of the plan is to bridge employees to
7 future employment?
8 A. I rely more on my knowledge of over 30 years of
9 working with John Hancock.
10 Q. In article one, if I can turn your attention to
11 article one --
12 A. Where is that?
13 Q. The very first page.
14 A. Yes.
15 Q. I don't see -- maybe you can refer me to another
16 document where it says that the purpose of the
17 Hancock Severance Pay Plan is to bridge employees
18 to future employment. Can you refer me to
19 another document because it doesn't say that
20 here?
21 A. It was -- I know it doesn't say it here. The
22 Summary Plan Description amendment or maybe it
23 was an announcement that went out to John Hancock
24 employees where I believe that is stated.

Page 34

1 Q. So someone interpreted the purpose of the plan,
2 whoever that may be, in this announcement that
3 the purpose was to bridge employees to future
4 employment; is that correct?
5     MR. FEEHERRY: Objection.
6 A. I don't know.
7     MR. FEEHERRY: You may answer.
8 Q. What was your role, if any, with respect to
9 amending the severance plan?
10 A. No role.
11 Q. Okay. Based on knowledge you may have acquired
12 after the plan was amended, was the plan amended
13 because some anticipated events were slated to
14 occur which rendered a plan amendment to section
15 3.2 necessary?
16 A. I don't know.
17 Q. You're not aware of any events that were, quote,
18 unquote, in the works or slated to occur around
19 the time that the plan amendment took place which
20 rendered the plan amendment necessary? Is that
21 your testimony?
22 A. Yes.
23 Q. Calling your attention back to section 3.2, were
24 subsection C and D -- strike that. Prior to the

Page 35

1 amendment to the plan, was there a subsection C
2 and D to section 3.2?
3     MR. FEEHERRY: Objection. You may
4 answer.
5 A. I don't know.
6 Q. Are you aware of section 3.2 only had a section A
7 and B?
8     MR. FEEHERRY: Objection. You may
9 answer.
10 Q. Or subsection A and B.
11 A. Are you asking about prior to the amendment?
12 Q. Prior to the amendment, which I believe you
13 stated earlier focused on subsection C --
14 A. Mm-hmm.
15 Q. Was subsection C added in its entirety to section
16 3.2 or was there already a subsection C in
17 section 3.2?
18     MR. FEEHERRY: Objection. You may
19 answer.
20 A. I do not know whether there was already a section
21 C. I know that section -- the language of this
22 section C was added.
23 Q. Are you aware that subsections C and D are
24 commonly referred to as the comparable job

Page 36

1 provision?
2 A. Yes.
3 Q. On November 15, 2002, the date of Exhibit 1, are
4 you aware if Hancock had a definition for
5 comparable position?
6 A. It states here that comparable position would be
7 determined by the company.
8 Q. Correct. But at that time on November 15, 2002,
9 did Hancock have a definition for comparable
10 position?
11     MR. FEEHERRY: Objection. You may
12 answer.
13 A. I don't think so.
14 Q. Okay. In November, 2002, what was your
15 understanding of the definition of comparable
16 position?
17     MR. FEEHERRY: Objection. You may
18 answer.
19 A. That the company would determine how it would be
20 defined.
21 Q. Were you aware or was there some understanding of
22 the definition of comparable position at Hancock
23 in November of 2002?
24 A. Repeat the question.

Page 49

```
 1  A. An electrician or an HVAC technician would be
 2     performing functions of a similar nature or to a
 3     similar end. Their overarching work would be
 4     around the maintenance of the building.
 5  Q. Is that your understanding of a business unit or
 6     is that Hancock's definition of a business unit?
 7        MR. FEEHERRY: I think the question
 8     was, what was her understanding?
 9        THE WITNESS: Right.
10  Q. Right.  I think my question to you is --
11        MR. FEEHERRY: I'm sorry.
12  Q. Maybe I'll clarify the question.  Your
13     understanding of what constitutes a business unit
14     -- strike that.  On what basis do you define a
15     business unit as you just did?
16  A. On my knowledge of -- and understanding of how
17     work units operate and are structured.
18  Q. Is your understanding of what constitutes a
19     business unit to the best of your knowledge
20     understood by other Hancock -- by other members
21     of the HR department as also being what
22     constitutes a business unit?
23        MR. FEEHERRY: Objection.
24  A. I don't know.
```

Page 50

```
 1        MR. FEEHERRY: You can answer.
 2  Q. Did you ever receive any documents from Hancock
 3     or from anyone defining or setting forth what
 4     constitutes a business unit?
 5  A. Not that I recall.
 6  Q. Did you ever receive any documents from Peter
 7     Mongeau or have any communications with Peter
 8     Mongeau discussing what constitutes a business
 9     unit?
10  A. Not that I recall.
11  Q. Were you the person who was going to be in charge
12     of determining whether a business unit had been
13     sold or outsourced?
14        MR. FEEHERRY: Objection.  You may
15     answer.
16  A. No.
17  Q. Did that responsibility fall on someone else?
18        Strike that.  Whose responsibility was
19     it to determine whether there had been a sale or
20     outsourcing of a business unit?
21        MR. FEEHERRY: Objection.  You may
22     answer.
23  A. The responsibility was among several people.  And
24     the responsibility was to within the language of
```

Page 51

```
 1     the severance plan document --
 2  Q. That's not the answer to my question.
 3        MR. FEEHERRY: Let her finish the
 4     answer.
 5        MR. ROBBINS: She is not answering.
 6        MR. FEEHERRY: Let her finish in any
 7     event.  One of the ground rules you set I think
 8     is you weren't going to interrupt her.
 9        If you could read back as far as she
10     got.  Let her finish the question and please feel
11     free to fire some more at her.
12        (Answer read.)
13  A. Determine if a work unit's functions would be
14     performed by a successor company.
15  Q. Where are the words "functions" in the severance
16     plan?
17  A. I used the word "functions" and I would take that
18     to be a similar term to the word "services,"
19     which is on page four of the Severance Pay Plan
20     under the definition of successor company.
21  Q. It's fair to say the word "functions" as you
22     defined it, as you stated so, is not in the
23     severance plan?
24        MR. FEEHERRY: We'll stipulate to that.
```

Page 52

```
 1  A. Yes.
 2  Q. Okay.  Did anyone communicate to you that the
 3     word "functions" and "services" should be used
 4     interchangeably when interpreting the Hancock
 5     severance plan?
 6  A. Not that I recall.
 7  Q. So on what basis do you use those words
 8     interchangeably?
 9  A. My own lexicon.
10  Q. Was it your responsibility to interpret the
11     Hancock severance plan in any way whatsoever?
12        MR. FEEHERRY: Objection.  You may
13     answer.
14  A. It was not my sole responsibility.
15  Q. Was it a responsibility?
16  A. It was not my -- the responsibility was not only
17     mine.
18  Q. Was it a responsibility of yours to interpret the
19     Hancock severance plan?
20  A. Yes.
21  Q. Who else had the responsibility of interpreting
22     the Hancock severance plan?
23  A. Many people.
24  Q. Okay.  That's a start.  Who?
```

Page 53

1  A. My peer, Lisa Blake, Sandi Colley, the head of
2     the workforce diversity area, Page Palmer,
3     members of legal.
4  Q. Who else was responsible for interpreting --
5     strike that. I don't know if you answered my
6     question before which was, who is responsible for
7     determining whether there has been a sale or an
8     outsourcing of a business unit?
9         MR. FEEHERRY: Objection. You may
10        answer.
11 Q. I believe you said there were a number of people.
12 A. I just cited a number.
13 Q. Did you ever receive any communication from any
14    of the people you just cited, Miss Blake, Miss
15    Colley or Miss Palmer, regarding whether there
16    had been ever a sale or an outsourcing of a
17    business unit?
18        MR. FEEHERRY: Objection. You may
19        answer.
20 A. Ever?
21 Q. Yes.
22 A. Could you repeat the question?
23 Q. Have you ever been privy to communication from
24    Miss Blake, Miss Colley or Miss Palmer wherein

Page 54

1     there was a determination that there had been a
2     sale or outsourcing of a business unit?
3     Specifically a determination that there had been
4     a sale or outsourcing of a business unit.
5         MR. FEEHERRY: Objection. You may
6         answer.
7  A. I have -- it is likely I would have received
8     communications from one or two of those people
9     that there had been a sale or outsourcing to a
10    successor company of a work unit.
11 Q. Do you recall, have specific knowledge or have a
12    specific recollection of any occasions when you
13    were informed or were privy to communications
14    that there had been a sale or outsourcing of a
15    business unit?
16 A. I had been informed by Lisa Blake that the IT
17    work unit was being outsourced to CGI. Excuse
18    me. IBM.
19 Q. Is that the only occasion in which you were
20    informed by Miss Blake, Miss Colley or Miss
21    Palmer that there had been a sale or outsourcing
22    of a business unit?
23        MR. FEEHERRY: Objection. You may
24        answer.

Page 55

1  A. That's the one I recall.
2  Q. Okay.
3         MR. FEEHERRY: We've been going about
4     an hour. When you think it's an appropriate time
5     to take a break, maybe we can take five minutes.
6         MR. ROBBINS: Okay. Why don't we --
7     let me just finish up with this document.
8         MR. FEEHERRY: Sure.
9  Q. On November 21, 2002, again, referring to Exhibit
10    2, what was your understanding of what
11    constituted an outsourcing of a business unit?
12 A. My understanding was when a work unit was -- when
13    the services performed by a work unit were being
14    transferred to a successor company.
15 Q. Is transfer -- I'm sorry. Is it your testimony
16    that transfer is the same as an outsourcing?
17        MR. FEEHERRY: Objection. You may
18        answer.
19 A. It is my testimony that outsourcing refers to
20    work being transferred to an entity unaffiliated
21    with John Hancock and performing the same
22    services or functions that were performed prior
23    to that transfer.
24 Q. On what basis did you come to that understanding?

Page 56

1  A. Over conversations with my peers.
2  Q. You had conversations with your -- I'm sorry.
3     Did I interrupt you?
4  A. (Witness shakes head.)
5  Q. You had conversations with your peers regarding
6     the definition of outsourcing as it pertains to
7     the plan amendment?
8  A. We had conversations about the amendment and --
9     discussions about the amendment.
10 Q. Did you have any discussions in which the term
11    "outsourcings" was defined, where it was
12    discussed what would constitute an outsourcing as
13    it relates to the plan amendment?
14        MR. FEEHERRY: Objection.
15 A. I don't recall specifically.
16 Q. Okay. On what basis then do you come to the
17    definition of outsourcing that you just set forth
18    for us?
19        MR. FEEHERRY: Objection.
20 A. I believe I said based on discussions of the
21    amendment and what the differences were.
22 Q. As you sit here today, do you have now a
23    different understanding of what constitutes an
24    outsourcing as it relates to the plan amendment?

Page 65

1 Q. Is Exhibit 4 the HR Q and A that you were
2    referring to in Exhibit 3?
3 A. I don't think so.
4 Q. Looking at Exhibit 3, I believe it says in the
5    second paragraph, "We have developed an HR Q and
6    A that we will give out at the end of the
7    meeting," et cetera.
8 A. Right. This document is not specific to HR
9    questions. That's why I'm not sure that it's the
10    same document.
11 Q. Are you aware there may have been a different HR
12    or a different -- strike that. A different Q and
13    A document that was distributed to employees?
14 A. I think there was.
15 Q. Okay. Referring back to Exhibit No. 4 now, did
16    Peter Mongeau assist you in the drafting of this
17    document?
18 A. Not that I recall.
19 Q. Was Exhibit 4 distributed to Hancock employees?
20 A. I don't believe so.
21       MR. FEEHERRY: Well, the question, was
22    it distributed to all employees? I suppose by
23    definition it went to some employees.
24       THE WITNESS: Yes.

Page 66

1       MR. FEEHERRY: Just so the question and
2    answer is right.
3 Q. Was Exhibit 4 distributed to any Hancock
4    employees?
5 A. Yes.
6 Q. Were they distributed to Hancock employees
7    affected by the sale of the Tower complex?
8 A. They would have been -- if -- I don't think this
9    is the HR Q and A document and so this document
10    would have been distributed -- if that's the
11    case, this document would have been distributed
12    to employees who were associated with the project
13    of selling the John Hancock complex.
14 Q. So if I understand you correctly, this document
15    that's been marked as Exhibit 4 may have
16    potentially been distributed solely to those
17    employees of Hancock who were involved in the
18    project of selling the Tower complex?
19 A. Correct.
20 Q. Okay. But it's your understanding that there was
21    an HR Q and A that did get distributed to those
22    employees affected by the sale of the Tower
23    complex?
24 A. Yes.

Page 67

1 Q. Okay. If I could turn your attention to page
2    six. Referring you to the third bulleted point
3    where it says, "Will JH continue to have its own
4    security group." If I can just have you take a
5    moment and read that paragraph.
6 A. Okay.
7 Q. Was the reason the number of security employees
8    were no longer able to work for Hancock due to a
9    reduction in staff stemming from the sale of the
10    Tower complex?
11 A. Yes.
12 Q. Were these security individuals offered severance
13    benefits?
14       MR. FEEHERRY: "These" meaning?
15 Q. Were the --
16       MR. ROBBINS: Thank you. I'll clarify
17    that.
18 Q. Were the employees within the security staff at
19    Hancock who were not retained by Hancock offered
20    severance benefits?
21       MR. FEEHERRY: Objection. "Not
22    retained by Hancock" is the problem.
23 Q. Were there any employees with respect to the
24    security group that's referenced on JH 1169, were

Page 68

1    there any Hancock security group employees
2    offered severance benefits?
3 A. No.
4 Q. Why not?
5 A. Because they were offered a comparable job by a
6    successor -- those employees who did not remain
7    with John Hancock as employees were offered
8    comparable jobs by the successor company.
9 Q. Who was the successor company?
10 A. Beacon.
11 Q. Okay. If it were not for the amendment to
12    subsections 3.2 C and D, would these security
13    staff members have been deemed terminated under
14    the plan and otherwise eligible to receive
15    severance?
16       MR. FEEHERRY: Objection. You may
17    answer.
18 A. If you're referring to those same -- those who
19    were no longer going to work for John Hancock,
20    they would have had a choice if they were offered
21    a job by Beacon to take the position or take
22    severance or receive severance. They would not
23    have gotten both.
24 Q. If it were not for subsection -- strike that. If

Page 73

1    determine benefits.
2  Q. When you say "plan descriptions," you're talking
3      about Summary Plan Descriptions, correct?
4            MR. FEEHERRY: Objection.
5  A. The SPD -- excuse me, no. I'm referring to the
6      actual plan documents that would have been voted
7      by the appropriate people within the company so
8      the Summary Plan Description is again the
9      document that's written for employees.
10 Q. Okay. But again, if we can focus on what my
11     question, which was, is there any less weight
12     given to the content of the Benefits Supplement
13     which has been marked as Exhibit 5 as opposed to
14     the content of a full Summary Plan Description?
15           MR. FEEHERRY: Objection.
16 A. It's an amendment.
17           MR. FEEHERRY: You may answer.
18 A. It's an amendment. Or the supplement. It adds
19     information.
20 Q. Okay. And is that the purpose of the Benefits
21     Supplement, to add information to the Summary
22     Plan Description?
23           Well, strike that question. What is
24     the purpose of the Benefits Supplement?

Page 74

1  A. To convey to employees any additional or changed
2      information from the existing Summary Plan
3      Description. To keep the information current.
4  Q. What is the purpose of the Summary Plan
5      Description?
6            MR. FEEHERRY: Objection. You may
7      answer.
8  A. I believe I answered that in that it is a
9      communication to employees in laymen's terms
10     about the various benefits offered by John
11     Hancock.
12 Q. Okay. Did the document that's been marked as
13     Exhibit 5 get distributed to Hancock employees?
14 A. It is -- I believe it was posted to the
15     electronic medium that all employees have access
16     to on what is called the Hub.
17 Q. If I could call your attention to the first page,
18     what has been marked as JH 1097. The fourth
19     paragraph down, second sentence, where it says,
20     "The 2003 SPDs will be accessible on-line."
21           Is that a reference to the fact that
22     all future SPDs will be accessible on-line?
23 A. As I read this, I would say that's true.
24 Q. Is it fair to say then, does that refresh your

Page 75

1      memory if this document, what has been marked as
2      Exhibit 5, was accessible on-line?
3  A. Um --
4  Q. In December of 2002.
5  A. I would -- based on the reading this, I would say
6      that it was distributed to employees rather than
7      being on-line.
8  Q. Do you recall when the document that's been
9      marked as Exhibit 5 was distributed to Hancock
10     employees?
11 A. No.
12 Q. Based on your experience, do Benefits Supplements
13     get distributed the same month that they are
14     published?
15 A. Generally.
16 Q. So based on your experience, it's not beyond the
17     realm of possibility that in December of 2002
18     this Benefits Supplement was distributed to
19     Hancock employees?
20 A. Yes.
21 Q. Okay. How was Exhibit 5 distributed to
22     employees? In what manner are they distributed?
23 A. I don't recall.
24 Q. Prior to SPDs and Benefits Supplements being made

Page 76

1      accessible on-line, how were they distributed?
2  A. They were distributed to employees. I just don't
3      know exactly how it happened.
4  Q. I mean, do you recall if they were mailed to
5      their home address?
6  A. I believe they were mailed to home address.
7  Q. Okay. Did you yourself as a Hancock employee
8      receive what's been marked as Exhibit 5?
9  A. Yes.
10 Q. Okay. Why is it that the Summary Plan
11     Description and Benefits Supplements are
12     distributed and the plan, which we marked as
13     Exhibit 1, is not distributed?
14           MR. FEEHERRY: Objection.
15 A. I believe I answered before that the reason is
16     because often the plans are in language that is
17     for lay folks not that -- not easily understood.
18 Q. Okay. Are you aware of any requirement that must
19     be followed -- strike that. Did you have any
20     duties or responsibilities with respect to the
21     distribution of the Summary Plan Description or
22     Benefits Supplement?
23 A. No.
24 Q. Are you aware of any requirements that must be

1  A. I can only answer for myself.
2  Q. What is the answer for yourself?
3  A. The answer is that I would have referred to the
4     pension -- the severance plan document.
5  Q. Okay. Is your testimony that you do not recall
6     referring to Exhibit 5 when determining whether
7     to apply the comparable job provision?
8  A. I would have -- could you repeat the question
9     again?
10 Q. I'm not interested in what you think. I'm
11    interested in what you know. As you sit here
12    today, do you have specific knowledge as to
13    whether the HR department has ever referenced
14    this document when determining whether to apply
15    the comparable job provision?
16       MR. FEEHERRY: Objection. You may
17    answer.
18 A. I do not have specific knowledge that the HR
19    department referenced this or -- no.
20 Q. But you do have specific knowledge -- strike
21    that. But it's your understanding that you
22    believe that when determining whether to apply
23    the comparable job provision you would have
24    relied solely on the plan?

1        MR. FEEHERRY: Objection.
2  Q. The Hancock severance plan.
3        MR. FEEHERRY: Sorry. Objection. You
4     may answer.
5  A. One more time, please.
6  Q. But it's your understanding that when determining
7     whether to apply the comparable job provision you
8     would have referred to solely the Hancock
9     severance plan?
10 A. I would have, yes.
11 Q. Looking at only JH 1112 and without referring to
12    any other document, what is your interpretation
13    of the bulleted paragraphs?
14       MR. FEEHERRY: Objection.
15 Q. On the bottom of the page.
16       MR. FEEHERRY: Objection. You may
17    answer.
18 A. That when an employee is offered a comparable job
19    or accepts a noncomparable job with a successor
20    company, severance will not be paid.
21 Q. What about is there a requirement that there be a
22    sale or outsourcing of a business unit?
23 A. The requirement is that the services performed by
24    the -- if the services performed by the employee

1  are then transferred to a successor company and
2  the employee is offered a comparable job, they
3  would not be eligible for severance.
4  Q. Where do you get that based on just the document
5     that's before you?
6        MR. FEEHERRY: Objection.
7  Q. Document 1112.
8  A. You asked me to interpret the language and that's
9     my interpretation.
10 Q. Right. Are you referring to any other document
11    when you're interpreting that language?
12       MR. FEEHERRY: Objection. You may
13    answer.
14 A. This document is -- I am referring to my
15    knowledge within the summary plan -- of the
16    severance plan and the interpretation because
17    that is the primary document and the document
18    that I rely upon. The severance plan is the
19    primary document.
20 Q. I believe my question was looking -- I let you
21    finish. My question is I understand Hancock's
22    position is, We looked at the plan. My question
23    is, with respect to just this document which is
24    the document that was distributed to Hancock

1  employees, just JH 1112 --
2  A. Yes.
3  Q. -- in looking at this language without referring
4     to any other document, how do you interpret just
5     these paragraphs?
6        MR. FEEHERRY: Objection. Asked and
7     answered.
8  A. I answered that question.
9  Q. Okay. And you believe a layperson would answer
10    that question the same way?
11       MR. FEEHERRY: Objection.
12 A. I -- I don't know how a layperson would interpret
13    it.
14 Q. But in order to make the interpretation that you
15    did, that you just set forth in your testimony,
16    you referred, you had to refer to the plan,
17    correct?
18       MR. FEEHERRY: Objection.
19 A. It was my interpretation.
20 Q. And in your interpretation you referred to the
21    plan, correct? That's a yes or no.
22 A. Yes.
23 Q. In the preceding section where there is a
24    bulleted paragraph that reads, "A lump sum

Page 89

```
 1      Hancock Severance Pay Plan?
 2 A. I don't recall specific conversations but I
 3      recall -- I believe that there were discussions
 4      with other members of human resources and with
 5      Page.
 6 Q. You believe there were discussions for which you
 7      were privy to?
 8 A. Discussions -- conversations that I was a part
 9      of.
10 Q. Okay.  Who else was a part of those
11      conversations?
12 A. Sandi Colley.
13 Q. What ultimately formed your basis or Hancock's
14      basis to decide which benefits would be included
15      in any competitive benefits assessment analysis
16      and which ones would be excluded?
17 A. Page Palmer as the plan administrator asked Peter
18      Mongeau to call together a group of people to
19      discuss and brainstorm what would be included and
20      not included.
21 Q. Do you recall when this happened, when Page
22      Palmer called for these discussions?
23 A. After the plan had been amended.
24 Q. So in late 2002?
```

Page 90

```
 1 A. I don't recall specifically.
 2 Q. Well, that's when the plan was amended.
 3 A. Right.
 4 Q. Okay.  Who was a part of this group that Page
 5      Palmer asked to have put together to discuss
 6      these issues?
 7 A. Peter Mongeau, myself, Lisa Blake, Sandi Colley.
 8 Q. How many meetings do you recall having wherein
 9      the definition of comparable job was discussed?
10 A. More than one.  Less than ten.
11 Q. And during what period of time do you recall
12      these meetings occurring?
13 A. I don't recall exactly.
14 Q. Were they meetings specifically scheduled in
15      order to discuss the definition of comparable
16      job?
17 A. Yes.
18 Q. What transpired at these meetings?
19 A. Generally there was discussion about what is
20      meant or how we would define similar salary,
21      competitive benefit offerings.  And competitive
22      benefit offerings.
23 Q. Do you recall there being meetings specifically
24      pertaining to the criteria for determining
```

Page 91

```
 1      whether a benefit offering was competitive?
 2 A. Yes.
 3 Q. How many meetings do you recall having in which
 4      the criteria for determining whether a benefit
 5      offering was competitive was discussed?
 6 A. More -- two or more.
 7 Q. Do you recall what transpired at those meetings
 8      with respect to the criteria for determining
 9      whether competitive -- for determining whether a
10      benefit offering was competitive?
11 A. There was discussion about benefits offered by
12      John Hancock and companies, other companies, and
13      a discussion of which ones would be -- we would
14      choose to evaluate against the benefits of --
15      which ones we would choose to evaluate when
16      making the determination whether or not a benefit
17      was competitive.
18 Q. What were the other companies that were
19      discussed?
20      Actually, why don't I strike that?
21      Make a more general question.  How were these
22      companies selected?
23      MR. FEEHERRY: Objection.
24 A. I should refine my statement to say that it was
```

Page 92

```
 1      more about within an industry where the successor
 2      company and the employees would be finding a job.
 3      Getting a job.  Would be offered a job.
 4 Q. At the point in time when you had -- strike that.
 5      And who was present for these meetings?
 6 A. I believe I answered it.  It was Peter Mongeau,
 7      Sandi Colley, myself and Lisa Blake.
 8 Q. Did you take any notes at the meetings?
 9 A. I believe I took a few.
10 Q. Did you produce any of those notes in relation to
11      this case?
12 A. I think it's on a document -- there's some
13      handwritten notes on a document that's titled --
14      I think it's called -- Project Cosmo. HR issues.
15 Q. Okay.  What do you recall about this document?
16      Can you describe this document for me?
17 A. It's a matrix of things that I was responsible
18      for coordinating that were associated -- HR
19      things that would be pertinent to the sale of the
20      Tower complex and employees affected by that.
21 Q. Okay.  Are these the only notes that you took at
22      any of the --
23 A. I don't recall.
24 Q. -- more than one or less than ten meetings that
```

Page 97

1 business unit?

2 A. Business unit was not a term that we used

3   necessarily in relation to this group.

4 Q. As we've made reference to throughout your

5   testimony here, there is reference to a business

6   unit. Is a business unit the same as a work unit

7   to the best of your knowledge?

8        MR. FEEHERRY: Objection. You may

9   answer, though.

10 A. You know, my lexicon, I would use the words "work

11   unit."

12 Q. I'm going to ask the question again. I don't

13   know if I got the answer. I apologize if I did.

14   Did these 64 people make up a work unit or

15   business unit?

16 A. They were people who worked in the -- who

17   performed functions that were in the building and

18   trade group. And so they were a work unit, yes.

19 Q. To the best of your knowledge, was Daniel Joyce a

20   member of this business unit?

21        MR. FEEHERRY: And now you're referring

22   specifically to Exhibit 6.

23 A. No.

24 Q. What was the name of Daniel Joyce's business

Page 98

1   unit?

2        MR. FEEHERRY: Objection.

3 A. He was a member of the real estate operations

4   department.

5 Q. I believe you said earlier that building and

6   trade was within the real estate operations

7   department, correct?

8 A. Right. It's a group of people. It's not the

9   name of a work unit.

10 Q. Okay. Is building and trade known as a separate

11   work unit --

12        MR. FEEHERRY: Objection. You may

13   answer.

14 Q. -- than the real estate operations --

15 A. It's a category --

16 Q. -- department?

17   Let me finish the question. Is the

18   building and trade business unit known as a

19   separate business unit than the real estate

20   operations department?

21 A. It's a group of people --

22        MR. FEEHERRY: Objection. You may

23   answer.

24        THE WITNESS: Sorry.

Page 99

1 A. It's a group of people within the real estate

2   operations department.

3 Q. My question can be answered yes or no. Is the

4   building and trade work unit different than or

5   separate from the business unit known as the real

6   estate operations department?

7        MR. FEEHERRY: Objection.

8 A. I --

9 Q. If you know.

10 A. I would not term real estate operations

11   department business unit.

12 Q. In what business unit was Daniel Joyce?

13        MR. FEEHERRY: Objection. You may

14   answer.

15 A. He worked within the real estate operations

16   department.

17 Q. But I believe you just said that real estate

18   operations department was not a business unit.

19   Is that correct?

20 A. I said I wouldn't term it that.

21 Q. Okay. In what business unit then, if it's not a

22   -- if the real estate operations department is

23   not in your opinion termed as a work unit, then

24   in what work unit was Daniel Joyce a part of?

Page 100

1        MR. FEEHERRY: Objection. You may

2   answer.

3 A. Could -- could you please repeat that?

4 Q. If you're not comfortable stating that the real

5   estate operations department is a work unit and

6   Daniel Joyce was a member of the real estate

7   operations department, what was the name of the

8   business unit in which he worked?

9        MR. FEEHERRY: Objection.

10 A. I believe I said that I would not use the term

11   "business unit." And your question was that I

12   was not -- you said that I was not comfortable

13   using the word "work unit." So I have to admit,

14   I'm confused.

15 Q. Okay. And that's what I want you to tell me.

16   Let's work through this.

17        Was there a formal -- strike that. Are

18   you aware of the name of Daniel Joyce's business

19   unit?

20        MR. FEEHERRY: Objection.

21 A. I am aware of the name of the department in which

22   he worked, which was the real estate operations

23   department.

24 Q. Is the real estate operations department a

Page 109

1   strike that. What was the assignment designated
2   to Peter Mongeau with respect to establishing
3   what criteria would be used for a comparable job
4   analysis?
5       MR. FEEHERRY: Objection. You may
6   answer.
7 A. Could you ask the question one more time?
8 Q. What was Peter Mongeau's responsibility with
9   respect to the comparable job analysis?
10 A. His responsibility was to determine guidelines to
11  be used for the competitive benefits piece of the
12  comparable job analysis and ultimately had
13  responsibility for doing any evaluations based on
14  those guidelines.
15 Q. Did Lisa Blake, Sandi Colley or yourself have any
16  role, duties or responsibilities with respect to
17  assisting Peter Mongeau in determining what the
18  criteria would be used for competitive benefits?
19 A. We were -- he asked us to work with him in a
20  collaborative way to determine which -- the
21  components used when determining competitive
22  benefits.
23 Q. And what were the components used when
24  determining competitive benefits?

Page 110

1 A. Which benefits we would focus on.
2 Q. Okay. Initially which benefits were going to be
3   the focus of any criteria for a competitive
4   benefit assessment analysis?
5 A. I don't recall specifically. I would need to
6   look at something.
7 Q. Did it change over a period of time?
8 A. Yes. It was a working group with, you know, that
9   kind of talked through and discussed how we would
10  approach this.
11 Q. Why were some benefits included in the assessment
12  ultimately and others excluded?
13 A. Depending -- the decisions were made depending on
14  what -- through our collective experience and
15  Peter's specific expert experience were deemed to
16  be valuable to employees when looking at benefit
17  offerings in terms of a comparable job.
18 Q. Why was Peter an expert, as you stated, in that
19  field?
20 A. Because he was John Hancock's second
21  vice-president, which -- and one of his
22  responsibilities was about benefit design for
23  John Hancock.
24 Q. But why would Peter Mongeau if he's an expert at

Page 111

1   determining which benefits should be included in
2   an assessment analysis seek the collaborative
3   input from yourself, Lisa Blake or Sandi Colley?
4 A. In the human resources area we always worked as a
5   team. We brought different fields of experience
6   and expertise to the table.
7 Q. But yourself, Sandi Colley or Lisa Blake, none of
8   you are experts in the same way that Peter
9   Mongeau was an expert?
10 A. That's correct.
11 Q. Okay. Ultimately what was the criteria used to
12  determine which benefits were selected for the
13  assessment?
14 A. The criteria used?
15 Q. Correct.
16 A. I think -- ultimately we talked about it and
17  determined based on the value of certain benefits
18  to employees that I believe we ended up with five
19  were the ones that we would focus on.
20 Q. Do you recall on what basis you ultimately came
21  to those five benefits?
22 A. Not specific.
23 Q. Were there reliance on other documents that
24  indicated these are the five benefits of the

Page 112

1   greatest value to Hancock employees?
2 A. I don't recall.
3 Q. Was there a poll taken of Hancock employees to
4   determine what was the most valuable benefit to
5   them?
6 A. No.
7 Q. I'm sorry?
8 A. No.
9 Q. So how was it determined that -- on what basis
10  was it determined that these were the five that
11  were the most important?
12 A. There was a great deal of reliance on Peter's
13  expertise and knowledge of benefits.
14 Q. Did anyone object within this group and say, I
15  believe that there are additional benefits that
16  are also of significant value to Hancock
17  employees?
18 A. I don't recall that, no.
19 Q. Initially I believe you said there was a
20  determination that there were more than five --
21  strike that. Were there ever more than five
22  benefits included in the assessment, in any
23  potential assessment -- strike that.
24      Eventually there were only five

1    benefits as part of the assessment, correct?

2 A. Yes.

3 Q. During the drafting process, was it ever

4    suggested that there be in addition to five or

5    more than five benefits included in it?

6 A. Yes.

7 Q. Okay. Why was there more than five initially

8    included?

9 A. We were collaborating and brainstorming ideas and

10   often with a work in progress you start with a

11   number of things and then hone in on the things

12   that are most significant to the exercise that

13   you're doing.

14 Q. Was the criteria from the beginning to determine

15   which benefits had the greatest value to Hancock

16   employees?

17      MR. FEEHERRY: Objection. You may

18   answer.

19 A. Please ask again.

20 Q. I believe ultimately you said the criteria that

21   you used in determining which benefits you would

22   select for the assessment was based on their

23   value or the greatest value to Hancock employees,

24   correct?

1 A. Their value to employees.

2 Q. To Hancock employees.

3 A. To employees.

4 Q. To employees in general.

5 A. Correct.

6 Q. Okay. And how did you come to that conclusion

7   based on employees in general?

8 A. Based on the collective experience of the

9   individuals involved in the process, based on

10   work they had done in the past, based on Peter's

11   experience in benefits, based on, as I mentioned,

12   our collective experience.

13 Q. Based on your experience, across the board

14   throughout all industries, are the same benefits,

15   rather, the same five benefits that were included

16   in this assessment considered to be those

17   benefits of the greatest value to employees?

18      MR. FEEHERRY: Objection. You may

19   answer.

20 A. I don't know how all employees of any company

21   would value benefits. It is my experience that

22   benefits important to employees were those five

23   that we ultimately decided upon.

24 Q. But is it fair to say that there are some

1   industries which may put a greater value on other

2   benefits than those within the John Hancock

3   financial services industry?

4 A. I don't know.

5 Q. What was the comparable job/competitive benefits

6   issue you were referring to in Exhibit 7?

7 A. It was the -- please ask the question again.

8 Q. What was the comparable job/competitive benefits

9   issue you were referring to in Exhibit 7?

10 A. It was the -- the issue or the statement refers

11   to the fact that the severance policy, plan, has

12   in it as a component the eligibility for

13   severance or ineligibility for severance if a

14   comparable job is offered by a successor company

15   to employees and Paul -- that's it.

16 Q. Was that referring to the -- was that phrase, the

17   comparable job/competitive benefits issue, is

18   that statement referring to the comparable job

19   provision?

20 A. Yes.

21 Q. Does this document help you refresh your memory

22   as to when Hancock finalized a definition for

23   comparable job?

24 A. It puts it in a more precise time frame.

1 Q. And what is that precise time frame?

2 A. In the March --

3 Q. March --

4 A. March time frame.

5 Q. March, 2003?

6 A. Correct.

7 Q. On March 3, 2003, what was the criteria that was

8   to be used for determining whether a benefit

9   offering was competitive?

10 A. Criteria was the five benefits that the guideline

11   committee, for lack of a better word, had

12   determined would be part of the definition and

13   that was the criteria against -- and then looking

14   at those benefits for a successor company within

15   that industry.

16 Q. Within the successor company's industry?

17 A. Within the industry -- yes. Primarily.

18 Q. Why was there a need to contact Hewitt as you

19   indicated in this E-mail marked as Exhibit 7?

20 A. Hewitt was the third-party vendor that or third

21   party that Peter Mongeau would be working -- one

22   of the third parties or one of the objective data

23   sources that Peter would be working with as he

24   performed the evaluation of benefit offerings by

Page 117

1   a successor company.
2 Q. Well, when you say that you needed to provide
3   Hewitt with a list of companies within the
4   industry, to what were you referring?
5 A. I was referring to companies within the property
6   management industry and the need for Hewitt to
7   have that information.  To see if they had the
8   data for benefits within that -- those specific
9   industries.
10 Q. Why was it necessary that you provide Hewitt with
11   a list of companies in the property management
12   industry to benchmark benefits?
13 A. Because at the time that we developed the
14   guidelines for the competitive benefits criteria,
15   we indicated that we would look at benefits,
16   competitive benefits within the industry of the
17   successor company.
18 Q. Did that ever change?
19 A. I don't know.
20 Q. Because I believe you said at that time that was
21   the understanding.
22 A. That's what I was referring to in terms of this
23   document.
24 Q. To the best of your knowledge, did that criteria

Page 118

1   ever change?
2 A. The criteria did not change.  However, the data
3   may not have been available in exactly this
4   format or on exactly this construction.
5 Q. I'm sorry.  If you can elaborate on that.
6 A. We may not have been -- Hewitt may not have been
7   able to provide us with specific data about the
8   -- this list of companies that I would have been
9   able to give them or Peter would have given them
10   through me.
11 Q. Okay.  Do you have specific knowledge if Hewitt
12   did have data available on the property
13   management industry benefits?
14 A. I believe it states on the analysis that Peter
15   did that -- what his data sources were.  And I
16   don't recall that I saw each of those -- any
17   company specifically listed.
18 Q. But as far as an industry was concerned, was it
19   your understanding that the analysis that was
20   done that you just referred to took into
21   consideration the property management industry?
22      MR. FEEHERRY: Objection.
23 A. If I had the document, that would be helpful but
24   I believe that the -- ultimately what Hewitt was

Page 119

1   able to do was to talk about general industry of
2   . which there would have been property management
3   companies included.
4 Q. But isn't that different than the criteria by
5   which the guidelines committee, as you put it,
6   came up with on how they would determine whether
7   a benefit offering was competitive?
8 A. I think that it's -- repeat the question.
9      MR. ROBBINS:  If you can repeat back
10   the question.
11      (Question read.)
12 A. It included the information within the industry.
13 Q. It's your understanding that the sources that
14   Peter Mongeau used included information within
15   the property management industry --
16 A. That was my understanding, yes.
17 Q. -- correct?  Okay.  Is there a difference, as you
18   sit here based on your experience, between
19   comparing the benefits of one particular industry
20   versus the industry in general?
21      MR. FEEHERRY: Objection.
22 A. I don't know specifically.
23 Q. Based on your knowledge and experience in HR.
24      MR. FEEHERRY: Objection.

