UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DANIEL JOYCE,<br>Individually and on behalf of a class of others<br>similarly situated,<br><br>   Plaintiff,<br><br>v.<br><br>JOHN HANCOCK FINANCIAL SERVICES,<br>INC. SEVERANCE PAY PLAN and JOHN<br>HANCOCK FINANCIAL SERVICES, INC.,<br>as Administrator and Fiduciary of the John<br>Hancock Financial Services, Inc. Severance<br>Pay Plan<br><br>   Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.05-11428 – WGY |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF HIS
## CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Kevin T. Peters (BBO#: 550522)
kpeters@toddweld.com
Seth J. Robbins (BBO#: 655146)
srobbins@toddweld.com
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
(617) 720-2626

*Attorneys for Daniel Joyce, et al.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................

INTRODUCTION .............................................................................................1

SUMMARY OF UNDISPUTED FACTS ...............................................3

ARGUMENT.....................................................................................................3

I.     STANDARD OF REVIEW ......................................................................3

       A.     Summary Judgment in ERISA Actions ...........................................3

II.    THE PLAIN, UNAMBIGUOUS LANGUAGE OF THE
       SUMMARY PLAN DESCRIPTION SHOWS THAT HANCOCK'S
       DETERMINATION TO DENY SEVERANCE BENEFITS TO JOYCE
       WAS UNREASONABLE .........................................................................5

       A.     The Sale of the Tower Complex Did Not Involve or Amount
              to an Outsourcing of Joyce's REOD Business Unit, Thereby
              Precluding the Application of the Plan Amendment .......................7

       B.     Joyce was Eligible for Plan Benefits Under Section 3.1 of the
              Plan Because the Sale of the Tower Complex Resulted in a
              Reduction in Staff and Joyce's Termination...................................10

       C.     Even if the Sale of the Tower Complex Involved an Outsourcing
              of Joyce's Business Unit, Hancock's Substantially Flawed
              Competitive Assessment Analysis of Beacon's Benefit
              Offerings Resulted in a Clearly Erroneous Determination
              to Deny Severance .........................................................................12

              1.     Hancock's Interpretation of "Competitive Benefit
                     Offerings" was Wholly Unreasonable ................................12

              2.     Even if Hancock's Interpretation of the "competitive
                     benefit offerings" was Reasonable, the Manner in
                     Which Hancock Conducted the Competitive Assessment
                     Analysis of Beacon's Benefit Offerings was Contrary
                     to Its Own Internal Guidelines Memorandum ...................13

              3.     Hancock Breached its Fiduciary Duty to Joyce.................14

       D.     The Hancock Benefits Appeals Committee Conducted an
              Illusory Review..............................................................................17

i

III.    IF HANCOCK'S INTERPRETATION AND APPLICATION
        OF THE TERMS OF THE PLAN AMENDMENT WERE
        REASONABLE, THEN THE SUMMARY PLAN DESCRIPTION
        WAS IN VIOLATION OF 29 U.S.C. §§ 1022(a) .....................................18


CONCLUSION..........................................................................................................20

# TABLE OF AUTHORITIES

**Federal Cases**                                                      **Page**

*Affonso v. New England Electric Systems Companies Standard Severance Plan,*
    2002 U.S. App. LEXIS 27228 ........................................................13

*Bachelder v. Commc'ns Satellite Corp.,*
    837 F.2d 519 (1st Cir. 1988).........................................................6, 19

*Bellino v. Schlumberger Technologies, Inc.,*
    944 F.2d 26 (1st Cir. 1991)..........................................................11, 12

*Blau v. Del Monte Corp.,*
    748 F.2d 1348 (9th Cir. 1984) ......................................................11

*Burke v. Kodak Retirement Income Plan,*
    336 F.3d 103 (2003)....................................................................18, 19

*Denmark v. Liberty Life Assurance Company of Boston*
    2005 WL 3008684 (D.Mass. 2005) ..............................................5

*Doe v. Travelers Ins. Co.,*
    167 F.3d 53 (1st Cir. 1999)............................................................5

*Doyle v. Paul Revere Life Ins. Co.,*
    144 F.3d 181 (1st Cir. 1998)..........................................................4

*Duldulao v. Saint Mary of Nazareth Hosp.,*
    115 Ill.2d 382 (1987) ...................................................................19

*Fenton v. John Hancock Mutual Life Ins. Co.,*
    400 F.3d 83 (1st Cir. 2005)............................................................4, 19

*Firestone Tire and Rubber Co. v. Bruch,*
    489 U.S. 101 (1989) .....................................................................3

*Frank v. Colt Industries,*
    910 F.2d 90 (3d Cir. 1990).............................................................6

*Glista v. Unum Life Insurance Co. of America,*
    378 F.3d 113 (1st Cir. 2004)..........................................................13

*Govoni v. Bricklayers, Masons & Plasterers Int'l. Union of Am.,*
Local No. 5 Pension Fund,
    732 F. 2d 250 (1st Cir. 1984).........................................................19

*Hansen v. Continental Insurance Company,*
    940 F.2d. 971 (5th Cir. 1991) .......................................................................18

*Harris v. Pullman Standard, Inc.,*
    809 F.2d 1495 (11th Cir. 1987) .......................................................................11

*Mauser v. Raytheon,*
    239 F.3d 51 (1st Cir. 2001).......................................................................19

