UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DANIEL JOYCE,<br>Individually and on behalf of a class of others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>JOHN HANCOCK FINANCIAL SERVICES, INC. SEVERANCE PAY PLAN and JOHN HANCOCK FINANCIAL SERVICES, INC., as Administrator and Fiduciary of the John Hancock Financial Services, Inc. Severance Pay Plan<br><br>    Defendants. | Civil Action No.05-11428 – WGY |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Daniel Joyce, individually and on behalf of a putative class of others similarly situated ("Plaintiff" or "Joyce"), pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, submits this response to Defendants' Statement of Undisputed Facts in Support of Defendants' Motion for Summary Judgment ("Statement").

    1.    Admitted.

    2.    Admitted in part. Plaintiff denies that Hancock ceased operating the Tower Complex in March 2003. Hancock operated the Tower Complex under a Transition Services Agreement with Beacon until July 2003. (Pl.'s LR 56.1 Statement of Undisputed Facts in Supp. of Pl.'s Cross-Mot. for Summ.J. ("Pl.'s Statement") ¶ 59).

    3.    Admitted.

4. Admitted.

5. Denied. The purpose of the Plan speaks for itself under Article I of the Plan. (Pl.'s Statement ¶ 3).

6. Admitted.

7. Admitted.

8. Admitted.

9. Admitted.

10. Admitted.

11. Admitted.

12. Admitted in part. Hancock does not have a uniform understanding, written or unwritten, for the definition of a "business unit," as the phrase is used in the context of the SPD. (Pl.'s Statement ¶ 42).

13. Admitted.

14. Admitted.

15. Denied. The deposition testimony referenced does not support the alleged statement of fact.

16. Denied. The plain language of the SPD explicitly states that prior to there being any application of the three component test of the "comparable job" provision of the Plan Amendment, Hancock must first determine that there has been a sale or outsourcing of a Hancock business unit. (Pl.'s Statement ¶ 35).

17. Admitted in part. Plaintiff admits insofar as "comparable job" and "comparable position" are used interchangeably between the Plan and SPD.

18. Admitted.

2

19. Admitted.

20. Admitted in part. Plaintiff denies Mr. Mongeau has an extensive background in the human resources field.

21. Admitted in part. Plaintiff denies Ms. DiCicco has a deep background in the human resources field.

22. Denied. There is no evidence to suggest that Hancock utilized the work of Mr. Mongeau, Ms. DiCicco, Ms. Blake and Ms. Colley to describe the term "comparable job" prior to publishing the SPD.

23. Admitted.

24. Admitted in part. The language in the company-wide email interpreted the Plan Amendment. (Pl.'s Statement ¶ 23).

25. Admitted insofar as the language of the SPD speaks for itself.

26. Admitted insofar as the language of the SPD speaks for itself.

27. Admitted.

28. Admitted.

29. Admitted in part. The HR Group decided to include select categories of benefits because the HR Group understood that the benefit categories selected were the benefits that had the most immediate impact and value to an employee. The HR Group relied in significant part on Mr. Mongeau's opinion as to which benefit categories should be selected for the benefits assessment analysis. (Pl.'s Statement ¶ 75).

30. Admitted.

31. Admitted.

32. Admitted.

33. Admitted in part. Following the March 2003 sale of the Tower Complex, Beacon, a wholly owned subsidiary of Beacon Capital, was formed to operate and manage the Tower Complex, however, Beacon did not commence operating and managing the Tower Complex until the expiration of the Transition Services Agreement in July 2003. (Pl.'s Statement ¶ 57, 59).

34. Admitted.

35. Admitted.

36. Admitted in part. Denied insofar as Beacon did not offer Joyce a comprehensive employee benefits program in the May 5, 2003 offer letter. (Pl.'s Statement ¶ 86).

37. Admitted.

38. Admitted.

39. Admitted.

40. Admitted.

41. Admitted in part. At Beacon, Joyce was not a Project Manager as his offer letter had stated. (Pl.'s Statement ¶ 156).

42. Admitted.

43. Admitted.

44. Admitted insofar as Joyce could not have found immediate employment.

45. Admitted insofar as Joyce sent a letter to John Durnan on June 17, 2003. Denied with respect to the characterization of letter as "arguing."

46. Admitted.

47. Admitted.

48. Admitted in part. Whether all of Beacon's job offers were to Hancock employees with expertise in managing and operating the Tower Complex is unknown.

