UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

<table>
<tr><td>

DANIEL JOYCE,<br>
Individually and on behalf of a class of others<br>
similarly situated,<br><br>

   Plaintiff,<br><br>

v.<br><br>

JOHN HANCOCK FINANCIAL SERVICES,<br>
INC. SEVERANCE PAY PLAN and JOHN<br>
HANCOCK FINANCIAL SERVICES, INC.,<br>
as Administrator and Fiduciary of the John<br>
Hancock Financial Services, Inc. Severance<br>
Pay Plan<br><br>

   Defendants.

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

Civil Action No.05-11428 – WGY

</td></tr>
</table>

**PLAINTIFF'S LOCAL RULE 56.1 STATEMENT IN SUPPORT**
**OF HIS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff, Daniel Joyce, individually and on behalf of a putative class of others similarly situated ("Plaintiff" or "Joyce"), pursuant to Local Rule 56.1 and in conjunction with his Cross-Motion for Partial Summary Judgment, submits this statement of material facts of record as to which there is no genuine issued to be tried.[1]

**I.**   **The Parties**

1.   Defendant John Hancock Financial Services, Inc. ("Hancock") is a Delaware corporation with a principal place of business in Boston, Massachusetts. (Defendants' Statement of Undisputed Facts in Support of Defendants' Motion for Summary Judgment ("Dfts' Statement") ¶ 1; Defendants' Answer to Plaintiff's First Amended Complaint ("Answer") ¶ 9)

---

[1] The attached exhibits are authenticated by the Affidavit of Seth J. Robbins, which is filed herewith.

2.      Defendant John Hancock Financial Services, Inc. Severance Pay Plan (the "Plan") is and was at all relevant times an employee welfare benefit plan governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§1001-1461. (Dfts' Statement ¶ 3; Answer ¶ 8)

3.      According to the Plan, the purpose of the Plan is to "make certain severance benefits available to its employees." (*John Hancock Financial Services, Inc. Severance Pay Plan*, hereinafter Exhibit 1, at art. I)

4.      Hancock is the Plan sponsor, Plan administrator and named fiduciary of the Plan. (Ex. 1 at art. I & § 7.1; Dfts' Statement ¶ 4; Answer ¶ 9)

5.      Joyce was an employee of Hancock from March 1994 to July 2003. (Dfts' Statement ¶ 6; Answer ¶ 7; Pl.'s Objs. & Answers to Dfts.' First Set of Interrogs. Answer Nos. ("Pl.'s Interrog. Answer Nos.") 10 & 13) Joyce remained at Hancock, in large part, due to the attractive benefits package offered by Hancock, which offset an otherwise below market salary. (Affidavit of Daniel Joyce ("Joyce Aff.") ¶ 1; Transcript of Deposition of Joan M. DiCicco of 05/24/06 ("DiCicco Dep. Tr.") at 104:24-105:8 (citing low morale among REOD employees regarding pay))

6.      From 2000 to 2003, Joyce was employed by Hancock as a Project Manager and Senior Project Manager in the business/work unit known as the Real Estate Operations Department ("REOD"). (DiCicco Dep. Tr. at 102:11-102:23; Transcript of Deposition of Thomas Moloney of 06/21/06 ("Moloney Dep. Tr.") at 23:18-24:2; Answer ¶ 17; Dfts' Statement ¶ 12 ("The term 'work unit' is used interchangeably with the term 'business unit.'")

7.      In March 2003, the REOD was primarily responsible for the leasing and daily operations of three Hancock-owned buildings, located at 200 Clarendon Street, 197 Clarendon

2

Street and 200 Berkeley Street in Boston, Massachusetts (collectively referred to as the "Tower Complex"). (Answer ¶ 14)

      8.     The REOD was comprised of Hancock employees who performed various building services within the Tower Complex, including building maintenance, construction, operations, office space planning and design, security, safety and purchasing. (Answer ¶ 15; *Chart of REOD*, hereinafter Exhibit 2; Dfts' Statement ¶ 55)

      9.     Joyce is not technically trained to be conversant in Plan documents or other ERISA documents. (Joyce Aff. ¶ 2)

## II.    The Plan and the Plan Amendment

      10.    In 2002 and 2003, the Plan provided for an assortment of severance benefits to those employees Hancock deemed eligible under the Plan, including, but not limited to: 1) Employability expenses; 2) Salary continuation for the term of service base on one week's pay per every six months of service (with a maximum payment of one year's salary); 3) An additional eight (8) weeks of salary, which may be in addition to the maximum benefit; 4) Group term life insurance and health care coverage until the expiration of the severance term (with the ability to request a temporary extension of benefits); 5) Service credit accrual for pension contribution purposes; and 6) 401(k) Plan (aka TIP) with matching contribution during term of severance period. (Ex. 1)

      11.    According to the Plan, a person is eligible for benefits under the Plan if:

        a.     he is a salaried employee of the Company or a Participating Subsidiary on his Last Day Worked;

        b.     he is not a Senior Officer, a Managing Director, or employed in a General Agency on his Last Day Worked;

        c.     his employment is terminated by the Company or a Participating Subsidiary as part of a reduction in staff;

> d.    he is not receiving payments on account of disability under any Company sponsored benefit or pension plan, including but not limited to, the John Hancock Financial Services, Inc. Employee Welfare Plan, on his Last Day Worked; and
>
> e.    he otherwise meets and complies with all the terms and conditions of this Plan.

(Ex. 1, §§ 3.1)

12.    "Last Day Worked" is defined by the Plan as "the date determined by the Company as the employee's last day of active employment with the Company as a salaried employee." (Ex. 1, art. II at 4)

13.    Eligible Plan participants were entitled to exercise an optional lump sum payment of benefits. (Ex. 1, art. V, § 5.1(d))

14.    Effective November 18, 2002, Hancock amended Sections 3.2(c) and (d) of the Plan (the "Plan Amendment") to read as follows:

> Employment is not terminated for the purposes of this Plan if an employee: . . . (c) is offered a comparable position, as determined by the Company, as an employee with, or provides services in any capacity to a Successor Company, or (d) accepts any position as an employee with, or provides services in any capacity to, a Successor Company.

(Ex. 1, §§ 3.2(c) & (d); Answer ¶ 19)

15.    A "Successor Company" is defined by the Plan as "an entity unaffiliated with the Company which performs the services previously performed by an employee's or a Participant's former work unit." (Dfts' Statement ¶ 11; Ex. 1, art. II at 4)

16.    The drafting of the Plan Amendment was inspired by the ongoing discussions at Hancock regarding the outsourcing of certain information technology ("IT") work. (Mongeau Dep. Tr. at 39:3-40:5)

4

17.   The term "comparable position" is not defined in the Plan.  (Ex. 1)

18.   A copy of the Plan containing the language of the Plan Amendment was distributed to Hancock employees only upon request.  (DiCicco Dep. Tr. at 28:23-29:9)

19.   The Plan Amendment did not serve to alter the type of Plan benefits available to eligible employees.  (Ex. 1, §§ 3.2 (c)-(d))

20.   Subsections 3.2 (c) and (d) are commonly referred to as the "comparable job provision."  (DiCicco Dep. Tr. at 35:23-36:2)

21.   On November 21, 2002, Hancock notified all Hancock employees through a company-wide email communication that a change had been made to two provisions of the Plan. (Dfts' Statement ¶ 24; DiCicco Dep. Tr. at 38:16-38:20)  The November 21, 2002 email communication interprets the language of the Plan Amendment as follows:

- In the event of the sale or outsourcing of a business unit, if an employee of the business unit is offered a comparable job by, or accepts a non-comparable job with the purchaser or successor company, severance will not be paid (comparable will be defined as similar salary, competitive benefit offerings and a work location within 50 miles of the current work location).

- If the purchaser or successor company subsequently terminates the employee within six months of the sale or outsourcing (and) hire date, severance will not be paid under the Plan.

