UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DANIEL JOYCE,
Individually and on behalf of a class of others
similarly situated,

        Plaintiff,

    v.

JOHN HANCOCK FINANCIAL SERVICES,
INC. SEVERANCE PAY PLAN and JOHN
HANCOCK FINANCIAL SERVICES, INC., as
Administrator and Fiduciary of the John Hancock
Financial Services, Inc. Severance Pay Plan,

        Defendants.

Civil Action No. 05–11428–WGY

**DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Anthony M. Feeherry (BBO #160860)
Daniel P. Condon (BBO #547676)
Erin N. Jackson (BBO #647375)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
617.570.1000

*Attorneys for John Hancock Financial
Services, Inc. Severance Pay Plan and John
Hancock Financial Services, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ...................................................................................................... 1

BACKGROUND ........................................................................................................ 2

I.    STATEMENT OF UNDISPUTED FACTS...................................................... 2

ARGUMENT .............................................................................................................. 2

I.    HANCOCK IS ENTITLED TO A DEFERENTIAL STANDARD OF REVIEW,
      AS THERE IS NO EVIDENCE THAT THE DECISION TO DENY JOYCE
      SEVERANCE BENEFITS WAS IMPROPERLY MOTIVATED. ................................. 2

II.   JOYCE WAS PROPERLY DENIED SEVERANCE BENEFITS UNDER
      THE PLAIN TERMS OF THE PLAN, AND THE SUMMARY PLAN
      DESCRIPTION ADEQUATELY DESCRIBES THOSE TERMS IN
      COMPLIANCE WITH ERISA. ...................................................................... 5

      A.    The Terms of the Plan Govern the Operation of the Plan ......................................... 5

      B.    The Amended Complaint Failed to State a Claim Under 29 U.S.C.
            § 1022(a), and the SPD Complies with ERISA in Any Event................................... 7

            1.    Joyce Has  Failed to Demonstrate "Significant or Reasonable Reliance"
                  Upon the SPD.................................................................................... 8

III.  IN ANY EVENT, JOYCE'S WORK UNIT/BUSINESS UNIT WAS
      OUTSOURCED TO BEACON, HANCOCK'S SUCCESSOR COMPANY ................. 10

IV.   JOYCE IS INELIGIBLE FOR SEVERANCE BENEFITS UNDER
      SECTION 3.1 OF THE PLAN BECAUSE HIS EMPLOYMENT WAS NOT
      TERMINATED WITHIN THE MEANING OF THE PLAN ........................................ 12

V.    HANCOCK'S INTERPRETATION OF THE TERM "COMPETITIVE
      BENEFIT OFFERINGS" AND ITS COMPETITIVE ASSESSMENT
      ANALYSIS OF BEACON'S BENEFIT OFFERINGS WERE NOT
      ARBITRARY.. ............................................................................................... 14

VI.   AS A MATTER OF LAW, JOYCE MAY NOT ASSERT A CLAIM
      FOR BREACH OF FIDUCIARY DUTY WHERE A CLAIM FOR
      BENEFITS IS AVAILABLE. ............................................................................ 16

VII.  JOYCE'S APPEAL WAS PROPERLY REVIEWED. .................................................. 19

CONCLUSION ......................................................................................................... 20

## TABLE OF AUTHORITIES

**Federal Cases**                                                                              **Page**

*Bachelder v. Commc'ns Satellite Corp.,*
    837 F.2d 519 (1st Cir. 1988)..............................................................................8, 9, 14

*Bellino v. Schlumberger Technologies, Inc.,*
    944 F.2d 26 (1st Cir. 1991) ....................................................................... 13

*Bowman v. Firestone Tire & Rubber Co.,*
    724 F. Supp. 493 (N.D. Ohio 1989)........................................................... 13

*Burke v. Kodak Retirement Income Plan,*
    336 F.3d 103 (2d Cir. 2003) ........................................................................ 8

*Edes v. Verizon Commc'ns, Inc.,*
    417 F.3d 133 (1st Cir. 2005)........................................................................ 1

*Fenton v. John Hancock Mut. Life Ins. Co.,*
    400 F.3d 83 (1st Cir. 2005) .................................................................... 4, 8

*Firestone Tire & Rubber Co. v. Bruch,*
    489 U.S. 101 (1989).............................................................................13, 16

*Fletcher v. Tufts Univ.,*
    367 F. Supp. 2d 99, 116 (D. Mass. 2005)................................................15, 18

*Fox v. PNC Fin. Servs. Group, Inc.,*
    37 EBC (BNA) 2316 (E.D. Pa. 2006) ..................................................... 5, 8

*Glista v. Unum Life Ins. Co. of Am.,*
    378 F.3d 113 (1st Cir. 2004)........................................................................ 2

*Govoni v. Bricklayers, Masons and Plasterers Int'l Union of Am., Local No. 5,*
    732 F.2d 250 (1st Cir. 1984)................................................................... 8, 10

*Harper v. R.H. Macy & Co., Inc.,*
    920 F.2d 544, 545 (8th Cir. 1990) ............................................................ 13

*Holland v. Burlington Indus., Inc.,*
    772 F.2d 1140, 1149 (4th Cir. 1985).......................................................13, 14

*Janeiro v. Urological Surgery Prof'l Assoc.,*
    Nos. 05-2150 & 05-2208, ____ F.3d ____, 2006 WL 224169
    (1st Cir. Aug. 7, 2006) ............................................................................ 4

**Page**

*Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech. Inc.*,
  125 F.3d 794, 798 (9th Cir. 1997) .................................................................... 4

*LaRocca v. Borden, Inc.*,
  276 F.3d 22 (1st Cir. 2002) ...................................................................16, 17

*Leahy v. Raytheon*,
  315 F.3d 11 (1st Cir. 2002) ......................................................................... 4

*Lesman v. Ransburg Corp.*
  719 F. Supp. 619, 621 (W.D. Mich. 1989),
  *aff'd*, 911 F.2d 732 (6th Cir. 1990)........................................................... 13

*Mauser v. Raytheon Co. Pension Plan for Salaried Employees*,
  239 F.3d 51 (1st Cir. 2001) ...................................................................8, 9, 10

*McKnight v. Southern Life and Health Insurance Co.*,
  758 F.2d 1566 (11th Cir. 1985) ...................................................................... 6

*Rowe v. Allied Chem. Hourly Employee Pension Plan*,
  915 F.2d 266, 269 (6th Cir. 1990) ............................................................. 13

