UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DANIEL JOYCE,
Individually and on behalf of a class of others
similarly situated,

              Plaintiff,

     v.

JOHN HANCOCK FINANCIAL SERVICES, INC.
SEVERANCE PAY PLAN and JOHN HANCOCK
FINANCIAL SERVICES, INC., as Administrator
and Fiduciary of the John Hancock Financial
Services, Inc. Severance Pay Plan,

              Defendants

Civil Action No. 05-11428–WGY

## DEFENDANTS' RESPONSE TO PLAINTIFF'S LOCAL RULE 56.1 STATEMENT IN SUPPORT OF HIS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, Defendants John Hancock Financial Services, Inc. Severance Pay Plan (the "Plan") and John Hancock Financial Services, Inc. ("Hancock") (collectively "Defendants") hereby respond to Plaintiff's Local Rule 56.1 Statement in Support of His Cross-Motion for Partial Summary Judgment ("Plaintiff's Statement" or "Pl.'s Statement").

## I.      The Parties

1.      Defendants admit the statement in paragraph 1 of Plaintiff's Statement. (Defs.' Statement of Undisputed Facts in Supp. of Defs.' Mot. for Summ. J. ("Facts") ¶ 1.)

2.      Defendants admit the statement in paragraph 2 of Plaintiff's Statement. (*Id.* ¶ 3.)

3.      Defendants admit that one purpose of the Plan is to "make certain severance benefits available to [Hancock] employees." (John Hancock Financial Services, Inc. Severance Pay Plan, Am. Compl., Ex. A, art. I.) Defendants further admit that another purpose of the Plan is

to bridge an employee who is involuntarily terminated by Hancock to future employment within his industry. (Facts ¶ 5; App. in Supp. of Defs.' Mot. for Summ. J. ("Appendix" or "App."), Mongeau Dep. Tr. at 71:8–71:16, 71:20–71:22 ("Given my experience and years in human resources, it was understood that a severance pay plan was provided to bridge an employee."), 72:11–72:12 ("The purpose of the Plan is to bridge the employees to new employment."); App., DiCicco Dep. Tr. at 31:10–31:16 ("[T]he purpose of the Severance Plan is to bridge employees to employment."), 32:15–33:3; E-mail from JH Communication to Hancock employees of 11/21/02, App., Exhibit 1 (identifying the "primary purpose" of the Plan as being to "'bridge' employees to future employment").

  4.  Defendants admit the statement in paragraph 4 of Plaintiff's Statement. (Facts ¶ 4.)

  5.  Defendants admit that Daniel Joyce ("Joyce") was an employee of Hancock from March 1994 to July 2003. (*Id.* ¶ 6.) Defendants further admit that Joyce has testified that he could have looked for another job outside of Hancock during the period of late November 2002 to mid July 2002, but he chose not to do so because he "was too busy working." (App., Joyce Dep. Tr. at 44:6–44:10; Facts ¶ 42.) Defendants deny that Joyce received a below-market salary. Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 5 of Plaintiff's Statement and therefore deny the same.

  6.  Defendants admit that from 2000 to 2003, Joyce worked within Hancock's Real Estate Operations Department as a Project Manager and Senior Project Manager in the Tower Complex. (*Id.* ¶ 7.) Defendants admit that Joyce's work unit/business unit at Hancock consisted of a group of employees who worked together and applied their trades and expertise in the Tower Complex to perform the similar service of managing and operating the Tower Complex, as

opposed to Hancock's several other properties. (*Id.* ¶ 52; App., DiCicco Dep. Tr. at 49:1–49:4; *see, e.g.*, App., Joyce Dep. Tr. at 39:4–40:11, 53:24–55:13 (discussing Joyce's expertise in the infrastructure of the Tower Complex; App., Hancock's Interrog. Answers No. 1). Defendants further admit that Joyce characterizes this group as the "multi-shop trade" group, comprising approximately twenty-five to twenty-seven employees from different trades who worked for Hancock in the Tower Complex and were supervised by Joyce in his role as a Project Manager. (Facts ¶ 53; App., Joyce Dep. Tr. at 60:21–61:16; *see also* App., Mongeau Dep. Tr. at 34:16–35:4 (identifying Joyce's business unit as a trades group that Joyce oversaw that was made up of the maintenance team, support group, "electricians, plumbers, people who worked in the building").) Defendants accordingly deny that Joyce's work unit/business unit was Hancock's Real Estate Operations Department and that the Real Estate Operations Department is a work unit/business unit at all.

7.      Defendants admit that in March 2003, the Real Estate Operations Department was primarily responsible for the leasing and daily operations of three Hancock-owned buildings located at 200 Clarendon Street, 197 Clarendon Street, and 200 Berkeley Street in Boston, Massachusetts (collectively referred to as the "Tower Complex.") (Defs.' Answer to Pl.'s First Am. Compl. ("Answer") ¶ 14.) Defendants deny the remaining allegations in paragraph 7 of Plaintiff's Statement.

8.      Defendants admit that employees of the Real Estate Operations Department performed various services for Hancock business units and non-Hancock related tenants, including building maintenance, construction, operations, office space planning and design, security, safety, and purchasing. (*Id.* ¶ 15; Facts ¶ 55.) Defendants deny the remaining allegations in paragraph 8 of Plaintiff's Statement.

9.      Defendants state that the phrase "not technically trained to be conversant" is ambiguous, and Defendants therefore deny the allegation contained in paragraph 9 of Plaintiff's Statement.

## II.      The Plan and the Plan Amendment

10.      Defendants deny that Plaintiff's characterizations of the benefits offered under the Plan are accurate, as Plaintiff's descriptions omit several important qualifying clauses and other details contained in the Plan.  By way of further response, Defendants state that the Plan speaks for itself.  (*See* Am. Compl., Ex. A.)

11.      Defendants admit that, as stated in the Plan, "[s]ubject to any exclusions and exceptions contained [in the Plan], a person is eligible for benefits under th[e] Plan if" the criteria set forth in sub-paragraphs a. through e. in paragraph 11 of Plaintiff's Statement, which quote the language contained in Section 3.1 of the Plan, are satisfied, based upon the definitions set forth in the Plan of all terms contained in Section 3.1 of the Plan.  (*Id.*, § 3.1.)  By way of further response, Defendants state that the Plan speaks for itself and that paragraph 11 of Plaintiff's Statement omits Section 3.2 of the Plan, which qualifies Section 3.1 and explains when "[e]mployment is not terminated for purposes of th[e] Plan" (*see id.*, § 3.2).  Defendants further admit that Section 3.2 of the Plan states that "[e]mployment is not terminated for the purposes of th[e] Plan if an employee: . . . (c) is offered a comparable position, as determined by the Company, as an employee with, or provides services in any capacity to, a Successor company, or (d) accepts any position as an employee with, or provides services in any capacity to, a Successor Company." (*Id.*, §§ 3.2(c) & (d).)  Defendants deny any remaining allegations in paragraph 11 of Plaintiff's Statement.

12.    Defendants admit the statement in paragraph 12 of Plaintiff's Statement.  (*Id.*, art. II, at 4.)  By way of further response, Defendants state that the Plan speaks for itself.

13.    Defendants admit the statement in paragraph 13 of Plaintiff's Statement.  (*Id.*, § 5.1(d).)  By way of further response, Defendants state that the Plan speaks for itself.

14.    Defendants admit the statement in paragraph 14 of Plaintiff's Statement, with the correction that a comma follows the word "to" in fourth line of the quoted language from Section 3.2 (c) of the Plan.  (*Id.*, §§ 3.2(c) & (d).)  By way of further response, Defendants state that the Plan speaks for itself.

15.    Defendants admit the statement in paragraph 15 of Plaintiff's Statement, with the correction that the words "with the Company" follow the term "work unit" in the Plan.  (*Id.*, art. II, at 4.)  By way of further answer, Defendants state that the Plan speaks for itself.

