UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DANIEL JOYCE,
Individually and on behalf of a class of others
similarly situated,

        Plaintiff,

   v.

JOHN HANCOCK FINANCIAL SERVICES,
INC. SEVERANCE PAY PLAN and JOHN
HANCOCK FINANCIAL SERVICES, INC., as
Administrator and Fiduciary of the John Hancock
Financial Services, Inc. Severance Pay Plan,

        Defendants.

Civil Action No. 05–11428–WGY

## SUPPLEMENTAL APPENDIX IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Anthony M. Feeherry (BBO #160860)
Daniel P. Condon (BBO #547676)
Erin N. Jackson (BBO #647375)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
617.570.1000

*Attorneys for John Hancock Financial
Services, Inc. Severance Pay Plan and John
Hancock Financial Services, Inc.*

# TABLE OF CONTENTS

| **DOCUMENT** | **TAB** |
| --- | --- |
| **EXHIBITS 1–2** ................................................................................... | EXHIBITS 1–2 |

**DEPOSITION TRANSCRIPT EXCERPTS**

Brian J. Bisciotti Deposition Transcript Excerpts.................................................Bisciotti Dep. Tr.

William A. Bonn Deposition Transcript Excerpts....................................................Bonn Dep. Tr.

Joan M. DiCicco Deposition Transcript Excerpts ...............................................DiCicco Dep. Tr.

Thomas E. Moloney Deposition Transcript Excerpts........................................Moloney Dep. Tr.

Peter J. Mongeau Deposition Transcript Excerpts............................................Mongeau Dep. Tr.

# EXHIBIT 1

# Beacon Capital Partners Management, LLC

## Employee Handbook

JOY 001360

# EMPLOYEE HANDBOOK

## TABLE OF CONTENTS

Page

**I.   GENERAL POLICIES**..................................................................................**4**
   1.1.   INTRODUCTION ..............................................................................4
   1.2.   EQUAL EMPLOYMENT OPPORTUNITY POLICY .........................4
   1.3.   DISCRIMINATION AND HARASSMENT POLICY ..........................5
   1.4.   PROHIBITION OF HARASSMENT....................................................5
   1.5.   REPORTING OF HARASSMENT ......................................................7

**II.   HOURS OF EMPLOYMENT** ......................................................................**9**
   2.1.   ATTENDANCE..................................................................................9
   2.2.   WORKWEEK......................................................................................9
   2.3.   MEAL AND REST BREAKS .............................................................9
   2.4.   TIME CARDS .....................................................................................9
   2.5.   SHIFT DIFFERENTIAL ...................................................................10
   2.6.   OVERTIME.......................................................................................10
   2.7.   INCLEMENT WEATHER ................................................................10
   2.8.   VOTING TIME .................................................................................10

**III.   PERFORMANCE AND DEVELOPMENT** ...............................................**11**
   3.1.   THE INTRODUCTORY PERIOD .....................................................11
   3.2.   PERFORMANCE REVIEWS ...........................................................11
   3.3.   OPPORTUNITIES FOR ADVANCEMENT .....................................11
   3.4.   JOB POSTINGS ...............................................................................12

**IV.   EMPLOYEE BENEFITS** ..........................................................................**13**
   4.1.   VACATION.......................................................................................13
   4.2.   SICK TIME.......................................................................................13
   4.3.   HOLIDAYS ......................................................................................14
   4.4.   PERSONAL DAYS ..........................................................................14
   4.5.   401(K) PLAN....................................................................................14
   4.6.   MEDICAL AND DENTAL INSURANCE .........................................15
   4.7.   LIFE INSURANCE AND AD&D INSURANCE..................................15
   4.8.   SHORT-TERM DISABILITY ..........................................................15
   4.9.   LONG-TERM DISABILITY..............................................................15
   4.10.   WORKERS' COMPENSATION .......................................................15
   4.11.   TUITION REIMBURSEMENT .........................................................16
   4.12.   OTHER BENEFITS..........................................................................16

**V.   LEAVES OF ABSENCE** ...........................................................................**17**
   5.1.   POLICY ON FAMILY AND MEDICAL LEAVES..............................17
   5.2.   MATERNITY LEAVE......................................................................21
   5.3.   SMALL NECESSITIES LEAVE ACT ...............................................21

LIBB/1192957.3

JOY 001361

5.4.  MEDICAL RECORDS ....................................................................22
5.5.  PERSONAL LEAVE........................................................................22
5.6.  MILITARY LEAVE ........................................................................23
5.7.  BEREAVEMENT.............................................................................24
5.8.  JURY DUTY ...................................................................................24

VI.  CONDUCT OF EMPLOYEES.................................................................25
6.1.  STANDARDS OF CONDUCT ........................................................25
6.2.  SAFETY AND HOUSEKEEPING ................................................26
6.3.  CORRECTIVE ACTION ................................................................27
6.4.  SUBSTANCE ABUSE.....................................................................27
6.5.  SOLICITATION AND DISTRIBUTION .......................................28
6.6.  CONFIDENTIALITY.......................................................................28

VII.  ADMINISTRATIVE INFORMATION ...................................................29
7.1.  APPLICATIONS/RECORDS...........................................................29
7.2.  EMPLOYEE CLASSIFICATIONS.................................................29
7.3.  PERSONNEL FILES .......................................................................29
7.4.  BULLETIN BOARDS ......................................................................30
7.5.  PAYROLL INFORMATION ...........................................................30
7.6.  ACCIDENTS/INJURIES..................................................................30
7.7.  EMPLOYMENT TERMINATION ..................................................30

VIII.  GENERAL INFORMATION ...................................................................32
8.1.  EMPLOYEE CONCERNS ..............................................................32
8.2.  "OPEN DOOR" PHILOSOPHY ......................................................32
8.3.  DRESS CODE ..................................................................................32
8.4.  OUTSIDE EMPLOYMENT.............................................................33
8.5.  EMPLOYMENT VERIFICATION AND REFERENCES................33
8.6.  DAMAGE CONTROL TEAM.........................................................34
8.7.  GUIDELINES FOR SNOW/EMERGENCY DAYS, EARLY CLOSING
       DAYS  AND LATE OPENING DAYS ...........................................34
8.8.  EMPLOYMENT OF RELATIVES.................................................35
8.9.  POLICY AND PROCEDURES PROHIBITING SMOKING ..........35
8.10.  TELEPHONES .................................................................................36
8.11.  SEARCHES ......................................................................................36
8.12.  COMPUTER AND INFORMATION SECURITY POLICY .............36
8.13.  INTERNET ACCEPTABLE USE POLICY .....................................38

IX.  Appendix A:  Safety Rules ...................................................................40
9.1.  GENERAL SAFETY .......................................................................40
9.2.  EMERGENCY PROCEDURES ......................................................40
9.3.  GENERAL FIRE PROCEDURES ..................................................40
9.4.  ACCIDENTS, INJURIES OR ILLNESSES.....................................41

**Welcome to Beacon Capital Partners Management, LLC !**

ii

LIBB/1192957.3

JOY 001362

You are now a member of our family and we are delighted to have you as part of our team. You have been asked to join us because we believe you will contribute to the Company's commitment to high quality customer service and employee teamwork.

You will see in this Handbook that we value our employees. The greatness of our Company is based on the respect we all have for each other and for our guests. In the time that we work together, we will help each other grow, we will make new friends, and we will learn from each other.

This Handbook outlines many of the policies and procedures of our workplace and will help you to orient yourself to your position. Reading this handbook, you will be assured a good start to achieving a positive experience in your job. Please read it carefully and feel free to discuss with your Supervisor any parts that you do not understand.

I personally look forward to meeting you and welcoming you to a great company. I ask that you commit to giving that little bit extra to always go above and beyond the expectations of our customers. Take pride in our workplace and help us be the best that we know we can be.

Again, congratulations and a warm welcome.


Janice Brochu
Vice President of Human Resources

LIBB/1192957.3

JOY 001363

# I.    GENERAL POLICIES

## 1.1.    *INTRODUCTION*

Embarking on a new employment relationship is exciting, and we believe that you will find being a part of the Beacon Capital Partners Management, LLC team interesting, challenging and rewarding. This Employee Handbook has been developed to help you get acquainted with the Company and to answer many of your initial questions.

As part of the Beacon team, the importance of your contribution cannot be overstated. Our goal is to provide the finest-quality services to our clients and to do this efficiently and economically.

You are an important part of this process for your work directly influences the Company's reputation.

The Company has provided you with this Employee Handbook to familiarize you with the Company's practices and procedures. This Handbook sets forth general guidelines and is provided simply to answer some of the questions you may have regarding your employment and benefits. While this Handbook reflects current personnel policies and practices, it is not a contract or part of a contract between you and the Company. The Company reserves the right to revise or rescind unilaterally any of the provisions of this Handbook at any time to reflect changes in Company practices and procedures or changes in the law.

**Employment at the Company is at-will. In other words, either you or the Company may terminate your employment at any time and for any reason. No employee or officer of the Company has the authority to modify the at-will nature of your employment, except that the President may do so on behalf of the Company, but only through a formal written contract signed by you and the President.**

In some instances, this Handbook briefly describes certain benefits available to Company employees, such as insurance benefits and leaves of absence. Separate materials which are available from the Human Resources Department describe those benefits in more detail and will govern to the extent that there may be inconsistencies between this Handbook and those materials. If you have any questions about any of the subjects described in this Handbook, please contact the Human Resources Department.

## 1.2.    *EQUAL EMPLOYMENT OPPORTUNITY POLICY*

The Company is committed to providing equal opportunity for all employees and applicants without regard to race, color, religion, sex, sexual orientation, age, national origin, disability or veteran status. The Company's policy regarding equal employment opportunity applies to all aspects of employment, including recruitment, hiring, job assignments, promotions, working conditions, scheduling, benefits, wage and salary administration, disciplinary action, termination, and social, educational and recreational programs.

LIBB/1192957.3

JOY 001364

The Company will not tolerate any form of unlawful discrimination. All employees are expected to cooperate fully in implementing this policy. In particular, any employee who believes that any other employee of the Company may have violated the Equal Employment Opportunity Policy should report the possible violation to the Human Resources Department. If it appears that the reported circumstances would, if true, constitute a possible violation of the Equal Employment Opportunity Policy, the Company will promptly investigate the allegations, typically through interviewing appropriate persons. To the extent feasible, only individuals whom the Company determines have a need to know will be informed of the allegations. All such persons will be requested to treat the matter confidentially. In the event that the Company determines that this policy has been violated, the Company may take disciplinary action against any violator, up to and including discharge from employment. This is not intended to restrict the Company's right to take disciplinary action against anyone who engages in inappropriate conduct that does not rise to the level of a violation of this policy. Regardless of the Company's determination regarding whether the reported conduct constitutes a violation of the Equal Employment Opportunity Policy, the Company will not take action against an employee for making a good faith report of a possible violation of the Equal Employment Opportunity Policy.

### 1.3.    *DISCRIMINATION AND HARASSMENT POLICY*

The Company is committed to maintaining a working environment which is free from discrimination and sexual harassment as well as all other types of discriminatory harassment. It is our goal to provide equal employment opportunities for all employees, to prevent any unlawful discrimination or harassment of any individual working at or with the Company, and to provide a mechanism by which individuals can bring any concerns about discrimination or harassment to the Company's attention. Therefore, the Company will not accept or tolerate any discrimination or different treatment of, by, or among employees, clients, suppliers or visitors based upon the following characteristics: gender, race, color, religion, sexual orientation, national origin, ancestry, disability, age or veteran status. Discrimination or harassment in all of these forms violates both the spirit of equal opportunity and the rights of the individual. To reinforce our commitment, the Company has developed a policy against discrimination and harassment and a reporting procedure for employees who have been subjected to or witnessed harassment. The Company's policy regarding discrimination and harassment applies to all aspects of employment, including recruitment, hiring, job assignments, promotions, working conditions, scheduling, benefits, wage and salary administration, disciplinary action, termination, and social, educational and recreational programs.

### 1.4.    *PROHIBITION OF HARASSMENT*

Harassment covers a range of behaviors, including subtle and not-so-subtle verbal and non-verbal behavior. It can be engaged in or experienced by both males and females. Harassment will not be tolerated in any form at any level.

Specifically, it is against the Company's policy for any employee to engage in verbal or physical conduct that denigrates or shows hostility or aversion towards an individual because of gender, race, color, religion, sexual orientation, national origin, ancestry, disability, age or other protected category and that:

5

LIBB/1192957.3

JOY 001365

- Has the purpose or effect of creating an intimidating, hostile or offensive working environment;
- Has the purpose or effect of unreasonably interfering with an individual's work performance; or
- Otherwise adversely affects an individual's employment opportunities.

Examples of discriminatory harassing conduct may, depending on the circumstances, include: (1) epithets, slurs, negative stereotyping, threats, or intimidating or hostile acts that relate to race, color, gender, religion, sexual orientation, age, national origin or disability or (2) written or graphic material that denigrates or shows hostility towards an individual or group because of gender, race, color, religion, sexual orientation, national origin, ancestry, disability or age and that is circulated in the workplace, or placed anywhere in the Company's premises, such as on an employee's desk or workspace or on Company equipment or bulletin boards.

While all types of harassment are prohibited, sexual harassment requires particular attention. The Company's policy against sexual harassment prohibits sexual advances or requests for sexual favors from an employee, or engaging in any other physical or verbal conduct of a sexual nature when:

- Submission to such conduct is made an express or implicit condition of employment;
- Submission to or rejection of such conduct is used as a basis for employment decisions affecting the individual who submits to or rejects such conduct; or
- Such conduct has the purpose or effect of interfering with an employee's work performance or creating an intimidating, hostile or offensive working environment.

While it is not possible to list all of the circumstances which would constitute sexual harassment, the following are some examples: (1) unwelcome sexual advances -- whether they involve physical touching or not; (2) requests for sexual favors in exchange for actual or promised job benefits such as favorable reviews, salary increases, promotions, increased benefits, or continued employment; or (3) coerced sexual acts.

Depending on the circumstances, the following conduct may also constitute sexual harassment: (1) use of sexual epithets, jokes, written or oral references to sexual conduct, gossip regarding one's sex life, foul or obscene language or gestures; (2) sexually-oriented comments about an individual's body, comments about an individual's sexual activity, deficiencies, or prowess; (3) displaying sexually suggestive objects, pictures, cartoons; (4) unwelcome leering, whistling, petting, pinching, deliberate brushing against the body in a suggestive manner; (5) sexual gestures, sexual innuendoes, suggestive or insulting comments; (6) inquiries into one's sexual experiences; (7) discussion of one's sexual activities; or (8) dissemination of sexually explicit voicemail, e-mail, graphics, downloaded material, or websites in the workplace.

While such behavior, depending on the circumstances, may not be severe or pervasive enough to create a sexually hostile work environment, it can nonetheless make co-workers uncomfortable. Accordingly, such behavior is inappropriate and may result in disciplinary action regardless of whether it is unlawful.

6

JOY 001366

Consensual sexual relationships will not be tolerated when one of the individuals is in a position to evaluate or influence the work performance or reemployment of the other. Such relationships may give rise to a conflict of interest, are potentially exploitative and may affect the environment for other employees or the manner in which they are treated. If a Supervisor/Subordinate sexual relationship develops, the Supervisor must immediately take steps to remove himself or herself from the supervisory responsibility over the other person. Failure to do so may result in termination.

This Discrimination and Harassment Policy applies at the workplace as well as any work-related setting outside the workplace such as during business trips, on office outings, at parties and business related social events. This Policy also covers other individuals who have a relationship with the Company which enables the Company to exercise some control over the individual's conduct in places and activities that relate to the Company's work (*e.g.*, directors, officers, contractors, vendors, customers, etc.). This Policy also applies to communications and materials sent or received electronically (including electronic mail system and voicemail) or via facsimile.

### 1.5.    *REPORTING OF HARASSMENT*

If you believe that you have experienced or witnessed sexual harassment or other discriminatory harassment, you should report the incident immediately to your supervisor or to Janice Brochu, Vice President of Human Resources. If for any reason you feel uncomfortable reporting an incident to your supervisor or Ms. Brochu, you may report an incident to William A. Bonn, Senior Vice President and General Counsel. Supervisors who receive reports will in turn report them to the Vice President of Human Resources. Ms. Brochu or her designee will promptly and thoroughly investigate all such reports as discreetly and confidentially as practicable under the circumstances. However, it may be necessary to discuss allegations of harassment with the accused individual or with other employees to conduct a thorough investigation, to determine whether harassment occurred, or to determine what action to take against the offending individual. In that case, only individuals who the Company determines have a need to know will be informed of the allegations and they will be instructed to treat the matter confidentially.

In certain situations, you may feel that the appropriate response to particular offensive conduct is either to stop it while it is happening, or to speak to the offending person later and explain that the conduct was offensive. This approach may be most appropriate when it appears that the offending person may not be aware that the conduct is offensive or is operating on the mistaken assumption that the conduct is not unwelcome. Self-help can be an effective means for stopping offensive behavior in a firm yet tactful manner.

If the Company determines that a violation of this policy has occurred, we will act promptly to eliminate the conduct and impose such corrective action as is necessary, including appropriate disciplinary action against the offending party, which can include counseling, warnings, transfers, suspension, probation and termination.

It is unlawful to retaliate against an employee for filing a complaint of sexual harassment or for cooperating in an investigation of a complaint of sexual harassment.

LIBB/1192957.3

JOY 001367

Employees who report violations of this policy and employees who cooperate in investigations into alleged violations of this policy will not be retaliated against in any way. Even if no violation is found after an investigation, no action will be taken against the reporting employee as a result of the report.

The Company recognizes that the question of whether a particular course of conduct constitutes a violation of this policy requires a factual determination. The Company also recognizes that false accusations have serious effects on innocent persons. If, after investigation, it is clear that a person who has accused another of violating this policy has maliciously or recklessly made a false accusation, the accuser will be subject to appropriate remedies which can include counseling, warnings, transfers, suspensions, probation and termination. It is important to note, however, that the fact that allegations are not substantiated or are determined not to constitute a violation of this policy does not mean that the allegations were made falsely.

Beacon hopes that employees will bring any concerns about sexual or other discriminatory harassment to the Company's attention and has instituted this policy and reporting procedure so that employees' concerns can be addressed promptly. Please see below for agencies responsible for enforcing discrimination and harassment laws in the various states in which we do business.

Adherence to this policy is a condition of each employee's employment. Any questions regarding this policy should be directed to Janice Brochu, Vice President of Human Resources.

**The state agencies responsible for enforcing the laws prohibiting harassment include:**

Massachusetts

Massachusetts Commission Against Discrimination
One Ashburton Place, Boston, MA 02108
(617) 727-3990

**The agency responsible for enforcing federal laws prohibiting harassment is the Equal Employment Opportunity Commission:**

Massachusetts

Boston Area Office
One Congress Street, 10th Floor, Room 1001, Boston, MA 02114
(617) 565-3200

8

LIBB/1192957.3

JOY 001368

## II.    HOURS OF EMPLOYMENT

### 2.1.    *ATTENDANCE*

The Company counts on you to be at work when scheduled so that we can provide high quality service to our clients.  Prompt and regular attendance is therefore required of all employees.  While the Company understands that employees may have to be absent from work occasionally due to illness and personal emergencies, you should remember that your absence creates additional burdens for your co-workers and for our business.  All employees are therefore expected to work a full scheduled work day, unless otherwise authorized by their supervisor.

If you are going to be late or absent, you must call and notify your supervisor no later than your scheduled starting time.  If you are prevented from doing so by an emergency, you must notify your supervisor as soon as possible thereafter.  Your failure to notify your supervisor of an absence, tardiness or early departure as outlined could result in disciplinary action, up to and including termination of employment.  Any time that you are out of work, your supervisor or Human Resources may request that you bring in a doctor's note upon your return to work attesting to the medical need for your absence and your ability to return to work.  If you are absent for more than three days without notifying your supervisor directly, you will be considered to have voluntarily resigned from your job.

Unexcused absenteeism or tardiness will not be tolerated and will result in discipline up to and including termination.  Despite receipt of appropriate notification, employees may be disciplined or terminated for frequent, chronic or a pattern of absences, tardiness or early departure (unless covered by the FMLA).

### 2.2.    *WORKWEEK*

Regular work hours may vary from department to department and may be changed at the discretion of the Company.  Your supervisor will inform you of your regular schedule and of your meal break period.  If you have any questions about your hours or schedule, contact your supervisor.

### 2.3.    *MEAL AND REST BREAKS*

Meal and rest breaks will be scheduled by your supervisor.

### 2.4.    *TIME CARDS*

Federal and state wage and hour laws require that the Company keep an accurate record of time worked for every non-exempt employee.  Therefore, all non-exempt employees must complete time cards on a daily basis.  Time cards are to be submitted weekly to supervisors for approval and signature.  Falsification of time cards or filling out another employee's time card is a serious violation of Company policy and may result in immediate discharge.

LIBB/1192957.3

JOY 001369

### 2.5.   *SHIFT DIFFERENTIAL*

Non-exempt employees who work during the hours of 9:00 p.m. to 7:00 a.m. are entitled to a shift differential for that portion of the shift which covers the specified period.

### 2.6.   *OVERTIME*

Because of the nature of the Company's business, employees may be required to work overtime. While the Company will generally try to give employees advance notice of the need for overtime, business needs may not make advance notice possible. If you have problems working assigned overtime, you must notify your supervisor as soon as possible to determine if other arrangements can be made. All overtime must be approved in advance by supervisors.

Non-exempt employees will be paid one and one-half times their regular hourly rate of pay for each hour worked in excess of 40 in a given workweek. Only hours actually worked by non-exempt employees will count towards an employee's overtime entitlement. Accordingly, hours paid for time not worked, such as vacation, sick time and holidays, will not be counted as time worked in computing any overtime entitlement.

### 2.7.   *INCLEMENT WEATHER*

If you believe weather conditions in your area make it impossible to report to work, please notify your supervisor as soon as possible. Your supervisor may excuse you from work and either allow you a vacation day if accrued or may determine that the absence is without pay. It is important that you speak with your supervisor personally so that alternate staffing arrangements can be made. The same applies should you desire to leave work due to inclement weather.

As always, the Company is concerned for the safety of its employees as well as providing quality services to its clients. Good judgment on the part of all concerned must be exercised.

### 2.8.   *VOTING TIME*

The Company encourages voting in all local, state and national elections. If your working hours make it impossible to get to the polls before or after work, please speak to your supervisor beforehand. If necessary, you may arrange to come in late or leave early to get to the polls.

