UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                )
DANIEL JOYCE,                   )
                                )
          Plaintiff,            )
                                )
          v.                    )   CIVIL ACTION
                                )   NO. 05-11428-WGY
JOHN HANCOCK FINANCIAL SERVICES,)
INC., SEVERANCE PAY PLAN, and   )
JOHN HANCOCK FINANCIAL SERVICES,)
INC.                            )
                                )
          Defendants.           )
                                )
```

MEMORANDUM AND ORDER

YOUNG, D.J.                                    November 22, 2006

     John Hancock Financial Services, Inc. ("Hancock")
administered a Severance Pay Plan ("Plan") for the benefit of its
employees.  Hancock did not administer the Plan perfectly,
leading at least one former employee to believe that he had been
cheated.  This lawsuit followed.  Although Hancock nonetheless
prevails because sloppiness does not, without more, give rise to
a cause of action, this putative class action should remind plan
administrators that they have the utmost duty to carry out the
plan competently and fairly on the behalf of beneficiaries.

I.   **INTRODUCTION**

     Daniel Joyce ("Joyce") filed his Complaint [Doc. No. 1] on
July 7, 2005 and Amended Complaint ("Am. Compl.") [Doc. No. 20]

on May 12, 2006.  Joyce raised, individually and on behalf of a class, eight counts: (I) denial of benefits due under the terms of the severance pay plan; (II)(A) breach of fiduciary duty under 29 U.S.C. § 1132(a)(1)(B); (II)(B) breach of fiduciary duty under 29 U.S.C. § 1132(a)(3); (III) unjust enrichment; (IV) equitable estoppel; (V) denial of right to review pertinent and relevant documents and information; (VI) violation of 29 U.S.C. § 1022(a) and 29 C.F.R. § 2520.102-2 (governing summary plan descriptions); (VII) promissory estoppel; and (VIII) declaratory relief. Hancock filed its Answer to the Complaint [Doc. No. 5] on September 9, 2005, and answered the Amended Complaint [Doc. No. 21] on June 6, 2006.

On July 7, 2006, Hancock moved for summary judgment on all counts ("Defs.' Mot.") [Doc. No. 24].  On July 25, 2006, Joyce filed a memorandum of opposition and in support of a cross-motion for partial summary judgment ("Pl.'s Cross-Mot.") [Doc. No. 28]. Joyce filed the formal cross-motion for partial summary judgment on July 26, 2006 [Doc. No. 33].  Joyce requested judgment enter on Counts I, II(A), V, and VI.  In the alternative, Joyce requested judgment enter as to liability on Counts II(B), III, IV and VIII.  On August 14, 2006, Hancock filed its reply ("Defs.' Reply") [Doc. No. 36] to Joyce's cross-motion for partial summary judgment.

On August 22, 2006, Joyce filed a motion to certify the class [Doc. No. 40].  On August 30, 2006, the Court granted

Hancock's assented-to motion to stay consideration of class certification pending resolution of the cross-motions for summary judgment [Doc. No. 43].

**A.   Facts**

The facts are largely undisputed.  Where there is dispute, both versions are presented in light of the cross-motions for summary judgment.

**1.   Sale of the Tower Complex**

On November 26, 2002, Hancock announced its intent to sell the John Hancock Tower Complex ("Tower Complex").  Exs. to Pl.'s Rule 56.1 Stat. ("Pl.'s App.") [Doc. No. 34], Ex. 5, at JH 001151.  In two separate announcements on November 26 and 27, Hancock informed its employees that it expected that positions would be eliminated as a result of the sale:

> We expect the company's trades people (i.e. electricians, mechanics and service technicians) and security personnel will be most affected by the sale of the property.
>
> Ultimately, it will be up to the new owner to determine how the buildings will be staffed.  Given the unique operational aspects of the Tower, it is our hope that many of our associates affected by the sale will be hired by the new owner and continue to perform essentially the same functions.
>
> In other cases, positions will be eliminated and those employees will be provided with a severance package under the terms of the company's severance plan.  The exact number of employees that may be impacted by this sale has not yet been determined.

Id., Ex. 4, at JH 001169; id., Ex. 5, at JH 001153.  Hancock stated in its Term Sheet for the Purchase and Sale Agreement for

the Tower Complex that it employed "several employees in its real estate operations and security area who may be available for employment by a prospective Purchaser"; that "[b]ids should include the potential interest of a prospective Purchaser to hire these employees, including the anticipated number of employees and the area of specialty"; and that "[b]ids [would] be evaluated in part on the nature and extent of the interest in hiring some or all of these employees." Id., Ex. 8, at JH 002370.

In March 2003, Hancock sold the Tower Complex to Beacon Capital Partners, LLC ("Beacon") for $910,000,000. Id., Ex. 9. Prior to the sale, Beacon had indicated that its "desire would be to bring over the property management team currently in place to the extent those employees are not retained by Hancock." Exs. to Defs.' Rule 56.1 Stat. ("Defs.' App.") [Doc. No. 26], Ex. 10. Hancock agreed to manage the building for a 120-day transition period, after which Beacon became responsible for operating and managing the Tower Complex facilities. Pl.'s App., Ex. 9.

### 2.    Beacon's Offer of Employment to Joyce

As a Hancock employee, Joyce worked in the Real Estate Operations Department ("REOD"), an umbrella department that manages Hancock's properties, including but not limited to the Tower Complex. Defs.' Rule 56.1 Stat. [Doc. No. 25] ¶ 55. Joyce supervised a "multi-shop trade" group that managed and operated

the Tower Complex, as opposed to Hancock's other properties.  Id. ¶ 52-53.

On May 5, 2003, Beacon offered Joyce a full-time position with Beacon upon transfer of management responsibilities for the Tower Complex from Hancock to Beacon.  Pl.'s App., Ex. 13. Beacon offered Joyce a salary of $75,100, an increase from his salary of $74,358 at Hancock.  Id.; Def.'s Rule 56.1 Stat. ¶ 69. Beacon also offered a bonus opportunity of up to 10 percent of his base salary, and benefits, about which more details would be forthcoming.  Pl.'s App., Ex. 13.  Although this letter requested a response by May 16, 2003, Beacon extended the deadline for a reply to the offer until June 13, 2003.  Pl.'s App., Exs. 13, 19.

By the time Joyce accepted Beacon's employment offer on June 13, 2003, he had reviewed the information provided by Beacon concerning its benefits package and knew what benefits he would receive.  Defs.' Rule 56.1 Stat. ¶¶ 40-41.  Joyce had not made any effort to look for a job in the six months preceding the deadline to accept Beacon's job offer.  Id. ¶ 42.  Joyce officially became an employee of Beacon on July 14, 2003 and did not miss a day of pay in the transition from employment by Hancock to employment by Beacon.  Id. ¶¶ 46-47.

### 3.   **The Severance Pay Plan**

The Plan vests full discretionary authority in Hancock as fiduciary and plan administrator.  Am. Compl., Ex. A, § 7.1.  The

5

Plan also reserves to Hancock the "right to amend or modify the Plan in any way whatsoever and to terminate it completely." Id. § 7.3.  On November 18, 2002, Hancock amended section 3.2 of the Plan ("Plan Amendment") to state that a Hancock employee is not eligible for severance benefits if he:

> (c) is offered a comparable position, as determined by the Company, as an employee with, or provides services in any capacity to, a Successor Company, or (d) accepts any position as an employee with, or provides services in any capacity to, a Successor Company.