Page 120

1 A. I don't have experience exactly around that
2   issue.
3 Q. Okay.  What benefits did you need to have
4   benchmarked?
5 A. The five that were determined within the
6   guidelines.
7 Q. Is this what you meant by "certain benefits"?
8 A. Yes.
9 Q. What were those benefits?
10 A. I believe they were pension, 401(k), health,
11   vacation.  I have forgotten the other one.
12 Q. Did you ultimately provide a list to Hewitt of
13   the companies within the property management
14   industry that Hancock could use for benchmarking
15   certain benefits?
16 A. I don't recall.
17 Q. Was the hope that Hewitt once it obtained a list
18   of certain companies within the property
19   management industry from you would then be able
20   to assess the competitiveness of any benefit
21   offering by a property management company?
22 A. That was the hope.
23 Q. When you refer to "Morgan," you were referring to
24   Morgan Stanley, correct?

Page 129

1   clear that they were interested in having, to the
2   extent possible, employee -- John Hancock
3   employees who were involved in providing services
4   within the Tower complex be transferred to a
5   purchaser. An acquirer of the building complex.
6 Q. Was that a requirement that John Hancock set
7   forth as part of the purchasing process?
8      MR. FEEHERRY: Objection.
9 A. I don't know specifically. I believe it was a
10   strong component of a decision.
11 Q. Was there any discussion prior to the sale of the
12   Tower complex regarding severance pay or, rather,
13   nonretained Hancock employees would be eligible
14   for severance pay?
15 A. That's a very broad statement. What do you mean?
16 Q. Are you aware if there were any discussions for
17   which you were privy to prior to the sale of the
18   Tower complex to Beacon regarding severance
19   benefits that may or may not be paid to those
20   affected by the sale of the Tower complex?
21 A. There were discussions about whether or not --
22   yes. There were discussions.
23 Q. What were the substance of those discussions?
24 A. Should an acquirer not provide or offer a

Page 130

1   comparable job as the successor company to
2   employees, they would be eligible for severance,
3   or if John Hancock terminated employees who were
4   -- as a staff reduction for John Hancock and were
5   not offered comparable positions by the successor
6   company, they would be eligible for severance.
7 Q. Were there any discussions in that context with
8   respect to determining whether the acquirer was
9   going to have Hancock employees outsourced to it?
10 A. One more time.
11 Q. Were there any discussions in the context of
12   these severance benefits discussions after the
13   sale of the Tower complex, were there any
14   discussions regarding the sale or outsourcing of
15   business units?
16      MR. FEEHERRY: Objection.
17 A. There were discussions about whether -- there
18   were discussions in the terms of the severance
19   plan about whether or not employees offered jobs
20   by Beacon were comparable jobs within the
21   definition of comparable job and successor
22   company.
23 Q. You're going to make me ask that question one
24   more time. You can answer it yes or no, I think.

Page 131

1   If the answer is no, it's no.
2      MR. ROBBINS: Can you read back that
3   question that I originally asked her, please?
4      (Question read.)
5 A. There were discussions about the eligibility of
6   those employees for severance benefits.
7 Q. Did the word "outsourcing" ever come up in any
8   discussions regarding the sale of the Tower
9   complex?
10 A. Yes.
11 Q. And what with respect to the word "outsourcing"
12   was discussed?
13 A. The notion that the employees who were being
14   offered jobs by Beacon were being -- were going
15   to be providing the services to a successor
16   company that they provided to John Hancock so it
17   was -- it equated to an outsourcing.
18 Q. Who told you -- who made such a statement that
19   such a transfer equated to an outsourcing?
20 A. That was -- what I just stated was my
21   paraphrasing of statements. And I would -- and
22   the discussions would have been with people like
23   Page Palmer.
24 Q. Did Page Palmer ever describe, specifically

Page 132

1   describe the sale of the Tower complex as
2   including specifically an outsourcing?
3      MR. FEEHERRY: Objection.
4 A. My prior answer stands for that question.
5 Q. I'm asking specifically about Page Palmer. Did
6   Page Palmer ever say, describe this sale of the
7   Tower complex as involving or amounting to an
8   outsourcing, actually used the word "outsourcing"
9   of a business --
10 A. I don't recall.
11 Q. -- unit?
12      I'm sorry. Just so we can get that on
13   the record, I think we interrupted each other.
14 A. I don't recall.
15 Q. Do you recall anyone other than Page Palmer at
16   Hancock describing the sale of the Tower complex
17   as constituting or amounting to an outsourcing of
18   any business unit at Hancock?
19 A. We would -- I recall that -- I don't recall
20   specifically.
21 Q. What is your knowledge and understanding of the
22   sale of the Tower complex? What was the purpose
23   of the transaction?
24      MR. FEEHERRY: Objection.

Case 1:05-cv-11428-WGY   Document 26-7   Filed 07/07/2006   Page 17 of 21

Page 133

1 A. That was -- it was a business strategy developed
2   by the senior leaders of the company. I don't
3   know the exact purpose.
4 Q. Well, what did the transaction involve?
5 A. Sale of three properties.
6 Q. Did it include anything else?
7       MR. FEEHERRY: Objection.
8 Q. Is it your testimony that the sale of the -- that
9   the transaction that we're speaking of involved
10   the sale of real estate assets?
11       MR. FEEHERRY: Objection.
12 Q. Is that your understanding?
13       MR. FEEHERRY: Objection.
14 A. It is my understanding that the actual
15   transaction involved the sale of three real
16   estate properties.
17 Q. Okay. Have you ever seen any document explaining
18   what constitutes an outsourcing of a business
19   unit?
20 A. No.
21 Q. With respect to the sale, was there ever any
22   discussion that Hancock would be outsourcing
23   Hancock employees as part of the transaction?
24       MR. FEEHERRY: Objection.

Page 134

1 Q. With respect to the sale of the Tower complex,
2   was there ever any discussion that Hancock would
3   be outsourcing Hancock employees as part of the
4   transaction?
5       MR. FEEHERRY: Objection. You may
6   answer.
7 A. There was discussion that Hancock would more
8   favorably consider bidders who would be offering
9   comparable jobs to employees who would be
10   providing services to a successor company. And
11   ultimately Beacon did that.
12 Q. Is it your understanding that that constitutes an
13   outsourcing?
14 A. In my mind, yes.
15 Q. Was there ever any discussion as to whether
16   Hancock as part of the Tower complex transaction
17   would be outsourcing any other business units?
18 A. Other than --
19 Q. Well, that's a good question. What business unit
20   is it your understanding was outsourced to
21   Beacon?
22       MR. FEEHERRY: Objection. You may
23   answer.
24 A. The services performed by the folks who supported

Page 135

1   those three buildings were in this vernacular
2   outsourced to Beacon.
3 Q. But what was their business unit?
4 A. It was the business unit that provided property
5   management to the three buildings.
6 Q. Okay. There is a business unit that provides
7   property management to the three buildings?
8 A. It was a subset of the real estate operations
9   department. A group of employees.
10 Q. Just so we have this clear so we can move on,
11   there was a group of employees within the real
12   estate operations department that were outsourced
13   to Beacon? Is that your understanding?
14 A. That were offered comparable jobs to a successor
15   company. And in my mind, based on my
16   understanding, that constituted an outsourcing.
17 Q. Did anyone ever express a different understanding
18   of what constitutes an outsourcing that you're
19   aware of?
20       MR. FEEHERRY: Objection.
21 A. I don't recall.
22 Q. Was there an outsourcing contract executed by
23   Beacon and Hancock for former Hancock employees?
24 A. I don't believe so.

Page 136

1 Q. Did the real estate transaction involve a sale of
2   any of Hancock's business units?
3       MR. FEEHERRY: Objection.
4 A. The real estate transaction involved the sale of
5   real estate.
6 Q. Did the real estate transaction involve a sale of
7   any of Hancock's business units?
8       MR. FEEHERRY: Objection.
9 A. It involved the sale of the three properties.
10 Q. Is the answer to the question no? I'm asking
11   you, was there a sale -- if I have to clarify,
12   please say so. My question is, did the real
13   estate transaction involve a sale of any of
14   Hancock's business units?
15 A. No.
16 Q. Okay. I believe earlier we said that Daniel
17   Joyce was a member or employed within the
18   business unit known as the real estate operations
19   department; is that correct?
20       MR. FEEHERRY: Objection.
21 A. He was employed -- excuse me. He was employed
22   within the real estate operations department,
23   that's correct.
24 Q. Is the real estate operations department a

Page 137

1  business unit?
2       MR. FEEHERRY: Objection.
3  A. "Business unit" is not a term that I use. He was
4     employed within the real estate operations
5     department. That's my understanding.
6  Q. Who is the person who is in charge of knowing
7     what a business unit is then at Hancock?
8  A. I don't know.
9       MR. FEEHERRY: Objection.
10 Q. Are you aware if Hancock retained any members of
11    Joyce's business unit after the sale?
12      MR. FEEHERRY: Objection.
13 A. Hancock retained members of the real estate
14    operations department after the sale.
15 Q. How many employees were there within Daniel
16    Joyce's business unit?
17      MR. FEEHERRY: Objection.
18 A. There were less than 100 employees within the
19    group, the work unit that Joyce was in, which was
20    a subset of the real estate operations
21    department, which had a couple of hundred
22    employees.
23 Q. What were other subsets of the real estate
24    operations department?

Page 138

1  A. There was a purchasing department. There was a
2     disaster recovery department. There was a
3     duplication -- it was graphic -- what was that
4     called? It was an area that did printing and
5     graphics and things like that. There was a space
6     planning department.
7  Q. Do you recall whether in assessing whether Beacon
8     had offered a comparable job to Daniel Joyce you
9     or anyone at Hancock undertook any steps to
10    assess the makeup of Daniel Joyce's business
11    unit?
12      MR. FEEHERRY: Objection.
13 A. No, we did not attempt to assess the makeup of
14    Daniel Joyce's business unit.
15 Q. In that case, how could you assess whether there
16    was a sale or outsourcing of a business unit if
17    you didn't know which business unit he was in?
18      MR. FEEHERRY: Objection. You may
19    answer.
20 A. We referred to the language in the plan document
21    that talks about a work unit that provides
22    services to a successor company and that's in
23    effect what happened. These folks supplied
24    services to John Hancock when John Hancock was

Page 139

1  the landlord. When the buildings were purchased
2  by Beacon, those same services were provided by
3  those employees who accepted comparable jobs with
4  Beacon.
5  Q. Was Beacon required to provide those same
6     services to Hancock?
7       MR. FEEHERRY: Objection.
8  A. They were required to -- they were required to
9     supply property management services as landlord
10    of the building.
11 Q. But were they required to employ that business
12    unit that you say was outsourced to them --
13    strike that. Were they specifically required to
14    employ Daniel Joyce's business unit -- strike
15    that.
16      In your experience, has there ever been
17    an outsourcing of a business unit at Hancock?
18      MR. FEEHERRY: Objection.
19 A. There have been outsourcing of work groups at
20    John Hancock.
21 Q. Again, just so we're clear, is a work group
22    different than a business unit?
23 A. Work group is people who are performing services.
24 Q. Is a work group different than a business unit?

Page 140

1  A. It's --
2       MR. FEEHERRY: Objection.
3  A. A work group and a business unit are terms. They
4     essentially mean the same thing.
5  Q. So when I make reference to a "business unit" and
6     you make reference to a "work group," are we
7     talking about the same thing?
8       MR. FEEHERRY: Objection. I don't know
9  --
10 Q. Or can we have an un --
11 A. I don't know what you're talking about. I know
12    what I'm talking about.
13 Q. When I make reference to a "business unit," you
14    have just told me that you think a similar term
15    is a "work group."
16 A. Work unit.
17 Q. A work unit or a work group. So we'll have an
18    understanding for this deposition that a business
19    unit is the same as a work group, which is the
20    same as a work unit. Is that fair?
21      MR. FEEHERRY: Objection.
22 Q. From this point forward.
23 A. If you would define for me what you mean by
24    "business unit." You say it's the same as a work

Page 141

```
 1    unit. Do you define it in the same way I do as
 2    work unit, in terms of providing services
 3    previously performed?
 4  Q. Miss DiCicco, I'm referring to documents as we
 5    looked at before which come from Hancock for
 6    which you have read that don't --
 7        MR. FEEHERRY: Okay.
 8  Q. -- classify this --
 9        MR. FEEHERRY: That's not a question.
10    So --
11        MR. ROBBINS: No. Actually, it was
12    going to be a question.
13  Q. We've referred to documents --
14  A. Mm-hmm.
15  Q. -- that use the term "business unit."
16  A. Mm-hmm.
17  Q. Not a work group. Not a work unit. My question
18    is, is your understanding that a business unit is
19    the same as a work unit?
20        MR. FEEHERRY: Asked and answered.
21  A. I've already answered that.
22  Q. You can answer the question.
23  A. That for these purposes, my definition of a work
24    unit is that it's services provided of -- a work
```

Page 142

```
 1    unit is a group of people who perform similar
 2    services. If that is your definition of a
 3    business unit, we can agree to call it business
 4    unit.
 5  Q. Okay.
 6        MR. FEEHERRY: Why don't we take a
 7    two-minute break now? Okay?
 8        MR. ROBBINS: I really would like to
 9    finish this. Can we just --
10        MR. FEEHERRY: I can't imagine there is
11    anything that isn't finished about that.
12        MR. ROBBINS: Well, I think I have to
13    go back.
14        MR. FEEHERRY: Let's take a two-minute
15    break. Okay? I won't even talk to the witness.
16    I just think it's a good idea to take a
17    two-minute break. Okay?
18        MR. ROBBINS: Okay.
19        MR. FEEHERRY: Take a minute.
20        THE WITNESS: Thank you.
21        (Recess.)
22  Q. Miss DiCicco, if I could refer you back to
23    Exhibit 5.
24  A. Mm-hmm.
```

Page 143

```
 1  Q. Page JH 1112.
 2  A. Mm-hmm.
 3  Q. Is it true that the reason why you can't tell me
 4    what a business unit is is simply because you
 5    don't know?
 6  A. No. That's not true.
 7  Q. Then why is it that you can't tell me what
 8    business unit is?
 9  A. I prefer to use the term "work unit" but for the
10    sake of this, I will say that work unit and
11    business unit are synonymous.
12        MR. FEEHERRY: Now that was easy.
13  Q. In your experience, other than the case, the
14    circumstances surrounding the sale of the Tower
15    complex, has there ever been an outsourcing of a
16    business unit at Hancock?
17        MR. FEEHERRY: Objection.
18  A. John Hancock outsourced the -- a portion of the
19    IT function to IBM.
20  Q. Did John Hancock and IBM execute an outsourcing
21    contract --
22  A. I don't know.
23  Q. -- with respect to --
24  A. I'm sorry.
```

Page 144

```
 1  Q. With respect to that transaction?
 2  A. I don't know.
 3  Q. Are you aware if it's typical in such
 4    circumstances that Hancock execute an outsourcing
 5    contract?
 6        MR. FEEHERRY: Objection.
 7  A. I know that there have been outsourcing contracts
 8    executed.
 9  Q. Is it your understanding that it's typical when
10    Hancock does outsource employees that there is an
11    outsourcing contract?
12        MR. FEEHERRY: Objection.
13  A. I know that it has been done. I don't know if
14    it's typical.
15  Q. To the best of your knowledge, was there ever an
16    outsourcing of a business unit at Hancock for
17    which there was no outsourcing contract or
18    agreement executed?
19  A. I don't know.
20        MR. FEEHERRY: Objection.
21  Q. I'm sorry?
22  A. I don't know.
23        MR. FEEHERRY: You may answer.
24  Q. Okay. Did Beacon sign an agreement or contract
```

Page 157

1  Q. Would be conducting a competitive benefits
2     assessment in order to assess whether Beacon's
3     job offers were competitive? Were comparable?
4  A. I hate to do this but could you repeat it again?
5     Got interrupted.
6  Q. Do you specifically recall the substance of what
7     you communicated to the affected Hancock
8     associates regarding the competitive benefits
9     assessment analysis that the HR department would
10    be undertaking?
11 A. I indicated that the benefit experts in the human
12    resource department would be conducting a
13    competitive benefit analysis with the help of a
14    third party.
15 Q. And you have a specific recollection of that?
16 A. (Witness nods.)
17       MR. FEEHERRY: You have to say yes.
18 A. Yes. Yes, I do.
19       MR. ROBBINS: Could you read back her
20    answer for me, please?
21       (Answer read.)
22 Q. Who were the benefit experts in the human
23    resources department?
24 A. Peter Mongeau.

Page 158

1  Q. So when you say "benefit experts," does -- it in
2     fact was only one expert?
3  A. At the time that I made the statement, I didn't
4     know whether Peter would be doing the analysis by
5     himself or he would include people on his staff
6     who were also benefits specialists.
7       MR. ROBBINS: Could you please mark
8     this as Exhibit 10?
9       (5/21/03 memorandum marked Exhibit No.
10    10.)
11 Q. Miss DiCicco, are you familiar with the document
12    that's been placed before you and marked as
13    Exhibit 10?
14 A. I've seen it.
15 Q. What is it?
16 A. It's a memorandum from me -- I mean, to me from
17    Albert Solecki and Susan Digilio who were the
18    third-party folks that Beacon used to develop
19    their benefit program. And it's a description or
20    a listing of the proposed benefit program for
21    Beacon Partners. For Beacon.
22 Q. Are Albert Solecki and Susan Digilio lawyers at
23    Goodwin Procter?
24 A. That's what the letterhead says.

Page 159

1  Q. Did you, do you recall receiving a copy of this
2     document?
3  A. Yes.
4  Q. Do you recall why this was sent to you?
5  A. So that I could pass it along to Peter Mongeau.
6  Q. Any reason why it wasn't sent directly to Peter
7     Mongeau?
8  A. That's the way we had set up the communication
9     chain.
10 Q. Do you recall how it was sent to you?
11 A. No, I don't. I mean, I don't know whether it was
12    couriered or whether it was via regular mail.
13 Q. Did it come in the form of an E-mail, a fax?
14 A. I think it was hard copy. I don't recall.
15 Q. Okay. Do you recall what you did with Exhibit 10
16    upon your receipt of it?
17 A. I supplied it to Peter Mongeau, I believe.
18 Q. Did you review the document yourself before
19    providing it to Peter Mongeau?
20 A. I looked at it.
21 Q. Do you recall when you provided it to Peter
22    Mongeau?
23 A. Not exactly.
24 Q. Was it on the same day that you received the

Page 160

1     document?
2  A. I don't recall exactly. I mean, it would have
3     been very close to the time that I received it.
4  Q. When you provided what's been marked as Exhibit
5     10 to Peter Mongeau, how did you provide it to
6     him?
7  A. I don't recall exactly but I presume I hand
8     delivered it to him.
9  Q. Do you recall there being a discussion with Peter
10    Mongeau upon your delivery of this document to
11    him?
12 A. I don't recall a discussion.
13 Q. Do you recall submitting a memorandum to him of
14    the nature of your impressions of the document?
15 A. I don't recall.
16 Q. Okay. After passing this document that's been
17    marked as Exhibit 10 on to Peter Mongeau, did you
18    have any involvement whatsoever with this
19    document from that day forward?
20 A. I don't recall that I did.
21 Q. Do you recall what consideration, if any, was
22    given to the fact that the document lists
23    Beacon's proposed benefits and not actual
24    benefits?

Page 165

1 Q. Who was assigned with the responsibility of
2    confirming whether Mr. Mongeau's findings in
3    Exhibit 11 were accurate?
4 A. I don't know. I relied upon his expertise as the
5    benefit expert within John Hancock that his
6    findings were accurate.
7 Q. And just to clarify, though, I believe your
8    answer to my question is you don't know if there
9    was anyone who was assigned with the
10   responsibility of confirming whether Mr.
11   Mongeau's findings were accurate?
12 A. That's correct.
13 Q. Is that correct?
14 A. That's correct.
15 Q. His findings in Exhibit 11 ultimately determined
16   whether the Hancock employees would get severance
17   benefits, correct?
18 A. His findings were a portion of the three
19   components that were evaluated in the comparable
20   job definition.
21 Q. Prior to the drafting of what has been marked as
22   Exhibit 11, had it already been determined by the
23   guidelines committee that the other two elements
24   of the comparable job provision had been

Page 166

1    satisfied?
2 A. It was determined by two folks -- two people,
3    Sandi Colley and myself, within that guidelines
4    committee, if you will, that the salary, the
5    similar salary component and the location were
6    comparable.
7 Q. And had the two of you come to that conclusion
8    prior to Mr. Mongeau's drafting of Exhibit 11?
9 A. Yes.
10 Q. So when Mr. Mongeau drafted -- is it fair to say
11   drafted Exhibit 11, his findings were going to be
12   the ultimate determination as to whether Hancock
13   employees would get severance benefits, correct?
14      MR. FEEHERRY: Objection. You may
15   answer.
16 A. His findings were going to be the third component
17   that would make that determination separately and
18   in aggregate of whether or not those people were
19   offered comparable positions by Beacon.
20 Q. In your experience at Hancock, was this the first
21   time you were aware of a competitive benefits
22   assessment analysis being conducted with respect
23   to the comparable job provision?
24 A. Yes.

Page 167

1 Q. Are there any other documents you can refer me to
2    which state that the benefits selected for this
3    analysis under Exhibit 11 are recognized as the
4    benefits most important to employees?
5 A. I don't know of documents. Of such a document.
6 Q. Have you ever seen a competitive benefits
7    assessment analysis that only used the same
8    selected benefits as was selected for this
9    analysis under Exhibit 11?
10 A. This is the first benefit, competitive benefit
11   analysis I had ever seen.
12 Q. Did you or any member of the human resources
13   department conduct any research on the benefits
14   offered by property management companies in
15   Massachusetts?
16 A. I did not. I don't know what others did.
17 Q. But to the best of your knowledge -- I don't want
18   to put words in your mouth, but are you aware if
19   anyone else other than yourself ever conducted
20   research on the benefits offered by property
21   management companies in Massachusetts?
22 A. I don't know.
23 Q. Okay. Are you aware of anyone who conducted
24   research on benefits offered by property

Page 168

1    management companies anywhere, not just limited
2    to Massachusetts?
3 A. I don't know.
4 Q. Does this competitive benefits assessment
5    analysis, which has been marked as Exhibit 11,
6    contain any information on the benefits offered
7    to employees in the property management industry?
8      MR. FEEHERRY: Objection.
9 A. The sources are listed at the bottom.
10 Q. Are you familiar with those sources?
11 A. In general.
12 Q. Do those sources offer information on the
13   benefits offered to employees in the property
14   management industry?
15 A. I don't know. I would defer to Peter Mongeau on
16   this.
17 Q. Was it your understanding when you reviewed this
18   document that's been marked as Exhibit 11 that
19   the assessment did contain information on the
20   benefits offered to employees in the property
21   management industry?
22 A. It was my understanding that Hewitt had
23   information about benefits in the general
24   industry and within that information there were

Joyce Dep. Tr.

1                                          VOLUME: I

2                                          PAGES: 1-111

3                                          EXHIBITS: 1-16

4              UNITED STATES DISTRICT COURT

5           FOR THE DISTRICT OF MASSACHUSETTS

6    - - - - - - - - - - - - - - - - - - x

7    DANIEL JOYCE, Individually and on behalf

8    Of a class of others similarly situated,

9                          Plaintiff,    Civil Action

10     v.                          No. 05-11428-WGY

11   JOHN HANCOCK FINANCIAL SERVICES, INC.

12   SEVERANCE PAY PLAN and JOHN HANCOCK

13   FINANCIAL SERVICES, INC., as

14   Administrator and Fiduciary of the

15   John Hancock Financial Services, Inc.

16   Severance Pay Plan,

17                          Defendants.

18   - - - - - - - - - - - - - - - - - - x

19           DEPOSITION of DANIEL P. JOYCE

20             June 2, 2006, 9:33 a.m.

21                Todd & Weld, LLP

22                28 State Street

23             Boston, Massachusetts

24       Reporter: Michael D. O'Connor, RPR

Page 6

1    A.   I lived in East Bridgewater.
2    Q.   What was the address there?
3    A.   Memorial Drive.
4    Q.   How long did you live there?
5    A.   Approximately three years.
6    Q.   And prior to that?
7    A.   I lived at 131 Bay Avenue in Marshfield.
8    Q.   For how long that prior time?
9    A.   Approximately three years.
10   Q.   Are you married?
11   A.   No.
12   Q.   Have you ever been married?
13   A.   I have.
14   Q.   When and are you divorced?
15   A.   Approximately 24 years ago, and I am
16   divorced.
17   Q.   When did you get divorced?
18   A.   Approximately 22 years ago.
19   Q.   Any children?
20   A.   No.
21   Q.   Any dependents?
22   A.   No.
23   Q.   Briefly, what's your educational
24   background?

Page 7

1    A.   I have a Bachelor's degree in business
2    administration and an Associate's in the science of
3    HVAC.
4    Q.   Where did you get those again?
5    A.   Eastern Nazarene College, I received my
6    Bachelor's degree from, and Blue Hills Technical
7    Institute, now called Massasoit, I received my
8    Associate's degree.
9    Q.   When did you get the Bachelor's in business
10   administration?
11   A.   I finished that course in 1995.
12   Q.   And the HVAC technology course?
13   A.   1979.
14   Q.   So I understand, does the Associate's
15   degree count towards the Bachelor's degree; they
16   aren't two entirely separate degrees?
17   A.   It does count towards it; parts of it does.
18   Q.   Again, after graduation, from '79 forward,
19   have you had any postgraduate type of education or
20   certification programs that you participated in?
21   A.   I attended Wentworth for a little bit, I
22   attended Northeastern for night school, and I've
23   taken classes certified facility manager, real
24   estate property administrator; classes such as that.

Page 8

1    Q.   You indicate in your Answers to
2    Interrogatories that you're a certified facility
3    manager - International Facility Management
4    Association?
5    A.   Correct.
6    Q.   Could you tell me what that certification
7    is and when you received it?
8    A.   I received it approximately two years ago,
9    maybe three years ago now.
10   Q.   Were you still at John Hancock when you
11   received it?
12   A.   I believe I was, yes.
13   Q.   How did you get certified?
14   A.   It was a series of classes, courses, that
15   were given revolving around facility management
16   approximately -- actually, there were a series of
17   courses revolving around facility management with an
18   exam at the end.
19   Q.   Were these courses that you attended or
20   were these online?
21   A.   I attended them.
22   Q.   Where did you attend them?
23   A.   At a -- through IFMA.  I forget the
24   location.  It was in Boston.

Page 9

1    Q.   IFMA is the International Facility
2    Management Association, correct?
3    A.   Correct.
4    Q.   And so you took the test and passed the
5    test?
6    A.   Correct.
7    Q.   Have you maintained that certification
8    since you received it?
9    A.   I have not in the past few years, no.
10   Q.   But I think you indicated that you just got
11   it a couple of years ago?
12   A.   Right.  Two to three years ago.  I think I
13   was still at John Hancock then.
14   Q.   Do you still maintain that certification
15   now?
16   A.   It's due for renewal this year.
17   Q.   What do you have to do to renew it?
18   A.   You would have to take accreditations
19   towards it.
20   Q.   Have you taken any of those?
21   A.   No.
22   Q.   Do you intend to?
23   A.   I haven't decided yet.  I have been so busy
24   with work.

3 (Pages 6 to 9)

Page 10

1    Q.  Licensed construction supervisor,
2    Commonwealth of Massachusetts.  What licenses do you
3    hold and how did you obtain them?
4    A.  Approximately 20 years ago or so I took an
5    exam based on the Massachusetts Building Code, and
6    that exam, if you passed it, they provided the
7    license.  It's a construction supervisor license is
8    what they called it.
9    Q.  Have you maintained it since you received
10   it?
11   A.  I have.
12   Q.  Is there anything you have to do in order
13   to maintain it?
14   A.  Just pay the annual fee or biannual fee.
15   Q.  You also indicate you're a real property
16   administrator candidate, Building Owners and
17   Managers Institute.  Tell me about that?
18   A.  That, again, is a series of real estate
19   classes revolving around facility management and
20   real estate management, property management, that
21   qualifies you to receive the real property
22   administrator certificate.
23   Q.  You don't have that yet, though?
24   A.  I don't have the certificate.  I'm one

Page 11

1    class short.
2    Q.  Okay.  Is it your intention to get that?
3    A.  I haven't decided yet.
4    Q.  You also in your Answers to Interrogatories
5    indicate some seminars that you took.  Are there any
6    seminars that you've taken, say, since 1990 that are
7    particularly relevant to the work that you do now?
8    A.  Yes.  I've taken seminars on child water
9    plants, on water treatment systems.  I've taken them
10   on energy conservation and such.
11   Q.  Okay.  Briefly, from your graduation from
12   what's now Massasoit Community back in 1979 up to
13   the present, tell me your employment history?
14   A.  After graduating Blue Hills Technical
15   Institute, I went to work for Barber Colman in 1979.
16   Q.  What is that?
17   A.  That's a temperature control company,
18   automatic temperature controls.
19   Q.  What did you do for them?
20   A.  I was initially a service technician, and I
21   also did design work for them.
22   Q.  Where geographically did you do that work?
23   A.  They were based in Canton, Massachusetts,
24   and geographically New England.

Page 12

1    Q.  Michael is going to want you to spell the
2    name of the company you worked for?
3    A.  B-a-r-b-e-r, C-o-l-m-a-n.
4    Q.  How long did you work for that company?
5    A.  Approximately three and a half years.
6    Q.  Did your duties change over that time?
7    A.  On occasion they would change, sure.
8    Q.  Did you get any raises, any change in
9    title, for example?
10   A.  I believe I did get raises, sure.
11   Q.  Any change in title?
12   A.  I don't recall.
13   Q.  So would it be fair to say that that period
14   of time you were a service tech?
15   A.  A service tech, and I also did application
16   engineering.
17   Q.  Was this for commercial applications or
18   residential or both?
19   A.  Commercial.
20   Q.  Did you supervise other people while you
21   had that position, and if so, not the names of
22   people, but --
23   A.  No.
24   Q.  Okay.  After that three and a half years,

Page 13

1    where were you next employed?
2    A.  I went to work for a company called LEA
3    Engineers.
4    Q.  Located where?
5    A.  Boston.
6    Q.  What did you do there?
7    A.  It was an engineering/architectural firm,
8    and I worked as a construction supervisor.  I did a
9    little bit of design work, and I also did building
10   evaluations.
11   Q.  Can you be a little bit more specific when
12   you say building evaluation; was this HVAC system,
13   mechanical, structural or what?
14   A.  It was mainly mechanical.
15   Q.  When you say "mechanical," what do you
16   mean?
17   A.  I mean heating, air conditioning, plumbing;
18   things like that.
19   Q.  Do you recall any of the buildings that you
20   worked in and around the City of Boston?
21   A.  We worked at the little building down here
22   on Boston Common.  We worked and built and designed
23   and constructed the Stop & Shop department stores,
24   that entire chain, and Bradlee's department stores.

4 (Pages 10 to 13)

7b35f361-f4a7-11da-a265-444553540000

Page 18

```
 1   often able to roll those over.  Do you recall if you
 2   had --
 3       A.  I don't recall.
 4       Q.  Are there any books or records that you
 5   could go back and look at to determine whether you
 6   had a 401K while at Niles?
 7       A.  I'm not sure.
 8       Q.  What's the earliest that you can recall
 9   contributing to a 401K plan?
10       A.  The earliest is probably at John Hancock.
11       Q.  Did you have a pension at Niles?
12       A.  No, no pension.
13       Q.  In 1994 you came to work at John Hancock?
14       A.  That's right.
15       Q.  How did that come about?
16           MR. ROBBINS:  Objection.  You can answer.
17       Q.  Let me try it another way.  Why did you
18   leave Niles and why did you come to John Hancock?
19       A.  I was trying to build a career in real
20   estate, and I wanted to go to work for a company, a
21   large corporation, that had good benefits.  I
22   admired the John Hancock building.  I could see it
23   from the building I worked at, and when I saw the ad
24   in the paper, I applied.
```

Page 19

```
 1       Q.  Do you recall who interviewed you?
 2       A.  I do.  I got phone interviewed first from a
 3   woman named, I think, Maureen Castaldi.
 4       Q.  And you eventually came to work at John
 5   Hancock?
 6       A.  Yes.
 7       Q.  From 1994 to 2003, can you tell me what
 8   your different titles were at John Hancock?
 9       A.  I started out as an operations coordinator,
10   and later my title changed to project manager.
11       Q.  Do you recall about when?
12       A.  It was about the year 2000.  Later on I
13   became a senior project manager, maybe two years
14   later.
15       Q.  Those three positions, real estate
16   operations coordinator, project manager and senior
17   project manager, in broad brush, can you explain
18   what your duties and responsibilities were in each
19   of those positions?
20       A.  They were progressive responsibilities
21   typically.  As a real estate operations coordinator,
22   I coordinated work between the building trade shops
23   and what needed to be done around the facility.  I
24   coordinated their group activities.
```

Page 20

```
 1       Q.  What trades?
 2       A.  HVAC, plumbing, electrical, electronics
 3   shop, paint shop, lock shop, whatever needed to be
 4   done, to facilitate work around the facility.
 5       Q.  Who gave you the work that had to be done?
 6       A.  Typically my supervisor.
 7       Q.  Who was that?
 8       A.  His name was Jim Bell.  Sometimes the work
 9   was generated either through our work order system,
10   service calls came in, projects were developed
11   through our space planning and design group, and
12   also I took it upon myself to find work if I needed
13   to.
14       Q.  When you did this work, did you do it for
15   John Hancock, as a tenant in the building, or for
16   other tenants in the Hancock tower?
17       A.  For both.
18       Q.  Did you ever do any design construction
19   work for tenants other than John Hancock?
20       A.  At the time I started out, it was minor at
21   first, and I did some work for other tenants as
22   well.
23       Q.  Give me a couple of the tenants you did
24   work for?
```

Page 21

```
 1       A.  Hill Holliday.
 2       Q.  What sort of work did you do for Hill
 3   Holliday?
 4       A.  If they had problems with their heating or
 5   cooling or they had a problem with an ice machine or
 6   some sort of problem, I would take a look at it on
 7   occasion.
 8       Q.  But, for example, any design/build,
 9   anything along those lines for a tenant, other than
10   John Hancock?
11       A.  Not specifically.
12       Q.  Did you ever coordinate the work of other
13   subcontractors who had been hired to do work, for
14   example, for Hill Holliday?
15       A.  No.
16       Q.  Have you told me everything you did as an
17   operations coordinator?
18       A.  I'm not sure I've told you everything, but
19   as much as I can think of at the moment.
20       Q.  Okay.  If you think of something else, just
21   tell me about it later.  Project manager, how did
22   your duties change in approximately 2000 when your
23   title changed?
24       A.  Well, as time went on at John Hancock, and
```

Page 26

1  facades. He worked on some plumbing and fire
2  protection systems, and things like that.
3      Q.  And Mr. Wright?
4      A.  Mr. Wright worked on fire protection
5  systems, fire alarm systems, mostly electrical or
6  electronic in nature.
7      Q.  How about Bill Moran?
8      A.  Bill Moran worked more for tenants, and he
9  also worked on base building infrastructure problems
10  as well.
11      Q.  When you say "base building
12  infrastructure," what do you mean?
13      A.  Larger projects that related to elevator
14  systems or we put in a front plaza, and he worked
15  doing projects like that.
16      Q.  During this last period of time, did you
17  ever manage other contractors or subcontractors
18  outside of John Hancock?
19      A.  I did.
20      Q.  Can you give me some examples?
21      A.  I managed the landscaping company,
22  Tru-Green, also Schumacher. They were the
23  landscaping companies we used. I managed Blouin
24  Sheet Metal. They did a lot of repairs around the

Page 27

1  complex. I managed Carrier Air Conditioning. They
2  did work on our chillers. I managed the pest
3  control company, Waltham Chemical. They managed our
4  rodent control and pest control.
5      Q.  How about the other managers, from time to
6  time did they manage contractors?
7      A.  Yes.
8      Q.  During this last period of time as senior
9  project manager, once again, did you do work for
10  tenants other than John Hancock in the building?
11      A.  I did on occasion, but not as frequently as
12  other people.
13      Q.  Have you ever been involved in a lawsuit
14  before?
15      A.  I have.
16      Q.  Can you tell me when?
17      A.  Approximately 20 years ago or so I was
18  involved in a car accident.
19      Q.  Okay. You brought a lawsuit on your own
20  behalf?
21      A.  I did, yes. I was injured in the accident.
22  I hurt my leg. I pulled a muscle and tore a muscle,
23  and that's how it happened.
24      Q.  Have you ever been involved in any other

Page 28

1  lawsuits?
2      A.  Another one around the year -- the late
3  '90s, I believe, and it had to do with a contractor
4  that I provided egress through my property to put in
5  a sewer line, and when he did so, he called all of
6  my trees; my apple tree, my pair tree, shrubs, and
7  so on, and so forth. So that was also generated
8  towards him.
9      Q.  Any other litigation that you've ever been
10  involved in?
11      A.  Not that I recall.
12      Q.  Any sort of litigation associated with
13  employment?
14      A.  In what sense?
15      Q.  A lawsuit associated with your leaving a
16  company, for example?
17      A.  No.
18      Q.  Have you ever been deposed before today?
19      A.  Yes.
20      Q.  On how many occasions?
21      A.  Twice that I can think of.
22      Q.  What were those?
23      A.  Those same occasions.
24      Q.  Take a couple of minutes more in terms of

Page 29

1  the reporting structure. You told me about John
2  Durnan. Do you know who Mr. Durnan reported to?
3      A.  I do.
4      Q.  Who was that?
5      A.  Paul Crowley.
6          MR. ROBBINS:  Just to clarify, what period
7  of time are we talking about?
8          MR. FEEHERRY:  During that period of time
9  that he was senior project manager.
10      Q.  Do you know who Mr. Crowley reported to?
11      A.  I believe Paul reported to Tom Moloney.
12      Q.  In terms of your job, I think you indicated
13  that project managers didn't report to you in terms
14  of an organizational structure during this period
15  that you were a senior project manager. Did any
16  specific individuals report directly to you?
17      A.  No, not in a fashion of doing annual
18  reviews or anything like that. I had trades people
19  report to me for projects, and things like that.
20      Q.  So if there were a special project to do,
21  you might be supervising an electrician and some
22  HVAC techs and some other people, correct?
23      A.  Correct.
24      Q.  But two weeks later, you might be

8 (Pages 26 to 29)

Page 30

1  supervising somebody else for a different project;
2  is that fair to say?
3      A.  Yes.
4      Q.  So was there ever a period of time when you
5  were project manager or senior project manager that
6  people reported to you in that sense of doing annual
7  reports, annual reviews, and things of that sort?
8      A.  Could you rephrase that again or state that
9  again.
10     Q.  Did you ever have supervisory
11 responsibility, day to day, for any individuals,
12 literally in terms of hiring, firing, preparing
13 annual reviews of employees, and the like?
14     A.  No.
15     Q.  Were you paid on an hourly basis or
16 salaried?
17     A.  Salary, with -- it was salary, but on
18 occasion we did receive overtime or time off for
19 time worked.
20     Q.  Can you explain that to me?  Did you have
21 an hourly rate?  Did you punch in a time clock, for
22 example?
23     A.  No time clock.
24     Q.  How did someone know to give you

Page 31

1  "overtime," if you will?
2      A.  Just on certain occasions, you either got
3  time off or on occasion you would get overtime.
4      Q.  Was there ever a period of time while you
5  were employed at John Hancock that you were paid on
6  an hourly basis where you were punching in a clock?
7      A.  No.
8      Q.  How did your salary change in the last five
9  years at John Hancock, if you recall?  Did you get
10 regular raises, and if so, when?
11     A.  I received regular raises, and it was
12 typically around the first of the year.  I had
13 received bonuses on occasion as well.
14     Q.  Okay.  Do you recall whether you received a
15 raise on approximately the first of the year in the
16 last year you worked for John Hancock?
17     A.  I believe so.
18     Q.  Do you recall what that raise was?
19     A.  I don't.  Typically it was around three to
20 four percent.
21     Q.  And you have no reason to believe that it
22 wasn't a typical raise that last January before you
23 ceased being employed by John Hancock?  We could
24 look it up, but I'm just testing your memory.