*McKnight v. Southern Life and Health Ins. Co.,*
    758 F.2d 1566 (11th Cir. 1985) .......................................................................6, 7, 18

*Reich v. John Alden Lide Ins. Co.,*
    126 F. 3d 1 (1st Cir. 1997).......................................................................3

*Santana v. Deluxe Corp.,*
    12 F.Supp.2d 162 (D.Mass. 1998) .......................................................................6

*Shea v. Road Carriers Local 707 Welfare Fund,*
    818 F.Supp. 631 (S.D. NY 1993).......................................................................6

*U.A.W. v. Skinner Engine Co.,*
    188 F.3d 130 (3d Cir. 1999).......................................................................15

*Ulmer v. Harsco Corp.,*
    884 F.2d 98 (3d Cir. 1989).......................................................................11

*Wallin v. Severance Plan of Electronic Data Systems,*
    2003 WL 23002522 (3d Cir. 2003) .......................................................................15

*Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan,*
    402 F. 3d 67 (1st Cir. 2005).......................................................................3, 4

## Federal Statutes and Codes

29 U.S.C. §§1001-1461 .......................................................................1

29 U.S.C. §§ 1022(a) .......................................................................2, 18

29 C.F.R. § 2560.503-1(f)(1)-4 (1977).......................................................................5

29 U.S.C. § 1022 (a)(1).......................................................................6

29 U.S.C. §§ 1022(a) & 1024(b).......................................................................18

**Federal Rules**

Fed.R.Civ. P. 56 (c) .........................................................................................3

## INTRODUCTION

Plaintiff, Daniel Joyce, individually and on behalf of a putative class of others similarly situated ("Plaintiff" or "Joyce") submits this Memorandum in Opposition to Defendants' Motion for Summary Judgment and in Support of His Cross-Motion for Partial Summary Judgment. Joyce requests that judgment enter in his favor as to liability on all counts of Plaintiff's Amended Complaint.[1]

Joyce, a former employee of the Defendant John Hancock Financial Services, Inc. ("Hancock"), seeks to recover the value of severance benefits he was otherwise entitled to receive under the John Hancock Financial Services, Inc. Severance Pay Plan (the "Plan"), an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§1001-1461, when in July 2003 his employment with Hancock was involuntarily terminated due to significant staff reductions stemming from the sale of the John Hancock Tower Complex (the "Tower Complex"). (Pl.'s Statement of Undisputed Facts in Supp. of Pl.'s Cross-Mot. For Summ. J. ("Facts") ¶ 2, 5, 127, 133)

Effective November 18, 2002, Hancock amended Sections 3.2(c) and (d) of the Plan (the "Plan Amendment") to read as follows:

> Employment is not terminated for the purposes of this Plan if an employee: . . . (c) is offered a comparable position, as determined by the Company, as an employee with, or provides services in any capacity to a Successor Company, or (d) accepts any position as an employee with, or provides services in any capacity to, a Successor Company.

(Facts ¶ 14)

The following month, Hancock distributed its Summary Plan Description ("SPD") of the Plan to Joyce, which stated the following with respect to the Plan Amendment:

---

[1] Plaintiff requests that judgment enter primarily on his substantive causes of action: Counts I, II(A), V and VI. In the alternative, Joyce requests that judgment enter as to liability on causes of action seeking equitable/declaratory relief: Counts II(B), III, IV, VII and VIII.

Effective November 18, 2002, two provisions of the Severance Pay Plan were changed as follows:

- In the event of the sale or outsourcing of a business unit, if an employee of the business unit is offered a comparable job by, or accepts a non-comparable job with the purchaser or successor company, severance will not be paid (comparable will be defined as similar salary, competitive benefit offerings and a work location within 50 miles of the current work location).

(Facts ¶ 21)

Hancock, as the Plan administrator and fiduciary, determined initially and on an illusory administrative appeal, that Joyce was not eligible for severance benefits under the Plan because he was offered and accepted a "comparable position," by a Successor Company, as defined by Hancock. In its haste to render its decision to deny benefits, Hancock knowingly and unreasonably ignored the plain language of the SPD, which unambiguously interprets the "comparable job provision" as being applicable only "[i]n the event of a sale or outsourcing of a business unit." The substantial evidence on the record indicates that: 1) there was no sale or outsourcing of Joyce's business unit, the Real Estate Operations Department ("REOD"); 2) Joyce was not offered a "comparable job," as defined by the SPD; and 3) Joyce accepted employment with Beacon only after Hancock misrepresented to him that he was ineligible to receive severance benefits and further misrepresented to him that Beacon's benefit offerings was competitive with benefits offered by other property management companies. Hancock's misinterpretation and misapplication of the Plan resulted in an arbitrary and capricious determination to deny Joyce Plan benefits.

In the event the SPD is deemed to be an inaccurate interpretation of the Plan Amendment, Joyce is entitled to Plan benefits because Defendants will have violated 29 U.S.C. §§ 1022(a) and because Joyce reasonably relied on or was prejudiced as a result of his reading of the faulty

SPD. Finally, Joyce asserts that Hancock's conduct and bias warrant a diminished or de novo standard of review, as opposed to deferential.

## SUMMARY OF UNDISPUTED FACTS

Plaintiff incorporates by reference his Local Rule 56.1 Statement of Undisputed Facts in Support of His Cross-Motion for Partial Summary Judgment.