49.   Admitted insofar as Hancock considered severance eligibility exclusively on the terms of the Plan and not the SPD.

50.   Admitted.

51.   Admitted.

52.   Admitted insofar as Joyce's work unit, the REOD, served the Tower Complex. Denied insofar as the REOD consisted of employees without trades. (Pl.'s Statement ¶ 8).

53.   Denied. Joyce's work unit was known as the REOD. (Pl.'s Statement ¶ 6). Admitted insofar as the "multi-shop trade" personnel were a part of the REOD work unit.

54.   Denied. Joyce was not transitioned to Beacon, he was terminated by Hancock and hired by Beacon. (Pl.'s Statement ¶ 69). At Beacon, Joyce's titles changed from Director to Director of Engineering and Construction to Manager of Engineering/Construction. (Id. at 156). With Joyce's changes in title, his duties changed as well. (Id.).

55.   Admitted insofar as the services provided by the REOD. Denied with respect to the implication that Joyce's work unit was not the REOD. (Pl.'s Statement ¶ 6).

56.   Admitted insofar Beacon did take on the building services previously performed by the REOD. Denied as to any determination that Hancock may have made at the time as to any outsourcing of Joyce's business unit to Beacon. (Pl.'s Statement ¶ 90).

57.   Admitted insofar as Beacon was under no written obligation to provide property management services for the Tower Complex after the expiration of the Transition Services Agreement. (Pl.'s Statement ¶ 60). Beacon had only expressed an intention of providing property management for the Tower Complex. (Id.)

58.     Admitted insofar as Hancock concluded that Beacon is a Successor Company, as defined by the Plan. Denied insofar as the characterization of "services" as "property management services."

59.     Denied. Hancock does not have a uniform definition of "outsourcing" as the term is used in the context of the SPD. (Pl.'s Statement ¶ 41). Hancock employees were not "transferred" to Beacon. (Pl.'s Statement ¶ 47). Mr. Bonn understood that those Hancock employees made available to Beacon for hiring were going to be terminated by Hancock due to a downsizing at the company. (Pl.'s Statement ¶ 69).

60.     Denied. Hancock and Beacon Capital executed a Transition Services Agreement whereby Beacon Capital hired Hancock to manage the Tower Complex until July 14, 2003. (Pl.'s Statement ¶ 59). During the transition, Hancock continued to manage the Tower Complex as the company had been managing it. (Id.)

61.     Admitted in part. Denied with respect to the term "this change."

62.     Denied. Beacon informed Morgan Stanley that Beacon had a "desire to bring over the property management team currently in place to the extent those employees [were] not retained by Hancock." (Pl.'s Statement ¶ 47).

63.     Denied insofar as the term "take on" is used to describe Beacon's intentions. (Pl.'s Statement ¶ 47, 69).

64.     Admitted in part. Hancock and Beacon Capital executed a Transition Services Agreement whereby Beacon Capital hired Hancock to manage the Tower Complex until July 14, 2003. (Pl.'s Statement ¶ 59). During the transition, Hancock continued to manage the Tower Complex as the company had been managing it. (Id.)

65.  Denied. Mr. Moloney does not recall there being any discussion about whether any business unit would be outsourced to Beacon as a result of the sale of the Tower Complex. (Pl.'s Statement ¶ 53). Ms. DiCicco does not specifically recall any Hancock employee describing the sale of the Tower Complex as constituting or amounting to an outsourcing of any business unit at Hancock. (Id.) Mr. Bonn does not recall there being any discussions with Morgan Stanley or Hancock about Hancock outsourcing its employees to Beacon as part of the real estate transaction. (Id.) Prior to conducting the competitive assessment analysis of Beacon's benefit offerings, Mr. Mongeau did not engage in any evaluation or conversation about whether Joyce's business unit was being outsourced nor did he undertake any evaluation as to whether there was an outsourcing resulting from the sale of the Tower Complex. (Id. at 90).

66.  Admitted.

67.  Admitted.

68.  Admitted.

69.  Admitted.

70.  Admitted in part. Denied insofar as it states that Hancock conducted the assessment properly. (Pl.'s Statement ¶ 78).

71.  Admitted.

72.  Admitted.

73.  Admitted.

74.  Admitted.

75.  Admitted.

76.  Admitted.

77.  Admitted in part. Denied as to the veracity of the statement that the Hewitt Benefit Index is a "trusted and reliable benefits analysis tool in the human resources field."