*(E-mail from JH Communication to Hancock Employees of 11/21/02* ("JH Communication"), hereinafter Exhibit 3; Joyce Aff. ¶ 4)

22.   Peter Mongeau, then Second Vice President of Human Resource Services for Hancock, drafted the JH Communication.  (Mongeau Dep. Tr. at 71:21-72:6)

23.   The plain language of the JH Communication explicitly states that prior to there being any application of the three component test of the "comparable job provision" of the Plan

5

Amendment, Hancock must first determine that there has been a sale or outsourcing of a Hancock business unit. (Ex. 3; Bisciotti Dep. Tr. at 76:22-77:6)

24. The JH Communication fails to explicitly state that the phrase "[i]n the event of the sale or outsourcing of a business unit" should be construed as an example of when the Plan Amendment would apply. (Ex. 3)

25. At the time of the JH Communication, Hancock had not drafted or finalized any guidelines for determining whether a Successor Company's benefit offerings were competitive. (DiCicco Dep. Tr. at 47:7-48:3)

26. By November 21, 2002, the date of the JH Communication, Hancock had announced it was contemplating the outsourcing of a specific work group within the IT business unit. (DiCicco Dep. Tr. at 57:24-58:8)

## III.    Hancock's Announcement of Intent to Sell the Tower Complex

27. On November 26, 2002, Hancock announced that it intended to sell the Tower Complex. (Dfts' Statement ¶ 30; Answer ¶ 22)

28. On November 26 and 27, 2002, Hancock informed its employees that it expected that positions within the REOD would be eliminated as a result of the sale of the Tower Complex. (*John Hancock Complex Questions and Answers, November 26, 2002*, hereinafter Exhibit 4, at 6; *Questions on Tower Complex Sale Answered in Q&A, 11/27/02*, hereinafter Exhibit 5, at 3; Dfts' Statement ¶ 31)

29. Hancock represented to its employees that in any sale of the buildings Hancock would retain employees within the REOD business unit, including a reduced security staff, and it would be the new owner's responsibility to decide how to staff the buildings and whether to extend offers of employment to the non-retained REOD employees. (Joyce Aff. ¶ 3; Answer ¶

6

23; Ex. 4 at 6; Ex. 5 at 3) Joyce understood Hancock's representations to mean he was going to

be terminated and eligible for severance benefits because the sale of the Tower Complex was not

going to involve a sale or outsourcing of his business, but instead a reduction in staff. (Joyce

Aff. ¶ 3) Hancock, in fact, did retain certain employees within the REOD business unit.

(Mongeau Dep. Tr. at 80:3-80:12)

## IV.    The Summary Plan Description

30.    In or around December 2002, Hancock distributed to employees a copy of the

Summary Plan Description ("SPD") of the Plan, including therein references to the Plan

Amendment. (*2002 Benefits Supplement to Your Summary Plan Description* ("SPD"),

hereinafter Exhibit 6, at 13)

31.    The SPD is "developed to inform employees of the benefits that Hancock

provides" and "provides information about such benefits in laymen's terms" because plan

documents are "written in legalese or in language . . . that is not easy to interpret." (DiCicco

Dep. Tr. at 71:23-72:18) "[T]he Summary Plan Description is again the document that's written

for employees." (Id. at 73:2-73:9)

32.    The SPD addressed the Plan Amendment as follows:

Effective November 18, 2002, two provisions of the Severance Pay
Plan were changed as follows:

- In the event of the sale or outsourcing of a business unit, if
an employee of the business unit is offered a comparable
job by, or accepts a non-comparable job with the purchaser
or successor company, severance will not be paid
(comparable will be defined as similar salary, competitive
benefit offerings and a work location within 50 miles of the
current work location).

- If the purchaser or successor company subsequently
terminates the employee within six months of the sale or

7

> outsourcing (and) hire date, severance will not be paid
> under the Plan.

(Ex. 6 at 13)

33.    The purpose of the SPD was to interpret for Hancock employees the terms of the

Plan and Plan Amendment so they could be understood by laypersons. (DiCicco Dep. Tr. at

78:6-78:18)

34.    The SPD was drafted by Mr. Mongeau and a member of his staff. (Mongeau Dep.

Tr. at 54:6-54:12) The SPD was drafted with the potential outsourcing of Hancock information

technology workers in mind. (Id. at 55:6-55:17, 59:6-59:17)

35.    The plain language of the SPD explicitly states that prior to there being any

application of the three component test of the "comparable job provision" of the Plan

Amendment, Hancock must first determine that there has been a sale or outsourcing of a

Hancock business unit. (Bisciotti Dep. Tr. at 44:21-45:6, 82:20-83:3) The terms of the SPD are

not contrary to the terms of the Plan, but instead serve as the interpretive language of the Plan.

(Id. at 45:7-45:10, 50:3-50:10)

36.    To the extent the SPD was distributed to Joyce and the Plan was not, when the

SPD stated that the Plan was changed "as follows," Joyce, as an average participant of the Plan,

reasonably understood the language of the SPD to mirror or interpret the language found in the

Plan Amendment. (Joyce Aff. ¶ 5)

37.    The SPD served as a means for Hancock employees to understand and interpret

the Plan Amendment and further explain the triggering event for when the Plan Amendment was

to be applicable. (Ex. 6 at 13) The SPD also served as a means for interpreting and defining the

components of the term "comparable" as used in the Plan Amendment. (Dfts' Statement ¶ 18;

Mongeau Dep. Tr. 93:3-93:14)

8

38.    Neither the Plan nor the SPD defines the term "competitive benefit offerings."
(Ex. 1; Ex. 6 at 13; Bisciotti Dep. Tr. at 71:19-72:4)

39.    The SPD does not expressly state that the phrase "[i]n the event of the sale or
outsourcing of a business unit" should be construed by employees as an example of when the
Plan Amendment will apply. (Ex. 6 at 13)

40.    The SPD does not expressly state that the term "competitive benefit offerings"
requires an assessment of only select benefits. (Ex. 6 at 13)

41.    Hancock does not have a uniform understanding, written or unwritten, for the
definition of "outsourcing" as the term is used in the context of the SPD. (Ex. 6 at 13; Bisciotti
Dep. Tr. at 59:8-59:19; DiCicco Dep. Tr. at 56:10-56:15, 57:2-57:9; Mongeau Dep. Tr. at 40:15-
41:12 (collectively proffering differing definitions of "outsourcing"); Moloney Dep. Tr. at 24:3-
24:18, 29:7-30:1, 30:16-30:20 (stating that there is not a set definition for "outsourcing")

42.    Hancock does not have a uniform understanding, written or unwritten, for the
definition of a "business unit," as the phrase is used in the context of the SPD. (Ex. 6 at 13;
Bisciotti Dep. Tr. at 51:17-51:18; DiCicco Dep. Tr. at 48:13-48:20 (referencing Ms. DiCicco's
own definition of a "business unit"))

43.    After his review of the JH Communication and SPD, Joyce understood that a
"comparable position" was to be defined by three components (i.e., similar salary, competitive
benefit offerings and a work location within 50 miles of the current work location). (Joyce Aff. ¶
6; Pl.'s Interrog. Answer Nos. 5 & 14) Joyce understood the SPD to interpret the Plan
Amendment. (Id.) Joyce understood the "competitive benefit offerings" component of the
comparable job provision as to require Hancock to conduct an evaluation of his entire benefits
package at Hancock versus the benefits package offered by his Successor Company because the

other two components of the provision required an evaluation of his salary and work location at Hancock versus those at his Successor Company. (Id.; Ex. 6 at 13)

44.    After the Plan Amendment became effective, Joyce continued to work for Hancock with the understanding that the only circumstance under which he would not be entitled to receive his Plan benefits would be in the event his REOD business unit was sold or outsourced to a Successor Company and said Successor Company offered him a comparable job, as defined by the SPD. (Joyce Aff. ¶ 7; Pl.'s Interrog. Answer Nos. 5 & 14) As a result, Joyce did not seek alternate employment after the announcement of the potential sale of the Tower Complex because the sale was not going to involve a sale or outsourcing of Joyce's business unit. (Id.) Instead, Joyce understood he was being terminated due to a significant reduction in staff stemming from a real estate transaction involving the sale of the Tower Complex. (Joyce Aff. ¶ 7; Pl.'s Interrog. Answer Nos. 5 & 14)