*Stahl v. Tony Bldg. Materials, Inc.*,
  875 F.2d 1404 (9th Cir. 1989) .................................................................. 6, 8

*Sunbeam-Oster Co., Inc. Group Benefits Plan for Salaried
  & Non-Bargaining Hourly Employees v. Whitehurst*,
  102 F.3d 1368, 1375 (5th Cir. 1996).......................................................5, 6, 8

*Watson v. Deaconess Waltham Hospital*,
  298 F.3d 102 (1st Cir. 2002)..................................................................16, 18

*Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan*,
  402 F.3d 67, 74 (1st Cir. 2005)..........................................................2, 4, 5

iii

**Federal Statutes**

29 U.S.C. § 1022 .................................................................................................. 8

29 U.S.C. § 1022(a) ........................................................................................5, 7, 8

29 U.S.C. § 1132(a)(1)(B) ................................................................................... 17

29 U.S.C. § 1132(a)(3).....................................................................................16, 17

29 C.F.R. § 2520.102-2........................................................................................ 8

**Other Authorities**

Reporting and Disclosure Under ERISA, Preamble,
   40 Fed. Reg. (Dep't of Labor Aug. 15, 1975) ............................................. 14

## INTRODUCTION

The John Hancock Severance Pay Plan (the "Plan") is the document that controls the terms under which severance benefits are granted to employees of John Hancock Financial Services, Inc. ("Hancock").  (*See* Am. Compl., Ex. A, art. I; App. In Supp. of Defs.' Mot. for Summ. J. ("App."), Ex. 2 at JH 001098; Defs.' Statement of Undisputed Facts in Supp. of Defs.' Mot. for Summ. J. ("Facts") ¶¶ 25, 26.)  Despite this undisputed fact, Joyce makes no attempt in his Memorandum in Opposition to Defendants' Motion for Summary Judgment and in Support of His Cross-Motion for Partial Summary Judgment ("Joyce's Memorandum" or "Pl.'s Mem.") to analyze or argue for benefits under the terms of *the Plan*.  Rather, throughout his Memorandum, Joyce attempts to divert the Court's focus from the terms of the Plan to Joyce's interpretation of the Summary Plan Description ("SPD").  The reasons for this are both simple and obvious; under the plain terms of the Plan, Joyce is not eligible for severance benefits for two separate and independent reasons: (1) he accepted a position as an employee with Hancock's Successor Company, Beacon Capital Partners Management, LLC ("Beacon") (Am. Compl., Ex. A, § 3.2(d); *see also* Defs.' Mem. of Law in Supp. of Defs.' Mot. for Summ. J. ("Defendants' Memorandum" or "Defs.' Mem."), Section II); *Edes v. Verizon Commc'ns, Inc.*, 417 F.3d 133 (1st Cir. 2005); and (2) he was offered a comparable position by Hancock's Successor Company, Beacon (Am. Compl., Ex. A, § 3.2(c); *see also* Defs.' Mem., Section III.C.).

While Joyce's Memorandum is styled in part as an "Opposition to Defendants' Motion for Summary Judgment," Plaintiff does not respond to numerous arguments in Defendants' Memorandum, including Sections II., IV., V., VI., and VII.  Accordingly, those arguments will not be re-addressed here, but are incorporated as if fully set forth herein by reference.  Moreover, what Joyce does argue in his Memorandum has no merit for all of the reasons discussed herein.

1

## BACKGROUND

### I.    STATEMENT OF UNDISPUTED FACTS

Please see Defendants' Statement of Undisputed Facts in Support of Defendants' Motion for Summary Judgment, which was filed on July 7, 2006.

## ARGUMENT

### I.    HANCOCK IS ENTITLED TO A DEFERENTIAL STANDARD OF REVIEW, AS THERE IS NO EVIDENCE THAT THE DECISION TO DENY JOYCE SEVERANCE BENEFITS WAS IMPROPERLY MOTIVATED.

Where, as in the instant case, "the ERISA plan grants the plan administrator discretionary authority in the determination of eligibility for benefits, the administrator's decision must be upheld unless it is arbitrary, capricious, or an abuse of discretion." *Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan*, 402 F.3d 67, 74 (1st Cir. 2005); (*see also* Defs.' Mem. at 4–5). Despite this well-established principle, Joyce argues that Hancock's denial of severance benefits to Joyce should be singled out for unwarranted scrutiny. (Pl.'s Mem. at 4–5.) Joyce makes this assertion on the basis of an alleged economic conflict of interest that he attempts to contrive from inconsequential facts and unsupported contentions. His claim is baseless.

Joyce points to the fact that Hancock is the administrator of its own Plan as evidence of a conflict of interest, implicitly accusing Hancock of self-dealing to avoid paying out claims. Under the law of the First Circuit, however, "'[t]he fact that [ ] the plan administrator [ ] will have to pay [the plaintiff's] claim[ ] out of its own assets does not change [the arbitrary and capricious] standard of review.'" *Wright*, 402 F.3d at 74 (alterations in original) (*quoting Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113, 125–26 (1st Cir. 2004) (noting that simply because a plan administrator has to pay a claim does not deprive the administrator of discretion when the terms of the plan grant discretion)).

2

Joyce also asserts that Hancock had a conflict of interest when considering Joyce's eligibility for severance benefits because it sold assets to Beacon and had a purported "incentive to transition its former employees to Beacon." (Pl.'s Mem. at 4.)  In support of this allegation, Joyce states that "Hancock and Beacon entered into a $910 million real estate transaction." [1] (*Id.*)  But the sale of the Tower Complex to Beacon Capital Partners, LLC was consummated— with the $910 million already in Hancock's hands—in March 2003, long before Hancock determined in May 2003 that Joyce was not entitled to severance benefits.  (Facts ¶¶ 32, 91, 92.)

Likewise, Joyce's suggestion that Hancock somehow sought to force Joyce into employment with Beacon by denying him severance benefits is unfounded.  Not only is there absolutely no evidence to support this claim—as demonstrated by the fact that Joyce cites none in his brief—but the evidence that does exist belies what Joyce argues.  Contrary to Joyce's claims, Hancock did not "provide" Joyce or any other employee with "only 2 weeks to find another job" before Beacon's job offers expired.  (Pl.'s Mem. at 4.)  First, Hancock informed Joyce in November 2002—well before the sale of the Tower Complex in March 2003—that his position might be eliminated as a result of the sale of the Tower Complex.  (Facts ¶ 31.)  This put Joyce on notice that he should look for another job.  Second, following the sale of the Tower Complex, Joyce continued on as Hancock's employee until July 14, 2003—a period of four months beyond the date of the sale of the Tower Complex.  (*Id.* ¶¶ 6, 46.)  Third, *Beacon*—not Hancock—chose the date that its job offers would expire, and Beacon set this date for June 13, 2003, five and a half weeks after it made its initial offer of employment to Joyce.  (*Id.* ¶¶ 35, 37.)