16.    Defendants admit Hancock "amended the Plan after" the IT outsourcing (App., Mongeau Dep. Tr. at 39:2) and that Hancock "looked at this change as a result of contemplating the IT outsourcing" (*id.* at 39:8–39:9).  Defendants deny the remaining allegations in paragraph 16 of Plaintiff's Statement.

17.    Defendants admit the statement in paragraph 17 of Plaintiff's Statement.

18.    Defendants admit that, as a general matter, the Plan was "distributed to Hancock employees if they asked for a copy." (App., DiCicco Dep. Tr. at 29:1–29:2.)  Defendants deny the remaining allegations in paragraph 18 of Plaintiff's Statement.

19.    Defendants admit the statement in paragraph 19 of Plaintiff's Statement.

20.    Defendants admit the statement in paragraph 20 of Plaintiff's Statement.

21.    Defendants admit the statements in paragraph 21 of Plaintiff's Statement, but refer the Court to Appendix, Exhibit 1 for the correct quoted language and punctuation as the

quotation in Plaintiff's Statement at paragraph 21 contains some errors. (App., Ex. 1; Facts ¶ 24.) By way of further answer, Defendants state that the e-mail communication cited speaks for itself.

22.    Defendants admit the statement in paragraph 22 of Plaintiff's Statement.

23.    Defendants deny the allegation in paragraph 23 of Plaintiff's Statement. Further responding, Defendants state that the cites listed in paragraph 23 of Plaintiff's Statement do not support the allegation stated there.

24.    Defendants admit that although not explicitly stated in the e-mail that is the subject of paragraph 24, the e-mail implies that "a sale or outsourcing of a business unit" are just two examples or circumstances of when the Plan Amendment would apply. (App., Ex. 1; Facts ¶ 16 (citing testimony explaining that a sale or outsourcing of a business unit were offered as two examples or circumstances in which the Plan Amendment would apply).)

25.    Defendants admit the statement in paragraph 25 of Plaintiff's Statement.

26.    Defendants admit the statement in paragraph 26 of Plaintiff's Statement.

**III.    Hancock's Announcement of Intent to Sell the Tower Complex**

27.    Defendants admit the statement in paragraph 27 of Plaintiff's Statement. (Facts ¶ 30.)

28.    Defendants admit the statement in paragraph 28 of Plaintiff's Statement. (Facts ¶ 31.)

29.    Defendants admit that in two separate announcements to employees, Hancock stated,

> We expect the company's trades people (i.e. electricians, mechanics and service technicians) and security personnel will be most affected by the sale of the property. Ultimately, it will be up to the new owner to determine how the buildings will be staffed. Given the unique operational aspects of the Tower, it is our hope that many of our associates affected by the sale will be hired by the new owner and continue to perform essentially the same functions. In other cases, positions will be eliminated and those employees will be provided with a severance package under the terms of the company's severance plan. The exact number of employees that may be impacted by this sale has not yet been determined.

(*John Hancock Complex Questions and Answers, November 26, 2002*, App., Ex. 4, at 6;

*Questions on Tower Complex Sale Answered in Q&A*, 11/27/02, App., Ex. 5, at 3; Facts ¶

31.)  Defendants further admit that in the same two announcements, Hancock also stated,

"[Hancock] will maintain a reduced security staff.  John Hancock's in-house security

operation will continue to provide many of the same functions they perform now for the

company, including Hancock identification distribution, special events work, business

contingency planning and disaster safety planning."  (App., Ex. 4, at 6; App., Ex. 5, at 4.)

Defendants also admit that following the sale of the Tower Complex, Hancock needed some

employees to provide executive security and the like and retained some employees to fulfill

those security functions.  (App., Hancock's Interrog. Answers No. 1,; App., Mongeau Dep.

Tr. at 80:3-80:12.)  Defendants deny the remaining allegations in paragraph 29 of Plaintiff's

Statement.

### IV.    The Summary Plan Description

30.    Defendants admit the statement in paragraph 30 of Plaintiff's Statement.  (*See*

Facts ¶¶ 14–18.)

31.    Defendants admit the statement in paragraph 30 of Plaintiff's Statement.

32.    Defendants admit the statements in paragraph 32 of Plaintiff's Statement, but

refer the Court to the *2002 Benefits Supplement to Your Summary Plan Description*, App., Ex. 2,

at 13, for the correct quoted language and punctuation as the quotation in Plaintiff's Statement at

paragraph 32 contains some errors.  (App., Ex. 2 at 13; Facts ¶ 23.)  By way of further answer,

Defendants state that the Summary Plan Description ("SPD") speaks for itself.

33.    Defendants admit the statement in paragraph 33 of Plaintiff's Statement.

34.     Defendants admit that the SPD was drafted by Mr. Mongeau and a member of his staff.  (App., Mongeau Dep. Tr. at 54:6–54:12.)  Defendants further admit that Mr. Mongeau was aware of the contemplated outsourcing of IT.  (*Id.* at 55:14–55:17.)  Defendants deny that the SPD was "drafted with the potential outsourcing of Hancock information technology workers in mind" (Pl.'s Statement ¶ 34) and deny that the citation provided by Joyce in paragraph 34 of Plaintiff's Statement supports such an assertion.

35.     Defendants admit that the terms of the SPD are not contrary to the terms of the Plan, but serve as interpretive language for the Plan by including examples and circumstances concerning when certain provisions of the Plan apply.  (App., Bisciotti Dep. Tr. at 45:7–45:10; App., Mongeau Dep. Tr. at 50:19–50:22, 60:15–60:18; 61:24–62:8; 89:12–89:15; Facts ¶ 16.) Defendants deny the remaining allegations in paragraph 35 of Plaintiff's Statement, as the citations in paragraph 35 do not support the allegations stated therein.  As the record reflects, Hancock testified that the language of the Plan governs and that the comparable job analysis of Section 3.2(c) of the Plan applies "even in the event that there is not a sale or outsourcing of a business unit."  (Supplemental App. in Supp. of Defs.' Mot. for Summ. J. ("Supplemental Appendix" or "Supplemental App."), Bisciotti Dep. Tr. at 41:12–41:17; App., Bisciotti Dep. Tr. at 42:4, 44:10-44:14.)

36.     Defendants deny the allegations in paragraph 36 of Plaintiff's Statement and incorporate by reference their response in paragraph 39 below.

37.     Defendants admit that the SPD of the Plan Amendment further explained to Hancock employees the meaning of the term "comparable position" as used in the Plan Amendment.  (Facts ¶ 14.)  Defendants deny the remaining allegations in paragraph 37 of Plaintiff's Statement.

38.     Defendants admit the allegation in paragraph 38 of Plaintiff's Statement.

39.     Defendants admit that the SPD informs Hancock employees that the "summary does not attempt to cover all details.  Full details of the Plan[] are available in [the] formal written plan document[] that legally govern[s] the operation of the [P]lan[].  If th[e] summary differs in any way from the terms of the plan document[], the plan document[] shall control."  (App., Ex. 2 at JH 001098.)  Defendants further admit that while the SPD does not expressly state that a "sale or outsourcing of a business unit" are examples of when the Plan Amendment would apply, the plain language of the Plan makes clear that a "sale or outsourcing of a business unit" are indeed just two examples or circumstances of when the Plan Amendment would apply.  (Am. Compl., Ex.; Facts ¶ 16 (citing testimony explaining that a sale or outsourcing of a business unit were offered as two examples or circumstances in which the Plan Amendment would apply).)

40.     Defendants admit the allegations in paragraph 40 of Plaintiff's Statement.  Defendants further admit that where the term "competitive benefit offerings" is not defined in the Plan, Hancock, under the terms of the Plan, has the "sole and exclusive right to interpret" that term.  (Am. Compl., Ex. A, § 7.1; Facts ¶ 13.)