LIBB/1192957.3

JOY 001370

## III.    PERFORMANCE AND DEVELOPMENT

### 3.1.    *THE INTRODUCTORY PERIOD*

Up to the first 90 calendar days of your employment is an introductory period. It is designed to give you a chance to become familiar with the Company and learn your job for a period of up to 90 days. It also gives your Supervisor a chance to work with you while you learn about your job, and evaluate your performance. During this period, you may be placed in different tasks if needed.

The introductory period is just that - - an introduction. At times, the Company finds that an individual does not possess the required knowledge or skills to perform the job, is unable to adapt to the work or is not conforming to prescribed standards of performance. Thus, the Company may terminate an individual's employment at any time during the introductory period with or without notice, or even after its completion with or without notice. Completion of the introductory period is not, nor should it be seen as, unqualified acceptance by the Company of your performance or an assurance of continued employment.

### 3.2.    *PERFORMANCE REVIEWS*

Employees will generally receive a performance review at the end of their 90-day introductory period. At that time, you will either become a regular employee, have your introductory period continued for a period of time, or be terminated.

For all other employees, the Company generally conducts performance reviews annually. Performance reviews may be held more frequently if an employee's job classification or performance changes significantly or if a supervisor determines that more frequent reviews may be necessary or helpful. In addition, your supervisor may informally discuss your performance with you at any other time. You should also feel free to discuss your performance with your supervisor at any time.

Performance reviews are an evaluation of how well you performed your work. They provide you and your supervisor with an opportunity to review what you have accomplished and to identify areas which need improvement. Among the factors that may be addressed in the performance review are: quality and quantity of work; job knowledge and skill; attitude about your job, the Company and other employees; ability to work cooperatively; compliance with Company standards and policies; dependability; enthusiasm and attendance.

Merit salary increases may be given at the time of annual performance reviews, but are not guaranteed. Any salary increases will be at the Company's discretion and will depend on factors such as an employee's job performance and business conditions.

### 3.3.    *OPPORTUNITIES FOR ADVANCEMENT*

The Company seeks to offer advancement opportunity to its employees and encourages them to apply for available jobs for which they are qualified. In some instances, the Company may recognize superior performance by promoting employees within their current job. Factors

LIBB/1192957.3

JOY 001371

the Company considers in promoting employees either into a new position or within their job category will vary with the job but may include work performance, quality of work, job knowledge and skill, ability, attitude, attendance and length of service. Of course, the Company reserves the right to select the candidate it believes is best qualified from within or outside the Company, and may choose not to seek internal candidates for some positions.

### 3.4.    *JOB POSTINGS*

The Company generally, but not always, posts open positions on Company bulletin boards. If you wish to be considered for a posted position, you should first notify your supervisor and then apply promptly to the department manager who posted the position. You are eligible to apply for posted positions after you have completed six months in your current assignment. In the Company's sole discretion, posted positions may be filled from inside or outside the Company.

LIBB/1192957.3

**JOY 001372**

## IV.   EMPLOYEE BENEFITS

### 4.1.   *VACATION*

#### A.   Accrual

The Company recognizes that all employees need a period of time for rest and relaxation. Eligible employees will accrue vacation on a pro-rata basis throughout the calendar year upon completion of their introductory period. Each fulltime employee is entitled to three weeks (15 days) of vacation per calendar year. Vacation will accrue at the rate of ten hours per month. Vacation may not be taken before it is accrued, except that during calendar year 2003, employees may use up to one week of vacation beginning on their first day of employment.

Vacation requests must be approved by your supervisor, and generally will be approved on a first-come, first-served basis. You are encouraged to seek vacation approval well ahead of the date vacation is desired. In the Company's sole discretion, vacation time may be denied for business reasons.

Eligible employees should use all of their accrued vacation each year, but may carry over up to a maximum of five (5) vacation days into the next calendar year. (Eligible employees will not be paid for any unused vacation days at the end of the calendar year.) Eligible employees will be paid for any unused, accrued vacation at the time of their separation from employment.

### 4.2.   *SICK TIME*

All full-time employees are eligible for up to 10 paid sick days per calendar year. Eligible employees will accrue sick days quarterly on a pro-rata basis throughout the calendar year. Each sick leave day is equal to seven hours and 30 minutes of straight time for full-time employees (or 8 hours of straight time, depending upon the employee's work schedule). Part-time employees who are normally scheduled to work a minimum of 20 hours per week (not counted for purposes of overtime) will be eligible to accrue paid sick leave on a prorated basis.

Sick days may be used by employees for their own or dependent's illness. Employees who are absent more than 10 sick days per year due to illness or injury will not be paid for those days, unless the employee is eligible for payment pursuant to one of the leave of absence policies. Sick leave can be used during the year in which it is credited and cannot be carried forward from year to year. Employees will not be paid for unused sick leave upon separation from employment for any reason.

In the case of illness, you should notify your supervisor or manager directly prior to the start of your regular shift on each day of your illness. The Company may require medical documentation verifying the illness or injury or prior to an employee's return to work. The Company may also require the employee to be examined by a medical professional selected by the Company.

LIBB/1192957.3

JOY 001373

If your illness or injury exceeds 10 calendar days or you are hospitalized immediately, you may be eligible for short-term disability benefits. Short-term disability benefits will be coordinated with your available sick leave, if appropriate. Contact the Human Resources Department for additional information and assistance.

Sick leave is only to be used for genuine instances of illness or injury. Abuse of the sick leave policy or excessive absenteeism, as determined by the Company, may result in discipline up to and including termination.

### 4.3.   HOLIDAYS

The Company observes 12 designated holidays each year. These are:

> New Year's Day
> Martin Luther King, Jr. Day
> President's Day
> Patriot's Day
> Memorial Day
> Independence Day
> Labor Day
> Columbus Day
> Thanksgiving Day
> Day after Thanksgiving
> Christmas Day
> Day after Christmas

To qualify for payment of these holidays, you must work your last scheduled work day before the holiday and your next scheduled work day after the holiday. Some employees may be required to work on a holiday. In the even that this happens, non-exempt employees will received eight hours of holiday pay and their regular pay for the hours that they actually worked.

### 4.4.   PERSONAL DAYS

The Company provides all employees with 2 personal days per calendar year to attend to personal business. Personal days cannot be carried forward and unused personal days are not paid upon separation from employment. The scheduling of personal days is subject to the operating needs of your department. Employees are asked to give as much advance notice as possible when they are requesting a personal day.

### 4.5.   401(K) PLAN

The Company maintains a voluntary 401(k) Savings Plan to help employees supplement their retirement income. Details are set forth in the Summary Plan Description.

14

JOY 001374

### 4.6.  *MEDICAL AND DENTAL INSURANCE*

The Company currently offers a choice of two health insurance plans through BlueCross BlueShield—HMO Blue and Blue Choice. Details are set forth in the Summary Plan Descriptions.

The Company offers a combined dental and vision plan. Details are set forth in the Summary Plan Descriptions.

### 4.7.  *LIFE INSURANCE AND AD&D INSURANCE*

The Company currently offers generous life insurance and accidental death and dismemberment insurance. Subject to the terms of the policy itself, employees are generally eligible for a benefit of up to two times their basic annual earnings with a maximum of $500,000. Additional details are set forth in the Summary Plan Description.

### 4.8.  *SHORT-TERM DISABILITY*

Subject to the terms of the plan, employees may be eligible for short term disability benefits of up to 60% of weekly earnings (maximum $2,000) for a period of up to 26 weeks, after a 14 day waiting period. Additional details are set forth in the Summary Plan Description.

To be eligible for salary continuation, employees must be on an approved leave of absence and must comply with all requirements for that leave. The Company may require medical documentation it deems necessary to verify the employee's illness or injury and inability to attend work. The Company reserves the right to grant the employee time off from work but deny the employee's request for short-term disability payments.

Employees who are unable to attend work due to a work-related illness or injury are not eligible for short-term disability payments and may apply for workers' compensation. The fact that an employee has been approved for and/or is receiving short-term disability payments does not entitle the employee to any job protection or reinstatement rights.

### 4.9.  *LONG-TERM DISABILITY*

Subject to the terms of the plan, employees may be eligible for long-term disability benefits of up to 60% of monthly earnings (maximum $7,500). Employees must be disabled, as defined by the policy, for a period of 180 days before payments may commence. Additional details are set forth in the Summary Plan Description.

The fact that an employee has been approved for and/or is receiving long-term disability payments does not entitle the employee to any job protection or reinstatement rights.

### 4.10.  *WORKERS' COMPENSATION*

The Workers' Compensation Act provides that certain benefits be paid in the event of injuries or illnesses arising out of and in the course of employment. The cost of workers' compensation is paid entirely by the Company and provides coverage for all employees.

15

LIBB/1192957.3

JOY 001375

### 4.11.  *TUITION REIMBURSEMENT*

Employees will be eligible for reimbursement of certain expenses incurred in connection with obtaining or maintaining required licenses and certifications with the prior written approval of management.

### 4.12.  *OTHER BENEFITS*

(a)    **Stay Fit Benefit**

The Company offers each employee $150 towards a gym membership at FitCorp in the Hancock Building.  Please see Human Resources for more details.

(b)    **Flexible Spending Accounts**

Employees may contribute to a health care flexible spending account and dependent care flexible spending account.  Please see Human Resources for more details.

(c)    **Parking Discount**

Employees are currently eligible for a parking discount. Please see Human Resources for more details.

(d)    **MBTA Transit Pass**

Please see Human Resources for more details.

(e)    **Direct Deposit**

Employees may have their paycheck automatically deposited into their checking or savings account.  Please consult Human Resources for further details.

LIBB/1192957.3

JOY 001376

## V.   LEAVES OF ABSENCE

### 5.1.   *POLICY ON FAMILY AND MEDICAL LEAVES*

(a)   Eligibility. You are eligible to take up to 12 weeks of unpaid family/medical leave within any 12 month period and be restored to the same or an equivalent position upon your return from leave provided you: (1) have worked for the Company for at least 12 months, and for at least 1250 hours in the last 12 months; and (2) are employed at a worksite that has 50 or more employees within 75 miles.

(b)   Reasons for Leave. You may take family/medical leave for any of the following reasons: (1) the birth of a son or daughter and in order to care for such son or daughter; (2) the placement of a son or daughter with you for adoption or foster care and in order to care for the newly placed son or daughter; (3) to care for a spouse, son, daughter, or parent ("covered relation") with a serious health condition; or (4) because of your own serious health condition which renders you unable to perform an essential function of your position. Leave because of reasons "1" or "2" must be completed within the 12 month period beginning on the date of birth or placement. In addition, spouses employed by the Company who request leave because of reasons "1" or "2" or to care for an employee's parent with a serious health condition may only take a combined total of 12 weeks leave during any 12 month period.

(c)   Notice of Leave. If your need for family/medical leave is foreseeable, you must give the Company at least 30 days prior written notice. If this is not possible, you must at least give notice as soon as practicable (within 1 to 2 business days of learning of your need for leave). Failure to provide such notice may be grounds for delay of leave. Additionally, if you are planning a medical treatment you must consult with Human Resources first regarding the dates of such treatment. Where the need for leave is not foreseeable, you are expected to notify the Company within 1 to 2 business days of learning of your need for leave, except in extraordinary circumstances. The Company has Request for Family/Medical Leave forms available from the Human Resources Department. You should use these forms when requesting leave.

(d)   Medical Certification. If you are requesting leave because of your own or a covered relation's serious health condition, you and the relevant health care provider must supply appropriate medical certification if the leave is expected to continue for more than three calendar days. You may obtain Medical Certification Forms from the Human Resources Department. When you request leave, the Company will notify you of the requirement for medical certification and when it is due (at least 15 days after you request leave). If you provide at least 30 days notice of medical leave, you should also provide the medical certification before leave begins. Failure to provide requested medical certification in a timely manner may result in denial of leave until it is provided.

The Company, at its expense, may require an examination by a second health care provider designated by the Company, if it reasonably doubts the medical certification

17

JOY 001377

you initially provide. If the second health care provider's opinion conflicts with the original medical certification, the Company, at its expense, may require a third, mutually agreeable, health care provider to conduct an examination and provide a final and binding opinion. The Company may require subsequent medical recertification. Failure to provide requested certification within 15 days, if such is practicable may result in delay of further leave until it is provided.

(e)    Reporting While on Leave.  If you take leave because of your own serious health condition or to care for a covered relation, you must contact Human Resources on the first and third Tuesday of each month regarding the status of the condition and your intention to return to work. *In addition, you must give notice as soon as practicable (within 2 business days if feasible) if the dates of leave change or are extended or initially were unknown.*

(f)    Leave Is Unpaid.  Family/medical leave is unpaid leave (although you may be eligible for short or long term disability payments and/or workers' compensation benefits under those insurance plans. These plans are described elsewhere in the handbook.). If you request leave because of a birth, adoption, or foster care placement of a child, any accrued paid vacation, personal leave, or family leave first will be substituted for unpaid family/medical leave. If you request leave because of your own serious health condition, or to care for a covered relation with a serious health condition, any accrued paid vacation, personal leave, family, or medical/sick leave first will be substituted for any unpaid family/medical leave. The substitution of paid leave time for unpaid leave time does not extend the 12-week leave period. Further, in no case can the substitution of paid leave time for unpaid leave time result in your receipt of more than 100% of your salary.

(g)    Medical and Other Benefits.  During an approved family/medical leave, the Company will maintain your health benefits as if you continued to be actively employed. If paid leave is substituted for unpaid family/medical leave, the Company will deduct your portion of the health plan premium as a regular payroll deduction. If your leave is unpaid, you must pay your health care premiums on a weekly basis as if actively employed. Your health care coverage will cease if your premium payment is more than 30 days late. If your payment is more than 30 days late, we will send you a letter to this effect. If we do not receive your co-payment within 15 days of this letter, your coverage may cease. If you elect not to return to work for at least 30 calendar days at the end of the leave period, you will be required to reimburse the Company for the cost of the health benefit premiums paid by the Company for maintaining coverage during your unpaid leave, unless you cannot return to work because of a serious health condition or other circumstances beyond your control.

(h)    Intermittent and Reduced Schedule Leave.  Leave because of a serious health condition may be taken intermittently (in separate blocks of time due to a single health condition) or on a reduced leave schedule (reducing the usual number of hours you work per workweek or workday) if medically necessary. If leave is unpaid, the Hotel will reduce your salary based on the amount of time actually worked. In addition, while you are on an intermittent or reduced schedule leave, the Company may

18

JOY 001378

temporarily transfer you to an available alternative position which better accommodates your recurring leave and which has equivalent pay and benefits.

(i)    Returning from Leave.  If you take leave because of your own serious health condition, (except if you are taking intermittent leave) you are required to provide medical certification that you are fit to resume work.  You may obtain Return to Work Medical Certification Forms from the Human Resources Department.  Employees failing to provide the Return to Work Medical Certification Form will not be permitted to resume work until it is provided.

(j)    State & Local Family & Medical Leave Laws & Other Company Policies.  Where state or local family and medical leave laws offer more protections or benefits to employees, the protections or benefits provided by such laws will apply.

(k)    Definitions. For the purposes of this policy, the following definitions apply:

(i)    *"Spouse"* is defined in accordance with applicable state law of the state where the employee resides, including common law marriage where recognized by the state where the employee resides.

(ii)    *"Parent"* includes biological parents and individuals who acted as your parents, but does not include parents-in-law.

(iii)    *"Son"* or *"daughter"* includes biological, adopted, foster children, stepchildren, legal wards, and other persons for whom you act in the capacity of a parent and who are under 18 years of age or over 18 years of age but incapable of caring for themselves because of a physical or mental disability.

(iv)    *"Serious health conditions"* means an illness, injury, impairment, or physical or mental condition which involves: (1) "Inpatient care," meaning an overnight stay in a hospital, hospice or residential care facility, including any period of "incapacity" or any subsequent "treatment" in connection with such inpatient care; or (2) "Continuing treatment" by a "health care provider," meaning an incapacity of more than three consecutive calendar days; and two or more treatments by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders or referral of a health care provider; or (b) one treatment by a health care provider which results in a "regimen of continuing treatment" under the supervision of the health care provider (e.g., prescription medication). Any period of incapacity because of pregnancy or prenatal care (even without treatment by a health care provider during the absence and even if the absence is less than 3 days; e.g., morning sickness); or any period of incapacity because of a "chronic serious condition" (even without treatment by a health care provider during the absence and even if the absence is less than 3 days: e.g., asthma attack, migraine headaches, etc.; or any period of absence to receive multiple treatments by health care providers or

19

JOY 001379

provider if health care services (under order or referral of a health care provider) for reconstructive surgery after an accident, injury or for a condition that would likely result in a period of incapacity of more than 3 consecutive calendar days if untreated (e.g., cancer (chemotherapy); severe arthritis (physical therapy), kidney disease (dialysis).

(v) *"Continuing treatment"* means: (1) two or more treatments by a health care provider; (2) two or more treatments by a provider of health care services (e.g., physical therapist) on referral by or under orders of a health care provider; (3) at least one treatment by a health care provider which results in a regimen of continuing treatment under the supervision of the health care provider (e.g., a program of medication or therapy); or (4) under the supervision of, although not actively treated by, a health care provider for a serious long-term or chronic condition or disability which cannot be cured (e.g., Alzheimer's or severe stroke).

(vi) *"Health care provider"* means (1) an MD or OD licensed by the State (or country in which he/she practices; (2) podiatrists, dentists, clinical psychologists, optometrists, chiropractors (limited treatment consisting of manual manipulation of the spine to correct a subluxation as demonstrated by X-Ray to exist) authorized to practice under the State law; (3) nurse practitioners and nurse-midwives authorized under State law; (4) Christian Science practitioners (may be required to submit to second or third certification through examination—not treatment of a health care provider); (5) certified social workers; (6) a health care provider also includes a health care provider who practices in a foreign country in accordance with the laws of that country and; (7) any other health care provider from whom the employer or the employee's group health plan benefits managers will accept certification of the existence of a serious health condition to substantiate a claim for benefits.

(vii) *"Needed to care for"* a family member encompasses: (1) physical and psychological care of a child, spouse or parent with a serious health condition; and (2) where the employee is needed to fill in for others providing care or to arrange for third party care of a child, spouse or parent who is receiving inpatient or home care.

(viii) The phrase *"unable to perform the functions of his/her job"* means an employee is: (1) unable to work at all; or (2) unable to perform any one of the essential functions of his/her position at the time notice is given or leave commenced, whichever is earlier. The term *"essential functions"* is borrowed from the Americans with Disability Act ("ADA") to mean "the fundamental job duties of the employment position," but does not include the marginal functions of the position.

20

JOY 001380

## 5.2.  MATERNITY LEAVE

After three months of service, regular full-time females will be granted 8 weeks of unpaid leave for the birth or adoption of a child under 18 or under 23 if the child is disabled. Upon returning to work, the employee will resume her previous position or similar position without loss of status. This policy runs concurrently with FMLA except where prohibited by law.

## 5.3.  SMALL NECESSITIES LEAVE ACT

(a)    Eligible Employees: Employees are eligible for 24 hours of unpaid leave per 12-month period under this statute. We will use a "rolling" method to determine the 12-month period. The rolling 12-month period is measured backward from the date the employee uses any leave under the Act. The employee must (1) have been employed for at least 12 months by the employer from whom the leave is requested, and (2) provided at least 1,250 hours of service to the employer during the previous 12-month period.

(b)    Purposes for Which the Leave May be Taken: The 24 hours of leave may be taken by an eligible employee for any of the following purposes:

(i)    to participate in school activities directly related to the educational advancement of a son or daughter of the employee, such as parent-teacher conferences or interviewing for a new school;

(ii)    to accompany a son or daughter of the employee to routine medical or dental appointments, such as check-ups or vaccinations;

(iii)    to accompany an elderly relative of the employee to routine medical or dental appointments or appointments for other professional services related to the elder's care such as interviewing at nursing or group homes.

(c)    Definitions:

(i)    The term "son or daughter" is defined as a biological, adopted, or foster child, a stepchild, a legal ward, or a child of a person standing in loco parentis. The son or daughter must either be under 18 years of age, or else should be older and incapable of self-care because of mental or physical disability.

(ii)    The term "elderly relative" is defined as an individual of at least 60 years of age who is related by blood or marriage to the employee.

(iii)    The term "school" is defined as a public or private elementary or secondary school; a Head Start program assisted under the Head Start Act, 42 U.S.C. paragraph 9831, et seq.; or a children's day care facility licensed under G.L. c. 28A.

21

LIBB/1192957.3

JOY 001381

(d)    <u>Substitution with Vacation/Personal/Sick Leave</u>: The Company will require the employee to substitute any of his/her accrued paid vacation leave, personal leave or sick leave for any of the unpaid leave only when taken in full 8-hour days.

(e)    <u>Intermittent Leave</u>: Leave under the Act may be taken intermittently or on a reduced leave schedule. An eligible employee need not take the entire 24 hour leave at once, but may take a few hours of time depending on the employee's needs, as long as the total leave does not exceed 24 hours during the rolling twelve e month period. The Company will require that employees take the leave in minimum increments of no less than one (1) hour.

(f)    <u>Notice Requirement</u>: To be entitled to the leave period, employees must provide notice to us as follows:

(i)    if the need for leave is foreseeable, the employee must request the leave no later than 7 days in advance;

(ii)    if the need is not foreseeable, the employee must notify the employer as soon as practicable under the particular circumstances of the individual case.

(g)    <u>Certification</u>: The Company will require that a request for leave be supported by a Certification. Certification forms may be obtained in the Human Resources Office or from your Supervisor. The Company reserves the right to require additional certification when it deems necessary.

## 5.4.    *MEDICAL RECORDS*

Documents relating to medical certifications, recertifications or medical histories of employees or employees' family members will be maintained separately and treated as confidential medical records, except that in some legally recognized circumstances, the records (or information in them) may be disclosed to supervisors and managers, first aid and safety personnel, or government officials.

## 5.5.    *PERSONAL LEAVE*

Employees who are not eligible for any leave of absence described in this Handbook may be eligible for personal leave. Personal leaves are unpaid and are granted in the sole discretion of the Company. Requests for personal leave will be reviewed on a case-by-case basis. When considering a request for a personal leave, the Company will consider factors such as the employee's position, the employee's length of service, the employee's performance record including attendance, the purpose of the leave, the needs of the department in which the employee works, the effect of the leave on other employees, and the Company's general business needs.