Id. §§ 3.2(c), (d); Defs.' Rule 56.1 Stat. ¶ 10.

The Plan defines a "Successor Company" as "an entity unaffiliated with the Company which performs the services previously performed by an employee's or a Participant's former work unit."  Am. Compl., Ex. A, art. II.  The Plan does not define "work unit."  The parties disagree whether Hancock had a uniform understanding, written or otherwise, for the definition of a "business unit" (used interchangeably with "work unit"). Compare Defs.' Rule 56.1 Stat. ¶ 12, with Pl.'s Rule 56.1 Reply [Doc. No. 30] ¶ 12.

Hancock provided to employees a Summary Plan Description ("Summary") further describing the Plan Amendment:

> In the event of the sale or outsourcing of a business unit, if an employee of the business unit is offered a comparable job by, or accepts a non-comparable job with, the purchaser or successor company, severance will not be paid (comparable will be defined as similar salary, competitive benefit offerings, and a work location within 50 miles of the current work location).

Am. Compl., Ex. B.  The Summary explains that the Plan "is intended to help [employees] financially while [they] find other employment."[1]  Id.  This language explaining the Plan Amendment also appeared in a company-wide e-mail communication to employees on November 21, 2002, three days after the Plan Amendment became effective.  Defs.' App., Ex. 1.  The e-mail explained that Hancock amended the Plan for three reasons: (1) to remain competitive with other employers; (2) to realign the Plan with its "primary purpose to 'bridge' employees to future employment"; and (3) "the need to support necessary and strategic divestitures and outsourcing."  Id.[2]

In a draft memorandum, Hancock interpreted the term "competitive benefit offerings" that was used in the Summary to mean benefits that are competitive within the industry of the

---

[1] On the second page of the 2002 Benefits Supplement to Your Summary Plan Description in which the Summary was published, Hancock cautioned its employees not to rely solely on the Summary:

> This Summary does not attempt to cover all details.  Full details of the Plans are available in formal written plan documents that legally govern the operation of the plans. If this summary differs in any way from the terms of the plan documents, the plan documents shall control.

Defs.' App., Ex. 2, at JH 001098.

[2] Hancock amended the Plan shortly before the outsourcing of some information technology employees to IBM.  Pl.'s App, Ex. 10 at Ex. 11-12.  An internal Human Resource ("HR") e-mail explained that while Hancock did not amend the Plan "as a direct result of the upcoming [outsourcing to IBM], it is important to note that several potential vendors have expressed concern that key people in our organization would have the option of severance even if offered a job."  Id.

Successor Company from which a given employee receives a job
offer.  Pl.'s App, Ex. 10 at 000046.  The HR working group
identified which benefits would be included in an analysis of the
benefit offerings of a Successor Company to determine whether the
Successor Company had competitive benefit offerings.  The benefit
categories selected for inclusion were 401(k) plan benefits,
pension benefits, medical benefits, dental benefits, and vacation
benefits.  Id.

### 4.    Hancock's Review of Joyce's Eligibility for Severance Benefits

When Beacon issued job offers to Joyce and other Hancock
employees, Hancock undertook to determine whether these employees
were entitled to severance benefits.  Specifically, Hancock
considered whether the job offers that the employees had received
were for comparable positions since, under the terms of the Plan,
an employee who "is offered a comparable position, as determined
by the Company, as an employee with, or provides services in any
capacity to, a Successor Company" is not eligible to receive
severance benefits under the Plan.  Defs.' Rule 56.1 Stat. ¶¶ 48-
49.

Hancock first determined that Beacon was a "Successor
Company" within the meaning of the Plan.  Defs.' Rule 56.1 Stat.
¶ 58.  Although the parties dispute the meaning and application
of the "work unit" term, Joyce admits that Beacon is a Successor

Company.  Defs.' Rule 56.1 Stat. ¶¶ 34, 52-55; Pls.' Rule 56.1
Reply ¶¶ 52-55.[3]

After determining that Beacon was a Successor Company,
Hancock evaluated Beacon's offers of employment to Hancock
employees in Joyce's "multi-shop trade" group to determine if the
job offers would (1) pay a "similar salary"; (2) have
"competitive benefit offerings"; and (3) have a "work location
within 50 miles of [the] current work location."  Am. Compl., Ex.
C.  With respect to the salary component, Hancock found the jobs
offered by Beacon to Joyce and others in his group paid similar
salaries to those paid by Hancock.  Joyce was offered $75,100, an
increase from his salary of $74,358 at Hancock.  Defs.' Rule 56.1
Stat. ¶ 69.  Hancock determined that Beacon offered competitive
benefits.  Id. ¶ 91.  Hancock also determined that Joyce and his
co-workers had a "work location within 50 miles of the current
work location" since they would continue to work at the Tower
Complex.  Id. ¶ 89.  Joyce does not dispute that Beacon offered a

---

[3] As described earlier, the application of the "work unit"
term is essential to the determination whether an organization is
a "Successor Company" within the meaning of the plan.  It was
therefore odd for Joyce to dispute vigorously Hancock's "work
unit" determination, but nonetheless to admit that Beacon is a
Successor Company.  Hancock determined that Joyce's "work unit"
consisted of Joyce and the employees who worked under him.
Defs.' Rule 56.1 Stat. ¶¶ 52-53.  Joyce argues that the proper
"work unit" was the REOD, which managed all of Hancock's
properties, including but not limited to the Tower Complex.
Pl.'s Rule 56.1 Reply ¶¶ 52-53.  In light of Joyce's concession
that Beacon is a Successor Company, the Court does not need to
determine Joyce's "work unit."

similar salary or that he continued to work at the Tower Complex; his disagreement rather is with Hancock's determination that Beacon offered competitive benefits.

Peter Mongeau ("Mongeau"), who worked in the HR Group, performed the competitive benefits assessment. Id. ¶ 74. Mongeau determined whether Beacon offered competitive benefits by conducting a competitive assessment analysis in which he relied on data sources to gather normative data about the range of competitive benefits offered to employees by general industry employers. Defs.' App., Ex. 11 at JH000041. The competitive assessment analysis was a composite assessment, made up of weighted scores assigned to each of the selected benefit categories that Beacon offered and added together to calculate the total competitive assessment score for Beacon's benefits package. Defs.' Rule 56.1 Stat. ¶ 77. This method of assessment was based on Hewitt Associates' Benefit Index Base Company "Total Value" Distribution, a benefits analysis tool in the human resources field. Id. According to this methodology, a score from zero, representing no benefits, to three, represent an above average benefit, was assigned to a selected benefits category based upon how that benefit offering compared to available normative data concerning that type of benefit among general industry employers. Id. Each of the selected benefits categories was also assigned a weighting percentage. Id.

Mongeau's application of this methodology is described below
with respect to each component:

401(k) plan: Mongeau found that Beacon's 401(k) plan would
match employee contributions by up to 4 percent, which was higher
than the general industry average of 3 percent.  Hancock assigned
Beacon's benefits a competitive score of three, representing
"above average."  This score counted for 20 percent of the
overall competitive assessment score.  Defs.' App., Ex. 11.

Pension plan: Since Beacon did not offer a pension plan as
part of its benefits package, Mongeau assigned a score of zero
that accounted for 15 percent of the composite competitive
assessment score for Beacon's benefits package.  Mongeau believed
that Beacon's lack of a pension benefit would be a "Significant
Noise Factor" among affected employees.  Id.