Page 32

1      A.  I don't recall exactly when I was made
2  senior project manager.  What I do recall is when I
3  was made senior project manager, I might have gotten
4  a bump up, and that was part of the reasoning for
5  the difference between project manager and senior
6  project manager.  I was taking on more
7  responsibilities and the projects were more fruitful
8  and they were saving money for the company, and so
9  on.
10     Q.  Where were you next employed after John
11 Hancock?
12     A.  Beacon Capital Partners Management.
13     Q.  BCPM.  When did you start working for
14 Beacon?
15     A.  I believe employed by Beacon in July of
16 2003; July 14th, I believe.
17     Q.  What was your initial title at Beacon?
18     A.  Well, the offer letter said project
19 manager, but my title was director soon after that.
20     Q.  Do you recall whether you ever had a title
21 of senior project manager?
22     A.  No, I never did.
23     Q.  So what's your title today with Beacon?
24     A.  I actually have no title today with Beacon.

Page 33

1  I'm in between jobs.
2      Q.  When did you leave Beacon?
3      A.  Today is my last day or yesterday actually.
4      Q.  Okay.  Tell me about that?
5      A.  Well, it just happened.  I gave my notice
6  two weeks ago, and I will be leaving Beacon.  I've
7  actually officially left Beacon.
8      Q.  When did you give your notice?
9      A.  About two weeks ago.
10     Q.  So you worked for Beacon for about three
11 years, correct?
12     A.  That's correct.
13     Q.  And the title that you had while at Beacon
14 was director?
15     A.  It was first director, and then it was
16 director of engineering and construction, and then
17 it was changed to manager of engineering/
18 construction.
19     Q.  I missed the last one?
20     A.  Manager of engineering/construction.
21     Q.  Where did you work for Beacon?
22     A.  We were based out of 200 Clarendon Street.
23     Q.  After when you went to Beacon, it was in
24 connection with the purchase by Beacon, by Beacon's

Daniel P. Joyce                                                                    6/2/06

Page 34

1   parent, of the John Hancock tower complex, correct?
2       MR. ROBBINS:  Objection.
3       A.  Could you state that again.
4       Q.  Well, at some point one of Beacon's
5   entities purchased the John Hancock tower complex,
6   correct?
7       A.  Correct.
8       Q.  And after that, in July of 2003, you became
9   an employee of BCPM, correct?
10      A.  Correct.
11      Q.  But you kept working at the tower complex,
12  correct?
13      A.  That's correct.
14      Q.  And in the three years that you worked for
15  Beacon, what buildings did you work on?
16      A.  200 Clarendon Street, 200 Berkeley Street,
17  197 Clarendon Street and 100 Clarendon Street.
18      Q.  Four of the same buildings that you had
19  worked on while employed at John Hancock?
20      A.  Correct, except for a few others that John
21  Hancock still owns, correct.
22      Q.  You didn't work for those any more?
23      A.  Correct.
24      Q.  Did you work in any other buildings while

Page 35

1   employed by Beacon?
2       A.  No.
3       Q.  How did your duties change when you came
4   over to Beacon?
5       A.  Well, initially, as director, I had some of
6   the trade shops reporting to me.  So I had, you
7   could say, supervisory responsibility for 27 people,
8   something like that.
9       Q.  And in what trade or in what shop?
10      A.  Primarily mechanical, HVAC, plumbing.
11      Q.  Were some of these people previously
12  employed by John Hancock?
13      A.  Correct.
14      Q.  Were all of them people who had been
15  employed previously by John Hancock?
16      A.  Initially.  Many Hancock employees had left
17  Beacon and many new employees have come to work for
18  Beacon.
19      Q.  But initially, the people you were
20  supervising were, like yourself, former John Hancock
21  employees, correct?
22      A.  Correct.
23      Q.  Now, I asked you if your duties changed,
24  and I think you've explained that in terms of

Page 36

1   supervising people?
2       A.  Correct.
3       Q.  Did your duties change in terms of what you
4   did day to day from that day in July when you were
5   working at John Hancock to the Monday in July when
6   you started working at Beacon?
7       A.  For the most part there were less projects
8   to do.  I became a project manager to a people
9   manager, and although there were other initiatives
10  and projects being discussed and some were being
11  performed, there were less larger projects to be
12  done.
13      Q.  Could you give me some examples of the
14  projects that used to get done that you worked on in
15  the two or three years prior to the end of your
16  employment at John Hancock that weren't then being
17  undertaken by Beacon?
18      A.  We put in new chillers on the 61st floor,
19  400-ton carrier chillers.  That was one project I
20  did.  We put in side stream water filtration systems
21  for our coolant towers.  We put in high-efficiency
22  frequency drives for our large 250 horsepower fans.
23      Q.  Once you came over to Beacon, that sort of
24  work you didn't do?

Page 37

1       A.  Correct, not initially.
2       Q.  With respect to the buildings that you
3   worked on, 200 Clarendon, 200 Berkeley, 197
4   Clarendon and 100 Clarendon, did John Hancock remain
5   as a tenant in some or all of those buildings?
6       A.  Yes.
7       Q.  In all of the buildings, correct?
8       A.  Yes.  The 100 Clarendon Street building is
9   actually a parking garage.  If you want to consider
10  they rented spaces, yes.
11      Q.  In all of the other buildings they
12  maintained office space as a tenant after the
13  building was sold, correct?
14      A.  Correct.
15      Q.  Did you do any work for John Hancock as
16  tenant after you went to Beacon?
17      A.  On occasion.
18      Q.  Give me some examples?
19      A.  Later on my title changed again, and when I
20  wasn't managing the group of people, I managed
21  construction projects, and I became, say, an owner's
22  rep during construction projects, of which Hancock
23  was doing the construction projects.
24          So I would work with Hancock's project

10 (Pages 34 to 37)

7b35f361-f4a7-11da-a265-444553540000

Daniel P. Joyce                                                                6/2/06

| Page 38 | Page 40 |
|---|---|
| 1  manager, Bill Moran, and other project managers on | 1       Q.   But certainly the rest of the |
| 2  projects. | 2  infrastructure for the building you were familiar |
| 3       Q.   Can you give me an example of one of those | 3  with and developed expertise during the period of |
| 4  projects? | 4  time that you worked for John Hancock, correct? |
| 5       A.   57th floor, Convexity is the tenant, and | 5           MR. ROBBINS:  Objection.  You can answer. |
| 6  Hancock was actually their landlord and our | 6       A.   True. |
| 7  subtenant -- our tenant and subtenant.  You know | 7       Q.   And you carried that expertise over to |
| 8  what I mean. | 8  Beacon when you came to work for them for the |
| 9       Q.   What was the project? | 9  approximately three years that you've worked for |
| 10      A.   It was a tenant improvement project. | 10  them, correct? |
| 11  Hancock moved out of the space, and they found a | 11      A.   Correct. |
| 12  tenant, so they demolished the space, and the tenant | 12      Q.   Which of the other building managers came |
| 13  built it out. | 13  over to Beacon, those three.  You mentioned Bill |
| 14      Q.   When you say the tenant built it out, what | 14  Moran.  How about Mr. Tellier and Mr. Wright? |
| 15  was your role, what was Mr. Moran's role, and were | 15          MR. ROBBINS:  Objection.  You can answer. |
| 16  there other contractors or subcontractors? | 16      A.   Mr. Tellier was severed in 2002 while he |
| 17          MR. ROBBINS:  Objection.  You can answer. | 17  worked for John Hancock, and Mr. Wright came over to |
| 18      A.   My role was primarily engineering support | 18  Beacon in 2003 with me, and he was let go as well. |
| 19  for their engineers that came in, their architects | 19      Q.   Do you know when? |
| 20  to make them familiar with the building, and a lot | 20      A.   I believe it was 2004. |
| 21  of the different systems that they need to connect | 21      Q.   Can you tell me anything more about your |
| 22  to, to interact with, things like that.  I also | 22  thinking, your decision-making, in terms of giving |
| 23  attended weekly meetings to watch over the project | 23  your notice at Beacon and what you're going to do |
| 24  and make sure they were building the project to the | 24  next? |

| Page 39 | Page 41 |
|---|---|
| 1  building specs, the building standard specs, to make | 1       A.   Yes.  I was in search to enhance my career |
| 2  sure they were keeping a safe environment, things | 2  to go from property management back to corporate |
| 3  like that. | 3  real estate, and I was looking for a company with |
| 4       Q.   And it's fair to say during the period of | 4  better benefits and long-term views on real estate |
| 5  time that you worked at the -- well, let's break it | 5  management and more security.  So I looked around |
| 6  up in two sections -- that you worked at the tower | 6  and found another job. |
| 7  complex for John Hancock, you became something of an | 7       Q.   With whom? |
| 8  expert in terms of understanding the systems for the | 8       A.   Liberty Mutual. |
| 9  tower complex buildings; is that fair to say? | 9       Q.   When did you start with Liberty Mutual? |
| 10      A.   Sure. | 10      A.   Next week. |
| 11      Q.   You developed expertise for the HVAC system | 11      Q.   What's your title? |
| 12  and for the electrical system, for plumbing, and a | 12      A.   Project manager. |
| 13  variety of the other mechanical systems that run | 13      Q.   Where are you going to work geographically, |
| 14  that building, correct? | 14  physically? |
| 15      A.   Correct. | 15      A.   Boston, New England, and perhaps throughout |
| 16      Q.   Taking the tower, for example, it's a | 16  the country. |
| 17  relatively sophisticated structure, correct? | 17      Q.   What's your salary? |
| 18      A.   Correct. | 18      A.   $94,000. |
| 19      Q.   With dampers to reduce building sway, | 19      Q.   How does that compare with your salary at |
| 20  correct? | 20  Beacon? |
| 21      A.   Correct. | 21      A.   It's better. |
| 22      Q.   Did you ever have occasion to work on those | 22      Q.   Do you know what your salary was at Beacon |
| 23  dampers? | 23  before you came over to Liberty Mutual? |
| 24      A.   Not physically.  But to -- not physically. | 24      A.   Approximately $82,000, plus bonus. |

11 (Pages 38 to 41)

Page 42

1    Q.  So you had a base salary of $82,000, plus a
2 bonus opportunity?
3    A.  Correct.
4    Q.  Last year what was your bonus?
5    A.  The last review, I received the maximum
6 bonus of ten percent.
7    Q.  So you were at a total comp of about
8 $90,000, correct?
9    A.  A little bit more than that, because I
10 received a raise as well.
11    Q.  What was your raise?
12    A.  It was, I think, four percent.  So I was
13 probably at $92,000, something, around that.
14    Q.  So now you're going to start at Liberty
15 Mutual at a little bit more?
16    A.  Yes.
17    Q.  Do you have a bonus opportunity at Liberty
18 Mutual?
19    A.  I do.
20    Q.  Did you look for any employment at the time
21 you left John Hancock?
22       MR. ROBBINS:  Objection.
23    A.  Not initially.
24    Q.  Well, in the six months before you started

Page 43

1 at Beacon and in the six months after you started at
2 Beacon, did you look for other employment?
3    A.  I don't recall.
4    Q.  When do you recall first looking for
5 employment other than at John Hancock?
6       MR. ROBBINS:  Objection.  You can answer.
7    A.  I started looking -- maybe being interested
8 in working elsewhere after working for Beacon
9 approximately six months.
10    Q.  Okay.  Where did you look?
11    A.  Just in the paper and online, things like
12 that.
13    Q.  Did you interview anywhere?
14    A.  No.
15    Q.  Did you apply anywhere?
16    A.  I did apply, and I did get some calls back,
17 but I wasn't interested.
18    Q.  Where did you apply and where did you get
19 your calls back?
20    A.  I applied at one of the hospitals, and I
21 forget which one, maybe Beth Israel.  I applied for
22 a real estate developer on the South Shore, and I
23 don't recall their name.  I applied at the Town of
24 Norwell as well.

Page 44

1    Q.  But you got no callbacks or you didn't have
2 any interviews for any of those?
3    A.  I did get a couple of calls to schedule
4 interviews, but I decided, after discussing the job
5 with them, I decided I wasn't interested.
6    Q.  Okay.  But in connection with the six
7 months before you went over to Beacon and up to that
8 six-month period of time that you were at Beacon,
9 you didn't look for any other employment?
10    A.  No.  I was too busy working.
11    Q.  What additional benefits will you be
12 getting at Liberty Mutual that you don't have at
13 Beacon?
14    A.  They have a pension plan.  They have a
15 better 401K.
16    Q.  Better how?
17    A.  A higher match.
18    Q.  Do you recall how much higher?
19    A.  They say in the offer letter 70 cents on
20 the dollar up, I think up limited, up to your
21 maximum a month.  They also have a severance plan.
22 They have four weeks' vacation, which is more than I
23 get now.  That's about it, that I can recall.
24    Q.  Okay.  Did you ever reapply for a job at

Page 45

1 John Hancock?
2    A.  No.
3    Q.  Do you recall whether you got a raise when
4 you joined Beacon from your last base salary at John
5 Hancock?
6    A.  Actually, we got a raise, a payment from
7 John Hancock after we joined Beacon from Hancock if
8 we signed the offer letters.
9    Q.  Of $1,000?
10    A.  Yes.
11    Q.  I'm more interested in your compensation
12 from Beacon?
13    A.  At Beacon?
14    Q.  Right.  Was that higher than your last base
15 salary sat John Hancock?
16    A.  Oh, okay.  I understand.  The new salary at
17 Beacon was a little bit higher than Hancock.
18    Q.  How much higher?
19    A.  It was less than $1,000.  It might have
20 been a few hundred dollars.  I'm not sure.
21    Q.  Do you recall how much?
22    A.  I don't recall exactly.
23    Q.  Do you recall that you were hired initially
24 with a base salary of $75,100 per year at Beacon?

12 (Pages 42 to 45)

**Page 46**

1  A. That sounds familiar, yes.
2  Q. Do you recall what your last base salary
3  was at John Hancock after that raise in the first of
4  the year of 2003?
5  A. I don't recall exactly.
6  Q. Had the benefits changed at Beacon from the
7  time that you joined Beacon to the date of your
8  departure from Beacon?
9  A. Yes, they have changed. We get supplements
10  on changes, but they have been mostly minor, I
11  believe.
12  Q. Do you recall what they have been?
13  A. Not exactly, no.
14  Q. Do you recall in what categories the
15  benefits have changed?
16  A. No.
17  Q. During the period of time you were employed
18  by Beacon, you gave me different titles you had over
19  that period of time, but did your duties change in
20  any material way over the three years that you have
21  been at Beacon?
22  A. They have changed.
23  Q. How so?
24  A. Well, initially I mentioned I was more

**Page 47**

1  people manager. I had people reporting to me. They
2  restructured their group, and they added more
3  management. So I performed different duties. I
4  reported to five different people over the last
5  almost three years now. So I had different duties,
6  depending on what their agenda was.
7  Q. But in terms of the day-to-day work, the
8  work was at the tower complex, correct?
9  A. True.
10  Q. And the focus of the work was the HVAC
11  system and the mechanical systems at the building?
12  A. Engineering, construction. Sometimes the
13  building systems, sometimes construction, tenants;
14  things like that.
15  Q. And although people came and went and
16  supervisors came and went, the day-to-day work that
17  you did was pretty much what you did in the last few
18  years at John Hancock, correct?
19  MR. ROBBINS: Objection. You can answer.
20  A. I wouldn't agree with you in that sense,
21  because I think managing projects is a lot different
22  than managing 30 people.
23  Q. I will go along with you.
24  A. Okay.

**Page 48**

1  Q. Leaving that issue aside of the managing of
2  people, the day-to-day things that were being done
3  in terms of the overall management of the building,
4  other than maybe some large projects, fewer large
5  projects, was the work essentially the same?
6  A. Except for the tenant work. I performed in
7  the last year more tenant work than I did at John
8  Hancock.
9  Q. And that's, in part, because John Hancock
10  has been reducing its presence in the tower and
11  other tenants are coming in, correct?
12  A. Correct, because there's new construction.
13  Q. And to some degree, you also continued to
14  provide, at least on some occasion, some work for
15  John Hancock as a tenant in the building, correct?
16  MR. ROBBINS: Objection.
17  A. Correct.
18  Q. Did you provide work for John Hancock,
19  other than in the tower itself, during the period of
20  time that you were at Beacon?
21  A. Yes.
22  Q. Can you characterize that work; what was it
23  about?
24  A. Hancock often reshuffles their space and

**Page 49**

1  renovates the space. So as a landlord, I provided
2  the services of owner's representative on
3  construction projects, with the same issues and the
4  same exercises involved.
5  Q. Did you ever supervise any Hancock
6  employees after you became a Beacon employee?
7  A. No, I wouldn't call it supervision, no.
8  MR. ROBBINS: Could we take a two-minute
9  break?
10  MR. FEEHERRY: Sure.
11  (Recess)
12  BY MR. FEEHERRY:
13  Q. I took a look at some records, and it
14  appears to me your last base salary at John Hancock
15  was $74,358.44. Does that sound right to you?
16  A. Yes.
17  Q. That would have been as of April of 2003?
18  A. Okay.
19  Q. Just so I'm sure that I understand, how
20  many hours were expected of you at John Hancock?
21  A. 37 and a half.
22  Q. And at Beacon, how many hours were expected
23  of you?
24  A. 37 and a half.

13 (Pages 46 to 49)

Page 50

1    Q.  And at John Hancock, were you entitled to
2   either compensatory time or overtime if you were
3   over 37 and a half?
4    A.  I believe the way they did it was if you
5   worked over 40, they gave you compensatory time.
6    Q.  Was that different when you came over to
7   Beacon?
8    A.  Yes.  I've never received any comp time.
9    Q.  I'm simply saying was the policy different?
10    A.  I don't recall.  I know we didn't get
11   overtime at Beacon, and we got some overtime at
12   Hancock.
13    Q.  Did you work overtime at Beacon?
14    A.  Yes.
15    MR. FEEHERRY:  Let's mark as the first
16   exhibit the first amended complaint that you have in
17   this case.
18    (Document marked as Exhibit 1
19    for identification)
20    MR. FEEHERRY:  As the second exhibit, your
21   offer letter.
22    (Document marked as Exhibit 2
23    for identification)
24    Q.  As best you can recall, when did you first

Page 51

1   hear that the Hancock tower complex was up for sale
2   or likely to be sold, just in terms of understanding
3   a chronology; what was the first inkling you had of
4   that potential development?
5    A.  The fall of 2002.
6    Q.  How did you learn?
7    A.  I don't recall.
8    Q.  Did you get some communications from people
9   at John Hancock?
10    A.  Yes.
11    Q.  Written communications?
12    A.  There were some written communications, I
13   believe, in October of '02.
14    Q.  Again, I'm testing your memory.  What do
15   you recall receiving?
16    A.  I don't recall.
17    Q.  But at least by the fall of 2002, you had
18   an idea that maybe the tower complex was going to be
19   sold, correct?
20    A.  There had been talk for years as well, yes.
21    Q.  But by the fall of 2002, you started
22   believing the talk, correct?
23    A.  Correct.
24    Q.  Because there were communications from John

Page 52

1   Hancock to the effect that there was this potential
2   of the sale, both of the company and the sale of the
3   building?
4    A.  If you say so.
5    Q.  Well, do you recall?
6    A.  I don't recall exactly if there were
7   written communications then.  I just recall
8   believing that maybe the time has come, and I heard
9   the company might be sold.  So I heard a lot of
10   things.
11    Q.  Well, do you recall, I think you said, in
12   October of 2002 seeing or receiving something; do
13   you recall what you were referring to?
14    A.  Not exactly.
15    Q.  From that first inkling that the tower
16   complex would be sold, just again, so I've got a
17   chronology, up to the date of your offer letter, how
18   did your information about the potential sale of the
19   building to someone, and eventually the sale of the
20   building to Beacon, how did your knowledge about
21   that set of circumstances change from the fall of
22   2002 up until May of 2003, May 5?
23    MR. ROBBINS:  Objection.  You can answer.
24    A.  Well, I started believing they were selling

Page 53

1   the property when we started touring with different
2   investors.
3    Q.  That sure gave you some indication?
4    A.  That will do it, yes.
5    Q.  Do you recall some of the investors that
6   you toured with?
7    A.  Beacon Capital, Tischman Spire, Equity.
8    Q.  What role did you have in terms of taking
9   these people around the building?
10    A.  That's just it.  I took them around and
11   showed them the mechanical plants, showed them some
12   tenant spaces; things like that.
13    Q.  Who else came to those walk-throughs?
14    A.  We divvied up the walk-throughs.  There
15   were numerous walk-throughs, multiple walk-throughs
16   with the same investor, and myself, Mr. Durnan,
17   perhaps Mr. Crowley, performed these walk-throughs,
18   as well as other people.
19    Q.  What was your role in connection with the
20   walk-throughs?
21    A.  Oftentimes I teamed up with their
22   mechanical people, and we looked at some of the same
23   things together.
24    Q.  So you brought to bear your expertise with

14 (Pages 50 to 53)

Page 54

1  regard to the mechanical systems of the building,
2  and passed on that information to protective
3  purchasers about the building; is that fair to say?
4      A.  Yes.
5      Q.  You would tell them about mechanical, you
6  would tell them about HVAC and the electric, and
7  some of the things that were unique about the tower
8  complex, correct?
9          MR. ROBBINS:  Objection.  You can answer.
10     A.  Unique or not unique, but just different
11  issues regarding different items, different building
12  systems, yes.
13     Q.  You told them about the commonplace and you
14  told them about the things that were unique as well?
15     A.  Right.
16     Q.  By way of category, can you tell me about
17  some of the things that are unique?  You had a fair
18  amount of experience in managing other buildings.
19  What about the Hancock tower complex would you
20  characterize as unique in terms of the mechanical
21  systems there?
22     A.  Well, in the tower itself, there are
23  chiller plants that serve 34 floors, more or less,
24  and that's sometimes unique.  We also have a central

Page 55

1  control center that watches all different aspects of
2  temperature and flow and different mechanical and
3  electrical aspects of the buildings.
4      Q.  Can you think of any others?
5      A.  The damper, of course.
6      Q.  And the damper, that is a system that is
7  intended to minimize the movement of the building?
8      A.  That's correct.
9      Q.  Anything else that you can think of?
10     A.  Just the logistical layout of the building
11  systems, and that's a challenge sometimes as well,
12  because of the size and capacity of some of these
13  systems.
14     Q.  Also the shape of the building, I take it,
15  there are some unique aspects of where in a
16  mechanical sense some things go, correct?
17     A.  Not really.
18     Q.  How about issues that have to do with
19  movement of the building itself, joints in the
20  building, things of that sort, did you have any
21  responsibility for understanding some of those
22  issues?
23     A.  No.
24     Q.  In addition, you mentioned that you started

Page 56

1  doing some walk-throughs with people.  How after
2  that did your information up through May change so
3  that you became more knowledgeable about the fact
4  that the building was going to be sold?
5      A.  At that point they were advertising.  There
6  were press releases about the sale of the building.
7      Q.  Do you recall when you saw those?
8      A.  They began the late fall of '02, I believe,
9  or early '03.
10     Q.  Nevertheless, you didn't start looking for
11  work somewhere else at that period of time?
12     A.  Correct.
13     Q.  Do you recall folks from Hancock
14  communicating that Hancock would favor in some way a
15  purchaser of the tower complex who agreed to hire
16  Hancock employees in connection with the subsequent
17  management of the building?
18     A.  I did hear that once.
19     Q.  From who and under what circumstances?
20     A.  I believe it was in a -- not in an internet
21  -- either an internal release or on the internet or
22  something like that.
23     Q.  And the internal release would be the hub,
24  if you will?

Page 57

1      A.  Correct.  It's an intranet.  I think they
2  called it the hub.  It's been a few years.
3      Q.  That was the way John Hancock management
4  could communicate with John Hancock employees,
5  correct?
6      A.  Some employees, correct.
7      Q.  Did you have access to the hub?
8      A.  I did.  Some people didn't, but I did.
9      Q.  Let's take a look at the offer letter and
10  make sure I understand it.  Your offer letter
11  indicates that you were going to get the title of
12  project manager, correct?
13     A.  Correct.
14     Q.  The base salary was a slight increase from
15  your prior salary at John Hancock, I think you
16  conceded, correct?
17     A.  Correct.
18     Q.  Did the terms of getting paid biweekly
19  change at all in terms of your prior employment at
20  John Hancock?
21     A.  Not that I recall.
22     Q.  The bonus opportunity of up to ten percent
23  of your base salary, was that the same or different
24  from John Hancock?

Boston Reporting Associates

Page 58

1    A.  I'm not sure if John Hancock had a standard
2  fixed or an upset limit on bonus opportunities.
3    Q.  Do you recall what your last bonus was with
4  John Hancock?
5    A.  I don't.
6    Q.  Do you recall if it was five percent or ten
7  percent or $5,000 or $10,000?
8    A.  I honestly don't recall.
9    Q.  Do you recall what your first bonus was at
10 Beacon?
11   A.  Percentage wise, it was, I believe, three,
12 four percent, something like that.
13   Q.  But that was for a portion of the year,
14 correct?  I'm asking about your bonus.
15   A.  Yes, I understand what you're saying.  It
16 was for -- it was based on your salary for the
17 annual, not a portion, but the whole year.
18   Q.  Okay.  Do you recall whether or not you
19 received the maximum bonus at Beacon for any years
20 that you were employed there?
21   A.  I did one year, yes.
22   Q.  This last year?
23   A.  This last term.
24   Q.  This letter indicates that you needed to

Page 59

1  respond by May 16, 2003 if you wanted to accept the
2  offer, correct?  It's the next to the last sentence.
3    A.  Correct.
4    Q.  But that was extended, wasn't it?
5    A.  Correct.
6    Q.  Do you recall how far out that date was
7  extended?
8    A.  It was a number of weeks.  I don't recall.
9  It was between two and four weeks, I believe.
10   Q.  You can see that you signed the letter on
11 the 13th of June, correct?
12   A.  Correct.
13   Q.  When you signed the letter, it was timely,
14 I assume, within the time specified by which you
15 could accept the offer, correct?
16   A.  They might have had a second extension to
17 the offer, because I don't think it was June 13th
18 the first time.
19   Q.  We can see it was May 16th, and it was
20 extended maybe twice do you think?
21   A.  I believe it was twice.
22   Q.  Obviously you accepted employment, correct,
23 at Beacon?
24   A.  Correct.

Page 60

1    Q.  Had you looked for employment anywhere else
2  from the fall of 2002 up to June 13, 2003?
3    A.  Not that I recall.
4    Q.  When you came over to Beacon, who was your
5  immediate supervisor?
6    A.  John Durnan.
7    Q.  That's the same man who was your immediate
8  supervisor at John Hancock, correct?
9    A.  Prior to this letter, sure.
10   Q.  And who was his immediate supervisor when
11 you came over to Beacon?
12   A.  Paul Crowley.
13   Q.  That was the same as was the case when you
14 were last at John Hancock, correct?
15   A.  Correct.
16   Q.  Do you know how many John Hancock employees
17 came over to work at Beacon in the July of 2003
18 period?
19       MR. ROBBINS:  Objection.  You can answer.
20   A.  In total, approximately 75.
21   Q.  And, I take it it's your testimony, and I
22 don't mean to beat a dead horse, that group of
23 people that you supervised when you first came over
24 to Beacon, they were all former John Hancock

Page 61

1  employees, correct?
2    A.  Correct.
3    Q.  And that group was about 20 or so, correct?
4    A.  A little bit more.  Maybe 25, 26, 27.
5    Q.  Okay.  And the trades that you were
6  supervising, if you can characterize those trades,
7  they would be what?
8    A.  HVAC -- they called it the multi-shop
9  trade, but it was HVAC, plumbing.  Primarily that.
10   Q.  The term "multi-shop trade," what does that
11 mean?
12   A.  It was a Hancock term that was set up, and
13 it carried over, just the name.
14   Q.  What does --
15   A.  It means a number of trades under one group
16 is all, with one supervisor, one foreman.
17   Q.  One of the documents that you produced to
18 us, we'll mark it as Exhibit 3.  I just need you to
19 take a look at it, and tell me if you ever sent it,
20 for example.
21       (Document marked as Exhibit 3
22        for identification)
23   Q.  My initial question is a simple one.  Did
24 you send this letter?

16 (Pages 58 to 61)

Page 70

1 along those lines?
2    A.  Correct.
3    Q.  But if it's 220, you're going to get an
4 electrician?
5    A.  They draw the line at the disconnect.  So
6 from the disconnect in, it's usually an electrician.
7 From the disconnect to the equipment, it's the HVAC
8 people.
9    Q.  Okay.  That would be a good way of
10 describing the function of folks in the
11 multi-mechanical shop, for example, they wouldn't be
12 dealing with the electrical as real electrical,
13 correct?
14    A.  Typically.
15       (Document marked as Exhibit 4
16       for identification)
17    Q.  Questions and answers, tell me if you've
18 seen that before?
19    A.  Could I take a couple minutes?
20    Q.  Sure.
21       (Recess)
22 BY MR. FEEHERRY:
23    Q.  Have you seen that document before?
24    A.  Yes.

Page 71

1    Q.  When?
2    A.  I would say it was November of 2002,
3 possibly early December, 2002.
4    Q.  Take a look at Page 6, the second bullet
5 point.  "What will happen to Hancock Associates who
6 currently perform," it says, "these duties.  How
7 many positions do you anticipate will be
8 eliminated"?  Did you read that back in November or
9 early December when you got this document?
10    A.  I did.
11    Q.  What was your understanding of that second
12 bullet point, if you had one, back then?
13    A.  It says what it says.  It was a question
14 and answer segment, and I wasn't sure what to make
15 of it.
16    Q.  Okay.  One sentence is, "Given the unique
17 operational aspects of the tower, it's our hope that
18 many of the associates affected by the sale will be
19 hired by the new owner and continue to perform
20 essentially the same functions."  Do you see that?
21    A.  Yes.
22    Q.  In fact, you were hired by the new owner or
23 subsidiary of the new owner, correct?
24    A.  Correct.

Page 72

1    Q.  And after being hired, you performed
2 essentially the same functions, plus a few, correct?
3    A.  Correct.
4    Q.  Let's take a look at the next document.
5 It's printed off the Hancock hub.
6       (Document marked as Exhibit 5
7       for identification)
8    Q.  Do you recall seeing this on the hub?  I
9 will represent to you that the portion on Page 3
10 that is referred to as "Employee Impact" is, I
11 believe, identical to the employee impact bullet
12 points that we looked at on Page 6 of the prior
13 exhibit.
14    A.  Okay.
15    Q.  Do you recall seeing this electronic
16 version of the Q&A about the tower complex?
17    A.  Something to this affect, yes.
18    Q.  It shows this is dated November 27th.  I
19 take it you saw it then or shortly after that,
20 November of 2002, correct?
21    A.  I believe so.
22    Q.  Let's take a look at the next exhibit.
23       (Document marked as Exhibit 6
24       for identification)

Page 73

1    Q.  Have you seen Exhibit 6 before?
2    A.  I have.
3    Q.  Did you see it on or about May 30, 2003?
4    A.  Correct.
5    Q.  Is it fair to say this letter extended the
6 acceptance date to Friday, June 13th?  You'll see
7 that in the next to last paragraph there.
8    A.  Correct.
9    Q.  Did you, on or about May 30th, take the
10 opportunity to either access the benefits on the
11 identified website and/or obtain a hard copy of the
12 benefits that you would get at Beacon?
13    A.  I believe so.
14    Q.  Which of those two did you do?
15    A.  I believe I ended up with a hard copy.  I'm
16 not sure if I went online with this.  I think they
17 actually had a problem with it online, accessing it.
18    Q.  Do you recall when you got the benefits
19 package?
20    A.  I would say within the next couple of
21 weeks, but I'm not sure exactly.  It was the
22 beginning of June.
23    Q.  When in the beginning of June?
24    A.  I don't recall.