## ARGUMENT

I.    **STANDARD OF REVIEW**

A.    **Summary Judgment in ERISA Actions**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ. P. 56 (c). In deciding a typical cross-motion for summary judgment, courts must consider each motion separately, drawing inferences against each movant in turn. *Reich v. John Alden Lide Ins. Co.*, 126 F. 3d 1, 6 (1st Cir. 1997).

The Supreme Court determined in *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Id. If, however, "the ERISA plan grants the plan administrator discretionary authority in the determination of eligibility for benefits, the administrator's decision must be upheld unless it is arbitrary, capricious, or an abuse of discretion." *Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan,* 402 F. 3d 67, 74 (1st Cir. 2005). This standard means that a "decision to deny benefits to a beneficiary will be upheld if the administrator's decision was reasoned and

supported by substantial evidence. Evidence is substantial when it is reasonably sufficient to support a conclusion." Id.

Hancock's conduct does not warrant the protections of deferential review because: (1) Hancock was the administrator of its own plan, (2) it had a lucrative financial relationship with Beacon, and an incentive to transition its former employees to Beacon, and (3) Hancock engaged in a host of conduct that demonstrates it acted as an adversary rather than a fair adjudicator of a claim for benefits. In determining whether to apply the arbitrary and capricious standard, the court must consider the administrator's conflict of interest as a factor if such a conflict is established. *Wright*, 402 F. 3d at 74d. "In this Circuit, if a court concludes there is an improper motivation amounting to a conflict of interest, the court may cede a diminished degree of deference—or no deference at all—to the administrator's determinations." Id.; see also *Fenton*, 400 F.3d 83, 90 (1st Cir. 2005) ("[T]he financial self-interest of a plan administrator may warrant arbitrary and capricious review with 'more bite.'"; citing *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, 184 (1st Cir. 1998)).

Hancock and Beacon entered into a $910 million real estate transaction. (Facts ¶ 55) Beacon wanted employees who knew how to operate the building, and who knew the intricacies of the buildings. Hancock accomplished this goal by essentially putting its former employees' backs against the walls, improperly denying them severance eligibility and providing them only 2 weeks to find another job before the date when Beacon's offers of employment expired. By creating such obstacles, Hancock assured Beacon that its likelihood of hiring former REOD employees would increase dramatically. This in turn benefited not only Beacon, but also Hancock. As Beacon's largest tenant, by ensuring that Beacon acquired essentially a turnkey operation, Hancock ensured that its tenancy was not interrupted. Stated another way, Hancock

had an interest in ensuring that security, maintenance, and other aspects of building operation were not interrupted, and it did so by denying severance and essentially forcing its employees into employment with Beacon.

As discussed in detail below, Hancock conducted its review of the REOD's rights to benefits in an egregious manner, failed to provide reasons for Joyce's denial of benefits in specific detail as required by 29 C.F.R. § 2560.503-1(f)(1)-(4) (1977), misrepresented the manner in which the competitive benefits assessment analysis was conducted, failed to comply with its own internal guidance memorandum for conducting the competitive benefits assessment analysis, and failed to provide pertinent documents for review as required by the Department of Labor Claims Regulations (C.F.R. § 2560.503-1(f)(1)-(4)(1977)) and ERISA. These facts, coupled with Hancock's incentive to transition all REOD employees to Beacon, tend to confirm Hancock's conflict.

Because Joyce has adduced "material, probative evidence, beyond the mere fact of the apparent [administrator/insurer] conflict, tending to show that the fiduciary's self interest caused a breach of the administrator's fiduciary obligations to the beneficiary", the Court should review Hancock's decision de novo. *Denmark v. Liberty Life Assurance Company of Boston*, 2005 WL 3008684 *12 (D. Mass. 2005) (recognizing that the First Circuit, by example in *Doe v. Travelers Ins. Co.*, 167 F.3d 53, 57, n. 2 (1st Cir. 1999), has not rejected conflict of interest analysis that is unrelated to the administrator/insurer's financial interest).

## II.    THE PLAIN, UNAMBIGUOUS LANGUAGE OF THE SUMMARY PLAN DESCRIPTION SHOWS THAT HANCOCK'S DETERMINATION TO DENY SEVERANCE BENEFITS TO JOYCE WAS UNREASONABLE

> "While a plan's summary may be easily understood, it does not fully comply with ERISA if it is not an accurate interpretation of the original [plan]"

5

*McKnight v. Southern Life and Health Ins. Co.*, 758 F.2d 1566 (11th Cir. 1985), see generally
*Bachelder v. Commc'ns Satellite Corp.*, 837 F. 2d 519 (1st Cir. 1988); *Santana v. Deluxe Corp.*,
12 F. Supp.2d 162, 175 (D.Mass. 1998).