78.  Admitted in part. Denied insofar as the cite refernce to Mongeau Dep. Tr. at 105:11-105:19 does not apply.

79.  Admitted insofar as the competitive assessment analysis speaks for itself.

80.  Admitted insofar as the competitive assessment analysis speaks for itself.

81.  Admitted insofar as the competitive assessment analysis speaks for itself.

82.  Admitted as to the manner in which the competitive assessment analysis was conducted.

83.  Admitted as to the manner in which the competitive assessment analysis was conducted.

84.  Admitted as to the manner in which the competitive assessment analysis was conducted.

85.  Admitted as to the manner in which the competitive assessment analysis was conducted. Plaintiff denies that the rounding principle employed was "simple" and further denies that the resulting score was average or that the benefits were competitive within the "industry."

86.  Denied. There was no data pertaining to the property management industry in the Hewitt general data study. Of the 960 employers surveyed in the Hewitt Study, not one company was identified by Hewitt as a company in the property management industry or even the real estate industry. (Pl.'s Statement ¶ 99). Accordingly, the Hewitt study was not an appropriate evaluation tool for specifically evaluating Beacon's benefit offerings against the benefits provided in the property management industry. (Pl.'s Statement ¶ 99).

87.  Admitted insofar as Hancock initially set out to gather information on the benefit offerings of employers in the property management industry. Denied as to Hewitt not having adequate data because at no time did Mr. Mongeau ever attempt to ascertain whether there was additional data available that could assist him in making a direct comparison of Beacon's benefit offerings to those benefits offered by employers in the property management industry. (Pl.'s Statement ¶ 103).

88.  Denied. Mr. Mongeau conducted a competitive assessment analysis of Beacon's benefit offerings between the late afternoon on May 21, 2003 and May 23, 2003. (Pl.'s Statement ¶ 94).

89.  Admitted.

90.  Admitted in part. Denied insofar as Hancock employees who received job offers from Beacon were not offered the same benefits package. Beacon's memorandum regarding its proposed benefits package included no defined benefit pension plan, no educational benefit program, provided for less vacation time, higher premiums for medical and dental insurance coverage and while it did reference a Beacon severance plan, ultimately Beacon never implemented a severance plan. (Pl.'s Statement ¶ 96).

91.  Admitted to extent the statement represents Hanock's conclusion. Denied with respect to the characterization of the analysis as "thorough." (Pl.'s Statement ¶ 103, 109). Further denied insofar as Beacon's benefits offerings were not "competitive" as defined by the internal administrative guidelines. (Id. at ¶ 77).

92.  Admitted.

93.     Admitted. Denied to the extent the statement asserts that Ms. DiCicco accurately explained the competitive assessment analysis of Beacon's benefits offerings. (Pl.'s Statement ¶ 119-121).

94.     Denied.

95.     Admitted.

96.     Admitted.

97.     Denied. The Appeal Committee did not conduct a thorough review. (Pl.'s Statement ¶ 142-145).

98.     Admitted in part. Denied insofar as the Appeal Committee did not review all pertinent documents, such as: 1) the SPD; 2) the November 21, 2002 company-wide email; 3) any document defining or referencing the "outsourcing of a business unit"; or 4) Joyce's e-mail correspondence with Ms. DiCicco. (Pl.'s Statement ¶ 138).

99.     Admitted.

100.    Admitted.

101.    Admitted in part. Plaintiff denies that the Appeal Committee had "undertaken in-depth review of pertinent documents." The Appeal Committee did not review the SPD, the November 21, 2002 company-wide email, any document defining or referencing the "outsourcing of a business unit" or Joyce's e-mail correspondence with Ms. DiCicco. (Pl.'s Statement ¶ 138). Moreover, Mr. Bisciotti took no steps to acclimate himself with the sale of the Tower Complex prior to or while reviewing Joyce's appeal of the denial of his severance benefits. (Pl.'s Statement ¶ 140).

Denied. The letter to appellants failed to provide specific reasons for the denial of the appeal for severance benefits submitted by Joyce and others former REOD employees. (Pl.'s Statement ¶ 147). The Appeal Letter fails specifically to reference the provisions of the Plan on which the Appeal Committee's decision was based. (Pl.'s Statement ¶ 148).

Respectfully submitted,

DANIEL JOYCE, et al.

By his attorneys,

*/s/ Kevin T. Peters*

Kevin T. Peters (BBO#: 550522)
kpeters@toddweld.com
Seth J. Robbins (BBO#: 655146)
srobbins@toddweld.com
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
(617) 720-2626

Dated:     July 25, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Fling (NEF) and paper copies will be sent to those indicated as non registered participants on July 25, 2006.

*/s/ Seth J. Robbins*

Seth J. Robbins

Date: July 25, 2006