## V.    Negotiations Pertaining to the Sale of the Tower Complex

45.    Morgan Stanley of New York, New York was hired to broker the sale of the three buildings in the Tower Complex and scheduled tours with prospective buyers. (Answer ¶ 24)

46.    Commencing in late February 2003, Beacon Capital Partners, LLC ("Beacon Capital") engaged in advanced discussions with Morgan Stanley regarding the purchase of the Tower Complex. (Transcript of Deposition of William A. Bonn of 5/16/06 ("Bonn Dep. Tr.") at 8:21-9:14)

47.    Beacon informed Morgan Stanley that Beacon had a "desire to bring over the property management team currently in place to the extent those employees [were] not retained by Hancock." (*E-mail from Jeff Brown of Beacon to Hugh MacDonnell of Morgan Stanley of 02/19/03*, hereinafter Exhibit 7; Dfts' Statement ¶ 62) Beacon's desire was "not described in

detail in [Beacon's] bid letter," as contemplated in the Term Sheet for the Purchase and Sale
Agreement. (Id.; *John Hancock Tower Complex in Boston Term Sheet for Purchase and Sale
Agreement,* hereinafter Exhibit 8, at 94) The purpose of Mr. Brown's e-mail was to convey to
Morgan Stanley "that to the extent there were employees available that Hancock had in their
employ who managed the [Tower Complex], [Beacon] would certainly like to interview them to
see if they were people that [Beacon would] want to hire to manage the [Tower Complex]."
(Bonn Dep. Tr. at 61:12-62:7) This was consistent with what Beacon was also trying to convey
to Hancock. (Id. at 62:8-62:17 ("[Beacon] wanted to assuage [Hancock's] concerns about a
change in the property management at the [Tower Complex], and to the extent that [Beacon]
could find good people that [Hancock] might have on staff that [Hancock] would [make]
available to [Beacon], the assumption being they wouldn't have jobs after [Beacon] took over
management . . . [Beacon] would be happy to interview them and, if [Beacon] liked them,
[Beacon would] extend offers to them.")) Mr. Brown's e-mail was merely a "sales pitch . . . to
try to get Hancock to accept [Beacon's] offer." (Id. at 63:11-63:14)

48.     The understanding at Hancock was that certain Hancock employees would be
terminated. (Mongeau Dep. Tr. at 96:1-96:8, 99:1-99:9)

49.     By March 1, 2003 Beacon Capital was informed that Hancock would be willing to
sell the Tower Complex to it. (Bonn Dep. Tr. at 9:15-9:21) The negotiation process was
"relatively expedited" and involved the signing of the purchase and sale on the same day as the
closing, which occurred on March 13, 2003. (Bonn Dep. Tr. at 8:14-8:16, 9:15-10:2)

50.     William A. Bonn served as general counsel for Beacon Capital and was
personally involved in the negotiations to acquire the Tower Complex. (Bonn Dep. Tr. at 11:6-
11:8). As general counsel, Mr. Bonn's role was primarily to "coordinate with outside counsel all

aspects of the acquisition of the property." (Id. at 11:6-11:15)  Mr. Bonn was entrusted to utilize

his background in human resources to handle the formation of the "management subsidiary and

coordinate the hiring of people and personnel to run it." (Id. at 11:15-11:18, 12:17-12:24)  Mr.

Bonn was also involved in creating the benefits package for former Hancock employees hired by

Beacon's subsidiary. (Bonn Dep. Tr. at 23:4-24:3)

     51.    During the period of negotiations for the sale of the Tower Complex, Thomas

Moloney served as Hancock's Chief Financial Officer and had final approval authority of the

terms of the documents associated with the sale of the Tower Complex. (Moloney Dep. Tr. at

17:4-17:9)  Mr. Moloney was Hancock's chief negotiator for the sale of the Tower Complex.

(Joan M. DiCicco's Objs. & Answers to Pl.'s First Set of Interrogs. Answer No. 4)  During this

time, Ms. DiCicco served as a liaison for Mr. Moloney. (Id.; DiCicco Dep. Tr. at 21:14-21:17)

     52.    The negotiations for the purchase of the Tower Complex did not involve Beacon

purchasing an existing business unit at Hancock. (Bonn Dep. Tr. at 16:15-17:21 ("We were not

acquiring a piece of the John Hancock company . . . [w]e were acquiring real estate."))

     53.    During the negotiations for the purchase of the Tower Complex, Mr. Bonn does

not recall there being any discussions with Morgan Stanley or Hancock about Hancock

outsourcing its employees to Beacon as part of the real estate transaction. (Bonn Dep. Tr. at

35:4-35:18 ("I do not recall anyone talking about outsourcing. We had asked if there would be

any people that would be available, current Hancock employees who would be available who

were involved in the management of the [T]ower [C]omplex that we could hire once we had

been awarded the transaction so that we could then get ready to get a management company up

and running.")) Similarly, Mr. Moloney does not recall there being any discussion about

whether any business unit would be outsourced to Beacon as a result of the sale of the Tower

Complex. (Moloney Dep. Tr. at 25:15-25:22) Ms. DiCicco does not specifically recall any

Hancock employee describing the sale of the Tower Complex as constituting or amounting to an

outsourcing of any business unit at Hancock. (DiCicco Dep. Tr. at 132:5-132:20)

## VI.    The Sale of the Tower Complex

54.    In March 2003, Morgan Stanley brokered the sale of the Tower Complex from

Hancock to Beacon Capital. (Answer ¶ 30; Bonn Dep. Tr. at 7:19-8:16)

55.    As part of the transaction, Beacon Capital paid Hancock $910 million. (Answer ¶

31)

56.    On March 14, 2003, Hancock published a press release on its "HubNews" website

stating the following in relevant part:

> Hancock expects the transition to the new owner to be seamless.
> Under the terms of the sale, Hancock will manage the property for
> a 120-day transition period. During that time, Hancock employees
> who operate, maintain and secure the buildings will continue in
> their normal roles. When the transition period ends, some of these
> employees will keep their positions and it is anticipated that many
> of the others will be hired by Beacon Capital.

(*Hancock Press Release of 03/14/06*, hereinafter Exhibit 9)

57.    Following the March 2003 sale of the Tower Complex, Beacon Capital Partners

Management, LLC ("Beacon"), a wholly owned subsidiary of Beacon Capital, was formed to

operate and manage the Tower Complex. (Dfts' Statement ¶ 33; Hancock's Interrog. Answer

No. 1; Bonn Dep. Tr. at 12:7-13:7)

58.    At the time of the sale of the Tower Complex, Beacon did not have any

employees. (Bonn Dep. Tr. at 20:17-21:1)

59.    As a result, Hancock and Beacon Capital executed a Transition Services

Agreement whereby Beacon Capital hired Hancock to manage the Tower Complex until July 14,

2003. (Bonn Dep. Tr. at 17:2-17:5, 43:1-43:3)  During the transition, Hancock continued to manage the Tower Complex as the company had been managing it. (Id. at 17:22-18:5)

60.    Beacon was under no written obligation to provide property management services for the Tower Complex after the expiration of the Transition Services Agreement. (Bonn Dep. Tr. at 45:7-46:13)  Beacon had only expressed an intention of providing property management for the Tower Complex. (Bonn Dep. Tr. at 46:14-47:1)

61.    The sale of the Tower Complex did not involve the sale of any Hancock business unit, including the REOD. (Hancock's Objs. & Responses to Pl.'s First Request for Admissions Answer ("Hancock's Admission No.") No. 16; (Bonn Dep. Tr. at 17:13-17:21, 21:21-22:11; 63:23-64:8 ("We did not hire a department or acquire a department from John Hancock."))