Joyce also recites a flimsy list of alleged problems with Hancock's administration of the Plan in an attempt to bootstrap a claim that Hancock has an actual conflict of interest.  (Pl.'s

---

[1]    Significantly, this is the *only* fact that Joyce cites in his entire argument in support of a less deferential standard of review.  (*See* Pl.'s Mem. at 4–5.)

Mem. at 4–5.)  "To affect the standard of review, however, a conflict of interest must be real. A chimerical, imagined, or conjectural conflict will not strip the fiduciary's determination of the deference that otherwise would be due."  *Leahy v. Raytheon Co.,* 315 F.3d 11, 16 (1st Cir. 2002))**;** *Wright*, 402 F.3d at 74.  Joyce's allegations do not amount to "material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self interest caused a breach of the administrator's fiduciary obligations."  *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech. Inc.*, 125 F.3d 794, 798 (9th Cir. 1997). Indeed, the innocuousness of Joyce's speculative allegations of conflict is apparent when they are compared to the concrete evidence of genuine conflict in *Janeiro v. Urological Surgery Professional Assoc.*, Nos. 05-2150 & 05-2208, ___ F.3d ___, 2006 WL 2241659 (1st Cir. Aug. 7, 2006).  In *Janeiro*, the plan trustee was found to have a conflict of interest where, in summary, he (1) held great personal animus toward the plaintiff participant, who was the trustee's former business partner; (2) delayed paying benefits to the plaintiff for nearly two years until the fifth valuation of plan assets came in at $195,036 less than the first valuation when plaintiff could have received his benefits; (3) owned 92 percent of the remaining plan assets and would have suffered a loss as a result of plaintiff's withdrawal of his share of the assets; and (4) sought revaluation out of fear of litigation based on earlier breaches of fiduciary duty.  2006 WL 2241659, at *2–3.  Nothing that Joyce alleges against Hancock even comes close to this scenario.

Accordingly, where Joyce has made no showing that Hancock's decision to deny him severance benefits was improperly motivated, a less deferential standard of review is not warranted.  *Fenton v. John Hancock Mut. Life Ins. Co.,* 400 F.3d 83, 90 (1st Cir. 2005) (finding that "John Hancock does not suffer from a conflict of interest warranting less deferential review," as plan participants had failed to show that "an adverse determination was improperly

motivated"); *Wright*, 402 F.3d at 78 (finding that the "arbitrary and capricious standard' was properly applied where plaintiff had "failed to establish any improper motivations" of the plan administrator despite asserting an extensive list of allegations).

**II.     JOYCE WAS PROPERLY DENIED SEVERANCE BENEFITS UNDER THE PLAIN TERMS OF THE PLAN, AND THE SUMMARY PLAN DESCRIPTION ADEQUATELY DESCRIBES THOSE TERMS IN COMPLIANCE WITH ERISA.**

### A. The Terms of the Plan Govern the Operation of the Plan.

In his memorandum, Joyce launches a dogged campaign to recast Hancock's severance benefits evaluation as one that must proceed exclusively according to the language set forth in the SPD. (*See generally* Pl.'s Mem.) According to the SPD itself, however, the terms of the Plan document, not the SPD, "legally govern the operation of the Plan" and "if [the] summary differs in any way from the terms of the plan document[], the terms of the plan document[] shall control." (App., Ex. 2 at JH 001098; Facts ¶ 25, ¶ 26; *see also* Defs.' Mem. at 6–7.) Thus, Joyce's persistent attempt to ensconce the occurrence of a sale or an outsourcing of a Hancock business unit—two mere examples or circumstances offered in the SPD of when the Plan Amendment would apply (Facts ¶ 16)—as absolute prerequisites for Hancock to be able to apply Sections 3.2(c) and (d) of the Plan, defies the very terms of both the Plan and the SPD.

In addition, where the SPD is only a *summary* description intended to be "*sufficiently* accurate and comprehensive to *reasonably* apprise . . . participants of their rights and obligations under the plan," 29 U.S.C. § 1022(a) (emphases added), it would be wholly unreasonable to expect that the SPD would enumerate every possible employment situation to which the language of Sections 3.2(c) and (d) of the Plan would apply. And the law has set forth no such requirement. *See, e.g.*, *Fox v. PNC Fin. Servs. Group, Inc.*, 37 EBC (BNA) 2316, 2320 (E.D. Pa. 2006) ("Nothing in ERISA requires an SPD to address every possible employment scenario."); *Sunbeam-Oster Co., Inc. Group Benefits Plan for Salaried & Non-Bargaining Hourly Employees*

5

*v. Whitehurst,* 102 F.3d 1368, 1375 (5th Cir. 1996) (SPD need not "expressly address every

conceivable factual variation of recovery"); *Stahl v. Tony's Bldg. Materials, Inc.*, 875 F.2d 1404,

1408 (9th Cir. 1989) (SPD is not required to discuss "every imaginable situation" that might

affect participant's rights to benefits, but should give ordinary employee [a] sense when there is a

danger that benefits could be lost or diminished").[2]

Joyce's claim that Hancock admitted that the SPD explicitly requires that a sale or

outsourcing of a business unit must occur before Section 3.2(c) of the Plan applies is simply

false.  (Pl.'s Mem. at 7.)  Hancock clearly testified that the language of the Plan governs and that

the comparable job analysis of Section 3.2(c) of the Plan applies "even in the event that there is

not a sale or outsourcing of a business unit."  (Supplemental App. in Supp. of Defs.' Mot. for

Summ. J. ("Supplemental App."), Bisciotti Dep. Tr. at 41:12–41:17; App., Bisciotti Dep. Tr. at

42:4, 44:10-44:14.)  After hearing this testimony, Joyce's counsel explicitly instructed Hancock

to "push the Plan aside for a second" and interpret the SPD "alone," without reference to the Plan

(*id.* at 44:21–45:5)—an instruction and interpretation that is forbidden by the terms of the SPD