41.     Defendants deny the allegations in paragraph 41 of Plaintiff's Statement.  (*See* Facts ¶¶ 59, 65; App., Mongeau Dep. Tr. at 40:19–41:3 ("[O]utsourcing generally would look to a third party to provide a service to [Hancock] or for employees that were performing a service for the company as employees of the company to provide those services by way of working for another employer that we would outsource to, and those employees would render services back to [Hancock].")

42.     Defendants deny the allegations in paragraph 42 of Plaintiff's Statement.  (*See* Facts ¶¶ 12, 52, 53.)

43.     Defendants admit that Hancock conveyed to Joyce that the three components of

the term "comparable position" were "similar salary, competitive benefit offerings, and a work

location within 50 miles of the current work location" (App., Ex. 2 at 13; Facts ¶¶ 14, 22, 23, 24,

93) and that the term "competitive benefit offerings," as used in the SPD, meant benefits that are

competitive within the industry of the Successor Company from which a given employee receives

a job offer.  (Facts ¶¶ 27, 93; s*ee* E-mail from Dan Joyce to Joan DiCicco of 6/2/2003, App., Ex.

13.)  Defendants are without knowledge or information sufficient to form a belief as to what

Joyce understood and can only admit what Hancock conveyed to Joyce.  In light of App., Ex. 13,

in which Ms. DiCicco explained directly to Joyce via reply e-mail on June 3, 2003 that the benefit

offerings of Beacon Capital Partners Management, LLC ("Beacon") were not compared to John

Hancock's benefits package, Defendants deny that Joyce was under any impression that

Hancock's benefits would be compared to the Successor Company, Beacon.  (*See id.*).

44.     Defendants deny the allegations in paragraph 44 of Plaintiff's Statement.  (*See*

Facts ¶¶ 14, 16, 25, 26, 42, 93; App., Ex. 13; App., Joyce Dep. Tr. at 44:6–44:10.)

**V.     Negotiations Pertaining to the Sale of the Tower Complex**

45.     Defendants admit the statement in paragraph 45 of Plaintiff's Statement.  (Answer

¶ 45.)

46.     Defendants admit the statement in paragraph 46 of Plaintiff's Statement.

47.     Defendants admit the statements in paragraph 47 of Plaintiff's Statement.  (*See*

*also* Facts ¶¶ 61–63.)

48.     Defendants admit the statement in paragraph 48 of Plaintiff's Statement.

(Supplemental App., Mongeau Dep. Tr. at 96:6–96:8 ("I understood that certain employees could

be terminated from John Hancock and might also be offered a position with the Successor

Company.").)

49.    Defendants admit the statement in paragraph 49 of Plaintiff's Statement.

50.    Defendants admit the statements in paragraph 50 of Plaintiff's Statement.

51.    Defendants admit the statements in paragraph 51 of Plaintiff's Statement, but

clarify that Ms. DiCicco acted as a liaison between Mr. Moloney and the Human Resources

Department, specifically.  (Exs. to Pl.'s Local Rule 56.1 Statement in Supp. of His Cross-Mot. for

Partial Summ. J. ("Plaintiff's Exhibits" or "Pl.'s Exs."), DiCicco's Objs. & Answers to Pl.'s First

Set of Interrogs., Interrog. Answer No. 4.)

52.    Defendants admit the statement in paragraph 52 of Plaintiff's Statement.

Plaintiff's further admit that Hancock explicitly stated in its Term Sheet for the Purchase and Sale

Agreement for the Tower Complex that Hancock employed "several employees in its real estate

operations and security area who may be available for employment by a prospective Purchaser";

that "[b]ids should include the potential interest of a prospective Purchaser to hire these

employees, including the anticipated number of employees and the area of specialty"; and that

"[b]ids [would] be evaluated in part on the nature and extent of interest in hiring some or all of

these employees."  (*John Hancock Tower Complex in Boston Term Sheet for Purchase and Sale

Agreement*, App., Ex. 9, at 94.)  The implication of these statements was that "Hancock would

look favorably upon a bid if someone hired the employees."  (App., Bonn Dep. Tr. at 60:7–

60:19.)

53.    Defendants admit the statements concerning Mr. Bonn's recollection.  Defendants

deny the statements concerning Mr. Moloney, who in fact testified that he did not have "any

recollection *one way or the other*" about discussions concerning the outsourcing of a Hancock

business unit to Beacon Capital Partners, LLC (Supplemental App., Moloney Dep. Tr. at 25:15–25:20 (emphasis added)) and that he did recall discussions with Beacon Capital Partners, LLC concerning "the critical need for hiring some of the [Hancock] people because of the complex nature of the [John Hancock Tower]" (*id.* at 25:23–26:17). Defendants further deny the statements concerning Ms. DiCicco, who actually testified that Beacon's hiring of Joyce's work unit "constituted an outsourcing" (App., DiCicco Dep. Tr. at 135:10–135:16, 131:7–131:17; Facts ¶ 65), although she could not specifically remember *who* described the sale of the Tower Complex as resulting in an outsourcing of a Hancock business unit (App., DiCicco Dep. Tr. at 131:7–132:20).

## VI.   <u>The Sale of the Tower Complex</u>

54.   Defendants admit the statement in paragraph 54 of Plaintiff's Statement. (Answer ¶ 30.)

55.   Defendants admit the statement in paragraph 55 of Plaintiff's Statement. (*Id.* ¶ 31.)

56.   Defendants admit the statement in paragraph 56 of Plaintiff's Statement, but refer the Court to Plaintiff's Exhibits, Exhibit 9 for the correct quoted language.

57.   Defendants admit the statement in paragraph 57 of Plaintiff's Statement. (Facts ¶ 33.)

58.   Defendants admit the statement in paragraph 58 of Plaintiff's Statement.

59.   Defendants admit the statements in paragraph 59 of Plaintiff's Statement.

60.   Defendants admit the statements in paragraph 60 of Plaintiff's Statement. Defendants further admit that, in fact, Beacon sought to take on Hancock's employees who were employed to run building operations for the Tower Complex. (*Id.* ¶ 63; App., Bonn Dep. Tr. at

35:12–36:8 (stating that Beacon inquired as to whether any Hancock employees "who were involved in the management of the Tower Complex" would be available to hire and noting that such people "would no longer be needed by John Hancock after we took over the management of the Tower Complex because that's what those people did" at Hancock), 62:18–63:22.) Defendants also admit that when Beacon Capital Partners, LLC became the new owner and landlord of the Tower Complex, Beacon assumed overall responsibility for the building services that Hancock had previously performed (*id.* at 64:24–66:15; Facts ¶ 64) and ultimately made job offers to and hired employees in Joyce's work unit/business unit to perform these functions (App., Bonn Dep. Tr. at 63:23–64:10, 92:16–92:18 (stating that "[t]he people that we hired from Hancock we hired in order to manage the complex"); Facts ¶ 64).

61.    Defendants admit that the sale of the Tower Complex did not involve the sale of a Hancock work unit/business unit, but rather involved an outsourcing of Joyce's work unit/business unit.  (App., Hancock's Interrog. Answers No. 1; Facts ¶¶ 55, 56, 59–65.) Defendants deny that the Real Estate Operations Department is a work unit/business unit.  (*See, e.g.*, App., DiCicco Dep. Tr. 99:10–99:11 ("I would not term the Real Estate Operations Department [a] business unit."); Facts ¶¶ 7, 55, 56.)

62.    Defendants admit the statements in paragraph 62 of Plaintiff's Statement. Defendants further admit that Hancock explicitly stated in its Term Sheet for the Purchase and Sale Agreement for the Tower Complex that Hancock employed "several employees in its real estate operations and security area who may be available for employment by a prospective Purchaser"; that "[b]ids should include the potential interest of a prospective Purchaser to hire these employees, including the anticipated number of employees and the area of specialty"; and that "[b]ids [would] be evaluated in part on the nature and extent of interest in hiring some or all

of these employees." (App., Ex. 9 at 94.) Hancock also admits that the implication of these statements was that "Hancock would look favorably upon a bid if someone hired the employees." (App., Bonn Dep. Tr. at 60:7–60:19.)