Personal leaves generally are unpaid. However, accrued vacation time may be used to continue an employee's salary during the leave. Vacation and sick time will not continue to

LIBB/1192957.3

JOY 001382

accrue during the leave of absence. Medical and life insurance benefits will continue on the same basis as if the employee were actively working. You must pay your health care premiums on a weekly basis as if actively employed.

The Company cannot guarantee reinstatement upon return from a personal leave. However, the Company will make a reasonable effort to place the employee in an available position for which he or she is qualified. If such a position is not available, then the employee's employment will terminate. Even in that event, the employee may later apply for reemployment.

### 5.6. *MILITARY LEAVE*

The Uniformed Services Employment Reemployment Rights Act of 1994 entitles an employee to a leave of absence for military duty, including National Guard duty and Reserve training. The typical length of military training leave which is generally requested annually is two weeks. However, the Company will consider all requests for military leaves of absence and will grant such requests in accordance with applicable law.

### A.    Military Leave Request

All military leave requests must be submitted in writing and must include the following:

- Documentation detailing the specifics of the request including departure date and return date;

- Documentation from the military indicating the dates of service; and

- A statement that the employee intends to return to work at the end of the leave.

The written request for leave must be submitted as soon as the employee receives orders which indicate that a leave may be necessary. If an employee's period of duty is extended during the leave, the employee must notify the Company of the need for an extension of the leave immediately upon learning of the extension. If the possibility of a leave or of the need to extend a leave is known to an employee, that employee should notify his or her supervisor and the Human Resources Department of that possibility orally as soon as possible.

### B.    Salary and Benefits Coverage

You will receive your regular pay, less any military pay received, for the first two weeks per year of military leave. Any leave over two weeks per year is unpaid. Vacation and sick leave will accrue during military leave.

### C.    Returning to Work

The Company will attempt to reinstate an employee to his or her prior position. In some instances, however, it may not be reasonable to return the employee to the same position, and, in such instances, the employee will be returned to a similar position with like seniority, status and pay.

23

LIBB/1192957.3

JOY 001383

An employee who takes a military leave of over one month should notify Human Resources at least four weeks prior to his or her intended return date so that placement can be arranged.

### 5.7.    *BEREAVEMENT*

Regular full-time employees are eligible to receive three days of paid leave to attend the funeral of an immediate family member. Immediate family member is defined as parent, in-law, sibling, child, grandchild or grandparent.

### 5.8.    *JURY DUTY*

If you are summoned for jury duty, you will be excused from work for the duration of the jury duty assignment. You will receive your regular pay for the first three days of jury service. An employee must show a jury duty summons to his or her supervisor as soon as possible so that the supervisor may make arrangements to accommodate the employee's absence. Employees are expected to report for work whenever the court schedule permits.

24

LIBB/1192957.3

JOY 001384

## VI.    CONDUCT OF EMPLOYEES

### 6.1.    *STANDARDS OF CONDUCT*

The Company expects all employees to conduct themselves in an appropriate and professional manner at all times while on the Company's premises or while on Company business.  Conduct which adversely affects the interests or safety of other employees, clients or the Company is prohibited at all times.

It is not possible to list all forms of behavior that are considered unacceptable in the workplace and employees are expected to use common courtesy and good judgment at all times. Listed below are examples of some conduct that may result in immediate disciplinary action, including suspension or termination of employment.  This list is not exhaustive and does not limit the Company's right to discipline in whatever manner it deems appropriate up to and including termination, depending upon the Company's assessment of the severity of the conduct.

Conduct which may lead to immediate disciplinary action includes:

- Excessive tardiness

- Excessive absenteeism or abuse of sick leave

- Failure to notify supervisors promptly of absences

- Failure to start work promptly at the beginning of the shift or scheduled work day or at the end of lunch or break

- Stopping work before the end of a shift or scheduled work day or not returning to work promptly at the end of lunch or rest break

- Absence from assigned work station or department without authorization by your supervisor

- Horseplay or other unnecessary boisterous conduct on Company or a customer's property

- Indecent or offensive language or conduct on Company or a customer's property

- Violation of smoking policy

- Violation of Company safety rules or of common safety practices

- Failure to follow job instructions

- Unsatisfactory job performance

25

LIBB/1192957.3

JOY 001385

- Insubordination

- Threatening or striking a supervisor or other employee

- Reporting to work under the influence of alcohol or drugs, bringing alcoholic beverages or drugs onto Company property, buying or selling, or attempting to buy or sell, drugs on Company property

- Possession of a firearm, explosives, or other weapon on Company property

- Theft of Company property or theft of the property of another employee

- Gambling of any kind on Company property

- Violation of the Company's anti-harassment policy or retaliation against an employee for reporting such harassment

- Falsification of documents, including but not limited to, job applications, resume, time cards, expense reports or other employment or production documents, whenever such conduct is discovered

- Filling out the time sheet of another employee or permitting another employee to fill out your time sheet

- Damage to Company property or to the property of another employee due to carelessness or negligence

- Verbal or physical abuse towards any employee

- Other fraudulent or dishonest conduct

- Violation of Company policies

- Sleeping, loafing or idleness during work hours

## 6.2.    *SAFETY AND HOUSEKEEPING*

The Company has the responsibility to provide and maintain a safe and healthy place for our employees to work. It is our intention to comply with all applicable safety and health standards set forth by the Occupational Safety and Health Act (OSHA). Employees must report all work-related accident and illnesses to Security & Management immediately.

The safety of our employees is directly tied to the Company's strict housekeeping standards. Each department has safety guidelines that employees must follow.

LIBB/1192957.3

JOY 001386

The Company also has general safety rules and emergency procedures that all employees are responsible to know and are expected to follow. Appendix A contains a copy of these rules and procedures.

The Right to Know Law in Massachusetts states that employees working with toxic or poisonous substances must be informed of that fact within 30 days of hire. A Material Safety Data Sheet for each substance is on file at the Right to Know stations in the designated departments. It is your right to see sheets for any substance with which you work. For more information, please see a representative from Security or Human Resources.

### 6.3.    CORRECTIVE ACTION

All employees are expected to maintain high standards of conduct and job performance and to observe all Company rules and policies. Failure to do so may result in discipline up to and including termination. When the Company believes it would be appropriate or useful, corrective action may be used to address performance, attendance or other problems. Corrective action which may be used includes verbal warnings, written warnings, final written warnings, suspension and discharge. Factors which may be considered in deciding whether to use corrective action and the level of corrective action may include the nature and seriousness of the conduct; the employee's past record; the impact of the employee's conduct on the employee's department, the Company and the Company's clients; and any mitigating or aggravating circumstances.

These corrective action measures will not apply in the event of conduct which the Company deems serious enough to warrant immediate discharge or in other circumstances when the Company determines that corrective measures would be inappropriate. The Company retains the discretion at all times to determine when to use corrective action and the level of action to take.

### 6.4.    SUBSTANCE ABUSE

Out of concern for its employees and the community, the Company has taken a strong stand against drug and alcohol abuse. Drug and alcohol abuse increases the risk of workplace accidents, impairs the health and well-being of the user and diminishes productivity. The Company is therefore committed to maintaining a work place that is free from the influence of drugs and alcohol.

The unlawful manufacture, distribution, possession or use of a controlled substance or alcohol on the Company property or while on Company business is prohibited. For purposes of this policy, a controlled substance is any illegal drug or any prescription drug that if abused may lead to physical or psychological dependence. In addition, working while under the influence of alcohol or of a controlled substance is prohibited unless use of the controlled substance is consistent with a physician's prescription and does not substantially impair the employee's ability to work satisfactorily or pose a risk to workplace safety. Employees should notify their supervisors if their use of properly prescribed drugs may affect their work performance.

27

JOY 001387

### 6.5.  SOLICITATION AND DISTRIBUTION

#### A.  Non-Employees

Persons who are not employed by the Company are not permitted to solicit employees or distribute literature or other materials, for any purpose or at any time, within the Company's premises.

#### B.  Employees

Employees are not permitted to solicit other employees for any purpose not directly related to their assigned work on the Company's premises during their own working time or during the working time of the employees being solicited.

Employees may not distribute literature or other materials for any purpose not directly related to their assigned work during their own working time or during the working time of the employees to whom distribution is made.  Employees are not permitted to distribute literature or other materials at any time in working areas of the Company.

Employees may not sell any item or post literature or other materials on Company property, other than for the Company's business purposes.  Materials for distribution to employees may not be stored on the Company's premises.

### 6.6.  CONFIDENTIALITY

Employment with the Company creates a relationship of confidence and trust between you and the Company with respect to all Confidential Information.  Confidential Information means information which the Company possesses or to which the Company has rights. Confidential Information includes, by way of example and without limitation, lists of clients, prospective clients, vendors, subcontractors and community affiliates, mailing lists, statistical data compilations, manuals or any other documents embodying Company practices and policies, trade secrets, product ideas, processes, techniques, software, improvements, inventions, data, know-how, copyrightable materials, marketing plans and strategies, and sales and financial information.  Confidential Information includes information developed by an employee in the course of his or her employment with the Company, as well as other information to which employees may have access in connection with their employment.

At all times, both during and after employment with the Company, all employees must keep in confidence and trust all such Confidential Information, and cannot use or disclose any such Confidential Information without the written consent of the Company, except as may be necessary in the ordinary course of performing duties for the Company.  In addition, unless specifically authorized by the Company to speak to the press, it is a violation of this Confidentiality Policy to speak to any member of the media regarding Confidential Information. A violation of this policy may result in disciplinary action, up to and including termination of employment.

LIBB/1192957.3

JOY 001388

# VII.  ADMINISTRATIVE INFORMATION

### 7.1.  *APPLICATIONS/RECORDS*

The Company relies upon the accuracy of information contained in the employment application, as well as the accuracy of other data presented throughout the hiring process and employment.  Any misrepresentations, falsifications, or material omissions in any of this information or data may result in the Company's exclusion of the individual from further consideration for employment or, if the person has been hired, termination of employment.

### 7.2.  *EMPLOYEE CLASSIFICATIONS*

The Company places employees into several classifications for purposes such as personnel administration, payroll transactions and benefits.

All positions at the Company are classified as "exempt" or "non-exempt".  An exempt employee is one who is considered to be an executive, professional or administrative employee under the Fair Labor Standards Act ("FLSA") and who is paid on a salaried basis.  Exempt employees are not eligible to be paid overtime if they work over 40 hours a week. A non-exempt employee is one whose job is not classified as exempt and who is generally paid on an hourly basis.  Pursuant to the FLSA, non-exempt employees are paid 1½ times their regular hourly rate for any hours worked over 40 in a week.

In addition, employees are classified as "introductory" or "regular".  The first 90 calendar days of employment at the Company is referred to as an "introductory period".  This 90-day period is a time for you to determine whether you like your work at the Company and for the Company to determine whether your work is satisfactory for its needs.  At the end of this 90-day period, you will either become a regular employee, have your introductory period extended for an additional period of time, or be terminated.  Certain benefits may not be available until an employee becomes a regular employee.

Regardless of an employee's classification or status, employment at the Company is at-will at all times.

### 7.3.  *PERSONNEL FILES*

The Company maintains personnel files for each of its employees and is committed to keeping the information collected in these records is accurate and up-to-date.   You should therefore inform the Human Resources Department of any changes in your address, telephone number, marital status or number of dependents.  Your receipt of general company mailings, tax information, and insurance benefits may be affected by inaccurate information.

If you wish to change your benefit coverage or your beneficiary, be sure to contact the Human Resources Department so that proper forms can be completed.

You may request to review or to receive a copy of your personnel file by contacting the Human Resources Department.  However, all original personnel files must remain in the Human Resources Department.

LIBB/1192957.3

JOY 001389

### 7.4.   BULLETIN BOARDS

Bulletin boards are located at various locations throughout the Company. These bulletin boards are maintained to keep employees informed of Company announcements, policies and job opportunities. The Company urges its employees to check the bulletin boards regularly. Bulletin boards are not to be used for any other purposes.

### 7.5.   PAYROLL INFORMATION

The Company is required by law to withhold social security payments and state and federal income taxes from employees' pay. A statement of deductions and earnings (Form W-2) for the preceding calendar year is issued each year during the month of January. If your employment with the Company ends prior to January, your W-2 Form will be mailed to you in January to the last address on record at the Company.

<u>Paydays/Paychecks</u>

All employees are paid on Thursdays. The pay period is from Monday, 12:01am to Sunday 11:59pm. Beacon Capital Partners Management, LLC is currently on a weekly pay system.

### 7.6.   ACCIDENTS/INJURIES

The Company strives to provide a safe working environment for its employees. Safety is every employee's responsibility and all employees are expected to take necessary and reasonable steps to keep the Company a safe place to work. The Company requests the cooperation of all employees in maintaining a safe workplace by reporting any condition which may be a hazard to safety or health.

No matter how insignificant an on-the-job injury may seem to be when it occurs, notify your supervisor or the Human Resources Department immediately when any work-related accident or injury occurs.

### 7.7.   EMPLOYMENT TERMINATION

Since employment with this Company is based on mutual consent, both the employee and the Company have the right to terminate employment at will, with or without cause, at any time. If you resign from employment, you are requested to provide two weeks notice. If you are absent from work for three workdays without directly notifying your supervisor, you will be considered to have resigned effective on your last day worked.

The Company will generally schedule exit interviews for terminating employees. The exit interview will provide an opportunity to discuss such issues as employee benefits and return of Company-owned property. Suggestions, complaints, and questions can also be voiced.

Generally, all employee benefits will cease at employment termination. Consistent with the Consolidated Omnibus Budget Reconciliation Act (COBRA), medical and dental insurance coverage may be continued at the employee's expense if the employee so chooses. The

30

JOY 001390

employee will be notified in writing of the benefits that may be continued and of the terms, conditions, and limitations of such continuance.

Employees are responsible for all property, materials, or written information issued to them or in their possession.  Employees must return all property of the Company including beepers, keys, access cards, etc. that are in their possession at the time of termination.

31

JOY 001391

# VIII. GENERAL INFORMATION

## 8.1. *EMPLOYEE CONCERNS*

Employees are encouraged to make it known when a job-related problem arises. Informal discussions often produce a solution to a problem quickly and easily. When a question or difficulty arises, the easiest and most efficient way of communicating is through a thorough and frank discussion with your supervisor, with the matter at issue being clearly stated and understood by both of you. Many problems and misunderstandings can be resolved in this manner.

In some cases, discussions with other management personnel or with the Human Resources Department may be helpful. If you are in doubt as to how to proceed, you should contact the Human Resources Department for assistance.

## 8.2. *"OPEN DOOR" PHILOSOPHY*

Effective communication forms the basis for sound employee-manager relationships and a positive and productive work environment. Our commitment to effective communication is reflected by our "open door" philosophy. Employees should always feel free to approach their manager with work-related ideas, observations and concerns. A frank talk with a manager is one of the best ways to get immediate feedback, to ease your mind about a particular situation or to resolve a problem.

Managers keep an "open door" for the questions and concerns of employees. This should be the first place an employee goes to voice concerns. However, there may be times when an employee feels, for some reason, that he or she is unable to discuss a particular situation with the manager. In these cases, the employee should express his or her concerns to a Human Resources representative.

## 8.3. *DRESS CODE*

Your personal appearance reflects your attitude toward the Company and how the Company is perceived by the public and our clients. Because you are a representative of the Company, the Company expects you to use common sense and good taste in dress and grooming and, in general, to avoid extremes. Hair, beards and mustaches should be kept trimmed, and clothing should be tasteful. Clothing that is dirty, outlandish or provocative should not be worn to work. An employee who reports for work inappropriately dressed, in the opinion of his or her supervisor, will be asked to go home and change, and may be docked for the time not worked. Employees will be expected to adhere to the following standards of dress:

### A.    Office Personnel

Office personnel are expected to dress in a manner which is appropriate for an office environment and which projects a businesslike appearance. T-shirts, jeans, shorts, sandals, athletic shoe or similar items of casual attire are not permitted.

32

LIBB/1192957.3

JOY 001392

**B.**    **Tradesmen**

(a)    All tradesmen will be assigned uniforms (pants and shirts with an arm patch) and will wear them at all times when on duty.

(b)    The uniforms will be kept neat and in good repair at all times. If a uniform is excessively dirty or torn it will immediately be returned to the stockroom for cleaning or repair.

(c)    Shirts will be appropriately buttoned (only top one or two buttons open).

(d)    Hats are discouraged; however they may be worn if working in mechanical spaces, ceiling plenums or outside. If hats are worn, they will be either with a John Hancock logo or plain with no logo.

(e)    Appropriate steel toe work boots must be worn when on duty.

(f)    No other patches, pins, badges or buttons are to be worn on the uniform except for the Company logo.

## 8.4.    *OUTSIDE EMPLOYMENT*

The Company does not object to your holding an outside job, as long as that outside job does not interfere with your duties or your performance at the Company. If the Company determines that an outside job would be inappropriate or would interfere with your employment for the Company, you may be asked to select between your two jobs. For that reason, all employees are required to notify their supervisors of outside employment.

When considering outside employment, you should avoid any situation that:

1.    Adversely affects your performance on the job at the Company, such as being too tired to perform effectively or being unable to work overtime if needed;

2.    Involves working in any capacity for an employer offering goods or services that are competitive with those offered by the Company; or

3.    Gives the appearance of presenting a conflict of interest, such as working for the Company's clients.

## 8.5.    *EMPLOYMENT VERIFICATION AND REFERENCES*

All inquiries, which you or others may have regarding your employment, should be directed to the Human Resources Department. Human Resources will ordinarily confirm only the following to anyone inquiring about your employment for such reasons as references, loans, mortgages, applications, etc.:

- Confirmation of employment

33

LIBB/1192957.3

JOY 001393

- Dates of employment
- Position (or last position held)

Additional information may be provided only after we receive your written request.

## 8.6.  *DAMAGE CONTROL TEAM*

As part of the Emergency Preparedness Organization (EPO), the Building Operations Department designates certain individuals to assist the Emergency Response Team (ERT) during an emergency incident.  These individuals are identified as members of the Damage Control Team (DCT).  The general responsibilities of the DCT is to limit damage to the Home Office Complex caused by emergencies such as fire or explosions, hazardous material or hazardous waste spills, or any other incident that may threaten life safety or cause property damage.

## 8.7.  *GUIDELINES FOR SNOW/EMERGENCY DAYS, EARLY CLOSING DAYS AND LATE OPENING DAYS*

Due to the nature of the tenancy of the John Hancock Complex, there is never a time that the buildings do not have occupancy by either John Hancock personnel or building tenants. Because of this, the Real Estate Operations Department must always staff the complex to maintain normal operations.  This does not necessarily mean a full complement of personnel is required at all times, however, a designated minimum staffing is required.  Below are guidelines that will be used for insuring that the complex is adequately staffed, and for establishing compensation for the time worked during emergency closings.

(a)    Work Guidelines for Policies 8.6 and 8.7

(i)    All non-administrative operations staff should expect to work their normal shift hours on all snow or other emergency days, early closing days and late opening days.

(ii)    Emergency Crews will be established for each department. Emergency Crew personnel are required to be available to work during any emergency days.  All personnel will be designated for the Emergency Crew on a rotating basis at some time during the year.

(iii)    Decisions on required personnel during emergency days will be made on a case-by-case basis. However, if staff is designated as Emergency Crew and do not report to work accordingly, this may be the basis for disciplinary action, including termination.

(b)    Compensation Guidelines for Policies 8.6 and 8.7

(i)    Staff who are not designated as Emergency Crew, are unable to get to work, or are excused from work by their supervisor during an emergency day that John Hancock Company is closed, will receive their normal

34

JOY 001394

compensation for that day. These hours will be counted as hours worked for the purposes of calculating overtime.

        (ii)     The Emergency Crew will receive normal compensation for the hours worked, plus an additional compensation of one straight time shift. Only the actual hours worked will be counted for the purposes of calculating overtime.

        (iii)    All evening and night shift staff will receive normal compensation for the hours worked, plus an additional compensation of one straight time shift. Only the actual hours worked will be counted for the purposes of calculating overtime.

        (iv)    In the event of late opening or early closing days, all the staff is expected to start or complete their shift accordingly. Compensation for this time will be for actual hours worked to complete the shift plus one additional hour for each hour that the company was closed, to either the end of the shift or the start of the workday. This does not apply to evening or night shifts.

Please note that existing policy states that vacation, personal, salary continuance (sick) days or jury duty are not considered time worked and will not be counted for the purposes of calculating overtime.

### 8.8.   *EMPLOYMENT OF RELATIVES*

It is the Company's policy not to hire close relatives of current employees. Close relatives include the spouse, siblings, parents, in-laws, children, grandparents, grandchildren, uncles, aunts, nieces or nephews of any current employee.

### 8.9.   *POLICY AND PROCEDURES PROHIBITING SMOKING*

        (a)    Purpose: It is recognized that smoking is dangerous to the health of the smoker and that involuntary smoking is a cause of disease, including lung cancer, in healthy nonsmokers. The simple separation of smokers and nonsmokers within the same air space may reduce, but does not eliminate, the exposure of nonsmokers to environmental tobacco smoke. This applies to *all* smoking tobacco products, i.e., cigarettes, cigars, and pipes. This policy has been developed to protect all persons from the exposure to environmental tobacco smoke and to ensure a safe working environment.

        (b)    Policy: Smoking is prohibited in all facilities and areas of the entire workplace with no exceptions. Smoking is not permitted anywhere at Beacon Capital Partners Management, LLC, including all common work areas, elevators, hallways, company vehicles, restrooms, cafeterias, employee lounges, conference and meeting rooms, and all other enclosed or outdoor areas in the workplace. The policy applies to all employees, clients, consultants, contractors, and visitors.

        (c)    Procedure:

35

JOY 001395

(i)    Compliance with the smoke-free policy is mandatory for all employees and persons visiting Beacon Capital Partners Management, LLC.

(ii)    Any disputes involving smoking will be referred to your immediate supervisor.

(iii)    Employees who violate this policy are subject to disciplinary action up to and including termination.

(iv)    No person or employer shall discharge, refuse to hire, refuse to serve, or in any manner retaliate against any employee, applicant or customer because such employee, applicant or customer takes any action in furtherance of the enforcement of this regulation or exercises any right conferred by this regulation.

(d)    Smoking Cessation Opportunities: Beacon Capital Partners Management, LLC encourages all smoking employees to quit smoking. We are available to provide you with contact information for Smoking Cessation resources and self-help materials for those employees who want to quit. For further information about these services please contact Human Resources.