Medical benefits: Mongeau found that Beacon's plan was
better than that of other employers in terms of the amount of co-
payments, deductibles, co-insurance, out-of-pocket maximums, and
prescription co-payments.  Mongeau assigned a score of three,
representing "above average."  This score counted for 30 percent
of the composite competitive assessment score.  Id.

Dental benefits: Mongeau found that the deductible for
dental benefits was the norm for industry but the annual maximum
benefit was larger.  Mongeau deemed Beacon's dental benefits
average to above average and assigned a score of two, meaning

11

"average."  This score counted for 5 percent of the composite competitive assessment score.  Mongeau believed that Beacon's dental benefit would be a "Modest Noise Factor" among affected employees.  Id.

Vacation benefits: Mongeau found that Beacon's vacation benefits were fixed, rather than being based on years of service. Mongeau deemed the vacation benefits below average and assigned a score of two, meaning "average."  This score counted for 30 percent of the composite competitive assessment score.  Mongeau believed that Beacon's vacation benefit would be a "Significant Noise Factor" among affected employees.  Id.

On the basis of these comparisons, the overall resulting competitive assessment score for Beacon's benefit offerings was 1.9.  An average score is 2.0.  Hancock viewed Beacon's score as average, and therefore competitive.  Id.

In the course of performing his competitive benefits analysis, Mongeau compared Beacon's benefit package to those offered by general industry employers even though the draft memorandum directed comparison to companies in the Successor Company's industry.  See Pl.'s Rule 56.1 Stat. ¶ 97; Defs.' App., Ex. 3.  Beacon is in the property management industry.  Pl.'s Rule 56.1 Stat. ¶ 78.  Hancock claims that while it initially set out to gather information solely on the benefit offerings of employers in the property management industry, Hewitt Associates -- which provided the normative data for the analysis -- had

insufficient data on such companies.  Def.'s Reply, at 15.
Hancock claims that it relied on data from property managers to
the extent that it was available through Hewitt Associates.  Id.
The Hewitt Study surveyed 960 employers, none of which were
identified by Hewitt as a company in the property management
industry or the real estate industry.  Pl.'s Rule 56.1 Stat. ¶
99.  Neither Joyce nor Hancock have produced any evidence about
what benefits are typical in the property management industry.

As described, Mongeau believed that some aspects of Beacon's
benefits would create "noise" among affected Hancock employees.
In an internal HR e-mail, Joan DiCicco ("DiCicco"), who worked in
Hancock's HR group, stated that with respect to the noise, she
"personally" did not know "whether we need to do anything -- it
is what it is."  Pl.'s App., Ex. 15.  She stated that she
believed that "[i]n today's market, I would think employees would
be hard pressed to receive job offers better than they have from
Beacon."  Id.

B.   **Joyce's Challenge to the Competitiveness of Benefits**

Hancock communicated the results of its "comparable job"
analysis to Hancock employees in a memorandum dated May 30, 2003,
in which Hancock stated, "[I]t has been determined that all the
job offers extended by Beacon Capital Partners, LLC are
comparable job offers and therefore recipients of a job offer

from Beacon are not eligible for . . . severance benefits." <u>Id.</u>,
Ex. 18.

On June 2, 2003, Joyce sent an e-mail to DiCicco challenging
the comparability determination that Hancock had made concerning
job offers from Beacon. <u>Id.</u>, Ex. 20. On June 3, 2003, DiCicco
responded with an e-mail that explained:

> The determination that the Beacon benefits package
> was competitive was based on an assessment of
> selected benefits, including health, pension,
> 401(k) and vacation. Senior members of the
> benefits team conducted the assessment and
> evaluation, using different, objective data
> sources. I should point out that the assessment
> was against normative data -- that is, what is
> within the range of competitive benefits offered to
> employees generally or in certain industries (in
> this case, property management). The assessment
> was not a comparison to John Hancock's benefits
> package and we did not make any such comparison.

<u>Id.</u> In late 2004, Joyce and other former Hancock employees
requested review by Hancock's Company Benefit Plan Appeal
Committee ("Appeal Committee") of the initial denial of benefits.
Defs.' Rule 56.1 Stat. ¶ 95. These appeals were considered by
two members of the Appeals Committee, Brian Biscotti, counsel in
Hancock's Tax Department, and Kathy Suchenski, Director of
Hancock's Signator Field Administration. <u>Id.</u> ¶ 96. Although
Mongeau was also a member of the Appeals Committee, he recused
himself from participation in these appeals due to his
involvement in the initial determination. <u>Id.</u>

The Appeal Committee conducted three meetings and questioned
Mongeau and DeCicco. <u>Id.</u> ¶¶ 99, 101. The Appeal Committee

14

reviewed the Plan, the draft memorandum defining "comparable job" as used in the Plan, and the Competitive Assessment of Beacon's benefits package.  Id. ¶ 98.  The Appeal Committee received a draft of the November 21, 2002 company-wide e-mail that would explain the Plan Amendment with the same language used in the Summary.  Defs.' Rule 56.1 Stat. Resp. [Doc. No. 30] ¶ 138.[4]  The Appeals Committee did not receive copies of the Summary, the actual company-wide e-mail explaining the Plan Amendment, Joyce's e-mail correspondence with DiCicco, or the data sources underlying Mongeau's competitive assessment analysis.  Pl.'s Rule 56.1 Stat. ¶ 138.

Hancock affirmed denial of severance benefits on December 16, 2004.  Am. Compl., Ex. D.  On February 10, 2005, Joyce requested a copy of the competitive assessment analysis for Beacon's benefit offerings.  Pl.'s Rule 56.1 Stat. ¶ 150.  Joyce made this request again on June 23, 2005.  Id. ¶ 151.  Hancock did not produce a copy of the competitive assessment analysis until March 2006, when the competitive benefit analysis was attached as an exhibit to Hancock's Answers to Interrogatories.  Id. ¶ 152.

---

[4] The draft is substantially similar to the language in the Summary, except that it does not include a description of what would later become section 3.2(d), the provision stating that employees are not entitled to severance benefits if they accept any job with the Successor Company.  Compare Defs.' Supp. App., Ex. 2, at JH 001371, with Am. Compl., Ex. B.

## II.   DISCUSSION

### A.   Standard of Review

The Supreme Court held in <u>Firestone Tire and Rubber Co.</u> v. <u>Bruch</u>, 489 U.S. 101, 115 (1989) that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." <u>Id.</u>  If, by its terms, "the ERISA plan grants the plan administrator discretionary authority in the determination of eligibility for benefits, the administrator's decision must be upheld unless it is arbitrary, capricious, or an abuse of discretion." <u>Wright</u> v. <u>R.R. Donnelly & Sons Co. Group Benefits Plan</u>, 402 F.3d 67, 74 (1st Cir. 2005) (quotation marks omitted).

In the summary judgment situation, "[t]he operative inquiry under arbitrary, capricious or abuse of discretion review is whether the aggregate evidence, viewed in the light most favorable to non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits." <u>Id.</u> (quotation marks omitted). In other words, a "decision to deny benefits to a beneficiary will be upheld if the administrator's decision was reasoned and supported by substantial evidence.  Evidence is substantial when

16

it is reasonably sufficient to support a conclusion." Id. (quotation marks omitted).