19 (Pages 70 to 73)

Page 74

1    Q.  Is it fair to say you knew what benefits
2  you would get at Beacon by the time you signed the
3  offer letter on June 13, 2003?
4    A.  Could you restate that, please.
5    Q.  Is it fair to say you knew what the
6  benefits would be at Beacon by the time you signed
7  the offer letter on June 13, 2003?
8    A.  Yes.
9    Q.  But you don't recall how much time you had
10  between when you first saw those benefits and when
11  you signed the offer letter; is that fair to say,
12  other than you got them in early June?
13    A.  Correct.
14    Q.  While at John Hancock, I'd like to be sure
15  that I know some of the benefits that you utilized,
16  for example.  In that last couple of years that you
17  were at John Hancock, what type of health benefits
18  did you, in fact, have?
19    A.  Medical, dental.
20    Q.  With whom?
21    A.  I don't recall.
22    Q.  You don't recall what insurer you had?
23    A.  No.
24    Q.  Did you have a family plan or an individual

Page 75

1  plan?
2    A.  Individual.
3    Q.  Did you ever have a family plan or a dual
4  plan at any point that you were an employee at John
5  Hancock?
6    A.  No.
7    Q.  How about the 401K, did you contribute to
8  it?
9    A.  I did.
10    Q.  Annually?
11    A.  Yes.  Weekly, right.
12    Q.  Up to the maximum?
13    A.  I believe so.
14    Q.  Every year?
15    A.  I don't recall that.
16    Q.  As far as the pension that you had at John
17  Hancock, it was a cash balance pension, correct?
18    A.  It ended up that way, correct.
19    Q.  What's your memory of what your cash
20  balance was or what was your cash balance when you
21  left John Hancock?
22    A.  I believe it was around $30,000.
23    Q.  Were you allowed to role that over into
24  something when you left John Hancock's employ?

Page 76

1    A.  Correct.
2    Q.  Do you recall how much got contributed into
3  that cash balance pension fund in the last couple of
4  years that you were at John Hancock?
5    A.  I don't recall.
6    Q.  Was it a percentage of your salary, if you
7  recall?
8    A.  I believe it was.
9    Q.  Do you know what percentage?
10    A.  I believe it was around four or five
11  percent.
12    Q.  Were you ever out on long-term or
13  short-term disability while you were at John
14  Hancock?
15    A.  I was.
16    Q.  When was that?
17    A.  I believe it was 2001.
18    Q.  How long?
19    A.  About three months.
20    Q.  What were the circumstances that had you
21  out three months?
22    A.  A back injury.
23    Q.  Something on the job?
24    A.  It was -- I believe so.  Actually, I'm not

Page 77

1  sure.  I don't recall.
2    Q.  Do you recall if you got any Worker's Comp?
3    A.  I was paid through short-term disability.
4    Q.  We'll leave it at that.
5    MR. FEEHERRY:  Let's mark these as the next
6  two exhibits.
7    (Documents marked as Exhibits 7 and 8
8    for identification)
9    Q.  Do you recall receiving either of these two
10  exhibits, Exhibit 7 or Exhibit 8, prior to the time
11  that you became employed at Beacon?  Again, do you
12  recall getting both of them?
13    Let me be sure that I don't mislead you.
14  The first one was a document produced out of John
15  Hancock's files, whereas the second one, Exhibit 8,
16  is a Beacon document.  Do you recall seeing either
17  of these documents before you became employed at
18  Beacon?
19    A.  This one I believe I saw before.
20    Q.  "This one," being Exhibit 7?
21    A.  Correct.  Exhibit 8, I'm not sure I
22  received this before.  I believe it was
23  approximately around the time that I was employed by
24  Beacon, but I'm not sure exactly of the date.

Daniel P. Joyce

Page 86

| | |
|---|---|
| 1 | A. I don't recall. |
| 2 | Q. It is another question and answer about |
| 3 | outsourcing, ISS and sale of buildings, correct? |
| 4 | A. Correct. |
| 5 | Q. But you don't recall seeing this one; is |
| 6 | that fair to say? |
| 7 | A. True. |
| 8 | Q. Let's take a look at Page 2. The question, |
| 9 | "What happens to my severance if I get another job?" |
| 10 | Do you see that one? |
| 11 | A. I do. |
| 12 | Q. Do you see the answer? |
| 13 | A. I do. |
| 14 | Q. Do you recall seeing a Q&A in substantially |
| 15 | this form prior to the time that you left John |
| 16 | Hancock? |
| 17 | A. I don't recall reading this document, |
| 18 | perhaps because it says "Special Edition |
| 19 | Outsourcing, ISS and Sale of Buildings." |
| 20 | Q. How would that be different? |
| 21 | A. Just maybe the outsourcing, ISS or sale of |
| 22 | buildings. |
| 23 | Q. Well, the last paragraph of that answer |
| 24 | about, "What happens to my severance if I get |

Page 87

| | |
|---|---|
| 1 | another job" reads as follows: "Employees who are |
| 2 | offered a comparable position or accept any position |
| 3 | with a company to which a business unit is sold or |
| 4 | its function is outsourced or transferred, and which |
| 5 | performs the services previously performed by the |
| 6 | employee's work unit, will not be eligible to |
| 7 | receive payments under this plan." Do you see that? |
| 8 | A. What paragraph is that? |
| 9 | Q. It's the second A under the Q&A. |
| 10 | A. I do see it. |
| 11 | Q. You don't recall seeing that, however, |
| 12 | correct? |
| 13 | A. Where is that again? |
| 14 | Q. Page 2, the second paragraph or what I will |
| 15 | call the second Q&A. The question is, "What happens |
| 16 | to my severance if I get another job?" Does that |
| 17 | help to refresh your recollection, looking at it |
| 18 | again, as to whether or not you saw this document |
| 19 | before you left John Hancock? |
| 20 | A. This is a Q&A. I wouldn't rely on this for |
| 21 | sure. I don't recall reading this document. |
| 22 | Q. Okay. Well, you were offered a job by |
| 23 | Beacon, correct? |
| 24 | A. Correct. |

Page 88

| | |
|---|---|
| 1 | Q. Then you took a job at Beacon, correct? |
| 2 | A. Yes. I had no choice in the matter. |
| 3 | Q. Let's try it this way. You were offered a |
| 4 | job at Beacon, correct? |
| 5 | A. Correct. |
| 6 | Q. And you took a job at Beacon, correct? |
| 7 | A. Correct. |
| 8 | Q. Now, you said you had no choice? |
| 9 | A. Right. |
| 10 | Q. But you knew about a potential sale of the |
| 11 | building from at least the fall of 2002, correct? |
| 12 | A. Correct. |
| 13 | Q. You walked people through the building in |
| 14 | the fall of 2002, correct? |
| 15 | A. Correct. |
| 16 | Q. You certainly could have looked for |
| 17 | employment elsewhere, correct? |
| 18 | A. Sure. |
| 19 | Q. Indeed, that's exactly what you did in the |
| 20 | months preceding this deposition, correct? |
| 21 | A. Correct. |
| 22 | Q. And you found other employment, right? |
| 23 | A. It took quite a while, but, yes. |
| 24 | Q. Well, how long did you look for other |

Page 89

| | |
|---|---|
| 1 | employment before you got the job at Liberty Mutual? |
| 2 | A. Probably a year and a half. |
| 3 | Q. But you told me in the six months before |
| 4 | you left John Hancock and the six months after you |
| 5 | got to Beacon, you didn't look for a job at all, |
| 6 | correct? |
| 7 | A. That's correct. |
| 8 | Q. Now, you indicated that you had no choice |
| 9 | but to accept the job at Beacon? |
| 10 | A. Correct. In my opinion I did, sure. |
| 11 | Q. But obviously your choice was to accept it |
| 12 | or not to accept it, correct? |
| 13 | A. Correct. |
| 14 | Q. You could have found employment elsewhere, |
| 15 | correct? |
| 16 | A. It would have taken some time, and I would |
| 17 | have been with no benefits and no salary, and I have |
| 18 | bills to pay. I couldn't just drop one job and go |
| 19 | to another. Hancock wasn't even offering |
| 20 | unemployment. They told us we couldn't even get |
| 21 | unemployment if we didn't accept the Beacon job. |
| 22 | Q. On a Friday you left John Hancock, correct, |
| 23 | and on Monday you started at Beacon, right? |
| 24 | A. Correct. |

23 (Pages 86 to 89)

7b35f361-f4a7-11da-a265-444553540000

Daniel P. Joyce

6/2/06

Page 90

1    Q.  You were doing essentially the same job
2  functions on Monday as you were on Friday, right?
3    A.  That and other things, sure.
4    Q.  You got a raise when you went to Beacon,
5  correct?
6    A.  Correct.  On salary I did.  I took a loss
7  with vacation, I took a loss with pension, et
8  cetera.  On the benefits, it was a loss.
9    Q.  You got a raise as far as your base salary
10  is concerned, correct?
11    A.  Correct.
12    Q.  You got a $1,000 bonus two weeks after you
13  actually started your employment at Beacon, correct?
14    A.  That's correct.
15    Q.  Okay.
16    MR. FEEHERRY:  Let's take a look at the
17  next exhibit, an e-mail from you to Joan DiCicco,
18  and a response.
19    (Document marked as Exhibit 13
20    for identification)
21    MR. FEEHERRY:  And we ought to mark this at
22  the same time.
23    (Document marked as Exhibit 14
24    for identification)

Page 91

1    Q.  Do you recall receiving the memo dated May
2  30, 2003 from Ms. DiCicco?
3    A.  I do.
4    Q.  And it advised you that you were not
5  eligible for a severance benefit, because you had
6  been offered a position by a successor company that
7  is deemed to be a comparable job, correct?
8    A.  That's what the letter says.
9    Q.  Then it goes on in the letter that, "There
10  are three components looked at when determining if a
11  job offer is comparably, they are similar salary,
12  competitive benefits and work location within 50
13  miles of your current work location," correct?
14    A.  That's what it says.
15    Q.  As far as those components are concerned,
16  you don't dispute you received a similar salary at
17  Beacon, correct?
18    A.  Correct.
19    Q.  You got a raise, right, on your base
20  salary?
21    A.  Correct.  But this, as far as I was
22  concerned, they told us --
23    Q.  One of the benefits I get from my job is I
24  get to ask the questions.  My question is, did you

Page 92

1  get a similar salary?
2    A.  Correct.
3    Q.  Was your work location within 50 miles of
4  your then current work location?
5    A.  Correct.
6    Q.  It was the same location, right?
7    A.  More or less, but not exactly.  There were
8  other buildings involved, but the same location
9  approximately, sure.
10    Q.  You weren't being sent more than 50 miles
11  away?
12    A.  No, correct.
13    Q.  You dispute whether or not you got
14  competitive benefits at Beacon, correct?
15    A.  We disputed that and other things, sure.
16    Q.  You sent an e-mail to Joan DiCicco in
17  response to Exhibit 14, right?
18    A.  Correct.
19    Q.  And that's Exhibit 13, correct?
20    A.  Correct.
21    Q.  And she responded to you, correct?
22    A.  Correct.
23    Q.  And she did so prior to the time that you
24  signed your offer letter of June 13, correct?

Page 93

1    A.  Correct.
2    Q.  Now, in response to my question about
3  whether you disputed if you got competitive
4  benefits, you said you disputed that and other
5  things?
6    A.  Correct.
7    Q.  Can you tell me what other things you're
8  disputing?
9    A.  Yes.  We disputed the fact that our real
10  estate operations group wasn't sold or outsourced,
11  and that's what dictated whether comparable benefits
12  or comparable job and competitive benefits were even
13  in effect.
14    Q.  How did you raise that issue, if you
15  recall?  Did you raise that in your e-mail to Joan
16  DiCicco?
17    A.  No, not the sale or outsourcing.
18    Q.  When did you raise that?
19    A.  I personally didn't raise that to Joan
20  DiCicco at that time.
21    Q.  When did you raise it?
22    A.  Other people had raised it.  I didn't raise
23  it.
24    Q.  Let's take a look at the next exhibit.

24 (Pages 90 to 93)

Boston Reporting Associates

7b35f361-f4a7-11da-a265-444553540000

Daniel P. Joyce

Page 94

```
 1        (Document marked as Exhibit 15
 2        for identification)
 3    Q.   Is this your handwriting, since I don't
 4   know.  We'll have very few questions if the answer
 5   is no?
 6    A.   Should I say no?
 7    Q.   You have to tell the truth.
 8    A.   I think it is my handwriting.
 9    Q.   When did you prepare this, if you recall?
10    A.   I'm not sure.  It's notes, it looks like.
11    Q.   Did you prepare it before or after you left
12   John Hancock?
13    A.   I would say after, but I'm not sure.
14    Q.   Do you recall how long after?
15    A.   I'm really not sure.
16    Q.   The bottom of the first page you refer to a
17   benefit workshop by e-mail, DiCicco, February, 2003,
18   for personnel not staying with John Hancock.  What's
19   that?
20    A.   Just a note.  I'm not sure.
21    Q.   But it refers to a specific e-mail.  Do you
22   recall if you had that e-mail?
23    A.   I'm not sure.
24    Q.   Page 2 refers to the purpose of the
```

Page 95

```
 1   severance plan, second bullet.  "Bridge Employees,"
 2   and there's a star and circle next to it.  Why did
 3   you write that down?
 4    A.   I'm not sure.
 5    Q.   Where did you get the language about the
 6   purpose of the severance plan?
 7    A.   I can't be sure about that.
 8    Q.   What's your best memory?
 9    A.   I can't be sure.
10    Q.   Do you recall discussing with anybody at
11   John Hancock the purpose of the amendments, which
12   occurred in November of 2002?
13    A.   Is that question related to this note?
14    Q.   Yes.  Why did you write it down?
15    A.   I'm not sure.
16    Q.   It refers to "Bridge Employees," and then
17   it says "New" as opposed to "Benefits Only, Old."
18   I'm just curious about whether or not you wrote this
19   down in connection with your review of the new
20   changes in the severance plan which occurred in
21   November of 2002?
22    A.   I'm not sure.
23    Q.   Do you understand that you purport to
24   represent a class of people in this lawsuit, do you?
```

Page 96

```
 1    A.   I do.
 2    Q.   Who is the class?
 3    A.   Fellow ex-employees at John Hancock.
 4    Q.   So that would include security people
 5   apparently?
 6    A.   Yes.
 7    Q.   It would include electricians and people
 8   that worked on electronics at John Hancock, correct?
 9    A.   Correct.
10    Q.   Even though you never had any
11   responsibility, supervisory or otherwise, for those
12   people, either at Hancock or at Beacon, correct?
13    A.   I did at Beacon.  We stated that.
14    Q.   Electricians?
15    A.   Yes -- well, not directly the electricians,
16   but on occasion.
17    Q.   How about the security people?
18    A.   No.
19    Q.   Can you take a look at this list of 19
20   people here -- I won't mark it yet -- and tell me if
21   any of those people were not in the so-called
22   multi-mechanical shop?
23    A.   Are they not included?
24    Q.   Yes.
```

Page 97

```
 1    A.   Yes.
 2    Q.   Which?
 3    A.   No. 6.
 4    Q.   Who else?
 5    A.   No. 9, No. 10, No. 11, 12, 13, 14, 15, 17,
 6   19, 22 and 23.
 7    Q.   In what categories do those people fit?
 8    A.   Some are management -- one was management,
 9   accounting, loading dock, which is what they called
10   themselves, administrative services, stock room,
11   security.
12    Q.   Were these all people would came over to
13   Beacon?
14        MR. ROBBINS:  Objection.  You can answer.
15    Q.   All of the people on the list of 23 people?
16    A.   Correct.
17    Q.   Who is Attorney Brian Joyce?
18    A.   A friend of mine.
19    Q.   He has the same last name, so I have to ask
20   the question.  Any relation?
21    A.   He is a distant cousin.
22    Q.   Where does he live?
23    A.   Milton.
24    Q.   Does he practice law?
```

25 (Pages 94 to 97)

# Pl.'s Interrog. Answers

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DANIEL JOYCE,<br>Individually and on behalf of a class of others<br>similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>JOHN HANCOCK FINANCIAL SERVICES,<br>INC. and JOAN M. DICICCO,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No.05-11428 – WGY<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF'S OBJECTIONS AND ANSWERS TO DEFENDANTS'
## FIRST SET OF INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiff Daniel Joyce ("Joyce"

or "Plaintiff"), individually and on behalf of a class of others similarly situated (the "putative

class"), hereby objects to and answers Defendants' First Set of Interrogatories (the

"Interrogatories") as follows:

### GENERAL OBJECTIONS

1. Joyce objects generally to the Interrogatories to the extent that they seek

information protected from discovery pursuant to the attorney-client privilege, work product

doctrine and/or any other applicable privilege, protection, or similar reason for nondisclosure.

2. Joyce objects generally to the Interrogatories to the extent that they seek legal

conclusions or are more properly considered Requests for Admissions on the ground that such

Interrogatories are not proper for the purposes for which Interrogatories may be propounded.

3.    Joyce objects generally to the Interrogatories to the extent that they seek information beyond the scope of discovery permitted by Rules 26 and 33 of the Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the District of Massachusetts.

4.    Joyce objects to the Interrogatories to the extent that they are unrestricted as to time frame and are, therefore, overly broad. Joyce shall interpret any Interrogatory that does not specify a time frame to be restricted to the time period relevant to the claims and allegations made in Plaintiff's Complaint.

5.    Joyce objects to the Interrogatories to the extent that they are vague, ambiguous, overbroad, unduly burdensome, not relevant, and/or not reasonably calculated to lead to the discovery of admissible evidence.

6.    Joyce objects to the Interrogatories, including without limitation the "Definitions" set forth in the Interrogatories, to the extent they contain terms or concepts that are undefined, vague, ambiguous, incorrectly defined as a matter of fact, and/or otherwise unintelligible.

7.    Joyce objects to the Interrogatories, including without limitation the "Definitions" set forth in the Interrogatories, to the extent that the term "Beacon" purports to refer to Beacon Capital Partners, LLC and not Beacon Capital Partners Management, LLC, the latter being the entity which offered Joyce employment following the sale of the Tower Complex.

8.    Joyce objects to the Interrogatories, including without limitation the "Definitions" set forth in the Interrogatories, to the extent that the term "Complaint" purports to refer to the Complaint as having been filed by James Joyce, and not the Plaintiff Daniel Joyce.

9.    Joyce objects generally to the Interrogatories to the extent that, including subparts, they exceed the number of interrogatories allowed under the Federal Rules of Civil Procedure and the Local Rules of the Massachusetts District Court.

10.    The foregoing General Objections are specifically incorporated into each of the following responses as Specific Objections and Answers if fully stated therein.

## SPECIFIC OBJECTIONS AND ANSWERS

### INTERROGATORY NO. 1:

Please identify all persons with knowledge of any of the facts or events that form the basis of any of the claims or allegations in this matter.

### ANSWER NO. 1:

Joyce objects to Interrogatory No. 1 on the ground that it is overly broad and unduly burdensome.

Subject to and without waiving this objection and the General Objections above, Joyce states that, to the best of his knowledge, all members of the Hancock Real Estate Operations Department ("REOD") business unit between November 18, 2002 and July 14, 2003 may have knowledge of the facts, events and claims relevant to this lawsuit. Joyce understands that his counsel has provided Hancock's counsel with copies of documents identifying approximately sixty-five (65) former Hancock REOD employees to whom offers of employment were extended by Beacon. In addition, Joyce understands that Hancock has in its possession documents referencing the identities of all employees within the REOD business unit during said period of time. Joyce refers to these documents in response to Interrogatory No. 1.

Based on Joyce's own personal recollection as well as his review of documents produced by Hancock and Beacon during the course of this litigation, it is his understanding

3

that the following people may also have some knowledge of the facts or events that form the basis of his claims:

Joan M. DiCicco, Lisa Blake, Peter Mongeau, Sandra M. Colley, Carlton Grant, Brian Bisciotti, Kathy Suchenski, Vicki A. Newman, Bill Bonn and the Senior Executives at Hancock and Beacon.

## INTERROGATORY NO. 2

Please identify all persons whom you intend to call as a witness at the trial of this matter, and for each such person, provide a description of the subject matter of the witness's expected testimony.

## ANSWER NO. 2:

Subject to and without waiving the General Objections above, Joyce states that he is unable to identify at this time each person he intends to call as a witness, but believes that the persons identified in response to Interrogatory No. 1 are likely to be called. Joyce will supplement at a later appropriate time his response to Interrogatory No. 2 to the extent required under the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Massachusetts.

## INTERROGATORY NO. 3:

Please identify and state for each person whom you expect to call as an expert witness at trial:

(A)    the name of the individual;

(B)    his/her business and home addresses and telephone numbers;

(C)    his/her qualifications and credentials;

(D)    the subject of his/her expertise;

(E)    the subject matter on which he/she is expected to testify;

(F)    the substance of the facts and opinions to which he/she is expected
       to testify;

(G)    the grounds for each opinion to which he/she is expected to testify;
       and

(H)    the treatises, reports, authorities, or other documents upon which
       he/she will rely in providing testimony in this action.

**ANSWER NO. 3:**

Joyce objects to Interrogatory No. 3 to the extent it purports to require the disclosure of information beyond what is required to be disclosed under the Federal Rules of Civil Procedure.

Subject to and without waiving this objection and the General Objections above, Joyce states that he will supplement his response to Interrogatory No. 3 to the extent required under the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Massachusetts at a later appropriate time.

**INTERROGATORY NO. 4:**

Please identify any documents, treatises, or other authorities that you will rely upon in cross-examination of Defendants' expert witness(es) at trial.

**ANSWER NO. 4:**

Joyce objects to Interrogatory No. 4 on the ground that it seeks discovery of attorney mental impressions, and is beyond the scope of expert discovery.

**INTERROGATORY NO. 5:**

Please state your understanding of the meanings and effects of the Plan Amendment and the Summary Plan Description.

**ANSWER NO. 5:**

Joyce objects to Interrogatory No. 5 on the ground that it is vague, ambiguous and unrestricted as to time and, therefore, overly broad.

Subject to and without waiving this objection and the General Objections above, Joyce states that since the Plan was amended in November 2002 he has at all times understood that he would be entitled to receive severance in the event of a sale or outsourcing of his REOD business unit if a successor company or purchaser did not offer him a job that was comparable to his job with Hancock. In November 2002, prior to publishing the SPD, Hancock informed Joyce on what basis it would deem a job offer to be comparable. After his review of the November email correspondence and SPD, Joyce understood that a "comparable position" was to be defined by three components (i.e., similar salary, competitive benefit offerings and a work location within 50 miles of the current work location). Joyce understood the SPD to interpret the Plan Amendment. At all times, Joyce understood the Comparable Job provision to require Hancock, in the event of a sale or outsourcing of his REOD business unit, to conduct an assessment which compares the successor company's or purchaser's salary offering to Hancock's salary, the successor company's or purchaser's work location offering to Hancock's work location and the successor company's or purchaser's benefits offering with the benefits offered by Hancock.

Joyce understood the SPD to require Hancock, in the event of a sale or outsourcing of his REOD business unit, to make a determination pursuant to its fiduciary duties whether an offered position was not comparable. If Hancock determined the offered position to be non-

comparable, the Plan would afford Joyce a choice between either accepting the position or electing to receive severance benefits.

Joyce understood that the Plan Amendment would be applicable only in the event of a sale or outsourcing of Joyce's business unit, the REOD, but not as the result of a reduction in staff within the REOD business unit stemming from Hancock's sale of some of its real estate assets.

**INTERROGATORY NO. 6:**

Please state your understanding of the phrases "comparable position, as determined by [Hancock]" and "Successor Company" as those phrases are used in the Plan Amendment.

**ANSWER NO. 6:**

Subject to and without waiving the General Objections above, Joyce refers to his response to Answer No. 5.

**INTERROGATORY NO. 7:**

Please state your understanding of the meanings of the phrases "accepts any position as an employee with, or provides services in any capacity to, a Successor Company" as used in § 3.2(d) of the Plan Amendment and "accepts a non-comparable job with[] the purchaser or successor company" as used in the Summary Plan Description.

**ANSWER NO. 7:**

Subject to and without waiving the General Objections above, Joyce understood the SPD to interpret the Plan Amendment. Thus, Joyce understood both phrases to mean that, in the event of the sale or outsourcing of his REOD business unit, Hancock would make a determination pursuant to its fiduciary duties whether an offered position was not "comparable", as defined in the SPD. If Hancock determined the offered position to be non-

7

comparable, the Plan would afford Joyce a choice between accepting the position or electing to receive severance benefits.  Under similar circumstances, if Hancock were to properly deem an offered position to be comparable, then Joyce would not be permitted to receive severance benefits under the Plan.

## INTERROGATORY NO. 8:

Please describe your duties and responsibilities in each position that you held as a Hancock employee, including but not limited to real estate operations coordinator, project manager, and senior project manager.

## ANSWER NO. 8:

Subject to and without waiving the General Objections above, Joyce states that in March 1994 he was hired by John Hancock Mutual Life Insurance.  Since 1994 Joyce has held the following positions:

Real Estate Operations Coordinator – Position had no official job description.  Facility management activities including technical support and coordination of activities for building trades, outside contractors, consultants and Hancock business units related to building systems maintenance, operations and improvements.

Project Manager - Facility management activities including technical support, contract management and coordination for outsourced activities for building trades, outside contractors, consultants and Hancock business units related to building systems maintenance, operation and improvements.

Senior Project Manager- Facility management activities including building system analysis, conceptual design, project management and operational specifications for various

building system improvements and capital improvements related to energy conservation and tenant comfort.

## INTERROGATORY NO. 9:

Please describe your educational background, detailing in your description the highest level of formal education or schooling that you have attained, and your participation in any courses, classes, seminars, workshops, and/or lectures since your departure and/or graduation from formal education or schooling.

## ANSWER NO. 9:

Subject to and without waiving the General Objections above, Joyce states that following:

Degrees: Associate of Science in HVAC technology from Massasoit Community College (formerly Blue Hills Institute of Technology); Bachelors of Science Business Administration from Eastern Nazarene College.

Post graduation professional programs: Certified Facility Manager -International Facility Management Association, Licensed Construction supervisor-Commonwealth of Massachusetts; Real Property Administrator candidate-Building Owners and Managers Institute.

Seminars: Water Conservation-MWRA, Chilled Water Plants-RG Vanderweil Engineers, Energy and utility program-NStar Electric and Gas, Water Treatment seminar-Ashland Chemical, Energy Conservation seminars-Association of Energy Engineers. Facility Management seminars-IFMA.

## INTERROGATORY NO. 10:

9

Please describe your employment history from January 1990 to the present, including your wage/salary history and the employer benefits/perks offered to you in each position. In your description, please identify any changes in employers, changes in title, changes in responsibility, promotions, and demotions along with the corresponding wage/salary and benefits/perks information.

## ANSWER NO. 10:

Joyce objects to Interrogatory No. 10 on the ground that it is vague, ambiguous, overbroad, unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving this objection and the General Objections above, Joyce states the following:

1990-1991
Analyze Properties
Director of Technical Services
contract employee

1991-1994
Niles Company
Building Manager
Salary range: $35,000 - $40,000.
Benefits included medical, dental, 401k, vacation

1994-2003
John Hancock
Real Estate Operations Coordinator, Project manager, Senior Project Manager
Benefits included medical, dental, disability, 401k, vacation, pension and a variety other benefits
Salary range: $50,000 -75,000.

## INTERROGATORY NO. 11:

Please describe your efforts to find or pursue employment outside of Hancock upon learning that some Hancock employees would be terminated and some would receive job offers from Beacon following the sale of the Tower-Complex. As part of your description, please (i)

state the criteria by which you conducted any search for employment; (ii) identify each

employer to whom you applied for a job; (iii) identify any job interviews that you were offered

or in which you participated; and (iv) identify any offers of employment that you received,

including salary, benefits, and other perks offered.

**ANSWER NO. 11:**

Subject to the General Objections above, Joyce states that he did not undertake any

such efforts.

**INTERROGATORY NO. 12:**

Please state the date on which any job offers were made to you by Beacon and the

terms of those offers, including job title, job responsibilities, salary, and benefits, and whether

and when you accepted, declined, or negotiated on any aspect of those offers.

**ANSWER NO. 12:**

Subject to and without waiving the General Objections above, Joyce states that on May

5, 2003 he was offered a full-time position with Beacon as a Project Manager. He was offered

a position with a base salary of $75,100.00 per year. As Project Manager, Joyce's

responsibilities included direct supervision of building trade shop personnel, real estate

operations, maintenance, engineering, construction, project management and other technical

services related to property management.

The May 5th offer letter did not indicate the specific benefits available from Beacon.

Instead, it stated that Beacon intended for its employee benefits program to include medical

and dental insurance, life insurance, short-term and long-term disability insurance and a 401(k)

plan. The May 5th letter indicated that Joyce had until May 16, 2003 to accept Beacon's offer

of employment.

11

On or about May 30, 2003, Joyce received a letter from Beacon indicating that the Beacon employee benefits program was available for Joyce's review on a website. The time for which Joyce could accept Beacon's offer of employment was extended until June 13, 2003. Joyce accepted Beacon's offer of employment on June 13, 2003.

**INTERROGATORY NO. 13:**

With respect to your employment by Beacon, please state the date on which you began working for Beacon, your job title, your job responsibilities, your salary, the benefits you were offered, and the date on which those benefits became available to you.

**ANSWER NO. 13:**

Subject to and without waiving the General Objections above, Joyce states that on May 5, 2003 he was offered a full-time position with Beacon as Project Manager. As Project Manager, Joyce's responsibilities included direct supervision of building trade shop personnel, real estate operations, maintenance, engineering, construction, project management and other technical services related to property management. No official job description or responsibilities were provided.

Joyce did not officially become an employee of Beacon until July 14, 2003. He was hired with a base salary of $75,100.00 per year. The May 5th offer letter did not indicate the specific benefits available, except that it was believed the Beacon employee benefits program would include medical and dental insurance, life insurance, short-term and long-term disability insurance and a 401(k) plan.

To the best of Joyce's knowledge Beacon afforded Joyce medical and dental coverage, short-term and long-term disability coverage, and life insurance coverage upon the

commencement of his employment. Beacon also offered 15 days of vacation, which is believed to have been accrued per month.

To the best of Joyce's recollection, Beacon did not offer a 401(k) plan until at least September 2003.

**INTERROGATORY NO. 14:**

If you contend that the job offered to you by Beacon following the sale of the Tower Complex was not a "comparable job," as defined in the Summary Plan Description, please state the basis for your contention.

**ANSWER NO. 14:**

Subject to and without waiving the General Objections above, Joyce states that he was not offered a "comparable job" by Beacon, as defined by the SPD. The Comparable Job provision in the SPD states that it only applies where there is a sale or outsourcing of Joyce's REOD business unit. Joyce contends that the sale of the Tower Complex did not constitute, result in or amount to a sale or outsourcing of the REOD business unit. Instead, the sale of the Tower Complex merely resulted in a reduction of staff within the REOD business unit due to Hancock's decision to sell some of its real estate holdings.

Joyce states he was never made aware of any outsourcing contract or that his services were sold to Beacon as part of the sale of the Tower Complex. In fact, at all times Hancock represented to Joyce that it would retain part of the REOD business unit in the wake of any sale involving the downtown buildings and that it would be the new owner's responsibility to decide how to staff the buildings and whether to extend offers of employment to the remaining employees within the REOD business unit. After the sale of the Tower Complex, Joyce understood that he was going to be terminated by Hancock and potentially offered a position

by Beacon. To this extent, Joyce contends the REOD business unit was not sold or outsourced

to Beacon. Therefore, Hancock's reliance on the Plan Amendment and "Comparable Job"

provision when determining whether to award severance benefits was improper.

     Joyce states that even if the sale of the Tower Complex was somehow deemed to have

constituted, amounted to or resulted in a sale or outsourcing of his REOD business unit and

even if Beacon were deemed to have been a purchaser or successor company under the Plan,

the SPD is written in such a manner that a reasonable plan participant, including Joyce, could

only understand the definition of "comparable job" to require that Hancock conduct an

assessment that compares the salary, work location and benefit offerings of Beacon to those

offered by Hancock. Joyce understood that in order for a job offer by Beacon to be deemed

comparable it had to suffice all three components of the definition of "comparable job." Joyce

understood the phrase "competitive benefits offerings," especially when used in conjunction

with and the context of the other two components of the "comparable job" definition, clearly

and unambiguously to require an assessment of whether Beacon's benefit offerings were

competitive with Hancock's offerings. Further, Joyce understood that the entire benefits

package offered by Beacon would be compared with each of the benefits offered by Hancock.

     Joyce states he did receive an offer of employment from Beacon, the terms of which

provided for a similar salary to his salary at Hancock and a work location within 50 miles of

his work location with Hancock. With respect to Beacon's benefits package, however, Joyce

later discovered that it included no severance plan, no pension plan, no immediate 401K plan,

significantly higher premiums for medical and dental coverage, half the vision care coverage,

significantly less long-term disability coverage, less vacation time, no tuition reimbursement,

substantially lower life insurance coverage, no holiday overtime pay and no holiday day-off

time.  As a result, Joyce deemed Beacon's benefit package to be non-competitive with

Hancock's benefit package, thus rendering Beacon's job offer to be non-comparable.

Joyce was later informed by Joan M. DiCicco that a competitive assessment analysis

was purportedly conducted by Hancock to determine whether Beacon's benefits package was

competitive with benefits offered by other companies in the property management industry and

that said analysis revealed that the selected benefits examined were competitive.  Joyce has

reviewed a two-page document Hancock purports to reflect the competitive assessment

analysis conducted by Hancock.  Joyce contends the assessment contains miscalculations and

was conducted in a manner inconsistent with Joyce's understanding of how the assessment

would be conducted as well as Hancock's own representations on how it was conducted.  For

instance, while Ms. DiCicco purported to claim that the competitive benefits assessment did

not consist of a comparison to Hancock's benefits package, the two-page document indicates

that nearly thirty-five percent of the assessment is dedicated to comparing Beacon's medical

benefits to Hancock's.  Further, Joyce contends Hancock's determination was clearly

erroneous because, even if "competitive benefit offering" was to be construed as requiring an

assessment of the range of competitive benefits offered to employees within the property

management industry, the assessment did not examine Beacon's benefits in relation to other

benefits packages offered to employees within the property management industry.  Joyce

contends Hancock at some point altered the parameters for determining what constitutes a

"competitive benefit offering" so that it could justify a determination that Beacon's benefits

package was "competitive."

**INTERROGATORY NO. 15:**

If you contend that the job offered to you by Beacon following the sale of the Tower Complex was a "non-comparable job," as defined by the Summary Plan Description, please state the basis for your contention.

**ANSWER NO. 15:**

Subject to and without waiving the General Objections above, Joyce refers to Answer No. 14.

**INTERROGATORY NO. 16:**

Please state the basis for your decision to seek severance benefits under the Plan after accepting a job offer from Beacon.

**ANSWER NO. 16:**

Joyce objects to Interrogatory No. 16 on the ground that it is not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving this objection and the General Objections above, Joyce states that his decision to seek severance benefits under the Plan after accepting a job from Beacon stems from Hancock's failure, pursuant to its fiduciary duty, to inform Joyce prior to his acceptance of Beacon's offer of employment that Beacon's job offer was not comparable. Following Hancock's determination that an offered position is not comparable, the Plan affords Joyce a choice between accepting the position and electing to receive severance benefits. By unreasonably determining that 1) the sale of the Tower Complex constituted a sale or outsourcing of the REOD business unit and 2) Beacon's benefit offerings were competitive, Hancock breached its fiduciary duty to Joyce and precluded him from properly exercising his rights under the Plan to elect severance pay.

**INTERROGATORY NO. 17:**

Please state the basis for any and all alleged damages suffered by the Plaintiff in connection with the claims and allegations contained in the Complaint, and illustrate your explanation using the precise values that compose your purported damage calculations.

## ANSWER NO. 17:

Subject to the General Objections above, Joyce states he is entitled all of the benefits that would have otherwise been made available to him had Hancock properly deemed Beacon's job offer to be non-comparable prior to Joyce's acceptance of Beacon's offer of employment.

Damages are to be measured, at least in part with respect to severance pay, pursuant to the Plan. Additional information is required from Defendants in order to compute the value of all of the benefits Joyce would have otherwise been entitled to receive. Subject to the foregoing, Joyce provides the following to the best of his knowledge at this time. In addition to the following Joyce has asserted claims seeking the recovery of interest on all amounts due, costs and attorney's fees. Under the Hancock Severance Pay Plan (the "Plan"), Joyce was entitled to:

Employability Expenses:

The value cannot be determined at this time.

Salary Continuation:

One week pay every 6 months of service:

9.4 years of service x 2 weeks per year = 18.8 weeks

$74,358.44 salary per year/52 weeks = $ 1429.97 per week

$1429.97 (salary per week) x 18.8 = **$26,883.44**

Eight additional weeks (per Plan):

$1429.97 x 8 = **$11,439.76**

**Total Due to Joyce: ($26,883.44+ $11,439.76) = <u>$38,323.20.</u>**

<u>Healthcare Coverage</u>:

    The value cannot be determined at this time.