In light of the above, the plain language of the SPD must be deemed to be an accurate

interpretation of the Plan Amendment because any other interpretation would not support the

correct, reasonable application of the SPD. Summary plan descriptions are considered part of the

ERISA plan documents. *Santana*, 12 F. Supp.2d at 175. ERISA provides that the summary plan

shall be an "accurate and comprehensive" document that reasonably apprises the employees of

their rights under the plan. 29 U.S.C. § 1022 (a)(1). Language in documents provided for

employees "must give 'words their ordinary meaning' as they would be construed by 'any

reasonable employee,' without imposing an arcane interpretation which could be surprising to a

lay person relying on the document." *Shea v. Road Carriers Local 707 Welfare Fund*, 818

F.Supp. 631, 634 (S.D. NY 1993); (quoting *Frank v. Colt Industries*, 910 F.2d 90, 96 n. 3 (3d

Cir. 1990)). Similarly, "[t]o interpret language contrary to both its own plain meaning and to

what the target audience of nonexperts would be likely to think it would mean . . . is both

arbitrary and capricious." *Shea*, 818 F. Supp. at 633.

*McKnight* involved a dispute over the interpretation and application of the plan and

summary plan description. Id. The employer contended that because the denial of pension

benefits was sound and consistent with the plan, the plan administrator's decision must be

sustained. Id. at 1569. The Eleventh Circuit disagreed and subjected the summary plan to a

reasonably clear and literal interpretation. Id. at 1570. The Court determined such even though

the summary booklet was not supplemented with questions and answers demonstrating the plan's

application. Id. Following a literal interpretation, the Appeals Court affirmed the district court's

ruling and held that "the reasonable application of the summary provision does not support [the employer's] position." Id.

Here, by Hancock's own admission, the reasonably clear and literal interpretation of the plain language of the SPD explicitly requires that prior to arriving at any determination as to whether a Successor Company has offered a Hancock employees a "comparable job," Hancock must first determine there has been a sale or outsourcing of a Hancock business unit. (Facts ¶ 35).

A.    The Sale of the Tower Complex Did Not Involve or Amount to an Outsourcing of Joyce's REOD Business Unit, Thereby Precluding the Application of the Plan Amendment

Hancock took no steps to assess whether the real estate transaction with Beacon resulted in or amounted to an outsourcing of a business unit and only retrospectively considers the transaction to have included an outsourcing of Joyce's business unit. (Facts ¶ 90)

> "We were not acquiring a piece of the John Hancock company . . . [w]e were acquiring real estate."
>
> . . .
>
> "I do not recall anyone talking about outsourcing. We had asked if there would be any people that would be available, current Hancock employees who would be available who were involved in the management of the [T]ower [C]omplex that we could hire once we had been awarded the transaction so that we could then get ready to get a management company up and running."

(Excerpts from the Transcript of the Deposition of William Bonn; Facts ¶¶ 52, 53)

As indicated above by the only impartial non-party who has first-hand personal knowledge of the negotiations and discussions surrounding the sale of the Tower Complex, the sale of the Tower Complex did not involve or amount to an outsourcing of the REOD business unit. (Id.) The transaction between Beacon and Hancock was limited to the sale of real estate. (Id.) Hancock, in its attempt to retrospectively justify its application of the comparable job provision of the Plan Amendment, now asserts that the sale of the Tower Complex involved an outsourcing of Joyce's business unit.

7

Hancock so contends despite the fact that: 1) there is not a single reference to the term "outsourcing," in the context of the sale of the Tower Complex, in the thousands of documents produced by Hancock, Morgan Stanley (the broker), and Beacon, which included emails, correspondence and memoranda pertaining to the sale (Facts ¶ 67); 2) neither Ms. DiCicco or Mr. Mongeau, representing two of the three members of the HR Group – the group of Hancock employees assigned to assess the severance eligibility of affected REOD employees – can specifically recall hearing anyone refer to the sale of the Tower Complex as involving an "outsourcing" of the REOD or any other Hancock business unit (Facts ¶ 53, 90); 3) Hancock took no steps to confirm whether there was an outsourcing of Joyce's business unit (Facts ¶ 90, 91); 4) Hancock had no uniform understanding or definition of the word "outsourcing," as used in the context of the SPD (Facts ¶ 41);  5) William Bonn, General Counsel for Beacon, confirmed in his deposition that there was no discussion of any outsourcing of any Hancock business unit prior to or in the months following the sale of the Tower Complex to Beacon (Facts ¶ 53); and 6) Hancock did not execute an outsourcing contract. (Facts ¶ 65)[2]

---

[2]     Certainly, Hancock knew what constituted an outsourcing, having just outsourced by written contract its IT department. On April 23, 2003, after months of discussions about a potential outsourcing of certain informational technology employees (which inspired the drafting of the Plan Amendment), Hancock announced that the technical services employees in its Infrastructure Support Services Department ("ISSD") were being outsourced to International Business Machines Corporation ("IBM"). (Facts ¶ 79) As part of the transaction, Hancock executed a multi-year outsourcing contract with IBM and issued a press release wherein it used the term "outsourcing" throughout the document. (Facts ¶ 80). By way of comparison, in the transaction involving the sale of the Tower Complex there was no outsourcing contract and Hancock's press release on the day after the sale of the Tower Complex, stated the following in relevant part:

> Hancock expects the transition to the new owner to be seamless. Under the terms of the sale, Hancock will manage the property for a 120-day transition period. During that time, Hancock employees who operate, maintain and secure the buildings will continue in their normal roles. When the transition period ends, some of these employees will keep their positions and it is anticipated that many of the others will be hired by Beacon Capital

(Facts ¶ 56)

     Noticeably absent from the Hancock press release is any mention of the term "outsourcing" or any determination as to their future employment with Beacon. (Id.) Also, it was only "anticipated" that many of the affected REOD employees would be extended offers after ceasing their employment relationships with Hancock.