62.    The terms of the sale of the Tower Complex did not require that Beacon Capital or Beacon hire Hancock employees, including Daniel Joyce. (Hancock's Admission No. 12; Bonn Dep. Tr. at 21:21-22:11, 58:9-59:7 ("We were given a list of employees that Hancock indicated they would no longer need after selling the complex, and if we wanted to, it was our discretion to interview these people and decide whether or not we wished to extend them offers.")

63.    The terms of the sale of the Tower Complex did not include any reference to the outsourcing of any Hancock employee or business unit to Beacon, including the REOD. (Hancock's Admission No. 13)

64.    Hancock did not offer a work unit of employees to Beacon to manage the Tower Complex. (Bonn Dep. Tr. at 91:17-92:21)

65.    Hancock did not execute a contract with Beacon or Beacon Capital for the outsourcing of REOD employees. (Hancock's Admission No. 14; Bonn Dep. Tr. at 19:23-20:5; Moloney Dep. Tr. at 24:19-24:20)

66.    Joyce was never made aware of any outsourcing contract or that his position was being outsourced as part of the sale of the Tower Complex. (Pl.'s Interrog. Answer No. 14; Bonn Dep. Tr. at 35:4-35:18; Joyce Aff. ¶ 8)

67.    In the thousands of pages of documents produced by Hancock, Morgan Stanley and Beacon there is not one reference to the term "outsourcing," in the context of the sale of the Tower Complex. (Joyce Aff. ¶ 17 )

68.    Hancock informed its REOD employees, including Joyce, that some employees in the REOD would retain their positions at Hancock, some would be terminated and eligible to receive Plan benefits and many would hopefully be offered jobs by Beacon. (Ex. 4 at 6; Ex. 5 at 3 ("Given the unique operational aspects of the Tower, it is our hope that many of our associates affected by the sale will be hired by the new owner . . ."))

69.    Mr. Bonn understood that those Hancock employees made available to Beacon for hiring were going to be terminated by Hancock due to a downsizing at the company. (Bonn Dep. Tr. at 35:19-36:12 ("I assumed that the list of employees I was given was people that would no longer be needed by John Hancock after we took over the management of the [T]ower [C]omplex because that's what those people did. If we didn't hire them, my assumption [was that] they would not have jobs."))

70.    As a result of the sale of the Tower Complex, Hancock became Beacon's largest tenant. (Bonn Dep. Tr. at 33:10-33:14, 43:24-44:12)

## VII.    Hancock's Internal Guidelines for Defining "Comparable Job"

71.    Attempts to further define and provide guidance for assessing the three components of the term "comparable job" were undertaken by a working group of employees from Hancock's Human Resources Services, including Peter Mongeau, then–Second Vice President of Human Resource Services; Joan DiCicco, a Human Resources Officer for Hancock at the time; and Sandra Colley, then-Director of Workforce Diversity (collectively referred to as the "HR Group"). (Dfts' Statement ¶ 67; Mongeau Dep. Tr. at 82:22-83:7, 124:20-125:3)

72.    The HR Group ultimately finalized an internal guidelines memorandum further defining "competitive benefit offerings." (Mongeau Dep. Tr. at 82:22-83:7, 84:7-84:13; DiCicco Dep. Tr. at 115:21-116:6; *Memorandum re: Comparable Job Definition*, hereinafter Exhibit 10, at 2)

73.    The HR Group also identified in Exhibit 10 which benefit categories would be included in any competitive benefits assessment analysis. (Dfts' Statement ¶ 28) Originally, Hancock determined the benefit categories for inclusion in the analysis should include 401(k) plan benefits, pension benefits, medical benefits, dental benefits, vacation benefits, flexible spending accounts and vision care coverage. (Mongeau Dep. Tr. at 115:19-116:23) The benefit categories ultimately selected for inclusion by the HR Group did not include flexible spending accounts or vision care coverage. (Ex. 10 at 2)

74.    A severance plan was not selected as a benefit category in the analysis even though Mr. Mongeau deemed severance to be "an important benefit to Hancock employees." (Mongeau Dep. Tr. at 25:10-26:2). Based on Mr. Bonn's experience in human resources, he too opined that severance "would be an important benefit to an employee." (Bonn Dep. Tr. at 34:9-34:16)

75.    The HR Group decided to include only select categories of benefits for a competitive benefits assessment analysis because the HR Group understood that the benefit categories selected were the benefits that had the most immediate impact and value to an employee. (Mongeau Dep. Tr. at 118:5-118:11; Dfts' Statement ¶ 29)  The HR Group relied in significant part on Mr. Mongeau's opinion as to which benefit categories should be selected for the benefits assessment analysis. (DiCicco Dep. Tr. at 112:9-112:13)

76.    Mr. Mongeau was the only member of the HR Group with any experience assessing competitive benefits. (Dfts' Statement ¶ 20)  At all times during the drafting of the internal guidelines memorandum Mr. Mongeau was aware that the studies upon which he had always relied when conducting competitive benefit assessment analyses contained normative data, which does not break down employer benefits data by industry. (Mongeau Dep. Tr. at 9:3-10:18)

77.    The HR Group interpreted the term "competitive benefit offerings," as used in the SPD, to mean benefits that are competitive in the industry of the Successor Company from which a given employee receives a job offer. (Exhibit 10 at 2; Dfts' Statement ¶ 27; Bisciotti Dep. Tr. at 86:21-86:24; DiCicco Dep. Tr. at 116:7-116:17)

78.    Beacon is in the property management industry. (Bisciotti Dep. Tr. at 111:8-111:10; DiCicco Dep. Tr. at 121:14-121:21)  In March 2003, the HR Group began to compile a list of companies in the property management industry so that Hewitt Associates could benchmark Beacon's benefits against benefit offerings at other property management companies, pursuant to the internal guidelines established by the HR Group in Exhibit 10. (DiCicco Dep. Tr. at 116:18-117:17)  DiCicco never provided Hewitt with a list of companies within the property management industry that could be used for the purpose of benchmarking certain benefits. (Id.

17

at 126:13-127:1)  DiCicco nor any other Hancock employee ever contacted any property management companies for the purpose of inquiring as to what benefits they were offering their employees. (DiCicco Dep. Tr. at 126:13-126:21)  DiCicco, as a member of the HR Group, has no recollection of anyone conducting any research on the benefits offered by property management companies in Massachusetts or elsewhere. (Id.; DiCicco Dep. Tr. at 167:12-167:16)

## VIII.   The Outsourcing of the ISSD Employees

79.     On April 23, 2003, Hancock announced that the technical services employees in its Infrastructure Support Services Department ("ISSD") were being outsourced to International Business Machines Corporation ("IBM"). (*Press Release re: John Hancock Plans to Assign Portion of Information Technology Services to IBM*, hereinafter Exhibit 11; Answer ¶ 25)

80.     As part of the transaction, Hancock executed an outsourcing contract with IBM. (Ex. 11; Answer ¶ 26; Moloney Dep. Tr. at 31:5-31:15 (stating that "there was an agreement under which [IBM] took over the operations, paid [Hancock] a price for that, and [Hancock] entered into an agreement with [IBM]))

81.     Certain ISSD employees were hired by IBM, certain ISSD employees were retained by Hancock and certain ISSD employees were provided severance benefits under the Plan. (Ex. 11; Answer ¶ 27)

82.     Hancock applied the three components of the 'Comparable Job' provision of the Plan Amendment when determining whether the ISSD employees were eligible for benefits under the Plan. (Answer ¶ 28)

83.     When determining whether IBM was offering the ISSD employees competitive benefits, the standard by which Hancock was to measure IBM's benefit offerings was against

other companies in either the IT or financial services industry, but a specific evaluation was not conducted. (*Severance Memorandum and E-Mail Regarding ISSD Outsourcing*, hereinafter Exhibit 12; Mongeau Dep. Tr. at 66:7-68:5)

## IX.    Beacon's Offer of Employment to Joyce

84.    On or around May 5, 2003, Joyce received a letter ("Offer Letter") from John Durnan, who was still an employee of Hancock at the time, offering Joyce employment at Beacon. (*Letter from John Durnan to Daniel Joyce of 05/05/03*, hereinafter Exhibit 13; Answer ¶ 65; Pl.'s Interrog. Answer No. 12; Bonn Dep. Tr. at 41:14-41:23)

85.    In the Offer Letter, Beacon offered Joyce a salary of $75,100 and a bonus opportunity of up to 10 percent of his base salary. (Ex. 13; Dfts' Statement ¶ 36).