(*see* App., Ex. 2 at JH 001098; Facts ¶¶ 25, 26; *see also* Defs.' Mem. at 6–7).  Joyce now

---

[2]     Joyce cites *McKnight v. Southern Life and Health Insurance Co.*, 758 F.2d 1566 (11th Cir. 1985) to support his claim that the language of the SPD governs in this case.  (Pl.'s Mem. at 6–7.)  His reliance on *McKnight*, however, is misplaced, and his analysis of the case is faulty.  In *McKnight*, the court considered whether the plaintiff was entitled to retirement benefits for two isolated segments of employment followed by breaks in service with her employer.  758 F.2d at 1568.  At the outset, the court found that "[a]lthough the plan and summary [were] worded differently" as to how breaks in service should be counted, "the result [was] the same" under both the plan and the summary.  *Id.* at 1569.  The court concluded that "[u]nder either analysis," the plaintiff was entitled to retirement benefits for the two isolated segments of service at issue.  *Id.*  Thus, the court did not need to decide whether the pension plan or the summary governed to resolve the matter, and any further analysis was dicta.
    Interestingly, the district court had "applied a literal interpretation of the relevant provisions of [the] pension plan . . . and found that [the plaintiff] was entitled to employment credit."  *Id.* at 1570.  "A subsequent analysis of the plan summary . . . which [parallels the plan] confirmed this result."  *Id.*  Thus, the summary was analyzed only *after* the district court found that the plan language did not comport with the administrator's decision.
    In addition, Joyce erroneously claims that the court "*subjected* the summary plan to a reasonably clear and literal interpretation" and then argues that the same should be done in this case.  (Pl.'s Mem. at 6 (emphasis added).)  The *McKnight* court, however, simply stated that the summary "*was subject to* a reasonably clear and literal interpretation," *McKnight*, 758 F.2d at 1570 (emphasis added), meaning that the summary's language was clear—not that the court imposed what it believed to be a clear and literal interpretation of that language.

6

attempts to exploit the response to his counsel's limited question—entirely out of context and
without any explanation concerning how his counsel extracted the response—so as to claim that
Hancock admitted that Section 3.2(c) of the Plan applies only in the context of a sale or
outsourcing of a Hancock business unit.  Such an admission was never made.

   In short, Hancock is legally bound by the SPD and the Plan to apply the terms of the
Plan, as defined by the Plan and interpreted by Hancock.  (App., Ex. 2 at JH 001098; Facts ¶¶ 25,
26; Defs.' Mem. at 6–7.)  As such, Hancock determined that Beacon's job offer to Joyce was for
a comparable position with a Successor Company and that Joyce, therefore, was not entitled to
severance benefits under the Plan.  (Facts ¶¶ 48–91; Defs.' Mem., Section III.C.)

## B.  The Amended Complaint Failed to State a Claim under 29 U.S.C. § 1022(a), and the SPD Complies with ERISA in Any Event.

   Joyce argues that 29 U.S.C. § 1022(a) has been violated because the SPD identified only
two examples or circumstances in which the Plan Amendment would apply (*i.e.*, the sale or the
outsourcing of a business unit), rather than listing the universe of possible scenarios in which the
Plan Amendment would apply.  (Pl.'s Mem. at 18–20.)  Count VI of the Amended Complaint,
however, does not plead that Defendants have violated 29 U.S.C. § 1022(a) by failing to list all
of the circumstances in which the Plan Amendment would apply.  (Am. Compl. ¶¶ 131–135.)
Rather, Plaintiff pleads there that Defendants violated 29 U.S.C. § 1022(a) by failing to write *the
Plan and the Plan Amendment* in a manner that was understandable to Joyce by failing to define
the term "competitive benefit offerings."  (*Id.*)  Joyce should not now be permitted to press a
different claim for alleged violation of 29 U.S.C. § 1022(a) from that which he continued to
plead as Count VI even after amending his original Complaint.[3]

---

[3]       Furthermore, please see Section VI of Defendants' Memorandum for a full discussion concerning why
Count VI, as pleaded, fails to state a cause of action.

Joyce's new claim also fails because the SPD does not contain "different terms" from the Plan (Pl.'s Mem. at 18). The SPD merely explained the term "Successor Company" that is used in the Plan by providing some examples of when the Plan Amendment would apply, such as "[i]n the event of the sale or outsourcing of a business unit." (Facts ¶ 16). Moreover, while Hancock did its best to make the Plan language understandable to the average participant, Hancock was not legally obligated to describe exhaustively every circumstance that could be envisioned by the terms used in the Plan. 29 U.S.C. § 1022; 29 C.F.R. § 2520.102-2; (*see also* Defs.' Mem. at 15–16); *Fox*, 37 EBC (BNA) at 2320; *Stahl*, 875 F.2d at 1408; *Sunbeam-Oster*, 102 F.3d at 1375.

1. ***Joyce Has Failed to Demonstrate "Significant or Reasonable Reliance" Upon the SPD.***

Even if Joyce were able to prove his new-found claim that the SPD violated 29 U.S.C. § 1022(a), he would not be entitled to relief because he has failed to demonstrate "significant or reasonable reliance" upon the SPD as required under First Circuit law. *Mauser v. Raytheon Co. Pension Plan for Salaried Employees*, 239 F.3d 51, 55 (1st Cir. 2001) (stating that relief for violation of 29 U.S.C. § 1022 "is only appropriate if the participant demonstrates significant or reasonable reliance on the Plan Summary"); *Fenton*, 400 F.3d at 88.[4] It is axiomatic, after all, that Joyce could not have reasonably relied on the SPD where the SPD explicitly instructed him not to and to consult the Plan itself. (*See* App., Ex. 2 at JH 001098; Facts ¶¶ 25, 26; *see also* Defs.' Mem. at 6–7.) Nevertheless, in his brief, Joyce claims that he is entitled to benefits

---

[4]       While Joyce claims that the First Circuit allows an employee to recover upon a showing of "*either* reliance or prejudice" (Pl.'s Mem. at 19 (emphasis in original)), *Fenton* and *Mauser*, which were decided in 2005 and 2001 respectively, clearly indicate that the First Circuit has shifted its focus solely to whether an employee relied on the SPD. *Fenton*, 400 F.3d at 88; *Mauser*, 239 F.3d at 55. Thus, Joyce's citation to *Burke v. Kodak Retirement Income Plan*, 336 F.3d 103, (2d Cir. 2003), a Second Circuit case discussing prejudice, is inapposite as it is not the law of the First Circuit. Moreover, as the discussion above makes clear, Joyce cannot demonstrate prejudice in any case. *Bachelder v. Commc'ns Satellite Corp.*, 837 F.2d 519, 523 (1st Cir. 1988); *Govoni v. Bricklayers, Masons and Plasterers Int'l Union of Am., Local No. 5*, 732 F.2d 250, 252 (1st Cir. 1984).