63.    Defendants deny that the Real Estate Operations Department is a work unit/business unit. (*See, e.g.*, App., DiCicco Dep. Tr. 99:10–99:11 ("I would not term the Real Estate Operations Department [a] business unit."); Facts ¶¶ 7, 55, 56.) Defendants admit the remaining statements in paragraph 63 of Plaintiff's Statement.

64.    Defendants admit the statement in paragraph 64 of Plaintiff's Statement and incorporate by reference their response in paragraph 62 above.

65.    Defendants admit the statement in paragraph 65 of Plaintiff's Statement.

66.    Defendants are without knowledge or information sufficient to form a belief as the truth of the allegations in paragraph 66 and therefore deny the same. Further responding, Defendants state that Joyce was informed on November 26 and 27, 2002, that Hancock "hope[d] that many of [Hancock's trades people and security personnel] affected by the sale [would] be hired by the new owner [of the Tower Complex] and continue to perform essentially the same functions." (App., Ex. 4 at 6; App., Ex. 5 at 3.)

67.    Defendants deny the allegations in paragraph 67 of Plaintiff's Statement. (*See, e.g.*, App., Ex. 2 at 13.)

68.    Defendants admit the statement in paragraph 68 of Plaintiff's Statement and incorporate by reference their response in paragraph 29 above. Further responding, Defendants state the documents that Joyce attempts to summarize and cites in paragraph 68 of Plaintiff's Statement speak for themselves.

69.    Defendants deny the statement in paragraph 69 of Plaintiff's Statement to the extent that it characterizes Mr. Bonn's understanding, when the cited testimony speaks for itself. Further responding, Defendants refer the Court to the cited text for the correct language as the quotation in paragraph 69 contains errors.

70.    Defendants admit the statement in paragraph 70 of Plaintiff's Statement.

## VII.    Hancock's Internal Guidelines for Defining "Comparable Job"

71.    Defendants admit the statements in paragraph 71 of Plaintiff's Statement.  (Facts ¶¶ 19–22, 27–29, 67.)

72.    Defendants admit that Hancock finalized an internal guidelines memorandum that, among other things, further defined the term "competitive benefit offerings."  (App., DiCicco Dep. Tr. at 115:21–116:6)  Defendants deny that the memorandum cited in paragraph 72 of Plaintiff's Statement is a "finalized" memorandum, as the document is clearly marked "Draft." (*See* Pl.'s Exs., Ex. 10; App., Ex. 3; Supplemental App., DiCicco Dep. Tr. at 185:5–185:10 (identifying App., Ex. 3 as "a working document, as we brainstormed ideas about how to do things and what we would be considering" and stating, "It gave us guidelines.  Guidelines are not specifics.  They are approaches to things.")  Further responding, Defendants state that the citations to the Mongeau deposition transcript do not support the proposition stated in paragraph 72 of Plaintiff's Statement.

73.    Defendants admit that the draft memorandum at Plaintiff's Exhibits, Exhibit 10 and Appendix, Exhibit 3 reflects the benefits that the HR working group identified for inclusion in an analysis of the benefit offerings of a Successor Company to determine whether the Successor Company has competitive benefit offerings.  Defendants also admit that the benefit categories selected for inclusion were 401(k) plan benefits, pension benefits, medical benefits,

dental benefits, and vacation benefits. (Facts ¶ 28.) Defendants further admit that the categories listed on the memorandum at Plaintiff's Exhibits, Ex. 10 and Appendix, Exhibit 3 do not include flexible spending accounts or vision care coverage. Further responding, Defendants state that the testimony cited in paragraph 73 states that Beacon's vision care coverage was considered when Hancock analyzed Beacon's benefit offerings.

74. Defendants admit the statements in paragraph 74 of Plaintiff's Statement. Further responding, Defendants note that Mr. Bonn testified that he did not "know if [he] could speak to" whether employees consider a severance plan to be "an important benefit" and that he does not "have a broad human resources background." (App., Bonn Dep. Tr. at 34:12–34:14.)

75. Defendants admit the statements in paragraph 75 of Plaintiff's Statement. Defendants further admit that the decision as to what benefits would be included in an analysis of the benefit offerings of a Successor Company was made based upon the "collective experience" of the HR working group and Mr. Mongeau's "specific expert experience" concerning which benefits "were deemed to be valuable to employees when looking at benefit offering in terms of a comparable job." (App., DiCicco Dep. Tr. at 110:11–110:17.)

76. Defendants deny the statements in paragraph 76 of Plaintiff's Statement. Further responding, Defendants state that the citations set forth in that paragraph do not support the propositions stated.

77. Defendants admit the statements in paragraph 77 of Plaintiff's Statement. (Facts ¶ 27.)

78. Defendants admit that Beacon is in the property management industry and that the HR working group began to compile a list of companies in that industry against which Hewitt Associates LLC ("Hewitt") could compare Beacon's benefit offerings. (App., DiCicco Dep. Tr.

at 116:18–117:17; Supplemental App., DiCicco Dep. Tr. at 121:14–121:21.)  Defendants also admit that Mr. Mongeau talked with Hewitt regarding the list of companies in the property management industry that Hancock had compiled to compare against Beacon's benefit offerings. (*Id.* at 126:22–127:4; *see also* Facts ¶¶ 86, 87.)  Defendants further admit that Hancock utilized the Hewitt tools to collect reliable benefits data rather than contact property management companies on an impromptu basis concerning their benefit offerings.  (*Id.*)  Defendants deny Joyce's statement that DiCicco has no recollection of research being conducted on the benefit offerings of property management companies, as she in fact testified that she did not "know what others did."  (App., DiCicco Dep. Tr. at 167:12–167:22.)

## VIII.    The Outsourcing of the ISSD Employees

79.    Defendants admit the statement in paragraph 79 of Plaintiff's Statement.

80.    Defendants admit the statement in paragraph 80 of Plaintiff's Statement.

81.    Defendants admit the statement in paragraph 81 of Plaintiff's Statement.

82.    Defendants admit the statement in paragraph 82 of Plaintiff's Statement.

83.    Defendants admit the statement in paragraph 83 of Plaintiff's Statement.

## IX.    Beacon's Offer of Employment to Joyce

84.    Defendants admit the statement in paragraph 84 of Plaintiff's Statement.  (Facts ¶ 35.)

85.    Defendants admit the statement in paragraph 85 of Plaintiff's Statement.  (*Id.* ¶ 36.)

86.    Defendants admit the statement in paragraph 82 of Plaintiff's Statement.  (*Id.* ¶¶ 36, 37.)

87.    Defendants admit that certain Hancock employees who had accepted offers of employment to be members of Beacon's management and signed letters in that capacity on behalf of Beacon that offered employment to other Hancock employees would have had knowledge of the content of the offer letters that were issued to Hancock employees, as evidenced by the signatures of those management employees on the offer letters.  (Supplemental App., DiCicco Dep. Tr. at 150:19–151:4.)  Defendants deny the remaining allegations in paragraph 87 of Plaintiff's Statement.

88.    Defendants deny the allegation in paragraph 88 of Plaintiff's Statement.

## X.    Hancock's Comparable Job Analysis

89.    Defendants admit the statements in paragraph 89 of Plaintiff's Statement.  (Facts ¶ 87; Pl.'s Exs., Hancock's Objs. & Rsps. To Plf.'s First Req. for Admissions, Response to RFA No. ("Hancock's Response to RFA No.") 18.)

90.    Defendants admit that that, consistent with the terms of the Plan, Mr. Mongeau focused on whether the job offers from Beacon, Hancock's Successor Company, were for comparable positions to those held by Hancock employees.  (App., Mongeau Dep. Tr. at 49:13–49:16 ("[O]ur focus was on the comparability of the job with the Successor Company."), 50:13–50:15 ("We would have looked at this from the standpoint of whether the job was comparable with the successor employer.")   Defendants also admit that Mr. Mongeau "understood along with the other HR professionals [he] was working with that an outsourcing was occurring."  (*Id.* at 47:12–47:14.)  Defendants admit the remaining allegations in paragraph 90 of Plaintiff's Statement.