(e)    Questions: Any questions regarding the smoke-free workplace policy should be directed to Human Resources.

## 8.10.    TELEPHONES

Personal calls may be made or received from Company telephones only in cases of genuine emergency and only with your supervisor's permission. There is a pay phone in the employee lounge for those who wish to make personal calls during break periods.

## 8.11.    SEARCHES

Desks, lockers, and other storage devices may be provided for the convenience of employees but they remain the sole property of the Company. Accordingly, they may be inspected by any agent or representative of the Company at any time either with or without prior notice. If you prefer not to have your personal items subjected to scrutiny, you should leave such items at home.

## 8.12.    COMPUTER AND INFORMATION SECURITY POLICY

This Policy sets forth some important reminders about the use of the Company's computer and communications systems. These systems include individual PCs provided to certain employees, all associated software, the Company's telephone, voice mail and electronic mail systems, all centralized computer equipment, and the local and wide-area networks.

The Company has provided these computer and communications systems to support the conduct of its business. No use of these systems should ever conflict with the primary business purpose for which they have been provided, with the Company's ethical responsibilities or with

36

LIBB/1192957.3

JOY 001396

applicable laws and regulations. Each user is personally responsible to ensure that these guidelines are followed.

All data in the Company's computer and communication systems (including documents, other electronic files, e-mail and recorded voice mail messages) is the property of the Company. The Company may inspect and monitor such data at any time, with or without the employee's assistance or consent. **No individual should have any expectation of privacy for messages or other data recorded in the Company's systems.** This includes documents or messages marked "private," which may be inaccessible to most users but remain available to the Company. The fact that computers are password-protected does not create any expectation of privacy in information or documents on an employee's computer. Likewise, the deletion of a document or message may not prevent Company access to the item or completely eliminate the item from the system.

The Company's systems must not be used to create or transmit material that is derogatory, defamatory, obscene or offensive, such as slurs, epithets or anything that might be construed as harassment or disparagement based on race, color, ancestry, citizenship, sex, sexual orientation, age, religion, national origin, pregnancy, marital status, physical or mental disability or other legally protected characteristics. Similarly, the Company's systems must not be used to solicit or proselytize others for commercial purposes, causes, outside organizations, chain messages or other non-job-related purposes.

Security procedures in the form of unique user sign-on identification and passwords have been provided to control access to the Company's host computer system, networks and voice mail system. In addition, security facilities have been provided to restrict access to certain documents and files for the purpose of safeguarding information. The following activities, which present security risks, should be avoided:

- Attempts should not be made to bypass, or render ineffective, security facilities provided by the Company.

- Passwords should not be shared between users. If written down, passwords should be kept in locked drawers or other places not easily accessible.

- Document libraries of other users should not be browsed unless there is a legitimate business reason to do so.

- Changes or modifications to the hardware configuration of computer equipment should never be made. Requests for such changes should be directed to your manager.

- Additions to or modifications of the standard software configuration provided on the Company PCs should never be attempted. Requests for such changes should be directed to your manager.

- Software or programs should never be loaded or executed on the Company computers by individual users. Requests for loading such software or programs should be

37

JOY 001397

directed to your manager to determine whether such software or programs present any risks to the Company's computer system or would violate any applicable laws.

- The Company's computer facilities should not be used to attempt unauthorized access to or use of other organizations' computer systems and data.

- Computer games should not be loaded on the Company's PCs.

- Software and documentation for programs licensed or owned by the Company should not be removed from the Company's offices or copied onto any media.

- The location or installation of computer equipment in offices and work areas should not be changed. Requests for such changes should be directed to your manager.

There are a number of practices which individual users should adopt that will foster a higher level of security. Among them are the following:

- Turn off your personal computer when you are leaving your work area or office for an extended period of time.

- Exercise judgment in assigning an appropriate level of security to documents stored on the Company's networks, based on a realistic appraisal of the need for confidentiality or privacy.

- Remove previously written information from CDs or disks before copying documents on such CDs or disks for delivery outside the Company.

Should you have any questions about any of the above policy guidelines, please contact your supervisor.

### 8.13.    *INTERNET ACCEPTABLE USE POLICY*

The Company has provided access to the Internet for certain employees to support its business. No use of the Internet should conflict with the primary business purpose of the Company, with the Company's ethical responsibilities or with applicable laws and regulations. Each user is personally responsible to ensure that these guidelines are followed.

The Company may monitor usage of the Internet by employees, including reviewing a list of sites accessed by an individual. **No individual should have any expectation of privacy in terms of his or her usage of the Internet.** In addition, the Company may restrict access to certain sites that it deems are not necessary for business purposes.

The Company's connection to the Internet may not be used for any of the following activities:

- The Internet must not be used to access, create, transmit, print or download material that is derogatory, defamatory, obscene, or offensive, such as slurs, epithets, or anything that may be construed as harassment or disparagement based

38

JOY 001398

on race, color, ancestry, citizenship, sex, sexual orientation, age, religion, national origin, pregnancy, marital status, physical or mental disability or other legally protected characteristics.

- The Internet must not be used to access, send, receive or solicit sexually-oriented messages or images.

- The Internet must not be used to download or copy materials without the permission of the publisher or owner. For assistance with copyrighted material, contact your manager.

- Employees should safeguard against using the Internet to transmit personal comments or statements through e-mail or to post information to news groups that may be mistaken as the position of the Company.

- Employees should guard against the disclosure of confidential information through the use of Internet e-mail or news groups.

- The Internet should not be used to send or participate in chain letters, pyramid schemes or other illegal schemes.

- The Internet should not be used to solicit or proselytize others for commercial purposes, causes, outside organizations, chain messages or other non-job related purposes.

- The Internet provides access to many sites that charge a subscription or usage fee to access and use the information on the site. Requests for approval must be submitted to your manager.

If you have any questions regarding any of the policy guidelines listed above, please contact your supervisor.

39

LIBB/1192957.3

JOY 001399

## IX.    Appendix A:  Safety Rules

### 9.1.    *GENERAL SAFETY*

- Obey all rules and regulations.
- Follow instructions; don't take chances.
- If you are not sure how to do a job safely, ask your supervisor.
- Be alert.  Be sure to look where you are going, and make sure there is enough light to see your way.
- Move at a pace so that you can stop quickly should a guest or employee step in front of you.
- Horseplay, practical jokes and running are strictly prohibited.
- Keep your work place clean and orderly.
- If you see unsafe or sub-standard conditions or practices you think might cause damage, illness or injury, report them immediately to your Supervisor or Security.
- If your job requires personal protective equipment, wear it properly and keep it in good condition (safety glasses, ear plugs, gloves, dust masks, etc.).
- Use the handrail when going up or down stairs, and use knob when opening or closing a door.
- Force should never be applied to open a container.  Always use the label before using chemicals.
- Conserve energy by turning off lights and equipment when not in use.
- Do not operate machines unless you have been properly trained.
- Clean spills immediately.  Use spill stations.
- Dispose of broken glass, etc. Do not pick up broken glass with your hands.
- Put equipment away after use.
- Report suspicious acting people to Security.

### 9.2.    *EMERGENCY PROCEDURES*

- Familiarize yourself with emergency and evacuation procedures.
- Know location of fire extinguishers, fire exits, and fire alarm pull stations.
- Know action to take in the event of:
  --Employee/guest accident or illness
  --You see fire, smell smoke, or see smoke
  --Chemical spill (if you work with hazardous chemicals)
  --Blood spill

### 9.3.    *GENERAL FIRE PROCEDURES*

It is everyone's responsibility to know the correct action to take in the event of a fire.  Be sure you are familiar with the location of fire alarms; pull stations and fire extinguishers, particularly in your specific work area.  If you discover a fire or smell smoke:

- Activate the nearest alarm pull station

40

LIBB/1192957.3

JOY 001400

- Dial _617-275-0123
- Give the exact location of the fire
- Follow instructions of your supervisor and be prepared to follow emergency evacuation routes to a safe area
- Do not place yourself in danger
- Do as much as possible to extinguish the fire with an extinguisher *if you have been trained how,* but do not use a fire hose
- Do not use water on an electrical fire
- Never enter a smoke-filled room or corridor

### 9.4.    *ACCIDENTS, INJURIES OR ILLNESSES*

Report all accidents, injuries or illnesses at once to Security and/or your Supervisor. Inspect or make note of the work condition that caused the injury and give this information to Security

41

LIBB/1192957.3

JOY 001401

# EXHIBIT 2

**John Hancock Financial Services, Inc.**

HR Shared Services

John Hancock Place
Post Office Box 111
Boston, Massachusetts 02117
(617) 572-6761
Fax: (617) 572-6732
E-mail: pmongeau@jhancock.com

Peter J. Mongeau, CEBS
Vice President

October 4, 2004

Carlton Grant
HRSS – Appeals

Carlton:

As requested in your July 16th note to me, and subsequent to you advising me that the appeal letters continue to come in and that you have scheduled a November, 2004 appeal committee meeting, attached please find the information from my files. The information is in somewhat of a chronological order as follows:

> - Beacon Capital "comparability" analyis
> - administrative guidelines to determine comparability
> - 11/02 severance plan
> - spring 2003 severance agreement
> - 11/02 final draft plan votes and employee communications
> - 11/02 severance memo (from Walters)
> - fall 2002 working papers on sale of business unit
> - fall 2002 and earlier working papers on various severance plan language/provision changes

This is the extent of the information I have on file short of material that is "privileged and confidential attorney-client communication/attorney work product". Also, you should request a copy of the final 11/02 Senior Committee vote adopting the revised severance plan from Antoniette Ricci.

As discussed, I will not hear the appeal, given my personal involvement in this matter. However, I will make myself available to the other committee members for any questions should that be necessary.

Peter Mongeau

**Mongeau, Peter J.**

| | |
|---|---|
| **From:** | Mongeau, Peter J. |
| **Sent:** | Thursday, November 14, 2002 2:45 PM |
| **To:** | Palmer, Page; Morton, Karen; Colley, Sandra M.; Clarkson, Philip |
| **Cc:** | Blake, Lisa; DiCicco, Joan M. |
| **Subject:** | FW: Final (?) Draft of Severance Plans and Vote |

I've made some "proof-reading" edits to 3.1, and some "consistency" edits in the language in 3.2 and 5.5. of each plan. I consider these ready to go. Phil, you'll want to add a space before "(1)" in the Resolution. Also attached is the "final?" draft of the employee communication (which incorporates a first-round of edits from Page, Sandi, Lisa Blake and Joan DiCicco).



severance2002eec
omm.doc (31 KB...

Ideally, if you have any final changes to the plans, please get them to Phil tomorrow or Monday. Get me any edits to the employee communication. If we can get this sent to David and Wayne by Monday or Tuesday of next week, Page and I can follow-up with them when we meet on another item on Wednesday.

Once the vote is approved, I will update the Hub Employee Central language, and we will work these changes into the SPD addendum we're preparing for distribution in December.

Sandi, I assume you are or have already revised the agreements for both employees and Senior Officers (including addressing ICP and non-solicitation), and that the Q&As have been amended to comply with these documents.

Thanks.

-----Original Message-----

| | |
|---|---|
| **From:** | Clarkson, Philip |
| **Sent:** | Wednesday, November 13, 2002 8:03 AM |
| **To:** | Palmer, Page; Mongeau, Peter J.; Morton, Karen; Colley, Sandra M. |
| **Subject:** | Final (?) Draft of Severance Plans and Vote |

        

PC3284.DOC (28    PC3272.DOC (76    PC3273.DOC (76
KB)                         KB)                         KB)

1

CONFIDENTIAL

JH 001370

JH Communication on behalf of Human Resources

Subject: Severance Pay Plan Changes

Annually, John Hancock evaluates the competitive standing and costs of its benefit plans. We typically focus on our health and retirement benefits, which can change year-to-year for all companies. We recently evaluated the Company's Severance Pay Plan as well – comparing its provisions to those of our peers and to industry norms.

Generally, our Severance Pay Plan is at or above average with respect to key provisions – for example, the number of weeks of pay per year of service, the alternative calculation which is based on base salary, the choice of various payout options which can extend the duration of severance payments, and continuing medical benefits and crediting service during severance. However, other provisions (pertaining to the sale or outsourcing of a business unit) were found to be the exception to those benefits offered by other employers. As a result, the following two provisions of the plan will be changed so that:

> in the event of the sale or outsourcing of a business unit, if an employee of the business unit is offered a comparable job by the purchaser or successor company, severance will not be paid (comparable will be defined as similar salary, competitive benefit offerings, and a work location within 50 miles of the current work location)

> if the purchaser or successor company subsequently terminates the employee within six months of the sale or outsourcing (and hire) date, severance will not be paid under the John Hancock plan

The reasons for these changes are:

> the competitive findings as described above

> the realignment of our Severance Pay Plan with its primary purpose to "bridge" employees to future employment

> the need to support necessary and strategic divestitures and outsourcing

We want to acknowledge that these changes to the Severance Pay Plan are being made at the same time some John Hancock business units have announced a sale or outsourcing is under consideration. Therefore, one of the evaluation criteria of the bidders may be their ability to offer viable positions to our employees in a company at which they can be successful. Should such positions not be available and offered by the purchaser or successor company, John Hancock severance benefits will be paid if an employee is terminated as a result of the sale or outsourcing.

JH 001371

Should you have any questions about this benefit change, please contact
Benefits & HR Services at 1-800-990-4404. If you are an employee in a business unit that
has announced a sale or outsourcing, you will receive additional information as soon as it
is available.

JH 001372

Bisciotti Dep. Tr.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


CIVIL ACTION NO. 05-11428-WGY


```
*************************************
DANIEL JOYCE, Individually and on     *
behalf of a class of others           *
similarly situated,                   *
         Plaintiff,                   *
                                      *
v.                                    *
                                      *
JOHN HANCOCK FINANCIAL SERVICES,      *
INC., and JOAN M. DiCICCO,            *
         Defendants.                  *
*************************************
```


DEPOSITION OF BRIAN J. BISCIOTTI,
taken pursuant to a mutual confidentiality
agreement and the applicable provisions of the
Federal Rules of Civil Procedure, before Susan L.
Prokopik, Registered Merit Reporter and Notary
Public in and for the Commonwealth of
Massachusetts, at the offices of Todd & Weld LLP,
28 State Street, Boston, Massachusetts, on
Tuesday, May 9, 2006, at 11:02 a.m.


KACZYNSKI REPORTING
72 CHANDLER STREET, SUITE 3

BOSTON, MASSACHUSETTS 02116

(617) 426-6060

Page 14

1  A. If there is any documents that kind of give --
2     basically a ground rules to make a decision?
3  Q. Correct.
4  A. None that I'm aware of.
5  Q. So based on your testimony here today, on what
6     basis are you stating the phrase "educated
7     decision"?
8  A. Based on just how we -- as a reasonable employee
9     of the company review any decision we're taking.
10 Q. So you step into the shoes, is it fair to say you
11    step into the shoes of a reasonable employee of
12    the company --
13       MS. JACKSON: Objection.
14 Q. -- when rendering your decision on whether to
15    uphold or reverse a decision on benefits?
16       MS. JACKSON: Objection. That's
17    leading.
18       MR. ROBBINS: Well, I can ask a leading
19    question.
20 Q. Would you like me to rephrase the question --
21 A. Um --
22 Q. -- or did you understand the question?
23 A. I did but I'm going to stand by the objection.
24 Q. Well, you can answer the question.

Page 15

1        MS. JACKSON: I'm going to instruct him
2     not to answer. If you would like to place a
3     nonleading question before him, then he can
4     answer that.
5        MR. ROBBINS: We reserved in our
6     stipulations that you reserve the right to object
7     as to form. You have made your objection. That
8     will come up at a later point in time.
9  Q. If you understand the question and if this does
10    not reveal privileged information, I would ask
11    that you answer the question.
12 A. Could you repeat the question, please?
13       MR. ROBBINS: Can you read back for me
14    what the question was?
15       (Question read.)
16 Q. Do you understand the question, Mr. Bisciotti?
17 A. I do. Yes.
18 Q. And what is your response?
19 A. I think it's fair to say I do.
20 Q. You do step into the shoes of a reasonable
21    employee when rendering a decision on --
22 A. Correct.
23 Q. On the Appeals Committee?
24 A. On the basis of the facts and the material I had

Page 16

1     to review the case, correct.
2  Q. Again, how do you determine what a reasonable
3     employee or how a reasonable employee would
4     interpret the plan?
5  A. Just more of a general understanding of the case.
6  Q. I mean -- sorry to interrupt. Is there a
7     consensus taken to determine what the reasonable
8     employee thinks or are you determining this as a
9     tax lawyer?
10 A. I'm --
11       MS. JACKSON: Objection.
12 Q. You can answer.
13 A. I'm not determining it as a tax lawyer. I'm
14    determining it as a committee member that votes
15    on the committee.
16       MR. FEEHERRY: Let's take a two-minute
17    break if that's okay with you.
18       MR. ROBBINS: Fine.
19       (Recess.)
20       (Question read.)
21 Q. Mr. Bisciotti, I would like to touch on this
22    "reasonable employee" phrase that you used in
23    your previous testimony and try and pinpoint what
24    it is, what steps that you take as a member of

Page 17

1     the Appeals Committee to best grasp the feel of
2     the reasonable employee.
3  A. Okay. When I say that, I believe that we are --
4     as a committee we get together to discuss the
5     case and make sure that the plan's been applied
6     fairly. That's where I get that -- that's where
7     I make that statement from. That the plan terms
8     have been applied non -- in a nonarbitrary,
9     capricious manner.
10 Q. Has anyone ever used that phrase before in order
11    to describe the standard of review when reviewing
12    an appeal?
13 A. I'm not aware of it.
14 Q. How many members are there on the Appeals
15    Committee?
16 A. At this -- for this case, there was three.
17 Q. And we'll get to that in a moment. Generally how
18    many members are there on the Appeals Committee?
19 A. Three.
20 Q. Is there ever less than three?
21 A. If someone needs to recuse themselves maybe.
22 Q. Is there ever more than three?
23 A. No.
24 Q. Okay. Have you ever been deposed due to the

KACZYNSKI REPORTING

Page 34

1   document?
2   A. Yes, I am.
3   Q. What is it?
4   A. It's the severance plan document.
5   Q. On the bottom right corner of this document
6       marked as JH 001909 through JH 001919 and
7       entitled "John Hancock Financial Services, Inc.,
8       Severance Pay Plan" is the date 11/15/02. What
9       does this date represent?
10  A. As far as I know, it's the effective date of the
11      latest statement of the plan.
12  Q. With respect to Exhibit 2, do you recall if this
13      document was a copy of the same 11/02 severance
14      plan Mr. Mongeau purportedly provided to Carlton
15      Grant for the Appeals Committee to review?
16  A. To the best of my knowledge it was.
17  Q. Do you recall whether the Hancock severance pay
18      plan was amended in any way in late 2002?
19  A. Yes.
20  Q. In what respects do you recall the plan being
21      amended?
22  A. The -- to my knowledge it was amended --
23      specifically article 3.2, I think.
24  Q. Calling your attention to section 3.2, were

Page 35

1   subsections C and D specifically the subsections
2   added to the plan in November of 2002?
3   A. That's -- I'm aware of, yes.
4   Q. Are subsections 3.2 C and D commonly referred to
5       as the comparable job provision?
6   A. I'm not aware of that.
7   Q. Have you ever heard the phrase "comparable job
8       provision" with respect to the severance pay
9       plan?
10  A. Just in the context of this appeal.
11  Q. Is this the severance plan that you were provided
12      and relied upon when reviewing Joyce's appeal for
13      severance benefits?
14  A. That's correct. Yes.
15  Q. Could you please review to yourself section 7.5
16      and 7.6?
17  A. Okay.
18  Q. Okay. What was the significance of section 7.5
19      and 7.6 to you as a member of the Appeals
20      Committee?
21  A. This is the procedure to follow in filing the
22      claim. Filing an appeal.
23  Q. So is it fair to say in addition to what has been
24      marked as Exhibit 1, the procedural rules, there

Page 36

1   are additional rules set forth in section 7.5 and
2   7.6 of the severance pay plan?
3   A. They're generally the same it seems.
4   Q. Okay.
5   A. They kind of go together, yes.
6   Q. On how many occasions have you been asked to
7       consider an employee's appeal for severance
8       benefits since the plan was amended in November
9       of 2002?
10  A. Just this one.
11  Q. When did you first become aware that the
12      severance pay plan had been amended?
13  A. During this appeal.
14  Q. Did you receive notice as a Hancock employee that
15      the plan had been amended prior to this appeal?
16  A. I can't recall. I may have.
17  Q. What does it mean in section 7.6 when it states
18      that the committee's decision "shall include
19      specific reasons for the decision"?
20  A. It must consider the specific reasons for the
21      appeal. It is what it is.
22  Q. How do you interpret that phrase? And how do you
23      apply it to your duties as a member of the
24      Appeals Committee?

Page 37

1   A. We must -- we must consider all the
2   documentation, consider the appeal and set forth
3   our reasons for why the plan is interpreted the
4   way it is.
5   Q. To set forth specific reasons, correct?
6   A. Right.
7           MR. ROBBINS: If we could mark this as
8   Exhibit 4.
9           (Severance Pay Plan marked Exhibit No.
10  4.)
11  Q. Mr. Bisciotti, are you familiar with this
12      document, which has now been marked as Exhibit 4?
13  A. Yes, I am.
14  Q. What is it?
15  A. It's the summary plan description of the
16      severance pay plan.
17  Q. Referring to the bottom of the page, where it
18      states "Benefits Supplement, December, 2002,"
19      what does that refer to?
20  A. This was supplemented December, 2002. Severance
21      pay plan. SPD.
22  Q. So is this document part of the severance pay
23      plan? Is this document part of the summary plan
24      description?

KACZYNSKI REPORTING

9a0ae8c5-545e-4b33-9728-a797a716bc34

Page 38

1   A. As far as I'm aware it is, yes.
2   Q. What is the purpose of a benefits supplement?
3   A. To explain the plan provisions.
4   Q. In this case to explain the severance pay plan
5       provisions, correct?
6   A. Correct.
7   Q. Okay. Do the last couple paragraphs beginning
8       with "Effective November 18, 2002" refer to
9       subsections 3.2 C and D of the severance pay
10      plan?
11  A. They may.
12  Q. Do you recall if at any point in time you ever
13      knew whether these two provisions referred to
14      subsections 3.2 C and D of the severance pay
15      plan?
16  A. Just in the course of this appeal.
17  Q. Is the purpose of these paragraphs to interpret
18      subsection 3.2 C and D of the severance pay plan?
19  A. As far as I'm aware.
20  Q. Is the purpose of these paragraphs to interpret
21      subsection 3.2 C and D so the subsections can be
22      understood, rather, so the plan provisions can be
23      understood by the average severance plan
24      participant?