In applying the arbitrary and capricious standard, "the existence of conflict of interest on the part of the administrator is a factor which must be considered." Id. (citing Firestone Tire & Rubber, 489 U.S. at 115). In the First Circuit, "if a court concludes there is improper motivation amounting to a conflict of interest, the court may cede a diminished degree of deference -- or no deference at all -- to the administrator's determinations." Id. (quotation marks omitted). At the same time, a "chimerical, imagined, or conjectural conflict will not strip the fiduciary's determination of the deference that otherwise would be due." Leahy v. Raytheon Co., 315 F.3d 11, 16 (1st Cir. 2002).

Under the law of the First Circuit, "the fact that the plan administrator will have to pay the plaintiff's claim out of its own assets does not change the arbitrary and capricious standard of review." Wright, 402 F.3d at 75 (citation omitted); see also Janeiro v. Urological Surgery Professional Assoc., 457 F.3d 130, 139 (1st Cir. 2006). The First Circuit has acknowledged that it is questionable whether an ERISA plan administrator that has a financial stake in the benefit decisions can truly act as a disinterested trustee. Wright, 402 F.3d at 75. Nonetheless, the First Circuit has declared that it is "well-established precedent" not to apply a less deferential standard solely

17

because the plan administrator has a financial stake in the
benefit decisions it makes.  Id.; Janeiro, 457 F.3d at 139.
Arbitrary and capricious review "with bite," however, may apply
where plan participants show that an adverse determination was
"improperly motivated."  Fenton v. John Hancock Mut. Life Ins.
Co., 400 F.3d 83, 90 (1st Cir. 2005) (citation omitted).  The
burden is on the claimant to demonstrate a conflict of interest.
Wright, 402 F.3d at 74 n.4.

    In the present case, section 7.1 of the Plan vests full
discretionary authority for all aspects of Plan interpretation
and application with Hancock, the Plan sponsor and administrator.
Am. Compl., Ex. A at § 7.1.  Although such language is ordinarily
enough to trigger arbitrary and capricious review under the rule
of Firestone Tire & Rubber, Joyce nonetheless argues that
Hancock's conduct does not warrant the protections of deferential
review for three reasons.  Pl.'s Cross-Mot. [Doc. No. 28] at 3-4.
First, Hancock was the administrator of its own plan.  Id. at 4.
Second, Hancock allegedly had a lucrative relationship with
Beacon and incentive to transition employees to Beacon.  Id.
Third, Hancock allegedly conducted review of Joyce's benefits in
an egregiously arbitrary manner.  Id. at 4.  These contentions
are addressed in turn.

    First, Joyce points to the fact that Hancock is the
administrator of its own Plan as evidence of a conflict of
interest.  Id. at 4.  As just described, however, First Circuit

18

law states that the fact that the plan administrator will have to pay the plaintiff's claim out of its own assets does not change the arbitrary and capricious standard of review.  Wright, 402 F.3d at 75.

Second, Joyce alleges that Hancock had a "lucrative financial relationship" with Beacon.  Joyce claims that after Hancock and Beacon entered into a $910,000,000 real estate transaction, Beacon wanted employees who knew how to operate the Tower Complex.  Specifically, Joyce claims that as Beacon's largest tenant, Hancock guaranteed that its tenancy was not interrupted by ensuring that Beacon "acquired essentially a turnkey operation."  Pl.'s Cross-Mot. at 4.

Hancock responds that the sale of the Tower Complex, and with it the transfer of $910,000,000, occurred in March 2003, two months before Hancock determined in May 2003 that Joyce was not entitled to severance benefits.  Defs.' Reply, at 3.  Further, Beacon, and not Hancock, gave Joyce only two weeks to accept Beacon's job offer.  Id.  Although Joyce argues that he was forced to work for Beacon, he has admitted that he did not look for other work because he was too busy.  Defs.' Rule 56.1 Stat. ¶ 42; Pl.'s Rule 56.1 Reply ¶ 42.

There is likely some truth to Joyce's assertion that Hancock, by remaining in the Tower Complex as a tenant, had incentive to ensure that Beacon had knowledgeable employees to manage the Tower Complex.  Hancock did agree to manage the Tower

19

Complex for 120 days after the sale to give Beacon time to arrange for such management. Nonetheless, that Joyce may have had some contact with and benefited Hancock while working for Beacon was the result of Beacon's own decision to hire Joyce. Therefore, even assuming Hancock benefited from Joyce's transfer to Beacon, it is a stretch to characterize this possibility as proof of improper motivation to deny Joyce severance pay.

Third, Joyce alleges that Hancock "engaged in a host of conduct that demonstrates that it acted as an adversary rather than a fair adjudicator of a claim for benefits." Joyce claims that Hancock conducted, in an egregiously arbitrary manner, its review of Joyce's right to severance pay. Specifically, Joyce alleges that Hancock failed to comply with its own internal guidance memorandum for conducting the competitive benefits assessment analysis, failed to provide reasons for the denial of benefits in the specific detail required by law, misrepresented the manner in which the competitive benefits assessment analysis was conducted, and failed to provide pertinent documents for review as required by law. Pl.'s Cross-Mot. at 4-5.

Drawing the inferences in Joyce's favor, he has succeeded in showing that Hancock did not conduct the review process perfectly. Hancock admits that it did not fully follow the guidelines set forth in a draft memorandum calling for comparison to companies in the Successor Company's industry. Had Hancock followed its draft memorandum, it would have compared Beacon's

20

benefits to those offered by other companies in the property
management industry.  Hancock claims that it could not do so
because data specific to the property management industry was not
readily available short of picking up the phone and calling
property management companies to see what benefits they offered.
There is no evidence in the record one way or the other about the
general level of benefits offered in the property management
industry, much less how those benefits compare to those in the
more general study.  There is also no evidence that Hancock
believed that the property management industry offered better
benefits.  The evidence suggests otherwise.  DiCicco stated in an
internal HR e-mail that she did not believe that the Hancock
employees could find better benefits elsewhere.

     Joyce argues that the e-mail DiCicco sent him explaining the
severance pay eligibility determination was misleading because it
stated that a "benefits team" had performed the competitive
benefits assessment when in fact Mongeau was the only person who
performed the analysis.  Joyce also argues that the e-mail was
misleading because it implied that the competitive benefits
assessment was based on comparisons with other companies in the
property management industry.  Id. at 16.  In the e-mail, DiCicco
stated that the assessment "was against normative data -- that
is, what is within the range of competitive benefits offered to
employees generally or in certain industries (in this case,
property management)."  Even drawing the inference that no

21

comparisons whatsoever were made to the property management
industry, DiCicco's e-mail does not clearly state that Hancock in
fact performed such analysis.  At most, her e-mail is ambiguous
about which industries were actually compared.  Although DiCicco
overstated the case when she said there was a "benefits team,"
this factually incorrect statement in isolation hardly seems to
warrant less deferential review.

Joyce also points to Hancock's delay in producing several
documents that Joyce requested.  Id. at 5.  Hancock does not
dispute that it was slow to provide some documents, though it
ultimately produced those documents.  In Wright, however, the
First Circuit stated that it would not consider minor
deficiencies in providing documents as an indication of bad
faith.  Wright, 402 F.3d at 78 (declining to conclude that an
omission of one document raises presumption of bad faith); see
also Denmark v. Liberty Life Assurance Co. of Boston, No. 04-
12261, 2005 WL 3008684 (D. Mass 1999) (Woodlock, J.) (applying
Wright to delay in producing documents).  Consequently, Hancock's
delay in producing documents is insufficient reason to give rise
to less than deferential review.