<u>Group term life insurance</u>:

    The value cannot be determined at this time.

<u>Service Credit Accrual for Pension Contribution Purposes</u>

    Joyce did not accrue daily contributions to his pension plan during the 18 week severance term. The value of this benefit cannot be determined at this time.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 10th DAY OF APRIL, 2006.

_____
Daniel Joyce

AS TO OBJECTIONS:

_____
Kevin T. Peters (BBO#: 550522)
kpeters@toddweld.com
Seth J. Robbins (BBO#: 655146)
srobbins@toddweld.com
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
(617) 720-2626

## CERTIFICATE OF SERVICE

By signing below I hereby certify that a true copy of the above document was served

upon Defendants' counsel by hand delivery on April 10, 2006:

_____
Seth J. Robbins

Hancock's Interrog. Answers

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DANIEL JOYCE,<br>Individually and on behalf of a class of others<br>similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>JOHN HANCOCK FINANCIAL SERVICES,<br>INC. and JOAN M. DICICCO,<br><br>        Defendants. | Civil Action<br>No. 05-11428-WGY |

**JOHN HANCOCK FINANCIAL SERVICES, INC.'S OBJECTIONS AND ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT JOHN HANCOCK FINANCIAL SERVICES, INC.**

Pursuant to Federal Rule of Civil Procedure 34, Defendant John Hancock Financial Services, Inc. ("Hancock") hereby objects to and answers Plaintiff's First Set of Interrogatories to Defendant John Hancock Financial Services, Inc. (the "Interrogatories"). Hancock's responses to the Interrogatories are based on information presently known and available to Hancock. Hancock hereby reserves its right to supplement, amend, or correct these responses in light of information later obtained through discovery or otherwise.

## GENERAL OBJECTIONS

1.      Hancock objects to the Interrogatories to the extent that Plaintiff seeks information beyond that contained in the administrative record compiled in connection with the determination of whether Daniel Joyce qualified for severance benefits under the terms of the Plan following the sale of the Tower Complex. As this matter concerns a dispute over the denial

1

of severance benefits to Joyce under the terms of the Plan following the sale of the Tower

Complex, the only information relevant to this matter is that which is contained in the

administrative record concerning that determination.

2.     Hancock objects to the Interrogatories to the extent that they are unrestricted as to

time frame and are, therefore, overly broad.  Hancock shall interpret any request that does not

specify a time frame to be restricted to the time period relevant to the claims and allegations

made in Plaintiff's Complaint.

3.     Hancock objects to the Interrogatories to the extent that they call for the

disclosure of information protected under the work product doctrine, the attorney-client

privilege, and/or any other applicable privilege, protection, or similar reason for nondisclosure.

4.     Hancock objects to the Interrogatories to the extent that they call for confidential,

proprietary, or sensitive business information and agrees to produce such information only after

entry of an appropriate protective order or confidentiality agreement by agreement between the

parties or by the Court.

5.     Hancock objects to the Interrogatories to the extent that they are vague,

ambiguous, overly broad, or unduly burdensome, or call for the disclosure of information neither

relevant to the subject matter involved in this action nor reasonably calculated to lead to the

discovery of admissible evidence.

6.     Hancock objects to the Interrogatories, including without limitation the

"Definitions" set forth in the Interrogatories, to the extent that they contain terms or concepts that

are undefined, vague, ambiguous, incorrectly defined as a matter of fact, and/or otherwise

unintelligible.

2

7.      Hancock objects to the Interrogatories, including without limitation the "Definitions" set forth in the Interrogatories, to the extent that they seek information related to "the Class," "the putative class," "putative class member(s)," "members of the Class," and any other derivations of these terms, as no class has been recognized or certified in this matter, and the Court has restricted discovery to the sole named Plaintiff, Daniel Joyce.

8.      Hancock objects to the Interrogatories, including without limitation the "Definitions" set forth in the Interrogatories, to the extent that the term "the Plan Amendment" purports to refer to page 13 of the December version of the *2002 Benefits Supplement to Your Summary Plan Description* (the "Summary Plan Description" or the "SPD"), which is attached to the Complaint as Exhibit B.  Hancock states that the Plan Amendment is contained in the provisions of §§ 3.2(c) and (d) of the Plan dated November 15, 2002, which is attached to the Complaint as Exhibit A.

9.      Hancock objects to the Interrogatories to the extent that they seek to impose obligations that exceed or are inconsistent with those imposed by the Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the District of Massachusetts.

10.     Hancock objects to the Interrogatories to the extent that they seek information not presently known or available to Hancock.

11.     Hancock objects to the Interrogatories to the extent they are duplicative, cumulative, or repetitive.

12.     No response to an Interrogatory shall be deemed to constitute any agreement or concession that the subject matter thereof is relevant to this action, and all responses are made

without waiving or intending to waive any objection, including but not limited to, objections as to relevancy, materiality, privilege, or admissibility.

13.     Hancock expressly incorporates each of the foregoing General Objections by reference into each of the Specific Objections and Answers set forth below.

## SPECIFIC OBJECTIONS AND ANSWERS

**Interrogatory No. 1:**

If you contend that the Sale involved a "sale or outsourcing" of the REOD business unit to BCPM, as referenced in the Plan Amendment, please state the basis for your contention.

**Answer to Interrogatory No. 1:**

Subject to and without waiving the General Objections above, Hancock states that the sale of the Tower Complex involved an outsourcing of the Joyce's work unit to a Successor Company. When Hancock was the owner and landlord of the Tower Complex, Hancock needed employees to fulfill the functions of building maintenance and building security for the Tower Complex. Certain employees in the Real Estate Operations Department fulfilled these functions. When Hancock sold the Tower Complex, the majority of the functions that these employees fulfilled were no longer Hancock's responsibility, as the new owner and landlord was in charge of maintaining and securing the Tower Complex buildings. Hancock explicitly stated in its Term Sheet for the Purchase and Sale Agreement for the Tower Complex that Hancock employed "several employees in its real estate operations and security area who may be available for employment by a prospective Purchaser"; that "[b]ids should include the potential interest of a prospective Purchaser to hire these employees, including the anticipated number of employees and the area of specialty"; and that "[b]ids [would] be evaluated in part on the nature and extent

4

of interest in hiring some or all of these employees." *John Hancock Tower Complex in Boston Term Sheet for Purchase and Sale Agreement*, at 94, attached hereto as Exhibit A.

Moreover, as part of its bid, Beacon Capital Partners, LLC and its affiliates ("Beacon") explicitly informed Hancock that Beacon's "desire would be to bring over the property management team currently in place to the extent those employees are not retained by Hancock." Email from Jeff Brown of Beacon to Hugh MacDonnell of Morgan Stanley of 2/19/03, attached hereto as Exhibit B. Accordingly, when Beacon became the new owner and landlord of the Tower Complex, Beacon assumed overall responsibility for building maintenance and security and sought to take on Joyce's work unit to perform these functions. Job offers to Daniel Joyce and the majority of employees in his work unit followed.

Following the sale of the Tower Complex, Hancock needed some employees to provide maintenance services in the buildings that it still owned, as well as executive security and the like. Accordingly, Hancock retained some employees to fulfill these functions.

**Interrogatory No. 2:**

If you contend the jobs offered by BCPM to Plaintiff and the Class were "comparable jobs," as defined by the Plan Amendment, please state the basis for your contention.

**Answer to Interrogatory No. 2:**

Hancock objects to Interrogatory No. 2 on the ground that it seeks information related to "the Class" when no class has been recognized or certified in this matter and the Court has restricted discovery to the sole named Plaintiff, Daniel Joyce.

Subject to and without waiving this objection and the General Objections above, Hancock states that the Summary Plan Description, which provides a further explanation for employees of the term "comparable position" in the Plan Amendment, defines the term "comparable job" as a job that (1) pays a "similar salary"; (2) has "competitive benefit

offerings"; and (3) has "a work location within 50 miles of the current work location."

Complaint ("Compl."), Ex. B. Consistent with its sole and exclusive right under the provisions

of the Plan to interpret the provisions of the Plan, Hancock interpreted and determined

"competitive benefit offerings" to mean benefits that are competitive within the industry in

which a given employee works. This interpretation was based upon the purpose of the Plan,

which is to bridge an employee to future employment within his industry.

Thus, Hancock evaluated offers of employment from Beacon to Hancock employees,

including Daniel Joyce, based on the three reasonable components enumerated above to

determine whether the offers were for comparable jobs. Hancock's evaluation revealed that

Beacon's job offers were indeed for comparable jobs, as defined by the Plan Amendment and the

Summary Plan Description. With respect to the first component, Hancock found that the jobs

offered by Beacon to Joyce and others in his work unit paid similar salaries to the salaries paid

by Hancock. Upon information and belief, the average Beacon salary for employee's in Joyce's

work unit was two percent higher than that paid by Hancock. Upon further information and

belief, Joyce was offered $75,100 by Beacon, an increase from his salary of $74,358 as a senior

project manager at Hancock. As to the second component, please see the *Competitive*

*Assessment of Beacon Capital Partners Management, LLC Benefits Package with respect to*

*John Hancock's Severance Pay Plan "Comparable Job" Eligibility Provision* (the "Competitive

Assessment of Beacon's Benefits Package"), attached hereto as Exhibit C, which determined that

Beacon's benefits package was competitive among general industry employers. On the third

component of the "comparable job" analysis, since all of the jobs offered by Beacon to

Hancock's employees, including Joyce, were located in the very same complex of buildings in

6

which those employees were currently working for Hancock, the jobs that Beacon was offering

were well within fifty miles of the Hancock employees' current work locations.

**Interrogatory No. 3:**

Please state the basis for the contention in your letter dated December 16, 2004, wherein you purport to state the basis for denying Plaintiff's appeal for severance benefits (attached as Exhibit D to the Complaint), that "competitive benefit offerings," in the context of the Plan Amendment, is to be construed as requiring that a competitive assessment analysis be conducted based on normative data, considering the competitiveness of selected benefits versus industry/normative data and assessing the successor company's employee benefit package with respect to the Plan's 'Comparable Job' provision.

**Answer to Interrogatory No. 3:**

Hancock objects to Interrogatory No. 3 to the extent that it misstates or misconstrues

Hancock's actions, interpretations, or determinations with regard to the Plan Amendment, the

Summary Plan Description, and Hancock's competitive assessment analysis of Beacon's benefits

package.

Subject to and without waiving this objection and the General Objections above,

Hancock states that the Plan was amended, effective November 18, 2002, to state that

"[e]mployment is not terminated for purposes of this Plan if an employee . . . (c) is offered a

comparable position, as determined by the Company, as an employee with, or provides services

in any capacity to, a Successor Company, or (d) accepts any position as an employee with, or

provides services in any capacity to, a Successor Company." Compl., Ex. A, §3.2 at 5. In an

effort to further explain to Hancock employees the meaning of the term "comparable position" as

used in the Plan Amendment, the Summary Plan Description clarified that "[i]n the event of a

sale or outsourcing of a business unit, if an employee of the business unit is offered a comparable

job by . . . the purchaser or successor company, severance will not be paid . . . ." Compl., Ex. B.

The term "comparable" was then defined "as similar salary, competitive benefit offerings, and a work location within 50 miles of the current work location." *Id.*

Pursuant to § 7.1 of the Plan, attached as Exhibit A to Plaintiff's Complaint, Hancock has "the sole and exclusive right to interpret the provisions of the Plan and to determine all questions arising in connection with the administration, interpretation, and application of the Plan." Compl., Ex. A, § 7.1, at 9. Accordingly, Hancock has interpreted and determined the Plan Amendment, as further explained by the Summary Plan Description, to mean that "competitive benefit offerings" refers to benefits that are competitive within a given employee's industry. Hancock's interpretation and determination was based upon the purpose of the Plan, which is to bridge an employee to future employment within his industry, and was solely within Hancock's right and discretion pursuant to the provisions of the Plan.

Thus, in its effort to assess the comparability of job offers from Beacon to Hancock's employees following the sale of the Tower Complex, Hancock conducted a competitive assessment analysis in which it properly relied upon objective data sources to gather normative data about the range of competitive benefits offered to employees by general industry employers. Consistent with the terms and provisions of the Plan, Hancock did not and was not required to make any direct comparison between its benefits package and that of Beacon.

**Interrogatory No. 4:**

If it is your contention that Hancock performed a competitive assessment analysis based on industry data, which considered the competitiveness of selected benefits versus industry/normative data and assessed BCPM's employee benefit package with respect the Plan's 'Comparable Job' provision, please state the basis for selecting certain benefits for the analysis and not others.

8

**Answer to Interrogatory No. 4:**

Subject to and without waiving the General Objections above, Hancock states that Hancock's competitive assessment analysis of Beacon's benefits package considered the competitiveness of various benefits versus available normative data from general industry employers. The benefit categories selected for inclusion in Hancock's competitive assessment analysis were 401(k) plan benefits, pension benefits, medical benefits, dental benefits, and vacation benefits. These categories of benefits were selected because, based on the knowledge and experience of Hancock's Human Resource professionals who worked on the competitive assessment analysis, these are the benefits that employees care about the most and that have the greatest monetary value to employees.

**Interrogatory No. 5:**

If it is your contention that Hancock's IT Department received comparable job offers from IBM in 2003, please state the basis for such a contention. In your answer, please describe how you assessed whether IBM was offering the outsourced Hancock IT department employees "competitive benefit offerings."

**Answer to Interrogatory No. 5:**

Hancock objects to Interrogatory No. 5 on the grounds that it calls for the disclosure of information neither relevant to the subject matter involved in this action nor reasonably calculated to lead to the discovery of admissible evidence.

**Interrogatory No. 6:**

Please state the basis for your representation in your May 30, 2003 letter to Plaintiff and the Class (attached as Exhibit C to the Complaint) that Hancock was permitted to review BCPM's offers of employment, in the context of the three components of the Plan Amendment, both separately and in the aggregate.

9

**Answer to Interrogatory No. 6:**

Hancock objects to Interrogatory No. 6 on the ground that it seeks information related to "the Class" when no class has been recognized or certified in this matter and the Court has restricted discovery to the sole named Plaintiff, Daniel Joyce.

Subject to and without waiving this objection and the General Objections above, Hancock states that the Summary Plan Description, which provides a further explanation for employees of the term "comparable position" in the Plan Amendment, defines a comparable job as a job that (1) pays a "similar salary"; (2) has "competitive benefit offerings"; and (3) has "a work location within 50 miles of the current work location." Compl., Ex. B. Accordingly, Hancock evaluated Beacon's offers of employment to Hancock employees within Daniel Joyce's work unit based on these three enumerated components to determine whether the offers were for comparable jobs. To do this, Hancock evaluated each component separately to determine whether the requirements of that particular component had been satisfied. Hancock then assessed whether the three components of the "comparable job" definition (i.e., similar salary, competitive benefit offerings, and work location within 50 miles) when taken together—that is, in the aggregate—satisfied the requirements for deeming a job comparable under the Plan Amendment as further explained by the SPD. Thus, as stated in Joan DiCicco's May 30, 2003 letter, the components of the SPD's "comparable job" definition were reviewed separately and in the aggregate.

**Interrogatory No. 7:**

Referring to the Fourth Affirmative Defense, please state the basis for your contention that Plaintiff was offered a comparable job.

10

**Answer to Interrogatory No. 7:**

Hancock objects to Interrogatory No. 7 on the ground that it is duplicative of Interrogatory No. 2. Subject to and without waiving this objection and the General Objections above, Hancock incorporates by reference its Answer to Interrogatory No. 2 as if fully set forth herein.

**Interrogatory No. 8:**

Referring to the Fifth Affirmative Defense, please state the basis for your contention that Plaintiff is not entitled to benefits under the Plan because he accepted a job offer with BCPM.

**Answer to Interrogatory No. 8:**

Subject to and without waiving the General Objections above, Hancock states that pursuant to the terms of the amended Plan, "a person is eligible for benefits under [the] Plan if[, in addition to other criteria,] . . . his employment is terminated by the Company or a participating Subsidiary as part of a reduction in staff . . . ." Compl., Ex. A, § 3.1 at 4–5. However, "[e]mployment is not terminated for purposes of [the] Plan if an employee . . . accepts any position as an employee with, or provides services in any capacity to, a Successor Company." *Id.*, Ex. A, §3.2(d) at 5. In Daniel Joyce's case, each of the criteria of § 3.2(d) have been satisfied, rendering Joyce ineligible for severance benefits.

It is undisputed that Daniel Joyce was an employee of Hancock from March 1994 through June 2003, Compl. ¶¶ 7, 50, and that he accepted a job with Beacon while he was still employed by Hancock, *id.* ¶ 39. It is also undisputed that Beacon was a Successor Company to Hancock. *Id.* ¶ 1 (referring to "Hancock's successor company, Beacon Capital Partners Management, LLC"), ¶ 54 ("On or around May 5, 2003, Joyce received an offer of employment from *the successor company, Beacon.*" (emphasis added)). Thus, where Joyce was an employee

11

of Hancock when he accepted a position as an employee with Beacon, the Successor Company to

Hancock, Joyce is not entitled to severance benefits under the plain terms of the amended Plan.

**Interrogatory No. 9:**

If it is your contention that Plaintiff and the Class were offered opportunities to meet
individually with Hancock Human Resources professionals to discuss their concerns regarding
severance benefits, please state the basis for your contention.

**Answer to Interrogatory No. 9:**

Hancock objects to Interrogatory No. 9 on the ground that it seeks information related to

"the Class" when no class has been recognized or certified in this matter and the Court has

restricted discovery to the sole named Plaintiff, Daniel Joyce. Accordingly, Hancock will

answer with regard to meetings concerning Daniel Joyce, including any individual and group

meetings to which Joyce was invited as an employee of Hancock.

Subject to and without waiving this objection and the General Objections above,

Hancock states that on November 26, 2002 at 9:00 a.m. and 3:00 p.m. and on November 27,

2002 at 7:00 a.m., meetings led by Paul Crowley, then-Vice President of Real Estate Operations,

and attended by representatives from Human Resources were held to announce the planned sale

of the Hancock Tower Complex and to answer any questions that potentially affected employees

might have about the effect of the sale on their employment, including any questions regarding

severance benefits. Meetings were held at these various times to accommodate the differing

shifts of potentially affected employees. Joan DiCicco, a Human Resources officer at the time,

and Sandra Colley, then-Director of Workforce Diversity, attended the meetings and were

available to speak with any employees who had questions or concerns.

Once the sale of the Tower Complex to Beacon was announced and a new management

contract for the property was entered between Hancock and Beacon, additional general

attendance meetings were held in February 2003 to inform employees about the new

management contract and to answer their questions regarding severance benefits.  Again,

meetings were held at various times to accommodate the differing shifts of potentially affected

employees.  These meetings were attended by Paul Crowley; John Heavey, then-Real Estate and

Security Second Vice President; John Durnan, then-General Director of Building Management;

and DiCicco.  Barry Camiel, Director of Corporate Security at the time, and Sandra Colley may

have also attended these meetings.

    As time drew closer to July 2003, and the benefits package being offered by Beacon to

the migrating Hancock employees took shape, additional in-depth, general attendance meetings

were held to answer questions from employees regarding the transition and severance benefits.

These meetings were led by Vicki A. Newman, a benefits specialist in Hancock's Benefits & HR

Services group, and were again scheduled to accommodate the various shifts of potentially

affected employees.

    Apart from the general attendance meetings that Hancock held to convey information to

employees about the sale of and management transition for the Tower Complex, members of

Hancock's Human Resources Department remained ready and willing to meet individually with

employees, including Daniel Joyce, who had questions or concerns about their employment

status and eligibility for severance benefits.  Joyce, however, never requested such a meeting.

Instead, he sent an email to Joan DiCicco on June 2, 2003, attached as Exhibit A to the

Interrogatories, in which he inquired about Hancock's method for evaluating whether a job offer

was comparable.  DiCicco responded to Joyce's inquiry within twenty-four hours by sending a

reply email on June 3, 2003, also attached as Exhibit A to the Interrogatories, in which she

explained the components of the "comparable job" definition and of the competitive assessment

analysis of the Beacon benefits package. DiCicco also invited Joyce to contact her with any

additional questions. DiCicco received no further inquiries from Joyce regarding severance

benefits until being contacted by his attorney.

**Interrogatory No. 10:**

Please state the basis for your contention that members of the Hancock security
department, in or around January 2006, were entitled to receive severance benefits under the
Plan, when select members of the same security department were denied claims for severance
benefits under the Plan following the sale of the Tower Complex in 2003.

**Answer to Interrogatory No. 10:**

Hancock objects to the use of the phrase "security department" within Interrogatory No.

10 on the ground that it presumes that such a department exists or existed within Hancock.

Hancock further objects to Interrogatory No. 10 on the grounds that it calls for the disclosure of

information neither relevant to the subject matter involved in this action nor reasonably

calculated to lead to the discovery of admissible evidence.

**Interrogatory No. 11:**

Please list each person you plan on calling as an expert witness at the trial of this matter
and for each please state:

- a. the subject matter on which each expert is expected to testify;
- b. the substance of the facts and opinions to which each expert is expected to testify;
- c. any scientific methods used to support said testimony;
- d. and please state each expert witness' credentials, expertise, or area of specialty allowing
  he or she to testify as an expert, and the business and home address and telephone
  number for each person listed.

**Answer to Interrogatory No. 11:**

Hancock objects to Interrogatory No. 11 on the grounds that it is premature. Subject to

and without waiving this objection and the General Objections above, Hancock states that it will

supplement its response to Interrogatory No. 11 to the extent required under the Federal Rules of

14

Civil Procedure and the Local Rules of the United States District Court for the District of

Massachusetts at a later appropriate time.

15

## VERIFICATION

I hereby state that the answers contained in the foregoing **JOHN HANCOCK FINANCIAL SERVICES, INC.'S OBJECTIONS AND ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT JOHN HANCOCK FINANCIAL SERVICES, INC.** are true and correct to the best of my information and belief. To the extent the answers are not based on personal knowledge, they are based upon reasonable investigation of corporate records and personnel of John Hancock Financial Services, Inc. and upon information collected and made available to me by others.

Dated: ___3/11 06___                        _____
                                            Peter J. Mongeau
                                            Vice President of Human Resources
                                            Services
                                            JOHN HANCOCK FINANCIAL
                                            SERVICES, INC.

16

Respectfully submitted,

JOHN HANCOCK FINANCIAL
SERVICES, INC.

As to objections, by its attorneys,

_Erin N. Jackson_

Anthony M. Feeherry (BBO #160860)
Daniel P. Condon (BBO #547676)
Erin N. Jackson (BBO #647375)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
617.570.1000

Dated: March 2, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2006, I caused a true copy of the foregoing **JOHN HANCOCK FINANCIAL SERVICES, INC.'S OBJECTIONS AND ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT JOHN HANCOCK FINANCIAL SERVICES, INC.** to be served upon counsel of record for Plaintiff by first-class mail.

_Erin N. Jackson_

Erin N. Jackson
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
617.570.1000

# EXHIBIT A

NY1BDF1421482@A2/05 DEC: 20@23:20 PM/dd

*John Hancock*

**Appendix B**

# Term Sheet for Purchase and Sale Agreement

John Hancock Tower
Complex in Boston

CONFIDENTIAL

Morgan Stanley

**John Hancock Tower
Complex in Boston**

Term Sheet for Purchase and Sale Agreement

# Purchase and Sale Agreement

| Term Sheet for Purchase and Sale Agreement | |
|---|---|
| **Purchaser** | Purchaser should specifically identify who the purchasing entity will be and describe its experience and financial capability, creditworthiness and capacity to meet the obligations under the Purchase and Sale Agreement. |
| **Purchase and Sale Agreement** | The form of Purchase and Sale Agreement will be circulated to prospective purchasers in a subsequent distribution (the lease with the Seller will be attached as an exhibit). Purchasers should not propose a new form of agreement or lease. |
| | Bids will be evaluated in part on the nature and extent of the comments to the Purchase and Sale Agreement. |
| **Property** | Purchasers should make a bid for all four of the properties—the Tower, Stephen L. Brown Building, 200 Berkeley Street and the Garage—as an entirety. Purchasers shall allocate a value to each building, but each proposal should cover all buildings and improvements composing the Property. |
| | Purchaser's allocation of value will not necessarily be determinative in any eventual sale. |
| **Purchase Price** | Seller will require a cash sale, meaning that the entire purchase price shall be paid by wire transfer, in good funds on the closing date. Seller shall not provide financing for the sale. |
| | Seller reserves the right to allocate the purchase price amongst the buildings composing the Property and between real estate and personal property. |
| | In addition to clearly stating the gross purchase price, please acknowledge that Purchaser will pay for the following closing costs, including: |
| | • Fees for recording documents of title |
| | • Title insurance and reinsurance costs and premiums |
| | • Any additional survey requirements beyond the surveys furnished by Seller |
| | • Escrow fees; and |
| | • Its own due diligence expenses including, without limitation, the cost of its lawyers, accountants, engineers, consultants and other agents and vendors |

CONFIDENTIAL    *John Hancock*

91

NY/IBGH 42/4826/4206 DEC 2006320 PM/100

**Morgan Stanley**

**John Hancock Tower Complex in Boston**

Term Sheet for Purchase and Sale Agreement

# Purchase and Sale Agreement (cont'd)

| Term Sheet for Purchase and Sale Agreement | |
|---|---|
| **Bid Capitalization** | Purchaser should indicate how it plans to capitalize its purchase, specifying its relative amounts of equity and debt and the intended use of senior, mezzanine, subordinate or structured debt.<br><br>Seller will not accept a condition or contingency for financing or funding. |
| **Deposit** | Seller will require a deposit equal to five percent (5%) of the gross Purchase Price of the Property upon the signing of the Purchase and Sale Agreement. The deposit shall be in the form of good funds held in escrow pursuant to the escrow provisions in the Purchase and Sale Agreement (or an independent escrow agreement) or a letter of credit issued by a bank and otherwise in form and substance satisfactory to Seller. |
| **Discretionary Authority and Required Approvals** | Please clarify the authority and discretion of Purchaser to commit the necessary capital for the acquisition.<br><br>Please clearly state:<br><br>• What approvals have been obtained already in making the written bid<br><br>• What approvals will be needed prior to the signing of a Purchase and Sale Agreement and consummating the transaction; and<br><br>• The timing of obtaining such approvals<br><br>The terms of the Purchase and Sale Agreement and closing of the sale may not be contingent upon obtaining any approvals. |
| **Due Diligence** | Purchasers should complete all or most of their due diligence (including without limitation title, survey and environmental due diligence) before the Purchase and Sale Agreement is signed. A short due diligence period after the contract's signing is strongly preferred, no more than seven (7) days. |
| **Closing** | Bids should provide for a closing within seven (7) days after expiration of the due diligence period in the Purchase and Sale Agreement. |

CONFIDENTIAL

MorganStanley

**John Hancock Tower
Complex in Boston**

Term Sheet for Purchase and Sale Agreement

# Purchase and Sale Agreement (cont'd)

| Term Sheet for Purchase and Sale Agreement | |
|---|---|
| **Conditions and Contingencies** | Please state any conditions or contingencies to which your proposal is subject (including additional due diligence requirements, if any). |
| | Bids will be evaluated in part on the nature and extent of the conditions and contingencies of a proposed Purchaser. |
| **Tenant Estoppel Certificates** | Seller will circulate to each tenant a form of tenant estoppel certificate attached to the proposed Purchase and Sale Agreement. It will be a condition of closing that Purchaser receive one for the Seller's space, for certain other tenants specified in the Purchase and Sale Agreement and from other tenants, to a total of seventy-five percent (75%) of the leased space at the Property. |
| | Subject to the provisions below, Purchaser may terminate the Purchase and Sale Agreement if Seller fails to obtain the required number of estoppel certificates or if a tenant estoppel certificate discloses a material default of the lease or a material deviation from the terms set forth in the rent roll (except for adjustments made to accommodate the remeasurement of space). |
| | Purchaser may not change the form of estoppel certificate attached to the draft Purchase and Sale Agreement and must accept the form attached to a given lease if it differs from that attached to the Purchase and Sale Agreement. |
| | Seller will have the right to deliver a landlord's estoppel certificate to compensate for any deficiencies in the tenant estoppels and cause the sale to close. Landlord's estoppel certificate would terminate and be replaced and superseded for any lease for which it actually obtains and delivers to Purchaser a tenant estoppel certificate, whether before or after closing. |
| **Managing Entity** | Purchaser should identify the property manager to be used and its relevant experience, if the Property will not be managed directly by the Purchaser. |

John Hancock

**CONFIDENTIAL**

**Morgan Stanley**

93

NY8IDF14Q14805A/2/06 DEC 0020320 PIVA102

John Hancock Tower
Complex in Boston

Term Sheet for Purchase and Sale Agreement

# Purchase and Sale Agreement (cont'd)

NY/EDF1421428A/005 DEC 2002930 PM103

| Term Sheet for Purchase and Sale Agreement | |
|---|---|
| Employees | Seller currently employs several employees in its real estate operations and security area who may be available for employment by a prospective Purchaser. |
| | Bids should include the potential interest of a prospective Purchaser to hire these employees, including the anticipated number of employees and the area of specialty. |
| | Bids will be evaluated in part on the nature and extent of the Interest in hiring some or all of these employees. |
| Name of Buildings and Reservation of Rights | The name "John Hancock Tower" for the property located at 200 Clarendon Street and the name "Stephen L. Brown Building" for the property located at 197 Clarendon Street shall remain in perpetuity and may not be changed without the prior written consent of the seller. |
| | There may also be certain reservation of rights and restrictions on the use of the likeness of the Property for particular purposes, which shall be embodied in the Purchase and Sale Agreement, the lease with Seller or a separate agreement. |
| Flip Protection | The Purchase and Sale Agreement will provide that should any or all of the Property be sold to a third party within five years of the closing, Seller will be entitled to fifty percent (50%) of the difference between the purchase price paid by the third party and the allocated purchase price paid by the Purchaser for the portion of the Property sold. |

CONFIDENTIAL

John Hancock

94

Morgan Stanley

**John Hancock Tower Complex in Boston**

Term Sheet for Purchase and Sale Agreement

# Purchase and Sale Agreement (cont'd)

**Term Sheet for Purchase and Sale Agreement**

**Reservation of Rights**

By submitting a bid or proposal, a prospective Purchaser acknowledges and agrees that (a) Seller is free to conduct the process leading to a possible sale of any or all of the Property as it, in its sole discretion, determines (including, without limitation, by entertaining or rejecting any bid or proposal, negotiating or not negotiating with any prospective Purchaser and entering into a Purchase and Sale Agreement for all or any portion of the Property without prior notice to any other person or prospective Purchaser), (b) Seller reserves the right, in its sole discretion, to change the procedures relating to its consideration of a sale of all or any portion of the Property at any time without prior notice to any person or prospective Purchaser, to reject any and all bids, proposals or offers made by any prospective Purchaser with regard to the Transaction, and to terminate discussions and negotiations with any prospective Purchaser at any time and for any reason prior to the signing a Purchase and Sale Agreement with that party, and (c) unless and until a Purchase and Sale Agreement for the Property has been executed, and subject to any limitations on liability contained in that agreement or otherwise applicable, Seller will have no liability to any prospective Purchaser with respect to a sale of all or a portion of the Property and then only to the parties to such Purchase and Sale Agreement to the extent set forth in that agreement.

**Purchaser Acknowledgment**

By submitting a bid or proposal, a prospective Purchaser acknowledges and agrees to all of the conditions in this investor bid package, including without limitation the terms of the disclaimer language contained in it.

CONFIDENTIAL    *John Hancock*

95

**Morgan Stanley**

# EXHIBIT B

**Moloney, Thomas**

| | |
|---|---|
| From: | Hugh.Macdonnell@morganstanley.com |
| Sent: | Wednesday, February 19, 2003 10:31 PM |
| To: | Devin.Murphy@morganstanley.com; tmoloney@jhancock.com; pcrowley@jhancock.com; Jeffrey.Granoff@morganstanley.com; Will.Kirby@morganstanley.com |
| Subject: | Fw: Hancock Property Management |

FYI - this was not described in detail in the bid letter.

--------------------------
Hugh Macdonnell
Morgan Stanley


----- Original Message -----
From: Jeff_Brown
Sent: 02/19/2003 02:47 PM
To: hugh.macdonnell@morganstanley.com
Subject: Hancock Property Management

Hugh,

Beacon will directly manage the complex.  Our desire would be to bring over the property management team currently in place to the extent those employees are not retained by Hancock.

Beacon's intention is to continue the level of service at the Complex and minimize the impact on Hancock of the change in ownership.

Jeff

1

CONFIDENTIAL

# EXHIBIT C

**Competitive Assessment of Beacon Capital Partners Management, LLC Employee Benefits Package with respect to John Hancock's Severance Pay Plan "Comparable Job" Eligibility Provision**

This assessment considers: 1) the competitiveness of selected benefits versus industry/normative data, 2) whether certain benefit differences may create a "noise factor" with transitioning associates, and 3) a comparison of employee health plan contributions for Beacon versus John Hancock.

| Benefit | Competitiveness* | Comment |
|---|---|---|
| 401(k) | Above Average | ➢ Up to 4% match versus 3% norm ($0.50 up to 6%) |
| Pension | NA | ➢ Note: Small employers do not offer pension plans – *Significant Noise Factor  (4% loss)* |
| Medical: Blue Cross Blue Shield includes large network (w/significant overlap to HPHC) | Above Average | ➢ HMO/POS office visit copay: $10 versus $15 norm<br>➢ POS out-of-network deductible: $250/$500 versus $400/$800 norm<br>➢ POS out-of-network coinsurance: 20% versus 30% norm<br>➢ POS out-of-network out-of-pocket maximum: $1,000/$2,000 versus $1,500/$2,500<br>➢ HMO/POS Rx 3-tier copays: $10/$20/$35 same as norm |
| Dental: Guardian network not as large as Delta Dental *Noise Factor* | Average to Above | ➢ Combined with Vision Care benefit – *Modest Noise Factor*<br>➢ Annual deductible: $50 same as norm<br>➢ Annual maximum: $1,500 versus norm of $1,000 |
| Health Plan Costs | Average | <table><tr><th>Plan/Weekly</th><th>JH single</th><th>Beacon single</th><th>JH family</th><th>Beacon family</th></tr><tr><td>HMO</td><td>$16.12</td><td>$19.01 ($1.50)</td><td>$49.84</td><td>$59.84 ($520)</td></tr><tr><td>POS</td><td>$18.65</td><td>$20.30 ($ .85)</td><td>$57.68</td><td>$63.88 ($320)</td></tr><tr><td>Dental/Vision</td><td>$3.36</td><td>$ 2.31 $ .55</td><td>$10.22</td><td>$ 7.67 $1.30</td></tr></table><br>The Beacon medical plan employee contributions are greater than JH's. Given an average JH salary of $46,000, the greatest impact would be for an associate with HMO family coverage in an amount of ~$500 (or 1%) which is offset by the average Beacon salary which is 2% higher than JH's. However, Beacon does not offer a "dual coverage" rate – and for associates with this coverage level under the JH plans, the additional (to the above) cost increases are HMO - $850 and POS - $980. *Noise Factor Recommendation:* One-time" grossed-up "bonus" payment to associates moving from dual to family. |
| Vacation | Below Average *Significant Noise Factor* | Only 1% of employers offer a fixed number of days of vacation to all employees. The majority (75%) of employers use a years-of-service schedule. Fifteen days of vacation is the norm for five years of service. Generally, there's an additional 2.5 days every five years thereafter. Therefore, for longer-service associates, the vacation schedule is not competitive. In addition, the MASBA average is 4 weeks. |

*Sources: Mercer/Foster Higgins 2002, Hewitt US Salaried 2002 and Massachusetts Small Business Association

^A one-time payment is recommended as it is "comparable" to the severance pay maximum of 52 weeks during which the lower contributions would apply.

CONFIDENTIAL

## "Competitive" Assessment Score

| Benefit | Weighting* | Score** | Total |
|---|---|---|---|
| *401(k)* | 20% | 3 | .6 |
| *Pension* | 15% | 0 | 0 |
| *Medical* | 30% | 3 | .9 |
| *Dental* | 5% | 2 | .1 |
| *Vacation* | 30% | 1 | .3 |
| *Total* | 100% | | 1.9 = Average |

Weighting: The weighting is based on Hewitt's Benefit Index Base Company "Total Value" Distribution
Scores: With respect to "Competitiveness," the scores are:  Above Average = 3   Average = 2   Below Average = 1   No Benefit = 0

**Summary:** The Beacon benefits package is competitive, and satisfies the "comparable job" criteria of the JH severance pay plan.