Hancock's reliance on the Term Sheet for Purchase and Sale Agreement ("Term Sheet") and the e-mail correspondence between Jeff Brown ("Brown") of Beacon and Hugh MacDonnell ("MacDonnell") of Morgan Stanley in support of its contention that the real estate transaction with Beacon involved an outsourcing is misguided and without merit. The Term Sheet was merely "a wish list" by Hancock, and did not require that Beacon hire any Hancock employees. (Facts ¶ 62) In fact, Beacon was under no written obligation to provide property management services to the Tower Complex after the expiration of the Transition Services Agreement. (Facts ¶ 60)

In the e-mail correspondence between Brown and MacDonnell, Beacon informed Morgan Stanley that Beacon had a "desire to bring over the property management team currently in place to the extent those employees [were] not retained by Hancock." (Facts ¶ 47) The purpose of Mr. Brown's e-mail was to convey to Morgan Stanley "that to the extent there were employees available that Hancock had in their employ who managed the [Tower Complex], [Beacon] would certainly like to interview them to see if they were people that [Beacon would] want to hire to manage the [Tower Complex]." (Id.) As Mr. Bonn stated, this was consistent with what Beacon was also trying to convey to Hancock:

> "[Beacon] wanted to assuage [Hancock's] concerns about a change in the property management at the [Tower Complex], and to the extent that [Beacon] could find good people that [Hancock] might have on staff that [Hancock] would [make] available to [Beacon], the assumption being they wouldn't have jobs after [Beacon] took over management . . . [Beacon] would be happy to interview them and, if [Beacon] liked them, [Beacon would] extend offers to them.")) Mr. Brown's e-mail was merely a "sales pitch . . . to try to get Hancock to accept [Beacon's] offer."

(Id.)

Substantial evidence points to the sale of the Tower Complex resulting not in an outsourcing of Joyce's business unit, but rather a business unit forced to sustain significant reductions in staff, and part of an overall downsizing of Hancock. On November 27, 2002, the

9

day after Hancock announced it was intending to sell the Tower Complex, Hancock published a

Q&A on its Website ("The Hancock Hub") regarding the effect of the sale on employees. (Facts

¶ 28) With respect to "Employee Impact," Hancock represented to its employees that in any sale

of the buildings it would retain employees within the REOD business unit, including a reduced

security staff, and it would be the new owner's responsibility to decide how to staff the buildings

and whether to extend offers of employment to the non-retained REOD employees. (Facts ¶ 29)

Accordingly, because there is substantial evidence to suggest that the sale of the Tower

Complex did not involve a sale or outsourcing of Joyce's or any other Hancock business unit,

Hancock improperly applied the comparable job provision of the Plan Amendment to the REOD

when evaluating their severance eligibility. As a result, the denial of Joyce's severance benefits

was wholly unreasonable.

**B.      Joyce was Eligible for Plan Benefits Under Section 3.1 of the Plan Because the Sale of the Tower Complex Resulted in a Reduction in Staff and Joyce's Termination**

Absent Hancock's unreasonable misapplication of the Plan Amendment, Joyce would

have been evaluated and ultimately deemed eligible for Plan benefits under Section 3.1 of the

Plan.

Section 3.1 of the Plan states that a person is eligible for severance benefits if:

    a.  he is a salaried employee of the Company or a Participating Subsidiary on his Last Day worked;

    b.  he is not a Senior Officer, a Managing Director, or employed in a General Agency on his Last Day Worked;

    c.  his employment is terminated by the Company or a Participating Subsidiary as part of a reduction in staff (emphasis added);

    d.  he is not receiving payments on account of disability under any Company sponsored benefit or pension plan, including but not limited to, the John Hancock Financial Services, Inc. Employee Welfare Plan, on his Last Day Worked; and

    e.  he otherwise meets and complies with all the terms and conditions of this Plan.

(Facts ¶ 11). As outlined at Paragraphs 124 through 133 of Joyce's Rule 56.1 Statement, it is undisputed that he met all of these conditions.

Federal courts have found employees eligible for severance pay notwithstanding the fact that they did not experience a period of unemployment. See *Bellino v. Schlumberger Technologies, Inc.*, 944 F.2d 26 (1st Cir. 1991); citing *Ulmer v. Harsco Corp.*, 884 F.2d 98, 102-03 (3d Cir. 1989); *Harris v. Pullman Standard, Inc.*, 809 F.2d 1495, 1498 (11th Cir. 1987); *Blau v. Del Monte Corp.*, 748 F.2d 1348, 1354-55 (9th Cir. 1984).

In *Bellino*, former employees sued to recover severance benefits. *Bellino*, 944 F.2d at 27. Defendant had negotiated an agreement, under the terms of which defendant was to "transition" to a third party much of the maintenance work it had handled under the earlier contract. Id. at 28. As a result, defendant informed plaintiffs that they would receive offers from the third party to perform substantially the same job that they had performed for defendant. Id. Finally, defendant informed plaintiffs, whether or not they accepted third party's job offers, they would not be eligible to receive severance benefits from defendant because it was defendant's policy to deny severance benefits to departing employees who are offered comparable jobs at comparable pay. Id.