86.    The Offer Letter did not provide Joyce with specific information pertaining to Beacon's benefits package because Beacon was still in the process of determining the specific benefits it would be offering its employees. (Ex. 13; Bonn Dep. Tr. at 41:5-41:13; Dfts' Statement ¶ 36). The Offer Letter requested that all offers be accepted by May 16, 2003. (Ex. 13)

87.    Hancock had knowledge of the content of the Offer Letter prior to its distribution to Joyce. (Hancock's Admission No. 21; Bonn Dep. Tr. at 41:14-41:23 (stating that the signator of the letter, John Durnan, was "an employee of John Hancock and did not become an employee of Beacon Capital Partners Management, LLC" until July 14, 2003); DiCicco Dep. Tr. at 150:19-151:4, 152:1-152:9)

88.    Hancock was aware that some REOD employees may accept job offers from Beacon prior to REOD employees learning whether they may be eligible for severance. (Joyce Aff. ¶ 9)

19

## X.     Hancock's Comparable Job Analysis

89.     In March 2003, Hancock set out to gather information solely on the benefit offerings of employers in the property management industry, and even compiled a list of such companies, for the purpose of comparing the benefit offerings of property management companies to Beacon's benefit offerings. (Hancock's Admission No. 18; DiCicco Dep. Tr. at 117:10-117:17)

90.     After the sale of the Tower Complex, Mr. Mongeau was advised that a group of employees were going to be terminated under the terms of the Plan and that he needed to address whether the affected employees were being offered a comparable job pursuant to the "comparable job provision." (Mongeau Dep. Tr. at 99:1-99:9, 162:9-162:20). As a result, prior to conducting the competitive assessment analysis of Beacon's benefit offerings, Mr. Mongeau did not engage in any evaluation or conversation about whether Joyce's business unit was being outsourced nor did he undertake any evaluation as to whether there was an outsourcing resulting from the sale of the Tower Complex. (Mongeau Dep. Tr. at 46:3-46:10, 50:4-52:8, 98:12-99:9) Mr. Mongeau's focus was on determining whether Beacon was offering "comparable jobs" to Hancock employees under the Plan. (Id. at 47:1-47:8)

91.     The HR Group did not take any steps to assess the make-up of Joyce's business unit. (DiCicco Dep. Tr. at 138:7-138:14)

92.     Prior to May 21, 2003, Hancock had already determined that Beacon's job offers to employees within the REOD included salaries similar to the salaries they were receiving from Hancock and a work location within 50 miles of their work location at Hancock. (DiCicco Dep. Tr. at 165:21-166:9) Hancock was not yet able to make a determination as to "competitive

20

benefit offerings" because Beacon was still in the process of determining the details of its

benefits package for employees. (Id. at 166:10-166:19; Dfts' Statement ¶ 36)

93.    In the late afternoon on May 21, 2003, Ms. DiCicco received a memorandum

from Beacon with its proposed benefits for Beacon employees. (*Memorandum Re: Proposed*

*Benefits for Beacon Capital Partners Management, LLC Employees*, hereinafter Exhibit 14;

*Correspondence from Ms. DiCicco to Thomas Moloney*, hereinafter Exhibit 15; Dfts' Statement

¶ 71) Between May 21, 2003 and May 23, 2003, Ms. DiCicco delivered the memorandum at

Exhibit 14 to Mr. Mongeau. (Ex. 15; DiCicco Dep. Tr. at 159:21-160:8)

94.    Between the late afternoon on May 21, 2003 and May 23, 2003, Mr. Mongeau

conducted a competitive assessment analysis of Beacon's benefit offerings to Hancock

employees, including Joyce. (Ex. 15; *Competitive Assessment of Beacon Capital Partners*

*Management, LLC Benefits Package with respect to Hancock's Severance Pay Plan*

*"Comparable Job" Eligibility Provision*, hereinafter Exhibit 16; DiCicco Dep. Tr. at 172:16-

173:3; Moloney Dep. Tr. at 39:11-40:1)

95.    The HR Group relied exclusively on the language of the Plan, without any

deference to the language of the SPD other than to refer to the parenthetical definition of

comparable job. (Mongeau Dep. Tr. at 48:24-50:1)

96.    Beacon's proposed benefits package, by comparison to Hancock's benefits

package, included no defined benefit pension plan, no educational benefit program, provided for

less vacation time, higher premiums for medical and dental insurance coverage and while it did

reference a Beacon severance plan, ultimately Beacon never implemented a severance plan.

(Exhibit 14; Bonn Dep. Tr. at 29:13-29:20, 30:14-30:19, 85:18-87:3; Dfts' Statement ¶ 72)

97.    Mr. Mongeau relied on the information contained in Beacon's memorandum of proposed benefits to conduct the competitive assessment analysis of Beacon's benefit offerings. (Dfts' Statement ¶ 74; Mongeau Dep. Tr. at 105:11-105:19)  Mr. Mongeau purports to have also relied on two general industry data sources, identified as Mercer/Foster Higgins 2002 and Hewitt U.S. Salaried 2002. (*Hewitt United States Salaries 2002-2003* (the "Hewitt Study"), hereinafter Exhibit 17; Mongeau Dep. Tr. at 15:6-15:14, 105:20-106:2)  These data sources Mr. Mongeau referred to were normative data studies, which evaluated data pertaining to benefits offered by the general employer industry and included a list of companies from various industries. (Mongeau Dep. Tr. at 14:15-15:5; DiCicco Dep. Tr. at 181:22-182:2)  The study did not focus on specific industries. (Id.)

98.    The Foster Higgins study ("Foster Study") focused on national health benefits. (Mongeau Dep. Tr. at 15:22-16:3).  The Foster Study was not an appropriate evaluation tool for conducting an evaluation of the health benefits offered specifically within the property management industry. (Mongeau Dep. Tr. at 19:3-20:1)  When asked to produce the Foster Study, Mr. Mongeau was unable to locate the file in which it was maintained as well all notes he generated while reviewing the sources he relied on when conducting the competitive assessment analysis of Beacon's benefit offerings. (Mongeau Dep. Tr. at 16:21-18:7)

99.    The Hewitt Study "summarizes the principal benefit plans for salaried employees of 960 major U.S. employers." (Ex. 17 at i)  Of the 960 employers surveyed in the Hewitt Study, not one company was identified by Hewitt as a company in the property management industry or even the real estate industry. (Ex. 17 at 158-168)  Accordingly, the Hewitt study was not an appropriate evaluation tool for specifically evaluating Beacon's benefit offerings against the benefits provided in the property management industry. (Mongeau Dep. Tr. at 20:2-21:4)

100.    Mr. Mongeau informed Ms. DiCicco that property management companies were included in the general industry data he relied on when conducting the competitive assessment analysis for Beacon benefit offerings. (DiCicco Dep. Tr. at 177:23-180:7) As a result, Ms. DiCicco was under the impression that the sources Mr. Mongeau relied on when conducting the competitive assessment analysis of Beacon's benefit offerings included property management companies in its general industry data. (DiCicco Dep. Tr. at 119:13-119:16, 168:17-169:1)

101.    The benefit categories selected for inclusion in Hancock's competitive assessment analysis of Beacon's benefits package were 401(k) plan benefits, pension benefits, medical benefits, dental benefits and vacation benefits. (Dfts' Statement ¶ 76; Hancock's Interrog. Answer No. 4; Ex. 10 at 2; DiCicco Dep. Tr. at 120:3-120:11)