because he "continued to work for Hancock" with the expectation that the only circumstances under which he would not receive severance benefits would be if a sale or outsourcing of a business unit occurred at Hancock. (Pl.'s Mem. at 19–20.) This assertion is both insufficient as a matter of law and false as a matter of fact. As a matter of law, "[i]t is not enough to show a 'mere expectation' that certain benefits will materialize; action must have been taken in reliance on reasonable expectations formed after reading the Plan Summary." *Mauser*, 239 F.3d at 55. Joyce's adherence to the *status quo* by continuing to work for Hancock, without even exploring *any* job offers (Facts ¶¶ 42–44), does not constitute "action" of any sort on his part.

As a matter of fact, Joyce's testimony reveals that his continued employment with Hancock was "for reasons unrelated" to the SPD. *See Bachelder*, 837 F.2d at 523 (finding no significant reliance on misleading example in summary plan description where plaintiffs' choice of action with regard to employer's stock option plan was unrelated to the faulty SPD); *Govoni*, 732 F.2d at 252 (finding no significant reliance where plaintiff's decision to take a break from employment was not based upon faulty SPD). While Joyce claims that he "refrained from applying" for other jobs because Hancock represented that Beacon's benefits were competitive (Pl.'s Mem. at 16), his own testimony illustrates that this claim is pure bunk. Although Joyce could have looked for a job other than the position that he accepted with Beacon, Joyce *chose* not to do so because he "was too busy working." (App., Joyce Dep. Tr. at 44:6–44:10; Facts ¶ 42.) This was Joyce's choice even though he had more than six months in which to conduct a job search. That is, Joyce was notified by Hancock as early as November 2002 that his position might be eliminated as a result of the sale of the Tower Complex; he received the job offer from Beacon on May 5, 2003; and he did not accept the offer until June 13, 2003. (*Id.* ¶¶ 31, 35, 37, 41.) Thus, the real reason that Plaintiff ended up continuing to work for Hancock and accepting

9

a job with Beacon rather than seeking other employment is that his failure to take any action to find another job ensured that he had no other options. *See Mauser*, 239 F.3d at 56 (finding no reliance on SPD where employee had rejected a more lucrative job before he had even applied to defendant employer based on rumors that defendant's pension plan was better).

Accordingly, Counts I, IV, and VI should be dismissed with prejudice.

## III.    IN ANY EVENT, JOYCE'S WORK UNIT/BUSINESS UNIT WAS OUTSOURCED TO BEACON, HANCOCK'S SUCCESSOR COMPANY.

Even if the SPD were controlling, an outsourcing of Joyce's work unit/business unit, the "multi-shop trade" group (Facts ¶¶ 12, 52, 53), to Beacon as Hancock's Successor Company indeed occurred. Outsourcing of a business unit occurs "when the services performed by a work unit [are] transferred to a Successor Company." (*Id.* ¶ 59.) "[O]utsourcing refers to work being transferred to an entity unaffiliated with John Hancock and performing the same services or functions that were performed prior to that transfer." (*Id.*) As a result, the Hancock employees transferred "would provide services to John Hancock as employees of another company." (*Id.*)

When Hancock was the owner and landlord of the Tower Complex, employees in Joyce's work unit/business unit provided building operations and management services for the Tower Complex. (*See id.* ¶¶ 2, 51, 52, 53.) When Hancock sold the Tower Complex, the majority of these functions were no longer Hancock's responsibility, as Beacon was in charge of maintaining and operating the Tower Complex buildings. (*Id.* ¶ 60.) Anticipating this change prior to the sale of the Tower Complex, Hancock stated in its Term Sheet for the Purchase and Sale Agreement for the Tower Complex that Hancock employed "several employees in its real estate operations and security area who may be available for employment by a prospective Purchaser"; that "[b]ids should include the potential interest of a prospective Purchaser to hire these employees, including the anticipated number of employees and the area of specialty"; and that

10

"[b]ids [would] be evaluated in part on the nature and extent of interest in hiring some or all of these employees." (App., Ex. 9, at 94; Facts ¶ 61.)  The implication of these statements was that "Hancock would look favorably upon a bid if someone hired the employees."  (*Id.*)

Moreover, as part of its bid, Beacon informed Hancock that Beacon's "desire would be to bring over the property management team currently in place to the extent those employees are not retained by Hancock."  (App., Ex. 10; Facts ¶ 62.)  William Bonn, Senior Managing Director and General Counsel of Beacon Capital Partners, LLC, also testified that Beacon sought to take on Hancock's employees who ran building operations for the Tower Complex.  (App., Bonn Dep. Tr. at 35:12–36:8 (stating that Beacon inquired as to whether any Hancock employees "who were involved in the management of the Tower Complex" would be available to hire and noting that such people "would no longer be needed by John Hancock after we took over the management of the Tower Complex because that's what those people did" at Hancock), 62:18–63:22; Facts ¶ 63.)  Indeed, Joyce too has conceded that "Beacon wanted employees who knew how to operate the building, and who knew the intricacies of the buildings."  (Pl.'s Mem. at 4.)

Thus, when Beacon became the new owner and landlord of the Tower Complex, Beacon assumed responsibility for the building services that Hancock previously performed (*id.* ¶ 64) and made job offers to and hired employees in Joyce's work unit/business unit to perform these functions (App., Bonn. Dep. Tr. at 63:23–64:10, 92:16–92:18 ("The people that we hired from Hancock we hired in order to manage the complex . . . ."); Facts ¶ 64).  According to Hancock's reasonable and rational interpretation of the Plan, this "constituted an outsourcing."  (*Id.* ¶ 65.)

Joyce points to Mr. Bonn's testimony that he did "not recall anyone talking about outsourcing" (App., Bonn Dep. Tr. 35:11–35:12) as if it is evidence that an outsourcing did not occur as a matter of fact within the meaning of the SPD.  The recollection of Beacon's employee

as to whether the term "outsourcing" was used in negotiations with Hancock is irrelevant to an evaluation of whether an outsourcing actually occurred within the meaning of the SPD. Having never been an employee of Hancock, Mr. Bonn is simply unqualified to speak about Hancock's internal human resource ("HR") terminology and evaluations and the meaning of its Plan.