91.    Defendants admit the statement in paragraph 91 of Plaintiff's Statement, as Hancock's responsibility was to apply the terms of the Plan to determine whether Joyce and other

Hancock employees had received job offers for comparable positions within the meaning of the Plan. (*Id.* at 62:10–62:13, 63:11–63:13 (explaining that the focus of the Plan was on whether an employee had been offered a comparable position with a Successor Company).) As Ms. DiCicco testified, Hancock "referred to the language in the plan document that talks about a work unit that provides services to a successor company and that's in effect what happened. These folks [in Joyce's work unit] supplied [property management] services to John Hancock when John Hancock was the landlord. When the buildings were purchased by Beacon, those same services were provided by those employees who accepted comparable jobs with Beacon." (App., DiCicco Dep. Tr. at 138:20–139:4.)

92. Defendants admit the statements in paragraph 92 of Plaintiff's Statement.

93. Defendants admit that on May 21, 2003, Ms. DiCicco received from Beacon a memorandum outlining "the benefits which Beacon Capital Partners Management, LLC . . . currently intends to offer to its property management employees at the Hancock Complex ." (*Memorandum Re: Proposed Benefits for Beacon Capital Partners Management, LLC Employees*, App., Ex. 12; Facts ¶ 71.) Defendants also admit that Ms. DiCicco promptly forwarded the memorandum to Mr. Mongeau to use in the competitive assessment analysis. (*Id.* ¶ 73.) Defendants deny the remaining allegations in paragraph 93 of Plaintiff's Statement.

94. Defendants deny the allegations in paragraph 94 of Plaintiff's Statement. Mr. Mongeau testified that the competitive assessment analysis of Beacon's benefit offerings was conducted and completed during the time frame from May 21, 2003 to May 30, 2003. (App., Mongeau Dep. Tr. at 158:23–158:24; Facts ¶ 88.)

95.     Defendants admit the statements in paragraph 95 of Plaintiff's Statement.  (*See id.* ¶¶ 48, 49, 58, 66; *see generally id.* ¶¶ 48–94; *see also* App., Mongeau Dep. Tr. 48:24–50:1; App., DiCicco Dep. Tr. at 82:6–82:10.)

96.     Defendants deny that Beacon did not offer an educational benefit program, as the *Beacon Capital Partners Management, LLC Employee Handbook* that Joyce received from Beacon and produced in discovery contains a section entitled "Tuition Reimbursement" that reads, "Employees will be eligible for reimbursement of certain expenses incurred in connection with obtaining or maintaining required licenses and certifications with the prior written approval of management."  (Supplemental App., Ex. 1 at 16.)  Defendants also deny that Beacon's proposed benefits package "provided for less vacation time" than Hancock's benefits (Pl.'s Statement ¶ 96) and state that Joyce has cited no evidence to support such an assertion. Defendants admit the remaining statements in paragraph 96 of Plaintiff's Statement, but state that the premiums for medical and dental insurance coverage were only slightly higher in a comparison of Beacon's and Hancock's premiums.  (App., Ex. 11 at 1.)  (While the *Competitive Assessment of Beacon Capital Partners Management, LLC Benefits Package with respect to John Hancock's Severance Pay Plan "Comparable Job" Eligibility Provision* (the "Competitive Assessment of Beacon's Benefits Package") did not include the cost of medical coverage, Mr. Mongeau, in his efforts to be diligent, reviewed this issue separately, comparing Beacon's and Hancock's benefits, and listed his findings on Exhibit 11, even though they did not factor into the final score of the Competitive Assessment of Beacon's Benefits Package—a choice, incidentally, that did not benefit any self-serving interest that Joyce imputes to Hancock, since Beacon's health plan costs were slightly higher than Hancock's.  (*Id.*, Facts ¶ 82; App., Mongeau Dep. Tr. at 138:12–139:20.)

97. Defendants admit the statements in paragraph 97 of Plaintiff's Statement. Plaintiff's also admit that in conducting the competitive assessment analysis, Hancock relied on data from property management employers in that such data was included among the general industry data to the extent that it was available through Hewitt. (Facts ¶ 86.) Further responding, Exhibit 17 of Plaintiff's Exhibits, which is cited in paragraph 97 of Plaintiff's Statement, is not the version or edition of the Hewitt U.S. Salaried 2002 report upon which Mr. Mongeau relied, as that document was unavailable by the time of this litigation. (Supplemental App., Mongeau Dep. Tr. at 14:3–18:7; App., Mongeau Dep. Tr. at 119:1–119:20; 122:2–122:19.)

98. Defendants deny that the Foster study was not an appropriate evaluation tool and state that Plaintiff's opinion in this regard is not supported by the citation set forth in paragraph 98 of Plaintiff's Statement. Defendants admit the remaining statements in paragraph 98 of Plaintiff's Statement. (Supplemental App., Mongeau Dep. Tr. at 16:17–18:7.)

99. Defendants deny that the Hewitt study was not an appropriate evaluation tool and state that Plaintiff's opinion in this regard is not supported by the citation set forth in paragraph 99 of Plaintiff's Statement. Defendants admit that Hewitt did not specifically list the companies included in the Hewitt study under a category of property management. Nonetheless, data concerning property management employers was included among the general industry data provided by Hewitt and relied upon by Hancock to conduct the competitive assessment analysis to the extent that it was available through Hewitt. (Facts ¶ 86.) Further responding, Exhibit 17 of Plaintiff's Exhibits, which is cited in paragraph 99 of Plaintiff's Statement, is not the version or edition of the Hewitt U.S. Salaried 2002 report upon which Mr. Mongeau relied, as that document was unavailable by the time of this litigation. (Supplemental App., Mongeau Dep. Tr. at 14:3–

18:7; App., Mongeau Dep. Tr. at 119:1–119:20; 122:2–122:19.)  Defendants admit the remaining statements in paragraph 99 of Plaintiff's Statement.

100.    Defendants admit the statements in paragraph 100 of Plaintiff's Statement, but deny the suggestion that Mr. Mongeau's representation was false when he informed Ms. DiCicco that data concerning property management employers was included among the general industry data upon which Hancock relied to conduct the competitive assessment analysis to the extent that it was available through Hewitt.  (*See* Facts ¶ 86.)

101.    Defendants admit the statement in paragraph 101 of Plaintiff's Statement.

102.    Defendants deny that Hancock "determined to evaluate only select benefits from Beacon's benefits package."  (Pl.'s Statement ¶ 102.)  Rather, Hancock's HR working group identified which benefits would be included in an analysis of the benefit offerings of a Successor Company to determine whether the Successor Company has competitive benefit offerings.  (Facts ¶ 28.)  The benefit categories selected for inclusion were 401(k) plan benefits, pension benefits, medical benefits, dental benefits, and vacation benefits.  (*Id.*)  These categories of benefits were selected because, based on the knowledge and experience of the HR professionals in the working group, these are the benefits that employees care about the most and that have the greatest monetary value to employees.  (*Id.* ¶ 29.)  Thus, contrary to Joyce's suggestion through a twist of words, the HR working group identified the benefits to be included in a competitive assessment analysis of a Successor Company entirely independent of the benefits offered by Beacon. Defendants admit the remaining statements in paragraph 102 of Plaintiff's Statement.

103.    Defendants deny that Mr. Mongeau did not attempt to identify benefits data for the property management industry.  (*See id.* ¶¶ 86, 87)  Indeed, he gave a list of property management companies to Hewitt, but learned that Hewitt did not have adequate data to focus

exclusively on those companies. (*See* App., DiCicco Dep. Tr. at 118:6–118:10; Supplemental App., DiCicco Dep. Tr. at 126:22–127:4.) Thus, Hancock relied on data from property management employers to the extent that such data was included among the general industry data available through Hewitt. (Facts ¶ 86.) Defendants admit the remaining statements in paragraph 103.