Page 39

1   A. That's my understanding.
2   Q. Was Daniel Joyce's appeal the first time you were
3       asked to interpret subsections 3.2?
4   A. Yes, it was.
5   Q. To the extent this was the first time you had to
6       interpret the newly amended provisions of the
7       plan, subsections 3.2 C and D would have been
8       helpful in you making your decision, correct?
9   A. Correct.
10  Q. In fact, these two paragraphs of Exhibit 4 would
11      have been helpful for you to interpret the
12      provisions of the plan?
13  A. Helpful, yes.
14  Q. Do you specifically recall whether you were
15      provided with a copy of Exhibit 4 when reviewing
16      Joyce's appeal?
17       I notice you're referencing Exhibit 2.
18  A. Right.
19  Q. Do you specifically recall without making
20      reference to Exhibit 2 from memory whether you
21      were provided with a copy of this document?
22  A. I believe so.
23  Q. On what basis do you form that belief?
24  A. I believe it was in the package of material we

Page 40

1       had when we -- before we met as a committee.
2   Q. If I could ask you to turn back to Exhibit --
3       what's been marked as Exhibit 2, which is the
4       letter from Mr. Mongeau to Carlton Grant. Was
5       this document marked as Exhibit 4 included in Mr.
6       Mongeau's package of documents sent to the
7       Appeals Committee?
8   A. To my recollection it was.
9   Q. I'm asking you with reference to Exhibit 2, is
10      it, do you know, is it clear from this document,
11      Exhibit 2, that Exhibit 4 was part of the package
12      of documents sent to the Appeals Committee?
13  A. Not from looking at Exhibit 2.
14  Q. So on what basis do you believe that Exhibit 4
15      was actually received by the Appeals Committee?
16  A. The documents, it's familiar to me.
17  Q. Is it possible you may have reviewed this
18      document, Exhibit 4, on an occasion other than
19      reviewing Dan Joyce's appeal?
20  A. No.
21  Q. It's not possible. And on what basis do you make
22      that determination that it could not be possible?
23  A. Because it isn't.
24  Q. Despite the fact it's not specifically referenced

Page 41

1       in Exhibit 2; is that fair to say?
2   A. Correct.
3           MS. JACKSON: Objection.
4   Q. Do you recall when the first time, when was the
5       first time you saw this document?
6   A. No, I don't.
7   Q. On how many occasions have you been asked to
8       interpret or apply subsections 3.2 C and D with
9       respect to an employee's appeal for severance
10      benefits?
11  A. Just this case.
12  Q. In reading this provision in Exhibit 4, was the
13      condition precedent for applying the comparable
14      job provision the sale or outsourcing of a
15      business unit?
16  A. If you look at the plan, it doesn't have that
17      language in it.
18  Q. Well, I'm asking you to take a look with respect
19      to Exhibit 4 and we've already established,
20      correct, that this language interprets the plan,
21      correct?
22  A. It helps interpret.
23  Q. It helps interpret or it does interpret?
24  A. It helps.

11 (Pages 38 to 41)

KACZYNSKI REPORTING

9a0ae8c5-545e-4b33-9728-a797a716bc34

| Page 50 | Page 52 |
|---|---|

**Page 50**

1     MS. MORTON: Off the record.

2     (Off the record.)

3  Q. According to just Exhibit 4, if we take Exhibit 4

4     as it is, must the plan administrator first

5     determine whether there is an outsourcing or sale

6     of a business unit before determining whether a

7     comparable job has been offered to an associate?

8     MS. JACKSON: Objection.

9  A. Again, this is the interpretive language of the

10    plan. That's the best I can offer for this.

11  Q. So according to the interpretive language of the

12    plan, that's what I'm only asking you about, must

13    the plan administrator first determine whether

14    there has been a sale or outsourcing of a

15    business unit before determining whether a

16    comparable job has been offered to an associate?

17    MS. JACKSON: Objection.

18  A. I don't think it's entirely clear to me from the

19    SPD.

20  Q. Did you rely on this document marked as Exhibit 4

21    in any way when reviewing Joyce's appeal?

22  A. I may have looked at it.

23  Q. I believe you stated earlier that this

24    provides -- you believe this provides some

**Page 51**

1    guidance for interpreting the plan. Is that

2    correct?

3  A. That's correct.

4  Q. Did you find that you needed this sort of

5    guidance in order to assist you in interpreting

6    the plan in this situation, being Joyce's appeal?

7  A. No. The plan was clear to me.

8  Q. If there is no sale or outsourcing of a business

9    unit, does subsection C and D of section 3.2 of

10    the severance plan apply?

11  A. Can you repeat that again? Sorry.

12  Q. If there is no sale or outsourcing of a business

13    unit, does subsections 3.2 C and D of the

14    severance pay plan apply?

15  A. Sale or outsourcing isn't referred to in 3.2

16    specifically.

17  Q. Okay. What is a business unit?

18  A. It's not a defined term. I'm not sure.

19  Q. Is the summary plan description distributed to

20    employees?

21  A. It's available to employees, yes.

22  Q. And the phrase "business unit" is used in the

23    summary plan description, correct?

24  A. Correct.

**Page 52**

1  Q. Being that you as a member of the Appeals

2    Committee often times put yourself in the shoes

3    of a reasonable employee, how do you interpret

4    the phrase "business unit"?

5  A. Business unit could vary between areas of the

6    company.

7  Q. Do you recall in which business unit Joyce was

8    employed?

9  A. The building service area, I believe.

10  Q. Is that the name --

11  A. I'm not sure that's the exact name. Real estate

12    --

13    MS. JACKSON: If you don't know, you

14    can just say you don't know.

15  A. I don't know.

16  Q. How many employees were there within Joyce's

17    business unit?

18  A. I'm not sure.

19  Q. Again, I'll ask you, do you recall what his

20    business unit was called?

21  A. Not specifically.

22  Q. Do you recall whether you or any member of the

23    Appeals Committee undertook any steps to assess

24    the makeup of Joyce's business unit?

**Page 53**

1  A. Not that I'm aware of.

2  Q. How could you assess whether there was a sale or

3    outsourcing of Joyce's business unit if you

4    didn't know which business unit he was in?

5  A. It was generally understood it was his unit.

6  Q. On what basis do you say "generally understood"?

7  A. There is documentation I reviewed.

8  Q. What documentation -- can you refer me to what

9    documents it was that provided you with this

10    general understanding?

11  A. Not specifically.

12  Q. Did you review those documents in anticipation of

13    your deposition testimony here today?

14  A. Likely, yes.

15  Q. Do you recall whether it was a letter, whether it

16    was correspondence, an E-mail?

17    MS. JACKSON: Objection.

18  A. I don't recall.

19  Q. Okay. Is it fair to say then that you didn't

20    take as a member of the Appeals Committee, you

21    did not take any steps to assess what the makeup

22    was of Joyce's business unit?

23  A. No. Because I think it was clear to us.

24  Q. And you say it was clear to you based on

KACZYNSKI REPORTING

9a0ae8c5-545e-4b33-9728-a797a716bc34

Page 54

```
 1       documentation that was provided to the Appeals
 2       Committee?
 3    A.  To my recollection, yes.
 4    Q.  Were you provided with any documentation in
 5       addition to what was listed in Exhibit 2?
 6            MS. JACKSON:  Objection.
 7    A.  I can't recall.
 8            MS. JACKSON:  Clarify when.
 9    Q.  Do you understand the question?
10    A.  I understand the question.
11    Q.  Okay.
12    A.  I can't recall specifically.
13    Q.  You understand that I'm talking about, as far as
14       a time period, when you were sitting on the
15       Appeals Committee reviewing Joyce's appeal,
16       correct?
17    A.  Right.
18    Q.  Of the documents listed in Exhibit 2, do any of
19       those documents refresh your memory as far as
20       which documents may have given you this clear
21       understanding of what made up Joyce's business
22       unit?
23    A.  There's papers on the sale of the business unit.
24       I can't recall the specifics of it, though.
```

Page 55

```
 1    Q.  You're referring to what's stated as "fall
 2       2002" --
 3    A.  Yes.
 4    Q.  -- "working papers on sale of business unit"?
 5    A.  Right.
 6    Q.  Fall 2002, that preceded the sale of the Tower
 7       complex, correct?
 8    A.  Correct.
 9    Q.  So why would there have been working papers
10       specific to Joyce's business unit in the fall
11       2002?
12    A.  I'm not sure.
13    Q.  Is it possible that there were no documents in
14       the working papers on the sale of the business
15       unit with respect to Joyce's business unit?
16    A.  I can't recall.
17    Q.  Okay.  What constitutes an outsourcing of a
18       business unit?
19    A.  A general knowledge of outsourcing is outsourcing
20       to an outside company.  The job is moved to
21       another company.  Successive company.
22    Q.  And on what basis do you come to this definition
23       of or your interpretation of an outsourcing of a
24       business unit?
```

Page 56

```
 1    A.  My knowledge and review of the plan.
 2    Q.  What about general knowledge?
 3    A.  General knowledge, too.  That's exactly part of
 4       the -- general definition of outsourcing.
 5    Q.  Was this your understanding of what constituted
 6       an outsourcing of a business unit when you
 7       reviewed Joyce's appeal in November of 2004?
 8            MS. JACKSON:  Objection.
 9    Q.  Let me rephrase the question.  This general
10       knowledge of what you believe constitutes an
11       outsourcing of a business unit that you just
12       stated, was that your understanding of what
13       constituted an outsourcing of a business unit
14       when you reviewed Joyce's appeal in November of
15       2004?
16    A.  It was my understanding based on reviewing all
17       the documentation involved in the plan.
18    Q.  So you formed your understanding of what an
19       outsourcing of a business unit was based on your
20       review of the plan?
21    A.  That was part of my decision-making process.
22    Q.  In your experience as a member of the Appeals
23       Committee, has there ever been an outsourcing of
24       a business unit at Hancock?
```

Page 57

```
 1    A.  Can you say that again?  I'm sorry.
 2    Q.  In your experience as a member of the Hancock
 3       Appeals Committee, has there ever been an
 4       outsourcing of a business unit?
 5    A.  Not that I'm aware of.
 6    Q.  Is it typical in such circumstances that when
 7       there is an outsourcing of a business unit that
 8       an outsourcing contract with another company be
 9       executed?  Is that your understanding of what
10       typically is involved in an outsourcing?
11            MS. JACKSON:  Objection.  We have
12       provided you with other designees to speak on
13       this topic from John Hancock, and Mr. Bisciotti
14       is not one of them.
15            MR. ROBBINS:  I'm asking his experience
16       as a member of the Appeals Committee who is in
17       charge of interpreting the terms of the plan,
18       terms of the summary plan description.
19    Q.  And I'm asking him in his experience is it
20       typical in circumstances where based on your
21       general knowledge as well when there is an
22       outsourcing of a business unit that an
23       outsourcing contract be executed with another
24       company?
```

15 (Pages 54 to 57)

KACZYNSKI REPORTING

9a0ae8c5-545e-4b33-9728-a797a716bc34

Page 66

1    as Exhibit 2?
2  A. I believe so.
3  Q. Were those documents listed on Exhibit 2 provided
4     to employees?
5  A. I don't know.
6  Q. Would that be an important assessment for a
7     member of the Appeals Committee to make as to
8     what the expectations were of the employees at
9     Hancock?
10  A. They should know but they don't necessarily have
11     to get those documents.  They should know what a
12     comparable position is but they didn't have to
13     have those documents.
14  Q. Okay.  With respect to Exhibit 2, can you
15     indicate which document assisted you in
16     determining that the sale of the Tower complex
17     involved a sale or outsourcing of Daniel Joyce's
18     business unit?
19  A. I can't recall exactly.
20  Q. Do you recall, do you specifically recall that it
21     was one of these documents, if any, that assisted
22     you in determining that the sale of the Tower
23     complex involved a sale or outsourcing of Daniel
24     Joyce's business unit?

Page 67

1  A. I can't specifically recall.
2  Q. Did you come to a conclusion as to whether the
3     sale of the Tower complex involved a sale or
4     outsourcing of Daniel Joyce's business unit?
5  A. Sorry.
6  Q. Did you come to a conclusion as a member of the
7     Appeals Committee whether the sale of the Tower
8     complex involved or resulted in an outsourcing or
9     sale of Daniel Joyce's business unit?
10  A. I'm not sure I quite see -- can you repeat that
11     again?
12  Q. Do you recall as a member of the Appeals
13     Committee --
14  A. Yeah.
15  Q. -- determining that the sale of the Tower complex
16     involved or resulted in an outsourcing or sale of
17     Daniel Joyce's business unit?
18  A. Yes.
19  Q. You specifically recall coming to that
20     conclusion?
21  A. That's my recollection that we did.
22         MS. JACKSON:  Objection.  It's been
23     asked and answered.
24  Q. What?

Page 68

1  A. It's my recollection.
2  Q. What is it that you recall about -- was this a
3     discussion in which it was determined?
4  A. I couldn't recall the specifics.
5  Q. Okay.  Is it possible that it was within your own
6     head that you came to this conclusion?
7         MS. JACKSON:  Objection.
8  A. I couldn't say.
9  Q. Is it fair to say from Mr. Mongeau's letter which
10     has been marked as Exhibit 2 that no documents
11     were provided to the Appeals Committee which
12     assisted you in assessing whether this was a sale
13     or outsourcing of Joyce's business unit?
14  A. Some documents may have helped us but I'm not
15     entirely sure.
16  Q. Can you refer me to any documents which assisted
17     you in determining whether there was a sale or
18     outsourcing of Daniel Joyce's business unit?
19  A. Nothing specifically I could point you to.
20  Q. On what basis was Joyce originally denied
21     severance benefits?
22  A. My understanding is that a comparable position
23     was offered.
24  Q. Were you provided with a written document

Page 69

1     specifically referencing the basis on which Joyce
2     was denied severance benefits?
3  A. Yes.  I do recall documentation to that regard.
4  Q. What document is that?
5  A. I can't refer to it specifically.
6  Q. Do you recall what the document said?
7  A. Not specifically.  Generally he was offered a
8     comparable position within the terms of the
9     severance plan.
10  Q. Prior to assessing whether Joyce was offered a
11     comparable job by Beacon Capital, did the Appeals
12     Committee arrive at a determination as to whether
13     Joyce's business unit was sold or outsourced to
14     Beacon?
15  A. I don't recall specifically.
16  Q. Do you recall, was this an outsourcing or a sale?
17     Did this transaction, the sale of the Tower
18     complex, did that constitute an outsourcing of a
19     business unit or a sale of a business unit or
20     neither?
21         MS. JACKSON:  Objection.
22  A. I'm not sure I can answer that question.
23  Q. Do you recall if at the time the Appeals
24     Committee came to a determination whether it was

18  (Pages 66 to 69)

9a0ae8c5-545e-4b33-9728-a797a716bc34

Page 82

```
 1          MR. ROBBINS:  I'm going to ask that we
 2     keep the speaking to a minimum.  If you would
 3     like to object, you can object, but let's keep
 4     the speaking objections to a minimum.
 5  Q.  Everything, of course, is if you know.
 6  A.  Absolutely.  As I just said.
 7  Q.  Sure.
 8          Okay.  That in fact did not occur,
 9     correct?  The plan was not amended after the IT
10     outsourcing was completed?
11  A.  I'm not sure when the IT outsourcing was
12     completed.
13  Q.  Did you hear any appeals for severance based on
14     the IT outsourcing?
15  A.  No, I didn't.
16  Q.  Joyce and many others were denied severance
17     because Hancock determined that he and others
18     were offered comparable jobs by Beacon, right?
19  A.  Correct.
20  Q.  Okay.  As we stated earlier, in order to first
21     assess whether an employee has been offered a
22     comparable job, the summary plan description,
23     which has been marked as Exhibit 4, states that
24     there must be a determination that there has been
```

Page 83

```
 1     a sale or an outsourcing of a business unit
 2     first, correct?
 3  A.  It appears so in the SPD.
 4  Q.  Okay.  To the best of your knowledge, on what
 5     basis did the Hancock human resources department
 6     determine that the sale of the Tower complex
 7     involved or amounted to a sale or outsourcing of
 8     Joyce's business unit?
 9  A.  By referring to the severance plan.
10  Q.  So you specifically recall that the human
11     resources department at Hancock came to a
12     conclusion that the sale of the Tower complex
13     involved or amounted to a sale or outsourcing of
14     Joyce's business unit?
15  A.  I couldn't say that specifically but in a fair
16     reading of the plan I would come to that
17     conclusion.
18  Q.  But I'm asking you, how do you know that the
19     human resources department came to that
20     conclusion?  I know you came to a conclusion.
21     But how do you know that the human resources
22     department came to that conclusion?
23          MS. JACKSON:  Objection.
24  A.  That's -- I couldn't comment.  I wasn't in their
```

Page 84

```
 1     meetings on this decision so I'm just reviewing
 2     their decision.
 3  Q.  But did they provide you with any documents
 4     stating that on the basis for which Joyce's
 5     appeal, Joyce's claim for severance benefits was
 6     denied was in part due to the fact this was a
 7     sale or outsourcing of his unit?
 8  A.  I couldn't recall that exactly.
 9  Q.  Were there any documents that you were provided
10     from the human resources department or from
11     another source which reflected the human
12     resources department's conclusion that this
13     transaction did involve or amount to a sale or
14     outsourcing of Joyce's business unit?
15  A.  I don't remember specifically seeing anything in
16     that regard.
17  Q.  Okay.  All right.  To the best of your knowledge,
18     what steps did the human resources department
19     take in order to assess whether the sale of the
20     Tower complex involved or amounted to a sale or
21     outsourcing of Joyce's business unit?
22          MS. JACKSON:  Objection.
23  A.  I couldn't make that -- I couldn't assume they
24     made -- I could only assume they based their
```

Page 85

```
 1     decision based on the severance plan.
 2  Q.  So you assumed that they made their decision
 3     based -- you assumed they made a decision one way
 4     or another whether it was a sale or outsourcing
 5     of the business unit; is that correct?
 6  A.  I assume so.
 7  Q.  Okay.
 8          MR. ROBBINS:  I'm sorry.
 9          MS. MORTON:  I'm talking to counsel.
10          MR. ROBBINS:  Okay.
11          MS. JACKSON:  To the extent it's
12     helpful to you getting that information, Mr.
13     Bisciotti does have -- it will be helpful if you
14     just state what you do know instead of assuming.
15          THE WITNESS:  That's fine.  I
16     understand.
17          MR. ROBBINS:  Could we mark this
18     document as Exhibit 7, please?
19          (Draft marked Exhibit No. 7.)
20          MR. ROBBINS:  And similarly, could we
21     mark this document as Exhibit 8?
22          (Draft marked Exhibit No. 8.)
23  Q.  Did the crux of your review of Joyce's appeal
24     center on determining whether Joyce was offered a
```

22 (Pages 82 to 85)

9a0ae8c5-545e-4b33-9728-a797a716bc34

Page 158

1  A. I'm not sure why I said that.
2       MR. ROBBINS: Please allow him to
3  answer. He can answer the question.
4       MS. JACKSON: Objection. This document
5  --
6       MR. ROBBINS: Please allow him to
7  answer.
8       MS. JACKSON: -- is not the letter that
9  was provided and you know that. You're
10  misrepresenting this on the record.
11       MR. ROBBINS: I'm asking --
12       MS. JACKSON: This is the E-mail. This
13  is not the letter that's referred to in 7.6.
14       MR. ROBBINS: I'm asking him about
15  this. Please. The speaking objections have got
16  to stop.
17       MS. JACKSON: This is --
18       MR. ROBBINS: I would like to make a
19  note of this.
20       MS. JACKSON: This is being
21  deliberately misleading.
22       MR. ROBBINS: I'm asking him a
23  question. He can answer the question. Please.
24  This is outrageous. This is outrageous that I

Page 159

1  can't ask him. Your objection will be duly noted
2  on the record but speaking objections are
3  strictly prohibited.
4  Q. Do you understand the question, Mr. Bisciotti?
5  A. Why did I write that, "in my attempt to be as
6  general as possible"?
7  Q. Right.
8  A. I'm not sure why I wrote that. I think we wrote
9  enough in there that you could say we had
10  specific reasons. Let's put it that way.
11  Q. I'm asking you a question about this particular
12  phrase, this particular E-mail.
13  A. I'm just trying to put it in context for you.
14  That's all.
15  Q. I understand. Was your E-mail in response to
16  Kathy Suchenski's E-mail below where she states,
17  "I don't know that we have to go into specifics"?
18  A. It appears so.
19  Q. Mr. Bisciotti, I've placed a document before you.
20  Have you ever seen this document before?
21  A. I may have.
22  Q. Do you specifically recall ever reviewing this
23  document?
24  A. If it was in the package of material I received

Page 160

1  for review of the committee, I reviewed it most
2  likely.
3  Q. If you would like, you can take a moment to
4  review the document.
5  A. I will.
6  Q. If you don't mind, if you don't mind taking
7  Erin's copy, we can have that marked as Exhibit
8  13.
9       (6/3/03 E-mail string marked Exhibit
10  No. 13.)
11  A. Okay. I'm ready.
12  Q. Did you have a copy of this document with you
13  when reviewing Mr. Joyce's appeal?
14  A. I don't recall exactly.
15  Q. Would you characterize this as a document that
16  would be important to your decision with respect
17  to Mr. Joyce's appeal?
18  A. It may be.
19  Q. Why may it be?
20  A. Well, I may or may not need this.
21  Q. Well, you conducted the appeal?
22  A. It would be helpful. Let's put it that way.
23  Q. Okay. It would be helpful. It would be helpful
24  because -- isn't it true this is relevant to your

Page 161

1  decision whether to deny severance?
2  A. Correct.
3  Q. If you could please take a look at the last two
4  sentences of the second paragraph from the top of
5  Joan DiCicco's E-mail to Dan Joyce. Are these
6  final two sentences which start, "I should point
7  out that the assessment was against normative
8  data," are these last two sentences accurate
9  representations?
10  A. As far as I know they are.
11  Q. Okay. Why is that?
12  A. Because that's what they say.
13  Q. Based on the knowledge that you have, was this an
14  accurate statement by Miss DiCicco?
15  A. As far as I know, yes.
16  Q. Was Beacon's benefit offering in fact compared to
17  benefits, benefit offerings in the property
18  management industry?
19  A. As far as that data was available, I was under
20  the impression that yes, it was.
21  Q. Does it say here as far as data is available?
22  A. I don't -- it doesn't say that.
23  Q. In fact, it says in this case the assessment was
24  done with respect to the property management

41 (Pages 158 to 161)

KACZYNSKI REPORTING

Page 170

1   attorney can instruct you not to answer but if we
2   have to take it up to the court, I'll take it up
3   in court.
4           What documents, if any, did you review
5   in anticipation of your testimony here today?
6           MS. JACKSON: I'm renewing my objection
7   on the basis of the attorney-client privilege as
8   well as attorney work-product doctrine. I'm
9   instructing Mr. Bisciotti not to answer the
10  question on that basis.
11          MR. ROBBINS: Okay. That's all I have.
12          MS. JACKSON: Okay. I have a few
13  questions.
14
15  EXAMINATION BY MS. JACKSON:
16  Q. Mr. Bisciotti, numerous times in response to a
17      question that Mr. Robbins posed to you your
18      answer was "I don't know" or "I don't recall" or
19      "I don't specifically recall" or "I can't
20      recall." Something of that nature. Is that
21      because this occurred approximately a year and a
22      half to two years ago?
23  A. That's correct.
24  Q. All the events that are at issue that you're

Page 171

1   being asked about?
2   A. Correct.
3           MR. ROBBINS: Objection.
4   Q. Looking at Exhibit 3, which is the John Hancock
5       Financial Services, Inc., Severance Pay Plan.
6   A. Okay.
7   Q. Turning your attention to section 3.2 in that
8       plan.
9   A. Yes.
10  Q. Can you explain how the committee understood and
11      interpreted provisions 3.2 C and 3.2 D?
12  A. Sure.
13          MR. ROBBINS: Objection. In what
14      context?
15          MS. JACKSON: In the context of the
16      case that is at issue. In the comparable text of
17      Daniel Joyce's case.
18  A. As we reviewed the decision by John Hancock
19      whether the associates were entitled or not
20      entitled to severance, we analyzed the case.
21      Where "employment is not terminated for purposes
22      of this plan if an employee is offered a
23      comparable position" --
24  Q. You're referring to 3.2 C right now?