Joyce cites Denmark v. Liberty Life Assurance C. of Boston
as an instance where a court granted something less than
deferential review.  Pl.'s Cross-Mot. at 5.  In that case, Judge
Woodlock drew the inference that there was a conflict of interest
after the plan administrator failed to comply with a court order

to stipulate to the number of claims accepted.  Denmark, 2005 WL
3008684, at *11.   The plan administrator refused to make the
stipulation, claiming undue burden.  Id.  As a sanction, Judge
Woodlock drew the inference that the plan administrator had
accepted no claims, and used that as the basis for finding
conflict of interest.  Id.  Judge Woodlock, however, calibrated
his sanction and applied heightened review only to the plan
administrator's reliance on evidence related to the requested
stipulations.  Id. at *18.  No such sanctions are involved in the
present case.  Further, unlike in the cited case where the
inference was drawn that no claims were accepted, Joyce has not
shown that Hancock did not pay any severance benefits.  To the
contrary, the record shows that Hancock anticipated paying
severance benefits to employees who were not offered positions
with the company that purchased the Tower Complex.[5]

     The First Circuit recently applied de novo review in
Janeiro.  In that case, the plan trustee was found to have a
conflict of interest where, in summary, he (1) held personal
animus towards the plaintiff participant; (2) owned 92 percent of
the remaining plan assets and would have suffered a loss as a
result of plaintiff's withdrawal of his share of assets; and (3)
sought revaluation out of fear of litigation based on earlier
breaches of fiduciary duty.  Janeiro, 457 F.3d at 139-41.

_____

     [5] The record, however, is silent as to whether Hancock
actually paid severance benefits to such employees.

Although <u>Janeiro</u> cited as a factor the fact that the plan administrator would have to pay out of his own pockets, the First Circuit was careful to point out that such a conflict by itself does not provide a basis for departing from the rule of arbitrary and capricious review. <u>Id.</u> at 139. This case is readily distinguishable on the other two grounds. There is no evidence that Hancock had animus against Joyce. There is also no evidence that Hancock avoided paying benefits out of fear of litigation; in fact, the evidence shows that Hancock acted despite concern about the potential for "noise" from employees unhappy about the level of benefits Beacon was offering.

In sum, Joyce's allegations do not amount to the material, probative evidence that is required to show conflict of interest and obtain less deferential review.[6] The Court will therefore apply arbitrary and capricious review in this case.

### B.  Severance Pay Benefits

The parties dispute how to interpret the Plan, specifically section 3.2, which declares that employees are ineligible for severance benefits when an employee is offered or accepts a position with a Successor Company. Hancock argues for a

---

[6] Joyce also argues that Hancock should be given less deference in part because it failed to provide reasons for the denial of benefits in the specific details required by 29 C.F.R. § 2560.503-1(f)(1)-(4). Although Joyce promised to explain this allegation in greater detail later in its memorandum of opposition, he never did so. Consequently, the Court deems this argument waived.

straightforward application of section 3.2.  In this view, Hancock prevails under either of two subsections of section 3.2. Its first theory is that Joyce is not entitled to severance benefits under subsection (d) because he <u>accepted</u> a position with Beacon.  Under that subsection, there is no requirement that the position be comparable.  Joyce does not dispute that he accepted a position with Beacon, a Successor Company.  Defs.' Mot., at 2-3; Defs.' Rule 56.1 Stat. ¶¶ 34, 41.  Joyce did not address section 3.2(d) in his opposition to Hancock's motion for summary judgment.

Hancock's second theory is that Joyce is not entitled to severance benefits under subsection (c) because he was <u>offered</u> a comparable position with Beacon, which Joyce admits is a Successor Company.  Joyce disputes that the position is comparable on the basis that the benefits Beacon offered were not competitive.  Defs.' Mot., at 8-15.

Joyce's theory, instead, is that the Summary narrowed section 3.2 to apply only in the event of sale or outsourcing. His contention is that since there was neither a sale nor an outsourcing, section 3.2 does not apply.  Pl.'s Cross-Mot., at 2. Rather, section 3.1 applies, the provision under which Joyce would win severance benefits.  <u>Id.</u> at 10.  Hancock disputes that there was no outsourcing but admits that Joyce otherwise meets all of the criteria in section 3.1.  This case therefore turns on

interpretation of section 3.2, specifically whether the Summary narrows the applicability of that provision.

Joyce has two primary legal bases for his contention that he is entitled to severance benefits: 29 U.S.C. § 1132(a)(1)(b), which authorizes beneficiaries to bring suit to recover benefits due under a plan; and 29 U.S.C. § 1022, which governs summary plan descriptions.  These claims are addressed in turn.

### 1.    Section 1132(a)(1)(B)

Joyce's argument throughout is that the Summary governs interpretation of the Plan.  Pl.'s Cross-Mot. at 6.  He does not argue that he is entitled to benefits under the terms of the Plan alone.  As such, Joyce's argument really falls solely under section 1022.  Nonetheless, Joyce has raised the section 1132(a)(1)(B) claim and the Court addresses that argument here.

When the plan administrator and the plan participant offer "rational, though conflicting, interpretations of plan provisions," the plan administrator's interpretation must be allowed to control.  Bachelder v. Communications Satellite Corp., 837 F.2d 519, 521(1st Cir. 1988) (citation omitted).  A plan administrator's conduct might be found arbitrary if, for instance, the plan administrator "impose[s] a standard not required by the plan's provisions," "interpret[s] the plan in a manner inconsistent with its plain words," or by its interpretation "render[s] some provisions of the plan

26

superfluous." Bouchard v. Crystal Coin Shop, Co., 843 F.2d 10,
13-14 (1st Cir. 1988).

Joyce contends that Bellino v. Schlumberger Technologies,
Inc., 944 F.2d 26 (1st Cir. 1991) is squarely on point. Pl.'s
Cross-Mot., at 11-12. In that case, the defendant employer had
negotiated an agreement with a third party employer whereupon the
third-party employer would assume responsibility for performing
maintenance work. Bellino, 944 F.2d at 28. Subsequently, the
defendant employer informed the employees that they would receive
offers from the third party to perform substantially the same job
they had previously performed. Id. The defendant employer also
informed the employees that whether or not they accepted the
third party's job offers, they would not be eligible to receive
severance benefits from the defendant because it was the
defendant's policy to deny severance benefits to departing
employees offered comparable jobs. Id. at 28. The First Circuit
held the employees could recover severance benefits. Id. at 29.

The First Circuit had, however, engaged in de novo review
because the severance pay plan had no provision granting the plan
administrator the discretionary authority required to trigger
arbitrary and capricious review. Bellino, 944 F.2d at 29 (citing
Firestone Tire & Rubber, 489 U.S. at 115). Further, the
severance pay plan in Bellino had no language equivalent to
section 3.2; the Bellino employer had only an unwritten policy in
place. Id. at 28-29. Consequently, Bellino is not on point.

27

Under the terms of the Plan as actually written, Hancock would seem to win outright.  Pursuant to section 3.2(d), Joyce is not entitled to severance benefits because he accepted a position with Beacon, which he concedes is a Successor Company within the meaning of the Plan.  Section 3.2(d) applies whether or not Beacon offered competitive benefits.