Assessor: Peter Mongeau, 2nd VP, Benefits & HR Services

CONFIDENTIAL

Mongeau Dep. Tr.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11428-WGY

```
*********************************
DANIEL JOYCE, Individually and on *
behalf of a class of others       *
similarly situated,               *
        Plaintiff,                *
                                  *
v.                                *
                                  *
JOHN HANCOCK FINANCIAL SERVICES,  *
INC., and JOAN M. DiCICCO,        *
        Defendants.               *
*********************************
```

**PURSUANT TO MUTUAL CONFIDENTIALITY AGREEMENT**

DEPOSITION OF PETER J. MONGEAU,
taken pursuant to the applicable provisions of the
Federal Rules of Civil Procedure, before Michelle
Kaczynski, a Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the offices of Todd & Weld LLP, 28
State Street, 31st Floor, Boston, Massachusetts, on
Monday, May 22, 2006, at 10:42 a.m.

**KACZYNSKI REPORTING**
**72 CHANDLER STREET, SUITE 3**
**BOSTON, MASSACHUSETTS  02116**
**(617) 426-6060**

Page 5

1    A. My name is Peter Mongeau, P E T E R,
2    M O N G E A U.
3    Q. And if you would give us your address?
4    A. 80 Sheffield, S H E double F I E L D, Road,
5    in Melrose, M E L R O S E.
6    Q. What do you do for a living, Mr. Mongeau?
7    A. I work in human resources at John Hancock.
8    Q. Do you have a title?
9    A. I'm the vice president of HR shared services.
10    Q. Okay, and how long have you had that
11    position?
12    A. This current position for two years.
13    Q. And before we get too deep into your
14    occupation, could you just give me a brief description
15    of your education?
16    A. I have a bachelor of science from Salem State
17    College in political science.
18    Q. Okay, and take me through your job
19    trajectory. Where did you start out working once you
20    graduated from school, and what brings you to your
21    position today?
22    A. My first employment after college was with
23    Blue Cross and Blue Shield in customer service and then
24    marketing area where I did communications work. I then

Page 6

1    moved to John Hancock and worked in their group benefit
2    department, again doing marketing and communications
3    work, and about fifteen or so years ago I transferred
4    into human resources, and I've during that tenure
5    focused on benefits and have assumed various
6    responsibilities over that period of time.
7    Q. Okay, so when did you start with John
8    Hancock?
9    A. 1986.
10    Q. And can you describe for me the various jobs
11    you had that pertain to benefits at John Hancock?
12    A. I was a benefit specialist or consultant, I
13    can't recall the exact title, focusing on our health
14    programs initially, and then became the director of the
15    benefit policy and design area. After that time I
16    assumed the administrative functions as well, and as
17    well as our payroll and systems and different types of
18    activities all fall under the what we refer to as
19    shared services today.
20    Q. What are shared services?
21    A. That would be the benefit programs,
22    compensation, payroll, systems, communications.
23    Q. When you were the director of benefits
24    policies and design, I've got the title or the concept

Page 7

1    correct, what were your responsibilities?
2    A. To manage and provide the oversight on the
3    benefit programs, the financials of those programs, to
4    ensure that we were providing our employees with a
5    benefit package that was attractive and competitive in
6    the marketplace.
7    Q. Okay, and in that context, did you rely on
8    various third parties or external sources to confirm
9    that the benefits that John Hancock was offering were
10    from your perspective and John Hancock's perspective
11    competitive?
12    A. Yes.
13    Q. Can you tell me the types of sources that you
14    turned to when you needed to evaluate whether or not
15    something was competitive when you were the director of
16    benefits, policies and design; again if I've got the
17    title correct?
18    A. The source that we typically used was a, the
19    firm was Hewitt, and their resource was called the
20    Benefit Index, and it was a valuation tool.
21    Q. Did you rely on any other information when
22    you were the director of benefits to evaluate the
23    competitiveness of John Hancock's benefits?
24    A. In my industry there are various studies and

Page 8

1    surveys done that provide information about benefit
2    trends and prevalence, so I would have referred to
3    those.
4    Q. And those studies -- I'm sorry, sir, let me
5    back up. First of all, Mr. Feeherry won't let me
6    interrupt you, he'll understand I'll do it
7    inadvertently. I don't intend to, so likewise, I may
8    ask a question, and you probably know exactly where I'm
9    going. You should wait till I'm finished as well so we
10    have a clean transcript, so in any event, you were
11    talking about these studies that you periodically
12    reviewed. Were the studies of the industry that John
13    Hancock was in?
14    Okay, next rule. If I ask a bad
15    question, feel free not to answer it, and that was a
16    bad one, I think it was confusing. Define for me John
17    Hancock's industry?
18    A. Financial services.
19    Q. Were the studies that you looked into in your
20    capacity as the director of benefits studies of the
21    financial services industry?
22    A. Yes.
23    Q. Okay. Did you have access to studies other
24    than studies of the financial services industry in your

Page 17

1    Q. Okay. When is the last time you saw it?
2    A. I don't recall the last time I saw it.
3    Q. It's a study you relied on in the context of
4    evaluating the competitiveness of Beacon's benefits --
5    A. Correct.
6    Q. Okay, and was it printed out?
7    A. Yes.
8    Q. And did you have a file folder where you kept
9    information that pertained to the assessment?
10    A. Yes.
11    Q. And when you produced documents in the
12    context of this case, did you produce that file folder
13    to your attorneys, yes or no?
14    A. No.
15    Q. Did the file folder exist at the time, the
16    file folder that contained information germane to your
17    competitive assessment?
18    A. When I was asked to produce it?
19    Q. Yes.
20    A. I could not find it.
21    Q. What information was contained in that
22    folder; if we were to go and recreate it, what would
23    we, where would we go to find the documents?
24    A. The file could have included notes that I

Page 18

1    would have made having reviewed the different materials
2    I've mentioned. There may have been a copy of the plan
3    document, things of that nature. The file wouldn't
4    necessarily have had the studies. The studies could
5    have also been, since they were normative information,
6    they could have simply been somewhere else in my office
7    for reference.
8    Q. Can you give me enough information about this
9    Foster Higgins study that I might with a little effort
10    find it?
11    A. The Foster Higgins firm was acquired by
12    Mercer, and Mercer/Foster Higgins continues to produce
13    that study on an annual basis.
14    Q. This was 2003 this assessment was being made?
15    Your assessment was made when?
16    A. My assessment was in 2004.
17    Q. So was the Foster Higgins study a 2004 study?
18    A. It would have been what was available in
19    2004. Some of these studies report on information, you
20    know, there may be a year lag, for example.
21    Q. Okay, but you relied on the most current
22    information that Foster Higgins had?
23    A. Correct.
24    Q. Okay, and was that information broken down by

Page 19

1    industry?
2    A. By industry, no.
3    Q. So if you wanted to do an evaluation of the
4    property management industry to see what was
5    competitive in the property management industry, could
6    you rely on the Foster Higgins data to inform that
7    judgment?
8    MR. FEEHERRY: Objection. You may
9    answer.
10    A. I could rely on that information to make a
11    determination as to what's competitive on a normative
12    basis if that, given that I did not have information
13    specific to the industry.
14    Q. Okay. My question is a little different, I
15    think. My question is could you rely on the Foster
16    Higgins data in order to determine whether or not the
17    Beacon benefits were competitive in the property
18    management industry?
19    MR. FEEHERRY: Objection. You may
20    answer.
21    A. I could rely on that information to compare
22    Beacon's benefits to what was normative.
23    Q. Okay, but not specifically the property
24    management industry, only normative, right?

Page 20

1    A. As I recall, that's correct.
2    Q. Now, what about the Hewitt studies, how,
3    describe those studies or that study for me, please,
4    and I'm specifically referring to the study that you
5    relied on to help inform your judgment about the
6    competitiveness of the Beacon benefits package?
7    A. That study included information on a number
8    of benefits, not just health, and it again was
9    normative in nature, was of a large group of companies
10    across all industries, and it provided information
11    based on prevalence.
12    Q. Okay, so if you wanted to determine whether
13    or not Beacon's benefits package was competitive within
14    the property management industry, you couldn't get that
15    information from the Hewitt study, is that correct?
16    MR. FEEHERRY: Objection. You may
17    answer.
18    A. The Hewitt study did not include a specific
19    number of property management companies, so the
20    analysis was based on the available normative data.
21    Q. Right, so if you want to specifically
22    evaluate benefits that Beacon offered against the
23    property management industry, you couldn't make that
24    specific analysis, you couldn't undertake that specific

Page 29

1  address in this language the idea of a comparable
2  position.
3      Q. And comparable position is under subparagraph
4  C of section 3.2, is that correct?
5      A. Yes.
6      Q. Okay, and at the time -- let me ask you this
7  question. Whose language is that, comparable position,
8  who suggested that language?
9          MR. FEEHERRY: Objection, but you may
10  answer.
11     A. I don't recall --
12     Q. Okay.
13     A. -- who exactly.
14     Q. I want to go back to the process of amending
15  this. Was this amended by a team of people; by this I
16  mean Exhibit 1?
17         MR. FEEHERRY: Objection. You may
18  answer.
19     A. I worked as I indicated with counsel to
20  incorporate the amendments into the plan document. It
21  was reviewed by myself, counsel when it was forwarded
22  for approval. The members of the management of our
23  committee that would have approved this would have also
24  reviewed the amendment or the document.

Page 30

1      Q. Did they, this committee, did they make any
2  substantive changes to the document?
3      A. No.
4      Q. Okay, so the authors of this document are you
5  and counsel?
6      A. We work in a collaborative way so that there
7  would have been other HR professionals that work with
8  me that it would have been typical for them to have
9  reviewed this information as well.
10     Q. Okay. Do you -- excuse me. Can you recall
11  whether any of these HR professionals suggested
12  language changes to what appear in section 3.2 of
13  Exhibit 1?
14     A. I can't recall specifically.
15     Q. In context of these efforts, these, this
16  effort to amend the plan, was there a discussion about
17  what the definition of comparable position means?
18     A. At the point of amending this plan?
19     Q. Yes, sir.
20     A. I don't recall whether there was specific
21  conversation about that.
22     Q. Do you remember having a definition in mind
23  in late 2002 of what a comparable position means?
24         MR. FEEHERRY: Objection. You may

Page 31

1  answer.
2      A. I don't recall.
3      Q. And you don't recall any documents that went
4  back and forth to define or refine the definition of
5  comparable position, is that a correct statement?
6      A. At this time?
7      Q. Yes, sir.
8      A. I believe that's a correct statement.
9      Q. Can you tell me, was there an event, upcoming
10  event or unfolding event that inspired you to seek to
11  amend the plan?
12         MR. FEEHERRY: Objection. You may
13  answer.
14     A. The plan was amended at the same time the
15  company was looking to sell certain properties.
16     Q. What properties?
17     A. John Hancock Tower.
18     Q. The properties that --
19     A. The --
20     Q. I'll let you tell me.
21     A. I believe it's what was referred to as John
22  Hancock Complex, there were three buildings.
23     Q. Okay, and why was the plan amended -- Strike
24  the question.

Page 32

1          What about the prospective sale of the
2  tower complex inspired John Hancock to amend the plan?
3          MR. FEEHERRY: Objection. You may
4  answer.
5      A. As I noted, the -- my recollection is the
6  earlier plan language did not address in the manner
7  this plan language does the idea of a comparable
8  position with a successor company, and it was
9  anticipated that when the tower complex was sold that
10  many of the John Hancock employees would continue to
11  perform the same functions but would do so for a
12  different employer on behalf of John Hancock, so they
13  would have a comparable position with the successor
14  company.
15     Q. What do you mean, they would do it with a
16  different company on behalf of John Hancock?
17     A. John Hancock ultimately sold the properties
18  to Beacon. Beacon needed to provide services for those
19  buildings, and it was those employees who could render
20  those services.
21     Q. Those services would be then rendered on
22  behalf of Beacon, not on behalf of John Hancock, right?
23         MR. FEEHERRY: Objection. You may
24  answer.

Page 33

1    A. If they were, if the individuals were
2  employees of Beacon, and Beacon is the landlord, and
3  the landlord agrees to provide services such as
4  maintenance for the building for those building
5  tenants, in my vernacular I would think that's on
6  behalf of the tenants. John Hancock was a tenant.
7    Q. Is that what you meant a moment ago?
8    A. Yes.
9        MR. PETERS: Can we mark this as the
10  next exhibit, please?
11        (Marked Exhibit 2; E-Mail, Mongeau to
12  Palmer and Others).
13    Q. Mr. Mongeau, we marked as Exhibit 2 an e-mail
14  from you to Page Palmer and others with document
15  control JH1976. Can you tell me if you remember
16  sending this e-mail?
17    A. Can I take a moment to read it?
18    Q. As much time as you need.
19        (Pause).
20    A. I recall this.
21    Q. Okay. Can you tell me in a general way what
22  the e-mail addresses?
23    A. At this time we were contemplating changes to
24  the severance plan that we discussed earlier this

Page 34

1  morning, and I conducted an initial assessment of our
2  plan provisions as well as what we were contemplating
3  and made some comment on those.
4    Q. And in the first sentence you write, I
5  finally contacted; I'm sorry, I finally connected with
6  Hewitt's M&A contact, talked about the two following
7  severance plan provisions in the context of IT
8  outsourcing. Can you tell me what you're referring to
9  there?
10    A. At about the same time the building was going
11  to be sold there was also a discussion of outsourcing
12  certain IT or information technology work.
13    Q. Outsourcing; well, tell me what was being
14  contemplated, outsourcing what?
15    A. I'm not certain that I am right, but I
16  believe the nature of this IT work was what we would
17  refer to as desktop support.
18    Q. And this was being outsourced to IBM?
19    A. Yes.
20    Q. Okay, and were you involved in any of the
21  negotiations with IBM that led to the outsourcing of
22  the IT people?
23    A. No.
24    Q. Do you know what, do you know that they were

Page 35

1  in fact outsourced to IBM, these IT folks?
2    A. I believe they were.
3    Q. Could you tell me what the name of their
4  business unit was, the IT business unit?
5        MR. FEEHERRY: Objection. You may
6  answer.
7    A. No, I can't.
8    Q. Is this word business unit something that
9  John Hancock uses in its business, is it a word you're
10  familiar with?
11        MR. FEEHERRY: Currently?
12        MR. PETERS: No, back in the
13  September-October 2002 time frame.
14    A. If we spoke organizationally, we would speak
15  about departments.
16    Q. Did the term business unit have any meaning
17  in November of 2002 as best you know?
18    A. Any specific defined meaning?
19    Q. Right.
20    A. There was a phrase to describe a group of
21  employees who provide services.
22    Q. All right, so if an employee at John Hancock
23  in November of 2002 wanted to determine what business
24  unit he belongs to or she belonged to, how would he or

Page 36

1  she go about doing that?
2        MR. FEEHERRY: Objection. You may
3  answer.
4    A. I can only answer the question with respect
5  to what I would do.
6    Q. Okay. What would you do?
7    A. It would be that I would know that I worked
8  for, in the example I gave you, the, a design and
9  policy group, that would have been my, in my way of
10  looking at things, a unit, a group of employees working
11  together.
12    Q. Okay. We're going to see documents later on,
13  Mr. Mongeau, that will lift the veil of mystery from
14  this line of questioning that uses that word, business
15  unit. Is it an ambiguous term from your perspective as
16  the vice president of human resources?
17        MR. FEEHERRY: Objection. You may
18  answer.
19    A. Would you define ambiguous for me?
20    Q. Sure, not subject to a single definable
21  understandable meaning.
22    A. As I explained, I think it would be
23  understood it's the unit, the group you work with.
24    Q. Okay, so you don't think it's an ambiguous

Page 37

```
 1   term, do you?
 2       A. I don't know if it would be ambiguous to
 3   someone else.
 4       Q. Okay. To you it's unambiguous?
 5           MR. FEEHERRY: Unambiguous?
 6           MR. PETERS: Unambiguous, yes.
 7       Q. To you, Mr. Mongeau, the term business unit
 8   is unambiguous, is that correct?
 9       A. To me the term business unit means what I
10   indicated. I'm having difficulty with this idea of
11   ambiguity, so it's clear to me that business unit would
12   be a group of employees working together.
13       Q. Okay. In a department?
14       A. It wouldn't have to be a department, they
15   could be part of a department.
16       Q. Okay, so Mr. Joyce, the plaintiff in this
17   case, what was his business unit?
18       A. I understand that his unit were what I refer
19   to as the trades group. He oversaw the maintenance
20   team support group that provide electricians, things of
21   that, people of that nature.
22       Q. Who is in it, not individuals, but types of
23   jobs, list them if you would?
24           MR. FEEHERRY: Objection. You may
```

Page 38

```
 1   answer if you can.
 2       A. I think I've told you about as much as I
 3   understand. I believe it was electricians, plumbers,
 4   people who worked in the building.
 5       Q. Well, we'll circle back to this notion.
 6           MR. FEEHERRY: The last of that I want
 7   to be sure, people who --
 8       A. Worked on the building.
 9           MR. FEEHERRY: Thank you.
10           MR. PETERS: Thank you, sorry for the
11   interruption.
12       Q. We'll circle back to this concept later on,
13   but let's get back to Exhibit 2, Mr. Mongeau. The IT
14   outsourcing that's referring to in the first sentence,
15   do you know whether or not there was a contract that
16   reflected that outsourcing?
17       A. I don't know personally.
18       Q. Do you know who worked on the IT outsourcing
19   from a management perspective to accomplish it?
20       A. I believe the CFO at the time was involved.
21       Q. Who was that?
22       A. Thomas Moloney.
23       Q. Was it this IT outsourcing that inspired you
24   to look at amending the plan that we marked as
```

Page 39

```
 1   Exhibit 1?
 2       A. We amended the plan after this assessment.
 3       Q. Right. My question is did the prospect of
 4   outsourcing IT inspire you to look at whether or not
 5   the plan should be amended?
 6           MR. FEEHERRY: Objection. You may
 7   answer.
 8       A. We looked at this change as a result of
 9   contemplating the IT outsourcing.
10       Q. Okay. Now, at the time you were
11   contemplating the IT outsourcing, was Hancock also
12   contemplating selling the tower complex?
13           MR. FEEHERRY: If you know.
14       A. I don't recall exactly the sequencing of
15   those two events.
16       Q. Okay. I want to go back to an earlier
17   statement that I think you made, and that is that the
18   sale or the prospective sale of the tower complex is
19   what inspired you to take a look at the, whether the
20   severance pay plan should be amended. Do you recall
21   generally that testimony?
22       A. Yes.
23       Q. Okay. Is it more correct -- Strike the
24   question.
```

Page 40

```
 1           In fact, wasn't it the IT outsourcing or
 2   potential IT outsourcing that inspired you to consider
 3   amending the plan?
 4       A. This document suggests that it would have
 5   been IT before the building.
 6           MR. FEEHERRY: And this document was a
 7   reference to Exhibit 2 to Mr. Mongeau's deposition.
 8       Q. I don't mean to go back over terrain that you
 9   may have exhausted your memory on. Have you told me
10   what you know about the structure of the IT
11   outsourcing; in other words, how it was supposed to be
12   done or contemplated being done?
13       A. Yes.
14       Q. Okay. You don't know -- well, let me ask you
15   this question. Can you define for me what outsourcing
16   means in the context of Exhibit 2?
17           MR. FEEHERRY: Objection. You may
18   answer.
19       A. There were a group of employees that provided
20   certain services as employees of the company. The
21   outsourcing would have been looking to, outsourcing
22   generally would look to either a third party to provide
23   a service to us or for employees that were performing a
24   service for the company as employees of the company to
```

Page 41

```
 1   provide those services by way of working for another
 2   employer that we would outsource to, and those
 3   employees would render services back to us.
 4       Q. So they would go from being Hancock employees
 5   to a third party's employees, and then as employees of
 6   that third party they would supply the same types of
 7   services that they supplied to Hancock as employees, is
 8   that a correct statement?
 9       MR. FEEHERRY: Objection. You may
10   answer.
11       A. They would provide services to John Hancock
12   as employees of another company.
13       Q. Okay. Now, this definition or description
14   that you've given to me, is it something that has been
15   discussed in the context of your position as vice
16   president of human resources with people other than
17   attorneys; in other words, to define what outsourcing
18   means?
19       A. Could you clarify the question?
20       Q. Yeah, I'll strike it, I'll ask it another
21   way.
22           We'll see a plan amendment later on in
23   this deposition that says in substance, in the event of
24   a sale or outsourcing, and then it continues. That
```

Page 42

```
 1   concept of outsourcing, is it something that was
 2   discussed internally so that you could come up with a
 3   set definition of what it means?
 4       MR. FEEHERRY: Objection.
 5       Q. And you might want to answer that question
 6   yes or no.
 7       MR. FEEHERRY: Objection. You can
 8   answer.
 9       A. Would you repeat the question then if I can
10   only answer yes or no?
11       Q. Yes, I'll get into more, trying to safeguard
12   the attorney-client privilege here. You shouldn't tell
13   me about things that you, if you had a conversation
14   with Attorney Morton, for example, it might be
15   privileged, it might not be, so I'm just moving
16   relatively carefully, perhaps too carefully. The
17   concept of sale or outsourcing as it appears in the
18   summary plan, do you remember having conversations with
19   anyone at John Hancock about what an outsourcing means?
20       A. Yes.
21       Q. Who?
22       A. In this case, Page Palmer, who was my boss,
23   would have explained the action the company was
24   anticipating in order for me to do my job, as was
```

Page 43

```
 1   indicated here.
 2       MR. FEEHERRY: And again, in this case
 3   he's referring again to Exhibit No. 2, just so the
 4   record is clear.
 5       Q. Anyone else other than Ms. Palmer?
 6       A. Well, as Exhibit 2 notes, I also spoke with
 7   Phil Clarkson and Karen Morton, and I would have spoken
 8   to Hewitt.
 9       Q. And still focusing on Exhibit 2, Mr. Mongeau,
10   what did Page Palmer tell you about the definition of
11   outsourcing?
12       A. I don't recall that she spoke to me
13   specifically about a definition of outsourcing, but
14   having responded to her in an e-mail I know we had to,
15   she had to have explained to me what was occurring so
16   that I could respond.
17       Q. You don't have a specific memory of the
18   conversation with, or communication with Ms. Palmer, is
19   that correct?
20       A. I do not have a specific memory of the
21   conversation. I -- this document 2 is in front of me
22   that I, refreshed my memory that this information was
23   sent to her in response.
24       Q. Okay, and your conversations or conversation
```

Page 44

```
 1   with Mr. Clarkson, do you have any memory of that
 2   discussion about, as it pertained to outsourcing?
 3       MR. FEEHERRY: I'm sorry if I'm going to
 4   talk like a lawyer, but if any lawyer was involved also
 5   in those discussions, I'm going to ask you to, direct
 6   you not to answer that question, but if you spoke to
 7   Mr. Clarkson separately from counsel, and I'm being
 8   reminded he is an attorney, so --
 9       Q. So let me rephrase the question and ask you
10   this. What did you and Attorney Clarkson talk about?
11   Just kidding, don't answer the question.
12           So you and Mr., you spoke with --
13       MR. PETERS: And this is yes or no, I
14   just want to round it out, Tony.
15       Q. You spoke with Attorney Clarkson about
16   outsourcing, the outsourcing of the IT department?
17       MR. FEEHERRY: That can be a yes or a
18   no.
19       A. Yes.
20       Q. Okay. Yes or no, do you have a memory of the
21   conversation or communication?
22       A. No.
23       Q. Okay, and did you speak with Attorney Morton
24   about the IT outsourcing, yes or no?
```

## Page 45

1    A. Yes.

2    Q. Do you have a memory of that communication,

3    yes or no?

4    A. No.

5    Q. So, and let me see if I have this right, you

6    have a general memory of discussing outsourcing with

7    Page Palmer?

8    A. I know I had to have had a conversation with

9    Page in order to do this work.

10    Q. Okay, but you don't have a memory of that

11    conversation?

12    A. The specific conversation, no.

13    Q. Okay. Now, did you ever from September 16,

14    2002 forward, leaving aside Mr. Feeherry and all of the

15    lawyers at Goodwin Procter, have a conversation with

16    anyone about what outsourcing means?

17    A. I don't recall.

18    Q. Okay. In the context of your work evaluating

19    the competitiveness of Beacon's benefits package, did

20    you have any discussions with anyone, yes or no, about

21    whether or not Mr. Joyce's business unit was being

22    outsourced?

23    A. What is the time frame?

24    Q. When you were evaluating the competitiveness

## Page 46

1    of Beacon's benefits package in 2004.

2    A. And then would you repeat the question?

3    Q. Yes. In the context of undertaking this

4    evaluation, did you have any conversations with anyone

5    about what, about whether or not there was an

6    outsourcing of a business unit, specifically in this

7    context the trades group?

8    A. I don't recall having a specific conversation

9    about whether or not it was an outsourcing. It was

10    understood to be that.

11    Q. Understood by whom?

12    A. By me.

13    Q. Okay, and --

14    MR. FEEHERRY: Make sure of the time

15    that you just asked, period of time that you were just

16    asking.

17    Q. Yes, I'm asking whenever you undertook your

18    evaluation whether or not Beacon's benefits were

19    competitive, whenever that was, did you have in mind

20    whether or not there was to be an outsourcing of the

21    trades group?

22    A. Thank you for the clarification. When I

23    conducted the competitive analysis, the outsourcing had

24    already or was in the process of occurring.

## Page 47

1    Q. Okay, so did you have any discussions with

2    anyone about whether or not what was transpiring, the

3    rehiring of Hancock employees by Beacon, for instance,

4    whether or not that was an outsourcing at the time you

5    made the evaluation of Beacon's, Beacon's benefits

6    packages's competitiveness?

7    A. My focus was on determining whether these

8    were comparable positions.

9    Q. I understand that. In the context of making

10    that evaluation, did you determine whether or not there

11    was to be or had been an outsourcing?

12    A. I would have understood along with the other

13    HR professionals I was working with that an outsourcing

14    was occurring.

15    Q. Is that something that you remember

16    considering?

17    A. We considered this to be an outsourcing.

18    Q. The plan --

19    MR. FEEHERRY: When you get a -- it's

20    about five minutes of twelve. At a point at which it

21    makes sense to take a couple of minute break I'd

22    appreciate it.

23    MR. PETERS: Yes, I'll be, just in a

24    few, unless there's some urgent call, I'd like to

## Page 48

1    just --

2    MR. FEEHERRY: No urgent call.

3    MR. PETERS: -- wind this up.

4    Q. Do you recall that the summary plan says in

5    substance, in the event of a sale or outsourcing, et

6    cetera, right?

7    MR. FEEHERRY: Is there a document you

8    want to show the witness?

9    MR. PETERS: I can if he doesn't

10    remember, Tony.

11    A. I'd like to see a document.

12    Q. Sure.

13    (Marked Exhibit 3; Severance Pay Plan).

14    Q. Exhibit 3 is a single-page document. It's

15    part of a larger document, and it's titled, twelve,

16    severance pay plan, and it's JH1112. In the bottom

17    quarter of the page you'll see a bullet point that

18    reads, in the event of the sale or outsourcing of the

19    business unit. Now, you take your time and read this,

20    and my questions will be directed to this document.

21    You'll let me know when you're ready to speak with me.

22    (Pause.)

23    A. I'm ready.

24    Q. The bullet point I directed you to before

Case 1:05-cv-11428-WGY    Document 26-12    Filed 07/07/2006    Page 10 of 31

Page 49

1 reads, in the event of the sale or outsourcing of a
2 business unit, if an employee of the business unit is
3 offered a comparable job by or accepts a noncomparable
4 job with the purchaser or successor company, severance
5 will not be paid, and then it continues, and in the
6 context of your evaluation of the benefits package, the
7 Beacon benefits package, you relied on this language,
8 didn't you?
9      MR. FEEHERRY: Objection.
10     A. No, we relied on the plan document language.
11     Q. Did you look at Exhibit 3 at all in
12 undertaking your evaluation?
13     A. I would have referred to the plan document,
14 and this has helped refresh my memory that our focus
15 was on the comparability of the job with the successor
16 company.
17     Q. My question is a little different. You
18 relied on the plan document, right?
19     A. Mm-hmm.
20     Q. Did you also review Exhibit 3 in the context
21 of undertaking the evaluation of Beacon's benefits
22 package?
23     A. I may have referred to this in my review with
24 respect to the definition, parenthetical definition in

Page 50

1 what you've pointed out on comparable.
2      Q. Okay. Do you have a memory of doing that?
3      A. Specifically to this document, no.
4      Q. Okay. Do you have a memory of undertaking
5 the initial determination as to whether or not the
6 trades group was going to either be sold or outsourced?
7      A. Will you repeat the question?
8      Q. Yes. In the context of your evaluation of
9 Beacon's benefits, do you remember taking or
10 undertaking the initial evaluation of whether or not
11 the trades group was going to be either sold to or
12 outsourced to Beacon?
13     A. We would have looked at this from the
14 standpoint of whether the job was comparable with the
15 successor employer.
16     Q. So you didn't undertake a separate
17 determination as to whether or not there was either a
18 sale or an outsourcing, is that correct?
19     A. I don't recall we had a -- the sale or
20 outsourcing was one example of how the severance plan
21 could come into play, so that's why we relied on the
22 plan.
23     Q. My question though, sir, is did you undertake
24 an evaluation, you, sir, as to whether or not there was

Page 51

1 a sale or an outsourcing in the context of undertaking
2 your evaluation of the Beacon's benefits?
3      MR. FEEHERRY: Asked and answered. You
4 may answer it again.
5      A. My evaluation would have been focused on
6 whether the job was comparable under the terms of the
7 plan that the successor employer was offering.
8      MR. FEEHERRY: So let's take a
9 five-minute break now.
10     MR. PETERS: Fine. I have to say though
11 with due respect to both my colleague and the witness
12 that I don't think I have an answer to the question, so
13 you can take a break, but I can't move off it.
14     Q. The question I really need answered, Mr.
15 Mongeau, is whether, I know you focused on
16 competitiveness, is that a correct statement, you
17 focused on the competitiveness --
18     A. That was one aspect of what was evaluated.
19     Q. Right. Did you evaluate whether or not there
20 was outsourcing, yes or no?
21     MR. FEEHERRY: Can you repeat the
22 question? I'm sorry.
23     (Reporter read the record as requested).
24     A. I don't recall a specific evaluation of that.

Page 52

1      Q. Do you recall evaluating it generally in
2 undertaking this analysis, yes or no, and then I'll let
3 you go, I don't mean this to be biological warfare, I
4 just want to finish this up?
5      MR. FEEHERRY: Please repeat the
6 question without the biological warfare references.
7      (Reporter read the record as requested).
8      A. I don't recall a general evaluation of that.
9      MR. PETERS: Okay. Thank you.
10     (Short break taken).
11     MR. PETERS: We're back on the record.
12     Q. Mr. Mongeau, when we were off the record we
13 just had a brief discussion about dates, and we may be
14 off a little bit in our dates. If there's anything you
15 want to clarify vis a vis dates, feel free.
16     A. Thank you. I believe that the question was
17 posed to me as to when the competitive analysis was
18 conducted, and I mentioned 2004. It was more
19 accurately 2003.
20     Q. Okay, and therefore the Hewitt data that you
21 were relying on in the context of conducting this
22 assessment would have been data from 2002 or 2003 at
23 the latest?
24     A. Correct.

## Page 53

1    Q. Okay.

2        (Marked Exhibit 4; E-Mail from Mongeau).

3    Q. Sir, I marked as Exhibit 4 an e-mail with a,

4 or I guess a meeting invitation perhaps, with a Bates

5 stamp JH1411. Can you take a look at this and tell me

6 if you've seen this before and recall it?

7    A. The -- this would have come from me, and

8 you're correct, they're notes from a meeting to the

9 meeting participants.

10    Q. And this meeting was set up to review the

11 severance plan document follow-up on review?

12    A. Yes.

13    Q. Okay, and you'll see about halfway down it

14 says, Page will get back to us on IT outsourcing,

15 change under discussion. Do you remember what that

16 refers to?

17    A. It would have referred to Page Palmer, my

18 boss at the time, identifying to the group that there

19 was an intention to outsource some part of our IT

20 operation.

21    Q. Okay, and did you discuss with her -- Strike

22 the question.

23        What we've marked as Exhibit 3, which is

24 a piece of a summary plan, did Exhibit 3 exist, had it

## Page 54

1 been prepared at the time of this outsourcing?

2        MR. FEEHERRY: This outsourcing --

3        MR. PETERS: The IT, IT outsourcing.

4    A. I don't recall exactly when the IT

5 outsourcing was completed.

6    Q. Did you have a role in drafting the language

7 in Exhibit 3?

8    A. Yes.

9    Q. What was your role?

10    A. I believe I most likely wrote this along with

11 a member of my staff who was charged with putting the

12 full supplement from which this came together.

13    Q. Okay. The language that we've been focusing

14 on which is the bullet point that starts, within the

15 event of the sale or outsourcing, is that your

16 language?

17    A. It was likely written by me.

18    Q. Okay, and when you used the word outsourcing

19 in the context of Exhibit 3, is it because Hancock

20 contemplated outsourcing its IT as discussed in a

21 general way in Exhibit 4?

22    A. That would have been one of the outsourcing

23 arrangements that was under discussion.

24    Q. Okay. What other outsourcing arrangements

## Page 55

1 were under discussion at the time?

2    A. I think I've stated that I don't recall

3 exactly the timing, but it is possible that there, it's

4 possible that subsequently there were discussions about

5 the building.

6    Q. Okay. I'm interested, and I want to exclude

7 subsequently for the time being and focus on what was

8 going on at the time you drafted the language in

9 Exhibit 3 we've been focusing on which starts with, in

10 the event of a sale or outsourcing. Other than the IT

11 outsourcing, are you aware, or were you aware, more

12 specifically, of any other contemplated outsourcings of

13 business units?

14    A. I don't recall at this time exactly which

15 outsourcing arrangements I was aware of.

16    Q. Okay. The IT is one?

17    A. Yes.

18    Q. And what in the second set of bullet points

19 is ICP award treatment?

20        MR. FEEHERRY: I think you're now

21 referring to Exhibit 4.

22        MR. PETERS: Pardon me, Exhibit 4.

23    A. ICP is the incentive compensation plan, which

24 is a bonus program for employees.

## Page 56

1    Q. In the change in IT outsourcing under

2 discussion, referencing back up a bullet, to the middle

3 bullet point, what change was it?

4    A. Based on the exhibits you provided to me, I

5 believe the changes were what we've discussed with

6 respect to the comparable position and the six-month

7 change that I've described earlier.

8    Q. Let me show you a letter dated November 18,

9 2002, JH2372, which we'll mark as Exhibit 5.

10        (Marked Exhibit 5; Letter from Mongeau,

11        11/18/02).

12        MR. PETERS: Go off the record for a

13 minute.

14        (Discussion off the record).