Plaintiff accepted employment offers extended by the third party. Id. They performed the same jobs that they had performed for defendant at the same facility, received a higher wage and did not miss a day's work as a result of their "transfer." Id. The Court concluded that defendant terminated plaintiffs because of "lack of work," and thus was required to grant them severance benefits pursuant to the terms of the plan. Id. at 29. Consequently, the court granted plaintiffs partial summary judgment (on liability) with respect to their ERISA claim and denied defendant's motion for summary judgment on the same claim. Id.

11

The First Circuit affirmed, determining that there could be no dispute that the plaintiffs were "terminated" within the plain meaning of the plan. Id. at 30. Similar to the case at bar, it was uncontested that the defendant ended its employment relationship with plaintiffs. Id. Also, there was no genuine dispute that defendant did not give plaintiffs the option to remain as employees; they were to choose either resignation or employment with the third party. Id. Defendant offered no significant evidence to counter plaintiffs' assertion that they were terminated due to "lack of work." Id.

The First Circuit confirmed that "[f]ederal courts have established no hard and fast rule that an individual must suffer a period of unemployment to qualify for severance benefits under ERISA. Id. at 31. Those courts that have deemed unemployment a prerequisite to such benefits have predicated their decisions on the particular terms of the ERISA plan at issue and its application to the specific facts before them." Id. The Court determined that the only pertinent rule that emerges from the case law is that courts are to construe ERISA plans by employing accepted principled of contract and trust law. Id.

In accordance with the plain interpretation of the SPD, the undisputed facts and Section 3.1 of the Plan show that Joyce was plainly eligible for benefits.

C.    **Even if the Sale of the Tower Complex Involved an Outsourcing of Joyce's Business Unit, Hancock's Substantially Flawed Competitive Assessment Analysis of Beacon's Benefit Offerings Resulted in a Clearly Erroneous Determination to Deny Severance**

1.    **Hancock's Interpretation of "Competitive Benefit Offerings" was Wholly Unreasonable**

The plain reading of the three part definition of "comparable job" is subject to one reasonable interpretation: that an evaluation is to be made which compares the Successor Company's salary, work location and benefit offerings to Hancock's.

A showing of a lack of ambiguity in the terms such that no other interpretation falls within reasonable bounds will overcome the deferential standard. *Affonso v. New England Electric Systems Companies Standard Severance Plan*, 2002 U.S. App. LEXIS 27228. While the term "competitive benefits" may, on its own, evoke reasonable conflicting interpretations, when used in the context of the SPD there is no other interpretation that falls within reasonable bounds other than to compare the Successor Company's full benefits package to Hancock's. Thus, Hancock's decision to further define "competitive benefit offerings" as requiring a comparison of select benefits of the Successor Company's benefits package to select benefits offered by employers in the Successor Company's industry is wholly unreasonable.

> **2.    Even if Hancock's Interpretation of the Term "competitive benefit offerings" was Reasonable, the Manner in Which Hancock Conducted the Competitive Assessment Analysis of Beacon's Benefit Offerings was Contrary to Its Own Internal Guidelines Memorandum**

"Where a plan administrator has chosen to interpret plan terms in a given way, that interpretation is relevant in assessing the reasonableness of the administrator's decision." *Glista v. Unum Life Insurance Co. of America*, 378 F.3d 113, 123 (1st Cir. 2004). The First Circuit has held that "[t]here is nothing uncommon about reviewing courts considering such internal memoranda containing ERISA interpretations." *Id.* (citing line of cases finding plan administrator's denial of benefits unreasonable because the denial conflicted with the plan administrator's own internal guidelines).

In the present case, attempts to further define the three components of the term "comparable job" were undertaken by a working group of employees from Hancock's Human Resources Services (collectively referred to as the "HR Group"). (Facts ¶ 71) The HR Group ultimately finalized an internal memorandum further defining "competitive benefit offerings." (Facts ¶ 72) The HR Group further defined the term to mean benefits that are competitive in the

industry of the Successor Company from which a given employee receives a job offer. (Facts ¶ 77) Beacon is in the property management industry. (Facts ¶ 78) In March 2003, the HR Group began to compile a list of companies in the property management industry so that a third-party consultant could benchmark Beacon's benefits against the benefit offerings at other property management companies. (Id.) Hancock never provided a third-party consultant with this list of companies. (Id.) Between May 21, 2003 and May 23, 2003, Mr. Mongeau completed the competitive assessment analysis of Beacon's benefit offerings. (Facts ¶ 94) The competitive assessment analysis did not compare select benefits from Beacon's benefits package to benefits offered to employees within the property management industry. (Facts ¶ 104) At no time did Mr. Mongeau ever attempt to ascertain whether there was additional data available that could assist him in making a direct comparison of Beacon's benefit offerings to those benefits offered by employers in the property management industry. (Facts ¶ 103)

Here, by creating and promulgating an internal guidance document that further defined "competitive benefit offerings," Hancock purported to exercise its discretion to define this term.[3] Because Hancock promulgated this standard, it is proper for the Court to hold Hancock to its own definitions. In its haste to conduct the assessment, Hancock made no effort to retrieve additional data that otherwise requires minimal effort to obtain. (Facts ¶ 109, 110) Hancock's failure to comply with its internal guidelines and procedures when conducting the competitive assessment analysis of Beacon's benefit offerings was relevant to determining whether Beacon's offers were comparable. It acted arbitrarily and capriciously in ignoring its own definition in undertaking the competitive benefits analysis.