102.    While the HR Group determined to evaluate only select benefits from Beacon's benefits package, the Hewitt Study identifies "twelve major" categories for "summaries of benefits specification." (Ex. 17 at i) The "twelve major" categories of benefits evaluated by Hewitt in the Hewitt Report were: defined benefit pension, defined contribution, group life insurance, short-term disability, long-term disability, pre-retirement medical, dental/vision/hearing, managed health/health initiatives, postretirement medical, time off with pay, work/life and flexible benefits. (Id. at i-iii)

103.    At no time did Mr. Mongeau ever attempt to ascertain whether there was additional data available that could assist him in making a direct comparison of Beacon's benefit offerings to those benefits offered by employers in the property management industry. (Mongeau Dep. Tr. at 134:3-134:14) Mr. Mongeau relied on the information he gathered about general industry employers from the sources identified at the bottom of the first page of Exhibit

16 to determine that select benefits offered by Beacon were competitive among general industry employers. (Mongeau Dep. Tr. at 152:10-152:17)

104.    The competitive assessment analysis conducted by Mr. Mongeau did not exclusively compare select benefits from Beacon's benefits package to benefits offered to employees within Beacon's industry, the property management industry, as required by the internal administrative guidelines adopted by the Hancock in Exhibit 10. (Hancock's Admission No. 17)

105.    The competitive assessment analysis of Beacon's benefit offerings was a composite assessment, made up of weighted scores assigned to each of the selected benefit categories that Beacon offered and added together to calculate the total competitive assessment score for Beacon's benefits package. (Dfts' Statement ¶ 77; Ex. 16). A score from zero, representing no benefit, to three, representing an above average benefit, was assigned to a selected benefits category based upon how that benefit offering compared to normative data concerning that type of benefit among general industry employers. (Id.) Mr. Mongeau assigned each of the selected benefits a weighting percentage, with the sum total of the percentage equaling one hundred percent. (Id.) The score assigned to each category of benefits was a percentage of the competitive assessment score: 401(k) plan benefits counted for 20 percent; pension benefits for 15 percent; medical benefits for 30 percent; dental benefits for 5 percent; and vacation benefits for 30 percent. (Id.)

106.    The competitive assessment analysis conducted by Mongeau identified certain benefits he believed may generate "noise" among affected REOD employees. (Ex. 16 at 1) Mr. Mongeau believed Beacon's pension and vacation benefits would be a "Significant Noise

24

Factor" among affected REOD employees. (Id.) Mr. Mongeau also believed Beacon's dental benefits would be a "Modest Noise Factor." (Id.)

107.    The overall resulting Competitive Assessment Score for Beacon's benefit offerings was a 1.9. (Ex. 16 at 2) According to the competitive assessment analysis, benefits that were deemed average received a score of 2.0. (Id.) Mr. Mongeau determined that Beacon's job offers included competitive benefit offerings, thereby allowing the HR Group to conclude that Beacon's job offers to REOD employees were comparable, as defined by the Plan Amendment and Summary Plan Description. (Dfts' Statement ¶ 91; DiCicco Dep. Tr. at 166:10-166:19; Hancock's Interrog. Answer No. 2)

108.    Other members of the HR Group deferred to Mr. Mongeau's competitive findings and did not question the manner in which he conducted the competitive assessment analysis for Beacon's benefit offerings. (DiCicco Dep. Tr. at 165:1-165:6, 168:4-168:16, 185:11-186:6 ("The guidelines committee developed guidelines and the actual assessment was done by Peter Mongeau who was a member of the guidelines committee but he was the one who did the assessment. And so if your question is if the guidelines committee made a determination to use normative data, the answer us no. However, Peter was the one who did the analysis and is the expert and he did the analysis based on the data that was available to him at the time."))

109.    It is common for inquiring companies to contact other property management companies for the purpose of inquiring as to the details of their benefits packages. (Bonn Dep. Tr. at 52:3-53:15 ("You can pick up the phone at one of those companies and a senior person might be willing to share that information with you as long as they didn't think you're using it to steal their employees."))

110.    Beyond compiling a list of property management companies in Massachusetts, Hancock undertook no further steps to obtain data on such companies. (Mongeau Dep. Tr. at 134:8-134:14, DiCicco Dep. Tr. at 181:4-182:2)

111.    To assess whether Beacon had satisfied the "competitive benefit offerings" component of the "comparable job provision" of the SPD, Mr. Mongeau conducted a competitive benefits assessment analysis in which he relied on data sources, including the Hewitt Index, to gather normative data about the range of competitive benefits offered to employees by general industry employers. (Dfts' Statement ¶ 70)

## XI.    The Initial Determination to Deny Severance Benefits to Joyce and Others

112.    On May 30, 2003, Joyce received a memorandum from Hancock to all affected REOD employees in which Hancock stated, "[I]t has been determined that all job offers extended by [Beacon] are comparable job offers and therefore recipients of a job offer from Beacon are not eligible for [Hancock] severance benefits." (*Memorandum to: Prospective Beacon Capital Partner Management, LLC Employees*, hereinafter Exhibit 18; Dfts' Statement ¶ 92)

113.    The letter does not address whether Joyce's business unit was deemed to have been outsourced, nor does it reference the internal administrative guidelines by which the three components of comparable job were measured or how the competitive benefits assessment analysis was conducted. (Ex. 18)

114.    Ms. DiCicco does not recall ever being informed or made aware of any determination by Hancock that the sale of the Tower Complex involved an outsourcing of any Hancock business unit. (DiCicco Dep. Tr. at 54:11-55:2)

115.    When assessing whether Joyce and other REOD employees were eligible for
benefits under the Plan, Hancock focused on whether Beacon was a Successor Company and
whether Beacon was offering competitive benefits, not whether Joyce's business unit was being
outsourced to Beacon. (Dfts' Statement ¶ 65)  Only retrospectively does Hancock contend that
Beacon's assumption of the responsibilities associated with owning the buildings and its
subsequent offering of jobs and hiring of Joyce's business unit constituted an outsourcing. (Id.)

116.    Also on May 30, 2003, Joyce received a letter from Beacon advising him that the
components of Beacon's "Benefits Program," had been finalized and posted on a website for his
review. (*Letter from Paul Crowley to Daniel Joyce of 05/30/03*, hereinafter Exhibit 19, at 1;
Dfts' Statement ¶ 39)  The letter further extended the deadline to accept Beacon's offer to June
13, 2003. (Exhibit 18 at 1; Bonn Dep. Tr. at 43:8-43:23; Dfts' Statement ¶ 37)

117.    The two May 30, 2003 letters provided Joyce with two weeks to decide whether
to: 1) accept Beacon's job offer and be terminated by Hancock in July 2003 without severance
benefits; or 2) reject Beacon's job offer and be terminated by Hancock in July 2003 without
severance benefits. (Exs. 18 & 19; Joyce Aff. ¶ 10)

## XII.    Joyce's Communications with Hancock

118.    On June 2, 2003, Joyce sent an email to DiCicco challenging the comparability
determination that Hancock had made concerning job offers from Beacon. (*E-mail
correspondence between Daniel Joyce and Joan DiCicco of 06/02/03 and 06/03/03*, hereinafter
Exhibit 20; Answer ¶ 69)

119.    On June 3, 2003, DiCicco responded to Joyce's email by stating:

> The determination that the Beacon benefits package was
> competitive was based on an assessment of selected benefits,
> including health, pension, 401(k) and vacation. Senior members of
> the benefits team conducted the assessment and evaluation, using

> different, objective data sources. I should point out that the
> assessment was against normative data – that is, what is within the
> range of competitive benefits offered to employees generally or in
> certain industries (in this case, property management). The
> assessment was not a comparison to John Hancock's benefits
> package and we did not make any such comparison.

(Ex. 20)

120.    Ms. DiCicco's email to Joyce contains inaccurate statements. (Bisciotti Dep. Tr.

at 162:8-162:13, 163:16-164:1) Senior members of the "benefits team" did not conduct the

assessment and evaluation as to whether Beacon's benefits package was competitive – only Mr.