As Hancock's experienced career HR professionals define it, "outsourcing generally would look to a third party to provide a service to [Hancock] or for employees that were performing a service for the company as employees of the company to provide those services by way of working for another employer that we would outsource to, and those employees would render services back to [Hancock]." (App., Mongeau Dep. Tr. at 40:19–41:3; *see also* Facts ¶¶ 20, 21.) Consistent with this definition, the transition of the specialized "multi-shop trade" group—Joyce's work unit/business unit (Facts ¶ 53)—to Beacon to perform building services in the Tower Complex from which Hancock benefited as a major tenant was appropriately regarded by Hancock as an outsourcing. (*See, e.g.*, Supplemental App., Mongeau Dep. Tr. at 96:9–97:5; App., DiCicco Dep. Tr. at 131:7–132:10.) Thus, Counts I, IV, and VI should be dismissed.

## IV. JOYCE IS INELIGIBLE FOR SEVERANCE BENEFITS UNDER SECTION 3.1 OF THE PLAN BECAUSE HIS EMPLOYMENT WAS NOT TERMINATED WITHIN THE MEANING OF THE PLAN.

Pursuant to the terms of the Plan, "a person is eligible for benefits under [the] Plan if[, in addition to other criteria,] . . . his employment is terminated by the Company or a participating Subsidiary as part of a reduction in staff . . . ." (Am. Compl., Ex. A, § 3.1 at 4–5.) However,

> [e]mployment is not terminated for purposes of [the] Plan if an employee . . . (c) is offered a comparable position, as determined by the Company, as an employee with, or provides services in any capacity to, a Successor Company, or (d) accepts any position as an employee with, or provides services in any capacity to, a Successor Company.

(*Id.*, §3.2(c) & (d).) For the reasons discussed in Sections II., III.B., and III.C. of Defendants' Memorandum, each of the criteria of Sections 3.2(c) and (d) of the Plan have been satisfied.

Accordingly, Joyce's employment was not terminated within the meaning of the Plan, and Joyce is ineligible for severance benefits.

In light of the explicit policies set forth in Sections 3.2(c) and (d) of the Plan, Plaintiff's reliance on *Bellino v. Schlumberger Technologies, Inc.*, 944 F.2d 26 (1st Cir. 1991) is inapposite. In *Bellino*, the First Circuit held that the plaintiff employees were entitled to severance benefits because their involuntary terminations from defendant employer Schlumberger were caused by lack of work, thus constituting a reduction in force within the meaning of Schlumberger's ERISA plan. *Id.* While Schlumberger claimed that its "policy was to deny severance benefits to departing employees who are offered comparable jobs at comparable pay" by another employer, "that policy did not appear explicitly in Schlumberger's written ERISA plan." *Id.* at 28. Thus, the alleged policy was contrary to the plain language of Schlumberger's severance plan. *Id.* at 29, 30. By contrast, Hancock's Plan explicitly states that severance benefits will not be paid where an employee is offered a comparable job by, or accepts any job with, a Successor Company. (Am. Compl., Ex. A, §3.2(c) & d.) As such, the situation here is nothing like the facts in *Bellino*. Moreover, Hancock's proper denial of severance benefits to Joyce based upon the terms of the Plan is supported by the findings of courts in numerous other cases.[5]

---

[5]    *See, e.g., Harper v. R.H. Macy & Co., Inc.,* 920 F.2d 544, 545 (8th Cir. 1990) ("the plan's language does not permit an interpretation that employees who continue to work without interruption on comparable terms for the purchaser of their employer's business have been 'permanently terminated' by the sale"); *Rowe v. Allied Chem. Hourly Employee Pension Plan,* 915 F.2d 266, 269 (6th Cir. 1990) ("it is clear that, even under a *de novo* interpretation of the Allied Plan, the . . . plaintiffs' separation from Allied and immediate employment with Armco upon the sale of the Ashland Plant did not constitute a layoff" entitling plaintiffs to severance); *Holland v. Burlington Indus., Inc.,* 772 F.2d 1140, 1149 (4th Cir. 1985) (corporation did not abuse its discretion in determining that "job elimination" requirement for severance pay was not met by former employees who remained continuously employed after transfer of corporation's ownership); *Bowman v. Firestone Tire & Rubber Co.,* 724 F. Supp. 493, 502 (N.D. Ohio 1989) (severance denied to former employees of company division sold to another company where former employees took jobs with new company and where employee handbook explicitly exempted such individuals from receiving severance); *Lesman v. Ransburg Corp.,* 719 F. Supp. 619, 621 (W.D. Mich. 1989) (individuals whose employment was terminated due to sale of entire business and who soon thereafter accepted comparable positions with purchaser were not entitled to severance pay from former employer since sale did not constitute "reduction in work force" within meaning of ERISA plan), *aff'd,* 911 F.2d 732 (6th Cir. 1990).

LIBA/1719624.2

V.    **HANCOCK'S INTERPRETATION OF THE TERM "COMPETITIVE BENEFIT OFFERINGS" AND ITS COMPETITIVE ASSESSMENT ANALYSIS OF BEACON'S BENEFIT OFFERINGS WERE NOT ARBITRARY.**

When Hancock interpreted the terms of the Plan Amendment, it further defined the term "competitive benefit offerings" that was used in the SPD. Hancock interpreted "competitive benefit offerings" to mean benefits that are competitive within the industry of the Successor Company from which a given employee receives a job offer. (Facts ¶¶ 20, 21, 27.) This interpretation was consistent with the purpose of the Plan, which is to bridge an employee who is involuntarily terminated to future employment within his industry. (*Id.* ¶ 5); *Bachelder*, 837 F.2d at 522 ("A plan must be interpreted in light of its apparent purposes, its structure and its history."); Reporting and Disclosure Under ERISA, Preamble, 40 Fed. Reg. 34,526, 34,527 (Dep't of Labor Aug. 15, 1975) (severance plans provide former employees with "temporary 'cushion' against loss of income from employment").