104.   Defendants deny that the memorandum cited in paragraph 104 of Plaintiff's Statement contains "internal administrative guidelines," as the document is clearly marked "Draft." (*See* Pl.'s Exs., Ex. 10; App., Ex. 3.) Defendants admit the remaining statements in paragraph 104, as Hancock conducted a competitive assessment analysis that compared certain categories of benefits from Beacon's benefits package to the same categories of benefits offered by general industry employers, including property management industry employers to the extent such information was available through the Hewitt Associates LLP Benefit Index Base Company "Total Value" Distribution ("Hewitt Benefit Index"), the benefits evaluation tool that Hancock employed in its competitive assessment analysis. (Hancock's Response to RFA No. 17; Facts ¶ 86.)

105.   Defendants admit the statements in paragraph 105 (Facts ¶ 77), but deny the suggestion that Mr. Mongeau independently decided the respective weighting percentages assigned to each of the selected benefit categories. As stated in paragraph 77 of Defendants' Facts, from which Joyce copied the facts set forth in paragraph 105 of Plaintiff's Statement nearly verbatim, the method of assessment that Hancock used in conducting the competitive assessment analysis was based upon the Hewitt Benefit Index, a trusted and reliable benefits analysis tool in the human resources field. (Facts ¶ 77.) Thus, the weighting percentage assigned to each of the

selected benefit categories was based on the Hewitt Benefit Index and was not independently determined by Mr. Mongeau. (*Id.*)

106. Defendants admit the statements in paragraph 106 of Plaintiff's Statement.

107. Defendants admit that the overall resulting Competitive Assessment Score for Beacon's benefit offerings was 1.9. (*Id.* ¶ 107.) Defendants also admit that an average score was 2.0 and that Hancock, consistent with simple rounding principles, reasonably and rationally viewed Beacon's score as average and, therefore, competitive within the industry. (*Id.*) Defendants further admit that after a thorough analysis of all three components of the "comparable job" definition, Hancock's evaluation revealed that Beacon's job offers included competitive benefit offerings and were indeed for comparable jobs, as defined by the Plan Amendment and the Summary Plan Description. (*Id.* ¶ 91.) Defendants deny the remaining allegations in paragraph 107 of Plaintiff's Statement.

108. Defendants admit that the HR working group gave deference to Mr. Mongeau's research and conclusions concerning the competitive assessment analysis, as Mr. Mongeau possessed expertise in the field of employee benefits. (*Id.* ¶ 20; App., DiCicco Dep. Tr. at 165:1–165:6; 185:20–186:6.) Defendants also admit that the HR working group "had been working collaboratively on [the competitive assessment analysis] on a day to day basis and [were] in contact with each other via phone, e-mail and in person." (App., Mongeau Dep. Tr. at 137:4–137:6.)

109. Defendants deny the allegations in paragraph 109 of Plaintiff's Statement, as the citation in paragraph 109 does not support the assertion made. Mr. Bonn, the deponent from whose testimony the citation and parenthetical quotation are drawn, did not say that it was "common for inquiring companies to contact other property management companies" to ask

about the property management companies' benefits (Pl.'s Statement ¶ 109).  To the contrary,

when asked if he knew how accessible such information would be, Mr. Bonn stated "I honestly

don't . . . ."  (Supplemental App., Bonn Dep. Tr. at 53:8.)  He then proceeded to speculate that he

"would think" that someone could call a property management company and someone "might be"

willing to share that benefits information.  (*Id.* at 53:4 –53:15.)

110.    Defendants deny that "Hancock under took no further steps to obtain data" on

property management companies in Massachusetts beyond compiling a list of such companies.

(Pl.'s Statement ¶ 110).  Indeed, Mr. Mongeau furthered Hancock's efforts by giving a list to

Hewitt of property management companies for which Hancock sought benefits data.  (Facts ¶ 87;

App., DiCicco Dep. Tr. at 118:6–118:10; Supplemental App., DiCicco Dep. Tr. at 126:22–127:4.)

He subsequently learned, however, that Hewitt did not have adequate data to focus exclusively on

those companies.  (Facts ¶ 87.)  Thus, Hancock relied on data from property management

employers to the extent that such data was included among the general industry data available

through Hewitt.  (*Id.* ¶ 86.)

111.    Defendants admit that to assess whether Beacon had "competitive benefit

offerings"—the second component of Hancock's evaluation of whether Joyce and other Hancock

employees had been offered a comparable position within the meaning of the Plan—Hancock

conducted a competitive assessment analysis in which it properly relied upon objective data

sources, including the Hewitt Benefit Index, to gather normative data about the range of

competitive benefits offered to employees by general industry employers.  (*Id.* ¶ 70.)  Defendants

deny the remaining allegations in paragraph 111 of Plaintiff's Statement.

XI.    **The Initial Determination to Deny Severance Benefits to Joyce and Others**

112.    Defendants admit the statement in paragraph 112 of Plaintiff's Statement. (Am. Compl., Ex. C; Facts ¶ 92.) Defendants further admit that the May 30, 2003 memorandum made several other statements and that those statements speak for themselves. (*See* Am. Compl., Ex. C.)

113.    Defendants admit the statements in paragraph 113 of Plaintiff's Statement and state that the May 30, 2003 memorandum speaks for itself. (*Id.*) Defendants also admit that the memorandum addresses the determination to deny severance benefits to Joyce and other affected employees based upon the terms of the *Plan*, which do not require outsourcing of a business unit in order for Sections 3.2(c) and (d) of the Plan to apply. (*See id.*; Am. Compl., Ex. A.) Defendants further admit that the memorandum references the three components factored into Hancock's analysis of whether a Hancock employee has received an offer for a "comparable position" within the meaning of the Plan. (Am. Compl., Ex. C.)

114.    Defendants deny the allegation in paragraph 114 of Plaintiff's Statement. (*See* Facts ¶¶ 64, 65.)

115.    Defendants admit that in determining whether Joyce and other Hancock employees were entitled to severance benefits under the Plan, Hancock applied the terms of the Plan to determine whether Joyce and other Hancock employees had received offers for comparable positions from a Successor Company within the meaning of the Plan. (Facts ¶¶ 48, 49, 58, 66.) Defendants deny the remaining allegations in paragraph 115 of Plaintiff's Statement. (*See generally* Facts ¶¶ 48–94.)

116.    Defendants admit the statement in paragraph 116 of Plaintiff's Statement. (App., Ex. 7; Facts ¶ 39.)

117.    Defendants deny the allegations in paragraph 117 of Plaintiff's Statement.  Far from having only two weeks to decide whether to accept Beacon's job offer, Joyce was informed by Hancock in November 2002—well before the sale of the Tower Complex in March 2003—that his position might be eliminated as a result of the sale of the Tower Complex, which put Joyce on notice that he should look for another job.  (Facts ¶ 31.)  Joyce then received his job offer from Beacon on May 5, 2003, five and a half weeks before he was required to respond to the job offer from Beacon on June 13, 2003.  (*Id.* ¶¶ 35, 37.)

## XII.    Joyce's Communications with Hancock

118.    Defendants admit the statement in paragraph 118 of Plaintiff's Statement.  (Facts ¶ 93.)

119.    Defendants admit the statements in paragraph 119 of Plaintiff's Statement.  (App., Ex. 13; Facts ¶ 93.)  Defendants further admit that Ms. DiCicco's June 3, 2002 e-mail made several other statements and that those statements speak for themselves.  (*See* App., Ex. 13.)

120.    Defendants deny the allegations in paragraph 120 of Plaintiff's Statement.  As to the first allegation, see Supplemental Appendix, Bisciotti Dep. Tr. at 180:11–181:8.  As to the second allegation, see Facts ¶¶ 19–22, 27–29 and Appendix, Mongeau Dep. Tr. at 137:4–137:6.  As to the third allegation, see Facts ¶ 86.