Page 172

1   A. I'm referring to 3.2 C. Essentially there is no
2       severance for -- if someone is "offered a
3       comparable position, as determined by the
4       company, as an employee with, or provides
5       services in any capacity to, a successor
6       company."
7           A successor company is defined --
8       defined term in article 2. "An entity
9       unaffiliated with the company which performs the
10      services previously performed by an employee's or
11      a participant's former work unit with the
12      company." And in determining -- and to getting
13      to that basically, we determined that Beacon was
14      a successor employer, clearly, and our decision
15      what was comparable was --
16  Q. Let me stop you right there for a moment.
17  A. Go ahead.
18  Q. Your reference to the term "successor company" in
19      the plan --
20  A. Yes.
21  Q. How did you determine that Beacon was a successor
22      company?
23  A. It's unaffiliated with John Hancock. They're
24      performing the services previously performed by

Page 173

1   the employee and -- or that previous employer --
2   employee's work unit with the company. Just says
3   -- it's defined here. Beacon in my mind is
4   clearly a successor company. It's unaffiliated
5   with John Hancock and they -- the work unit which
6   Mr. Joyce was a part of went to that successor
7   company.
8   Q. Are you aware whether the benefits supplement,
9       the 2002 version of the benefits supplement to
10      the Summary Plan Description that Hancock issues
11      to its employees contains a provision stating
12      that the severance pay plan, the language in the
13      severance pay plan will govern when there is any
14      difference between the language in the benefits
15      supplement and the plan?
16  A. Yes, I am.
17  Q. And were you aware of that at the time that you
18      considered the appeal?
19  A. Yes, we were. Yes, I was.
20  Q. Is that the reason that you focused on the
21      language in the severance pay plan throughout
22      your consideration of the appeal?
23  A. That's correct.
24  Q. Let me call your attention to Exhibits 7 and 8.

44 (Pages 170 to 173)

Page 178

1     Bisciotti?
2  A.  No, I'm not.
3  Q.  So you were not able to take down every word that
4     occurred, that was spoken at the Benefits Plan
5     Appeal Committee meetings, were you?
6  A.  No, I wasn't.
7  Q.  We were just looking at Exhibit 12, Mr.
8     Bisciotti.  And we had established that that --
9     and it was established earlier in the deposition
10    today that this is a copy containing minutes from
11    the Company Benefit Plan Appeal Committee from
12    December 9, 2004, correct?
13 A.  Correct.
14 Q.  And those minutes are contained in the E-mail at
15    the bottom of the page going from page one to two
16    of Exhibit 12; is that right?
17 A.  Correct.
18 Q.  Now, Mr. Robbins asked you a question.  He had
19    asked you to read from section 7.6 of the
20    severance pay plan.
21 A.  Okay.
22 Q.  He had asked you to read sentence two.  Is that
23    accurate?  Why don't you get there and I can ask
24    you a question?

Page 179

1         He had asked you to read the second
2     sentence.
3  A.  Yes.
4  Q.  It states, "The decision," referring to the
5     appeal committee's decision, "shall be in writing
6     and shall include specific reasons for the
7     decision and specific references to the
8     provisions of the plan on which the decision is
9     based."
10 A.  Correct.
11 Q.  After asking you to read that sentence, Mr.
12    Robbins asked you to refer back to Exhibit 12.
13    Is that accurate?
14 A.  Correct.
15 Q.  And then he asked you to explain why you had
16    stated that you were trying to be as general as
17    possible with respect to the minutes --
18        MR. ROBBINS:  Objection.
19 Q.  -- that appear in the E-mail.
20 A.  Correct.
21 Q.  But it's your understanding that 7.6 refers to
22    specifying reasons for the decision of the
23    committee?
24 A.  Right.

Page 180

1  Q.  And it does not refer to the minutes that are set
2     forth by the committee?
3  A.  That's correct.
4  Q.  So in fact, would it be accurate to say that your
5     understanding is that section 7.6 of the
6     severance pay plan has nothing to do with the way
7     that the committee writes its minutes; is that
8     accurate?
9        MR. ROBBINS:  Objection.
10 A.  That's correct.
11 Q.  If you could turn your attention to Exhibit 13
12    for a moment.
13 A.  Okay.
14 Q.  And if you could look at the last sentence of the
15    second paragraph.
16 A.  Okay.
17 Q.  And could you read that sentence out loud?
18 A.  "The assessment was not a comparison to John
19    Hancock's benefits package and we did not make
20    any such comparison."
21 Q.  Is it accurate to say that your understanding of
22    the word "assessment" is the entire overall
23    assessment?
24        MR. ROBBINS:  Objection.

Page 181

1  Q.  Of Beacon's benefit package?
2        MR. ROBBINS:  Objection.
3  A.  Correct.
4  Q.  And to the extent that the assessment does refer
5     to Beacon's entire benefit package, Miss
6     DiCicco's statement is accurate, isn't it?
7        MR. ROBBINS:  Objection.
8  A.  Correct.
9  Q.  Just one moment, please.
10        If you can just give us a moment.  I'll
11    confer with co-counsel.
12        (Recess.)
13 Q.  Mr. Bisciotti, were you aware that you were
14    required to state specific reasons for your
15    decision for denying the appeal of Daniel Joyce
16    and other employees at Hancock?
17 A.  Yes.
18 Q.  And I would like to call your attention to
19    Exhibit 14.
20 A.  Sorry.  I shuffled these around.
21        Okay.
22 Q.  Calling your attention to paragraph two of that
23    letter.  If you could just review that paragraph
24    for a moment.

KACZYNSKI  REPORTING

9a0ae8c5-545e-4b33-9728-a797a716bc34

Page 182

1  A. Okay. General review was -- "the committee has
2     thoroughly reviewed all the facts and
3     circumstances" --
4  Q. Actually, if you can just read that paragraph to
5     yourself and then I want to ask you --
6  A. I'm sorry.
7  Q. That's okay.
8  A. Okay.
9  Q. Okay. If you can read -- now if you can read
10    that out loud.
11 A. The entire paragraph?
12 Q. Yes.
13 A. "The committee has thoroughly reviewed all the
14    facts and circumstances regarding your clients'
15    severance appeals. In addition, John Hancock
16    performed a competitive assessment analysis based
17    on industry data which considered the
18    competitiveness of selected benefits versus
19    industry/normative data and assessed Beacon's
20    employee benefits package with respect to John
21    Hancock's severance pay plan comparable job
22    provision.
23        "Based on this review and the
24    competitive assessment analysis, the committee

Page 183

1     has voted unanimously to uphold the denial."
2  Q. Now, I'm going to call your attention to the term
3     "comparable" -- "Hancock severance pay plan
4     comparable job provision."
5  A. Okay.
6  Q. Is it your understanding that that reference to
7     the "comparable job provision" in fact refers to
8     3.2 C of the severance pay plan?
9         MR. ROBBINS: Objection.
10 A. Correct.
11        MR. ROBBINS: Is that your
12    understanding now or was that your understanding
13    then? I just want to clarify.
14        THE WITNESS: That's always been my
15    understanding.
16 Q. So as far as you understood it, paragraph two
17    addresses both the specific reasons for the
18    denial as well as references the specific
19    provisions of the plan on which the appeal
20    committee based its decision?
21        MR. ROBBINS: Objection.
22 Q. Is that correct?
23 A. Correct.
24 Q. Okay. We have no further questions.

Page 184

1         MR. ROBBINS: If I can just have 30
2     seconds.
3
4     EXAMINATION BY MR. ROBBINS:
5  Q. Mr. Bisciotti, why were you attempting to be as
6     general as possible in the minutes of your
7     meeting on December 9, 2004?
8  A. I'm not sure why I wrote that.
9  Q. Are there rules governing the specificity of the
10    minutes of Appeals Committee meetings?
11 A. Not that I'm aware of.
12 Q. That's all I have.
13 A. Okay.
14        (Whereupon, the deposition was
15    concluded at 4:14 p.m.)

Page 185

1  Excerpt from Rule 30(e):
   Submission to Witness; Changes; Signing.
2
       When the testimony is fully transcribed,
3  the deposition shall be submitted to the witness
   for examination and shall be read to or by
4  him/her, unless such examination and reading are
   waived by the witness and by the parties. Any
5  changes in form or substance which the witness
   desires to make shall be entered upon the
6  deposition by the officer with a statement of the
   reasons given by the witness for making them.
7
   ****************************************
8
9      I, Brian J. Bisciotti, have examined the
   above transcript of my testimony and it is true
10 and correct to the best of my knowledge,
   information and belief. Any corrections are
11 noted on the errata sheet.
12
13     Signed under the pains and penalties of
   perjury this     day of        , 2006.
14
15
16
       --------------------------
17         Deponent's Signature
18
19
20
21
22
23
24

# Bonn Dep. Tr.

1                                    Volume:    I
                                     Pages:     1 to 97
2                                    Exhibits:  1 to 12

3

4                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
5
      * * * * * * * * * * * * * * * *
6     DANIEL JOYCE, Individually
      and on behalf of a class of
7     others similarly situated,
                              Plaintiff,
8
            vs.                        Civil Action No.
9                                      05-11428 WGY

10    JOHN HANCOCK FINANCIAL SERVICES,
      INC., SEVERANCE PAY PLAN and
      JOHN HANCOCK FINANCIAL SERVICES,
11    INC., as Administrator and
      Fiduciary of the John Hancock
12    Financial Services, Inc.,
      Severance Plan,
13                            Defendants.
      * * * * * * * * * * * * * * * *

14

15    PURSUANT TO THE MUTUAL CONFIDENTIALITY AGREEMENT

16

                    DEPOSITION OF WILLIAM A. BONN, a
17    witness called on behalf of the Plaintiffs, taken
      pursuant to the applicable provisions of the Federal
18    Rules of Civil Procedure before Cynthia A. Powers,
      Shorthand Reporter and Notary Public in and for the
19    Commonwealth of Massachusetts, at the law offices of
      Todd & Weld, LLP, 28 State Street, Boston,
20    Massachusetts, on Tuesday, May 16, 2006, commencing
      at 2:15 p.m.

21
                         * * * * *
22
                    KACZYNSKI REPORTING
23               72 Chandler Street, Suite 3
                  Boston, Massachusetts 02116
24                    (617) 426-6060

Page 53

1  Goodwin to do some comparison, but I -- honestly,
2  that's one thing I'm not clear on. I'm quite certain
3  I did, but I don't recall.
4       Q. And in your present life or any other
5  version, as general counsel or working for the
6  insurance companies, do you know how accessible this
7  information would be?
8       A. I honestly don't, but I would think
9  that just if someone -- so often in the real estate
10 world, as I usually joke, there are only 200 of us
11 and the rest of us are name changes and mirrors. You
12 can pick up the phone at one of those companies and a
13 senior person might be willing to share that
14 information with you as long as they didn't think
15 you're using it to steal their employees.
16      MR. PETERS: I'm done. Thank you.
17      THE WITNESS: Well, you're very
18 welcome.
19      MS. JACKSON: I am going to have
20 several questions for you. I'm wondering what would
21 be --
22      MR. PETERS: I'll switch.
23
24

Page 54

1            CROSS EXAMINATION
2  BY MS. JACKSON:
3       Q. Mr. Bonn, we were introduced earlier.
4  My name is Erin Jackson. I'm an attorney with
5  Goodwin Procter. I'm representing the defendants in
6  this case, which is John Hancock Financial Services,
7  Inc. Severance Play Plan as well as John Hancock
8  Financial Services, Inc., the company itself.
9            Is there any reason you can think of
10 why you may not be able to answer the questions that
11 I'm posing today truthfully and accurately?
12      A. Only if something is subject to a
13 confidentiality agreement and the purchase and sale
14 agreement for the purchase of the tower complex or
15 ancillary documents thereto.
16      Q. Sure.
17      MS. JACKSON: Can you please mark this
18 for identification as Defendants' Exhibit 1.
19      MR. PETERS: Can I recommend just so
20 we can keep it together that we just mark them
21 serially? Exhibit 7 will be reflected on the record
22 that you introduced it.
23      MS. JACKSON: Sure. We can stick with
24 that.

Page 55

1       (Marked Exhibit 7; Term Sheet for
2       Purchase and Sale Agreement)
3       Q. Mr. Bonn, as you've just been told,
4  that's a document that has been marked as Exhibit 7.
5  You can just take a minute to look it through. Do
6  you recognize that document, Mr. Bonn?
7       A. I have seen thousands of documents
8  such as this so -- but I don't recall it directly,
9  but I'm -- if this looks like it's for the sale of
10 the John Hancock Tower Complex, it looks like it was
11 prepared by Morgan Stanley perhaps or John Hancock,
12 so I would assume I saw this since we would have
13 received the bid package.
14      Q. This document as indicated by the
15 front page is the term sheet for the purchase and
16 sale agreement for the tower complex that Hancock had
17 issued to bidders in connection with the sale of the
18 tower complex?
19      A. Yes.
20      Q. I take it from your answer that you
21 may have seen this document before, would that be
22 accurate?
23      A. Yes.
24      Q. Are you familiar with the terms

Page 56

1  contained in the term sheet as they apply to the sale
2  of the tower complex?
3       A. Well, this is just a term sheet. It's
4  a wish list for John Hancock. So that doesn't mean
5  that any of these terms at all appeared in the final
6  purchase and sale agreement.
7       Q. Okay. Do you recall, are you familiar
8  with the terms in this, as you said this bid, this
9  bid sheet, this wish list?
10      A. No. I mean, I'm reading it again now.
11 It's been over four years since I would have seen
12 this. I've seen so many of these in my career. I
13 would have to read it all the way through if you want
14 me to respond to particular thing.
15      Q. I can direct your attention to the
16 provision I'd like to ask you about. Turn to page 94
17 on that sheet and if you could read through the
18 section entitled, Employees.
19      A. Okay. Yes, I've read the section,
20 employees.
21      Q. Does that refresh your recollection
22 regarding that term that Hancock had put out there to
23 bidders as a potential part of the sale of the tower
24 complex?

Page 77

1    the complex. I think this is a summary sheet which
2    would be a distillation of 119 and 120. It looks
3    like 121 is sort of a summary.
4        Q. Okay. If you look at pages 119 and
5    120, how did Beacon determine that the specific
6    Hancock employees listed on those two pages would be
7    offered jobs with Beacon, the ones -- the pages 119
8    and 120.
9        A. Yes.
10       Q. How did Beacon determine that the
11   Hancock employees listed on this page, the ones with
12   the notation "hire," how did Beacon determine that
13   they would be offered jobs with Beacon?
14       A. Interviews and conversations with
15   Barry Camiel and John Durnan as to their
16   recommendations.
17       Q. Was it based in part on the positions
18   that these individuals held?
19       A. Well, as I think I indicated earlier,
20   there could be reasons we may not have thought
21   someone had the skill sets to do the particular job,
22   or they might not have been as highly thought of by
23   Barry Camiel or John Durnan. We would have no way of
24   knowing that -- they were Hancock employees -- as to

Page 78

1    what their history of employment was, whether they
2    were considered to be a good worker, not a good
3    worker.
4        Q. But for the individuals who the
5    notation is written "hire" --
6        A. Yes.
7        Q. -- those individuals, would it be
8    based in part on the position and the function that
9    they performed?
10       MR. PETERS: Asked and answered.
11       A. Well, yes. I mean, if we were getting
12   a recommendation from Barry Camiel and John Durnan
13   and then from an interview that these folks appeared
14   to have the skill sets and experience to do the
15   particular job, yes.
16       Q. Thank you. I just wanted to be clear
17   that I was understanding you right. And correct me
18   if I'm wrong, I think your answer indicated that
19   Hancock through Barry Camiel and John Durnan provided
20   input regarding which employees should be hired?
21       A. Yes, they did.
22       MS. JACKSON: If you could, please
23   mark that for identification as Exhibit 10 I believe
24   we are up to.

Page 79

1        (Marked Exhibit 10; Hancock Personnel
2        to be Hired by Beacon-65 Total)
3        Q. Mr. Bonn, you're looking at a document
4    that's just been marked as Exhibit 10. Do you
5    recognize it?
6        A. Yes, I do.
7        Q. What is that document?
8        A. This is a document that I believe was
9    prepared by our company to indicate, try to match up
10   the names of persons that whom, to whom we decided to
11   extend offers that Hancock had indicated would be
12   available for us to hire and match them up by the
13   position to which we thought we would offer them a
14   job.
15       Q. Would it be fair to say that that
16   document in your hands that's been marked Exhibit 10
17   is a finalized version of the pages in the document
18   that we just looked at, which is Exhibit 9, pages
19   BCPM 119 and BCPM 120?
20       MS. DeIASI: Objection to form.
21       A. I believe so. But once again, what's
22   frustrating for me as an attorney is there are no
23   dates on the documents, but I believe this came
24   afterward, yes. Although I can't be certain of that

Page 80

1    because how we would have 65 on the first one unless
2    we had gone through this exercise. These might have
3    been contemporaneous.
4        MS. DeIASI: Can we take a short
5    break?
6        MS. JACKSON: Oh, sure.
7        (Whereupon, a recess was taken)
8    BY MS. JACKSON:
9        Q. Mr. Bonn, I'm going to call your
10   attention back to an exhibit that we used first in
11   the deposition, Exhibit No. 1.
12       A. Okay.
13       Q. This list here, does that include all
14   of the Hancock employees who accepted Beacon's job
15   offers to the best of your knowledge?
16       A. I believe so, yes.
17       Q. And is the information that's included
18   in this document under other categories; you know,
19   start date, title, salary, bonus, hours per week, all
20   the various other categories, is that information to
21   the best of your knowledge accurate based on Beacon's
22   business practices?
23       A. Correct. I would have no personal
24   knowledge as to whether these numbers tie out as the

**Page 81**

1 salary that was ultimately agreed to in the letters,
2 but it would be our business practice to accumulate
3 this information in this format, yes.
4 Q. And one other question for you on that
5 document. If I represented to you that I counted the
6 number of names on that document and that it came up
7 to a total of 73 names, would that sound about
8 accurate to you?
9 A. Yes, it would.
10 Q. Certainly if you'd like to count them
11 you can.
12 A. No, I have a recollection vaguely that
13 we made, we hired a little over seventy people.
14 MS. JACKSON: Could you please mark
15 that for identification as Exhibit 11.
16 (Marked Exhibit 11; Spreadsheets)
17 Q. Mr. Bonn, you're looking at a document
18 that we've just marked as Exhibit 11. Do you
19 recognize that document?
20 A. I don't have recollection of it at
21 this moment, but -- no, I don't. It appears to be a
22 list of employees --
23 Q. Would that be a list of employees that
24 Hancock intended to hire as the new owner of the

**Page 82**

1 tower complex?
2 A. Do you mean that Beacon would intend
3 to hire?
4 Q. Yes, that Beacon would have intended
5 to hire?
6 A. I honestly don't recall this. It does
7 say BCP proposed salary and shift differential and to
8 whom the person reports or would report, but I don't
9 recall if, quite frankly if this is something that we
10 prepared or this was something that was given to us.
11 I would assume it was us, prepared by us, Beacon,
12 because BCP proposed salary. I just don't recognize
13 this.
14 Q. Based on what you can gather from the
15 document, does it appear to be the preliminary list
16 of Hancock employees that Beacon wanted to make job
17 offers to to run the tower complex?
18 MR. PETERS: Objection.
19 A. To be honest with you, once again
20 there's no date on it. I don't know if it's
21 preliminary or it comes subsequent to Exhibit 10
22 where it lists titles and -- I recall seeing
23 Exhibit 10. I don't recall seeing this one.
24 Q. Well, let me ask you this. Do you

**Page 83**

1 know how that document that you're looking at now,
2 which we've just marked as Exhibit 11, do you know
3 how that one relates to Exhibit 1?
4 MS. DeIASI: Objection.
5 MR. PETERS: Objection.
6 A. I don't know what you mean, relate.
7 I'm really sorry. I don't recall seeing Exhibit 11
8 before. So I don't know if it was prepared the same
9 time or subsequent to Exhibit 1 or Exhibit 10.
10 Q. Okay. We looked at two documents
11 earlier -- they were Exhibits 9 and 10 -- which
12 indicated that Beacon was planning on hiring
13 approximately 65 Hancock employees; is that right?
14 A. Yes.
15 Q. And then we just looked at Exhibit 11
16 as well as Exhibit 1, and I represented to you that
17 the number of names I had counted was approximately
18 73; is that correct?
19 A. Yes.
20 Q. Do you know how it was that Beacon
21 would have moved from thinking it would be hiring
22 about 65 to ultimately hiring about 73?
23 A. I don't recall if we ended up
24 extending offers to some people that initially the

**Page 84**

1 recommendation might have been from Barry Camiel or
2 John Durnan not to make an offer to those people or
3 whether Hancock subsequently told us there were more
4 people potentially available. I honestly don't
5 recall that. I wouldn't be surprised if it's the
6 former; that we ended up making an independent
7 determination, we thought that people did have the
8 skill sets.
9 Q. I'd like to turn now toward the
10 selection of the benefits that Beacon elected to
11 offer to employees that it was hiring for the tower
12 complex. We touched on this a little bit earlier.
13 We might be going over some questions we asked
14 before.
15 How did Beacon determine which
16 benefits it would offer to the Hancock employees that
17 it was hiring to work for Beacon in the tower
18 complex?
19 MR. PETERS: Objection.
20 MS. DeIASI: Objection.
21 A. I do think I went over that in some
22 detail and I -- can you repeat the question again,
23 please?
24 Q. Just briefly, how did Beacon make the

DiCicco Dep. Tr.



UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11428-WGY

```
*****************************************
DANIEL JOYCE, Individually and on    *
behalf of a class of others          *
similarly situated,                  *
          Plaintiff,                 *
                                     *
v.                                   *
                                     *
JOHN HANCOCK FINANCIAL SERVICES,     *
INC., and JOAN M. DiCICCO,           *
          Defendants.                *
*****************************************
```

<u>PURSUANT TO MUTUAL CONFIDENTIALITY AGREEMENT</u>

DEPOSITION OF JOAN M. DiCICCO, taken pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Susan L. Prokopik, Registered Merit Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Todd & Weld LLP, 28 State Street, Boston, Massachusetts, on Wednesday, May 24, 2006, at 10:33 a.m.

**KACZYNSKI REPORTING**
**72 CHANDLER STREET, SUITE 3**
**BOSTON, MASSACHUSETTS 02116**
**(617) 426-6060**

**Page 1**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11428-WGY

```
*****************************************
DANIEL JOYCE, Individually and on     *
behalf of a class of others           *
similarly situated,                   *
              Plaintiff,              *
                                      *
v.                                    *
                                      *
JOHN HANCOCK FINANCIAL SERVICES,      *
INC., and JOAN M. DiCICCO,            *
              Defendants.             *
*****************************************
```

PURSUANT TO MUTUAL CONFIDENTIALITY AGREEMENT

DEPOSITION OF JOAN M. DiCICCO, taken
pursuant to the applicable provisions of the
Federal Rules of Civil Procedure, before Susan L.
Prokopik, Registered Merit Reporter and Notary
Public in and for the Commonwealth of
Massachusetts, at the offices of Todd & Weld LLP,
28 State Street, Boston, Massachusetts, on
Wednesday, May 24, 2006, at 10:33 a.m.

KACZYNSKI REPORTING
72 CHANDLER STREET, SUITE 3
BOSTON, MASSACHUSETTS 02116
(617) 426-6060

---

**Page 2**

```
1   APPEARANCES:
2
3       ON BEHALF OF THE PLAINTIFF:
4       SETH J. ROBBINS, ESQ.
        Todd & Weld LLP
        28 State Street
5       Boston, MA  02109
        (617) 720-2626
6
7       ON BEHALF OF THE DEFENDANT JOHN HANCOCK
8       FINANCIAL SERVICES, INC., and THE DEPONENT:
9       ANTHONY M. FEEHERRY, ESQ.
        Goodwin Procter LLP
10      Exchange Place
        Boston, MA  02109
11      (617) 570-1000
12      and
13      KAREN V. MORTON, ESQ.
        JOHN HANCOCK FINANCIAL SERVICES, INC.
14      John Hancock Place
        P.O. Box 111
15      Boston, MA  02117
        (617) 572-9201
16
17
18
19
20
21
22
23
24
```

---

**Page 3**

```
                    I N D E X

EXAMINATION BY MR. ROBBINS...............Page 4



                E X H I B I T S

No.    Description                    Page No.
 1    Severance Pay Plan                28
 2    11/21/02 E-mail                   41
 3    11/22/02 E-mail                   59
 4    Questions and Answers
      November 26, 2002                 63
 5    Benefits Supplement               70
 6    Memo                              93
 7    3/3/03 E-mail string             107
 8    List of Area's Largest Office
      Buildings and Area's Largest
      Commercial Property Managers     123
 9    5/5/03 letter                    149
10    5/21/03 memorandum               158
11    Competitive Assessment of
      Beacon Capital Partners
      Management, LLC Employee
      Benefits Package                 163
12    Memo                             169
13    5/30/03 memorandum               174
14    6/3/03 E-mail string             177
15    6/26/03 E-mail and attachments   182
16    11/16/04 E-mail string and
      attachment                       189
17    4/7/05 E-mail string             195
18    Joan M. DiCicco's Objections and
      Answers to Plaintiff's First
      Set of Interrogatories to
      Defendant Joan M. DiCicco    200/201
```

---

**Page 4**

# PROCEEDINGS

- - - - -

JOAN M. DiCICCO

having been satisfactorily identified and duly
sworn by the Notary Public, was examined and
testified as follows:

MR. ROBBINS: Okay. Tony, the usual
stipulations?

MR. FEEHERRY: Absolutely.

EXAMINATION BY MR. ROBBINS:

Q. Okay. The witness having been sworn in, could
you please state your name and address for the
record?

A. Mm-hmm. Joan DiCicco. D I capital C I C C O.
109 Wildwood Avenue, W I L D W O O D, Braintree,
Massachusetts.

Q. Miss DiCicco, we met outside. My name is Seth
Robbins. And as you know, I represent Daniel
Joyce as the plaintiff individually and on behalf
of potentially others similarly situated in an
action involving John Hancock Financial Services,
Inc. Your presence has been requested here today
because you have been designated by your employer

Page 85

```
 1   payment in an amount determined by the company
 2   but not to exceed $2,500 to be used for
 3   employability expenses," how were employability
 4   expenses determined by Hancock?
 5 A. I believe the -- the paragraph below it talks
 6   about it.
 7 Q. I believe that's what employability expenses
 8   include, but how was the determination made by
 9   the company as far as how much they're going to
10   pay up to $2,500?
11 A. I don't know.
12 Q. When did Hancock arrive at a definition of
13   comparable job -- strike that. When did Hancock
14   arrive at a definition of comparable position?
15       MR. FEEHERRY: Comparable position.
16   Objection.
17 A. What do you mean by "Hancock"?
18 Q. I mean John Hancock Financial Services, Inc.
19 A. I don't know specifically.
20 Q. Was there a time when John Hancock Financial
21   Services, Inc., arrived at a definition of
22   comparable position?
23 A. Yes.
24 Q. Did that occur before the sale of the Tower
```

Page 86

```
 1   complex to the best of your memory?
 2       MR. FEEHERRY: Objection.
 3 A. Could you ask the question again?
 4 Q. Sure. I'm trying to narrow down a time frame
 5   when we may have, there may have been a finalized
 6   definition of comparable position. Would that
 7   have, would Hancock -- strike that. Did Hancock
 8   arrive at a final definition of comparable
 9   position prior to May 30, 2003?
10 A. I think so.
11 Q. And on what basis do you believe so?
12 A. I'm trying -- based on my memory of the time line
13   of things happening. Of --
14 Q. Was the definition of comparable position a work
15   in progress over a period of time?
16 A. Yes.
17 Q. Were there draft documents setting forth the
18   definition of comparable position?
19 A. Yes.
20 Q. Or comparable job?
21 A. Yes.
22 Q. How many drafts, if you're aware, of -- if you're
23   able to answer this question, how many drafts
24   were there that went back and forth until a
```

Page 87

```
 1   finalized definition was reached regarding
 2   comparable position?
 3       MR. FEEHERRY: Objection. You can
 4   answer.
 5 A. I believe there were two -- at least two. There
 6   may have been more.
 7 Q. Do you recall at what time the first draft was
 8   drafted?
 9 A. I don't recall exactly.
10 Q. Was the definition of comparable finalized by the
11   time the severance plan was amended? And I'm
12   referring to the severance plan being amended on
13   November 18, 2002.
14 A. I don't believe so.
15 Q. Is it your understanding that Hancock gets to
16   define comparable position in any way it sees
17   fit?
18 A. That's my understanding --
19       MR. FEEHERRY: Objection.
20 A. -- that the plan document says that it's as
21   determined by the company.
22 Q. And who within the company gets to determine what
23   the definition of comparable position would be?
24 A. The plan --
```

Page 88

```
 1       MR. FEEHERRY: Objection. Calls for a
 2   legal conclusion. Go right ahead.
 3 A. It's my understanding it's the plan
 4   administrator.
 5 Q. And who is the plan administrator?
 6 A. Page Palmer.
 7 Q. On what basis do you say Page Palmer was the plan
 8   administrator?
 9 A. As my knowledge as a member of the human resource
10   professional community.
11 Q. Did you ever receive any documents or receive any
12   communications indicating that Page Palmer is the
13   plan administrator of the Hancock Severance Pay
14   Plan?
15       MR. FEEHERRY: Objection.
16 A. I may have. I may have.
17 Q. Do you specifically recall seeing any documents
18   in which Page Palmer was designated as the plan
19   administrator for the Hancock Severance Pay Plan?
20 A. I don't specifically recall that.
21 Q. Do you specifically recall any conversations with
22   anyone in which it was communicated to you that
23   Page Palmer has been designated or had been
24   designated as the plan administrator for the
```

Page 121

1  A. Yes.
2  Q. Can you describe for me the, quote, unquote,
3     initial list of potential investors that Morgan
4     Stanley developed?
5  A. It was a list of companies that could be
6     prospective buyers of the Tower complex.
7  Q. Do you recall any companies that were on this
8     list?
9  A. No.
10 Q. You don't have to name all of them. Any of them?
11 A. No.
12 Q. Were they all property management companies?
13 A. I don't recall.
14 Q. What criteria were you using to find the, as you
15    state, best matches?
16 A. I was asking Paul Crowley to call me so that he
17    and I could talk about whether or not -- whether
18    he could identify companies that would be within
19    Beacon's industry.
20 Q. And what industry was that?
21 A. Property management.
22 Q. What did you mean by "zeroing in on the most
23    relevant companies for the analysis"?
24 A. The same thing as identified below when I talked

Page 122

1     about best matches.
2  Q. Okay. Does the E-mail above your E-mail from
3     Paul Crowley reflect his response to your E-mail
4     to him?
5  A. Yes.
6  Q. Is the BBJ the Boston Business Journal?
7  A. I don't know.
8  Q. Do you know what he was referring to when he
9     said, "I understand that JH gave you a list from
10    the BBJ"?
11 A. I know that JH refers to John Heavey and that he
12    was giving me a list that some entity had
13    identified as top real estate firms.
14 Q. Is this list from the BBJ that Paul Crowley is
15    referring to the same document as your initial
16    list of potential investors that was provided to
17    you by Morgan --
18 A. I don't know.
19 Q. -- Stanley? If I can finish. That was provided
20    to you by Morgan Stanley?
21 A. I don't know.
22 Q. Is it your understanding these could be two
23    separate lists?
24 A. They could be, yes.

Page 123

1  Q. Okay. What are companies within the building
2     trades industry?
3  A. He's referring -- building trades industry would
4     be an industry where the -- where the services
5     rendered are around maintenance of buildings
6     through trade professions such as electricians,
7     et cetera.
8  Q. And he makes reference that a company called
9     BTE/Balco is a company within the building trades
10    industry, correct?
11 A. Yes.
12        MR. ROBBINS: Can you mark this as
13    Exhibit 8?
14        (List of Area's Largest Office
15    Buildings and Area's Largest Commercial Property
16    Managers marked Exhibit No. 8.)
17 Q. Miss DiCicco, are you familiar with the document
18    that's been placed before you and marked as
19    Exhibit 8?
20 A. I've seen it.
21 Q. What is this?
22 A. Let me just take a moment.
23        It's a list of companies and I see in
24    the corner it says "Boston Business Journal" so

Page 124

1     it's the list that's referred to by Paul Crowley
2     in that letter. In that memo.
3  Q. In the memo that's been marked as Exhibit 7?
4  A. Correct.
5  Q. Okay. What is the difference between JH 1235 and
6     JH 1236?
7  A. It seems to be geographic. Where it says "ranked
8     by square feet by property managed within
9     Interstate 495" on 1236 and the other one just
10    says "Area's largest office buildings ranked by
11    square feet."
12 Q. So JH 1235 lists the largest real estate firms
13    and JH 1236 lists the largest commercial property
14    management companies; is that right?
15        MR. FEEHERRY: Objection.
16 Q. Or JH -- strike that. JH 1235 lists the area's
17    largest office buildings and JH 1236 lists the
18    largest commercial property management companies;
19    is that correct?
20 A. That's what the titles say, yes.
21 Q. Okay. Is this your handwriting throughout JH
22    1236?
23 A. I know the bottom is my handwriting. The last --
24    those three written words are my handwriting.

CondenseIt™    DiCICCO-5/24/06
Case 1:05-cv-11428-WGY   Document 39-6   Filed 08/14/2006   Page 6 of 8
Page 125     Page 127

**Page 125**

1 Q. But the -- are those your markings next to the
2    listed companies?  Looks like a star.
3 A. Yeah.  I don't recall.
4 Q. Okay.  Do you know what the markings next to the
5    list of firms on JH 1236 signify?
6 A. I don't recall exactly.
7 Q. Do you know why they were marked?
8 A. Because they -- I presume it was they had
9    significance to whoever did the marking and I
10    mean, I can -- I think they were the -- let's
11    see.
12       That they were marked as perhaps the
13    best matches or the companies that were most
14    relevant.
15 Q. And you're referring to Exhibit 7?
16 A. I am.
17 Q. Okay.  What do the words on the bottom of page JH
18    1236 signify?
19 A. Additional companies.
20 Q. Companies in addition to the companies marked
21    with stars?
22 A. I believe they're companies in addition to the
23    list.
24 Q. At the top where it says in someone's handwriting

**Page 126**

1    -- I can't tell if that's John or Joan.  Do you
2    know who this is referring to?
3 A. I believe it's John Heavey's handwriting and it's
4    "Joan."
5 Q. Okay.  Again, what was the significance of this,
6    of you being provided with a copy of the area's
7    largest commercial property managers?
8 A. It was in response to the E-mail I sent asking
9    for information on a list of companies within the
10    industry.
11 Q. The property management industry?
12 A. Correct.
13 Q. Okay.  Did you ever contact any of the companies
14    listed on JH 1236 to inquire as to what benefits
15    they were offering their employees?
16 A. No.
17 Q. Did anyone at Hancock that you are aware of
18    contact any of the companies listed on JH 1236 to
19    inquire as to what benefits they were offering
20    their employees?
21 A. I don't believe so.
22 Q. Did you ever provide Hewitt with a list of
23    companies within the industry that could be used
24    for the purpose of benchmarking certain benefits?

**Page 127**

1 A. I did not.
2 Q. Are you aware if anyone did?
3 A. I believe -- I think that Peter Mongeau talked
4    with Hewitt on this matter.
5 Q. With respect to the sale of the Tower complex,
6    what was your role, if any, during the bidding
7    process?
8 A. No role during the bidding process.
9 Q. Do you know what criteria Hancock was looking for
10    in bids from prospective purchasers?
11 A. No.
12 Q. Are you aware if there were any discussions prior
13    to the sale of the Tower complex with respect to
14    the impact that the sale would have on specific
15    business units at Hancock?
16       Would you like me to repeat that
17    question?
18 A. Mm-hmm.
19 Q. Are you aware if there were any discussions to
20    the best of your knowledge prior to the sale of
21    the Tower complex with respect to the impact that
22    the prospective sale would have on specific
23    business units at Hancock?
24 A. I am aware that there was some discussion about

**Page 128**

1    the impact that the sale of the building might
2    have on services provided by certain areas within
3    John Hancock.
4 Q. Anything with respect to specific business units
5    within John Hancock?
6 A. The work units within the real estate operations
7    department.
8 Q. Yes, there were?
9 A. There were.  And so it would be with reference to
10    those work units.
11 Q. Okay.  What discussions, if any, were there
12    regarding Daniel Joyce's business unit?
13       MR. FEEHERRY: Objection.  You may
14    answer.
15 A. I don't -- I mean, I was not privy to any
16    specific discussions.
17 Q. Were you aware of any general discussions that
18    were going on with respect to the impact that the
19    sale of the Tower complex would have on Joyce's
20    business unit?
21       MR. FEEHERRY: Objection.  You may
22    answer.
23 A. It was my understanding that John Hancock during
24    the process with potential investors made it

Page 149

1  Q. Okay. Do you recall during what period of time
2     these conversations took place?
3  A. Post the announcement of the sale and up until
4     some point before they decided upon their final
5     benefit package.
6  Q. Did you have any discussions with any Beacon
7     employee regarding Hancock associates' census
8     data?
9  A. I didn't have any discussion. I provided
10    information and I believe I provided it through a
11    third party that they had engaged to work on
12    their benefit design.
13 Q. But you don't recall having any discussions
14    regarding the data that you had provided to them?
15 A. No. Actually, there was someone else in the HR
16    department who had those conversations.
17       MR. ROBBINS: Can you mark this as
18    Exhibit 9, please?
19       (5/5/03 letter marked Exhibit No. 9.)
20 Q. Miss DiCicco, are you familiar with the document
21    that's been marked as Exhibit 9?
22 A. I've seen it.
23 Q. What is it?
24 A. It's an offer letter from Beacon Capital Partners

Page 150

1     Management to -- an offer of employment letter
2     from Beacon Capital Partners Management to Daniel
3     Joyce.
4  Q. Did Hancock know that Beacon would be sending out
5     offer letters on May 5, 2003?
6  A. I can say -- we knew they would be sending out
7     offer letters. I don't -- I mean, I see that
8     it's May 5th but I didn't recall that that was
9     the exact date.
10 Q. Right. But at some point prior to May 5th, was
11    Hancock essentially put on notice that offer
12    letters from Beacon were going to be distributed
13    to Hancock employees?
14 A. Yes.
15 Q. Do you recall when in relation to May 5th Hancock
16    was notified that offer letters would be
17    forthcoming from Beacon?
18 A. I don't recall the exact timing.
19 Q. Are you aware if anyone at Hancock had knowledge
20    of the substance of the offer letters prior to
21    May 5, 2003?
22 A. The offer letters are signed by people who were
23    Hancock -- John Durnan was a Hancock employee at
24    the time that this offer letter was written. He

Page 151

1     was going to be a Beacon Capital Partners
2     employee and so there were people like John
3     Durnan I know were aware of it because they
4     signed the documents.
5  Q. Who does John Durnan report to?
6        MR. FEEHERRY: Did?
7  A. At what point in time?
8  Q. Who did John Durnan report to at this time, May
9     5, 2003?
10 A. Paul Crowley.
11 Q. Okay. Did John Durnan draft this offer letter
12    that's been marked as Exhibit 9?
13 A. I don't know.
14 Q. Are you aware of anyone who assisted in the
15    drafting of the document that's been marked as
16    Exhibit 9 or any documents similar to a document
17    like Exhibit 9?
18 A. I don't know.
19 Q. What was John Durnan's position at Hancock on May
20    5, 2003?
21 A. I don't recall his exact title but he was the
22    senior manager reporting to Paul Crowley of
23    several work units within the real estate
24    operations department.

Page 152

1  Q. Okay. Was Hancock aware that specific
2     information regarding Beacon's employee benefits
3     package was not included in the offer letter
4     dated May 5th?
5  A. Hang on, please.
6        Yes. Certain members of Hancock were
7     aware of that.
8  Q. Were they aware of that prior to May 5, 2003?
9  A. Yes.
10 Q. Do you recall if Beacon had a benefits package in
11    place by May 5, 2003?
12 A. My best recollection is that it was not -- they
13    were working on it at that point in time.
14 Q. Is it your understanding that Beacon was asking
15    these selected Hancock employees to accept offers
16    without having knowledge as to the specifics of
17    Beacon's benefits package?
18       MR. FEEHERRY: Objection. You may
19    answer.
20 A. This document indicates that they needed to reply
21    by May 16th. And at the time that this document
22    was sent out, it says that additional information
23    would be provided shortly.
24 Q. Okay. Are you aware if that information was

Page 185

1  that benefits would be assessed based on
2  normative data?
3  A. Sorry. I just need to read this document.
4  Q. Please do.
5  A. This document was a working document, as we
6     brainstormed ideas about how to do things and
7     what we would be considering. It was developed
8     prior to the actual work that Peter did. It gave
9     us guidelines. Guidelines are not specifics.
10    They are approaches to things.
11        Ultimately, Peter took this approach
12    and I rely -- using normative data and the source
13    documents that he used. And I rely on his
14    expertise in this regard.
15        MR. ROBBINS: I just want to make sure
16    I got an answer to the question that I put forth.
17    Can you repeat the question that I put on the
18    record?
19        (Question read.)
20 A. The guidelines committee developed guidelines and
21    the actual assessment was done by Peter Mongeau
22    who was a member of the guidelines committee but
23    he was the one that did the assessment. And so
24    if your question is if the guidelines committee

Page 186

1  made a determination to use normative data, the
2  answer is no.
3        However, Peter was the one who did the
4     analysis and is the expert and he did the
5     analysis based on the data that was available to
6     him at the time.
7  Q. Prior to conducting the assessment, did Peter
8     contact any members of the guidelines committee
9     to inform the guidelines committee that he was
10    going to be straying from the guidelines that had
11    been previously set forth by the guidelines
12    committee and applying normative data?
13        MR. FEEHERRY: Objection.
14 A. Not that I recall.
15        MR. FEEHERRY: You may answer.
16 A. Not that I recall.
17 Q. What's been marked as JH 1431, is this your
18    understanding of the final criteria or definition
19    of competitive benefit offerings as it would be
20    applied to competitive benefit assessment
21    analyses?
22        MR. FEEHERRY: Objection.
23 A. I believe these are the five components we were
24    going to be looking at for competitive benefits.