Joyce's theory of the case, however, is that Hancock misrepresented to him that he was not eligible for severance benefits on the basis that Beacon offered competitive benefits.  Although Joyce does not so argue under the terms of the Plan alone, it is possible to import his theory of the case into this context.  The argument would be that section 3.2(d) should not apply because had Joyce known that Beacon did not offer comparable benefits, he would not have accepted the position with Beacon in order to remain eligible for severance benefits.

This argument is premised on making two showings: (1) that section 3.2(c) of the Plan was not applicable because Beacon did not offer a comparable position; and (2) that Joyce was tricked into disqualifying himself from receiving severance pay by taking a non-comparable position at Beacon, thereby falling within the scope of section 3.2(d).  Stated again, Joyce would have had to show that he would have taken the severance pay rather than accept a non-comparable job with Beacon.

Joyce cannot make out this argument on the record presented.  Although Joyce argues that Hancock misrepresented that Beacon's

28

benefits were competitive, Joyce produced little or no evidence showing that Beacon's benefits were not competitive.  At most, Joyce has shown that Hancock's benefit determination process was not perfect.  Such a showing does not, however, translate into a finding that Beacon did not offer competitive benefits.  Although Hancock failed to measure Beacon's benefits against those offered in the property management industry, there is no evidence in the record about what kind of benefits are typical in that industry.

There is only one piece of evidence in the record that might conceivably support Joyce's contention that Beacon's benefits were not competitive.  Hancock, using the Hewitt methodology, assigned Beacon's benefits a competitive assessment score of 1.9 on a scale where 2.0 was "average."  Hancock contends that it applied "simple rounding principles" in "reasonably and rationally" viewing Beacon's score as average.  Defs.' Rule 56.1 Stat. ¶ 85.  Joyce denies that the rounding principle employed was "simple" and further denies that the resulting score was average of that the benefits were competitive within general industry.  Pl.'s Rule 56.1 Resp. ¶ 85.  Without more evidence supporting Joyce's position, however, it is difficult to conclude that Hancock acted arbitrarily or capriciously in determining that Beacon's benefits were competitive and therefore tricked Joyce into disqualifying himself from receiving benefits by accepting the job offer with Beacon.  For these reasons, Joyce

has failed to show that he was not offered a comparable position with Beacon.

For these reasons, the Court grants summary judgment for Hancock on the section 1132(a)(1)(B) claim (Count I).

### 2. The Summary Plan Description

Having addressed the issue whether Joyce is entitled to benefits under the Plan alone, the Court now turns its attention to Joyce's main theory of the case, namely that he is entitled to benefits under the Summary.

The First Circuit has recognized that a Summary that violates section 1022 is binding on a plan administrator. <u>Mauser</u> v. <u>Raytheon Co. Pension Plan</u>, 239 F.3d 51, 55 (1st Cir. 2001). The plan participant must, however, also make out a further showing of harm in order to recover. <u>Id.</u> The Court discusses in turn whether Joyce satisfies each of these two requirements.

### a. Section 1022

Section 1022(a) requires, in relevant part, that the Summary "be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a). Central to the dispute between the parties is the fact that the Summary discusses what happens only in the event of sale or outsourcing. The Summary is silent as to what happens when there is no sale or outsourcing. Joyce argues in essence that this silence means

30

that there <u>must</u> be a sale or outsourcing for the Plan Amendment to apply.[7]  Since Joyce alleges in essence that the Summary is not "sufficiently accurate and comprehensive" because it added a term, the following analysis focuses on whether the Summary and the Plan are in conflict in that regard.

At the outset, Hancock points to the disclaimer in the Summary that the summary "does not attempt to cover all details" and that in the event of conflict, the Plan is the legally controlling document.  Hancock's reliance on this statement is in tension with the case law holding that when the plan and its summary conflicts, the summary controls.  "[T]he more thorough the [summary] appears to be, the less likely it will place the employee on notice that he must consult to the plan document itself." <u>Mauser</u> v. <u>Raytheon Co. Pension Plan</u>, 31 F. Supp. 2d 168, 174 (D. Mass. 1998), <u>rev'd on other grounds</u>, 239 F.3d 51 (1st Cir. 2001).  Otherwise, "what would be the sense of [a summary] if the employee were required to scour the plan document to make sure there were no conflicts between the [summary] and the plan document?"  <u>Id.</u>  For these reasons, the Court will not credit the Summary's disclaimer that in the event of conflict with the Plan, the Plan controls.

---

[7] Joyce contends that Hancock admitted that this interpretation controls.  Pl.'s Cross-Mot., at 7.  Hancock denies making any such admission.  Defs.' Reply, at 6-7.  Joyce's citation to the record does not support its assertion that Hancock made this admission.  <u>Compare</u> Pl.'s Rule 56.1 Stat. ¶ 35, <u>with</u> Defs.' Rule 56.1 Resp. ¶ 35.

The Court finds instructive a First Circuit case addressing possible conflict between the plan and its summary. In Bachelder v. Communications Satellite Corp., 837 F.2d 519 (1st Cir. 1988), the court held that the plan summary did not control the timing of cash distributions even though the plan was textually silent on that point. Id. at 522. The court interpreted the plan in light of its apparent purposes, structure, and history. Id. The court ruled that requiring the plan distributor to disburse funds in accordance with the summary's apparent requirement might expose fiduciaries to allegations of breach of fiduciary duties. Id. To avoid this result, the court held that the structure and constraints of the plan were sufficient to prevail over the potentially competing terms of the summary. Id. There was no conflict because "the [summary was] ambiguous and the Plan [was] not silent." Id.

     In the present case, section 3.2 is not limited by its own terms to apply only to a sale or outsourcing. The Plan Amendment's stated purpose supports Hancock's broad reading of the provision. The Summary clearly states that a purpose of the Plan is to bridge employees between periods of unemployment. Joyce points to cases finding employees eligible for severance pay notwithstanding the fact that they did not experience a period of unemployment. See, e.g., Bellino, 944 F.2d at 31 (stating that "[f]ederal courts have established no hard and fast rule that an individual must suffer a period of unemployment to

qualify for severance benefits under ERISA"). Nonetheless, Hancock's denial of severance benefits to employees who would not miss a day of pay in transferring to Beacon is in keeping with the Plan's stated purpose of bridging employees in between jobs.

Although less conclusive, the history of the Plan Amendment can be read to support Hancock's interpretation of section 3.2. Hancock had in mind the planned outsourcing of employees to IBM when it amended the Plan on November 18, 2002. There is no evidence that Hancock had in mind the sale of the Tower Complex, which occurred eight days later. On that day, however, Hancock informed employees that those not hired by the buyer would receive severance pay. The notice makes no similar assurance that employees hired by the buyer would receive severance benefits. As such, the notice suggests that Hancock believed -- at around the same time that it amended the Plan -- that the Plan Amendment applied even when no sale or outsourcing took place.

Although Joyce's arguments are not wholly without force, Hancock's interpretation is neither arbitrary nor capricious. As in Bachelder, the Summary is ambiguous and the Plan is not silent. Hancock's reading of the Summary as merely listing some examples when section 3.2 would apply is a rational interpretation that reconciles the Plan and the Summary. Section 1022(a) does not require that the Summary imagine every possible circumstance: the Summary need only be "sufficiently . . . comprehensive." See Sunbeam-Oster Co., Inc. Group Benefits Plan

33

for Salaried & Non-Bargaining Hourly Employees v. Whitehurst, 102
F.3d 1368, 1375 (5th Cir. 1996) (explaining that the plan summary
need not "expressly address every conceivable factual variation
of recovery"); Stahl v. Tony's Bldg. Materials, Inc., 875 F.2d
1404, 1408 (9th Cir. 1989) (stating that the plan summary is not
required to discuss "every imaginable situation" that might
affect participant's rights to benefits, but should "enable the
ordinary employee to sense when there is a danger that benefits
could be lost or diminished").