15        MR. FEEHERRY: I know that you've shown

16 Exhibit 5 and have now added one page to it. I think

17 that there are, there may have been two pages attached

18 to it, one which would have been 2373, and then the one

19 that you've got, 2374 --

20        MR. PETERS: That's logical.

21        MR. FEEHERRY: -- which just have the

22 signatures of Mr. D'Alessandro, and then the 74 that

23 has Mr. Budd's signature --

24        MR. PETERS: That's logical, so it's the

Page 57

1  same resolution but different signature blocks.
2      MR. FEEHERRY: We'll put these together
3  at lunch or something like that.
4      Q. So we've added 2374 to Exhibit 5, and we may
5  amend it yet again, but now that I've given you more to
6  read, Mr. Mongeau, I'll give you another minute and
7  you'll let me know when you're prepared to answer
8  questions.
9      (Pause).
10     A. I'm ready.
11     Q. So this is a letter, sir, from you to various
12  executives at John Hancock, correct?
13     A. Yes.
14     Q. And can you tell me in a general way what you
15  were conveying to the recipients of this letter?
16     A. I was asking them to approve changes to the
17  company severance plan with respect to a variety of
18  provisions that needed to be incorporated into the plan
19  language as well as changes with respect to comparable
20  position and what I refer to as the six-month provision
21  that we've discussed.
22     Q. Okay, and you'll see the language in the
23  second bullet point, amends the plan to conform with
24  your recent decision not to offer severance benefits in

Page 58

1  the event of a sale or outsourcing of a business unit
2  if a John Hancock associate is offered a comparable
3  position, et cetera. The words here, sale or
4  outsourcing, was there any discussion with any of the
5  recipients of this letter?
6      (Telephone interruption).
7      Q. The sale or outsourcing referring to in this
8  bullet point, was there any discussion about that in
9  the context of the resolution that's attached?
10     A. Could you refine the question --
11     Q. Yes, start over.
12     A. I'm not certain what you're asking.
13     Q. I can. Exhibit 5 attaches a resolution of
14  senior management, correct?
15     A. Correct.
16     Q. And in the second bullet point which
17  describes the resolution, you state that it
18  accomplishes an amendment, quote, to conform with your
19  recent decision not to offer severance benefits in the
20  event of a sale or outsourcing of a business unit if a
21  John Hancock associate is offered a comparable
22  position. Do you recall any discussions about that
23  provision in the context of working on, discussing or
24  otherwise participating in the effort that led to the

Page 59

1  resolution that's attached?
2      MR. FEEHERRY: I've got to object, I
3  mean, just to the form. I lost it somewhere in there,
4  I apologize. Could you repeat that question for us?
5      MR. PETERS: Yes.
6      Q. Tell me what you spoke with senior management
7  about that has to do with the language in the second
8  bullet point of Exhibit 5?
9      A. I would have been asked to amend the plan as
10  a result of their advising me of the company's
11  objective to at the time outsource IT or a section of
12  IT that we discussed. I may have been informed of
13  other outsourcing or sales. I don't completely recall
14  the timing of when I was advised, but based on that
15  instruction I was requested to amend the plan to
16  address the comparable position and successor company
17  intent.
18     Q. The resolution that's attached?
19     A. Mm-hmm.
20     Q. I may be missing something here, but I don't
21  see any reference to sale or outsourcing. Is it here
22  and I'm just missing it?
23     A. The resolution deals with the actual plan
24  provisions which addresses comparable position with the

Page 60

1  successor company.
2      Q. But the concept of sale or outsourcing,
3  that's not in the resolution, is it, specifically?
4      A. That's correct.
5      Q. Okay, so how is it that your bullet point
6  states that this resolution accomplishes the amendment
7  regarding what is to transpire in the event of a sale
8  or outsourcing, where does that concept come from if
9  not from the resolution?
10     A. Because it was, I was advised that the, for
11  an objective of certain outsourcing was that employees
12  who were currently employed by John Hancock may be
13  employed by a successor company, and in that event we
14  did not want to provide severance benefits as there was
15  a comparable job with a successor company. The sale or
16  outsourcing was an example or a situation at the time,
17  but the provisions of the plan dealt specifically with
18  the comparable position and the successor company.
19     Q. Taking a look at Exhibit 5, does it refresh
20  any recollections that you have about discussions with
21  anyone or had with anyone in the November '02 time
22  frame about what a sale or outsourcing of the business
23  unit meant?
24     A. I would have been advised that a sale or

Page 61

1    outsourcing had occurred or was under consideration,
2    and based on that I was asked to see through the
3    amendments to the plan.
4        Q. I understand. My question though really is
5    limited to your memory today, not what you think or you
6    know must have been said, but what you can tell me
7    about. Does this refresh, Exhibit 5 refresh any
8    memories of specific conversations about the definition
9    of sale or outsourcing other than what you've disclosed
10   to me already?
11       A. This doesn't help me remember any specific
12   conversation.
13       Q. Now, the amendment reflected in Exhibit 5 was
14   intended to accomplish the decision not to offer
15   severance benefits in the event of a sale or
16   outsourcing of a business unit if the associate gets a
17   comparable position, among other things, right?
18       A. Repeat the question.
19       Q. The amendment is intended to preclude
20   severance in the event of a sale or outsourcing of a
21   business unit if members of those business, if a member
22   of that business unit gets a job, a comparable job with
23   a successor company?
24       A. No, the amendment was to not provide benefits

Page 62

1    if there was a comparable position with a successor
2    company, and the sale or outsourcing was one way in
3    which that could come to be.
4        Q. Okay, so this language here in the second
5    bullet point of Exhibit 5, sale or outsource of a
6    business unit, that's just an example, it's not
7    exclusive, is that your testimony?
8        A. Yes.
9        Q. And what's the basis of that belief?
10       A. Because the plan language is what governs the
11   benefits that we provide, and they were focused on, or
12   it was focused on the comparable position with a
13   successor company.
14       Q. When you drafted Exhibit 5, did you think
15   that the use of the language here, in the event of a
16   sale or outsourcing of a business unit, was meant to be
17   just a description of one event or exclusive?
18       MR. FEEHERRY: Can you just -- you're
19   referring to Exhibit 5 now, I take it, the letter only,
20   correct?
21       MR. PETERS: Yes, right.
22       MR. FEEHERRY: As opposed to the other
23   things which might end up being finally attached to
24   Exhibit 5 when we get done with this.

Page 63

1        MR. PETERS: Yes, I'm really referring
2    to the language in the second bullet point.
3        MR. FEEHERRY: Of the letter.
4        MR. PETERS: Of the letter where you say
5    or use the word, sale or outsourcing.
6        Q. Is it your testimony that that's merely an
7    example and wasn't intended to be exclusive?
8        A. Yes.
9        Q. And that was your view at the time in
10   November when you drafted this letter?
11       A. My understanding at the time was that we did
12   not seek to provide benefits to an employee who would
13   have a comparable position with a successor company.
14       Q. Yes, I -- different question. My question is
15   when you used the words sale or outsourcing of a
16   business unit and sent that along to your chairman of
17   the board and your general counsel, did you mean it as
18   an example of when one is not entitled to severance, or
19   is it an exclusive circumstance?
20       A. I would say it's one situation in which those
21   benefits would not be available.
22       Q. And that's what you meant at the time?
23       A. Mm-hmm.
24       MR. FEEHERRY: You've got to say yes or

Page 64

1    no.
2        A. Yes.
3        Q. Did you have any conversations with anyone
4    about that perspective in the November time frame?
5        A. Not that I recall.
6        Q. When you write here that the plan is amended
7    with, to conform with your recent decision, what recent
8    decision are you referring to?
9        A. As the letter says, the decision not to offer
10   the severance benefits in the event of sale or
11   outsourcing if the associate has a comparable position
12   with the successor company.
13       (Marked Exhibit 6; E-Mail and
14       Memorandum).
15       Q. I put a document before you, Exhibit 6, which
16   is an e-mail with a memorandum attached, control
17   numbers JH1401 through 1402. Would you take a look at
18   these two documents? My first question is going to be
19   whether or not page one and page two belong together,
20   and then I'll ask you questions about it specifically.
21       A. I believe they belong together.
22       Q. Okay, and can you tell me generally what
23   these documents pertain to?
24       A. I need a moment to read it.

## Page 69

1    a very competitive benefit package.
2         Q. Were the ISS employees offered severance?
3              MR. FEEHERRY: Objection. You may
4    answer.
5         A. An employee who was terminated by John
6    Hancock and did not take a comparable position with
7    IBM, the successor, would have been offered severance.
8         Q. Otherwise no?
9         A. Well, if an employee could have retained
10   employment, but otherwise no.
11        Q. Okay, and one of the reasons that John
12   Hancock determined that these people were not entitled
13   to severance from John Hancock's perspective is because
14   they had a comparable job, right?
15        A. Correct.
16        Q. And part of the determination as to whether
17   or not the ISS employees received a comparable job
18   offer from IBM was the nature of the benefits package,
19   correct?
20        A. Correct.
21        Q. And therefore someone had to in a general way
22   or specific way undertake an evaluation as to whether
23   or not those benefits were competitive, correct?
24        A. Correct.

## Page 70

1         Q. And the analysis that was undertaken was
2    whether or not the benefits were competitive with John
3    Hancock's benefits, right?
4              MR. FEEHERRY: Objection. You may
5    answer.
6         A. That I can't answer, I don't know.
7         Q. Well, who would have an answer to that
8    question if you know, Laura Blake; Lisa Blake, pardon
9    me?
10        A. Lisa may.
11        Q. But as best you know, the definition of what
12   is comparable is accurately summarized in the last
13   sentence of the second paragraph of Exhibit, of the
14   memorandum attached to Exhibit 6, correct?
15             MR. FEEHERRY: Objection.
16        A. Repeat the question.
17        Q. The sentence that begins, our definition of
18   comparable is that the job must include, do you see
19   that sentence?
20        A. Yes.
21        Q. That is the definition that was used to
22   determine whether the benefits package offered by IBM
23   to the ISS employees was comparable, correct?
24             MR. FEEHERRY: Objection.

## Page 71

1         A. This was the definition that was used at the
2    time.
3              MR. PETERS: I've got ten to one, Tony,
4    I'm happy to keep going. Do you want to break for
5    lunch?
6              MR. FEEHERRY: I always like to ask the
7    witness and the stenographer --
8              THE WITNESS: We can keep going.
9              (Discussion off the record).
10             MR. FEEHERRY: But, I mean, let's try,
11   you know, a little bit after one o'clock when you
12   finish the next, you know, area that you want to get
13   into.
14             (Marked Exhibit 7; E-Mail from Mongeau,
15             11/02).
16        Q. Mr. Mongeau, Exhibit 7 is an e-mail from
17   November of '02, control number JH1808. Is this a
18   document that you've seen before?
19        A. Yes.
20             (Discussion off the record).
21        Q. So sir, is this a document that you drafted
22   or participated in drafting?
23        A. Yes.
24        Q. It's from JH communication?

## Page 72

1         A. Yes.
2         Q. What is that?
3         A. It is a general e-mail communication to all
4    employees at John Hancock.
5         Q. Okay, and you are the author?
6         A. Yes, I recall I'm the author.
7         Q. And to whom was this e-mail sent?
8         A. To all of our John Hancock employees.
9         Q. Now, what was the purpose of this e-mail sent
10   to all John Hancock employees?
11        A. To advise them of a change in the severance
12   plan provisions.
13        Q. Okay, and the changes in the severance plan
14   provisions, are those changes at least some of which we
15   discussed with regard to Exhibit 1?
16        A. Yes.
17        Q. In the first sentence you write, annually
18   John Hancock evaluates the competitive standing and
19   cost of its benefits plan, benefit plans. We typically
20   focus on our health and retirement benefits which can
21   change year to year. Why is it, sir, that John Hancock
22   typically focuses on health and retirement benefits?
23        A. Because those are the benefits that are most
24   valued and have the largest economic value for

1  employees.
2      Q. Okay, and then you go on to discuss the key
3  changes or provisions that were changed in the
4  severance plan in the next paragraph and bullet points,
5  is that correct?
6      A. Yes.
7      Q. And the bullet point that we first see is one
8  that says, quote, in the event of the sale or
9  outsourcing of a business unit, if an employee of the
10  business unit is offered a comparable job by or accepts
11  a noncomparable job with the purchaser or successor
12  company, severance will not be paid, and comparable is
13  then defined in parentheses, right?
14     A. Correct.
15     Q. Was there any document sent
16  contemporaneously; that is, in the November-December
17  time frame, that described for the employee what an
18  outsourcing was?
19     A. I was not responsible for sending a
20  communication like that, I'm not certain if there was
21  one sent.
22     Q. You don't remember seeing one?
23     A. No.
24     Q. Would it be something you would have been

1  copied on if it went out?
2      A. I may have been.
3      Q. Okay, and we also read in that bullet point
4  that the concept of a, quote, comparable job is
5  outlined, and it's described as, quote, comparable will
6  be defined as a similar salary, competitive benefits,
7  benefit offerings and a work location within
8  fifty miles of the current work location. The
9  definition or I should say the phrase here, competitive
10  benefit offerings, was that defined for John Hancock
11  employees at or around the time this e-mail was sent to
12  them?
13     A. It was not defined further than what is in
14  this communication by communication that I would have
15  seen.
16     Q. Have you seen any documents that define what
17  competitive benefits mean from Hancock's perspective
18  that were given to its employees?
19     A. No.
20     Q. Back up to the first paragraph where you
21  read, we typically focus on our health and retirement
22  benefits, and then you read the next sentence, we
23  recently evaluated the company's severance pay plan as
24  well, comparing its provisions to those of our peers

1  and industry norms. Were you involved in that
2  comparison?
3      A. Yes.
4      Q. What did you look at?
5      A. We looked at the amount of severance payments
6  such as the number of weeks of severance pay that are
7  made available. We looked at whether benefits were
8  included in some period of time after termination,
9  things of that nature.
10     Q. The industry norms that you refer to in this
11  sentence, do you recall specifically what you looked
12  at?
13     A. Specifically no.
14     Q. Were they financial services businesses?
15     A. The industry norms would have been general
16  industry, all companies. Peers would have been
17  financial services.
18     Q. And you see in the second set of bullet
19  points that the reasons for the changes are, second
20  bullet point, to realign, the realignment of our
21  severance pay plan with its primary purpose to bridge
22  employees to future employment. Where is that, where
23  would I find that purpose other than in this Exhibit 7,
24  is it in some other document that you relied on in

1  preparing this?
2      A. I don't know if it's in another document, but
3  this was the purpose of the plan.
4      Q. And where did you get that information from,
5  is it your own description or did someone else provide
6  it to you?
7      A. Given my experience and years in human
8  resources, it was understood that a severance pay plan
9  was provided to bridge an employee.
10     Q. That was your understanding?
11     A. Yes.
12     Q. And the next bullet point, quote, the need to
13  support necessary and strategic divestitures and
14  outsourcing, can you tell me what you meant by that?
15     A. As I've referred to before by way of example,
16  we've talked about IT and the interest of a successor
17  company employing former John Hancock employees as part
18  of a divestiture or outsourcing.
19     Q. Well, how does the amendment to the severance
20  plan facilitate the rehiring of Hancock employees by a
21  successor?
22     A. The purpose of the plan is to bridge the
23  employees to new employment. If the plan is not
24  available as in the event the employee has new

Page 77

1 employment or is offered employment, that is how it
2 would support those efforts.
3       Q. So in substance, an employee is more likely
4 to accept a job with a successor company if he or she
5 does not have the election to take severance, is that a
6 correct statement from your perspective?
7             MR. FEEHERRY: Objection. You may
8 answer.
9       A. Whether, what a particular employee is likely
10 or not likely to do I can't say, but the plan provision
11 was clear to an employee if they didn't. If they were
12 offered a comparable position with a successor company,
13 they would not have severance pay.
14       Q. But the reason for the amendment was to
15 encourage these employees to take jobs with the
16 successor company rather than elect severance?
17       A. I believe the company felt that this change
18 would support the divestiture and outsourcing.
19       Q. In what way?
20       A. By being clear to employees that if they were
21 offered a comparable job with a successor company they
22 would not receive severance pay.
23       Q. If you take a look at Exhibit 1, article one,
24 does that describe the purpose of the severance plan

Page 78

1 from your perspective?
2       A. It defines that the plan will provide certain
3 severance benefits to employees.
4       Q. Was this purpose as articulated in article
5 one ever amended to your knowledge?
6       A. I don't recall.
7       Q. And the, back to Exhibit 7, in the second to
8 last paragraph, you write that some John Hancock
9 business units have announced a potential sale or
10 outsourcing of their businesses. Focus on the word
11 units there, business units. Does reading this
12 document refresh any recollection as to which business
13 units other than ISS were considering the potential
14 sale or outsourcing of their business?
15       A. In addition to IT is your question?
16       Q. Yes, other than, other than IT, which we've
17 already identified.
18       A. And I think I've said that I am not a hundred
19 percent, I don't recall exactly when it was understood
20 that the sale was, of the properties was being
21 undertaken, that it could well have been about this
22 time as well.
23             MR. PETERS: Why don't we break.
24             (Lunch break taken from 1:07 p.m. to

Page 79

1             1:51 p.m.).
2             (Marked Exhibit 8; Documents).
3       Q. Would you take a look at Exhibit 8, Mr.
4 Mongeau, it's documents with control numbers 11, JH1164
5 through 1172. Tell me if you're familiar with the
6 document, if you've seen it before?
7       A. I'm not familiar with this particular
8 document.
9       Q. Okay, so did you participate in any process
10 that led to the generation of a document to be sent to
11 John Hancock employees to answer questions about the,
12 that they may have about the sale of the tower complex?
13             (Pause).
14       A. I don't recall participating in the creation
15 of this document.
16       Q. Just to close the loop on this, take a look
17 at page six, would you, please? This discusses, quote,
18 employee impact, close quote, and specifically there's
19 a question posed, what will happen to Hancock
20 associates who currently perform these duties, how many
21 positions do you anticipate will be eliminated. I take
22 it as you read through that that none of the
23 information contained here is information that you
24 either supplied personally or participated in supplying

Page 80

1 to the employees?
2       A. I don't recall contributing to these answers.
3       Q. Okay. The bullet point beneath the one I
4 just directed you to which discusses the fact that John
5 Hancock will maintain a reduced security staff, do you
6 know whether or not that's the case, whether or not
7 John Hancock maintained a reduced security staff?
8       A. Yes, there were certain security staff
9 members that were retained.
10       Q. Okay, and those were security staff members
11 that were already employed at John Hancock?
12       A. Yes.
13             (Marked Exhibit 9; Cosmo, HR Issue
14 List).
15       Q. Exhibit 9 is a two-page document, control
16 numbers JH1225 and 26. Is this a document that you're
17 familiar with?
18       A. The document itself I don't recall, the
19 subject matter I do.
20       Q. Okay. The document is titled at the top,
21 Cosmo, HR issue list. What is or who is Cosmo?
22       A. That I don't know specifically.
23       Q. Is there a person at John Hancock that that
24 may refer to based on your experience there?

Case 1:05-cv-11428-WGY    Document 26-12    Filed 07/07/2006    Page 17 of 31

1      A. No.
2      Q. Do you know whether or not a document
3  containing the information in Exhibit 9 was prepared
4  and given to employees at John Hancock? I'm going to
5  strike the question and direct you to some particular
6  points on the document.
7          You'll see in the bottom of the first
8  page under description of item, severance eligibility,
9  you will read, associate not retained by JH only
10  eligible for severance if not offered a comparable job
11  with acquirer, and then after that it states, what is
12  definition of comparable job and competitive benefits,
13  and next to that under solution it lists people, Lisa
14  Blake, yourself, Sandy Collie and Joan DiCicco to draft
15  slash develop what constitutes comparable job slash
16  comparable benefits, so am I correct to assume that as
17  of the date of this document, whenever it may be, that
18  the definition of comparable job and comparable
19  benefits had not yet been developed?
20      A. The group that you noted was charged with
21  developing definitions with respect to those items.
22      Q. Okay, and was it a collective effort?
23      A. Yes.
24      Q. Did any one person assume a role that you can

1  describe for me, or was it more or less collaborative?
2      A. It was a collaborative effort as we talked
3  through the terms of comparable position.
4      Q. Can you tell me by looking at the document
5  what the vintage of this document is?
6      A. I don't know specifically, I didn't prepare
7  it.
8      Q. Do you know whether or not this Exhibit 9 was
9  prepared before or after the summary plan description
10  that we marked as Exhibit 3?
11      A. I don't know.
12      Q. The handwriting on the document, do you
13  recognize any of it?
14      A. No.
15      Q. Can I see your version for a minute, sir?
16          MR. PETERS: Off the record.
17          (Discussion off the record).
18      Q. Sir, Exhibit 9, we were discussing the
19  writing on the second page, and I've asked you whether
20  you can identify any of it?
21      A. No.
22      Q. Can you look at the contents of the writing
23  and tell me whether or not you understand what is being
24  addressed by virtue of your participation in the

1  process of defining among other things comparable
2  benefits?
3          MR. FEEHERRY: Objection. You may
4  answer.
5      A. I understand that I was with a working group
6  to determine further the definition of comparable job
7  and competitive benefits.
8      Q. When did the group arrive at a definition for
9  those two concepts?
10      A. I can only answer with respect to the general
11  time frame.
12      Q. Okay.
13      A. And that general time frame would have been
14  in the late 2002, early 2003 area.
15      Q. What event or events inspired your group to
16  address the definition of comparable job and comparable
17  benefits?
18      A. The company amended its severance plan with
19  respect to a comparable position with the successor
20  employer or company.
21      Q. So at the time the plan was amended, the
22  concepts of what is comparable either for jobs or
23  benefits had not been decided, is that correct?
24      A. It had not been further defined.

1      Q. And there was no other event other than the
2  fact that the plan was amended that inspired your group
3  to address the issue of what comparability means, is
4  that correct?
5      A. We've discussed what was taking place at John
6  Hancock with respect to IT in the building.
7      Q. Okay, so it was the IT group, the outsourcing
8  of IT that inspired you to define comparability, is
9  that correct?
10      A. The plan language incorporated the
11  terminology, comparable position with a successor
12  company, and we needed to further define comparable
13  position.
14          (Marked Exhibit 10; Employee Evaluation
15          Worksheet).
16      Q. Exhibit 10 is a two-page document, employee
17  evaluation worksheet, JOY381, 382. Would you tell me
18  if you've seen this before?
19      A. I have not.
20      Q. Have you seen employee evaluation worksheets
21  from the March '03 time period, maybe not Mr. Marcos,
22  but others?
23      A. I have not.
24      Q. Do you know who John Durnan is, D U R N A N?

1 the third paragraph that this is an update, and it's a
2 directory on how to obtain additional information, and
3 the second page provides information with respect to
4 the plan documents, and that this summary simply
5 highlights and that the full details are available in
6 the plan documents.
7     Q. Okay, so based on those two things, you
8 believe that John Hancock has described to its
9 employees that the third bullet point is provided
10 simply as an example of when severance benefits are not
11 available?
12     A. It highlights the fact that benefits are not
13 available if there is a comparable job with a successor
14 employer, and that, and it prefaces it in this by way
15 of example in the event of a sale or outsourcing.
16     Q. Why didn't you say in substance, the
17 provisions of the severance pay plan were changed and
18 the following is an example; for example, in the event
19 that a sale or outsourcing, why didn't you use that to
20 make it very clear that what you were stating here is,
21 as you now told us under oath, merely an example of
22 when severance benefits are unavailable?
23     A. It wasn't the language that I used.
24     Q. When you wrote here, in the event that a sale

1 or outsourcing, Mr. Mongeau, didn't you write that
2 because that was a condition, there had to be either a
3 sale or an outsourcing of a business unit?
4     MR. FEEHERRY: Objection. You may
5 answer.
6     A. I did not see it as a condition, I saw it as
7 a circumstance.
8     Q. And you've now told us everything that an
9 employee would look to in order to understand that this
10 is merely a circumstance or an example, correct,
11 page one of Exhibit 11 and page two of Exhibit 11?
12     A. Would you repeat the question, and with
13 respect to those two pages?
14     Q. Yes. I asked you before, Mr. Mongeau, to
15 tell me where an employee would look to confirm that
16 the information in Exhibit 13, the third bullet point
17 is merely an example, right, and you pointed me to two
18 places. You pointed me to page one where it says, this
19 supplement is intended to update, and you pointed me to
20 page two which spoke about, speaks about the fact that
21 this summary describes highlights, et cetera, and the
22 rest of the document.
23     A. They would --
24     Q. Is there anything else that would trigger an

1 employee's, or was intended to trigger an employee's
2 understanding that all you were really talking about in
3 this third bullet point was an example?
4     A. By providing the employees with the
5 information on page two that indicates the plan
6 documents provide the details, if they had referred to
7 the plan document they would have seen the language
8 with respect to comparable position with a successor
9 company.
10     Q. Well, if we look at Exhibit 1, section 3.2,
11 we don't find a definition here or anywhere else of
12 what a comparable position was, do we?
13     A. The language states just a comparable
14 position as determined by the company.
15     Q. Right. It doesn't provide the definition of
16 a comparable position, does it?
17     A. No.
18     Q. And comparable is not defined anywhere in the
19 severance pay plan, Exhibit 1, is it? And the reason
20 we know that without going through the entire document,
21 Mr. Mongeau --
22     MR. FEEHERRY: Let him just answer the
23 question or --
24     MR. PETERS: I'll amend it a little bit.

1     Q. The reason we can conclude that, can't we, is
2 because as of the date of Exhibit 9 you were still
3 looking to prepare a definition, right?
4     A. Correct.
5     Q. Okay, so if the employee wants to know what a
6 comparable job is, he or she is going to have to look
7 at your third bullet point on what we've marked as
8 Exhibit 3, right?
9     MR. FEEHERRY: Objection.
10     A. There is a further definition of comparable
11 in that exhibit, yes.
12     Q. Right, so at least in that respect, what
13 you've written in this third bullet point is not
14 intended to be an example, is it, it's intended to
15 provide context and definition to an important term in
16 Exhibit 1, and that important term is comparable
17 position, right?
18     MR. FEEHERRY: Objection.
19     A. When I've referred to example or
20 circumstance, I was speaking of sale or outsourcing.
21 With respect to comparable, it is further defined in
22 this document in the parentheses.
23     Q. Okay, so at least in that respect, what you
24 have provided in Exhibit 3 modifies or clarifies more

1  I'll show you some documents, perhaps you don't
2  remember without the documents, that the date for
3  accepting offers was extended by Beacon. Is that
4  something you have a recollection of?
5      A. It could have been, I don't specifically
6  recall an extension.
7          (Marked Exhibit 14; Documents).
8      Q. Exhibit 14 has control numbers BCPM203
9  through 235. Would you take a look at it, please, and
10  tell me if you've seen this before?
11      A. I believe this document would have been
12  provided to me in order to conduct the competitive
13  analysis.
14      Q. Okay, and do you recall relying on this
15  document in undertaking the competitive analysis?
16          MR. FEEHERRY: Objection.
17      A. I recall being provided with information, I'm
18  assuming it is this particular information, so that I
19  could complete the task of the analysis.
20      Q. Okay. Tell me, if you will, what documents
21  you recall relying on in undertaking your
22  competitiveness assessment?
23      A. A description of the Beacon plan, a Hewitt
24  document that we discussed this morning plus the Foster

1  Higgins document, and my, and I believe that's what I
2  used.
3          (Marked Exhibit 15; Letter from Mongeau,
4          10/4/04).
5          MR. PETERS: Tony, I'm light a copy.
6          MR. FEEHERRY: What is it?
7          MR. PETERS: Transmittal letter on
8  Peter.
9      Q. Would you take a look at what's been marked
10  as Exhibit 15, Mr. Mongeau, and I'll tell you that it's
11  a letter from you dated October 4, 2004 with control
12  numbers JH1369. Is this a letter you wrote?
13      A. Yes, it is.
14      Q. Okay. This letter was prepared in the
15  context of an appeal that was made on your decision,
16  correct?
17          MR. FEEHERRY: Objection.
18      Q. Or your analysis, I guess that's the better
19  way to put it?
20          MR. FEEHERRY: Objection.
21      A. This letter was prepared to provide
22  information to a committee to which there had been
23  appeal, an appeal for denial of severance benefits
24  under the terms of the company's plan.

1      Q. Okay. Are the documents listed on this
2  exhibit the documents that you relied on in conducting
3  your comparability analysis?
4      A. I'd need to see the documents.
5      Q. I can't give them to you because I can't
6  identify them based on this letter, to be honest.
7          MR. FEEHERRY: I think Seth has asked
8  this question before, and I think we have given him the
9  Bates range numbers for the so-called administrative
10  appeal so that, you know, so that there's
11  three-quarters of an inch or half an inch of documents
12  that were behind this letter, but if there's any
13  question we'll give those to you again.
14          MR. PETERS: Well, if you gave him the
15  Bates range, Tony, then we've got the information we
16  need. I just as it turns out don't have it handy, and
17  I'm not sure if I did I would go into it given the
18  hour --
19          MR. FEEHERRY: And I'm sure that --
20  right, and I'm sure that I do not, I do know that some
21  of the documents you've shown him today were
22  included in the administrative record, but I know that
23  I did not bring a, you know, a tab, for example, that
24  has the documents.

1          MR. PETERS: I don't think I need to get
2  into that kind of detail with this witness in any
3  event, we'll get into that with the appeals folks, but
4  let me just ask you -- thank you, Tony, though.
5      Q. Let me just ask you, Mr. Mongeau, when you
6  pulled together the information to provide to the
7  appeals committee, where did you go to get the
8  information, what sources did you turn to to pull
9  together what the committee would review?
10      A. I provided them what was available in my
11  files at this time with respect to the items that are
12  delineated in the letter.
13      Q. Is all of the information listed in bullet
14  points here the information that you evaluated when you
15  undertook the analysis for the first time?
16      A. This information is, there's more information
17  here than would have been specific to the evaluation,
18  and I'm also noting that I've referred to the Hewitt
19  information, Foster Higgins, that's not listed here,
20  but that would have been referred to in arriving at the
21  comparability analysis.
22      Q. Okay. Why wasn't that information, the
23  Hewitt or Foster Higgins information provided to the
24  appeals committee?

## Page 109

1      A. Because what I was able to provide was what I
2  had available at this time. That was no longer
3  available.
4      Q. You didn't have copies of the information at
5  that point in time to give to the committee, I take it?
6      A. In my files, that is correct.
7      Q. Okay, and at the time did you recall
8  specifically what information you had relied on so that
9  you could provide it to the committee, or I should say
10  you could direct the committee to it?
11      A. The Beacon Capital comparability analysis
12  referred to in the letter?
13      Q. Yes.
14      A. I recall provided source documents, but that
15  document also provided certain data points on what was
16  normative, so it was the summary of what the source
17  documents, I had learned from the source documents.
18      Q. How important was the Hewitt data and the
19  Higgins data to you in undertaking your evaluation of
20  competitiveness?
21      A. Very important because they provided me the
22  objective information I needed.
23      Q. Okay. Now, when the appeals committee then
24  went and checked up on your work, for lack of a better

## Page 110

1  description, did you think it was important that they
2  rely on the same information that you relied on?
3      A. I think it was important that they reviewed
4  any information I provided to them as it related to the
5  terms of the plan.
6      Q. My question is a little different. My
7  question is do you think it was important for the
8  committee to review the material than you reviewed, not
9  the material that you gave them to review, but the
10  material that you reviewed in undertaking this
11  analysis?
12          MR. FEEHERRY: Objection. You may
13  answer.
14      A. I think it was important that they understood
15  the result of the analysis.
16      Q. Okay, but not necessarily review the
17  documents, you didn't think that was meaningful, and by
18  the documents, I mean the documents that you relied on
19  in coming to your conclusion?
20      A. I don't believe that it was critical that
21  they review those documents.
22      Q. Well, I didn't use the word critical, I used
23  the word important.
24      A. Important.

## Page 111

1      Q. You don't think it was important, right?
2      A. Correct.
3      Q. What other documents other than the Hewitt
4  information and the -- what's the other company?
5      A. Foster Higgins.
6      Q. Foster Higgins. What other information
7  besides the Hewitt information and the Foster Higgins
8  information was unavailable to you at the time you
9  transmitted documents to the appeals committee to
10  evaluate your analysis?
11      A. There were, my analysis would have also
12  indicated that I gathered some information from the
13  Massachusetts Small Business Association, and I could
14  not find that information either.
15      Q. Was that information important to your
16  evaluation?
17      A. It provided additional information to help me
18  with my analysis.
19      Q. Did you consider the information from the --
20  sorry, what was it, the Massachusetts what?
21      A. I'd have to refer to the actual document, but
22  I think it was the Massachusetts Small Business
23  Association.
24      Q. Was the information you reviewed from the

## Page 112

1  Massachusetts Small Business Association important to
2  you in undertaking your evaluation of Beacon's
3  benefits?
4      A. It was another source of objective
5  competitive information, so it was important that I
6  have that.
7      Q. Okay. Do you believe therefore that it was
8  important for the appeals committee to have access to
9  that information in evaluating your assessment?
10      A. No, I think it was important that they have
11  the results of my analysis.
12      Q. Well, if they didn't have the, some of the
13  important underlying documents that you relied on to
14  come to your conclusions, how could they check up on
15  your work, how could they evaluate whether or not you
16  came to the right decision?
17      A. The summary document provided them
18  information.
19      Q. The summary document is your conclusions
20  though, correct?
21      A. Including information about what the
22  normative data indicated.
23      Q. And so your view is that the source documents
24  that informs your opinion were not necessary for the

| Page 113 | Page 115 |
|---|---|

**Page 113**

1    appeals committee to review in evaluating whether or
2    not you got it right, is that correct?
3       A. I think the summary analysis was sufficient.
4          MR. FEEHERRY: If we could take five
5    minutes at some point --
6          MR. PETERS: Sure.
7          MR. FEEHERRY: -- that would be good.
8          MR. PETERS: Now is fine.
9          (Short break taken).
10         (Marked Exhibit 16; Draft Comparable Job
11         Definition).
12         (Marked Exhibit 17; Document).
13      Q. Mr. Mongeau, I'm going to show you two
14   documents we've marked as 16 and 17.  16 is JH38 and
15   39, 17 is JH45 and 46.  I'd like you to take a look at
16   both and tell me if you --
17         MR. PETERS: Tony, I think I gave you a
18   set.  If I didn't, I intended to.
19      Q. Take a look at those while we're sorting this
20   out between us, Mr. Mongeau.
21         MR. FEEHERRY: I may have gotten them in
22   the wrong order, sorry.  16 is former Exhibit 7, and 17
23   is, got it.
24      Q. Question number one, are they familiar to

**Page 114**

1    you?  Question number two, how?  Question number three,
2    what's the, which order do they go in, what's the more
3    recent one?  You may not be able to answer three, if
4    you can answer one and two.
5       A. Yes, they're familiar to me because these
6    document the guidelines that we used in determining
7    whether a job was comparable under the terms of the
8    plan, and I believe the order is 17 preceded 16.
9       Q. 17 is older?
10      A. I believe so.
11      Q. Okay.  Now, both documents reference a
12   November 21 communication.  That November 21
13   communication is Exhibit 7, right?
14      A. Yes.
15      Q. And did you participate in drafting 16, 17,
16   either, both?
17      A. I was a member of the group that worked on
18   this, so I would have commented or at least have read
19   the drafts at the time.
20      Q. Okay, and just looking at the evolution, if
21   you will, of what competitive benefits offerings are,
22   Exhibit 17 on the second page says, the following
23   benefits will be considered in this comparison, and it
24   lists five, right?

**Page 115**

1       A. Correct.
2       Q. And Exhibit 16, which is the later document,
3    lists more than that, seven benefits, right?
4       A. Correct.
5       Q. Are the benefits listed on Exhibit 16 the
6    benefits that you evaluated in determining whether or
7    not Beacon's benefits were competitive?
8       A. I would need to see my analysis.
9       Q. Why don't we give you that.
10         (Marked Exhibit 18; Analysis).
11      Q. Is Exhibit 18 which is JH41 and 42 your
12   analysis?
13      A. Yes.
14      Q. Okay, and when we were speaking a moment ago
15   about the analysis that was provided to the appeals
16   committee along with your October 4 transmittal letter,
17   Exhibit 15, is it this analysis, Exhibit 18?
18      A. Yes.
19      Q. Okay, and so now that you have Exhibit 18, my
20   question is did the benefits listed on Exhibit 16
21   include the benefits, all of the benefits that you
22   evaluated in determining whether or not Beacon's
23   benefits package was competitive?
24      A. With the exception of the FSA, which is a

**Page 116**

1    flexible spending account that employees put their own
2    money in to pay for certain benefit expenses, it looks
3    as if my analysis addressed the other benefits.
4       Q. What about vision, is vision among the
5    benefits you evaluated?
6       A. My analysis makes reference to vision care
7    benefits, and I've referred to Exhibit 14 which
8    includes information about vision benefits, which leads
9    me to conclude that I would have looked at that.
10      Q. Let's take a look at Exhibit 18 so I can get
11   a better understanding of this.  The fourth box down
12   under benefits discusses dental, and under a comment it
13   says, combined with vision care benefit, modest noise,
14   modest noise factor.  What does that mean?
15      A. The Exhibit 14 talks about dental insurance
16   and the vision plan, and that there's one carrier, The
17   Guardian, under which or from which both dental and
18   vision care benefits are provided, and because of that,
19   combining those two benefits, the Delta Dental plan,
20   which was common in the Massachusetts marketplace, and
21   also what was available to these employees at the time
22   they were employed by John Hancock would not be
23   available.
24      Q. Nor was a vision plan available, is that your

Page 117

1  understanding? I'm really focusing on vision, I think
2  you told me that vision was among the things that you
3  considered when determining whether or not Beacon's
4  benefits package was competitive. I'm trying to
5  understand in light of that testimony how to read this
6  statement, combined with vision care benefits, modest
7  noise factor. You're combining dental which is
8  unavailable with vision that's not provided?
9       A. By whom?
10      Q. Beacon.
11      A. Exhibit 14 tells me that both dental and
12  vision care benefits will be provided.
13      Q. Well, Exhibit 14 also says that there will be
14  a severance plan, doesn't it?
15      A. It does.
16      Q. Was there?
17      A. I don't know.
18      Q. You evaluated the competitiveness of Beacon's
19  offer. Did you ascertain whether or not there was a
20  severance plan to be offered at Beacon?
21      A. My analysis focused on those benefits that
22  are identified in Exhibit 18.
23      Q. And severance isn't among them, right?
24      A. Correct.