### 3.    Hancock Breached its Fiduciary Duty to Joyce

---

[3] Joyce denies that Hancock had the right to do so, inasmuch as the term "competitive" is unambiguous in the context of the SPD.

14

By affirmatively misrepresenting to Joyce that he was ineligible for severance benefits and misrepresenting that the competitive assessment analysis of Beacon's benefit offerings included an evaluation of Beacon's benefits versus benefits offered by employers in the property management industry, Hancock breached its fiduciary duty to Joyce.

In *Wallin v. Severance Plan of Electronic Data Systems*, 84 Fed.Appx. 193, 196 (3[d] Cir. 2003), the Court held that in order to sustain a breach of fiduciary duty complaint under ERISA, a plaintiff must demonstrate (1) the company was acting in a fiduciary capacity; (2) the company made affirmative representations or failed adequately to inform plan participants and beneficiaries; (3) the company knew of the confusion generated by its misrepresentations or its silence; and (4) there was resulting harm to the employees. Id.; (citing *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., U.A.W. v. Skinner Engine Co.*, 188 F.3d 130, 148 (3d Cir. 1999)).

On May 30, 2003, Joyce received a memorandum from Hancock which stated, "[I]t has been determined that all job offers extended by [Beacon] are comparable job offers and therefore recipients of a job offer from Beacon are not eligible for [Hancock] severance benefits." (Facts ¶ 112) The memorandum did not adequately inform Joyce and other REOD members whether their business unit had been outsourced. (Facts ¶ 113) The memorandum also failed to apprise Joyce and others that Hancock conducted a competitive benefits assessment analysis or that Hancock had taken efforts to further define the three-part definition of "comparable job." (Id.) As a result, many participants remained silent because they did not know better or else were confused – Joyce among them. (Facts ¶ 122)

On June 2, 2003, Joyce sent an email to Ms. DiCicco challenging the comparability determination that Hancock had made concerning job offers from Beacon. (Facts ¶ 118). On June 3, 2003, DiCicco responded to Joyce's email by stating:

> The determination that the Beacon benefits package was competitive was based on an assessment of selected benefits, including health, pension, 401(k) and vacation. Senior members of the benefits team conducted the assessment and evaluation, using different, objective data sources. I should point out that the assessment was against normative data – that is, what is within the range of competitive benefits offered to employees generally or in certain industries (in this case, property management). The assessment was not a comparison to John Hancock's benefits package and we did not make any such comparison.

(Facts ¶ 119)

Ms. DiCicco's e-mail to Joyce is replete with significant misrepresentations. (Facts ¶ 120) First, senior members of the "benefits team" did not conduct the assessment – only Mr. Mongeu conducted the assessment. (Id.) This is relevant because such a representation gives the appearance that this was a collaborative undertaking when, in reality, it was an assessment conducted by Mr. Mongeau without any Hancock employee confirming the accuracy of his findings.

Second, the competitive assessment analysis did not assess the range of competitive benefits offered to employees in the property management industry. (Facts ¶ 120) The e-mail makes no reference to the definition of the term as set forth in the internal guidelines memorandum. (Facts ¶ 119) Of the 960 employers surveyed in the Hewitt Study, not one company was identified by Hewitt as a company in the property management industry or even the real estate industry. (Facts ¶ 99) By affirmatively misrepresenting the manner in which the assessment was conducted, Hancock confused and silenced Joyce. (Facts ¶ 122) Upon learning that Hancock had purportedly conducted a competitive assessment analysis of Beacon's benefit offerings and determined them to be competitive in the property in the property management industry, Joyce refrained from applying for property management positions at other companies,

16

believing that Beacon's benefits were purportedly competitive with the industry standards. (Facts ¶ 121) As a result, and only after Hancock misrepresented to Joyce that he was ineligible for severance, Joyce accepted Beacon's job offer. (Facts ¶ 123, 124) Accordingly, Hancock's breached its fiduciary duty to Joyce.

### D.    The Hancock Benefits Appeals Committee Conducted an Illusory Review

Hancock's Company Benefit Plan Appeal Committee (the "Appeal Committee") was responsible to determine whether Mr. Mongeau's competitive benefits assessment analysis was accurate, and yet did not have all of the relevant documents before it to confirm this. Absent from the package of documents reviewed by the Appeal Committee was: 1) the SPD; 2) the November 21, 2002 company-wide email; or 3) any document defining or referencing the "outsourcing of a business unit." (Facts ¶ 138) Further, the Appeal Committee was not provided with any of the data sources which Mr. Mongeau relied upon when conducting the competitive assessment analysis of Beacon's benefit offerings. (Id.) As a result, Mr. Bisciotti, one of the two sitting Appeal Committee members, merely "assumed" that the HR Group had made a determination that the sale of the Tower Complex involved a sale or outsourcing of Joyce's business unit and simply deferred to Mr. Mongeau's decision to conduct the competitive benefits assessment in the manner Mr. Mongeau thought appropriate and trusted Mr. Mongeau's findings to be accurate. (Facts ¶ 139, 145)

Such a haphazard approach implemented by the administrative panel entrusted with assessing Hancock's initial determinations to deny benefits defeats the purpose of the ERISA mandate that employees exhaust all administrative remedies prior to commencing an action to recover benefits. Despite the meetings, which focused on irrelevant items to the denial of benefits, Joyce's appeal was an exercise in futility. (Facts ¶ 142-144)

17

Accordingly, the acts and omissions by the Appeal Committee are indicative of the

arbitrary and capricious manner in which Hancock determined to deny Joyce's benefits under the

Plan.