Mongeau conducted the assessment. (DiCicco Dep. Tr. at 163:18-164:15; Ex. 16) The

assessment did not evaluate Beacon's benefit offerings to companies within Beacon's industry,

the property management industry. (Ex. 17 at 158-168; Bisciotti Dep. Tr. at 162:8-162:13,

163:16-164:1)

121.    Upon being informed by Ms. DiCicco that Hancock had purportedly conducted a

competitive assessment analysis which found Beacon's benefits package to be competitive with

benefits offered by employers in the property management industry, Joyce refrained from

applying for property management positions at other companies because he deferred to

Hancock's fiduciary duty to conduct a fair and accurate competitive benefits assessment. (Joyce

Aff. ¶ 11; Bisciotti Dep. Tr. at 164:10-164:13)

122.    While Joyce could not understand how Beacon's benefits could be deemed

competitive when other property management companies seemed to be offering better benefits

than Beacon, he relied on the study conducted by Hancock. (Joyce Aff. ¶ 12) He was confused,

but he could not afford to reject Beacon's offer of employment after being deemed ineligible for

severance benefits under the Plan. (Id.)

123.    On June 13, 2003, Joyce accepted Beacon's offer of employment. (Pl.'s Interrog. Answer No. 12)  Nearly seventy-three (73) Hancock employees from the REOD received and accepted job offers from Beacon. (Bonn Dep. Tr. at 23:9-23:23, 80:9-80:16; Dfts' Statement ¶ 38)

124.    Hancock ended its employment relationship with Joyce. (Hancock's Admission No. 9)

125.    Hancock ceased employing Joyce due to a reduction in staff stemming from the sale of the Tower Complex. (Hancock's Admission No. 11)

126.    Hancock did not give Joyce the option to remain as an employee; he was to choose either resignation or employment with Beacon. (Hancock's Admission No. 10)

127.    Joyce's "Last Day Worked," as defined by the Plan, was July 11, 2003. (Ex. 1 at 4; Joyce Aff. ¶ 13)

128.    Joyce was a salaried employee at Hancock on his "Last Day Worked," as that term is defined by the Plan. (Hancock's Admission No. 1)

129.    Joyce was not a Senior Officer, a Managing Director, or employed in a General Agency on his Last Day Worked. (Hancock's Admission No. 2)

130.    Joyce was not receiving payments on account of disability under any Hancock-sponsored benefit or pension plan, including but limited to, the John Hancock Financial Services, Inc. Employee Welfare Plan, on his Last Day Worked. (Hancock's Admission No. 4)

131.    Joyce's cessation of employment with Hancock was not voluntary. (Hancock's Admission No. 6)

132.    Joyce's cessation of employment with Hancock was not related to Joyce's performance. (Hancock's Admission No. 8)

133.   Joyce's position at Hancock was eliminated due to a reduction in staff stemming from the sale of the Tower Complex.  (Hancock's Admission No. 7)

## XIII.   Joyce's Appeal of the Denial of Severance Benefits

134.   In late 2004, Joyce and other former Hancock employees from the REOD requested review by Hancock's Company Benefit Plan Appeal Committee (the "Appeal Committee") of the initial denial of benefits.  (Dfts' Statement ¶ 95; Mongeau Dep. Tr. at 160:5-160:10; Bisciotti Dep. Tr. at 30:1-30:5)

135.   These appeals were considered collectively by members of the Appeals Committee, including Brian Bisciotti, Counsel in Hancock's Tax Department, and Kathy Suchenski, Director of Hancock's Signator Field Administration, because each appeal presented similar issues.  (Dfts' Statement ¶ 65; Mongeau Dep. Tr. at 160:18-160:20; Bisciotti Dep. Tr. at 136:10-137:6)  Although Mr. Mongeau was also a member of the Appeals Committee, he recused himself from participation in these appeals due to his involvement in the initial determination of severance benefits to Joyce.  (Dfts' Statement ¶ 96; Mongeau Dep. Tr. at 160:11-160:17; Bisciotti Dep. Tr. at 33:3-33:11)

136.   The duties and responsibilities of Appeal Committee are to assess whether Hancock made an "educated decision" when it rendered its initial determination to deny a plan benefit to an employee.  (Bisciotti Dep. Tr. at 12:11-13:1))  In order to assess whether Hancock made the appropriate initial determination to deny a plan benefit to an employee, the Appeal Committee must step into the shoes of a reasonable employee of the company and review all of the pertinent documents informing the basis on which the claim for benefits was initially denied. (Id. at 12:22-12:23, 14:5-15:22, 29:3-29:7); *Procedural Rules for Claims Appeals*, hereinafter Exhibit 21, ¶ 5))

137.    It was the responsibility of the Appeals Committee to determine whether Mr.

Mongeau's competitive benefits assessment analysis was accurate. (Bisciotti Dep. Tr. at 119:3-

119:15)

138.    In anticipation of the meeting of the Appeal Committee, Mongeau forwarded a

package of documents to the Appeal Committee Coordinator, Carlton Grant, for the Appeal

Committee's review. (*Letter from Peter Mongeau to Carlton Grant of 11/04/04*, hereinafter

Exhibit 22) The following documents were not included in the package to the Appeal

Committee: 1) the SPD; 2) the November 21, 2002 company-wide email; 3) any document

defining or referencing the "outsourcing of a business unit"; or 4) Joyce's e-mail correspondence

with Ms. DiCicco. (Ex. 21; Bisciotti Dep. Tr. at 160:6-161:2 (stating that Joyce's email

correspondence with Ms. DiCicco would have been "helpful" to Mr. Bisciotti's assessment of

Joyce's appeal because the document is relevant)) Further, the Appeal Committee was not

provided with any of the data sources upon which Mr. Mongeau relied when conducting the

competitive assessment analysis of Beacon's benefit offerings because Mr. Mongeau did not

believe it was important. (Bisciotti Dep. Tr. at 109:2-110:1, 141:18-141:21; Mongeau Dep. Tr.

at 108:22-111:2) It was Mr. Mongeau's opinion that the Appeal Committee only needed to

review the results of his competitive benefits assessment analysis to assess whether he had

rendered a proper determination that Beacon's benefit offerings were competitive. (Mongeau

Dep. Tr. at 110:6-110:15, 112:7-113:3, 130:24-131:8)

139.    The package of documents submitted by Mr. Mongeau did not assist the Appeal

Committee in assessing whether the HR Group reasonably determined that the sale of the Tower

Complex involved an outsourcing of Joyce's business unit. (Bisciotti Dep. Tr. at 68:9-68:19) As

a result, Mr. Bisciotti "assumed" the HR Group had made a determination that the sale of the

Tower Complex involved a sale or outsourcing of Joyce's business unit. (Bisciotti Dep. Tr. at 84:17-85:6)

140.    Mr. Bisciotti took no steps to acclimate himself with the sale of the Tower Complex prior to or while reviewing Joyce's appeal of the denial of his severance benefits. (Bisciotti Dep. Tr. at 61:9-61:11)

141.    On November 16, 2004, the two member panel Appeal Committee convened to discuss Hancock's initial decision to deny severance benefits to Joyce and other Hancock employees. (*Minutes of Company Benefit Appeal Committee of 11/16/04*, hereinafter Exhibit 23)

142.    During the Appeal Committee meeting on November 16, 2004 the Appeal Committee members: 1) took no steps to assess the make-up of Joyce's business unit or how many employees were within his business unit (Bisciotti Dep. Tr. at 52:22-53:1, 146:1-146:11); 2) did not address the issue whether Joyce's business unit was outsourced to Beacon (Bisciotti Dep. Tr. at 145:2-145:24); 3) did not have enough information regarding the competitive benefits assessment analysis (Ex. 22); 4) did not discuss whether Mr. Mongeau had compared any of Beacon's benefits to benefits offered by employers in the property management industry when conducting the competitive assessment analysis of Beacon's benefits offerings (Bisciotti Dep. Tr. at 147:2-147:13); and 5) did not review the sources relied upon by Mr. Mongeau when conducting the competitive assessment analysis for Beacon's benefits offerings (Bisciotti Dep. Tr. at 147:14-148:2)