Joyce argues that Hancock's comparison of Beacon's benefit offerings to those of general industry employers, rather than to Hancock's benefits, was unreasonable. (Pl.'s Mem. at 13.) However, not only were Hancock's actions reasonable and rational in interpreting the term "competitive benefit offerings" as it did, but Hancock acted entirely within its authority under the terms of the Plan in doing so. Pursuant to the explicit terms of the Plan, Hancock has "the sole and exclusive right to interpret the provisions of the Plan and to determine all questions arising in connection with the administration, interpretation and application of the Plan." (Am. Compl., Ex. A, § 7.1; Facts ¶ 13.) Furthermore, "[w]ith respect to issues not addressed in the provisions of the Plan, or where such provisions are ambiguous, . . . the Company or its designee shall have discretionary authority to make the determination." (Am. Compl., Ex. A, § 7.1; Facts ¶ 13.) Thus, the Company, through its working group of HR professionals, had discretion to interpret the undefined term of "competitive benefit offerings," as it is one of the three

14

components of the term "comparable position" in the Plan Amendment and "comparable job" in the SPD, and its definition of that term is entitled to deference. (*See generally* Defs.' Mem., Section III.A. (discussing arbitrary and capricious standard of review to be applied to Hancock's interpretation and application of Plan); *see also Firestone Tire*, 489 U.S. at 111 (administrator's interpretation of the Plan "will not be disturbed if reasonable").

To evaluate whether Joyce and other Hancock employees had received offers for comparable jobs from Beacon, Hancock, among other things, conducted a competitive assessment analysis of Beacon's benefit offerings to determine whether they were competitive among general industry employers.[6] Despite Hancock's professional, thoughtful, and diligent analysis, based on the tools and data of Hewitt Associates LLC ("Hewitt"), a highly reputable source within the HR industry, Joyce challenges Hancock's use of benefits data from general industry employers, as opposed to data drawn solely from property management companies. (Pl.'s Mem. at 12–14.)  As an initial matter, Hancock indeed relied on data from property management employers in that such data was included among the general industry data that Hancock utilized to the extent that it was available through Hewitt. (Facts ¶ 86.)  Moreover, while Hancock initially set out to gather information solely on the benefit offerings of employers in the property management industry, Hewitt did not have adequate data on such companies.[7] (*Id.* ¶ 87.)  In order to apply the Hewitt evaluation tool consistently, Hancock was required to broaden its focus. (*Id.*)  Even in doing so, however, Hancock relied on data gathered from a highly reputable group of employers.  For example, the data was drawn in part from "the

---

[6]    A detailed discussion of the analysis that Hancock undertook appears in Section III.C.2. of Defendants' Memorandum.

[7]    Contrary to Joyce's claim that Hancock did not provide Hewitt with a list of property management companies (Pl.'s Mem. at 14), Hancock indeed gave just such a list to Hewitt. (*See, e.g.*, App., DiCicco Dep. Tr. at 118:6–118:10; Supplemental App., DiCicco Dep. Tr. at 126:22–127:4.)

principal benefit plans for salaried employees of *960 major* U.S. employers," including "79% of

the *Fortune 100* and 55% of the *Fortune 500* companies." (Exs. to Pl.'s Local Rule 56.1

Statement in Supp. of His Cross-Mot. for Partial Summ. J., Ex. 17 (emphases added).)

Nevertheless, Joyce pumps his proverbial fist, incorrectly arguing that (1) Hancock failed

to follow internal guidelines and (2) Hancock should have called property management

companies on the telephone to ask for benefits information. First, the document to which Joyce

refers was a draft of the "Comparable Job definition" and is explicitly marked as such. (App.,

Ex. 3; App., Bisciotti Dep. Tr. at 174:1-174:17.) It was a work in progress. (Supplemental App.,

DiCicco Dep. Tr. at 86:14-87:5, 185:5–185:10 (identifying App., Ex. 3 as "a working document,

as we brainstormed ideas about how to do things and what we would be considering" and stating,

"It gave us guidelines. Guidelines are not specifics. They are approaches to things.").) Second,

putting aside the feasibility and reliability of randomly calling property management companies,

Hancock was under no obligation to conduct its competitive assessment analysis in this manner,

as long as the approach it used was reasonable and rational. (*See generally* Defs.' Mem., Section

III.A.) Moreover, had Hancock selectively utilized only certain parts of the Hewitt tool rather

than taking a consistent approach, Joyce would now be stoning Hancock for cherry-picking.

Accordingly, Counts I, IV, and VI should be dismissed with prejudice.

## VI.    AS A MATTER OF LAW, JOYCE MAY NOT ASSERT A CLAIM FOR BREACH OF FIDUCIARY DUTY WHERE A CLAIM FOR BENEFITS IS AVAILABLE.

In arguing that Hancock breached its fiduciary duty, Joyce completely ignores black-

letter ERISA law stating that a breach of fiduciary duty claim is only available to an individual

plan participant under Section 1132(a)(3) where the plaintiff does not claim to be entitled to

benefits *under the plan*. (*See* Defs.' Mem., Section V); *Watson v. Deaconess Waltham Hospital*,

298 F.3d 102, 110 (1st Cir. 2002); *LaRocca v. Borden, Inc.*, 276 F.3d 22, 29 (1st Cir. 2002)

("when the plaintiff can bring a claim for benefits under [Section 1132] a(1), . . . equitable relief would not be appropriate . . . and she *does not have a cause of action* under Section [1132] a(3)" (internal quotation marks and brackets omitted)); *Fletcher v. Tufts Univ.*, 367 F. Supp. 2d 99, 116 (D. Mass. 2005). Joyce's "breach of fiduciary duty" claim is of precisely the type that can only be brought as a benefits action under Section 1132(a)(1)(B), as the only harm claimed in the Amended Complaint is not receiving severance benefits. (*See generally* Am. Compl. ¶¶ 87–145; *see also id.* ¶ 1.) As such, under *LaRocca* and *Fletcher*, Count II must be dismissed.[8]

Even if the fiduciary breach claim could be brought, it would fail. Joyce alleges Hancock breached its fiduciary duties by misrepresenting that Joyce was ineligible for severance benefits, by stating it considered benefits data provided by property management companies, and by reporting that an HR team had worked on the "comparable job"/competitive assessment analyses. (Pl.'s Mem. at 15–17.) First, Hancock's determination that Joyce was ineligible for severance benefits was proper for the reasons stated in Section III.C. of Defendant's Memorandum. Second, as explained in Section III.C.2. of Defendant's Memorandum and Section V. above, benefits data from employers in the property management industry was included among the general industry data upon which Hancock relied for its competitive assessment analysis to the extent that it was available through Hewitt. (Facts ¶ 86.) Moreover, Joan DiCicco personally informed Joyce that the competitive assessment analysis "was against normative data—that is, what is within the range of competitive benefits offered to *employees generally or in certain industries (in this case, property management)*." (App., Ex. 13 (emphasis

---

[8]     Where Joyce's Memorandum addresses only (1) his claim for benefits under the Plan, (2) his claim that the SPD is inadequate, and (3) his claim of breach of fiduciary duty, Defendants have responded accordingly in this opposition brief. To the extent that Joyce seeks to rely on 29 U.S.C. § 1132(a)(3) for equitable relief from any other purported causes of action that he has not discussed in his Memorandum, this is also impermissible as a matter of law pursuant to *LaRocca* and *Fletcher* since a claim for benefits under 29 U.S.C. § 1132(a)(1)(B) is available to Joyce. *See LaRocca*, 276 F.3d at 29; *Fletcher*, 367 F. Supp. 2d at 116.