121.    Defendants deny the allegations in paragraph 121 of Plaintiff's Statement.  Far from "refrain[ing] from applying for property management positions at other companies because he deferred to" Hancock's competitive assessment analysis (Pl.'s Statement ¶ 121), Joyce testified that although he could have looked for a job other than the position that he accepted with Beacon, he *chose* not to do so because he "was too busy working."  (App., Joyce Dep. Tr. at 44:6–44:10; Facts ¶ 42.)

122.    Defendants deny the allegations in paragraph 122 of Plaintiff's Statement. Further responding, Defendants state that Joyce could not have known whether "other property management companies seemed to be offering better benefits than Beacon" (Pl.'s Statement ¶ 122), since Joyce, by his own admission, made no effort to explore employment with other property management companies during the more than six months preceding his acceptance of the job offer from Beacon. (Facts ¶¶ 42–44.)

123.    Defendants admit the statement in paragraph 123 of Plaintiff's Statement. (*Id.* ¶ 41; Supplemental App., Bonn Dep. Tr. at 80:9–81:13.)

124.    Defendants admit the statement in paragraph 124 of Plaintiff's Statement. (Pl.'s Exs., Hancock's Response to RFA No. 9.)

125.    Defendants admit the statement in paragraph 125 of Plaintiff's Statement. (Pl.'s Exs., Hancock's Response to RFA No. 11.)

126.    Defendants admit that Joyce did not have the option to remain working for Hancock as a Senior Project Manager in the Tower Complex. (Pl.'s Exs., Hancock's Response to RFA No. 11.) Defendants also admit that Joyce could have looked for other potential positions with Hancock, but never attempted to do so. (Facts ¶ 42.) Defendants also admit that Joyce had a choice to accept or to not accept employment with Beacon. (*Id.* ¶ 43.) Defendants deny that Joyce "was to choose either resignation or employment with Beacon" (Pl.'s Statement ¶ 126), as Joyce could have chosen employment with an employer other than Hancock or Beacon (Facts ¶¶ 42–44). Defendants further state that Hancock's Response to RFA No. 10, which is cited in support of Joyce's assertions in paragraph 126, does not support his assertions and largely states what has been set forth in this paragraph.

127.    Defendants admit the statement in paragraph 127 of Plaintiff's Statement.

128.     Defendants admit the statement in paragraph 128 of Plaintiff's Statement.  (Pl.'s Exs., Hancock's Response to RFA No. 1.)

129.     Defendants admit the statement in paragraph 129 of Plaintiff's Statement, based upon the definitions in the Plan of the capitalized terms used in paragraph 129.  (Pl.'s Exs., Hancock's Response to RFA No. 2.)

130.     Defendants admit the statement in paragraph 130 of Plaintiff's Statement.  (Pl.'s Exs., Hancock's Response to RFA No. 4.)

131.     Defendants admit the statement in paragraph 131 of Plaintiff's Statement.  (Pl.'s Exs., Hancock's Response to RFA No. 6.)

132.     Defendants admit the statement in paragraph 132 of Plaintiff's Statement.  (Pl.'s Exs., Hancock's Response to RFA No. 8.)

133.     Defendants admit the statement in paragraph 133 of Plaintiff's Statement.  (Pl.'s Exs., Hancock's Response to RFA No. 7.)

## XIII.     Joyce's Appeal of the Denial of Severance Benefits

134.     Defendants admit the statement in paragraph 134 of Plaintiff's Statement.  (Facts ¶ 95.)

135.     Defendants admit the statements in paragraph 135 of Plaintiff's Statement.  (*Id.* ¶ 96; App., Bisciotti Dep. Tr. at 136:10–137:6.)

136.     Defendants admit that the Hancock Company Benefit Plan Appeal Committee (the "Appeal Committee") examines whether Hancock "made an educated decision based on the terms of the Plan[] and on the appeal at hand" and that this involves "[r]eview of all the pertinent documents," "review [of] the situation at hand," and "even hand administration of the case." (App., Bisciotti Dep. Tr. at 12:20–12:21, 12:23–12:24.)  In sum, the Appeal Committee

"review[s] the whole—the case at hand, whatever kind of documents were given to [the Appeal Committee] to review," "ask[s] questions as far as if that needs to done," and "interview[s] applicable people as that may require." (App., Bisciotti Dep. Tr. at 13:5–13:9.) Defendants further admit that the members of the Appeal Committee "get together to discuss the case and make sure that the plan's been applied fairly" and "[t]hat the plan terms have been applied . . . in a nonarbitrary, noncapricious manner." (Supplemental App., Bisciotti Dep. Tr. at 17:4–17:9.) Defendants deny the remaining allegations in paragraph 136 of Plaintiff's Statement.

137.    Defendants admit the allegations in paragraph 137 of Plaintiff's Statement.

138.    Defendants admit that Mr. Mongeau forwarded a package of documents to the Appeal Committee for review in connection with Joyce's appeal (Supplemental App., Ex. 2) and that Mr. Bisciotti testified that he reviewed the SPD at some point in connection with the appeal (Supplemental App., Bisciotti Dep. Tr. at 39:19–40:20.) Defendants deny that the text of the November 21, 2002 company-wide e-mail was not included in that package. In fact, the original draft of the text appears on the second and third pages of the package of documents that was attached to the October 4, 2004 cover letter from Mr. Mongeau to Carlton Grant. (*See JH Communication on behalf of Human Resources*, Supplemental App., Ex. 2 at JH 001371–JH 001372.) This text differs from the November 21, 2003 company-wide e-mail with respect to only a few minor words. (*Compare* App., Ex. 1 *with* Supplemental App., Ex. 2 at JH 001371–JH 001372.) Defendants also deny that documents referring to the outsourcing of a work unit/business unit were not included in the package and state that Joyce cites no evidence in support of his claim to the contrary. Defendants state that Mr. Bisciotti testified that he could not "recall exactly" whether he had a copy of the e-mail correspondence between Joyce and Ms. DiCicco when he reviewed Joyce's appeal. (Supplemental App., Bisciotti Dep. Tr. at 160:6–

160:14.)  Defendants further deny that the reason that the Appeal Committee did not receive the data sources underlying the competitive assessment analysis of Beacon's benefits was "because Mr. Mongeau did not believe it was important" (Pl.'s Statement ¶ 138).  Mr. Mongeau explicitly testified that he was unable to provide such materials because he did not have copies in his files by the time the appeal took place, but he did provide the Competitive Assessment of Beacon's Benefits Package (App., Ex. 11), which contained "certain data points on what was normative, so it was the summary of what the source documents [said], what [he] learned from the source documents."  (App., Mongeau Dep. Tr. at 108:22–109:6; 109:14–109:17.)  Mr. Mongeau believed that "it was important that [the Appeal Committee] understood the result of the analysis," but did not believe that it was "critical" that they review the unavailable data source documents, given that they had the Competitive Assessment of Beacon's Benefits Package.  (*Id.* 110:14–110:21.)

139.    Defendants deny that the package of documents submitted by Mr. Mongeau did not assist the Appeal Committee in assessing whether there had been a sale or outsourcing of Joyce's work unit/business unit, as Mr. Bisciotti testified, "Some of the documents may have helped us but I'm not entirely sure."  (Supplemental App., Bisciotti Dep. Tr. at 68:9–68:15.) Defendants further deny that "Mr. Bisciotti 'assumed' that the HR group had made a determination that the sale of the Tower Complex involved a sale or outsourcing of Joyce's business unit" (Pl.'s Statement ¶ 139) and state that the citation in paragraph 139 does not support this proposition.  Rather, Mr. Bisciotti testified that he "assumed" that the Human Resources department "based their decision based on the severance Plan," which does not refer to a sale or outsourcing of a business.  (Supplemental App., Bisciotti Dep. Tr. at 84:24–85:1.)