Page 187

1  Q. But with respect to the criteria for how to
2     determine whether a benefit offering was to be
3     deemed competitive, does this E-mail from Lisa
4     Blake indicate to you that JH 1431 represents the
5     finalized understanding of how to interpret
6     competitive benefit offerings?
7        MR. FEEHERRY: Objection.
8  A. It was the last document that we worked on, I
9     think, around the guidelines, which are just
10    that. Guidelines.
11 Q. In fact, she says, "The only thing left to
12    finalize was how we were going to determine
13    mileage," correct?
14        MR. FEEHERRY: Objection.
15 A. "To finalize our working paper."
16        MR. FEEHERRY: Thank you.
17 Q. Correct. But she says the only thing left to
18    finalize was how we were going to determine
19    mileage, correct?
20 A. That's a sentence within a two-sentence statement
21    that talks about that we never finalized the
22    working paper and that there was one more thing
23    to work on on a working paper --
24 Q. Mm-hmm.

Page 188

1  A. -- which is --
2  Q. Are you aware of any subsequent -- strike that.
3     Are you aware of any document looking at the
4     elements of the comparable job provision that
5     postdates what's been marked as Exhibit 15?
6  A. I don't know. I'm not aware -- I don't recall
7     that I'm aware of it.
8  Q. Did you receive any other feedback other than
9     from Daniel Joyce -- strike that. Did you
10    receive any feedback from Hancock employees other
11    than Daniel Joyce following the distribution of
12    your May 30th letter?
13 A. Could you define "feedback" for me?
14 Q. Did you receive any communications from any
15    Hancock employees in response to the May 30th
16    letter, other than from Daniel Joyce?
17 A. I do not recall if I personally received any
18    communications.
19 Q. Would that be something -- would such
20    communications be the type that you would keep in
21    a file in your office?
22 A. Yes.
23 Q. Do you recall if you produced that file to your
24    attorneys?

Moloney Dep. Tr.

1                Volume:    I
                Pages:     1 to 47

2                 Exhibits:   1 to 10

3

4          UNITED STATES DISTRICT COURT
          DISTRICT OF MASSACHUSETTS

5    * * * * * * * * * * * * * * * *

6    DANIEL JOYCE, Individually
    and on behalf of a class of

7    others similarly situated,
               Plaintiff,

8

     vs.                Civil Action No.

9                     05-11428 WGY

    JOHN HANCOCK FINANCIAL SERVICES,

10   INC., SEVERANCE PAY PLAN and
    JOHN HANCOCK FINANCIAL SERVICES,

11   INC., as Administrator and
    Fiduciary of the John Hancock

12   Financial Services, Inc.,
    Severance Plan,

13                Defendants.
    * * * * * * * * * * * * * * * *

14

15    PURSUANT TO THE MUTUAL CONFIDENTIALITY AGREEMENT

16

17              DEPOSITION OF THOMAS E. MOLONEY, a
   witness called on behalf of the Plaintiffs, taken

18   pursuant to the applicable provisions of the Federal
   Rules of Civil Procedure before Cynthia A. Powers,

19   Shorthand Reporter and Notary Public in and for the
   Commonwealth of Massachusetts, at the offices of John

20   Hancock Financial Services, Inc., 200 Clarendon
   Street, Boston, Massachusetts, on Tuesday, June 20,

21   2006, commencing at 10:13 a.m.

22               * * * * *

23            KACZYNSKI REPORTING
        72 Chandler Street, Suite 3

24        Boston, Massachusetts 02116
          (617) 426-6060

Page 25

1   A. I have no recollection one way or the
2 other whether it was or wasn't used.
3   Q. There was an outsourcing of the IT
4 group at one time to IBM; is that correct?
5   MR. FEEHERRY: Objection. You may
6 answer.
7   A. Yes, there was.
8   Q. Were you involved in that?
9   A. Only peripherally.
10   Q. Do you know whether or not an
11 outsourcing contract was signed in that context?
12   A. I don't remember all the legal
13 documents. I didn't do the legal part of that
14 transaction or anything else.
15   Q. Do you remember any discussion
16 whatsoever, Mr. Moloney, about whether or not any
17 business unit would be outsourced to Beacon in the
18 context of the sale of the tower complex?
19   A. I don't have -- as I said, I don't
20 have any recollection one way or the other. I go
21 back to my basic premise on the documents and
22 everything else.
23   Q. Were you one of the people that had
24 conversations with Beacon about hiring the people or

Page 26

1 some of the people from the real estate operations
2 division?
3   A. I would have had discussions with them
4 on some of the people.
5   Q. Do you recall with whom you spoke
6 about that issue?
7   A. It probably would have been Fred
8 Siegel at a very high level and everything else and
9 then some of his operating folks. I don't remember
10 the names of them, but --
11   Q. Okay. Do you remember any of the
12 conversations enough to talk about them in
13 deposition?
14   A. It would have been only at a very high
15 level about the, you know, the critical need for
16 hiring some of the people because of the complex
17 nature of this building; the glass curtain walls, the
18 need for HVAC, the security systems and all, not only
19 for the tower but also for the two other buildings
20 and as well as the garage operations.
21   Q. There were people that did not get an
22 offer from Beacon in the real estate operations
23 division; is that consistent with your memory?
24   A. That would be consistent with my

Page 27

1 memory.
2   Q. Were they kept by John Hancock?
3   A. Some of them would have been. I
4 don't -- I couldn't tell you who or what, and they
5 probably wouldn't have gotten an offer because we
6 were keeping them anyways, not because they didn't
7 get an offer. That would be kind of my recollection
8 of kind of the high level piece of it, but --
9   Q. Do you remember at a high level people
10 in the real estate operations division who neither
11 got an offer from Beacon nor kept their jobs at
12 Hancock?
13   A. I don't remember the names of
14 individuals or anything else.
15   Q. Conceptually did that happen?
16   A. I couldn't tell you because I can't go
17 through -- you know, I haven't got a recall of that
18 one way or the other.
19   Q. I'm not asking you to speculate. I'm
20 asking if you have a memory.
21   A. I have no recall one way or the other.
22   Q. Are you aware of any outsourcing
23 contracts that John Hancock has signed in the past,
24 say, ten years?

Page 28

1   MR. FEEHERRY: Objection. You may
2 answer.
3   A. Yeah, there would have been one
4 outsourcing, I think -- I don't know. I have to go
5 back and look. I don't remember if our group benefit
6 operations had an out -- no, I don't think it did. I
7 don't remember. I don't think so.
8   Q. Group benefit operation may or may not
9 have been an outsourcing?
10   A. No, I think it was a sale, and I think
11 there was an administration agreement associated with
12 it, but no outsourcing associated with that
13 transaction. I can't think of any others, but there
14 probably were.
15   Q. Just in a general way, can you tell me
16 what type of work the group benefits organization
17 did?
18   A. Yeah, it was our group life and health
19 business that was sold back in '97 or so.
20   Q. Okay. And the company had acquired,
21 the company that acquired that business segment, did
22 they hire the employees from the group benefits --
23   A. Yes.
24   Q. And then did the employees in the

# Mongeau Dep. Tr.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11428-WGY

```
**********************************
DANIEL JOYCE, Individually and on *
behalf of a class of others       *
similarly situated,               *
        Plaintiff,                *
                                  *
v.                                *
                                  *
JOHN HANCOCK FINANCIAL SERVICES,  *
INC., and JOAN M. DiCICCO,        *
        Defendants.               *
**********************************
```

### PURSUANT TO MUTUAL CONFIDENTIALITY AGREEMENT

DEPOSITION OF PETER J. MONGEAU,
taken pursuant to the applicable provisions of the
Federal Rules of Civil Procedure, before Michelle
Kaczynski, a Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the offices of Todd & Weld LLP, 28
State Street, 31st Floor, Boston, Massachusetts, on
Monday, May 22, 2006, at 10:42 a.m.

**KACZYNSKI REPORTING**
**72 CHANDLER STREET, SUITE 3**
**BOSTON, MASSACHUSETTS  02116**
**(617) 426-6060**

1    A. Will you repeat the question?

2    Q. Yes. You assessed the competitiveness of

3  Beacon's benefits package, didn't you?

4        MR. FEEHERRY: Objection. You may

5  answer.

6    A. Yes.

7    Q. Okay, and in assessing the competitiveness of

8  Beacon's package, did you rely on Hewitt?

9    A. Hewitt was one of the sources I used.

10    Q. And did you rely on normative data?

11    A. Yes.

12    Q. Did you rely on anything else?

13    A. No.

14    Q. Okay. The normative data that you relied on,

15  was it the type of normative data that you relied on as

16  the director of benefits and as VP of HR shared

17  services?

18        MR. FEEHERRY: Objection. Form, the

19  type of.

20        MR. PETERS: I'll rephrase it.

21        MR. FEEHERRY: If you can.

22    Q. And believe me, it will be completely obvious

23  to you when Mr. Feeherry doesn't want you to answer a

24  question because he'll say, don't answer that, and then

1  we'll get into a huge fight on the record. No, let me

2  ask the question again.

3        The normative data that you relied on in

4  assessing the competitiveness of Beacon's benefits, was

5  it the type of normative data that you had relied on in

6  the past in your capacity as the director of benefits

7  or as the VP of HR shared services?

8    A. It was the same type of information I would

9  have referred to.

10    Q. Was it in any way different than the type of

11  normative data that you had relied on in the past in

12  making the assessments of competitiveness?

13        MR. FEEHERRY: Objection. You may

14  answer.

15    Q. Other than the obvious, Mr. Mongeau, which is

16  it related to the year in which you were looking at the

17  benefits, and so was that data, that normative data

18  broken down by industry?

19    A. One of the studies would have had information

20  broken down by industry.

21    Q. Is that a study you relied on in making this

22  assessment?

23    A. Can I correct an answer?

24    Q. Certainly.

1    A. The study did not have information broken

2  down by industry. It had a list of companies that

3  participated in the study that was broken down by

4  industry. The results were normative, were all

5  industries considered together.

6    Q. Okay. Do you recall what study it was?

7    A. It was -- on this particular?

8    Q. Yes, sir.

9    A. For Beacon?

10    Q. Yes, sir.

11    A. It was, there were two particular studies,

12  the Foster Higgins, I don't recall the year, and the

13  Hewitt salaried survey, I think I have the name

14  correct.

15    Q. Okay, and let's take them one at a time.

16  Let's take the Foster study first. The Foster study

17  was -- was the Foster study broken down by participants

18  in the study?

19    A. Can you clarify the question?

20    Q. Yes, maybe I should ask you to describe the

21  study for me rather than endeavor to lead you through

22  the questions. Tell me in a general way what the study

23  depicted?

24    A. The Foster Higgins study is focused on health

1  benefits nationally, as well as I believe there are

2  regional breakouts and possibly employer size

3  breakouts.

4    Q. Do you have a copy of this at your office?

5    A. No.

6    Q. If I wanted to find this study --

7        MR. PETERS: Do we have this?

8        MR. ROBBINS: I don't believe we do.

9        MR. PETERS: Well, we'll look into it.

10  If we don't have it, we'd like to get it if you've got

11  it.

12        MR. FEEHERRY: And we don't. I think --

13        MR. PETERS: Okay.

14        MR. FEEHERRY: -- if you ask some more

15  questions --

16        MR. PETERS: Right, we'll figure it out.

17        MR. FEEHERRY: We produced everything

18  available.

19        MR. PETERS: Oh, I don't doubt that,

20  yes, I don't doubt that.

21    Q. Do you have the Foster Higgins study?

22    A. No.

23    Q. What happened to it?

24    A. I don't recall.

Page 17

1    Q. Okay. When is the last time you saw it?

2    A. I don't recall the last time I saw it.

3    Q. It's a study you relied on in the context of

4 evaluating the competitiveness of Beacon's benefits --

5    A. Correct.

6    Q. Okay, and was it printed out?

7    A. Yes.

8    Q. And did you have a file folder where you kept

9 information that pertained to the assessment?

10    A. Yes.

11    Q. And when you produced documents in the

12 context of this case, did you produce that file folder

13 to your attorneys, yes or no?

14    A. No.

15    Q. Did the file folder exist at the time, the

16 file folder that contained information germane to your

17 competitive assessment?

18    A. When I was asked to produce it?

19    Q. Yes.

20    A. I could not find it.

21    Q. What information was contained in that

22 folder; if we were to go and recreate it, what would

23 we, where would we go to find the documents?

24    A. The file could have included notes that I

Page 18

1 would have made having reviewed the different materials

2 I've mentioned. There may have been a copy of the plan

3 document, things of that nature. The file wouldn't

4 necessarily have had the studies. The studies could

5 have also been, since they were normative information,

6 they could have simply been somewhere else in my office

7 for reference.

8    Q. Can you give me enough information about this

9 Foster Higgins study that I might with a little effort

10 find it?

11    A. The Foster Higgins firm was acquired by

12 Mercer, and Mercer/Foster Higgins continues to produce

13 that study on an annual basis.

14    Q. This was 2003 this assessment was being made?

15 Your assessment was made when?

16    A. My assessment was in 2004.

17    Q. So was the Foster Higgins study a 2004 study?

18    A. It would have been what was available in

19 2004. Some of these studies report on information, you

20 know, there may be a year lag, for example.

21    Q. Okay, but you relied on the most current

22 information that Foster Higgins had?

23    A. Correct.

24    Q. Okay, and was that information broken down by

Page 19

1 industry?

2    A. By industry, no.

3    Q. So if you wanted to do an evaluation of the

4 property management industry to see what was

5 competitive in the property management industry, could

6 you rely on the Foster Higgins data to inform that

7 judgment?

8    MR. FEEHERRY: Objection. You may

9 answer.

10    A. I could rely on that information to make a

11 determination as to what's competitive on a normative

12 basis if that, given that I did not have information

13 specific to the industry.

14    Q. Okay. My question is a little different, I

15 think. My question is could you rely on the Foster

16 Higgins data in order to determine whether or not the

17 Beacon benefits were competitive in the property

18 management industry?

19    MR. FEEHERRY: Objection. You may

20 answer.

21    A. I could rely on that information to compare

22 Beacon's benefits to what was normative.

23    Q. Okay, but not specifically the property

24 management industry, only normative, right?

Page 20

1    A. As I recall, that's correct.

2    Q. Now, what about the Hewitt studies, how,

3 describe those studies or that study for me, please,

4 and I'm specifically referring to the study that you

5 relied on to help inform your judgment about the

6 competitiveness of the Beacon benefits package?

7    A. That study included information on a number

8 of benefits, not just health, and it again was

9 normative in nature, was of a large group of companies

10 across all industries, and it provided information

11 based on prevalence.

12    Q. Okay, so if you wanted to determine whether

13 or not Beacon's benefits package was competitive within

14 the property management industry, you couldn't get that

15 information from the Hewitt study, is that correct?

16    MR. FEEHERRY: Objection. You may

17 answer.

18    A. The Hewitt study did not include a specific

19 number of property management companies, so the

20 analysis was based on the available normative data.

21    Q. Right, so if you want to specifically

22 evaluate benefits that Beacon offered against the

23 property management industry, you couldn't make that

24 specific analysis, you couldn't undertake that specific

**Page 93**

1　specifically from your perspective -- start the
2　question again.
3　　　　At least when it comes to what is
4　comparable job, what you've written in Exhibit 3
5　defines a term that's contained in Exhibit 1, and that
6　term is comparable position, right?
7　　　　MR. FEEHERRY: Objection. You may
8　answer.
9　　A. It defines that term.
10　　Q. It's not an example, it's a definition,
11　right?
12　　　　MR. FEEHERRY: Objection. You may
13　answer.
14　　A. It is a definition for comparable.
15　　Q. So that's a definition, but when you discuss
16　up above sale or outsourcing, that's not a definition,
17　that's an example?
18　　A. It's a circumstance.
19　　Q. A circumstance, and not an exclusive one,
20　right?
21　　　　MR. FEEHERRY: Answer that yes or no,
22　sorry.
23　　A. Yes.
24　　　　MR. FEEHERRY: I mean, you've got to

**Page 95**

1　　Q. Were you involved in any way in the process
2　that led to the sale of the tower complex?
3　　A. No.
4　　Q. Were you involved in any of the discussions
5　prior to the sale of the tower complex that involved an
6　impact on Hancock's employees, whether or not the sale
7　of the office complex would, tower complex would impact
8　in any way the employees of Hancock?
9　　A. My involvement would be with respect to the
10　severance plan and the changes we've discussed.
11　　Q. Did you understand that Hancock intended to
12　terminate the employment of the employees who were
13　running the tower complex in the context of its sale of
14　the tower complex?
15　　A. It was my understanding that certain
16　employees could be terminated as a result of the sale
17　of the complex.
18　　Q. There was no discussion, was there, of
19　keeping on for example a group of employees to manage
20　the office tower complex once it was sold; that was
21　going to be the responsibility of the new owners,
22　managing the property, right?
23　　A. I was not close to specific conversations
24　about that.

**Page 94**

1　answer it verbally, that's all I meant.
2　　Q. Do you know when the summary plan
3　description, Exhibit 11, was given to employees?
4　　A. The date on the supplement is December '02,
5　I -- so it would have been about that time.
6　　Q. Okay. Was it prior to the ISS outsourcing;
7　in other words, was Exhibit 11 distributed prior to the
8　ISS outsourcing?
9　　A. Can I ask for a clarification? When you say
10　outsourcing, do you mean the outsourcing being
11　completed or the outsourcing being, happening?
12　　Q. Yes, yes, that's a fair point. Was it prior
13　to the time that John Hancock determined that it would
14　outsource the ISS department?
15　　A. I don't believe it was.
16　　Q. It was prior to the decision, I'm just trying
17　to get context, and I think you've answered. Before
18　John Hancock determined that they would outsource the
19　IT to IBM, did it supply what we've marked as
20　Exhibit 11 to the people in the IT department?
21　　A. These things were occurring at the same,
22　roughly the same time, and I do not recall exactly
23　where things were with the outsourcing and the
24　distribution of this document.

**Page 96**

1　　Q. Okay, and I know we touched upon this this
2　morning, but were you privy to any conversations in the
3　context of the sale of the tower complex about whether
4　the real estate operations department would be
5　outsourced to Hancock?
6　　A. I understood that certain employees could be
7　terminated from John Hancock and might also be offered
8　a position with the successor company.
9　　Q. I'm interested in conversations that you
10　participated in where the concept of outsourcing
11　Hancock employees was among the things discussed. Do
12　you recall any of those?
13　　A. I was told what would be happening, I was not
14　directly involved in those conversations.
15　　Q. When you were told about this transaction or
16　prospective transaction, did anyone tell you that there
17　would be an outsourcing of Hancock employees?
18　　A. Yes.
19　　Q. Who told you there would be an outsourcing of
20　Hancock employees?
21　　A. I would have been advised by my manager, Page
22　Palmer.
23　　Q. And you recall her using the word
24　outsourcing?

Page 97

1    A. I recall that there would be employees
2  terminated and hired by the successor employer, and it
3  was at that time that the terminology outsourcing was
4  being used as well. What she specifically said to me I
5  can't recall.
6    Q. You don't have a memory of the word
7  outsourcing being used with respect to the real estate
8  operations department, do you, by Page Palmer or anyone
9  else?
10    A. The specific statement that we would
11  outsource that department I don't recall being said.
12    Q. Nor do you recall any discussions where the
13  word business unit was used to describe any particular
14  aspect of Hancock's business, do you, and I'm talking
15  about now in the context of the sale of the tower
16  complex?
17    A. Specific conversations, no.
18    Q. Generally do you remember the term business
19  unit being discussed in the context of the sale of the
20  tower complex?
21    A. Within the context of the documents that
22  we've reviewed --
23    Q. Yes.
24    A. -- is how I remember it.

Page 98

1    Q. And tell me what you remember about those
2  discussions, please, as best you can recall?
3    A. Not the discussions, I'm saying I -- business
4  unit has been presented in these written materials.
5    Q. Right, I'm sorry, go ahead. I'm just
6  interested if I haven't interrupted your answer, I'm
7  just interested in what you can remember people saying
8  about that concept. Do you have any memory of anyone
9  saying or discussing what a business unit is in the
10  context of the sale of the tower complex?
11    A. No specific discussions.
12    Q. And you don't remember any specific
13  evaluation you made about what a business unit was
14  comprised of in the context of evaluating the
15  competitiveness of Beacon's benefits, correct?
16      MR. FEEHERRY: Objection. You may
17  answer.
18    A. In evaluating the competitiveness of the
19  benefits, I was comparing benefits, not dealing with
20  the concept of a business unit.
21    Q. I understand that. My question is you don't
22  have any memory of undertaking that evaluation; in
23  fact, you didn't, did you?
24      MR. FEEHERRY: Objection.

Page 99

1    A. I was advised that a group of employees would
2  be terminated under the terms of this plan, and I
3  needed to determine to address the comparability issue.
4    Q. And in the context of doing that, you didn't
5  evaluate whether or not something was a business unit,
6  yes or no?
7    A. No.
8    Q. You did not?
9    A. I did not.
10    Q. Okay.
11      (Marked Exhibit 12; Provisions of
12      Severance Plan).
13    Q. Mr. Mongeau, Exhibit 12 is a document with
14  control numbers JH1403 through 1408. Is this a
15  document that you've seen before?
16    A. Yes.
17    Q. Would you describe what it is, please?
18    A. It is a document; well, some of it is a
19  document that I prepared to address certain provisions
20  of the company's severance plan.
21    Q. When was it prepared?
22    A. The document is not dated, but given our
23  conversation this morning I would say the latter part
24  of '02.

Page 100

1    Q. In the first page where we have a caption,
2  severance plan, sale of business unit provision?
3    A. Yes.
4    Q. What provision are you referring to?
5    A. The two provisions that are identified at the
6  top of the page is what was being referred to.
7    Q. The provision, the provisions that are, have
8  bullet points next to them?
9    A. Yes.
10    Q. Okay. Do you recognize in the last couple of
11  pages of the document whose handwriting appears, or
12  it's actually the second to last page?
13    A. Page Palmer's.
14    Q. Where she writes, our plan provision is
15  unusual, could be an impediment to deal, do you know
16  what she's referring to?
17    A. The first bullet that we, on the first page
18  of the exhibit is the provision I believe that she's
19  referring to.
20    Q. Employee in the business unit to be sold have
21  the option to elect severance or to take a job with the
22  buyer?
23    A. Correct.
24    Q. And then asterisk says, twenty percent of