Because Hancock did not abuse its discretion in applying the
Plan the way it did, the Court defers to Hancock's interpretation
of section 3.2 as not requiring a "sale or outsourcing" before
its provisions apply.

### b.    Showing of Harm

Even if Joyce could make out a section 1022 violation, he
would still not prevail.  Although a summary that violates
section 1022 is binding on a plan administrator, the plaintiff
must show that he was harmed by the violation.  Mauser v.
Raytheon Co. Pension Plan, 239 F.3d 51, 55 (1st Cir. 2001).
There is, however, some unclarity in the First Circuit with
respect to what type of harm a plaintiff must show to recover for
a violation of section 1022.

The First Circuit first addressed this question in Govoni v.
Bricklayers, Masons & Plasterers Int'l Union of Am., Local No. 5
Pension Fund, 732 F.2d 250, 252 (1st Cir. 1984).  Govoni states

34

that to secure relief, the employee seeking benefits "must show some significant reliance upon, or possible prejudice flowing from, the faulty plan description." Id. Although Govoni stated that a showing of either significant reliance or possible prejudice was sufficient, subsequent cases have cast some doubt on the viability of the "possible prejudice" prong.

In Mauser, the First Circuit stated that relief "is only appropriate if the participant demonstrates significant or reasonable reliance on the Plan Summary." Mauser, 239 F.3d at 55 (citing Bachelder, 837 F.2d at 523). Mauser does, however, refer in passing to "measurable prejudice." Id. at 56. In Fenton v. John Hancock Mut. Life Ins. Co., 400 F.3d 83, 88 (1st Cir. 2005), the First Circuit cited Mauser for the reliance standard only. Fenton, however, also cited Govoni, quoting parenthetically the language in that opinion stating that a showing of either "significant reliance" or "possible prejudice" is sufficient. Id. Thus, the Mauser and Fenton courts emphasize that a showing of reliance is required, stopping only briefly to mention prejudice. This treatment of the prejudice prong suggests that the First Circuit has collapsed the reliance and prejudice prongs, treating them as one and the same or at least requiring very similar showings of harm. See, e.g., Burstein v. Ret. Account Plan for Employees of Allegheny Health Educ. & Research Found., 334 F.3d 365, 380 (3d Cir. 2003) (characterizing First Circuit law as requiring a showing of reliance).

35

Joyce argues for a relaxed understanding of prejudice based on <u>Burke</u> v. <u>Kodak Ret. Income Plan</u>, 336 F.3d 103 (2nd Cir. 2003), a Second Circuit case. Before considering this argument, it is worth noting that there is a four-way circuit split on the question of what showing must be made to recover for a deficient summary. The Seventh and Eleventh Circuits have adopted a detrimental reliance standard. <u>See</u> <u>Andersen</u> v. <u>Chrysler Corp.</u>, 99 F.3d 846, 859 (7th Cir. 1996); <u>Branch</u> v. <u>G. Bernd Co.</u>, 955 F.2d 1574, 1579 (11th Cir. 1992). The Fourth, Eighth, and Tenth Circuits have followed <u>Govoni</u> in adopting a reliance or possible prejudice standard. <u>Palmisano</u> v. <u>Allina Health Sys., Inc.</u>, 190 F.3d 881, 887-88 (8th Cir. 1999); <u>Chiles</u> v. <u>Ceridian Corp.</u>, 95 F.3d 1505, 1519 (10th Cir. 1996); <u>Aiken</u> v. <u>Policy Mgmt. Sys., Corp.</u>, 13 F.3d 138, 142 (4th Cir. 1993). The Third Circuit, joined by the Sixth Circuit in dictum, has not required a showing of either reliance or prejudice. <u>Burstein</u>, 334 F.3d at 381; <u>Edwards</u> v. <u>State Farm Mut. Ins. Co.</u>, 851 F.2d 134, 137 (6th Cir. 1988). Finally, the Second Circuit adopted in <u>Burke</u>, 336 F.3d at 113, a "likelihood of prejudice" standard that does not require a showing of detrimental reliance. <u>See generally</u> Michael Cavadel, <u>Burke v. Kodak and the SPD Circuit Split</u>, 7 U. Pa. J. Lab. & Emp. L. 139, 144-47, 151 (2004).

Joyce argues in essence that <u>Govoni</u>'s prejudice prong, to the extent that it is still viable, is the same as the one the Second Circuit announced in <u>Burke</u>. In that case, the Second

36

Circuit explained that under its rule, a plan participant must show that he "was <u>likely</u> to have been harmed as a result of a deficient [Summary]." <u>Burke</u>, 336 F.3d at 113. The court further explained that this "likely prejudice" standard avoids the use of harsh common law principles to defeat employees' claims; the result is a presumption of prejudice in favor of the plan participant after an initial showing that he was likely to have been harmed. <u>Id.</u> at 113-14. Joyce proceeds to argue that he was prejudiced under this standard. <u>Burke</u> is, however, not the law of the First Circuit. As discussed above, the First Circuit has apparently treated reliance and prejudice as equivalent terms by referring to them alternately. At minimum, this suggests that to the extent that the prejudice prong is still viable in the First Circuit, a stronger showing must be made to satisfy the prejudice prong than a mere "likelihood of prejudice."

Nonetheless, the Court does not need to resolve what kind of showing of prejudice, if any, is sufficient under First Circuit law because Joyce does not even make out an initial claim of prejudice. Joyce argues that the First Circuit has recognized that an employee who continues to work for a company under the guidelines set forth by a company in an employee booklet may be deemed to have reasonably relied on such document. For support, Joyce points to <u>Bachelder</u>, 837 F.2d at 523, which quoted <u>Duldulao</u> v. <u>Saint Mary of Nazareth Hosp.</u>, 505 N.E.2d 314, 319 (Ill. 1987). Pl.'s Cross-Mot., at 19. In <u>Duldulao</u>, the Illinois Supreme Court

stated, "[t]here is no question but that plaintiff continued to
work with knowledge of the handbook provisions.  Under these
circumstances the handbook's provisions became binding on the
employer."  Duldulao, 505 N.E.2d at 319.  The court also observed
that the employee reasonably relied on the handbook because the
handbook stated at the outset that it was "designed to clarify
[employees'] rights and duties."  Id. (emphasis in original).  In
the present case, however, the Summary did not so instruct
Hancock employees.

    In essence, Joyce claims that the Summary should control
because he continued to work for Hancock with knowledge of the
Summary language pertaining to severance.  See Pl.'s Cross-Mot.
at 20.  Taken at face value, this argument would eliminate any
requirement to show any kind of harm; all employees like Joyce
would have to show would be that they continued to work for their
employers.  This argument must be rejected as inconsistent with
First Circuit law declaring that "[i]t is not enough to show a
'mere expectation' that certain benefits will materialize; action
must have been taken in reliance on reasonable expectations
formed after reading the Plan Summary."  Mauser, 239 F.3d at 55.