Page 118

1       Q. In fact, if we take a look at Exhibit 16,
2  severance is among the excluded benefits from the
3  analysis, do you see that listed?
4       A. I see it listed.
5       Q. Can you tell me how your group collectively
6  determined which benefits would be excluded from the
7  analysis of competitive benefits?
8       A. We included the benefits that had the most
9  immediate impact to an employee and had the most value
10  to employees, including the cost associated with that
11  paid by the company.
12      Q. Did you rely on any documents, any studies,
13  anything other than your opinions in determining which
14  benefits would be included and which benefits would be
15  excluded from the competitive benefits analysis?
16      A. Relied on our collective HR experience in the
17  industry as well as context of the studies that I have
18  referred to before.
19      Q. The Hewitt studies, for example?
20      A. Correct.
21      Q. And so we don't spend the entire day without
22  marking a one-inch document, let me give you these
23  which we'll mark as the next exhibit.
24      (Marked Exhibit 19; Hewitt Report).

Page 119

1       Q. This Hewitt document, Exhibit 19, with
2  control numbers JH2198 through 2365, is this a document
3  that you relied on in the context of your analysis of
4  what constitutes, or your analysis of whether Beacon's
5  benefits were competitive?
6       A. In that I did not have this information at
7  the time I was asked to produce it, I'm basing my
8  answer on the footnote. My source for this analysis is
9  Hewitt U.S. salary 2002, which is consistent with the
10  footnote of this document that says U.S. salary 2002.
11      Q. By this document you mean Exhibit --
12      A. Exhibit 19.
13      Q. 19? Okay. Do you remember reviewing a
14  document about this substantial?
15      A. Yes.
16      Q. Can you tell me, retracing your steps,
17  specifically what information you relied on in Exhibit
18  19? I don't want you to read the whole thing, but if
19  you can direct me to sections that are sections you
20  would have relied on, I would appreciate it.
21      A. Exhibit 19, page 17 by way of example talks
22  about the rate of an employer match to a 401(k) plan,
23  and it indicates that thirty percent of the surveyed
24  employers provided fifty cents on the dollar up to a

Page 120

1  six percent match, so in essence a three percent match,
2  which is what is referred to in my analysis as the
3  norm, as it is the highest percentage of employers that
4  offer that type of match compared to the four percent
5  that Beacon would offer.
6       Q. Anything else in Exhibit 19 that you relied
7  upon?
8       A. On Exhibit 19, page 58, there's reference to
9  a median co-payment for office visits to a physician,
10  and it indicates that fifteen dollars is normative, and
11  my analysis compares that to the ten dollar office
12  co-payment of the Beacon plan.
13      Q. Okay. Anything else?
14      (Pause.)
15      MR. PETERS: while you're looking, Tony,
16  we've had some discussion about metadata, not you and I
17  but our colleagues. I would like -- this is a good
18  example of where it's important to understand which
19  document comes first. I know the witness's testimony,
20  but it will be on the electronic version of the
21  metadata. You only have to tell me, you know, call me
22  and let me know, but where documents don't have
23  dates --
24      MR. FEEHERRY: I think that we

Page 121

1   indicated, I know that Erin indicated to Seth that if
2   he gave her a list --
3       MR. PETERS: A list, yes.
4       MR. FEEHERRY: -- at least with respect
5   to dates, there's no question we'll give all of that
6   information to you, and specifically with respect to 16
7   and 17 we'll get that for you. I'm assuming you'll get
8   it, assuming that it's available.
9       MR. PETERS: Yes, sure.
10       (Pause).
11    A. Exhibit 19, page 97 speaks about deductible
12   for dental plan and fifty dollars being the norm, and
13   page 97 suggests that forty-nine percent of the
14   surveyed employers had a fifty dollar deductible, so
15   that would have been another data point I would have
16   referred to.
17    Q. In your -- I'm going to have you continue
18   this analysis, but let me just ask you this on that
19   point. On Exhibit 19, when you assigned the
20   competitiveness average to above, what's the basis of
21   that, given the fifty dollar deductible is normal --
22    A. The fact that the annual maximum, I'm looking
23   at different features of the plan.
24    Q. It's fifteen versus a thousand?

Page 122

1    A. Yes.
2    Q. Okay, and I interrupted you, and you were on
3   page 97, and the question before you, Mr. Mongeau, is
4   whether you can point me to or would you please point
5   me to pages that you relied on in forming your analysis
6   that appears on Exhibit 18?
7    A. And my responses have identified certain data
8   points that are consistent with my analysis. What this
9   does not include is the Foster Higgins survey, which
10   would also have been other information I would have
11   referred to. I'm referring to page 121 with respect to
12   vacation schedule, and the fact that vacation schedules
13   vary by years of service. This document indicates that
14   it's seventy-two percent of employers, my analysis
15   indicates indicate seventy-five percent, and I am, so
16   that would be consistent, but that would suggest to me
17   that this material is done in different editions, so
18   what I was referring to would not have been exactly
19   this document.
20    Q. Okay.
21    A. I -- from based on what I've been able to
22   review here, I think that other data points may have
23   been part of the Foster Higgins. Another data point
24   that I may have relied on if I was looking at a

Page 123

1   document similar to this, page 55 speaks about the
2   point of service out of network co-insurance. The
3   Hewitt document refers to what the employer would pay,
4   so it refers to seventy percent, where my document
5   speaks about what the employee would pay, which says
6   thirty percent in the norm versus twenty percent, which
7   is what the Beacon plan would have covered.
8    Q. Have you now told me as best you can recall
9   what information you relied on from Hewitt, whether it
10   be what we've marked as Exhibit 19 or some recent
11   version of that same data?
12    A. These are, these data points are consistent
13   with my findings in what I've noted in going through
14   this so far, yes.
15    Q. Well, how far did you get? I mean, the last
16   time I checked you were on page 121. Did you get all
17   of the way to the end?
18    A. I have been referring. This is a, there's a
19   lot of information here, so I've been looking at my
20   comments and looking to correlate the two.
21    Q. Okay, thank you, and we'll move on from that
22   point and I'll direct you back to Exhibit 16. Now,
23   Exhibit 16 is still listed as a draft of this
24   comparable job definition. Was there a final version

Page 124

1   of this document generated?
2    A. I do not believe there was a subsequent
3   document to these two.
4       MR. PETERS: Off the record.
5       (Discussion off the record).
6    Q. Referring to Exhibit 16, there is under
7   competitive benefits offering on the second page a
8   statement that says, the medical plan will be compared
9   to the Harvard Pilgrim HMO rather than either the high
10   or low cost options available to JH employees. Was
11   that how you evaluated the medical plan when looking at
12   the Beacon benefits?
13    A. My analysis was based on Beacon's being
14   compared to the normative data that we've discussed. I
15   did not compare it to the Harvard Pilgrim HMO.
16    Q. Why not?
17    A. With, when I -- I say that with respect to
18   the features of those plans, because we were comparing
19   to the normative data.
20    Q. I understand that, but on Exhibit 16, which
21   is -- well, let me back up and understand this document
22   better than perhaps I do. Was the purpose for
23   Exhibit 16 to collectively agree on a process for
24   determining how you would evaluate what is competitive

Page 125

1  benefits?
2      A. It was a document to provide guidance to
3  conduct the comparable job evaluation.
4      Q. Right, and one of the components of a
5  comparable job evaluation is a benefits assessment?
6      A. Correct.
7      Q. And when you undertook your benefits
8  assessment that's memorialized as Exhibit 18, did you
9  refer back to what your group put together and that
10 we've marked as Exhibit 16?
11     A. I would have referred back to either 16 or 17
12 exhibits, and then actually engaging in the process of
13 conducting the competitive analysis have arrived at the
14 determination I made here.
15     Q. Sure, but your analysis and the components of
16 your analysis were contained in Exhibit 16, correct?
17     A. Exhibit 16 and 17 were as you've noted draft
18 documents working toward operationalizing the terms of
19 this plan. What ultimately was done, the analysis, is,
20 was the, is indicative of the final comparison that was
21 conducted.
22     MR. FEEHERRY: You're referring there to
23 Exhibit 18 --
24     MR. PETERS: 18.

Page 126

1      THE WITNESS: 18.
2      Q. Was there some other written document, some
3  other written protocol that came after Exhibit 16 that
4  you relied on in determining what you had to do to
5  determine comparability?
6      A. These are the only documents I'm aware of.
7      Q. So I understand you relied on normative data
8  in evaluating the medical plan that Beacon offered, is
9  that a correct statement?
10     A. Yes.
11     Q. Okay. My question is not what you did, my
12 question is more focused on what you didn't do. Why
13 didn't you evaluate the medical plan compared to the
14 Harvard Pilgrim HMO?
15     A. At the time that I conducted the actual
16 analysis, the determination was now based on comparing
17 Beacon to normative data, not back to the John Hancock
18 plan.
19     Q. Why?
20     A. The severance plan included a provision of
21 comparable job to a successor company, and our frame of
22 reference was within the industry that the employee
23 worked.
24     Q. Well, when you --

Page 127

1      A. Which was not, in this case would have been
2  those types of positions we've talked about, IT,
3  building maintenance.
4      Q. When you take a look at Exhibit 16, you see
5  under competitive benefits offering, in determining
6  whether or not benefits offered are competitive, we
7  will consider the value of the benefits package to the
8  employee compared to the industry in which the
9  successor company is a part, right, do you see that?
10     A. Yes.
11     Q. So as far back as whenever Exhibit 16 was
12 drafted, the idea was to compare Hancock's benefits to
13 the benefits in the industry of the successor company,
14 right?
15     MR. FEEHERRY: Objection.
16     Q. Well, I may be reading it wrong. It says, we
17 will consider the value of the benefits package to the
18 employee compared to the industry of which the
19 successor company is part. What does that mean?
20     A. We would compare the benefit package of the
21 successor employer to the industry in which the
22 successor employer operated.
23     Q. Was that the evaluation that you undertook?
24     A. I used available data at the time, which was

Page 128

1  normative data.
2      Q. Okay, so the answer is no, right, you did not
3  compare the benefits package to the employee with the
4  industry compared to the industry to which the
5  successor company is part, right?
6      A. Most of the data I had was normative.
7      Q. Why didn't you undertake the evaluation, the
8  type of evaluation that Exhibit 16 sets out?
9      A. The evaluation that I conducted was generally
10 consistent with what Exhibit 16 sets out in draft form.
11 We discussed the benefits that were included, which
12 were part of my analysis, with the exception of the
13 flexible spending account, and I believe on reflecting
14 on this document that the medical plan value may be
15 referring to not the design elements of the plan, which
16 I've talked about by way of co-payments and things of
17 that nature, but more to the actual cost of that plan.
18     Q. Let me ask you some questions that I will ask
19 you to answer one of three ways, yes, no, or I'm sorry,
20 Mr. Peters, I can't answer that question yes or no,
21 because I've got an hour, okay? Question number one,
22 did you consider the value of the benefits package to
23 the employee compared to the industry of which the
24 successor company is a part when you evaluated the

| Page 129 | Page 131 |
|---|---|

**Page 129**

1 Beacon benefits package?

2    A. I can't answer that yes or no.

3    Q. And why is that, what information are you

4 missing that would allow you to answer my question yes

5 or no?

6    A. Because I don't have all of the source

7 documentation available to me, I can't answer the

8 question.

9    Q. Do you remember considering the value of the

10 benefits package to the employee compared to the

11 industry of which the successor company is part; yes,

12 no or I can't answer that way?

13    A. Yes.

14    Q. You remember doing that?

15    A. I remember considering the industry of which

16 it was part.

17    Q. What industry data, industry -- back up a

18 little bit. We are talking now about the property

19 management industry, aren't we?

20    A. Yes.

21    Q. What property management data did you rely on

22 in evaluating the value of the benefits package to the

23 employee compared to the property management industry

24 of Beacon?

**Page 130**

1    A. I believe with respect to the pension plan

2 not being available to small employers such as the

3 smaller employers in the property management industry

4 would have been a point of comparison.

5    Q. Okay. Any other industry -- Strike the

6 question.

7       Any other property management industry

8 data that you relied on in evaluating the

9 competitiveness of Beacon's benefits package other than

10 pension information?

11    A. I can't recall anything specifically.

12    Q. And the pension information is the source of

13 your industry data listed on Exhibit 18?

14    A. I can't answer emphatically, but I believe

15 that the Massachusetts Small Business Association would

16 have been a reference point.

17    Q. Okay. Was that data supplied to the appeals

18 committee when you transmitted information to the

19 appeals committee with Exhibit 15?

20    A. No.

21    Q. Was it among the other data that was missing;

22 the Hewitt data, for example?

23    A. Yes.

24    Q. Was it data that was important to your

**Page 131**

1 evaluation?

2    A. Any of the objective resources identified

3 here were important to my evaluation.

4    Q. Did you consider that they were important for

5 the benefits appeal committee to review in the context

6 of evaluating the correctness of your assessment?

7    A. No, I thought the assessment provided the

8 information.

9    Q. Other than pension benefits, did you consider

10 the value of the benefits package to the employee

11 compared to the property management industry of Beacon;

12 yes, no or I can't answer?

13    A. I guess I can't answer.

14    Q. And you can't answer because you can't

15 remember what other information you relied on?

16    A. Correct.

17    Q. Go down if you would on Exhibit 16 under

18 process, and --

19    A. Yes.

20    Q. -- I'd respectfully ask that you apply the

21 same rules that we've been applying so that we can get

22 through this. Did you undertake the process listed in

23 bullet point number one when you were assessing

24 Beacon's, the competitiveness of Beacon's benefits

**Page 132**

1 package?

2    A. Yes.

3    Q. Directing you to bullet point number two, did

4 HR obtain comparative benefit data and valuations for

5 those identified companies from Hewitt Associates in

6 the context of evaluating Beacon's benefits?

7    A. No.

8    Q. Bullet point number three, did human

9 resources obtain aggregate benefit costs for each

10 successor company and compare single, dual and family

11 coverage to John Hancock offerings in evaluating

12 Beacon's benefits?

13    A. I can't answer.

14    Q. Why not, what information are you missing --

15    A. Because I'm -- mm-hmm. When it refers to

16 each successor company.

17    Q. Okay, so let me ask it another way. Did

18 human resources obtain aggregate benefit costs for

19 Beacon and compare single, dual and family coverage to

20 JH offerings in evaluating the Beacon benefits?

21    A. Yes.

22    Q. Was the overall comparability assessment

23 determined from the entire, for the entire affected

24 group rather than on an employee by employee basis when

Page 133

1   you were evaluating the Beacon benefits?
2      A. Yes.
3      Q. Did an appeal form ever get developed?
4      A. I don't believe so.
5      Q. Okay. Let's go back to the second bullet
6   point. Why didn't human resources obtain comparative
7   benefit data and valuations for those identified
8   companies from Hewitt Associates in evaluating the
9   Beacon benefits?
10     A. We were advised that the company mix was with
11  respect to property management companies, and Hewitt
12  database did not include those particular companies, so
13  we looked to normative data instead of the specific
14  company data.
15     Q. Who advised you of that, Beacon? Last
16  response was, we were advised that company mix, and
17  then you continued on.
18     A. Mm-hmm. We --
19     Q. Assuming any credibility in my recall from
20  memory, who gave you that advice?
21     A. Our management.
22     Q. Do you have a specific memory of talking
23  about this with anyone from management?
24     A. No.

Page 134

1      Q. Was any effort undertaken -- Strike the
2   question.
3         Did you undertake any effort to
4   determine who might be a competitor of Beacon who would
5   have information on benefits that you might use to
6   evaluate Beacon's benefits?
7      A. I was relying on the resources here.
8      Q. I understand that, but I'm wondering whether
9   or not you undertook any effort prior to relying on
10  these resources or even after that for that matter to
11  identify companies that were in Beacon's industry,
12  property management, and ascertain whether or not the
13  information was available on what benefits they offer?
14     A. No.
15     Q. Did anyone from your company suggest that
16  that might be a productive exercise, something you
17  ought to undertake?
18     A. I don't recall.
19     Q. Who was involved in the decision to rely on
20  normative data rather than industry-specific data?
21     A. I believe the working group that we've
22  identified is involved with this document.
23     Q. Now, is that group known as the comparability
24  evaluation group, and I'd refer you to the last bullet

Page 135

1   point on Exhibit 17, it's where I get that?
2      A. Yes.
3      Q. And that is the group that was involved in
4   preparing this document or these documents we've marked
5   as Exhibit 17 and -- I'm sorry, 16 and 17?
6      A. Yes.
7      Q. Okay. Now, was it contemplated that the
8   comparability evaluation group would be the group that
9   undertook the assessment of whether a job offer was
10  comparable?
11     A. Please repeat the question.
12     Q. Yes. At some point, a decision was made that
13  you, Peter Mongeau, would be the person to make the
14  initial determination as to whether or not the
15  employees such as Mr. Joyce had received comparable
16  offers or competitive job offers, right?
17        MR. FEEHERRY: Objection.
18     Q. Comparable job offers?
19     A. It was the group that determined whether
20  these were comparable job offers.
21     Q. Okay, so the information that's contained on
22  Exhibit 18, which is the assessment, can you tell me
23  who was involved in undertaking this assessment?
24     A. Exhibit 18 that deals with the benefit piece

Page 136

1   of the comparable job was my work shared with the other
2   members of the comparability evaluation group, using
3   the objective resources that I've identified.
4      Q. Would you remind me, I know you told me
5   before, who was on this comparability evaluation group?
6      A. Lisa Blake, Joan DiCicco and Sandy Collie.
7      Q. And the four of you undertook the analysis
8   that is memorialized, written down on Exhibit 18, is
9   that correct?
10     A. No, that's not correct. I shared the outcome
11  of this analysis with them.
12     Q. Okay, so you undertook the analysis that's
13  reflected on Exhibit 18, and once you had come to the
14  conclusions reached in this document you then spoke
15  with Ms. Blake, Ms. DiCicco and Ms. Collie about your
16  analysis, is that a correct statement?
17     A. Yes, as we had shared all along.
18     Q. Okay, and then the group made the
19  determination that these benefits were competitive, the
20  Beacon benefits?
21     A. Yes.
22     Q. Was there a meeting where you discussed and
23  you presented your findings?
24     A. That I don't recall.

Page 137

1    Q. Do you remember in a general way how you
2    communicated your conclusions to Ms. DiCicco, Ms. Blake
3    and Ms. Collie?
4    A. We had been working collaboratively on this
5    on a day to day basis and in contact with each other
6    via phone, e-mail and in person.
7    Q. Is there something at John Hancock, more
8    specifically, was there something at John Hancock
9    called the administrative guidelines to determine
10   comparability?
11   A. I don't recall specifically.
12   Q. Does Exhibits 17 contain the guidelines for
13   determining comparability, yes or no, or option three?
14   A. Option three, I can't answer yes or no.
15   Q. Were any of the employees of John Hancock
16   provided with any documents that laid out the
17   guidelines for how you and your group were to determine
18   comparability of job offers; I now direct you back to
19   Exhibit 3, I'm looking for something in addition to
20   this that exists?
21   A. Exhibit 3 and Exhibit 7 address comparable
22   with respect to similar salary, competitive benefit
23   offering and work location within fifty miles.
24   Q. Other than 3 and 7, are you aware of any

Page 138

1    other documents that employees are provided so that
2    they would understand exactly what you were going to do
3    in determining whether or not a job offer was
4    comparable?
5    A. Exhibit 6 that went to IT employees addressed
6    that in some way as well, but it was not a general
7    communication such as Exhibits 3 and 7.
8    Q. Okay, so do we have the universe of documents
9    as best you know that describe the process of
10   identifying comparability?
11   A. As best I know.
12   Q. Now, I want to take a look at Exhibit 18 in a
13   little more detail. The benefits listed or assessed
14   are 401(k) pension, medical, dental, health plan costs
15   and vacation, right?
16   A. Correct.
17   Q. And those are then laid out on the second
18   page as well, correct?
19   A. Health plan cost is not laid out on the
20   second page.
21   Q. Why was it excluded?
22   A. The assessment considered the competitiveness
23   of the benefits we just identified against the industry
24   or normative data, and it also considered a comparison

Page 139

1    of the health plan contributions, the Beacon versus
2    John Hancock, but that is a separate item from the
3    competitiveness.
4    Q. I don't understand why it wasn't included,
5    maybe you've told me and I'm just, maybe it's the hour.
6    When you put together your second page competitive
7    assessment score, why didn't you assign a number to the
8    health plan cost?
9    A. Because when the benefits were being
10   evaluated, they were being evaluated based on the value
11   that the benefit delivered and what was competitive in
12   the industry, so what the match was for 401(k) or what
13   the level of coverage would be for medical, not the
14   cost of that coverage. A secondary matter was to look
15   at the cost of the health plan for John Hancock versus
16   Beacon.
17   Q. So that was evaluated separately from the
18   numerical evaluations on the second page?
19   A. That was evaluated separately from the
20   competitive assessment on the second page.
21   Q. Okay. Let's focus on the second page for a
22   moment. The weighing column, how did you arrive at the
23   percentages assigned to each benefit?
24   A. These were based on the Hewitt Benefit Index

Page 140

1    that I have explained was a valuation tool we used, and
2    it was an objective and well accepted industry tool
3    that weighted benefits in this way to arrive at
4    assessing competitiveness.
5    Q. Is that data in what we've marked as Exhibit,
6    Exhibit 19?
7    A. I don't believe so because this data is a
8    collection of normative data, where this is based on an
9    actual valuation.
10   Q. What document -- I take it this is Hewitt
11   data that you don't have access to any more, this
12   Hewitt data that does, that assesses or assigns a
13   weighted average to a benefit?
14   A. That information was not in my files.
15   Q. But you relied on a specific document in
16   determining, for example, that 401(k) benefits have a
17   twenty percent weighted average?
18   A. Yes.
19   Q. Can you describe the documents for me?
20   A. It would have been what we called a Hewitt
21   Benefit Index, and I believe I would have referred to a
22   Benefit Index that was conducted for John Hancock, and
23   the beginning of that index described the methodology
24   including this weighting, which was not specific to

Page 141

1 John Hancock, it was specific to how the tool worked.
2      Q. Was Hewitt involved directly in undertaking
3 the competitive benefits assessment?
4      A. For Beacon?
5      Q. Yes.
6      A. No.
7      Q. So this Hewitt Benefits Index that you've
8 been describing for me, is it a document that was
9 prepared for John Hancock?
10     A. Yes.
11     Q. In what context?
12     A. When John Hancock conducted its annual
13 competitive analysis of its benefits in the financial
14 services industry.
15     Q. Okay, and what was the date generally of the
16 document you relied on, the Hewitt Benefit Index?
17     A. This was an annual process, and I believe in
18 the spring is when we first started getting results,
19 but could evolve all of the way through the summer to
20 the fall.
21          MR. PETERS: Do we have this, Tony, have
22 you seen it, the Hewitt Benefit Index?
23          MR. FEEHERRY: No.
24          MR. PETERS: Can we put that on -- maybe

Page 142

1 I'll send you a letter, but can we put that on the list
2 of things to poke around for, or do you think it's
3 gone?
4          MR. FEEHERRY: Can we go off the record
5 for a second?
6          MR. PETERS: Yes, off the record.
7          (Discussion off the record).
8      Q. This index that you relied on, Mr. Mongeau,
9 did you have the only copy as best you know?
10     A. No.
11     Q. Okay. Who had copies of this Benefit Index
12 other than you?
13     A. Members of my staff who, it could have been
14 members of my staff, it could have been Page Palmer.
15     Q. How many copies were in the world, best you
16 know?
17     A. We usually get no more than half a dozen.
18          MR. PETERS: Okay, and I'll say on the
19 record, we got documents from Hewitt recently, for all
20 I know it's in there, Tony, and then I'd be giving it
21 to you, but let's go back to the assessment.
22     Q. So that the numbers that we've got here,
23 these twenty percent, fifteen percent, et cetera under
24 weighing, there was no subjective component to that

Page 143

1 from your perspective, this is information that you
2 relied on that Hewitt generated?
3      A. My notice saying that the weightings were
4 based on the index, I would need to refer to the index
5 to see if I modified this in any way.
6      Q. Really what I'm trying to find out is where
7 are the value judgments so that I can test them. The
8 weighing here, does that reflect any of your own
9 personal view of how much weight should be given to,
10 for example, pension benefits?
11     A. No, this was based on Hewitt and their tool
12 and actuaries, and so it was an objective, it was an
13 attempt to have an objective versus subjective
14 weighting.
15     Q. And when we get the scores three zero three
16 under the score column, that's just an interpolation of
17 this weighing?
18     A. The weighting is one component of the
19 determination. The score is related to my analysis as
20 to whether the benefit was average, above or below
21 average.
22     Q. Okay, so when you determine that a 401(k)
23 benefit, that Beacon's 401(k) benefit was above
24 average, that's your conclusion based upon data that

Page 144

1 you reviewed, right?
2      A. Correct.
3      Q. There was no other source, I'm not going to
4 find, for example, a Hewitt report that you relied on
5 that says that the, that a benefit that Beacon was
6 offering would be considered above average?
7      A. No, not that I'm aware of.
8      Q. And when you concluded that totally -- start
9 that over again.
10          Under total you come up with an average
11 of 1.9, correct?
12     A. Correct.
13     Q. And you conclude that 1.9 is average?
14     A. Correct.
15     Q. That's because average would be two, right;
16 two would also be average is a better question?
17     A. Two would also be average.
18     Q. Did you determine how far down our decimal
19 system we'd go before a benefit was considered to be
20 below, or the benefits were considered to be below
21 average?
22          MR. FEEHERRY: Objection. You may
23 answer.
24     A. I don't recall going through an exercise like

Page 145

1    that.

2    Q. You didn't say beforehand, if I get to a 1.5,

3    that's going to be below average?

4    A. I don't recall doing that.

5    Q. Did you have in your file handwritten notes

6    that reflected your analysis or the process of reaching

7    your conclusions?

8    A. I can only recall what I was able to provide

9    in my files, and that I provided that to the appeal

10    committee, so I would, it's likely I, as I've

11    indicated, there are files that I have not been able to

12    locate that would have had notes of one form or

13    another, yes.

14    Q. Were the files missing by the time you sent

15    Exhibit 15?

16    A. Yes.

17    Q. Have you been able to reconstruct what

18    happened to them?

19    A. No.

20    Q. Was there an office move, for example?

21    A. There have been a number of office moves, and

22    there have been other files that have been, that I

23    cannot find, it's not just these files.

24    Q. At the time you were preparing this analysis,

Page 146

1    were you anticipating that employees would be

2    discontented, would be upset with your conclusion that

3    Beacon was offering competitive benefits?

4    A. My analysis identified, in addition to

5    whether the plans were competitive based on the

6    objective information, it also identified areas where I

7    felt employees could be upset.

8    Q. That's the noise factor --

9    A. Correct.

10    Q. -- referred to in this document, right?

11    A. Correct.

12    Q. So you were expecting some noise, weren't

13    you?

14    A. Expecting, I can't say whether I was

15    expecting, I was advising through this analysis that it

16    is, could be possible.

17    Q. But didn't you think when you were putting

18    all these documents in your file that the documents and

19    your file were going to be very likely important,

20    either in litigation or if there was an administrative

21    appeal?

22    MR. FEEHERRY: Objection. You may

23    answer.

24    A. I did not suppose one way or the other.

Page 147

1    Q. What efforts did you take to make sure that

2    these documents in this file that reflected your

3    analysis of competitiveness were safe?

4    A. The same effort I take with all of my

5    documents and files.

6    Q. Are there other files missing other than this

7    that you know of?

8    A. As I indicated, there have been other files

9    that I have gone to look for that I have not been able

10    to put my hands on.

11    Q. Do you recall how much time it took to

12    undertake the analysis reflected in Exhibit 18?

13    A. I don't recall specifically how long it took

14    me, no.

15    (Marked Exhibit 20; E-Mail).

16    Q. Mr. Mongeau, Exhibit 20 is an e-mail, Bates

17    number JH1234. Have you seen it before?

18    A. Yes.

19    Q. Can you tell me in a general way what the

20    e-mail addresses?

21    A. It is addressing the work around identifying

22    or assessing comparability with respect to benefits,

23    and the effort that was taken to identify companies in

24    the industry, that we would then look to Hewitt to see

Page 148

1    if they had those companies in their database in order

2    to conduct the analysis, where ultimately went, we went

3    to normative data in that those companies were not part

4    of the database.

5    Q. Okay. Now, as of March 3rd, the date of this

6    e-mail, had you finalized a criteria for determining

7    competitive benefits, what constitutes competitive

8    benefits?

9    A. I don't believe I have.

10    Q. So the documents we have been looking at --

11    let me ask you this way. Does the e-mail that we just

12    marked as Exhibit 20 help identify in time either

13    Exhibits 16 or 17?

14    A. In Exhibit 20 there's a statement that Joan

15    DiCicco is advising Paul Crowley that she's working

16    with Page and other members of HR on the criteria to

17    decide comparability, which I believe is in reference

18    to Exhibits, the work of 16 and 17.

19    Q. Okay, so the documents that we've marked as

20    Exhibit 16 and 17 are in the March, April time frame?

21    A. I believe so.

22    Q. Okay. Was a list of companies within

23    Beacon's industry ever generated?

24    A. I believe so.

1     Q. Focusing on the real estate operation

2   department, were all of these benefits available to the

3   members of the real estate operations department; if

4   not, which ones were not available?

5     A. Some senior members, if you were an officer

6   of the company, the, or a director, I believe you would

7   have financial counseling and deferred compensation.

8   Otherwise those would not have been available to you.

9     Q. Okay, so do you know whether members of the

10   real estate operations division were senior members of

11   Hancock, either officers or directors?

12     A. I'd have to see a list of employees.

13     Q. Fine, exclude those two from my next

14   question. Do you know which of the benefits listed

15   under Exhibit 16 excluded benefits which were provided

16   by Beacon? Let me make it easier for you. Can you

17   take a look at the excluded benefits and tell me which

18   of them Beacon did not offer?

19     A. I would have to refer back to --

20     Q. You're now looking at Exhibit 14?

21     A. I'm looking at Exhibit 14 and comparing it to

22   the list in Exhibit 16. It looks like the child care

23   center would not have been offered by Beacon, and the

24   adoption benefit would not be offered by Beacon.

1   Otherwise it looks like some form of these benefits

2   would be offered by Beacon.

3     Q. Well, I'll tell you that there's no

4   severance. Is that, do you have any reason to doubt me

5   when I tell you Beacon didn't offer severance?

6     A. I'm referring to this document.

7     Q. Right, and this document says Beacon intends

8   to include, right?

9     A. Mm-hmm.

10     Q. Doesn't say that these are going to be all of

11   the benefits offered, does it?

12     A. This document says Beacon intends to include.

13     Q. All right, they didn't provide severance,

14   okay, so let me ask you then, was there any evaluation

15   done on any of the excluded benefits to compare the

16   benefits listed on Exhibit 16, the excluded benefits

17   listed on Exhibit 16 to Beacon's benefits?

18     A. No, the analysis was as Exhibit 18 shows, on

19   those benefits.

20     Q. Did Hewitt have information that you could

21   have relied on to evaluate, for example, Beacon's

22   disability benefits with Hancock's disability benefits?

23     A. I'm not certain I'm answering your question

24   properly, but if I were, if something was undertaken to

1   review Beacon versus John Hancock by using Exhibit 14

2   and what was referenced as intended to information I

3   had at John Hancock would have been a way of comparing.

4     Q. All right, that's a fair point. Let me ask

5   it another way. Was there any effort to evaluate the

6   short-term disability benefits that Beacon was offering

7   to any normative data that you had access to on

8   short-term disability benefits?

9     A. Not that I recall, no.

10     Q. Could it have been done?

11         MR. FEEHERRY: Objection. You may

12   answer.

13     A. It could have been done.

14     Q. Okay. I mean, you could have undertaken an

15   analysis of all of Beacon's benefits, not just selected

16   benefits, correct?

17         MR. FEEHERRY: Objection. You may

18   answer.

19     A. That could have been done.

20     Q. Why not, why wasn't it done?

21         MR. FEEHERRY: Objection. You may

22   answer.

23     A. Because our focus was on the benefits that

24   are most valued in our professional HR experience and

1   those with the most monetary value and immediate impact

2   to an employee given this change. The other benefits,

3   disability, life insurance, long-term care, have

4   meaning when an event such as disability or death would

5   occur, so we focused on the most significant benefits.

6     Q. The rest of the benefits, Mr. Mongeau, are

7   valuable benefits, aren't they, from your perspective?

8         MR. FEEHERRY: Objection. You may

9   answer.

10     A. They can be. I'm not certain I can use the

11   word valuable, but they are benefits that can be used

12   or appreciated in the event that they are created for

13   such as disability.

14     Q. Right. Did anything prevent your group from

15   undertaking a competitive assessment of all of Beacon's

16   benefits to either Hancock's benefits or normative

17   data?

18         MR. FEEHERRY: Objection. You may

19   answer.

20     A. Other than our administrative decision under

21   the terms of the plan where we opted to focus on these

22   benefits as I've discussed, no.

23     Q. How much time would it have taken to evaluate

24   all of Beacon's benefits against either Hancock's

Page 157

1    benefits or normative data had you chosen to do so?
2        MR. FEEHERRY: Objection. You may
3    answer.
4        A. There would have been some additional amount
5    of time. If I look at the list, the one's longer than
6    the other, so it might have doubled the amount of time,
7    I'm not, I'm just supposing.
8        (Marked Exhibit 22; Memorandum from
9            DiCicco).
10       Q. A moment on Exhibit 22, Mr. Mongeau. It's
11   got a number at the bottom, could you read it for me?
12       A. JH001368.
13       Q. Okay, and that is Ms. DiCicco's notification
14   to the employees, certain employees that they would not
15   be eligible for severance benefits?
16       A. Her memorandum is to what she refers to as
17   prospective Beacon Capital employees.
18       Q. Okay.
19       A. And it's with respect to eligibility for John
20   Hancock severance.
21       Q. And the conclusion is that they're not
22   eligible?
23       A. Correct.
24       Q. Okay. When did you get Beacon's benefits

Page 158

1    package so that you could undertake the evaluation that
2    led to the conclusion that employees were not entitled
3    to, or I should say eligible for benefits?
4        A. I don't know when I began to receive
5    information. Exhibit 14 provides information that
6    seemed to be current at that time on May 21st.
7        Q. So the earliest you could have begun your
8    analysis was May 21st, is that correct?
9        A. The earliest I could have begun a comparison
10   of this specific description of benefits would have
11   been May 21st, yes.
12       Q. And do you remember undertaking a comparative
13   analysis prior to May 21st?
14       A. I may have, I don't recall specifically.
15       Q. I'm trying to get the bookends to determine
16   how much time it took to undertake this analysis, and
17   I've got a letter telling employees that are entitled
18   to severance that's dated May 30th, and I've got
19   proposed benefits dated May 21st, so there's a nine-day
20   window. Do you remember there being more time than
21   that to undertake the analysis that is captured in
22   Exhibit 18?
23       A. I don't, I think that that was the time frame
24   this particular analysis was conducted in.

Page 159

1        Q. Okay, and not the whole nine days, I take it;
2    in other words, you didn't use nine days of your
3    precious time undertaking the analysis that's reflected
4    in 18, did you?
5        MR. FEEHERRY: Objection.
6        Q. Or you did? I think your time is precious.
7        A. It did not take me nine complete days to do
8    this analysis.
9        Q. How much time did it take, in hours if you
10   can tell me, and I'll take an estimate.
11       A. I would -- I don't recall. I'm thinking of
12   the nature of the work, and it could have taken two to
13   three work days.
14       Q. Did you have help?
15       A. I had the resources that I've referenced.
16       Q. Right, I'm talking about maybe someone to
17   find the pages in the book to flip to. Did you have an
18   administrative assistant, for example, that helped you
19   conduct the analysis?
20       A. No, I would have done this on my own.
21       Q. Okay. Did you have any or participate in any
22   meetings with Hancock employees about either the
23   process of coming to these conclusions reflected in
24   Exhibit 18 or, well, leave it there?

Page 160

1        A. I did, I don't recall participating in
2    employee meetings.
3        Q. Any of them for any purpose?
4        A. Not that I recall, no.
5        Q. Now, Mr. Joyce and others appealed their,
6    decision not to provide them with an opportunity to
7    take severance, do you recall that?
8        A. Could you repeat the question?
9        Q. Joyce appealed, right?
10       A. Mm-hmm.
11       Q. But you didn't sit in on the appeal process,
12   did you?
13       A. No, I did not.
14       Q. You recused yourself?
15       A. Yes, I did.
16       Q. Because you were involved in the analysis?
17       A. Yes.
18       Q. Who was in the appeals committee?
19       A. Kathy Suchenski, S U C H E N S K I, and Brian
20   Bisciotti, which I think is B I S C I O T T I.
21       Q. Those two?
22       A. Correct.
23       Q. Now, on Exhibit 16, 15 or 16, there's a
24   description at the back page as to who would sit on the