### III.   IF HANCOCK'S INTERPRETATION AND APPLICATION OF THE TERMS OF THE PLAN AMENDMENT WERE REASONABLE, THEN THE SUMMARY PLAN DESCRIPTION WAS IN VIOLATION OF 29 U.S.C. §§ 1022(a)

> To allow the Plan to contain different terms that supersede the terms of the SPD would defeat the purpose of providing the employees with summaries. It is of no effect to publish and distribute a plan summary booklet designed to simplify and explain a voluminous and complicated document, and then proclaim that any inconsistencies will be governed by the plan. Unfairness will flow to the employee for reasonably relying on the summary booklet.

*McKnight*, 758 F.2d at 1570 (11th Cir. 1985); see also *Hansen v. Continental Insurance Company*, 940 F.2d. 971, 982 (5th Cir. 1991).

In the event Hancock's position regarding the interpretation of the Plan Amendment is

deemed to be reasonable, Joyce is still entitled to recover the value of his severance benefits

because the SPD must then be deemed to have been faulty. Further, if the terms of the Plan are

deemed to be in conflict with the terms of the SPD, the SPD must control because Joyce

reasonably relied on or sustained prejudice resulting from his reading of the faulty plan

description.

ERISA requires employers to distribute summary plan descriptions describing the plan's

benefits to their employees. 29 U.S.C. §§ 1022(a) & 1024(b). The SPD must be written in a

manner calculated to be understood by the average plan participant and must be sufficiently

accurate and comprehensive to apprise participants and beneficiaries of their rights and

obligations under the plan. Id. at § 1022(a). Thus, the statute contemplates that the summary

will be an employee's primary source of information regarding employment benefits, and

employees are entitled to rely on the descriptions contained in the summary. *Burke v. Kodak

Retirement Income Plan*, 336 F.3d 103, 110 (2nd Cir. 2003). The First Circuit has recognized

that a summary plan description that violates 29 U.S.C. §§ 1022 will be binding on a plan

administrator. *Mauser v. Raytheon*, 239 F.3d 51, 55 (1st Cir. 2001) (citing *Bachelder*, 837 F.2d

at 523 (1st Cir. 1988)).

The First Circuit allows for an employee to recover in deficient SPD cases upon a

showing of *either* reliance or prejudice. *Govoni v. Bricklayers, Masons & Plasterers Int'l. Union

of Am., Local No. 5 Pension Fund*, 732 F. 2d 250, 252 (1st Cir. 1984)(stating to secure relief

based on the summary plan description, the plan participant "must show some significant

reliance upon, or possible prejudice flowing from, the faulty plan description."); see also *Fenton*,

400 F.3d at 83, 88. Typically, for a showing of prejudice it is required that a plan participant

"was *likely* to have been harmed as a result of a deficient SPD." *Burke*, 336 F.3d at 113. The

"likely prejudice" standard avoids the use of harsh common law principles to defeat employees'

claims based on a federal law designed for their protection. Id. at 114. The result is a

presumption of prejudice in favor of the plan participant after an initial showing that he was

likely to have been harmed. Id.

The First Circuit has recognized that an employee who continues to work for a company

under the guidelines set forth by a company in an employee booklet may be deemed to have

reasonably relied on or sustained prejudice from the employee's reliance on said document.

*Bachelder*, 837 F.2d at 523 (citing *Duldulao v. Saint Mary of Nazareth Hosp.*, 115 Ill.2d 482,

492 (1987) (stating that "[t]here is no question but that plaintiff continued to work with

knowledge of the handbook provisions. Under these circumstances the handbook's provisions

became binding on the employer")).

Here, the language of the SPD was such that an employee, such as Joyce, would

reasonably believe that the only circumstances under which he would not be entitled to severance

would be in the event of a sale or outsourcing of a business unit. (Facts ¶ 35, 44) Hancock

distributed the SPD to Joyce and intended that Joyce become familiar with its contents. (Facts ¶

30-31) Joyce continued to work for Hancock with knowledge of the SPD language pertaining to

severance. (Facts ¶ 44) Under these circumstances, the SPD's provisions became binding on

Hancock.

Accordingly, in the event the terms of the Plan are deemed to be in conflict with those in

the SPD, Joyce has sufficiently shown significant or reasonable reliance on or prejudice flowing

from his reading of the faulty SPD.

## CONCLUSION

For all the reasons set forth above, Plaintiff requests that the Court enter summary

judgment in his favor on all Counts of Plaintiff's Amended Complaint.

Respectfully submitted,

DANIEL JOYCE, et al.

By his attorneys,

Kevin T. Peters (BBO#: 550522)
kpeters@toddweld.com
Seth J. Robbins (BBO#: 655146)
srobbins@toddweld.com
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
(617) 720-2626

Dated: July 25, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Fling (NEF) and paper copies will be sent to those indicated as non registered participants on July 25, 2006.

Seth J. Robbins

Date: July 25, 2006