143.    On December 9, 2004, the Appeal Committee members met with Mr. Mongeau and Ms. DiCicco. (*Minutes of Company Benefit Plan Appeal Committee of 12/9/04*, hereinafter Exhibit 24) Mr. Mongeau was consulted with regards to the competitive assessment analysis for Beacon's benefit offering and Ms. DiCicco was consulted with regards to the informational

meetings with Hancock employees. (Ex. 24; Bisciotti Dep. Tr. at 149:21-150:6) Mr. Mongeau informed the Appeal Committee that the HR Group collected information on competitive benefits offered within the property management industry. (Bisciotti Dep. Tr. at 111:21-112:10) During the meeting with Mr. Mongeau, Mr. Bisciotti relied on Mr. Mongeau's representation that he compared Beacon's benefit offerings to those benefits offered by employers in Beacon's industry to the best of his ability. (Bisciotti Dep. Tr. at 115:5-115:20)

144.    The minutes of said meeting do not reflect any discussion pertaining to whether Joyce's business unit was outsourced to Beacon nor were the Appeal Committee members provided with the data sources upon which Mr. Mongeau relied when conducting the competitive benefits assessment analysis. (Ex. 24)

145.    Mr. Bisciotti simply deferred to Mr. Mongeau's decision to conduct the competitive benefits assessment in the manner Mr. Mongeau thought appropriate and trusted Mr. Mongeau's findings to be accurate without consulting the sources upon which Mr. Mongeau relied when drafting the assessment. (Bisciotti Dep. Tr. at 124:2-125:18) When Mr. Bisciotti reviewed Mr. Mongeau's competitive benefits assessment analysis he understood for the 401(k) plan analysis that the three percent represented the average employer matching 401(k) contribution within the property management industry. (Id. at 127:4-128:16) Mr. Bisciotti took no steps to confirm whether the average employer 401(k) contribution within the property management industry was three percent. (Bisciotti Dep. Tr. at 128:17-129:7) Further, Mr. Bisciotti took no steps to confirm whether the averages for each of the benefit categories listed in the assessment were the averages or norms for the property management industry. (Id. at 129:11-129:15)

146.    In a letter dated December 16, 2004 ("Appeal Letter"), the Appeal Committee denied the appeals of the denial of severance benefits submitted by Joyce and other former REOD employees. (*Letter from Carlton Grant on behalf of Appeal Committee of 12/16/04,* hereinafter Exhibit 25; Joyce Aff. ¶ 14)

147.    The Appeal Letter fails to provide specific reasons for the denial of the appeal for severance benefits submitted by Joyce and others former REOD employees. (Ex. 25; Ex. 1, §§ 7.6)

148.    The Appeal Letter fails specifically to reference the provisions of the Plan on which the Appeal Committee's decision was based. (Ex. 25; Ex. 1, §§ 7.6)

149.    Joyce exhausted all administrative remedies prior to commencing this action. (Answer ¶ 75)

## XIV.    Joyce's Request for Pertinent Documents

150.    On February 10, 2005, after being notified of the existence of a competitive assessment analysis for Beacon's benefit offerings, Plaintiff requested, through his counsel, a copy of the competitive benefits assessment analysis conducted by Hancock. (*E-mail from Plaintiff's counsel to Hancock's counsel of 02/10/05,* hereinafter Exhibit 26)

151.    In a letter dated June 23, 2005, Plaintiff again requested through counsel a copy of the competitive benefits assessment analysis and further advised that failure to provide a copy of said document could be deemed a violation of 29 U.S.C. § 1133(2). (*Letter from Plaintiff's counsel to Hancock's counsel of 06/23/05,* hereinafter Exhibit 27)

152.    Hancock did not produce a copy of the competitive assessment analysis for Beacon's benefit offerings to Joyce or his counsel until it was attached as an exhibit to Hancock's Answers to Interrogatories in March 2006. (Joyce Aff. ¶ 16)

153.    For the sake of full disclosure, it would have been fair for Hancock to provide a copy of the competitive benefits assessment analysis. (Bisciotti Dep. Tr. at 166:20-167:7)

**XV.    Joyce's Employment Status Between July 14, 2003 and the Present**

154.    Joyce, as with at least seventy-two other former REOD employees, became an employee of Beacon on July 14, 2003. (Dfts' Statement ¶ 46; Pl.'s Interrog. Answer No. 13; Joyce Dep. Tr. at 32:13-32:16)

155.    In total, Beacon has approximately one hundred employees who collectively undertake the day-to-day property management functions at the Tower Complex. (Bonn Dep. Tr. at 64:24-65:6)

156.    At Beacon, Joyce was not a Project Manager as his offer letter had stated. (Joyce Dep. Tr. at 32:17-32:22)  At Beacon, Joyce's titles changed from Director to Director of Engineering and Construction to Manager of Engineering/Construction. (Id. at 33:13-33:18) With Joyce's changes in title, his duties changed as well. (Joyce Dep. Tr. at 46:17-47:6)

157.    While employed by Beacon, Joyce's interaction with Hancock was limited to him serving as Beacon's representative on Hancock's construction projects. (Joyce Dep. Tr. at 37:15-38:2, 48:18-49:4)  Joyce had no supervisory authority over any Hancock employee after he became employed by Beacon. (Id. at 49:5-49:7)

158.    Joyce began looking for another job, in part, to pursue a position with a property management company with competitive benefits in the property management industry. (Id. at 40:21-41:6)

159.    Joyce resigned from Beacon in June 2006 to accept a position at Liberty Mutual. (Joyce Dep. Tr. at 33:2-33:7)  As opposed to Beacon, Liberty Mutual offers its employees a defined benefit pension plan, a severance plan and four weeks vacation. (Joyce Dep. Tr. at

44:11-44:23) Liberty Mutual also offers a higher employer match on its 401(k) plan than

Beacon. (Id.)

160.    In his new position as Project Manager with Liberty Mutual, Joyce earns a base

salary of $94,000, which is nearly $20,000 more than his last annual salary at Hancock and

initial salary at Beacon. (Joyce Dep. Tr. at 41:9-41:21, 45:23-46:1, 49:13-49:16)

                                    Respectfully submitted,

                                    DANIEL JOYCE, et al.

                                    By his attorneys,


                                    Kevin T. Peters (BBO#: 550522)
                                    kpeters@toddweld.com
                                    Seth J. Robbins (BBO#: 655146)
                                    srobbins@toddweld.com
                                    TODD & WELD LLP
                                    28 State Street, 31st Floor
                                    Boston, MA 02109
                                    (617) 720-2626


Dated: July 25, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Fling (NEF)

and paper copies will be sent to those indicated as non registered participants on July 24, 2006.


                                    Seth J. Robbins

Date: July 25, 2006

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DANIEL JOYCE,<br>Individually and on behalf of a class of others<br>similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>JOHN HANCOCK FINANCIAL SERVICES,<br>INC. SEVERANCE PAY PLAN and JOHN<br>HANCOCK FINANCIAL SERVICES, INC.,<br>as Administrator and Fiduciary of the John<br>Hancock Financial Services, Inc. Severance<br>Pay Plan<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.05-11428 – WGY |

## NOTICE OF MANUAL FILING OF EXHIBITS TO
## PLAINTIFF'S LOCAL RULE 56.1 STATEMENT

I, Seth J. Robbins, hereby give Notice of Manual Filing of Exhibits (1-27) to Plaintiff's

Local Rule 56.1 Statement in Support of His Cross-Motion for Partial Summary Judgment due to

the voluminous pages of exhibits attached thereto.

Respectfully submitted,

DANIEL JOYCE, et al.

By his attorneys,

Kevin T. Peters (BBO#: 550522)
kpeters@toddweld.com
Seth J. Robbins (BBO#: 655146)
srobbins@toddweld.com
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
(617) 720-2626

Dated:  July 25, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Fling (NEF) and paper copies will be sent to those indicated as non registered participants on July 25, 2006. A true copy of the Exhibits was served upon the attorney of record by first-class mail.

Seth J. Robbins

Date: July 25, 2006