17

added).)  Third, contrary to Joyce's contention, the "comparable job"/competitive assessment analyses were conducted and evaluated by senior members of Hancock's benefits team—including Peter Mongeau, then-Second Vice President of Human Resource Services for Hancock; Joan DiCicco and Lisa Blake, both Human Resources Officers for Hancock at the time; and Sandra Colley, then-Director of Workforce Diversity (Facts ¶¶ 19–22, 27–29)—who "had been working collaboratively on this on a day to day basis and [were] in contact with each other via phone, e-mail and in person."  (App., Mongeau Dep. Tr. at 137:4–137:6.)

Furthermore, Joyce fails to demonstrate that he suffered any harm as a result of the purported misrepresentations.  While he claims that he was "confused and silenced" (Pl.'s Mem. at 16), the truth is that in an e-mail to Joan DiCicco on June 2, 2003—well before he accepted Beacon's job offer on June 13, 2003—Joyce articulately challenged the comparability determination that Hancock had made concerning job offers from Beacon (App., Ex. 13; Facts ¶ 93).  Joyce's clear understanding of and disagreement with Hancock's comparability determination is further evidenced by his appeal of Hancock's initial determination that he was not eligible for severance benefits and by bringing this very lawsuit.  Indeed, Plaintiff began plotting this suit against Hancock shortly after joining Beacon, marshaling a list of items that he apparently believed supported this position and seeking counsel with his cousin concerning the events surrounding Hancock's denial of severance benefits.  (Facts ¶ 94.)  Thus, Plaintiff's actions since being denied severance benefits reveal that he had the presence of mind and independence of thought to disagree with Hancock's assessment and to take action accordingly.

Moreover, as discussed in Section II.B.1. above, Joyce's alleged lack of employment options was his own fault.  Joyce continued as a Hancock employee after learning in November 2002 that the Tower Complex would be sold simply because he never bothered to put in the

18

effort to identify any other job opportunities at any point in the six months before he accepted

employment with Beacon. (Facts ¶¶ 42–44.) Thus, any alleged harm he suffered was due to his

own lack of effort in pursing other employment during than six and a half months before

accepting the Beacon offer, which ensured he had no other jobs to choose from by June 2003.

      Accordingly, Count II should be dismissed with prejudice.

## VII.  JOYCE'S APPEAL WAS PROPERLY REVIEWED.

      In a separate section of Joyce's Memorandum, he complains that Hancock's Company

Benefit Plan Appeal Committee (the "Appeal Committee") conducted an inadequate review of

the decision denying Plan benefits to Joyce and others. First, this is not an independent claim; it

is part and parcel of Joyce's claim for Plan benefits. Second, the allegation is simply untrue.

      As Brian Bisciotti of the Appeal Committee testified, the Appeal Committee conducted a

thorough review of Hancock's initial decision to deny severance benefits to Joyce and other

employees. (*Id.* ¶ 97; App., Bisciotti Dep. Tr. at 13:2–13:9 (stating that the work of the Appeal

Committee involves review of the whole case at hand, including supporting documents, and

questioning relevant individuals as necessary).) In undertaking this evaluation, the Appeal

Committee reviewed documents that were pertinent to the initial determination, including the

Plan (Am. Compl., Ex. A), the draft guidelines concerning Hancock's "comparable job"

definition (App., Ex. 3.), and the Competitive Assessment of Beacon's Benefits Package (App.,

Ex. 11). (Facts ¶ 98.) The Appeal Committee also questioned both Peter Mongeau and Joan

DiCicco about various aspects of the information provided to effected Hancock employees,

Hancock's communications with the affected employees, the work that Mr. Mongeau and Ms.

DiCicco had performed, the sources upon which they relied, and the conclusions that had been

reached. (*Id.* ¶ 99.) In addition, Mr. Bisciotti reviewed case law concerning how the terms

"comparable job" and "comparable position" have been defined and applied in the context of other employers' severance plans. (*Id.* ¶ 100.) By the time the Appeal Committee had completed its consideration of the appeal, they had conducted three separate meetings, undertaken in-depth review of pertinent documents, questioned the initial decision-makers, and conducted outside legal research. (*Id.* ¶ 101.)

Upon reaching its conclusion that Hancock had properly denied severance benefits to Joyce and other Hancock employees who had appealed the initial determination, the Appeal Committee completed its work by writing a letter to the appellants that, as required by Section 7.6 of the Plan, set forth the specific reasons for the denial, as well as the specific provision of the Plan upon which the Appeal Committee had based its decision. (Am. Compl., Ex. D; Facts ¶ 102.)

Accordingly, Counts I, IV, and VI should be dismissed.

## <u>CONCLUSION</u>

For the reasons set forth above and in Defendants' Memorandum, Defendants request that the Court enter summary judgment in their favor on all Counts of the Amended Complaint.

Respectfully submitted,

JOHN HANCOCK FINANCIAL
SERVICES, INC. SEVERANCE PAY
PLAN and JOHN HANCOCK FINANCIAL
SERVICES, INC.,

By their attorneys,

*/s/ Erin N. Jackson*_____
Anthony M. Feeherry (BBO #160860)
Daniel P. Condon (BBO #547676)
Erin N. Jackson (BBO #647375)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
617.570.1000

Dated: August 14, 2006

20

## <u>CERTIFICATE OF SERVICE</u>

I, Erin N. Jackson, hereby certify that on August 14, 2006 this DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT was filed through the ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on this date.


Dated: August 14, 2006                          */s/ Erin N. Jackson*
                                                Erin N. Jackson
                                                GOODWIN PROCTER LLP
                                                Exchange Place
                                                Boston, MA 02109-2881
                                                617.570.1000

21