140.    Defendants admit the statement in paragraph 140 of Plaintiff's Statement.

141.    Defendants admit the statement in paragraph 141 of Plaintiff's Statement.

142.    Defendants admit that while Mr. Bisciotti—roughly a year and a half after he participated in Joyce's appeal of the denial of severance benefits—could no longer recall the details surrounding the identification of Joyce's business unit, he did recall that it was clear to the Appeal Committee at the time of the appeal to which business unit Joyce belonged, based on documentation that was provided to the Appeal Committee.  (*Id.* at 53:2–54:3, 170:16–171:2.) Defendants also admit that the Appeal Committee applied the terms of the Plan to Joyce's appeal, which does not refer to the sale or outsourcing of a business unit nor require that such events occur before Sections 3.2(c) and (d) of the Plan may be applied.  (*Id.* at 51:7–51:16.) Defendants deny the remaining allegations in paragraph 142 of Plaintiff's Statement and state that the citations in paragraph 142, and the testimony surrounding the testimony contained in the citations, do not support the propositions set forth in paragraph 142.

143.    Defendants deny the allegation that Mr. Bisciotti simply "relied on" any representation by Mr. Mongeau regarding the competitive assessment analysis, as Mr. Bisciotti clearly testified that the Appeal Committee studied the Competitive Assessment of Beacon's Benefits Package (App., Ex. 11) and questioned Mr. Mongeau at length regarding the sources used, the Hewitt benefits evaluation tool, and other matters.  (Facts ¶ 99; App., Bisciotti Dep. Tr. at 106:4–106:24.)  Defendants admit the remaining statements in paragraph 143 of Plaintiff's Statement.

144.    Defendants admit the statements in paragraph 144 of Plaintiff's Statement, as the Appeal Committee, relying upon the requirements set forth in the Plan, focused on whether the appellants had received offers for comparable positions from the Successor Company, Beacon, and questioned Mr. Mongeau in person about the sources upon which he had relied when

conducting the competitive assessment analysis.  (*See* Supplemental App., Bisciotti Dep. Tr. at 35:11–35:14; App., Bisciotti Dep. Tr. at 48:22–49:5; Facts ¶¶ 97–101.)

145.    Defendants deny that Mr. Bisciotti "simply deferred to Mr. Mongeau's decisions" regarding the competitive assessment analysis of Beacon's benefits, as the Appeal Committee help three separate meetings, undertook in-depth review of the pertinent documents, questioned Mr. Mongeau and Ms. DiCicco regarding their work and findings, and conducted outside legal research in the course of the Appeal Committee's consideration of the appeal of the denial of severance benefits to Joyce and other Hancock employees.  (Facts ¶¶ 97–101.)  Defendants further deny the remaining allegations in paragraph 145 of Plaintiff's Statement as the allegations are not supported by the testimony contained in the citations and/or the testimony is misstated or taken out of context in Plaintiff's Statement.

146.    Defendants admit the statement in paragraph 146 of Plaintiff's Statement.  (*See* Am. Compl., Ex. D; Facts ¶ 102.)

147.    Defendants deny the allegation in paragraph 147 of Plaintiff's Statement.  The Appeal Letter specifically states the many considerations and reasons that supported the Appeal Committee's decision to uphold the denial of severance benefits to Joyce.  (*See* Am. Compl., Ex. D; Supplemental App., Bisciotti Dep. Tr. at 181:13–183:23; Facts ¶ 102.)

148.    Defendants deny the allegation in paragraph 148 of Plaintiff's Statement.  The Appeal Letter specifically cites the "Comparable Job" provision of the Plan as the Plan provision upon which the Appeal Committee had based its decision to deny Joyce severance benefits.  (*See* Am. Compl., Ex. D; Supplemental App., Bisciotti Dep. Tr. at 181:13–183:23; Facts ¶ 102.)

149.    Defendants admit the statement in paragraph 149 of Plaintiff's Statement.

**XIV.**    **Joyce's Request for Pertinent Documents**

150.    Defendants admit the statement in paragraph 150 of Plaintiff's Statement.  Further responding, Defendants admit that Joyce's request for a copy of the competitive benefits assessment analysis was made long after Joyce's appeal of Hancock's decision to deny severance benefits was concluded on December 16, 2004.  (*See* Pl.'s Exs., Ex. 26; Am. Compl., Ex. D; Facts ¶ 102.)

151.    Defendants admit the statement in paragraph 151 of Plaintiff's Statement.  Further responding, Defendants admit that Joyce's request for a copy of the competitive benefits assessment analysis was made long after Joyce's appeal of Hancock's decision to deny severance benefits was concluded on December 16, 2004.  (*See* Am. Compl., Ex. D; Facts ¶ 102.)

152.    Defendants admit the statement in paragraph 152 of Plaintiff's Statement.  Further responding, Defendants admit that Joyce's request for a copy of the competitive benefits assessment analysis was made long after Joyce's appeal of Hancock's decision to deny severance benefits was concluded on December 16, 2004.  (*See* Pl.'s Exs., Ex. 26; Am. Compl., Ex. D; Facts ¶ 102.)

153.    Defendants deny the allegation in paragraph 153 of Plaintiff's Statement.  Further responding, Defendants state that Joyce received full disclosure of the benefits that were considered as part of the competitive benefits assessment analysis on June 3, 2003.  (*See* App., Ex. 3.)

**XV.**    **Joyce's Employment Status Between July 14, 2003 and the Present**

154.    Defendants admit the statement in paragraph 154 of Plaintiff's Statement.

155.    Defendants admit the statement in paragraph 155 of Plaintiff's Statement.

156.     Defendants deny that Joyce "was not a Project Manager" at Beacon, as Joyce's testimony reflects that at least initially, this was his title until it was changed at an unspecified later point.  (App., Joyce Dep. Tr. at 32:17–32:19.)  In addition, the letter that Joyce signed to accept Beacon's employment offer on June 13, 2003 states that his title was "Project Manager." (App., Ex. 6.)  Likewise, the letter that Joyce wrote to his supervisor at Beacon on June 17, 2003 after accepting Beacon's job offer reiterates that the title of the position that he accepted was "Project Manager."  (App., Ex. 8.)  Defendants admit the remaining statements in paragraph 156 of Plaintiff's Statement.

157.     Defendants admit the statements in paragraph 157 of Plaintiff's Statement.

158.     Defendants deny the allegation in paragraph 158 of Plaintiff's Statement, as the testimony corresponding with the citation in that paragraph states that Joyce "was in search to enhance [his] career to go *from* property management *back to* corporate real estate . . . " (App., Joyce Dep. Tr. at 41:1–41:3) and does not state that he was pursuing "a position with a property management company."

159.     Defendants admit the statements in paragraph 159 of Plaintiff's Statement.

160.     Defendants admit the statements in paragraph 160 of Plaintiff's Statement.

Respectfully submitted,

John Hancock Financial Services, Inc. Severance
Pay Plan and John Hancock Financial Services,
Inc.,

By their attorneys,

*/s/ Erin N. Jackson*
Anthony M. Feeherry (BBO #160860)
Daniel P. Condon (BBO #547676)
Erin N. Jackson (BBO #647357)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
Dated:  August 14, 2006          617.570.1000


## CERTIFICATE OF SERVICE

I, Erin N. Jackson, hereby certify that on August 14, 2006 DEFENDANTS' RESPONSE
TO PLAINTIFF'S LOCAL RULE 56.1 STATEMENT IN SUPPORT OF HIS CROSS-
MOTION FOR PARTIAL SUMMARY JUDGMENT was filed through the ECF system and
will be served electronically on the registered participants, including Plaintiff's Counsel, as
identified in the Notice of Electronic Filing.  Paper copies will be sent to those indicated as non-
registered participants on this date.

*/s/ Erin N. Jackson*
Erin N. Jackson
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
617.570.1000