    Because Joyce has produced no evidence of reliance or
prejudice, he cannot prevail under section 1022 even if the Court
were to find that the Summary controlled interpretation of
section 3.2 of the Plan.  For these reasons, the Court grants

38

summary judgment for Hancock on the section 1022 claim (Count VI).

### C.    Remaining Claims

Joyce's remaining claims are duplicative, preempted, or moot.  The claims are addressed in turn.

### 1.    Equitable Estoppel

Joyce brings a claim for equitable estoppel under 29 U.S.C. §§ 1132(a)(2) and (3), which authorizes equitable relief.  The First Circuit has openly questioned whether an equitable estoppel claim is permitted under ERISA.  Mauser, 239 F.3d at 57.  At minimum, to the extent that his equitable estoppel argument is based on misrepresentations in the Summary, his claim is precluded by First Circuit law holding that there is no equitable estoppel claim based solely on an inadequate plan summary. Fenton, 400 F.3d at 88; Mauser, 239 F.3d at 58.  Joyce's allegation is that Hancock misrepresented that the sale of the Tower Complex involved a "sale or outsourcing" of the REOD business unit.  Am. Compl. at ¶¶ 120-21.  To the extent that this claim relies on the Summary as the controlling interpretation, this argument is precluded by First Circuit precedent.

Joyce also alleges that Hancock misrepresented that Beacon's offer of employment was comparable and that he detrimentally relied on Hancock's representations when he accepted Beacon's offer of employment.  Id. at ¶¶ 121-22.  This allegation is not automatically precluded as matter of law because it rests on the

39

terms of the Plan itself.  The Court nonetheless rejects this argument for the same reasons that it rejects Joyce's section 1132(a)(1)(B) claim.  For these reasons, the Court grants summary judgment for Hancock on Count IV.

### 2.    Breaches of Fiduciary Duty

Joyce brings claims under sections 1132(a)(1) and (3) for breaches of fiduciary duty.  A claim of improper denial of benefits necessarily implicates breach of fiduciary duty.  To the extent that Joyce seeks recovery of severance benefits under section 1132(a)(1) for breach of fiduciary duty, this claim is duplicative and is rejected for the reasons described in this opinion.  See Varity Corp. v. Howe, 516 U.S. 489, 514 (1996) ("[C]haracterizing a denial of benefits as a breach of fiduciary duty does not necessarily change the standard a court would apply when reviewing the administrator's decision to deny benefits.").[8]

Joyce's breach of fiduciary duty claim under the catch-all provision, section 1132(a)(3) fails for similar reasons.  Federal courts have "uniformly concluded that, if a plaintiff can pursue benefits under the plan pursuant to [section 1132(a)(1)], there is an adequate remedy under the plan which bars a further remedy

---

[8] To the extent that Joyce relies solely on the Summary, the First Circuit "do[es] not recognize a duplicative claim for breach of fiduciary duty based wholly on an inadequate Plan Summary." Mauser, 239 F.3d at 58; see also Fenton, 400 F.2d at 88.  Nonetheless, the Court has given Joyce the benefit of the doubt in addressing any arguments that he may have under the terms of the Plan alone.

under [section 1132(a)(3)]"). <u>LaRocca v. Borden, Inc.</u>, 276 F.3d 22, 28 (1st Cir. 2002). In this vein, the First Circuit has explained that the Supreme Court "has . . . limited the applicability of an individual claim for breach of fiduciary duty to those participants who are unable to avail themselves of other remedies." <u>Mauser</u>, 239 F.3d at 58. As Joyce seeks severance benefits under section 1132(a)(1), the section 1132(a)(3) claim necessarily fails as matter of law.

For these reasons, the Court grants summary judgment for Hancock on Count II.

### 3. State Law Claims

Joyce brought two claims under state law for unjust enrichment (Count III) and promissory estoppel (Count VII). ERISA preempts "any and all State laws" that "relate to any employee benefit plan" subject to ERISA. 29 U.S.C. § 1144(a). A "cause of action 'relates to' an ERISA plan when a court must evaluate or interpret the terms of the ERISA-regulated plan to determine liability under the state law cause of action." <u>Hampers</u> v. <u>W.R. Grace Co., Inc.</u>, 202 F.3d 44, 52 (1st Cir. 2000). Accordingly, the First Circuit has held that ERISA preempts all state-law claims -- such as Joyce's claims for unjust enrichment and promissory estoppel -- that affect an ERISA plan. <u>See, e.g.</u>, <u>id.</u> at 51-54; <u>Turner</u> v. <u>Fallon Cmty. Health Plan, Inc.</u>, 127 F.3d 196, 199-200 (1st Cir. 1997). For these reasons, the Court grants summary judgment for Hancock on Counts III and VII.

### 4.   Right to Review Documents

In Count V of the Amended Complaint, Joyce alleged that he was denied the right "to review the pertinent documents, records and other information generated or referenced in support of Defendants' decision to deny Plan benefits."  Am. Compl. ¶ 129. Hancock argues that this Count fails to state a claim because Joyce did not identify any specific documents in the pleadings. Defs.' Mot. at 18.  In the alternative, Hancock argues that the claim is moot.  Id.  Joyce did not address Count V in its memorandum of opposition and cross-motion for summary judgment. Consequently, the Court deems this argument waived and grants summary judgment for Hancock on Count V.[9]

## III. CONCLUSION

Although Hancock prevails in full, its administration of the Plan leaves much to be desired.  The Summary "was indeed unfortunate in that it may have led to confusion for some participants." Bachelder, 837 F.2d at 523.  Hancock did not adhere to its own guidelines for determining benefits.  Hancock sent a sloppy e-mail to Joyce about the denial of benefits that only added to the confusion.  Hancock was also slow to produce the documents Joyce requested.  Such imperfections, however, do not, without more, give rise to a claim to severance benefits.

---

[9] For all the reasons stated in this opinion, the Court declines to award declaratory relief to Joyce.  Consequently, the Court grants summary judgment on Count VIII.

42

When plan administrators are transparent and adhere to clearly established guidelines, they can go a long way in assuring plan beneficiaries that the plan is being carried out competently and fairly. Had Hancock clearly and accurately administered the plan, it could perhaps have avoided lawsuits such as the instant action.

Hancock's Motion for Summary Judgment [Docket No. 23] is ALLOWED and Joyce's Cross-Motion for Summary Judgment [Docket No. 33] is DENIED. Joyce's Motion to Certify the Class [Doc. No. 40] is accordingly DENIED.[10]

SO ORDERED.

/s/ William G. Young

WILLIAM G. YOUNG
DISTRICT JUDGE

---

[10] Although Joyce brought suit individually and on behalf of a class, he did not file the motion to certify the class until after the parties had filed cross-motions for summary judgment. Hancock filed an assented-to motion to stay certification until after resolution of the cross-motions for summary judgment. Because Hancock preferred to seek summary judgment as to Joyce only, the Court's order issues only as to Joyce. Cf. Partington v. American Intern. Specialty Lines Ins. Co., 443 F.3d 334, 340 (4th Cir. 2006) ("Federal courts may only adjudicate the rights of putative class members upon certification of that class."); Washington v. Finlay, 664 F.2d 913, 928 (4th Cir. 1981) (intimating that due process requires the conclusion that members of the putative class cannot be bound by judgment against individual plaintiffs when members of the putative class had no notice or opportunity to be heard on the certification issue).

43